# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SJUNDE AP-FONDEN and THE CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>GENERAL ELECTRIC COMPANY and JEFFREY S. BORNSTEIN,<br><br>  Defendants. | 17 Civ. 08457 (JMF) (GWG)<br><br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

LATHAM & WATKINS LLP
Miles N. Ruthberg
Blake T. Denton
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000

Sarah A. Tomkowiak (*pro hac vice*)
J. Christian Word (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

*Attorneys for Defendants*

August 30, 2021

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

PROCEDURAL HISTORY.........................................................................................................4

LEGAL STANDARD..................................................................................................................7

ARGUMENT ..............................................................................................................................8

I.      THE PROPOSED CLASS PERIOD IS OVERBROAD ....................................................8

        A.      The Class Period Should Begin On May 5, 2016 .....................................................9

        B.      The Class Period Should End On April 21, 2017 ...................................................12

II.     INTRA-CLASS CONFLICTS BAR CERTIFICATION ....................................................15

CONCLUSION.........................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..................................................................................................19

*Boucher v. Syracuse Univ.*,
   164 F.3d 113 (2d Cir. 1999)........................................................................................8

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
   322 F. Supp. 3d 676 (D. Md. 2018)......................................................................10, 12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...................................................................................................7, 8

*De la Fuente v. DCI Telecomms., Inc.*,
   206 F.R.D. 369 (S.D.N.Y. 2002) ..............................................................................15

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................................16

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   141 S. Ct. 1951 (2021).............................................................................................8, 14

*Gordon v. Sonar Cap. Mgmt. LLC*,
   92 F. Supp. 3d 193 (S.D.N.Y. 2015)...........................................................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)....................................................................................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009).........................................................................................15

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006), *decision clarified on denial of reh'g*, 483 F.3d 70
   (2d Cir. 2007)..............................................................................................................8

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018).........................................................................15

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011).......................................................................................19

*In re Miva, Inc., Sec. Litig.*,
    2008 WL 681755 (M.D. Fla. Mar. 12, 2008) ........................................................................12

*In re Sanofi-Aventis Sec. Litig.*,
    293 F.R.D. 449 (S.D.N.Y. 2013) ........................................................................................9

*In re Smart Techs., Inc. S'holder Litig.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ........................................................................................15

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................................9

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................................................................13

*Lumen v. Anderson*,
    280 F.R.D. 451 (W.D. Mo. 2012) ........................................................................................10

*Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*,
    993 F.2d 11 (2d Cir. 1993) ........................................................................................8

*Nguyen v. MaxPoint Interactive, Inc.*,
    234 F. Supp. 3d 540 (S.D.N.Y. 2017) ........................................................................................2

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ........................................................................................19

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................................12, 14

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    2021 WL 3744894 (2d Cir. Aug. 25, 2021) ........................................................................................16

*Schaffer v. Horizon Pharma Plc*,
    2016 WL 3566238 (S.D.N.Y. June 27, 2016) ........................................................................................16

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) ................................................................. *passim*

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) ................................................................. *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................7, 8

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ........................................................................................8, 12

iii

**RULES**

FED. R. CIV. P. 23 ................................................................................................................7, 8, 15, 19

Defendants General Electric Co. ("GE") and Jeffrey S. Bornstein respectfully submit this memorandum of law in opposition to Plaintiffs' Motion for Class Certification (ECF No. 218) (the "Motion").

**INTRODUCTION**[1]

Plaintiffs request that the Court certify, and appoint them to represent, a class of investors that purchased or acquired GE common stock between March 2, 2015 and January 23, 2018, inclusive (the "Proposed Class Period"), and were damaged thereby. ECF No. 219 at 1. But that Proposed Class Period is impermissibly overbroad, because it begins more than a year before the first remaining alleged omission and ends almost nine months after GE disclosed the information that Plaintiffs allege was concealed. Plaintiffs' indefensible Proposed Class Period is a transparent attempt to maximize the theoretical damages of the putative class and lacks any sound legal or factual rationale. Plaintiffs offer no justification at all for a class period beginning on March 2, 2015, and there is none. Plaintiffs' own confidential witness, as well as an internal GE document relied upon by Plaintiffs' expert, demonstrate that Defendants could not have made an omission during 2015 regarding the only conduct still at issue in this action—*i.e.*, GE's "comprehensive" factoring of receivables from long-term service agreements ("LTSAs") in GE Power. Similarly, Plaintiffs cannot explain how or why any investor who purchased GE common stock after April 21, 2017 could have been misled or damaged, because Plaintiffs allege that GE revealed the relevant truth about factoring on that date. Plaintiffs' Proposed Class Period thus starts too early and ends too late. Moreover, the putative class Plaintiffs seek to certify suffers from insurmountable intra-class conflicts that compel denial of class certification.

---

[1] Unless otherwise indicated, all internal citations and quotation marks are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Blake T. Denton, submitted herewith.

