# EXHIBIT G

Philip W. Danziger, Esq.
C. Neil Gray, Esq.
(admitted *pro hac vice*)
Julia A. Lopez, Esq.
**REED SMITH LLP**
506 Carnegie Center, Suite 300
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824

Richard Schirtzer, Esq.
(admitted *pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Adam Abensohn, Esq.
(admitted *pro hac vice*)
Sandra Bresnick, Esq.
(*pro hac vice* pending)
Jeffrey Miller, Esq.
(*pro hac vice* pending)
Jesse Bernstein, Esq.
(admitted *pro hac vice*)
Leigha Empson, Esq.
(admitted *pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants Allergan plc, Brenton L. Saunders,
Paul M. Bisaro, Maria Teresa Hilado, R. Todd Joyce, Sigurdur
O. Olafsson, David A. Buchen, James H. Bloem, Christopher
W. Bodine, Tamar D. Howson, John A. King, Ph.D., Catherine
M. Klema, Jiri Michal, Jack Michelson, Patrick J. O'Sullivan,
Ronald R. Taylor, Andrew L. Turner, Fred G. Weiss, Nesli
Basgoz, M.D., and Christopher J. Coughlin*

<table>
<tr><td>IN RE ALLERGAN GENERIC DRUG PRICING SECURITIES LITIGATION</td><td>**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

Civil Action No. 2:16-cv-09449 (SDW) (LDW)

**MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**</td></tr>
</table>

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND AND COMPLAINT ALLEGATIONS ...........................................6

ARGUMENT .........................................................................................................................10

I. THE COURT SHOULD NOT CERTIFY PLAINTIFFS' SECTION 10(B) AND 20(A) CLASS BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE...................................................................................................10

    A. Plaintiffs Cannot Rely On The *Basic* Presumption Because Plaintiffs Would Have Bought Or Sold Allergan Stock Even If They Were Aware Of The Alleged Misrepresentations.........................................................11

    B. Plaintiffs Cannot Rely On The *Affiliated Ute* Doctrine Of Classwide Reliance.............................................................................................15

    C. If Certified, Any Section 10(b) And 20(a) Class Should Be Limited To The First Alleged Corrective Disclosure .............................................17

        1. The *Basic* presumption is rebutted because the Second Alleged Corrective Disclosure did not provide new, value-relevant information to the market.........................................................18

        2. The *Basic* presumption is rebutted because the Second Alleged Corrective Disclosure did not have a statistically significant price impact.......................................................................................22

II. THE COURT SHOULD NOT CERTIFY PLAINTIFFS' SECTION 14(A) CLASSES BECAUSE INDIVIDUAL ISSUES OF TIMELINESS PREDOMINATE...................................................................................................28

III. DAMAGES FOR ALL CLASSES ARE NOT SUSCEPTIBLE TO A COMMON METHODOLOGY ........................................................................................31

IV. PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES .......................32

CONCLUSION......................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ............................................................................. *passim*

*In re Allergan Generic Drug Pricing Secs. Litig.*,
No. 16-cv-9449, 2019 WL 3562134 (D.N.J. Aug. 6, 2019) ............................ 28, 30

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ...................................................................... 10, 11, 27, 33

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) .................................................................. 18, 19

*Ascroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................. 28

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................. *passim*

*Beck v. Status Game Corp.*,
No. 89-cv-2923, 1995 WL 422067 (S.D.N.Y. Jul. 14 1995) ................................ 33

*Bing Li v. Aeterna Zentaris, Inc.*,
324 F.R.D. 331 (D.N.J. 2018) ..................................................................... 11

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ......................... 16

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................ 5, 31, 32

*In re Comm. Bank of N. Va.*,
622 F.3d 275 (3d Cir. 2010) ............................................................... 4, 28, 30

*In re Conagra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ................................................................. 32

*Curley v. Klem*,
298 F.3d 271 (3d Cir. 2002) ...................................................................... 11

*Darvin v. Int'l Harvester Co.*,
610 F.Supp. 255 (S.D.N.Y. 1985) ................................................................. 35

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009) ..................................................................... 17

ii

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014)...................................................................................... 16

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)....................................................................... 16, 17

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3rd Cir. 2011)........................................................................................ 27

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D.Tex. 2015) ............................................................... 17, 19, 22, 23

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ...................................................................................................... 10

*In re Exxon Mobil Corp. Sec. Litig.*,
  387 F. Supp. 2d 407 (D.N.J. 2005) ............................................................................... 28

*In re Finisar Corp. Secs. Litig.*,
  No. 11-cv-01252, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)................................... 23

*Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014)................................................................................... 31

*Greenspan v. Brassler*,
  78 F.R.D. 130 (S.D.N.Y. 1978)..................................................................................... 35

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ............................................................................................... *passim*

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016).......................................................................................... 19

*In re Initial Pub. Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)....................................................................................... 14, 15

*In re Intuitive Surgical Sec. Litig.*,
  No. 5:13-cv-01920, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)............................. *passim*

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Sec., LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009)........................................................................... 33

*Johnston v. HBO Film Mgmt., Inc.*,
  265 F.3d 178 (3d Cir. 2001)....................................................................................... 3, 16

*In re JPMorgan Chase & Co. Shareholder Derivative Litig.*,
  No. 08-cv-0974, 2008 WL 4298588 (S.D.N.Y. Sept. 19, 2008)................................... 33

*In re Kosmos Energy Ltd. Sec. Litig.*,
  299 F.R.D. 133 (N.D. Tex. 2014) ..................................................................... 33, 34, 35

*Kottaras v. Whole Foods Market, Inc.*,
281 F.R.D. 16 (D.D.C. 2012) .............................................................................. 32

*Levine v. Berg*,
79 F.R.D. 95 (S.D.N.Y. 1978) .............................................................................. 34

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) ................................................................................. 29

*Lupyan v. Corinthian Colleges, Inc.*,
761 F.3d 314 (3d Cir. 2014) ................................................................................. 11

*In re Merck & Co., Sec., Derivative & ERISA Litig.*,
Civ. Nos. 05-1151, 2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................ 11

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................................... 23

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Corp.*,
No. 4:08-cv-0160, 2018 WL 3861840 (N.D. Oh. Aug. 14, 2018) ......................... 32

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ................................................................................. 21

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013) ................................................................................. 28

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ............................................................................ 18

*Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) ........................................................................... 16, 17

*Skeway v. China Nat. Gas, Inc.*,
304 F.R.D. 467 (D. Del. 2014) ......................................................................... 16, 17

*Stoll v. Ardizzone*,
No. 07-cv-00608, 2007 WL 2982250 (S.D.N.Y. Oct. 9, 2007) ............................. 29

*In re Vivendi Universal, S.A., Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009) ................................................................... 27

*Vizirgianakis v. Aeterna Zentaris, Inc.*,
775 F. App'x 51 (3d Cir. 2019) ............................................................................ 19

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) .............................................................................. 16, 17

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................................................... 1

*Westinghouse Elec. Corp. v. Franklin*,
    993 F.2d 349 (3d Cir. 1993) ................................................................................ 28


## **Statutory Authorities**

15 U.S.C. § 78u–4(a)(3)(B)(i) ................................................................................ 33


## **Rules and Regulations**

Fed. R. Civ. P. 8(c) ................................................................................................. 4

Fed. R. Civ. P. 12(b) ............................................................................................. 28

Fed. R. Civ. P. 23 ........................................................................................... *passim*

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 10(b), 14(a), and 20(a) | Sections 10(b), 14(a), and 20(a) of the Exchange Act, respectively |
| Actavis | Actavis plc, renamed Allergan plc on June 15, 2015 following the Actavis Merger |
| Actavis Merger | Actavis' acquisition of Allergan Inc., completed on March 27, 2015 |
| Allergan | Allergan plc |
| Allergan DOJ Subpoena | Subpoena received by Allergan as part of the DOJ's antitrust investigation and disclosed on August 6, 2015 |
| Br. __ | Citation to Plaintiffs' Motion for Class Certification, Dkt. 143 |
| Class Period | Plaintiffs' proposed class beginning October 29, 2013 and ending November 2, 2016 |
| Coffman ¶ __ | Citation to the Mar. 20, 2020 Expert Report of Chad Coffman, CFA, Plaintiffs' proffered expert, attached as Ex. A to the Ornsbee Declaration, Dkt. 143-3 |
| Complaint (or "SAC") | Plaintiffs' Consolidated Second Amended Class Action Complaint, Dkt. 82 |
| Defendants | Allergan, the Individual Defendants, and the Director Defendants |
| Director Defendants | (1) James H. Bloem; (2) Christopher W. Bodine; (3) Tamar D. Howson; (4) John A. King, Ph.D; (5) Catherine M. Klema; (6) Jiri Michal; (7) Jack Michelson; (8) Patrick J. O'Sullivan; (9) Ronald R. Taylor; (10) Andrew L. Turner; and (11) Fred G. Weiss |
| DOJ | U.S. Department of Justice |
| Ex. __ | Citation to exhibits appended to the accompanying Declaration of Jeffrey C. Miller |
| Exchange Act | Securities Exchange Act of 1934 |
| First Alleged Corrective Disclosure | Allergan's Form 10-Q quarterly report for the period ending June 30, 2015, filed August 6, 2015, disclosing its receipt of the Allergan DOJ Subpoena, attached as Ex. 7 to the Declaration of Jeffrey C. Miller |
| Forest | Forest Laboratories, Inc. |
| Forest Merger | Actavis' acquisition of Forest, completed on July 1, 2014 |

| | |
|---|---|
| Individual Defendants | (1) Paul M. Bisaro, Actavis's CEO and President between October 2013 and July 2014; (2) Brenton L. Saunders, Allergan's CEO and President since July 2014; (3) R. Todd Joyce, Actavis's CFO from October 2009 to December 2014; (4); Maria T. Hilado, Allergan's CFO since December 2014; (5) Sigurdur O. Olafsson, president of Actavis Pharma, the predecessor entity to Allergan's generic business, between April 2012 and June 2014; and (6) David A. Buchen, Actavis's Chief Legal Officer from April 2012 to July 2014, and Executive Vice President of its Generics business from July 2014 to May 1, 2015 |
| Kleidon ¶ __ | Citation to the Oct. 14, 2020 Expert Report of Allan Kleidon, Ph.D., Defendants' proffered expert, attached as Ex. 1 to the Declaration of Jeffrey C. Miller |
| Lead Plaintiffs | Plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union") |
| Second Alleged Corrective Disclosure | *U.S. Charges in Generic-Drug Probe Said to Be Filed by Year-End*, Bloomberg News Enterprise, Nov. 3, 2016, attached as Ex. 12 to the Declaration of Jeffrey C. Miller |
| Teva | Teva Pharmaceuticals, which acquired Allergan's legacy Actavis generic drugs division on August 2, 2016 |