*First*, Plaintiffs' Proposed Class Period starts before the first remaining alleged omission. When this case commenced, Plaintiffs challenged a variety of alleged misstatements and omissions made over a putative class period between February 27, 2013 and January 23, 2018, which they alleged were corrected through a series of disclosures starting on April 21, 2017. Only two claims survived Defendants' motions to dismiss: (i) an alleged Item 303 omission of widespread and comprehensive factoring in GE's filings "from 2015 on"; and (ii) an alleged misstatement about the purpose of factoring in GE's 2016 Form 10-K, filed on February 24, 2017. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 2021 WL 311003, at *11, *13 (S.D.N.Y. Jan. 29, 2021) ("*AP7 II*"). After the majority of Plaintiffs' claims were dismissed, Plaintiffs needed to identify a new class period beginning on the date of the first *remaining* alleged omission. Plaintiffs now contend this date should be March 2, 2015, the first trading day after GE filed its Form 10-K for 2014. However, as explained below, the proposed March 2, 2015 date for the start of the class period is inconsistent with the Court's prior rulings and based on an allegation that has been conclusively disproven by a document produced by Plaintiffs themselves.

In the operative Fifth Amended Complaint (ECF No. 191) (the "5AC"), Plaintiffs alleged that a confidential witness described as "FE-7" stated that "***beginning in 2015***, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs." 5AC ¶ 394. Crediting that allegation, the Court permitted Plaintiffs' "factoring-based Item 303 claim against Defendants . . . for GE's filings from 2015 on" to survive. *AP7 II*, 2021 WL 311003, at *11.[2] But Plaintiffs mischaracterized what FE-7 actually

---

[2] The Court's decision in *AP7 II* in no way suggests that Plaintiffs' allegations support a claim for fraud in GE's Form 10-K for 2014, a filing that GE made on February 27, 2015 but concerned only 2014 financial results. *See, e.g., Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540,

2

alleged. According to a document produced by Plaintiffs, FE-7 stated that the so-called task force was created in "*Q4 2015*," and that GE was "monetizing customers' future payments as often as possible *in 2016*." Ex. 1, Plaintiffs_LS0068175-84 ¶¶ 7-8, 10.[3] Plaintiffs thus know there is no basis to suggest that any of GE's filings from 2015 were materially misleading for failing to disclose an Item 303 trend in widespread or comprehensive factoring of LTSA receivables. This is underscored by an internal GE document relied upon by Plaintiffs' loss causation expert, Dr. David I. Tabak, which reflects that GE Power first monetized an immaterial amount of LTSA receivables in the fourth quarter of 2015. Ex. 2, GE_SDNY00241579. Thus, the class period cannot begin any earlier than *May 5, 2016*, the first trading day after GE filed its Form 10-Q for the first quarter of 2016. At minimum, the class period should start to run *no earlier than February 29, 2016*, the first trading day after GE filed its Form 10-K for 2015, which, according to the document relied upon by Dr. Tabak, reflected an immaterial amount of monetization of LTSA receivables in GE Power in the fourth quarter of 2015.

*Second*, the other problem with the Proposed Class Period is that it ends almost a year too late. On April 21, 2017, GE announced its financial results for the first quarter of 2017, including negative $1.6 billion in Industrial cash from operating activities ("CFOA"). 5AC ¶ 451. Plaintiffs allege that this is when the market learned of GE's comprehensive factoring of LTSAs in GE Power and its impact on GE's cash flows, and thus learned that GE's prior filings were allegedly

---

546 (S.D.N.Y. 2017) (holding that company had "no general obligation to disclose the results of a quarter in progress").

[3] Pursuant to Rule 7(C)(i) of the Court's Individual Rules and Practices in Civil Cases, Defendants met and conferred with Plaintiffs regarding this document, which Plaintiffs had previously designated as confidential. Plaintiffs agreed to withdraw the designation but instructed Defendants to redact certain personally identifying information of the confidential witness, including the witness's name, address, and contact information, asserting that such redactions were proper under Rule 7(A) of the Court's Individual Rules and Practices in Civil Cases and the Southern District of New York's Privacy Policy.

false or misleading. *Id.* ¶ 453. Plaintiffs do not allege that anything regarding the relevant "truth" about factoring was left unknown after this date, or that any alleged subsequent corrective disclosure revealed anything new about widespread factoring of LTSA receivables as opposed to other topics that were the subject of Plaintiffs' dismissed claims. Nor does Plaintiffs' expert, Dr. Tabak, attempt to demonstrate that Defendants disclosed additional information after April 21, 2017 that was necessary to correct any misstatements or omissions associated with the remaining claims, let alone point to any subsequent disclosures that mentioned widespread factoring at all. The class period must therefore end **no later than April 21, 2017**.