Pursuant to Fed. R. Civ. P. 23, Defendants respectfully submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

## PRELIMINARY STATEMENT

The Complaint alleges that Defendants made affirmative misstatements concerning Allergan's earnings and competition in the generic pharmaceutical market that were rendered false by its supposed participation in a price-fixing conspiracy. SAC ¶¶ 76–179, 194–233; Br. 4–5. Plaintiffs claim that two alleged corrective disclosures—an Allergan announcement on August 6, 2015, disclosing its receipt of the Allergan DOJ Subpoena, and a *Bloomberg* article on November 3, 2016 allegedly serving as the "corrective" end point to Plaintiffs' Class Period (SAC ¶ 241)—caused Allergan's stock prices to decline. Defendants deny these allegations.

Plaintiffs seek to certify three classes of investors:

**Class (1):** those who acquired Allergan common or preferred stock between October 29, 2013 and November 2, 2016, and claim injury due to alleged violations of Sections 10(b) and 20(a) of the Exchange Act;

**Class (2):** those who held Forest common stock as of May 2, 2014, were entitled to vote on the Forest Merger, and claim injury due to alleged violations of 14(a) of the Exchange Act; and

**Class (3):** those who held Allergan common stock as of January 22, 2015, were entitled to vote on the Actavis Merger, and claim injury due to alleged violations of 14(a). SAC ¶¶ 237, 240, 241; Br. 2, 5.

Plaintiffs' motion should be denied. Class certification is only appropriate where plaintiffs "affirmatively demonstrate" by a preponderance of evidence that "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 362 (2011) (quoting Fed. R. Civ. P. 23(b)(3)). Plaintiffs have not met that burden and cannot, because individual issues will predominate, making class certification inappropriate for all three classes.

1

**Class 1:** To certify its proposed 10(b) and 20(a) class of common and preferred stockholders, Plaintiffs invoke the rebuttable "fraud on the market" presumption of classwide reliance in an attempt to show that common issues predominate over individual ones, the so-called "*Basic*" presumption. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

However, the *Basic* presumption is rebutted if it is shown "that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) ("*Halliburton II*"). Here, Plaintiffs' allegations and the allegations by other class members reveal that many purported class members bought or sold Allergan stock with the belief that Allergan was engaged in a price-fixing conspiracy (*i.e.*, with knowledge that the stock was purportedly tainted by fraud). Specifically, Plaintiffs allege that certain price increases made no economic sense "*absent the existence of a price-fixing scheme*." SAC ¶ 8 (emphasis added). Accepting those allegations as true, however, necessarily means that a material portion of the class would have reached the conclusion that the public price increases could only be the product of a price-fixing scheme. In fact, this necessary by-product of Plaintiffs' own allegations is borne out by the fact that many plaintiffs, including plaintiffs who fall within the purported class, filed antitrust claims alleging price-fixing against Allergan well before the end of the Class Period. Therefore, many proposed class members had concluded that Allergan's "stock[] price was tainted by fraud" before buying or selling Allergan stock, and those plaintiffs cannot rely on the *Basic* presumption. As such, individual issues of reliance will predominate, and no 10(b) class should be certified.

In the absence of the *Basic* presumption of reliance, Plaintiffs attempt to rely on the narrow *Affiliated Ute* presumption to establish classwide reliance. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128 (1972). This attempt fails too, because this presumption only

applies in the narrow circumstance where a plaintiff's allegations rest primarily on *omissions that are independent* of alleged misstatements, *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001). Here, the Complaint is based almost entirely on allegations that Defendants made affirmative misstatements concerning competition in the generics market and about Allergan's financial results. The only supposed "omission" Plaintiffs allege is of the type that "[D]efendants failed to disclose that the allegedly misleading fact was untrue." *Id.* at 193. Such "omissions" are not independent of the alleged misrepresentations, but inextricably linked to them. Therefore, the *Affiliated Ute* presumption does not apply either. *Id.*

Alternately, although the Court should deny Plaintiffs' motion, to the extent the Court is inclined to certify a class for Plaintiffs' 10(b) and 20(a) claims, the Class Period should end with the First Alleged Corrective Disclosure. The *Basic* presumption is rebutted as to a given alleged corrective disclosure by any showing that the alleged disclosure did not actually affect the market price of the stock. *Halliburton II*, 573 U.S. at 278; *Basic*, 485 U.S. at 248. Defendants have shown that the Second Alleged Corrective Disclosure had no price impact in two ways, either of which is sufficient to rebut the presumption: First, Defendants' expert, Dr. Allan Kleidon,[1] analyzed the Second Alleged Corrective Disclosure, as well as dozens of other disclosures, media, and analyst reports involving Allergan during the relevant time period, and concluded that it disclosed no new, value-relevant information to the market with regards to Allergan's securities, particularly in light of Teva's acquisition of Allergan's generic drug liabilities. Kleidon ¶¶ 79, 82–104.

---

[1] Dr. Allan William Kleidon is a Senior Vice President at Cornerstone Research, a financial and economic consulting firm, with extensive experience providing expert testimony regarding securities markets and industry analysis. He is the author of more than two dozen publications, has served as associate editor of the Journal of Finance and the Journal of Financial Economics, and has taught courses in finance and econometrics at Stanford University, the University of California, Berkeley, and the University of Chicago. Kleidon, Ex. 1.

Second, Dr. Kleidon conducted an event study of the November 3, 2016 *Bloomberg* article and demonstrated it had *no statistically significant impact* on the price of Allergan's common and preferred stocks. Kleidon ¶¶ 128–48. Dr. Kleidon's findings are unrebutted, because Plaintiffs' expert, Mr. Chad Coffman, did not evaluate whether the November 3, 2016 disclosure had a statistically significant price impact. Ex. 2 (Deposition of Chad Coffman, dated March 20, 2020) ("Coffman Tr.) 14:10–18 (Q. Aside from opining that the market was efficient, you're not offering any other opinions with respect to reliance, right? . . . A. I think that's fair, yes."). As the *Basic* presumption does not apply to the November 3, 2016 *Bloomberg* article, the Class Period should end on the latest alleged corrective disclosure with an established price impact: the First Alleged Corrective Disclosure.

**Classes 2 and 3:** Individual questions of timeliness will also predominate over common questions for Plaintiffs' proposed 14(a) classes, rendering class certification inappropriate. *See In re Comm. Bank of N. Va.*, 622 F.3d 275, 293–94 (3d Cir. 2010); Fed. R. Civ. P. 8(c) and 23(b). Certain class members filed antitrust complaints alleging price-fixing against Allergan in early 2016—more than one year before filing their 14(a) claims and outside the applicable statute of limitations. Plainly, then, some number of class members, and perhaps most (given that the complaints were publicly filed), had concluded, long before filing 14(a) claims in this action, that Allergan had participated in the conspiracy alleged here. Additionally, Plaintiffs' allegations in this case—that Allergan's price increases, which were public well outside the limitations period, made no sense absent price-fixing activity—means that many proposed class members had "discovered" their claims more than a year before filing the Complaint. Accordingly, individual issues of timeliness will predominate, and the proposed 14(a) classes cannot be certified.

4

**All Classes.** Class certification as to all classes should be denied for two additional reasons. First, Plaintiffs fail to establish that damages are susceptible to a common methodology. Although Mr. Coffman sketches out a method for calculating classwide damages, he admits he has made no attempt to apply his outline to the facts of the case, and concedes that he has not determined how he would model difficult issues such as varying inflation and confounding variables. Coffman Tr. 125:17–128:14, 141:24–143:5. Mr. Coffman's proposed damages outline, which is only a promise that he could design a model, is insufficient to support a finding of predominance. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

Second, the putative class representatives do not "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Lead plaintiffs AP7 and Union are inadequate because they lack knowledge and familiarity with their own Complaint. At their depositions, Lead Plaintiffs ██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████. *See, e.g.*, Ex. 3 (Deposition of Richard Grottheim, dated July 9, 2020) ("Grottheim Tr.") 216:20–217:20.[2] Moreover, they testified that ██████████████

█████████████████████████████████████████████████████████████████████████.

Grottheim Tr. 161:13–162:7, 173:13–22, 232:6–15, 213:4–10; Ex. 4 (Deposition of Jochen Riechwald, dated October 9, 2020) ("Riechwald Tr.") 118:17–20. As such, class certification should be denied.