*Third*, Plaintiffs' remaining claims are based upon two temporally distinct misstatements that were supposedly corrected simultaneously over multiple alleged corrective disclosures. This gives rise to internal conflicts between differently situated factions within the proposed class— many of which have interests antagonistic to those of the Plaintiffs—and compels denial of class certification, or at minimum, creates the need for sub-classes and corresponding representatives to protect the interests of the various differently situated class members.

Accordingly, the Court should deny Plaintiffs' Motion. To the extent the Court does certify a class in this action, the class period should begin no earlier than May 5, 2016 and end no later than April 21, 2017.

## PROCEDURAL HISTORY

Lead Plaintiff Sjunde AP-Fonden ("AP7") is a Swedish public pension fund, established as a Swedish governmental agency and represented by proposed class counsel, Kessler Topaz Meltzer & Check, LLP ("KTMC"). 5AC at 165-66, ¶ 42. Additional Plaintiff The Cleveland Bakers & Teamsters Pension Fund ("CBT") is a Taft-Hartley pension fund, represented by proposed liaison counsel, Grant & Eisenhofer P.A. ("G&E"). *Id.* at 166, ¶ 43.

On May 30, 2018, the Court appointed AP7 as lead plaintiff and KTMC as lead counsel.

4

ECF No. 139. The Court did not appoint CBT to serve in any capacity in connection with this action. Nevertheless, when AP7 subsequently filed the Third Amended Complaint (ECF Nos. 153, 157) (the "3AC") on July 23, 2018, CBT and G&E were named as Additional Plaintiff and local counsel to the proposed class, respectively. 3AC at 1, 181. The 3AC alleged a putative class period of February 27, 2013 through January 23, 2018. *Id.* at 1, 181-82.

Defendants filed a motion to dismiss the 3AC. ECF No. 172. After Plaintiffs filed their opposition (ECF No. 178), but before Defendants filed their reply (ECF No. 180), Plaintiffs filed the Fourth Amended Complaint (ECF No. 179) (the "4AC"). The 4AC eliminated allegations concerning a confidential witness (FE-6) who was referenced in the 3AC but subsequently contacted KTMC and requested to be removed from Plaintiffs' pleadings. ECF No. 177 at 1. It also asserted the same putative class period as the 3AC (from February 27, 2013 through January 23, 2018) and alleged that the challenged practice of widespread factoring began in 2015. *E.g.*, 4AC at 1, ¶ 290. In order to support that theory, Plaintiffs relied on a single statement by one confidential witness, alleging that "FE-7 confirmed that beginning in 2015, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs." *Id.* ¶ 290.

The Court dismissed the vast majority of the claims asserted in the 4AC, reasoning that Plaintiffs had failed to plead falsity or scienter and that certain claims were barred by the statute of repose. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 391-92, 404-08, 410-14 (S.D.N.Y. 2019) ("*AP7 I*"). The only two claims that survived were Plaintiffs' Item 303 claim based on an allegedly undisclosed trend in GE's Forms 10-K and 10-Q of "comprehensive" or "widespread" factoring of LTSA receivables in GE Power that "would have a material impact on future revenue"; and Plaintiffs' claim based on a statement regarding the purpose of factoring in

GE's Form 10-K for 2016. *Id.* at 408-09, 413-14. The Court observed, however, that the 4AC contained "no allegations of widespread factoring prior to 2015." *Id.* at 409 n.22. Referencing FE-7's allegations, the Court noted that "GE Power management set up the factoring task force 'beginning in 2015,'" and was "monetizing customers' future payments as often as possible *in 2016.*" *Id.* (citing 4AC ¶¶ 290, 297) (emphasis in original). Accordingly, the Court explained that it was "doubtful" that the 4AC adequately alleged "a claim for fraud as to GE's Class Period filings prior to the Form [1]0-K for 2015." *Id.* The Court ruled that "Plaintiffs' factoring-based Item 303 claim survive[d] against GE and Bornstein for GE's 2015 filings and beyond," *id.* at 409, and granted Plaintiffs leave to amend the 4AC, *id.* at 415-16.

Plaintiffs then filed the 5AC, again asserting a putative class period from February 27, 2013 through January 23, 2018. 5AC at 1. The 5AC did not assert any new allegations regarding when the challenged practice of factoring began. Rather, it again alleged that "beginning in 2015, GE had resorted to factoring its receivables to manage liquidity," *id.* ¶ 393, claiming that "FE-7 confirmed that beginning in 2015, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs," *id.* ¶ 394. On January 29, 2021, the Court again dismissed the bulk of the claims asserted in the 5AC but permitted the same claims that survived Defendants' motion to dismiss the 4AC to proceed. *See AP7 II*, 2021 WL 311003, at *11, *13 (citing *AP7 I*, 417 F. Supp. 3d at 408-09 & n.22, 413). Thus, the Court granted Defendants' motion to dismiss except as to Plaintiffs' claims concerning "factoring in GE's 2016 Form 10-K" and "GE's failure to disclose factoring in its Class Period financial statements from 2015 on" under Item 303. *Id.* at *14.