---

[2] ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████

## FACTUAL BACKGROUND AND COMPLAINT ALLEGATIONS

Allergan is a global branded pharmaceutical company. Ex. 5 (Allergan 2019 10-K) at 50. It was previously known as Actavis plc. Ex. 6 (Allergan 2015 10-K) at 3. In July 2014, Actavis plc acquired Forest, a branded pharmaceutical company. *Id.* at 7–8. In March 2015, Actavis plc acquired Allergan, Inc., maker of Botox® and other branded medications (it did not sell generic drugs). *Id.* at 3. On June 15, 2015, Actavis plc renamed itself Allergan plc. *Id.* Following the Actavis/Allergan acquisition, the combined company manufactured both generic and branded pharmaceuticals, though the generics portion of its business was small compared to its branded products. Ex. 7 (Allergan June 30, 2015 10-Q) at 32 (reflecting that Allergan/Actavis' branded products amounted to over 64% of the combined company's revenue in the first quarter post-merger, whereas generic products were less than 28% of revenue). On July 26, 2015, Allergan agreed to sell its Actavis generic drug division to Teva. Ex. 6 at 3. The sale closed on August 2, 2016. Ex. 5 at 70. Allergan has not sold any generic drugs since then.

Plaintiffs allege that, during the Class Period, Allergan was a "central participant in a massive cartel that fixed the prices of [six] generic drugs sold in the U.S," specifically: Propranolol, Ursodiol, Doxycycline Hyclate, Desonide, Verapamil, and Glyburide-Metformin. Br. 4; SAC ¶¶ 76–179.[3] Prior to March 2015, Actavis sold these six drugs along with nearly 550 other generic drugs and approximately 80 branded drugs, none of which appear in the Complaint. Ex. 8 (Actavis 2014 10-K) at 2, 12. Plaintiffs allege that Defendants made numerous statements, rendered false as a result of Allergan's alleged participation in price-fixing, regarding

---

[3]  The Complaint alleges that Allergan and its co-conspirator competitors colluded to "raise and maintain the prices" of Propranolol, beginning in "late 2014," Ursodiol, beginning in "mid-2014," Doxycycline hyclate, beginning in "early 2013" (with a "drastic increase" in February 2013), and Desonide, beginning in "mid-2013." SAC ¶¶ 107, 126, 140–44, 159. Plaintiffs do not make particularized pricing allegations for Verapamil and Glyburide-Metformin.

competition in the generic drug market, the basis for Allergan's revenue growth and increases in drug prices, the significance of the Allergan DOJ Subpoena, and Allergan's Sarbanes-Oxley certifications and Code of Conduct.  SAC ¶¶ 194–233.

Plaintiffs allege that these misrepresentations artificially inflated the prices of Allergan's stock and were revealed by two alleged corrective disclosures that purportedly caused the prices of Allergan's common and preferred stock to drop.  Br. 5, 11; SAC ¶ 241.  Those were:

*The First Alleged Corrective Disclosure.*  On August 6, 2015, Allergan disclosed in its Q2 2015 10-Q that it had received a subpoena from the DOJ "seeking information relating to the marketing and pricing of certain of [Allergan's] generic products and communications with competitors about such products."  SAC ¶ 234; Ex. 7 at 64.  According to Plaintiffs, this First Alleged Corrective Disclosure "was the first indication that Allergan was implicated in [a] DOJ investigation."  Br. 5.  Plaintiffs allege that Allergan's common and preferred share prices fell approximately 5% and 3.5%, respectively, "[i]n response to this news."  SAC ¶ 234–37.

*The Second Alleged Corrective Disclosure.*  On November 3, 2016, a *Bloomberg* news article reported that:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion . . . the first charges could emerge by the end of the year . . . . [T]he drugmakers to have received subpoenas . . . include Actavis, which Teva bought from Allergan plc in August [2016].  SAC ¶ 17; Ex. 12 (Second Alleged Corrective Disclosure) at 1.

Plaintiffs claim this disclosure shows that "the DOJ's investigation had intensified and gathered enough evidence of criminality such that charges ***could*** be filed against Allergan and other co-conspirators."  Br. 5 (emphasis added).  Plaintiffs allege that Allergan's common share price fell approximately 4.6%, and its preferred share price fell approximately 4.1%, on November 3, 2016, "[o]n th[e] news" of the Second Alleged Corrective Disclosure.  SAC

¶¶ 239–40. However, this Second Alleged Corrective Disclosure was published at 2:10 PM ET—after much of the price movement of Allergan's stock that day. Kleidon ¶¶ 121–22. Plaintiffs define November 2, 2016 as the end point of the Class Period. Br. 2.

Well before the Plaintiffs' two alleged "corrective" disclosures (and, in particular, over *one year* before the publication of the Second Alleged Corrective Disclosure), there were many reports that Allergan was being investigated for alleged price-fixing and could be subject to potential civil or criminal liability. These disclosures included:

On **October 2, 2014**, Congress announced it was investigating Actavis/Allergan and thirteen other generic drug companies for "soaring generic drug prices." SAC ¶¶ 12, 180; Kleidon ¶ 38.

On **November 20, 2014**, the U.S. Senate Subcommittee on Primary Health and Aging held a hearing on why "generic drugs [are] skyrocketing in price." Kleidon ¶¶ 39.

**Beginning on November 6, 2014**, several drug makers disclosed that that they had received DOJ subpoenas in connection with a federal antitrust investigation of the generic drugs industry. SAC ¶ 13; Kleidon ¶¶ 40–41.

On **November 13, 2014**, the media reported that the DOJ subpoenas "signal[ed] a much broader federal investigation into potential Sherman Act violations in the generic pharmaceutical industry—*with potential criminal implications*." Kleidon ¶ 41 (emphasis added).[4]

On **June 26, 2015**, a media report disclosed that "[t]he belief inside the DoJ [was that the] investigation [could involve] plea deals from dozens of companies and executives involved in a multitude of different conspiracies." *Id.* ¶ 42.[5]

On **August 6, 2015** (the same day as the First Alleged Corrective Disclosure), the media linked the Allergan DOJ Subpoena to subpoenas received by other generic drug makers as part of "the government's widening antitrust probe of the industry," with its concurrent potential for criminal charges. *Id.* ¶¶ 62–63,[6] 93.

---

[4]  Ex. 13 (*DOJ Investigation into Generic Pharmaceutical Pricing Signals Potential Criminal Exposure*, JDSupra, Nov. 13, 2014) at 1.

[5]  Ex. 14 (*DoJ Believes Collusion Over Generic Drug Prices Widespread – Source*, Policy and Regulatory Report, June 26, 2015) at 2.

[6]  Ex. 15 (*Allergan Brought Into Widening U.S. Probe of Generic Drug Prices*, Bloomberg News Enterprise, August 6, 2015) at 1; *see also* Ex. 16 (*Actavis gets subpoena as DOJ probe of*

> On **March 2, 2016**, plaintiffs began filing civil antitrust suits alleging that Allergan and other generic drug manufacturers "conspir[ed] to exponentially raise the cost of . . . generic drugs." *Id.* ¶ 45; *see also* SAC ¶ 16 ("The various civil antitrust actions alleging price-fixing [against Allergan] have now been consolidated into [seven] multidistrict lawsuits alleging antitrust claims against generic drug conspirators.").

All of the above information was in the public domain well before the Second Alleged Corrective Disclosure. Therefore, Plaintiffs are wrong in claiming that the November 3, 2016 disclosure broke the news that "charges could be filed against Allergan." Br. 5. The possibility of antitrust liability against Allergan had already been reported multiple times to the market, and investors had already alleged the same underlying conduct of price-fixing in complaints filed months earlier. Kleidon ¶¶ 45, 62–63, 93. Though Plaintiffs allege the Second Alleged Corrective Disclosure meant "the DOJ's investigation had *intensified*," Br. 5 (emphasis added), nothing in it indicates the DOJ was targeting Allergan for criminal charges, and previous disclosures had already reported the DOJ's ambitions for the antitrust investigation. Kleidon ¶¶ 42, 89-94.

Plaintiffs' allegations, accepted as true, further establish that many investors would have concluded that Allergan was engaged in price-fixing as early as 2013, when Allergan's "price hikes" allegedly began. As noted above, in March 2016, many market participants filed antitrust complaints against Allergan, raising the same charges of price-fixing as alleged in this action. Moreover, the Complaint itself alleges that reasonable investors could draw no conclusion *other than* Allergan was price-fixing well before the two alleged corrective disclosures were published.

---

*generic pricing moves up food chain*, FiercePharma, August 7, 2015) ("Actavis . . . has been drawn into the Justice Department's widening criminal probe.").

According to the Complaint, Allergan's generic drug price increases are themselves evidence of Allergan's participation in the alleged price-fixing conspiracy.[7]

## ARGUMENT

Before granting class certification, a court must undertake a "rigorous analysis[] that the prerequisites of Rule 23 are met," including an "assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence . . . at trial," and must "delve beyond the pleadings" if there is "[a]n overlap between a class certification requirement and the merits of a claim." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309, 312, 316–17 (3d Cir. 2008) (citations and quotation marks omitted). A court "should not certify [a] class where [it] finds that there are serious problems" at the certification stage. *Id.* at 318 (citation omitted).

## I. THE COURT SHOULD NOT CERTIFY PLAINTIFFS' SECTION 10(B) AND 20(A) CLASS BECAUSE INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE

Class certification in a securities fraud action requires a plaintiff to satisfy the Rule 23(b)(3) prerequisite of predominance by establishing that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (quoting Fed. R. Civ. P. 23(b)). To determine predominance, a court examines the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). To recover damages in a

---

[7] Plaintiffs allege that "[n]ormal market forces cannot explain [Allergan's] astronomical hikes," "it would not be in [Allergan's] unilateral self-interest to increase the prices of its generic drugs *unless it had an agreement with other drugmakers that they would do the same*," and these "extraordinary and historic price increases" made no economic sense "*absent the existence of a price-fixing scheme*." SAC ¶¶ 6, 8, 245 (emphasis added).

private securities fraud case under 10(b), a plaintiff must prove, *inter alia*, "reliance upon the misrepresentation or omission." *Amgen*, 568 U.S. at 460–61.[8]

Plaintiffs rely on the "fraud on the market" or "*Basic*" presumption to establish classwide reliance. *Basic*, 485 U.S. at 248 & n.27. But Defendants may rebut the *Basic* presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id.* at 248. Without the *Basic* presumption, certification would be precluded "because individual reliance issues would overwhelm questions common to the class." *Amgen*, 568 U.S. at 462–63.