Following the Court's decision in *AP7 II*, the parties commenced fact discovery. The parties' document productions are now substantially complete, and the parties have exchanged

6

initial disclosures, served requests for the production of documents and interrogatories, as well as responses and objections to the same, and issued third-party subpoenas. Additionally, Defendants deposed the Rule 30(b)(6) representatives of both AP7 and CBT. On May 21, 2021, Plaintiffs filed their motion seeking to certify a class consisting of "[a]ll persons and entities that purchased or acquired GE common stock between March 2, 2015 and January 23, 2018, inclusive . . . and were damaged thereby." ECF No. 218 at 1; ECF No. 219 at 1. In support of their Motion, Plaintiffs submitted an expert report by Dr. Tabak, in which he stated that he understood that the Court's opinion in *AP7 II* "upheld 'the [5AC's] factoring-based Item 303 claim . . . for GE's filings from 2015 on'" and that the "earliest of all of [Plaintiffs'] claims is found in the [2014] 10-K filed after market hours on February 27, 2015." ECF No. 220-1 at 1 n.1.

In addition, pursuant to the Court's Civil Case Management Plan and Scheduling Order, ECF No. 211 at 6, the parties engaged in loss causation expert discovery. On May 21, 2021, Plaintiffs served their expert report on loss causation by Dr. Tabak. ECF No. 235-1 (the "Tabak Causation Rep."). On June 30, 2021, Defendants served a rebuttal expert report by Daniel R. Fischel. ECF No. 235-2. On August 16, 2021, after the close of loss causation expert discovery and in connection with their opposition to Defendants' request to file an early summary judgment motion on the issue of loss causation, Plaintiffs requested leave to submit, and appended, a reply expert report from Dr. Tabak. *See* ECF No. 237 at 1 n.1; ECF No. 237-2.

## LEGAL STANDARD

Because the "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," "a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rule 23 "does not set forth a mere pleading standard." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Rather, courts must conduct a "rigorous analysis"

7

to ensure compliance in fact with all the prerequisites of Rule 23(a) as well as at least one of the provisions of Rule 23(b). *Id.* at 33-34; *see, e.g.*, *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 198 (S.D.N.Y. 2015). Even though such an analysis often "entail[s] some overlap with the merits of the plaintiff's underlying claim," that "cannot be helped." *Wal-Mart*, 564 U.S. at 351. "As [the Supreme Court] ha[s] repeatedly explained, a court has an obligation before certifying a class to 'determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits.'" *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1960-61 (2021) (third alteration in original) (quoting *Comcast Corp.*, 569 U.S. at 35). This "obligation to make [Rule 23] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *decision clarified on denial of reh'g*, 483 F.3d 70 (2d Cir. 2007). Courts have wide discretion in matters of class certification, and can reject or modify an improperly defined class. *See, e.g.*, *Boucher v. Syracuse Univ.*, 164 F.3d 113, 118 (2d Cir. 1999) ("[d]istrict judges have broad discretion over class definition" and "are required to reassess their class rulings as the case develops"); *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993) (observing that "the district court is not bound by the class definition proposed in the complaint"); *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 521 (S.D.N.Y. 2018) ("[T]he Court has authority sua sponte to modify a proposed class definition.").

## ARGUMENT

### I. THE PROPOSED CLASS PERIOD IS OVERBROAD

Plaintiffs' Proposed Class Period begins too soon and ends too late. The Supreme Court has repeatedly held that, in a securities fraud case like this, the appropriate class period falls between "the time the misrepresentations were made and when the truth was revealed." *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*"). Here,

8

Plaintiffs' own allegations do not show that GE's "comprehensive" factoring of LTSA receivables in GE Power commenced before the first quarter of 2016. Because GE's Q1 2016 Form 10-Q is the first time GE allegedly could have disclosed this trend in an SEC filing, the class period should begin on **May 5, 2016**, the first trading day after GE filed its Form 10-Q for the first quarter of 2016. At minimum, the class period should start to run no earlier than **February 29, 2016**, the first trading day after GE filed its Form 10-K for 2015, which, according to the document relied on by Dr. Tabak, reflected an immaterial (*not* widespread) amount of factoring of LTSA receivables in GE Power during the fourth quarter of 2015. And, because Plaintiffs allege that the previously concealed truth about factoring was revealed on **April 21, 2017**, the class period should end on that date.

### A. The Class Period Should Begin On May 5, 2016

In a typical securities case, "the class period begins on the date of the first misstatement, as it is the injection of misinformation into the marketplace that distorts the price of the stock." *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 n.12 (S.D.N.Y. 2013) (rejecting plaintiffs' request for the class period to begin on February 20, 2006 because the first alleged misstatement occurred on February 24, 2006); *see also In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 241 (S.D.N.Y. 2006) (beginning the class period in a securities class action on the date of the first actionable alleged misstatement because plaintiffs' requested start date was based on statements that were "not actionable under the securities laws"). Thus, the class period in this case should begin on the date of the first alleged omission for which the Court held Plaintiffs had pled a claim; *i.e.*, the date that GE's comprehensive and widespread factoring of LTSA receivables allegedly began. *See AP7 I*, 417 F. Supp. 3d at 408-09.