To rebut the presumption, a defendant "need only produce enough evidence 'to withstand a motion for summary judgment or judgment as a matter of law on the issue.'" *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 344 (D.N.J. 2018) (quoting *Lupyan v. Corinthian Colleges, Inc.*, 761 F.3d 314, 320 (3d Cir. 2014)). Accordingly, all inferences should be drawn in defendants' favor. *Curley v. Klem*, 298 F.3d 271, 276 (3d Cir. 2002).

### A. Plaintiffs Cannot Rely On The *Basic* Presumption Because Plaintiffs Would Have Bought Or Sold Allergan Stock Even If They Were Aware Of The Alleged Misrepresentations

The *Basic* presumption can be rebutted by a showing "that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Halliburton II*, 573 U.S. at 269. Plaintiffs' allegations and multiple undisputed facts make clear that many members of the proposed class had already concluded that Allergan was price-fixing (and thus the stock's price was "tainted by fraud") *before* they purchased Allergan stock. ***First,*** the Complaint alleges that:

---

[8] The arguments in this opposition regarding the 10(b) claims are also applicable to the 20(a) control person allegations because the latter are derivative of the former. *See In re Merck & Co., Sec., Derivative & ERISA Litig.*, Civ. Nos. 05-1151, 05-2367, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013).

> [P]rice increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest *absent the price-fixing scheme*. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for generic [Propranolol, Ursodiol, Doxycycline, or Desonide] each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue. SAC ¶¶ 118, 131, 151, 164 (emphasis added).

Indeed, Plaintiffs allege that Allergan's market behavior itself evidences the purported price-fixing conspiracy, asserting that: (1) "[n]ormal market forces cannot explain [Allergan's] astronomical hikes" in the pricing of its generic drugs; (2) "it would not be in [Allergan's] unilateral self-interest to increase the prices of its generic drugs *unless it had an agreement with the other drugmakers that they would do the same*"; (3) there was no other explanation "that would justify or otherwise explain the dramatic and concerted price increases for these drugs and Allergan's competitors' generic drugs during the Class Period"; (4) despite "the dramatic price increases [in generic drugs,] neither Allergan nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby . . . *demonstrating the absence of a competitive market*"; and (5) Allergan's "extraordinary and historic price increases . . . would have been against [its] economic self-interest *absent the existence of a price-fixing scheme*." SAC ¶¶ 6, 8, 124, 138, 157, 170, 243–45 (emphases added).

According to the Complaint, these facts would have been evident to the market as early as February 2013 (when the purported price increases began, *see supra* n.3), and certainly by October 2014 at the latest, when Allergan became the subject of a widely-publicized congressional investigation into generic drug price increases. SAC ¶¶ 12, 180. Therefore, according to the Complaint, many investors would have concluded by October 2014 that Allergan was engaged in anti-competitive behavior because "normal market forces" could not explain Allergan's conduct.

*Second,* on August 6, 2015, Allergan announced to the public, through the First Alleged Corrective Disclosure, that Allergan had received a subpoena from the DOJ.  SAC ¶ 234; Ex. 7 at 64.  Plaintiffs allege that "[t]he fact that the DOJ sent [this] subpoena to Allergan *after* sending subpoenas to certain of its competitors ***strongly suggests*** that evidence learned in those other investigations led the DOJ to believe that Allergan was also participating in a price-fixing conspiracy."  SAC ¶¶ 16, 183 (emphasis added).  According to Plaintiffs, the DOJ's subpoena signaled to the public that the DOJ believed Allergan was engaged in price-fixing.  *Id.* Consequently, if accepted as true, certain investors would have concluded that Allergan was participating in a conspiracy at that point, and before they purchased Allergan stock.  *Id.*  Indeed, Union's representative testified that ██████████████████████████████████████ ██████████████████.  Riechwald Tr. 115:9–16, 126:5-11.[9]

*Third,* multiple media sources reported that the DOJ's investigation was expected to lead to criminal liability.  *See, e.g.*, Kleidon ¶ 42 (discussing June 26, 2015 news report that "[t]he belief inside the DoJ is that [the generic drug antitrust] investigation could become the next auto parts investigation . . . [with] plea deals from dozens of companies and executives involved in a multitude of different conspiracies"); *id.* ¶ 63 (discussing August 6, 2015 article linking Allergan DOJ Subpoena to DOJ antitrust criminal probe).  Based on these reports, many investors likely concluded that Allergan was price-fixing well before the Second Alleged Corrective Disclosure.

*Fourth,* any remaining doubt as to whether members of the proposed class believed Allergan was price-fixing during the Class Period is dispelled by the fact that, by March 2016— months before the Second Alleged Corrective Disclosure and the lapse of the Class Period—

---

[9] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

multiple antitrust lawsuits had already been filed against Allergan, including by members of the class or their affiliates, alleging the same underlying price-fixing conduct.[10] It is thus undeniable that many investors formed the belief that Allergan was engaged in price-fixing well before the end of the Class Period.

Taken together, Plaintiffs' allegations and the undisputed facts—the disclosure of the Allergan DOJ Subpoena and the existence of multiple antitrust lawsuits against Allergan—show that many class members "bought or sold the stock" at the existing prices even though they were "aware that the stock's price was tainted by fraud." *Halliburton II*, 573 U.S. at 269. This showing "severs the link between the alleged misrepresentation and . . . [Plaintiffs'] decision to trade at a fair market price," rebutting the *Basic* presumption. *Basic*, 485 U.S. at 248.

The present case is similar to *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ("*In re IPO*"). There, after noting that "a section 10(b) claimant must allege and prove that the claimant traded in ignorance of the fact that the price was affected by the alleged manipulation," the Second Circuit found that plaintiffs' own

> allegations, evidence, and discovery responses demonstrate that the predominance requirement is defeated because common questions of knowledge do not

---

[10] *See* Transfer Order, *In re Generic Pharma. Antitrust Litig.*, No. 16-md-02724 (J.P.M.L. Aug. 5, 2016), ECF No. 1 at Schedule A (transferring ten antitrust lawsuits filed in early 2016 against Allergan, three of which were filed in March 2016, to E.D. Pa. for consolidated proceedings); *see also* Ex. 9 (Complaint, *Int'l Union of Operating Eng'rs Local 30 Benefits Fund v. Lannett Co. et al.*, No. 16-cv-00990 (E.D. Pa. Mar. 2, 2016), ECF No. 1) at ¶ 2 (alleging that Allergan participated in "a broad conspiracy among manufacturers of generic drugs to fix the prices charged for those drugs in recent years" and citing the DOJ subpoenas and June 26, 2015 news report as support); Ex. 10 (Complaint, *NECA-IBEW Welfare Trust Fund v. Allergan plc et al.*, No. 16-cv-01371 (E.D. Pa. Mar. 25, 2016), ECF No. 1) at ¶ 106 (alleging that Allergan "engaged in a continuing agreement [and] conspiracy . . . to artificially raise, fix, maintain, or stabilize the prices of generic including, including . . . doxycycline"); Ex. 11 (Complaint, *Tulsa Firefighters Health and Welfare Trust v. Allergan plc, et al.*, No. 16-cv-01388 (E.D. Pa. Mar. 25, 2016), ECF No. 1) at ¶ 1 (alleging that Allergan participated in a "conspiracy to fix, raise, maintain, and stabilize the prices of certain [generic drugs] and allocate markets and customers for those products").

14

> predominate over individual questions [where] [t]he claim that lack of knowledge
> is common to the class is thoroughly undermined by the Plaintiffs' own
> allegations as to how widespread was knowledge of the alleged scheme.

*Id.* at 43 (further finding that plaintiffs, who alleged there was an "industry-wide understanding" of the allegedly "fraudulent devices" (*id.* at 27) used to inflate the stock price, "were fully aware of the obligation that is alleged to have artificially inflated share prices").[11]

Because numerous class members concluded, before and during the Class Period, that Allergan was engaged in price-fixing before acquiring Allergan stock, Plaintiffs are not entitled to the *Basic* presumption of reliance. The Court, therefore, would need to engage in individualized inquiries to determine whether each class member relied on Allergan's alleged misrepresentations. *Basic*, 485 U.S. at 248. Accordingly, under Rule 23(b), class certification is improper for Plaintiffs' 10(b) and 20(a) claims.

### B. Plaintiffs Cannot Rely On The *Affiliated Ute* Doctrine Of Classwide Reliance

Plaintiffs further contend they are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.,* 406 U.S. 128 (1972). Br. 26. The *Affiliated Ute* presumption provides that "positive proof of reliance is not a prerequisite to recovery" for a claim "involving primarily a failure to disclose." 406 U.S. at 153. However, "no presumption arises in cases of alleged misrepresentations," and a misrepresentation claim "should not be transformed into an omission simply because the defendants failed to disclose that the allegedly misleading fact was untrue," because doing so would "allow the presumption to swallow the reliance requirement."

---

[11] The *In re IPO* plaintiffs alleged that defendants inflated the stock price through fraudulent devices that caused a "broad extent of knowledge of the scheme throughout the community of market participants and watchers." *In re IPO*, 471 F.3d at 44. This is comparable to Plaintiffs' allegations that Allergan's price increases *could only be* evidence of a "price-fixing scheme." *See, e.g.*, SAC ¶¶ 6, 8, 245. In either scenario, many investors would have been aware of the alleged misrepresentation, and "it is this widespread knowledge that would precipitate individual inquiries as to the knowledge of each member of the class." *See In re IPO*, 471 F.3d at 44.

*Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192–93 (3d Cir. 2001).  In other words, the

*Affiliated Ute* presumption "does [*not*] apply to misstatements whose only omission is the truth

that the statement misrepresents."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017).[12]

For cases involving both omissions and misrepresentations, the presumption only applies where

"the offenses can be characterized primarily as omissions."  *See, e.g.*, *Johnston*, 265 F.3d at 193

(finding "primary claim" to be misrepresentation).

The Complaint is based almost entirely on alleged misrepresentations.  Plaintiffs allege at

least 28 specific "false and/or misleading statements" misrepresented the state of competition in

the generic pharmaceutical market and the basis for increases in Allergan's drug prices and/or

revenue.  SAC ¶¶ 195–220, 223–33.  The only omissions, acts of concealment, or failures to

disclose alleged are "that the allegedly misleading fact was untrue."  *Johnston*, 265 F.3d at 193.

Plaintiffs' allegations that Allergan "omitted" to disclose that these representations were false are

insufficient to "transform" Plaintiffs' misrepresentation claims into omission claims.  *See id.*

Allergan's alleged misrepresentations are precisely those "misstatements whose only omission is

the truth that the statement misrepresents" discussed in *Waggoner*, 875 F.3d at 96.[13]  Because

---

[12]  In *Waggoner*, the court found that the purported omission defendant failed to disclose ("that Liquidity Profiling did not apply to a significant portion of the trades conducted") was simply the inverse of the alleged misrepresentation ("that Liquidity Profiling protected [] traders"), and therefore did not trigger the *Affiliated Ute* presumption.  *Id.*; *see also City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 392–93 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) (declining to apply presumption on basis of allegations defendant omitted disclosure of an antitrust price-fixing conspiracy as the source of defendant's revenue growth where plaintiff also alleged that defendant made misrepresentations regarding its "supposedly competitive marketplace" and "reasons for revenue improvements").

[13]  Plaintiffs' cases are inapposite because they involve actual claims for omissions, unlike the present case.  *See Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269–70 (S.D.N.Y. 2014) (applying presumption because defendant's risk disclosures, though not misrepresentations on their own, nevertheless omitted material information) (citing *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 645–46 (S.D.N.Y. 2012)); *Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 475–76 (D. Del. 2014) (applying presumption because disclosures omitted

Plaintiffs' 10(b) claims plainly allege misrepresentations,[14] they are not entitled to rely on the

*Affiliated Ute* presumption to establish reliance and predominance under Rule 23(b)(3).[15]

### C. If Certified, Any Section 10(b) And 20(a) Class Should Be Limited To The First Alleged Corrective Disclosure

Although the Court should deny Plaintiffs' motion, to the extent the Court is inclined to

certify a class for Plaintiffs' 10(b) and 20(a) claims, the Class Period should end with the First

Alleged Corrective Disclosure. This is because the Second Alleged Corrective Disclosure:

(1) disclosed no new, value-relevant information to the market with regards to Allergan, and (2)

had no statistically significant price impact on Allergan's common and preferred stock. Either

showing is sufficient to rebut the *Basic* presumption of reliance as to the Second Alleged

Corrective Disclosure. *See Halliburton II*, 573 U.S. at 281 (finding defendant event study

demonstrating lack of price impact would constitute evidence rebutting the *Basic* presumption);

*Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 271–73 (N.D. Tex. 2015)

("*Halliburton III*") (finding *Basic* presumption rebutted where defendant demonstrated that

---

certain transactions). Here, in contrast, Plaintiffs allege that Allergan's statements were "standing alone, false," *Dodona I*, 847 F. Supp 2d. at 646, because Allergan's statements misrepresented, *e.g.*, the true cause of price increases on the generic drug market.

[14] Regardless of the Court's determination as to whether Plaintiffs' claims regarding Allergan's financial statements, SAC ¶¶ 221–22, are for misrepresentations or omissions, it is beyond reasonable dispute that Plaintiffs' 10(b) claims are primarily for misrepresentations. *See, e.g.*, *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940–41 (9th Cir. 2009) (affirming refusal to apply *Affiliated Ute* because "[this] was not primarily an omissions case"); *Skeway*, 304 F.R.D. at 475–76 (district court must determine "whether the offenses can be characterized *primarily* as omissions or misrepresentations") (citations and quotation marks omitted) (emphasis added).

[15] Moreover, "[the] *Affiliated Ute* presumption is rebutted if a defendant proves by a preponderance of the evidence that the plaintiff did not rely on the omission [at issue] in making his investment decision." *Waggoner*, 875 F.3d at 102 (citation and quotation marks omitted); *see also Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007). As discussed *supra* in Section I.A, numerous class members did not rely on any omission by Allergan, since they already believed Allergan was price-fixing before acquiring Allergan stock.

alleged corrective disclosure did not disclose new information and had no statistically significant price impact).

As there is no reliance on the Second Alleged Corrective Disclosure, the Class Period should end on or before the First Alleged Corrective Disclosure. *See In re Intuitive Surgical Sec. Litig.*, No. 5:13-cv-01920, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016) (finding that class certification should extend through the latest corrective disclosure with an established price impact).[16]

### 1. The *Basic* presumption is rebutted because the Second Alleged Corrective Disclosure did not provide new, value-relevant information to the market

Defendants can rebut the *Basic* presumption by showing that a corrective disclosure did not provide new, value-relevant information to the market. "Whether a misrepresentation was reflected in the market price at the time of the transaction—whether it had price impact—'is *Basic*'s fundamental premise.'" *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) (quoting *Halliburton II*, 573 U.S. at 283). If a plaintiff buys or sells stock after a misrepresentation is correctively disclosed, then that plaintiff does not act in reliance on the misrepresentation or the stock's "fraud-tainted price", and there is no price impact. *See Halliburton II*, 573 U.S. at 278. Accordingly, the *Basic* presumption can be

---

[16] *See also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-01582, 2019 WL 5287980, at *40 & n.262 (S.D.N.Y. Oct. 18, 2018) ("*Chicago Bridge I*"), *adopted by* No. 17-cv-01582, 2020 WL 1329354 (S.D.N.Y. March 23, 2020) ("*Chicago Bridge II*") ("'[C]ourts are required to cut off the class period on the date of a statement or event that cures the market,'" which is "typically . . . the date of the last corrective disclosure") (quoting *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 48 (S.D.N.Y. 2018)).

rebutted by showing that information contained in an allegedly corrective disclosure is not new—that is, it had already been disclosed to the market.[17]

Lack of "new" information in an alleged corrective disclosure can be established through expert testimony. *See Ark. Teachers Ret. Sys.*, 879 F.3d at 485–86 (remanding where district court did not consider defendant's expert evidence that information in purported corrective disclosure had already been disclosed on multiple occasions); *Halliburton III*, 309 F.R.D. at 272–73 (finding no price impact where plaintiff failed to rebut defendant's expert testimony that alleged corrective disclosure did not "disclose[] any information related to its asbestos liability that was not already impounded in the market price of the stock [at the time of the alleged corrective disclosure] and therefore, there can be no price reaction"); *Chicago Bridge I*, 2019 WL 5287980, at *39 (finding no price impact for alleged corrective disclosure that disclosed "no new information" based on expert testimony that relevant information was previously disclosed).[18] Courts review the "newness" of a corrective disclosure at the class certification stage. *Ark. Teachers Ret. Sys.*, 879 F.3d at 485–86.

Dr. Kleidon demonstrates that the Second Alleged Corrective Disclosure "provided no new, value-relevant information" to the market concerning Allergan. Kleidon ¶¶ 79, 82–94. The Second Alleged Corrective Disclosure stated that at least ten pharmaceutical companies, "includ[ing] Actavis, which Teva bought from Allergan Plc" had received subpoenas as part of an antitrust investigation. SAC ¶¶ 17, 239. But "it was well known prior to November 3, 2016

---

[17] *See Chicago Bridge I*, 2019 WL 5287980, at *23 ("If a court finds that the alleged corrective disclosure is: [] not new [or] merely speculative . . . then the defendant will have severed the link between the misrepresentation and the stock price.") (citing *Basic*, 485 U.S. at 248).

[18] *See also IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782–83 (8th Cir. 2016) (finding no price impact where experts testified that "economic substance" of alleged misrepresentation and previous disclosure were "virtually the same"). In contrast, courts apply the *Basic* presumption to purported corrective disclosures that "convey[] new, valuation-relevant information." *Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51, 54 (3d Cir. 2019).

that various generic drug manufacturers [including Allergan, with respect to its then generic drug division Actavis] had received DOJ subpoenas" as part of the DOJ's antitrust investigation. Kleidon ¶ 86; *see also* ¶¶ 83–94.[19]  The market was undeniably aware that Allergan was under DOJ investigation for potential antitrust violations by August 6, 2015, at the latest.  Kleidon ¶¶ 83–94.  This statement in the Second Alleged Corrective Disclosure was not new, value-relevant information.  Kleidon ¶¶ 83–94.

The Second Alleged Corrective Disclosure also noted that "the first charges" against unspecified targets in the DOJ's antitrust probe "could emerge by the end of the year."  SAC ¶¶ 17, 239.  But this speculation also did not contain any new information—previous disclosures had already estimated that antitrust liability was possible.[20]  Further, the Second Alleged Corrective Disclosure did not confirm that Allergan had committed antitrust violations or was even viewed as a target for criminal charges.  Kleidon ¶ 90.  The Second Alleged Corrective Disclosure merely repeated past disclosures.  As such, the Second Alleged Corrective Disclosure did not disclose any new information relating to the possibility of liability for Allergan.

---

[19]  Previous disclosures of the DOJ's generic drug pricing investigation include:  (1) statements from several drug manufacturers that they had received subpoenas relating to the DOJ's investigation (Kleidon ¶ 40); (2) media reports analyzing the "broad[] federal investigation into potential Sherman Act violations in the generic pharmaceutical industry" signaled by the subpoenas (*id.* ¶¶ 41–42); (3) the First Alleged Corrective Disclosure, which disclosed Allergan's receipt of a DOJ subpoena relating to "the marketing and pricing of [Allergan's] generic products and communications with competitors about such products," (*id.* ¶ 62); and (4) media reports linking the Allergan DOJ Subpoena to subpoenas received by other generic drugmakers as part of "the government's widening antitrust probe of the industry" (*id.* ¶¶ 63, 93).