Plaintiffs begin their Proposed Class Period on March 2, 2015, the first trading day after GE filed its Form 10-K *for 2014*. ECF No. 219 at 1. Plaintiffs do not even attempt to justify this

9

choice; nor could they.  The 5AC contains no allegations of comprehensive or widespread factoring of LTSA receivables in GE Power in 2014.  *See Lumen v. Anderson*, 280 F.R.D. 451, 455-56 (W.D. Mo. 2012) (noting that "the class period cannot begin before an actionable statement or concealment occurs," and that whether a particular date should constitute the start of the class period depends on whether it had been "properly pled").  Indeed, the Court recognized this when it observed that Plaintiffs had pled "no allegations of widespread factoring ***prior to*** 2015."  *AP7 I*, 417 F. Supp. 3d at 409 n.22.  Plaintiffs instead appear to have selected March 2, 2015 with the sole purpose of maximizing the class's theoretical damages because it is the first trading day after GE's first SEC filing "in 2015" and thus theoretically compliant with the Court's order that their Item 303 claims survived for GE's "financial statements from 2015 on."  *AP7 II*, 2021 WL 311003, at *14.  But GE's 2014 Form 10-K contained no "financial statements from 2015," and there is no basis to conclude that GE engaged in widespread factoring of LTSA receivables in 2014 or that the 2014 Form 10-K could contain an actionable omission triggering the start of the class period. The class period simply cannot begin on March 2, 2015.

The question thus becomes when should the class period start.  As explained above, the class period cannot begin before the alleged concealment of GE's comprehensive and widespread factoring of LTSA receivables occurred.  *See City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) (shortening the class period to start on the date of the "first actionable statement under the PSLRA" because "the [c]ourt [wa]s required at the class certification stage to limit the proposed [c]lass based on the alleged misrepresentations found to be actionable").  The three pages the 5AC devotes to factoring confirm that there are no particularized allegations establishing that "widespread" factoring began at any point in 2015.  *See* 5AC ¶¶ 393-405.  Rather, Plaintiffs' conclusory claim that factoring began "in

2015" (and thus the Court's conclusion that the 2015 financial statements included actionable omissions, *e.g.*, *AP7 I*, 417 F. Supp. 3d at 409 n.22) is based on FE-7's supposed claim that GE created a task force "beginning in 2015." *See* 5AC ¶¶ 393-94; 4AC ¶ 290. However, a document produced by Plaintiffs demonstrates that FE-7 stated that the task force was created in late 2015 and that widespread factoring of LTSAs at GE Power did not begin until 2016.

Plaintiffs' *own records* of what FE-7 actually said make clear that FE-7 was very specific with regard to the timing of the relevant events related to factoring: FE-7 stated that "beginning in *Q4 2015*, GE Power management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs" and that GE was "monetizing customers' future payments as often as possible *in 2016*." Ex. 1, Plaintiffs_LS0068175-84 ¶¶ 7-8, 10. This more precise allegation is consistent with the remaining allegations attributed to FE-7 about GE's factoring starting in 2016. *E.g.*, 5AC ¶¶ 394-95, 401. It is also consistent with an internal GE document relied upon by Plaintiffs' expert, Dr. Tabak, showing that GE only monetized an immaterial amount of LTSA receivables in the fourth quarter of 2015 (when the task force was allegedly created). Tabak Causation Rep. at 16, 19; Ex. 2, GE_SDNY00241579. Thus, GE's filings simply could not have omitted a trend of comprehensive factoring of LTSAs in GE Power prior to GE's filing of its first quarter 2016 Form 10-Q on May 4, 2016. The next trading day (*May 5, 2016*) is then the earliest date upon which the class period can begin.

To be sure, the document relied upon by Dr. Tabak suggests that GE's Form 10-K for 2015 reflected a *de minimis* (*i.e.*, neither comprehensive nor widespread) amount of factoring of LTSA receivables. This is consistent with the Court's prior observations that "it is doubtful that the Complaint supports such a claim for [widespread factoring-based] fraud as to GE's Class Period filings prior to the *Form [1]0-K for 2015*." *AP7 I*, 417 F. Supp. 3d at 409 n.22. Were the Court

11

to conclude that the small amount of factoring in the fourth quarter of 2015 is sufficient to plead the existence of a trend necessitating additional disclosure, the class period would start on *February 29, 2016*, the first trading day after GE filed its Form 10-K for 2015, at the earliest. *E.g.*, *City of Cape Coral*, 322 F. Supp. 3d at 682; *In re Miva, Inc., Sec. Litig.*, 2008 WL 681755, at \*2 (M.D. Fla. Mar. 12, 2008) (shortening class period to February 23, 2015 because "all statements prior to the February 23, 2005 conference call were not actionable").