[20]  Previous disclosures of possible antitrust and/or criminal liability for participants in the alleged price-fixing conspiracy include:  (1) media reports that the subpoenas signal "potential criminal implications for the companies and individuals involved" in the DOJ's antitrust investigation, and that the DOJ "anticipates uncovering criminal antitrust conduct," (Kleidon ¶ 41); (2) media reports that the DOJ anticipated the antitrust probe would involve "plea deals from dozens of companies and executives involved in a multitude of different conspiracies," (*id.* ¶ 42); and (3) media reports linking Allergan's subpoena to the DOJ's "widening" probe and its concurrent potential for criminal charges (*id.* ¶¶ 63, 93).

Plaintiffs claim the Second Alleged Corrective Disclosure disclosed "that U.S. prosecutors *might* file criminal charges against Allergan," SAC ¶¶ 17, 239, but the article actually states that "charges could emerge by the end of the year," with *no target specified*. Ex. 12 at 1. That Allergan "might" or "could" face antitrust liability is not a new disclosure. It was already public knowledge that Allergan was involved in the DOJ's antitrust investigation (Kleidon ¶¶ 60–63, 93), and certainly the market was aware that any recipient of a DOJ subpoena concerning antitrust violations *could* face liability.

Further, a disclosure that an unspecified target *could* face liability is mere speculation. Such vague, speculative public statements providing no new information are insufficient to constitute a corrective disclosure.[21] As the Second Alleged Corrective Disclosure provided no new information (and what information it did provide was vague and speculative), it could not have had any price impact, and the *Basic* presumption is rebutted as to that disclosure.

To the extent Plaintiffs argue that the Second Alleged Corrective Disclosure indicated that the DOJ's antitrust investigation was continuing as of November 2016, such information (even if "new") was not relevant to *Allergan's* valuation, because Teva's acquisition of the Actavis generic drug division meant that potential antitrust liabilities related to Actavis had transferred from Allergan to Teva on August 2, 2016, when the Teva transaction closed. Kleidon ¶¶ 95–104. This was made clear to the market in disclosures on November 3–4, 2016, which reported Allergan was not responsible for Actavis' liability relating to the antitrust investigation. *Id.* As such, even if the Second Alleged Corrective Disclosure could be argued to disclose new

---

[21] *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (finding alleged disclosure was not corrective where it "added nothing to the public's knowledge"); *Chicago Bridge I*, 2019 WL 5287980, at *23 (any link between alleged corrective disclosure and stock price is severed where disclosure is "merely speculative"); *see also Chicago Bridge II*, 2020 WL 1329354, at *8 (disclosures were corrective where they disclosed "specific" and "new" information).

information, it did not disclose any new information that was value-relevant to Allergan. *Id.* ¶¶ 79, 82–94.

### 2. The *Basic* presumption is rebutted because the Second Alleged Corrective Disclosure did not have a statistically significant price impact

The *Basic* presumption also does not apply to the Second Alleged Corrective Disclosure because it did not have a statistically significant price impact. *Halliburton II*, 573 U.S. at 281 (holding the *Basic* presumption is rebuttable by showing that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock," *i.e.*, "that the misrepresentation had no 'price impact.'"). Without "price impact," the *Basic* presumption of reliance collapses because "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* (quoting *Basic*, 485 U.S. at 248).

Event studies demonstrate a lack of price impact where they establish that an alleged corrective disclosure did not have a statistically significant price impact. *Halliburton III*, 309 F.R.D. at 271 ("Accordingly, neither [defendant's expert] Coffman's, nor [plaintiff's expert] Allen's, analysis shows price impact on June 28, 2001, and Defendants have rebutted the *Basic* presumption as to the corrective disclosure on that date."). As such, the *Basic* presumption is rebutted by showing, through expert analysis and testimony, that an alleged corrective disclosure did not have a statistically significant price impact. [22] *See id.* at 269–80 (finding lack of price impact as to all but one of the disputed misrepresentations or corrective disclosures where

---

[22] Courts analyze the presence or absence of statistically significant stock price changes "with respect to corrective disclosure dates, as opposed to the misrepresentations alleged, because this method more accurately captures the impact, if any, of a material misrepresentation or omission." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *13.

defense expert's event study found no statistically significant price reaction following the alleged events).[23]

In securities class actions, statistical significance is generally defined as a 95% confidence interval. *Halliburton III*, 309 F.R.D. at 262 (citing Merritt B. Fox, *Halliburton II: It All Depends on What Defendants Need to Show to Establish No Impact on Price*, 70 Bus. Law. 437, 442, n.17 (2015)); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15 (rejecting Mr. Coffman's attempt to define statistical significance at a 90% confidence level and defining statistical significance as a "95% confidence level").[24] Plaintiffs' expert, Mr. Coffman, acknowledges that a 95% confidence interval is "the confidence level that [he] was using for the formal test" to determine whether to reject the null hypothesis that any price movement was random. Coffman Tr. 48:17–49:22.

Plaintiffs argue the Second Alleged Corrective Disclosure caused Allergan's common and preferred stock prices to drop on November 3, 2016 and, consequently, the Class Period should extend to November 2, 2016. SAC ¶¶ 17, 240–41, 268. Notably, however, Plaintiffs' expert, Mr. Coffman, makes no attempt to assess the impact of the November 3, 2016 disclosure

---

[23] *See also In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15–16 (finding lack of price impact for alleged corrective disclosure where neither Mr. Coffman's nor defense expert's event study analyses showed a statistically significant price impact); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (defendants rebutted *Basic* presumption where "to a proper confidence level, Defendants have demonstrated [through their expert's event study analysis] that there is no date on which any alleged misrepresentation caused a statistically significant increase in the price"); *In re Finisar Corp. Secs. Litig.*, No. 11-cv-01252, 2017 WL 6026244, at *6–9 (N.D. Cal. Dec. 5, 2017) (defendants rebutted *Basic* presumption through defense expert event study demonstrating lack of statistically significant price impact); *Chicago Bridge II*, 2020 WL 1329354, at *3 ("[A] defendant can rebut the *Basic* presumption with evidence that the alleged misrepresentation was not associated with 'negative price stock-returns,' *i.e.*, there was no statistically [abnormal] negative, 'back-end' impact on stock following a corrective disclosure.").

[24] *See also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. at 493 n.11 (describing a "95% confidence level" as a "conventional statistical measure" for linking a corrective disclosure and price change).

on the price of Allergan's stocks; doubtless because his analysis would have revealed that the Second Alleged Corrective Disclosure had no meaningful price impact.

Mr. Coffman's report purports to conduct an event study analysis to assess market efficiency (and not the price impact of the two alleged disclosures). However, in analyzing market efficiency, Mr. Coffman necessarily assesses the price impact of Allergan announcements and disclosures on various dates. Mr. Coffman's report provides the event study methodology, data sources, and regression formulas that he uses to conduct his market efficiency analysis, thereby allowing Dr. Kleidon to use Mr. Coffman's own methodology and data sources to assess the price impact of the Second Alleged Corrective Disclosure. *See, e.g.*, Kleidon ¶¶ 54, 115. Using an event study analysis to compare the residual return of Allergan's securities against market and industry peers, Dr. Kleidon found that the Second Alleged Corrective Disclosure did not have a statistically significant price impact on Allergan's stock, as discussed below. *Id.*

**The Second Alleged Corrective Disclosure did not have a statistically significant price impact on November 3, 2016.** Plaintiffs compare closing prices on November 2 and November 3, 2016 and allege that the Second Alleged Corrective Disclosure caused drops in Allergan's common and preferred stock prices of $9.07 and $30.03, respectively, "[o]n this news." SAC ¶ 17. However, "this assertion is demonstrably false." Kleidon ¶¶ 121–22. The Second Alleged Corrective Disclosure was published at 2:10 PM ET, over four-and-a-half hours after trading opened, which Plaintiffs neglect to mention. *Id.* Approximately *half* of the common and preferred stock price declines took place *prior* to the publication of the Second Alleged Corrective Disclosure. *Id.* Obviously, any stock price decline prior to a disclosure's release is irrelevant to an analysis of the price impact of that disclosure. *Id.* ¶ 123. Mr. Coffman agrees:

24

when analyzing a similar scenario, he opined that the "proper 'event window' to analyze . . . should run from *just before the release of the news* at 3:55pm . . . rather than incorporating almost a full day before the event occurs." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (emphasis added) (quotation marks omitted).

Therefore, for his price impact assessment, Dr. Kleidon analyzed the impact of the Second Alleged Corrective Disclosure from the time of its publication until the close of trading on November 3, 2016, and found no statistically significant price impact based on a 95% confidence interval, meaning any residual returns on the prices of Allergan's securities were not statistically distinguishable from zero (or, in other words, any price changes were indistinguishable from random movement). Kleidon ¶¶ 124–27. Even accepting Plaintiffs' false premise, Dr. Kleidon also demonstrates that the Second Alleged Corrective Disclosure had no statistically significant price impact from bell-to-bell on November 3, 2016. *Id.* ¶¶ 111–20, 127.[25]

**The Second Alleged Corrective Disclosure did not have a statistically significant price impact from November 3–4, 2016.** Dr. Kleidon also assessed the price impact of the Second Alleged Corrective Disclosure using a two-day window—November 3 through November 4, 2016. Dr. Kleidon selected this event window because, to the extent the Second Alleged Corrective Disclosure reported new information, the relevance of this information to the value of

---

[25] Dr. Kleidon found the Second Alleged Corrective Disclosure had no statistically significant price impact from 2:10 PM ET through close of trading November 3, 2016, or from bell-to-bell on November 3, on Allergan's common and preferred stock using Mr. Coffman's event study model and industry index. *Id.* ¶¶ 115–120, 141–42, 146–47. In particular, using Mr. Coffman's event study model, Dr. Kleidon found the price change for Allergan's common stock on November 3, 2016 was *positive* (implying there is no statistical evidence whatsoever the Second Alleged Corrective Disclosure caused Allergan's common stock price to decline), and for Allergan's preferred stock the price change was only significant using a 26% confidence interval, implying a 74% chance the price movement was purely random. Kleidon, Ex. 5.