## B. The Class Period Should End On April 21, 2017

"In a securities fraud class action, 'courts are required to cut off the class period on the date of a statement or event that cures the market'" and "the class period ends on the date 'when the full truth has been disclosed to the market.'" *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 48 (S.D.N.Y. 2018) (Furman, J.); *see also Yi Xiang*, 327 F.R.D. at 521 (holding that the class period definition should exclude individuals who purchased defendant's stock after the date of the alleged corrective disclosure). Plaintiffs propose to end the class period on January 23, 2018—the date AP7 and CBT used in all prior iterations of their complaints, wherein their claims were based on myriad other alleged omissions and misstatements that have since been dismissed. *See* 3AC at 1; 4AC at 1; 5AC at 1. But all that remains now are Plaintiffs' factoring-based claims. *See AP7 II*, 2021 WL 311003, at \*11, \*13, \*14. The factoring omissions and misstatement were, according to Plaintiffs, corrected on April 21, 2017, when GE announced its financial results for the first quarter of 2017, including negative $1.6 billion in Industrial CFOA. 5AC ¶¶ 451-53. Plaintiffs allege that this is when the market learned of GE's comprehensive factoring of LTSA receivables and its impact on GE's cash flows, and thus when it was supposedly revealed that GE's disclosures omitted material information about factoring required by Item 303 and that the statement in its 2016 Form 10-K misstated the true purpose of factoring. *See id.* In other words, GE's April 21, 2017 announcement corrected the alleged omissions and misstatement, or revealed the risks

previously concealed by GE. *See id.*

Plaintiffs do not allege that anything regarding the relevant "truth" about factoring was left unknown after GE's April 21, 2017 announcement. Nor do Plaintiffs plead anywhere in the 5AC that any alleged corrective disclosure after April 21, 2017 revealed anything new about the widespread factoring of LTSA receivables or otherwise corrected the alleged misstatement or omissions that were already corrected on April 21, 2017. *See, e.g.*, 5AC ¶¶ 455-57 (July 21, 2017); *id.* ¶¶ 462-67 (October 20, 2017); *id.* ¶¶ 476-81 (November 13-14, 2017); *id.* ¶¶ 501 (January 24, 2018). In fact, in their 5AC, Plaintiffs emphasized how the alleged corrective disclosures after April 21, 2017 each revealed some new truth related to GE's long-term care insurance portfolio—*i.e.*, corrected information relating to claims that this Court has dismissed. *See, e.g.*, 5AC ¶ 457 (noting that on July 21, 2017, GE disclosed that it recently "had ***adverse claims experience in a portion of [its] long-term care portfolio***" (emphasis in original)); *id.* ¶ 462 (noting that on October 20, 2017, GE announced it was "deferring decision on additional dividends until Insurance reserve review [related to LTC insurance] is completed" (alteration in original)); *id.* ¶ 479 (noting that on November 13, 2017, GE discussed the reasons for its dividend cut, including "the lack of an upstream dividend from GE Capital to GE for the remainder of 2017 and 2018 as a consequence of the LTC insurance issues"); *id.* ¶ 501 (noting that on January 24, 2018, GE disclosed that it had "been ***notified by the SEC that they are investigating*** the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long term-service agreements" (emphasis in original)).[4] None of these subsequent disclosures

---

[4] Additionally, the announcement of an SEC investigation does not in and of itself reveal any relevant "truth" to the market—there must be some specific connection between the announcement of the investigation and the alleged misrepresentations. *See, e.g.*, *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of an SEC [] internal

13

even mentioned factoring. *Accord Goldman Sachs*, 141 S. Ct. at 1961 (suggesting that lower courts can and should consider any "mismatch between the contents of the misrepresentation and the corrective disclosure" at the class certification stage); *Pirnik*, 327 F.R.D. at 48 (holding that alleged corrective disclosure—an EPA notice of violation of one regulation—did not disclose the full truth concerning defendant's regulatory violations because it explicitly stated that the EPA's investigation into violations of a separate regulation was ongoing, and "[i]t was not until [four months later] that the EPA explicitly claimed that [defendant] had installed defeat devices in violation of" the separate regulation).