Allergan's securities could not be determined until additional information was disclosed beginning at 5:43 PM ET on November 3, 2016, *after* the market had closed. *Id.* ¶¶ 68–75, 105–110, 129.

Specifically, these disclosures reported that Allergan's generic pharmaceutical liabilities, including any liabilities related to Actavis' potential antitrust violations, were transferred to Teva during Teva's 2016 acquisition of Allergan's generic drugs division. *Id.* ¶ 71 (discussing an after-market November 3, 2016 Bloomberg article disclosing that "Allergan *doesn't have a liability* from potential DoJ charges against generic manufacturers on pricing . . .") (emphasis added); *see also id.* ¶¶ 68–75 (discussing additional news articles and analyst reports published on or after November 3, 2016 reiterating that "any liability related to the investigation was transferred to TEVA with the sale of the Actavis Generics business" and that "Allergan [] avoids the generic market industry issues after the recent sale of its generics unit to Teva."). As such, these disclosures clarified that any potential Actavis antitrust liability would not affect Allergan's value. *Id.* ¶¶ 98–104. Therefore, these additional disclosures allowed investors to assess and determine that the news of the DOJ's continued investigation into Actavis was irrelevant to the value of Allergan's securities. *Id.*[26]

Because these disclosures were not made until *after* the close of trading on November 3, 2016, this information would not be incorporated into Allergan's stock prices until November 4, 2016. *Id.* ¶¶ 105–110. Therefore, a price impact assessment of the Second Alleged Corrective Disclosure should analyze the two-day return on November 3–4, 2016, as opposed to simply assessing a one-day return that ignores information clarifying the relevance of the Second

---

[26] To the extent there was any initial price reaction to the Second Alleged Corrective Disclosure, these additional disclosures signaled to investors that such a reaction was unwarranted. *Id.* ¶¶ 98–104.

Alleged Corrective Disclosure to Allergan. *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3rd Cir. 2011) (finding that efficient market can take two days to incorporate information, depending on circumstances), *abrogated on other grounds by Amgen*, 568 U.S. 455.[27]

Dr. Kleidon's two-day event study analysis demonstrates that the price impact of the Second Alleged Corrective Disclosure on Allergan's stock was not statistically significant, again based on a 95% confidence interval, meaning "[f]or both Allergan's common and preferred stock, none of the residual returns on November 3–4, 2016 are statistically distinguishable from zero using the Coffman Report event study or any other model [Dr. Kleidon] examined."[28] Kleidon ¶ 130; *see also id.* ¶¶ 128–40, 143–45, 148. Dr. Kleidon's conclusions are equally applicable if the price impact of the Second Alleged Corrective Disclosure is assessed from 2:10 PM ET on November 3, 2016 through the close of trading on November 4, 2016. *Id.* ¶¶ 133 n.103, 142 n.107.

---

[27] *See also In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (using a three-day window for analysis).

[28] Dr. Kleidon conducted several sensitivity analyses to determine the degree to which his event study analysis establishes price impact. Kleidon ¶¶ 130, 135–40, 144. Mr. Coffman used a generic pharmaceutical industry index as a benchmark in his event study analysis. *Id.* ¶ 135–36. However, that industry index included several generic drug manufacturers referenced in either the Second Alleged Corrective Disclosure or the Complaint. *Id.* To account for the possible argument that those drugmakers were negatively affected by the disclosure and would need to be controlled for to isolate the disclosure's price impact on Allergan stock, Dr. Kleidon developed two alternate analyses for assessing price impact: (1) an "Alternate Peer Index" that removes companies cited in the Second Alleged Corrective Disclosure or Complaint (*id.* ¶ 136) and (2) a "Branded Peer Index" that removes *all* generic drug companies from the industry index (*id.* ¶ 138). The analyses otherwise replicate Mr. Coffman's methodology. *Id.* ¶¶ 80, 130. Dr. Kleidon found no statistically significant price impact for the Second Alleged Corrective Disclosure from November 3–4, 2016 using the Coffman industry index, Alternate Peer Index, or Branded Peer Index. *Id.* ¶¶ 133–40, 143–45. In particular, using Mr. Coffman's event study model, Dr. Kleidon found the price changes for Allergan's common and preferred stock on November 3–4, 2016 were *positive*, implying there is no statistical evidence whatsoever the Second Alleged Corrective Disclosure caused Allergan's common or preferred stock price to decline. Kleidon, Exs. 9, 11.

**II.** **THE COURT SHOULD NOT CERTIFY PLAINTIFFS' SECTION 14(A) CLASSES BECAUSE INDIVIDUAL ISSUES OF TIMELINESS PREDOMINATE**

Individual questions relating to timeliness predominate as to Plaintiffs' 14(a) claims. Based on antitrust complaints filed in 2016, as well as allegations in the Complaint, it is apparent that many class members concluded, over one year prior to filing their 14(a) claims, that Allergan was engaged in price-fixing. Thus, the Court will need to engage in individualized inquiries to determine whether each class member's claim is timely under the statute of limitations. *See, e.g., In re Comm. Bank of N. Va.*, 622 F.3d at 293–94. Accordingly, class certification is improper as to Plaintiffs' 14(a) claims.

The statute of limitations for a 14(a) claim is one year from when the plaintiff discovered, or a plaintiff exercising reasonable diligence would have discovered, the facts essential to the violation. *Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 353–54 (3d Cir. 1993). To discover the facts essential to a violation, the plaintiff need merely have discovered facts sufficient to survive a 12(b)(6) motion to dismiss. *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 275 (3d Cir. 2013). To survive a Rule 12(b) motion to dismiss, a plaintiff must assert a plausible claim and provide sufficient factual allegations to support the claim. *Ascroft v. Iqbal*, 556 U.S. 662, 679 (2009). A 14(a) claim requires a plaintiff to allege that a proxy statement contained a material misrepresentation that caused it injury. *In re Allergan Generic Drug Pricing Secs. Litig.*, No. 16-cv-9449, 2019 WL 3562134, at * 15 (D.N.J. Aug. 6, 2019). Thus, as soon as an investor "discovered" that Allergan was engaged in price-fixing, the basis for the alleged misrepresentations, the 14(a) claim accrued. *See In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 417 (D.N.J. 2005) ("[S]tatute of limitation on Section 14(a) claims begins to run when plaintiffs have any . . . data

that would alert a reasonable person to the probability that misleading statements . . . have been made.").

As such, in determining class certification, the Court must weigh whether individualized questions concerning *whether* and *when* class members concluded that Allergan was engaged in price-fixing will predominate over common issues. Individual limitations issues "invariably weigh[] against class certification under Rule 23(b)(3)." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002) (citation omitted).[29]

Based on the Complaint allegations themselves, many investors likely concluded that Allergan was engaged in price-fixing over a year before filing their 14(a) claims. Plaintiffs first brought their 14(a) claims when they filed the First Amended Complaint on May 1, 2017.[30] According to the Complaint (and as discussed in Section I.A.), market behavior and market information that allegedly had no explanation other than a price-fixing conspiracy was evident *three or four years* before Plaintiffs brought their 14(a) claims. These alleged facts were known by early 2013 or, at the latest, October 2014 (when the congressional investigation into Allergan

---

[29] In *In re Linerboard Antitrust Litig.*, the Third Circuit declined to adopt a "mechanical" rule that treated "individualized statute-of-limitations determinations" as "automatic disqualifier[s]" for class certification. 305 F.3d at 162 (citation omitted). However, there, the court found that common issues pervaded its predominance analysis with regard to defendant's statute of limitations defense because the "critical inquiry" was whether defendant's fraudulent concealment would toll the statute of limitations, "which proof will be common among the class members in each class." *Id.* at 163. In contrast, the predominance analysis with regards to Plaintiffs' timeliness will be entirely individualized because the critical inquiry will be *when* plaintiffs discovered Allergan's alleged price-fixing, which proof will be individual to each member of the proposed class.

[30] The 14(a) claim does not relate back to the original complaint (filed December 22, 2016) because no proxy statements were mentioned in the original complaint. *See Stoll v. Ardizzone*, No. 07-cv-00608, 2007 WL 2982250, at *4 (S.D.N.Y. Oct. 9, 2007) (14(a) claim in amended complaint did not relate back to original complaint despite same SEC filings being subject of both complaints).

was launched).  Thus, certain investors would have discovered (and could have plausibly claimed) that Allergan was engaged in price-fixing by October 2014 at the latest.

Also, the First Alleged Corrective Disclosure, which reported that Allergan had been subpoenaed by the DOJ, was disclosed on August 6, 2015, *over a year and a half* before Plaintiffs filed their 14(a) claim.  SAC ¶ 15.  As discussed in Section I.A., the Allergan DOJ Subpoena "strongly suggest[ed]" to the public that Allergan was "participating in a price-fixing conspiracy," which would have led at least some class members to reach the same conclusion as of August 6, 2015.

Finally, as previously discussed, the filing of multiple antitrust lawsuits against Allergan by March 2016 demonstrates that numerous investors believed and in fact alleged, that Allergan was engaged in price-fixing, more than one year prior to the filing of Plaintiffs' 14(a) claims.  Therefore, individualized questions relating to *when each* class member discovered the facts essential to the 14(a) claim will be a critical inquiry when evaluating Allergan's 14(a) statute of limitations defense.