Furthermore, Plaintiffs' expert, Dr. Tabak, opined that GE's stock price decline following the April 21, 2017 announcement was caused by the market realizing that GE's factoring statements were not true, and appreciating the true impact of the widespread and comprehensive factoring on GE's industrial CFOA. *See* Tabak Causation Rep. ¶ 34 ("Management noted receivables were weaker given a substantial $1.3B of less factoring to GECS in the quarter. . . . ***The bottom line is that GECS factoring has been bolstering Industrial CFOA by ~$2B per year, and this quarter shows what happens when this normalizes***." (emphasis in original) (quoting "1Q Wrap: Red is the New Black," *J.P. Morgan*, April 24, 2017)). Dr. Tabak made no attempt to demonstrate that the market was still misled by the alleged factoring misstatement and omissions (or by anything Defendants said on April 21, 2017) after April 21, 2017, nor does he attempt to demonstrate that GE disclosed additional information after April 21, 2017 that corrected the alleged factoring misstatement and omissions. Indeed, Dr. Tabak cannot say that the subsequent statements mentioned factoring at all, or that he is sure any of GE's stock price declines after April

investigation," as a disclosure, "must reveal more than just the existence of a[n] [] investigation. It must link the [] investigation to the actual fraudulent conduct alleged in the complaint.").

14

21, 2017 related to factoring.  *See* Tabak Causation Rep. ¶¶ 42, 45-46, 49, 50, 59.

To the extent any of the Item 303 disclosures or statement in GE's 2016 Form 10-K were false or misleading for the reasons alleged by Plaintiffs, they were corrected on ***April 21, 2017***, for the same reasons alleged by Plaintiffs.  No purchasers of GE stock after that date can properly be included in the class.  *See, e.g.*, *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 58-59 (S.D.N.Y. 2013) (excluding from the class individuals who purchased defendant's stock after date of corrective disclosure because "[a]ny investor who purchased after the . . . corrective disclosure would have known of the alleged 'untruth or omission at the time of his or her acquisition of the security,' and thus, that his or her claims would be incongruous with plaintiff's"); *De la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369, 389 (S.D.N.Y. 2002) (excluding from the class individuals who "could not have relied on the allegedly fraudulent statements in making the decision to buy [defendant's] stock").

## II.     INTRA-CLASS CONFLICTS BAR CERTIFICATION

Next, it is well settled that a class can be certified "only if . . . the representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  To satisfy the adequacy requirement, "[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  The focus of the "adequacy inquiry" is "to uncover conflicts of interest between named parties and the class they seek to represent."  *Id.* at 625; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (Rule 23(a)(4) "entails inquiry as to whether . . . plaintiff's interests are antagonistic to the interest[s] of other members of the class.").  An actual conflict is not a prerequisite to finding inadequacy, however; even "[a] 'potential conflict of interest' is sufficient to render a named plaintiff an inadequate class representative."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 565 (S.D.N.Y. 2018); *see*

15

*also Schaffer v. Horizon Pharma Plc*, 2016 WL 3566238, at *3 (S.D.N.Y. June 27, 2016) (Furman, J.) ("[M]any courts have rejected appointments of lead plaintiffs based on *potential* risks." (emphasis in original)). Plaintiffs' remaining claims are based upon two temporally distinct misstatements that were supposedly corrected simultaneously on multiple dates and allegedly give rise to recoverable damages. *See AP7 II*, 2021 WL 311003, at *11, *13; 5AC ¶¶ 444-505. This fact pattern results in two insurmountable intra-class conflicts that bar class certification.

*First*, Plaintiffs have a financial conflict of interest with class members that purchased GE stock after February 24, 2017, when GE filed its 2016 Form 10-K. Some absent class members, like Additional Plaintiff CBT, purchased GE stock after the first alleged Item 303 omission but before the second alleged misstatement in the 2016 Form 10-K, *see* ECF No. 191-2, and can thus only recover for the amount of the stock price decline caused by the market learning the purported truth about the first misstatement. *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 2021 WL 3744894, at *8 (2d Cir. Aug. 25, 2021) (A plaintiff "'cannot share in any recovery' based solely on statements made after the date of [the plaintiff's] purchase."); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) ("[A] plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."). CBT and similarly situated class members' stock purchases could not have been at a price inflated by the second alleged misstatement because that statement had not yet been made. Thus, Plaintiffs will need to prove how much of each corrective disclosure's stock price decline is attributable to each challenged statement in order to calculate damages recoverable by each class member. And this is what creates intra-class conflict.

As Plaintiffs' expert, Dr. Tabak, explained in a 2015 law review article, "in a situation where some investors purchased after one alleged misrepresentation but before a second one . . .

16

the early purchasers would have a financial interest in attributing as much as possible of the price decline following a corrective disclosure to the alleged misrepresentation before their purchase (*i.e.*, the statement they could have relied upon)." Ex. 3, David Tabak, *Implications for Market Efficiency and Damages Analyses of Plaintiff Interpretations of* Halliburton II*'s Statement That "Market Efficiency Is A Matter of Degree"*, 46 LOY. U. CHI. L. J. 467, 479-80 (2015). In contrast, later purchasers will seek to "allocat[e] a disproportionate share of the price decline following a corrective disclosure to the alleged misrepresentation for which they are more likely to recover." *Id.* at 480. That is precisely the situation here. For example, CBT purchased the entirety of its GE stock on October 10, 2016, *see* ECF No. 191-2, after the first alleged misstatement but before GE filed the 2016 Form 10-K containing the second alleged misstatement. So, CBT can recover losses, if any, only for the inflation of the stock price purportedly caused by the first misstatement and any subsequent corrective disclosure. Dr. Tabak claims that both alleged misstatements were corrected on April 21, 2017 and caused a market-adjusted decline in GE's stock price of $0.72. *See* Tabak Causation Rep., Exhibit 4 at 1. Because CBT can only recover for the portion of this decline attributed to the alleged Item 303 misstatement, it (and similarly situated class members) will argue that most of the $0.72 decline is related to the alleged Item 303 omission and not the alleged 2016 Form 10-K misstatement, upon which they did not rely.