Because the critical inquiry for Allergan's 14(a) statute of limitations defense is individualized, Plaintiffs' proposed 14(a) classes do not satisfy the predominance requirement of Rule 23(b)(3), and the Court should decline to certify it. [31]

---

[31]  This Court's prior ruling, which rejected Defendants' statute of limitations arguments regarding Plaintiff's 14(a) claims, does not control at class certification. *See In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *15.  There, the Court concluded that it would be inappropriate to dismiss Plaintiffs' 14(a) claims at the motion to dismiss stage because the timeliness of a claim is a fact-specific inquiry. *Id.*  Here, however, it is precisely the predominance of individual class members' fact-specific claims and Allergan's defenses thereto that defeats class certification. *See In re Comm. Bank of N. Va.*, 622 F.3d at 293–94.  Specifically, although at the motion to dismiss stage the inquiry was focused on when a "reasonable investor" would have discovered the alleged wrongdoing, an objective test, here the inquiry is when each individual investor personally discovered the alleged wrongdoing, a subjective test.  As demonstrated above, numerous investors subjectively determined that

## III. DAMAGES FOR ALL CLASSES ARE NOT SUSCEPTIBLE TO A COMMON METHODOLOGY

The proposed class should also be rejected because Plaintiffs fail to "establish[] that damages are capable of measurement on a classwide basis." *Comcast Corp.*, 569 U.S. at 34. Although Plaintiffs need not provide an "actual calculation . . . at this stage," they must offer more than an expert's "say-so" that a viable model of classwide damages exists. *Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014). Plaintiffs fail to meet this standard.

Mr. Coffman proposes that he would use the "out-of-pocket" method to calculate classwide damages, but admits that he has made no attempt to actually apply this methodology to the facts of this case. *See* Coffman ¶¶ 104–06. For example, Plaintiffs allege increasing amounts of price-fixing as the Class Period progressed. *See, e.g.*, SAC ¶¶ 109, 112, 115, 128, 142, 145, 148, 161. Mr. Coffman admits that this could result in increasing inflation such that the corrective disclosure at the end of the Class Period would not properly measure inflation at the beginning of the Class Period. Coffman Tr. 125:17–126:17 (opining that, if inflation increases over time, "how much inflation there is in the stock price . . . might not be . . . one-for-one correlated with the dollars of revenue generated from the . . .price fixing."). Mr. Coffman asserts that he could use "valuation methodologies" to address this issue, but does not provide any specifics on what tools he would actually use here to do so. Coffman Tr. 126:16–128:14 (explaining that he "do[es]n't know what precisely that methodology [to calculate inflation] would be because it could depend greatly on the facts and circumstances"). Thus, Mr. Coffman's proposed damages methodology, which is only a promise that he could design a

---

Allergan engaged in the alleged wrongdoing more than a year prior to the filing of the Complaint and therefore those investors' claims are untimely, and it would require individualized questions to identify each of those investors.

model, is insufficient to support a finding of predominance. *See In re Conagra Foods, Inc.*, 302 F.R.D. 537, 577–78 (C.D. Cal. 2014) (expert report "describ[ing] the methods [the expert] would use to make the [damages] calculation," but failing to "report that [the expert] has actually employed them" did not satisfy *Comcast*). Mr. Coffman also does not explain how he would avoid the effects of confounding variables on Allergan's stock price. Coffman Tr. 141:24–143:5 (explaining that he has not "considered" or "evaluate[d]" whether any decline in the price of Allergan stock was "really due to the corrective information released on that day [or] due to . . . confounding information that might make that an overestimate of [] the inflation"). *See Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 26 (D.D.C. 2012) (expert's proposed methodology for calculating classwide damages was too vague because it failed to account for "[confounding] factors that may have affected price").

Thus, Mr. Coffman's proffered sketch for calculating damages for the proposed 10(b) and 14(a) classes is insufficient to support a finding of predominance. *Comcast Corp.*, 569 U.S. at 34–35 (plaintiffs failed to satisfy predominance requirement for class certification where damages model did not "establish that damages [were] susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" and, absent such a showing, "[q]uestions of individual damage calculations [would] inevitably overwhelm questions common to the class").[32]

## IV.    PLAINTIFFS ARE NOT ADEQUATE CLASS REPRESENTATIVES

Class certification in a securities fraud case also requires a plaintiff to satisfy the Rule 23(a)(4) prerequisite of adequacy, meaning it will "fairly and adequately protect the interests of

---

[32]    *See also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Corp.*, No. 4:08-cv-0160, 2018 WL 3861840, at *19 (N.D. Oh. Aug. 14, 2018) (rejecting plaintiff's model of classwide damages in 10(b) suit as "general and vague" where expert "describe[d] in his report various techniques he believes he could use to calculate out-of-pocket damages based on inflation," but had not decided "the specifics of exactly which model [he] would use to calculate damages").

the class." *Amgen*, 568 U.S. at 459. Because the PSLRA was "intended to curtail the vice of 'lawyer-driven' litigation," the class representative must "act like a 'real' client, carefully choosing counsel and monitoring counsel's performance." *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Sec., LLC*, 616 F. Supp. 2d 461, 463 (S.D.N.Y. 2009) (citation and quotation marks omitted); *see* 15 U.S.C. § 78u–4(a)(3)(B)(i). Accordingly, "class representative status may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *In re JPMorgan Chase & Co. Shareholder Derivative Litigation*, No. 08-cv-0974, 2008 WL 4298588, at *8 (S.D.N.Y. Sept. 19, 2008) (citation omitted).

Such an outcome is warranted here where Plaintiffs have demonstrated a basic (or utter) lack of knowledge regarding the allegations in this action, underscoring that is it being driven by the attorneys, not the Plaintiffs. [33] "[A] putative class representative is inadequate when the putative representative has demonstrated lack of familiarity with the class-action suit." *Beck v. Status Game Corp.*, No. 89-cv-2923, 1995 WL 422067, at *6 (S.D.N.Y. Jul. 14, 1995) (collecting cases denying class certification). An inquiry into the knowledge of Plaintiffs' representatives is necessary "to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney." *Id* (citation omitted). [34]

---

[33] ██████████████████████████████████████████████████████████████ *See* Grottheim Tr. 45:2–9; Riechwald Tr. 96:15–16, 96:21–97:7 ████████ ██████████████████████████ *See id.*

[34] *See also Kosmos*, 299 F.R.D. at 145 ("[P]laintiffs seeking certification must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation.").

The Lead Plaintiffs have demonstrated that their knowledge falls short of what is required to represent the class. Critically, AP7's representative testified that

. Grottheim Tr. 161:13–162:7, 173:13–22.

Riechwald Tr. 118:17–20; 131:11–14. This alone warrants a finding that Plaintiffs are inadequate class representatives. *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 147–50 (N.D.Tex. 2014) (class certification denied where lead plaintiff had never seen registration statement at issue); *Levine v. Berg*, 79 F.R.D. 95, 97 (S.D.N.Y. 1978) (class certification denied where lead plaintiff demonstrated a "lack of familiarity" with defendant's documents containing alleged misrepresentations).

Worse, AP7's representative

. Grottheim Tr. 232:6–15

This warrants denial of Plaintiffs' motion. *Kosmos*, 299 F.R.D. at 147 (denying class certification where lead plaintiff "did not know what might have caused the price of the purchased stock to decline").

34

Lead Plaintiffs' depositions demonstrate that their "personal knowledge of many of the facts pleaded in the complaint is extremely limited or nonexistent." *Darvin v. Int'l Harvester Co.*, 610 F.Supp. 255, 257 (S.D.N.Y. 1985) (denying class certification).[35] Strikingly, AP7's representative [REDACTED]. Grottheim Tr. 162:8–163:13, 232:4–233:7. Instead, [REDACTED].[36] Thus, "plaintiffs appear to place undue emphasis on their counsel's ability to conduct the litigation." *Greenspan v. Brassler*, 78 F.R.D. 130, 133–34 (S.D.N.Y. 1978) (denying class certification where class representatives were not "aware of certain elements of the complaint"). Lead Plaintiffs' "limited personal knowledge of the facts underlying this suit, as well as their apparently superfluous role in this litigation to date, indicate their inadequacy as class representatives." *Id.* Class certification should be denied given the inadequate knowledge of the purported class representatives.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for class certification.

---

35 That Lead Plaintiffs have had limited participation in this case through various certifications or declarations does not demonstrate adequacy. *See Kosmos*, 299 F.R.D. at 147–50.

36 Grottheim Tr. 153:4–6, 158:20–23, 163:6–9, 164:3–9, 165:3–4, 167:15–19, 170:6–8, 172:14–17, 175:4–8, 176:9–18, 177:17–23, 178:14–20, 179:8–10, 188:11–16, 189:5–9, 192:7–13, 195:4–9, 196:7–8, 201:17–23, 204:17–24, 209:19–21, 212:6–8, 214:23–215:5, 216:7–10, 219:7–10, 230:9–13, 233:4–7. [REDACTED] Riechwald Tr. 161:7–162:5, 170:20–172:25, 173:2–13, 175:14–23, 178:15–22, 182:12–17, 183:21–184:2, 186:25–187:9.

Respectfully submitted,

**REED SMITH LLP**

Dated: October 14, 2020

*s/ Philip W. Danziger*_____
Philip W. Danziger, Esq.
C. Neil Gray, Esq. (admitted *pro hac vice*)
Julia A. Lopez, Esq.
506 Carnegie Center, Suite 300
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Richard Schirtzer, Esq.
(admitted *pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Adam Abensohn, Esq.
(admitted *pro hac vice*)
Sandra Bresnick, Esq.
(*pro hac vice* pending)
Jeffrey Miller, Esq.
(*pro hac vice* pending)
Jesse Bernstein, Esq.
(admitted *pro hac vice*)
Leigha Empson, Esq.
(admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendants*

36