Plaintiffs may respond that the differently situated class members (*i.e.*, investors who purchased GE stock after both alleged misstatements) do not care how much of the stock price decline is allocated to the first misstatement because they are eligible to recover the total decline, as they relied on both alleged misstatements. This, however, assumes that Plaintiffs will ultimately prevail on both bases, which is far from certain. Plaintiffs must prove each element of their Section 10(b) claim separately for each alleged misstatement or omission. In the event they fail to carry

17

their burden on the first statement but succeed on the second, any disproportionate allocation of the stock price decline to the first statement reduces their recovery on the second. CBT simply cannot be expected to forego its financial interests for the benefit of differently situated absent class members.

Plaintiffs may also claim that AP7 can adequately represent the class because, unlike CBT, it purchased some GE stock after both of the challenged statements. This is insufficient to resolve the conflict because AP7 purchased 549,000 shares after the first misstatement but before the second (*i.e.*, purchases like CBT's), but only 168,100 shares after the second misstatement and before the first corrective disclosure on April 21, 2017. *See* ECF No. 191-1 at 5. Like CBT, AP7 has a far greater financial interest in recovering on the first misstatement than the second.

*Second*, there are insurmountable intra-class conflicts between class members who purchased GE stock before April 21, 2017 and those that purchased after each of Plaintiffs' remaining alleged corrective disclosures. A misstatement can only be corrected once, and as explained above, the remaining alleged misstatements were corrected, to the extent they were false, on April 21, 2017. *See supra* § I.B. Yet, Plaintiffs' Proposed Class Period would permit purchasers *after* April 21, 2017 to recover. To the extent the Court certifies a class ending on the date of a subsequent alleged corrective disclosure, post-April 21, 2017 purchasers would be incentivized to argue that the alleged misstatements were not actually corrected on April 21, 2017.

For example, in order to maximize their recovery, class members who purchased GE stock on April 22, 2017 would argue that GE's disclosure on April 21, 2017 was not corrective, and instead that the challenged statements were corrected on, for example, July 21, 2017, which is Plaintiffs' second alleged corrective disclosure. 5AC ¶¶ 455-61. This April 22 purchaser is irreconcilably differently situated than the pre-April 21 purchasers. But the conflicts do not stop

18

there. A class member who purchased on July 22, 2017 would similarly argue that neither the disclosures made on April 21 nor those made on July 21 of 2017 corrected the purportedly false statements, but that the market actually learned the truth on, for example, the next alleged corrective disclosure date, October 20, 2017. 5AC ¶¶ 462-74. The same conflict of interest would follow for each group of class members that purchased after October 20, 2017, including those that purchased between October 21 and November 13-14 of 2017, and those that purchased between November 15, 2017 and January 23, 2018. 5AC ¶¶ 475-84, 499-505. "Although all affected members of the plaintiff class are interested in maximizing their individual compensation, severally they accomplish that goal in different ways." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251 (2d Cir. 2011). In other words, Plaintiffs' proposed class is plagued by inherent conflicts of interest that will not permit their collective claims to "prevail or fail in unison" on the crucial question of when the market learned the full truth. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60 (2013).

This lack of cohesion should preclude certification of any class including investors after the first alleged corrective disclosure on April 21, 2017, but, at minimum, requires the creation of sub-classes and the appointment of appropriate sub-class representatives of each. *See* FED. R. CIV. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."); *Literary Works*, 654 F.3d at 249-50 (observing that intra-class conflicts "can be cured by dividing the class into separate 'homogenous subclasses . . . with separate representation to eliminate conflicting interests of counsel'" (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999))).

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion. To the extent the Court does certify a class, however, that class should begin no earlier than May 5, 2016 and end no later than April 21, 2017.

Dated: August 30, 2021
New York, New York

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/ Sarah A. Tomkowiak
Miles N. Ruthberg
Blake T. Denton
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200
miles.ruthberg@lw.com
blake.denton@lw.com

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700
sean.berkowitz@lw.com

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000
william.trach@lw.com

Sarah A. Tomkowiak (*pro hac vice*)
J. Christian Word (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200
sarah.tomkowiak@lw.com
christian.word@lw.com

*Attorneys for Defendants General Electric Company and Jeffrey S. Bornstein*