# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| | ) | |
| In re Ocwen Financial Corporation | ) | Case 14-81057 CIV-WPD |
| Securities Litigation | ) | |
| | ) | |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**GREENBERG TRAURIG, P.A.**

Jeffrey Hirsch, Esq.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477
Florida Bar No. 199850
Email: hirschj@GTLAW.com

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

John P. Coffey, Esq.
Jonathan M. Wagner, Esq.
Jason M. Moff, Esq.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: scoffey@kramerlevin.com

*Counsel for Defendants*

Case 0:14-cv-81057-WPD Document 128 Entered on FLSD Docket 10/14/2016 Page 3 of 26
888

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ................................................................1

II. BACKGROUND ................................................................2

III. ARGUMENT ................................................................5

    A.    Plaintiff Bears The Heavy Burden of Satisfying Rule 23 ........................................5

    B.    AP7 Does Not Satisfy Rule 23(a)'s Typicality Requirement ................................6

        1.    AP7 Did Not Own Ocwen Common Stock When The Alleged Corrective Disclosures Were Made. ......................................7

        2.    AP7 Engaged in Short Selling During the Class Period ...............................9

    C.    AP7 Does Not Satisfy Rule 23(a)'s Adequacy Requirement ................................11

    D.    Even Assuming the Other Corrective Disclosures Cited by Plaintiff Are Still Relevant Despite the Law of the Case, Those Disclosures Defeat a Finding of Predominance Under Rule 23(b)(3) and Underscore AP7's Inadequacy as Class Representative ................................12

    E.    Mr. Thren Does Not Satisfy Rule 23(a)'s Adequacy Requirement. ......................14

    F.    The Class Should Not Be Certified on the Independent Basis that No Class-Wide Price Impact Exists ................................17

        1.    Related-Party Transaction Statements ................................18

        2.    Statements Concerning NMS Servicing Standards................................19

IV. CONCLUSION................................................................20

Defendants Ocwen Financial Corporation, William Erbey and Ronald Faris ("Defendants") respectfully submit this memorandum in opposition to Plaintiff's motion for certification under Fed. R. Civ. P. 23(a) & 23(b)(3) of the class of all persons and entities who purchased or otherwise acquired Ocwen common stock from May 2, 2013 through December 19, 2014. For the multiple reasons below, Plaintiff does not satisfy the requirements of Rule 23.

## MEMORANDUM OF LAW

### I. PRELIMINARY STATEMENT

Plaintiff's class certification wrongly presumes that all the claims pleaded in the Third Amended Complaint ("TAC") passed muster under the Court's two dismissal decisions. In fact, only two allegations survived those rulings: (i) Ocwen purportedly misstated that Mr. Erbey recused himself from significant related-party transactions, and (ii) Ocwen supposedly misstated in December 2013 that the Company "services and subservices loans…in compliance with [National Mortgage Settlement ("NMS")] standards as applicable." As a result, the only two corrective disclosures remaining in the action are (i) a December 16, 2014 report by the NMS Monitor finding that Ocwen was in "potential violation" of certain NMS regulations; and (ii) a December 22, 2014 Consent Order between the New York Department of Financial Services ("DFS") and Ocwen stating that Mr. Erbey did not recuse himself from approvals of certain transactions with related parties.

Against this backdrop, and as we show below, Plaintiff has failed to sustain its heavy burden on this motion.

*First*, AP7 is not an adequate representative and is not typical for class action purposes, because (i) AP7 sold its Ocwen stock prior to the only corrective disclosures now at issue in this action, and thus is subject to unique defenses that it cannot demonstrate loss causation or damages, and (ii) AP7 shorted Ocwen stock, betting against its fellow class members and pocketing a $440,000 profit – an action inconsistent with both its supposed reliance on Defendants' alleged misstatements here and the fraud-on-the-market theory underlying Plaintiff's motion for class certification.

*Second*, AP7 erroneously claims that earlier corrective disclosures remain at issue in this action, but even assuming those disclosures were still relevant, they would nonetheless preclude Plaintiff from satisfying the predominance requirement of Rule 23(b)(3). The predominance requirement mandates that common factual and legal issues be capable of

1

determination on a class-wide basis using class-wide proof. Yet the multiple disclosure dates pleaded by Plaintiff atomize the class into numerous sub-classes, each with its own individualized and conflicting state of knowledge of the purported fraud, an essential element of Plaintiff's claims. And by its self-interested effort to identify some sort of corrective disclosure while it still owned Ocwen shares, Plaintiff purposely puts at risk the claims of purchasers late in the proposed class period because, according to AP7's own pleading, those purchasers were on repeated notice of Defendants' supposed fraud yet bought anyway.

*Third,* AP7 tacitly concedes the foregoing disqualifications by seeking to introduce at the eleventh hour an "additional" class representative who was a stranger to this action until a few weeks ago and who is unqualified to serve in that role given his lack of knowledge about or involvement in this action.

*Finally*, even were Plaintiff somehow able to overcome all these hurdles, class certification should be denied because no class-wide price impact exists with respect to the two alleged false statements remaining at issue. *See Halliburton v. Erica P. John Fund*, 134 S. Ct. 2398 (2014) ("*Halliburton II*"). Properly analyzed, and as set forth in the report by Ocwen's expert, Professor Glenn Hubbard, not one of the only statements still at issue had a material impact on the price of Ocwen stock.

## II. <u>BACKGROUND</u>

On August 12, 2014, the first complaint was filed on behalf of a putative class of all investors who acquired Ocwen common stock between May 2, 2013 and August 11, 2014. [D.E. 1]. On October 14, 2014, Plaintiff AP7 filed a motion for appointment as lead plaintiff to represent that putative class. In connection with that motion, Plaintiff filed a certification listing its trades in Ocwen common stock during the alleged class period. [D.E. 19-7]. AP7 did not disclose in that certification, and thus did not inform the Court or competing aspirants for lead plaintiff, that it had bet against its fellow class members during the class period, shorting 60,100 shares of Ocwen common stock in August 2014 and making a $440,000 profit. [*See id.*]. *See also* Ex. I[1] (Dep. Ex. 18); Ex. G (Gröttheim Dep. Tr.) at 84:24-85:2 (describing August 28 transaction as short sale).

---

[1] "Ex. __" refers to exhibits attached to the Declaration of John P. Coffey In Opposition to Plaintiff's Motion for Class Certification, which is being filed today along with this brief.

Unaware of AP7's short, the Court granted AP7's motion for appointment as lead plaintiff on November 7, 2014 [D.E. 42]. On February 6, 2015 Plaintiff filed a Consolidated Amended Complaint ("CAC") on behalf of a putative class of all investors who acquired Ocwen common stock between May 2, 2013 and December 19, 2014 ("Class Period"). [D.E. 60]. Plaintiff attached to the CAC a list of its trades in Ocwen common stock during the Class Period, showing that Plaintiff had sold all its Ocwen stock by November 25, 2014. [D.E. 60-1].

The CAC alleged that Ocwen had made a series of false statements and omissions concerning: (i) the adequacy of Ocwen corporate governance; (ii) the failure of Mr. Erbey, Ocwen's former Executive Chairman, to recuse himself from approvals of transactions with other companies he chaired ("Related Party Transaction Statements"); (iii) the purported noncompliance of Ocwen's mortgage servicing operations with various regulatory requirements; and (iv) the "above-market rates" charged to Ocwen-serviced borrowers. (CAC ¶¶ 200-03). The CAC alleged that the truth concerning Ocwen's purported fraud was revealed over a series of corrective disclosures, including (i) four letters issued by DFS during 2014; (ii) a December 16, 2014 report by the NMS Monitor finding that Ocwen was in "potential violation" of certain NMS settlement requirements during the first two quarters of 2014 concerning the structure of its Internal Review Group and the dating of loan modification letters; and (iii) a December 22, 2014 Consent Order between DFS and Ocwen providing among other things that Ocwen not be permitted to purchase mortgage servicing rights until allowed by a newly-appointed monitor. [*See generally* D.E. 60].

On September 4, 2015, this Court granted Defendants' motion to dismiss the CAC, with leave to replead. [D.E. 70]. In dismissing AP7's pleading, the Court held that none of the alleged misstatements satisfied the falsity requirement of Rule 10b-5. [D.E. 70, at 6-17, 23].[2] As to Ocwen's recusal-related statements, the Court held that the CAC did not identify any related-party transaction from which Mr. Erbey had failed to recuse himself. [*Id.* at 14]. And as to Ocwen's statements concerning NMS and other regulatory compliance, the Court held that those statements were either puffery, mere opinions, or not actionable under *Santa Fe Indus.,*

---

[2] Defendants had submitted with their motion a set of tables listing all the alleged false statements. [DE.64-1, D.E. 64-2 & D.E. 64-3]. The Court referred to those tables in its falsity analysis. [D.E. 70 at 7]. A copy of those tables (the "First MTD Tables") is attached as Exhibit A.

*Inc. v. Green*, 430 U.S. 462 (1977). [D.E. 70 at 7-12, 15]. The Court also held that the CAC failed to allege scienter. [*Id.* at 17-23].

The Court's September 4 ruling also addressed and rejected the CAC's allegations concerning matters referenced in the DFS Letters. Specifically, the Court held that (i) the allegations in a February 26, 2014 DFS letter concerning overlapping employees at Ocwen and Altisource, another company chaired by Mr. Erbey, were not actionable because "one overlapping officer, even with additional managers," did not "render the statements about the companies' independence from one another false or materially misleading" [D.E. 70 at 14-15]; (ii) the allegations in an April 21, 2014 DFS letter concerning Altisource subsidiary Hubzu's "differential in rates" were not actionable in light of disclosures contained in publicly disclosed materials concerning those rate differentials [*id.* at 13]; (iii) the allegations in an August 4, 2014 DFS letter concerning Mr. Erbey's failure to recuse himself from certain transactions were not untrue because the transaction described in that letter was not a related-party transaction [*id.* at 14]; and (iv) the allegations in an October 21, 2014 DFS letter concerning "backdating" did not satisfy 10b-5's scienter requirement [*id.* at 20].

On September 25, 2015, Plaintiff filed a Consolidated Second Amended Class Action Complaint. [D.E. 71]. Shortly thereafter and with Defendants' consent, AP7 filed the TAC. [D.E. 74]. The TAC re-pleaded—with one lone addition—the same purported statements and omissions that the Court had previously held did not satisfy 10b-5's falsity requirement. [*See* 78-2]. As set forth in the charts submitted along with Defendants' Motion (Ex. B (the "Second MTD Tables")), the only new Ocwen statement, pleaded in TAC ¶ 77(d), was made on December 3, 2013 and stated in part that "Ocwen services and subservices loans . . . in compliance with [OCC Consent Orders and NMS] standards as applicable." [*See* Second MTD Tables (Ex. B), at 3]. The TAC also re-pleaded the same supposed corrective disclosures, including (i) the four DFS letters that the Court had previously ruled out-of-bounds, (ii) the NMS Monitor's December 16, 2014 report, and (iii) the December 22, 2014 DFS Consent Order. [*Compare* First MTD Tables (Ex. A) at D.E. 64-1 at 7, *and* D.E. 64-2 at 8, *with* Second MTD Tables (Ex. B)].[3]

---

[3] The Second MTD Tables contained a column cross-referencing where the various alleged misstatements in the TAC had appeared in the CAC. The only new statement alleged in the TAC was the December 3, 2013 statement concerning regarding NMS servicing. [Ex. B., at 3].

4

On December 22, 2015 the Court granted Defendants' motion to dismiss the TAC with the sole exception of claims addressed to two Ocwen statements. At the outset of its December 22 Order, the Court held that "[t]o the extent it is not contravened by [the December 22 Order], the Court incorporates the [September 4] Dismissal Order as applicable." [D.E. 81, at 2]. In its analysis of the falsity and scienter elements, the Court referred back to its prior dismissal rulings [*see* D.E. 81, at 5 & 7], and then addressed what the Court considered to be allegations in the TAC as to which a different conclusion was warranted. First, the Court found that the TAC's sole new statement, concerning compliance with NMS servicing standards, met 10b-5's pleading requirement for falsity at the motion-to-dismiss stage. [D.E. 81, at 6]. Second, the Court held on the pleadings that the Related Party Transaction Statements satisfied the 10b-5 falsity requirement. (*Id.* at 6-7). The December 22 Order did not contain any other falsity determinations contravening the September 4 Order.

Under these circumstances, only two disclosures pleaded in the TAC could constitute corrective disclosures with respect to the Ocwen statements surviving the Court's rulings on the motions to dismiss: (i) the corrective disclosure concerning Ocwen's compliance with NMS mortgage servicing standards – according to AP7, the NMS Monitor's December 16, 2014 report; and (ii) the corrective disclosure concerning Mr. Erbey's purported non-recusal from certain related-party transactions—the December 22, 2014 DFS Consent Order. The Court did not make any exception from its prior ruling concerning any of the four DFS letters or any of the other alleged corrective disclosures.[4]

## III. ARGUMENT

### A. Plaintiff Bears The Heavy Burden of Satisfying Rule 23

The Supreme Court has "made clear that plaintiffs wishing to proceed through a

---

[4] AP7 repeatedly references compliance "statements"—plural—when as discussed above there is just one alleged misstatement concerning regulatory compliance at issue: Ocwen's statement in December 2013 that the Company services mortgages in compliance with NMS standards. The other statement to which AP7 has from time to time alluded (a May 1, 2014 statement by Mr. Erbey that "we consider our solid balance sheet, [NMS] compliance and long history of success in large servicing transfers . . . to be substantial competitive advantages") was dismissed as "non-actionable puffery" in the September 4 Order [*see* DE 70 at 15 (citing the First MTD Tables at D.E. 64-2 at 8], and this ruling was not contravened by the December 22 Order's holding that "an affirmative misrepresentation that the corporation is in compliance [with NMS standards] is actionable," especially since the December 22 Order reaffirmed that the May 1, 2014 statement was merely "aspirational." [DE 81 at 5-6].

class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 134 S. Ct. at 2412. To satisfy Rule 23, Plaintiff must meet several requirements: (1) the class must be "so numerous that joinder of all members is impracticable" – numerosity; (2) there must be "questions of law or fact common to the class" – commonality; (3) the claims and defenses of the representative parties must be "typical of the claims or defenses for the class" – typicality; and (4) the representative parties must "fairly and adequately protect the interests of the class" – adequacy. Fed R. Civ. P. 23(a). Plaintiff must also demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The burden of proof for each of these criteria rests with the party seeking class certification. "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). Therefore, "[a] district court that has doubts about whether 'the requirements of Rule 23 have been met should refuse certification.'" *Id.* at 1233-34. The district court's determination concerning class certification should be conducted using a "rigorous analysis." *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 534 (S.D. Fla. 2015) (Dimitrouleas, D.J.). Moreover, even assuming that Rule 23 may otherwise be satisfied, securities defendants may defeat class certification "through evidence that the [alleged] misrepresentation did not in fact affect the stock price." *Halliburton II*, 134 S. Ct. at 2414.

Although a failure with respect to even one of these criteria will preclude class certification, Plaintiff has not met its burden of establishing that (i) AP7 satisfies the typicality requirement of Rule 23(a); (ii) AP7 or Mr. Thren satisfies the adequacy requirement of Rule 23(a); (iii) the predominance requirement of Rule 23(b)(3) has been met; and (iv) the alleged misstatements and corrective disclosures had a price impact as required by the Supreme Court's ruling in *Halliburton II*. For all or any one of these reasons, Plaintiff's motion for class certification should be denied.

**B. AP7 Does Not Satisfy Rule 23(a)'s Typicality Requirement**

AP7 has not proven that it is a typical representative under Rule 23(a). Rather,

AP7's interests are squarely at odds with the interests of the other members of the putative class.

To demonstrate typicality, "[a] class representative must possess the same interest and suffer the same injury as the class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009). Proposed class representatives "must show, by a preponderance of the evidence, that its claims are typical of the claims of the class, and that it is 'not subject to any unique defenses which threaten to become the focus of the litigation.'" *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147, *quoting In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009). *See also Kettel v. Phillips*, No. 14-81310-CIV, at 7-8 (S.D. Fla. May 18, 2015) (Dimitrouleas, D.J.) ("The main principle behind typicality is that the plaintiff will advance the interests of the class members by advancing his or her own interests.") (internal citation omitted). Moreover, "[i]t is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class." *In re IMAX*, 272 F.R.D. at 147 (citation omitted).

AP7's motion fails to mention two dispositive facts. *First*, AP7 claims that it is typical because like other members in the putative class, "AP7 suffered a diminution in the value of the Ocwen common shares when news of Defendants' fraud was revealed to the market." [D.E. 112 at 11]. However, AP7 did not suffer any such diminution because AP7 did not own Ocwen common stock at the time of the corrective disclosures in December 2014. Not having suffered any damages itself, AP7's claim cannot be typical of the class members on whose behalf it seeks to recover damages. *Second*, AP7 omits that it shorted Ocwen stock during the Class Period. This bet against Ocwen's share price demonstrates that AP7 believed that Ocwen's stock was overvalued by the market. Since AP7 did not buy Ocwen's shares in reliance on the belief that the market accurately valued Ocwen's stock, the fraud-on-the-market presumption of class-wide reliance is inapplicable to AP7. These two undisputed facts subject AP7 to unique defenses and thus AP7 cannot establish Rule 23(a) typicality.

### 1. AP7 Did Not Own Ocwen Common Stock When The Alleged Corrective Disclosures Were Made

Because AP7 did not own Ocwen common stock at the time of the two corrective disclosures, it cannot establish loss causation or damages, and its claims are not typical. Under Supreme Court precedent, "[i]f the purchaser sells the shares . . . before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Following that precedent, lower courts have held that

proposed class representatives fail to establish typicality when they have sold their stock prior to the corrective disclosures. *See, e.g.*, *In re IMAX*, 272 F.R.D. at 147 (declining to certify a 10b-5 class led by proposed class representative who did not hold defendant's common stock at time of curative disclosure; representative would be "subject to unique defenses" for failure to suffer actual loss); *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 617-22 (S.D.N.Y. 2015) (same).

The only corrective disclosures relevant to AP7's remaining claims were made on December 16, 2014 and December 22, 2014. Yet by November 25, 2014, AP7 had already sold all its Ocwen common stock. (Ex. H). AP7 is thus subject to unique and dispositive defenses, for AP7 cannot prove two critical elements of its claims: loss causation and damages. And although the TAC contained allegations that AP7 suffered losses as a result of the four DFS letters pre-dating the December 2014 disclosures, the Court has twice dismissed allegations connected to these disclosures on the grounds that these disclosures did not reveal that any challenged statement was false.[5]

Because AP7 had sold all its Ocwen common stock before the only alleged

---

[5] The subject matters of the four DFS letters cited in the TAC as corrective disclosures do not concern the principal subject matter of the December 2013 statement that Ocwen serviced mortgages in compliance with NMS standards (and indeed say nothing about NMS). The December 2014 NMS Monitor report principally addressed issues concerning (a) Ocwen's Internal Review Group ("IRG"), which pertained to *enforcement* of the NMS *judgment* and did not speak at all to whether Ocwen was or was not *servicing* in accordance with NMS *standards*, and (b) potential violations regarding letter dating that the NMS Monitor flagged for additional investigation. (*See* Ex. C. (December 16, 2014 NMS Monitor Report) at 21-22) Although the DFS Letters also referenced the alleged "backdating" of loan modification denial letters, the Court has twice dismissed claims predicated on backdating. [D.E. 70 at 20; D.E. 81 at 5-6].

Other corrective disclosures alleged in the TAC are similarly untethered to either the Related Party Transaction Statements or the statement concerning servicing of mortgages in compliance with NMS standards—the only two of Ocwen's statements at issue in this case. For example, the TAC alleges that the DFS announced on February 5, 2014 that DFS was halting Ocwen's purchase of Wells Fargo mortgage servicing rights. However, that statement did not reveal any purported truth concerning related-party transactions or NMS mortgage servicing standards; the announcement did not reference this subject. And the only transaction identified in the August 4, 2014 DFS letter was "a transaction between Ocwen and a third party insurance agent," that the court held was "not a related transaction." [D.E. 70 at 14.] Moreover, the movement in Ocwen stock on that date was not statistically significant (*see* Ex. D at ¶ 43), and AP7 therefore would not be able to prove damages keyed to that day in any event.

corrective disclosures remaining at issue in this action, AP7 is subject to unique defenses concerning loss causation and damages and is therefore not typical under Rule 23(a).

### 2. AP7 Engaged in Short Selling During the Class Period

AP7 falls short of Rule 23(a)'s typicality requirement for another, independent reason; AP7 shorted Ocwen common stock during the Class Period, and thus is subject to unique defenses concerning Section 10(b)'s element of reliance.

AP7 shorted 60,100 shares of Ocwen common stock on August 28, 2014 and did not repurchase those shares to cover the short position until October 29, 2014. (*See* Ex. H; Ex. G at 69:4-10). Since AP7 bet that Ocwen's shares were overvalued during the Class Period, it is not "logical" either to assume that AP7 believed Ocwen's stock price was indicative of its value or to apply the fraud-on-the-market theory underlying the TAC. *Zlotnick*, 836 F.2d at 822-23. AP7's own CEO Richard Gröttheim conceded the point, testifying that "shorting a stock . . . assume[s] that it will decline." (Ex. G at 74:22-23). Plaintiff's expert, Dr. Zachary Nye, gave similar testimony. (*See* Ex. J (Nye Dep. Tr.) at 81:7-11 (agreeing that "if an investor believed a stock is overpriced, the investor will short the stock").)

AP7 seeks to satisfy Rule 23 by claiming that it is entitled to a presumption of class-wide reliance through the fraud-on-the-market theory. [D.E. 112 at 14-17] However, this theory depends on the "presumption, . . . subject to rebuttal . . . that persons who traded [Ocwen's] shares did so in reliance on the integrity of the price set by the market." *Basic v. Levinson*, 485 U.S. 224, 245 (1988). *See also Zlotnick v. TIE Communications*, 836 F.2d 818, 822 (3d Cir. 1988) (fraud-on-the-market theory presumes reasonable reliance and reliance in fact, both "necessary to establish actual reliance"). But AP7's short-transaction demonstrates that AP7 did not rely on the integrity of the price set by the market. Rather, that transaction makes business sense only if AP7 (or rather the investment manager who made the trade on AP7's behalf) believed the market price *overstated* the value of Ocwen's shares. By shorting Ocwen's stock, AP7 has forfeited its entitlement to the fraud-on-the-market presumption of reliance. Thus, AP7 is subject to unique defenses concerning its reliance on the alleged misstatements at issue, and has failed to show that its claims are typical of other putative class members'. *See Zlotnick* 836 F.2d at 822-23 (rejecting short-seller as class representative).[6]

---

[6] A preliminary inquiry into the applicability of the fraud-on-the-market doctrine is appropriate when considering a motion for class certification. *See Falcon*, 457 U.S. at 155, 102 S. Ct. 2364

In line with this reasoning, courts have declined to certify or appoint class representatives who, like AP7, have engaged in short-selling. For example, in *In re Critical Path, Inc. Securities Litigation*, 156 F. Supp. 2d 1102 (N.D. Cal. 2001), the court denied a short seller's class motion, noting that "[i]t is a poor choice to appoint a class representative who engaged in a trading practice premised on the belief the stock would fall." *Id.* at 1109-10 ("[s]hort sales raise the question of whether the seller was actually relying on the market price" and "class is not served by its representative coming under such scrutiny"). And in *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 392 (D.N.J. 1998), the court ruled that a proposed class representative was unsuitable because his short sale "raise[d] questions concerning the ability of [the proposed representative] to benefit from the fraud-on-the-market theory." As the court explained, it is "not reasonable to allow a purchaser to take advantage of a theory premised on the assumption [that] the price of a given security reflected all available information when the purchaser sold the stock short on the belief the price did not reflect all available information." *Id.* at 392. *See also In re Bank One Shareholders Class Actions*, 96 F. Supp. 2d 780, 783-84 (N.D. Ill. 2000) (rejecting hedge fund bid for appointment as lead plaintiff because of trading pattern akin to short selling). Under these authorities, short-sellers have been deemed vulnerable to unique defenses that the class would not otherwise face, including whether the facts demonstrated that the fraud-on-the-market theory was applicable to the short seller and whether the damages of the class representative should be offset on account of unique factors affecting the price of the short sale contracts. *See Weikel*, 183 F.R.D. at 391-92 (factual issues rendered short-seller an atypical and unsuitable representative).[7]

Because AP7 may not avail itself of the fraud-on-the-market theory to establish reliance, certifying a class represented by AP7 would subject the entire class to factual distinctions and mini-trials concerning reliance that are "likely to threaten to become the focus of the litigation." *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (internal quotation marks and citations omitted). This disconnect between AP7 and the class precludes a finding that AP7

("Evaluation of many questions entering into determination of class action is intimately involved with the merits of the claims.").

[7] It is of no moment that AP7 also engaged in long transactions, as courts have declined to certify or appoint representatives who engaged in short sales even when they held long positions during the same relevant period. *See, e.g., Critical Path*, 156 F. Supp. 2d at 1110; *Weikel*, 183 F.R.D. at 393-94.

10

satisfies the Rule 23(a) typicality requirement.

### C.      AP7 Does Not Satisfy Rule 23(a)'s Adequacy Requirement

AP7's trading activity in Ocwen common stock likewise precludes a finding that AP7 has satisfied Rule 23(a)'s adequacy requirement.  A proposed class representative is adequate and a class may be certified only if the class representative "has no interests antagonistic to the interest of the class." *Sanchez-Knutson*, 310 F.R.D. 529 at 540 (Dimitrouleas, D.J.).  When the class members "have opposing interests or when [the class] consists of members who benefit from the same acts alleged to be harmful to other members of the class," the class representative has not defeated the presumption against adequacy.  *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 989 (11th Cir. 2016) (citation omitted).

AP7 is inadequate for class representation purposes for the same reasons that AP7 is atypical.  *Cf. Weikel*, 183 F.R.D. at 389 (noting that typicality and adequacy criteria "tend to merge").  First, AP7 did not hold Ocwen common stock at the time of the two corrective disclosures in December 2014.  The absence of stock ownership at that key juncture subjects AP7 to dispositive defenses – no loss causation and no damages – that are antagonistic to the recovery of putative class members who still held Ocwen shares as of that time.  *Id.* at 389 (plaintiff was inadequate to represent class when it purchased and sold shares prior to corrective disclosure).  Second, AP7 shorted Ocwen stock, an action that severely undermines the class members' interest in employing the fraud-on-the-market theory.  *See Weikel*, 183 F.R.D. at 392 (plaintiff who shorted stock during class period was inadequate to represent class); *Critical Path*, 156 F. Supp. 2d at 1109-10 (plaintiff who shorted stock was unsuitable as class representative).

The case cited by Plaintiff to support a claim of adequacy, *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 U.S. Dist. LEXIS 33637 (S.D. Fla. Mar. 16, 2016) (Pl. Br. 11-12), actually establishes the opposite.  While the court held that proposed class representatives who had sold their shares following an alleged corrective disclosure satisfied the adequacy requirement, *Thorpe*, 2016 U.S. Dist. LEXIS 33637 at *23-24, the court contrasted these representatives with a proposed class representative in an earlier case who was deemed inadequate because she sold her shares *prior* to the alleged corrective disclosures.  *See id.* at *23-24, contrasting *Almonor v. BankAtlantic Bancorp.*, 261 F.R.D. 672, 676-77 (S.D. Fla. 2009) (proposed representative who had sold her stock prior to corrective disclosures was an inadequate class representative).  Even

11

under Plaintiff's own authorities, AP7's trading activity bars a finding of Rule 23(a) adequacy.[8]

**D.**     **Even Assuming the Other Corrective Disclosures Cited by Plaintiff Are Still Relevant Despite the Law of the Case, Those Disclosures Defeat a Finding of Predominance Under Rule 23(b)(3) and Underscore AP7's Inadequacy as Class Representative**

Plaintiff identifies (at D.E. 112 at 6) certain alleged corrective disclosures issued during the period that AP7 held Ocwen common stock—even though the Court already dismissed all allegations relevant to those disclosures, and held that the alleged August 4, 2014 corrective disclosure did not demonstrate that any of the Related Party Transaction Statements was false. Even assuming those alleged corrective disclosures somehow remain relevant, and putting aside AP7's disqualifying short sale, the particular timing of those multiple disclosures would preclude Plaintiff from demonstrating predominance under Rule 23(b)(3), and AP7's attempt to solve its *Dura* problem by conjuring multiple "corrective" disclosures selfishly prejudices late Class Period purchasers by making them vulnerable to a "bought into the fraud" defense. *See In re Initial Public Offerings Sec. Litig.*, 471 F.3d at 43 ("There is no dispute that a section 10(b) claimant 'must allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by the alleged manipulation.'") (citation omitted).

A class action may be certified only when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This standard mandates that the common factual and legal issues be capable of determination "on a class-wide basis using class-wide proof." *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 703-04 (5th Cir. 2012). Plaintiff bears a "demanding" burden of proof to demonstrate predominance. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

Courts have declined to find predominance when, as here, numerous alleged corrective disclosures atomize members into groups and subgroups who possess different levels of knowledge concerning the securities at issue and alleged misconduct of defendants. For

---

[8] As explained in the separately filed Defendants' Motion to Preclude AP7 From Offering Evidence of Ocwen Transactions, AP7, which invests through third-party money managers, refused to contact the manager who executed the August 2014 short, or any of the other managers who transacted in Ocwen securities on AP7's behalf -- notwithstanding (a) Defendants' specific request that AP7's Rule 30(b)(6) deponent be prepared to address those transactions and (b) the contractual obligation of those managers to provide information concerning those transactions had AP7 asked for the information. Granting that motion would provide yet another basis to exclude AP7 as a class representative.

example, in *In re Kosmos Energy Ltd. Securities Litigation*, the court found that plaintiff did not demonstrate predominance because a series of partial disclosures on multiple dates during the class period made it infeasible to adjudicate knowledge of the alleged fraud on a class-wide basis. Each partial disclosure created a "separate opportunit[y] during the putative class period . . . for potential class members to have acquired varying levels of knowledge regarding the [alleged] false and misleading statements." 299 F.R.D. 133, 153-54 (N.D. Tex. 2014) (knowledge element was further fragmented because class members had different due diligence practices and varied levels of sophistication, such that actual knowledge acquired by different members during same time would differ). A similar result was reached in *New Jersey Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160, 170 (S.D.N.Y. 2011), where class members purchased shares at different times and increasing amounts of corrective information became publicly available throughout the putative class period, casting "increasing levels of doubt on whether the" challenged statements were true. On account of that circumstance, the court found predominance lacking. *Id. See also In re Initial Public Offerings Sec. Litig.*, 471 F.3d at 43-44 (no predominance when class members had varying amounts of knowledge concerning alleged fraud).

These authorities squarely apply here. As AP7's CEO Mr. Gröttheim testified, the alleged serial partial corrective disclosures identified in the TAC create at minimum nine different sub-types of investors, each privy to varying degrees of publicly available information supposedly revealing the purported fraud. (*See* Ex. G at 135:23-178:23; Ex. I). In light of the cases cited above, that number of sub-classes renders it impossible to make determinations concerning knowledge on a class-wide basis.

In fact, the trades by the two class representatives show why individual issues would predominate with regard to whether putative class members purchased their Ocwen shares with knowledge of the supposed fraud. Plaintiff's new proposed class representative, Jay Thren, purchased shares on April 4, 2014 after two of the alleged corrective disclosures had taken place, and he held the stock through mid-2015. (*See* Ex. F (Dep. Ex. 2)). By contrast, AP7 purchased some of its Ocwen shares prior to those two disclosures, purchased other shares after those disclosures, shorted the stock between August and October 2014, and sold all its Ocwen shares before the final two corrective disclosures occurred. (*See* Ex. H; *see also* Ex. I & Ex. G at 135:23-178:23 (referencing Exhibit I and describing how putative class member who purchased

13

at the same time as Mr. Thren would have had different degree of knowledge concerning alleged fraud than an investor who purchased when AP7 bought stock)). Accordingly, AP7 and Mr. Thren would have had differing degrees of knowledge of the purported fraud and would not share common proof on the issue of reliance on the alleged misstatements.

This infirmity exponentially multiplies when applied to all other class members across the numerous corrective disclosures. *Cf. Kosmos*, 299 F.R.D. at 153 (finding that number of class members across multiple alleged disclosure dates exacerbates differences among class members and their knowledge of purported fraud). Therefore, even assuming the other corrective disclosures are still at issue, the nature, timing, and multiplicity of those disclosures precludes a finding of predominance across the class that AP7 seeks to represent.

Moreover, AP7's insistence, albeit mistaken, that multiple partial corrective disclosures remain relevant in this case underscores AP7's inadequacy as a class representative. By including these numerous disclosures and thus creating conflicts bearing on predominance issues, AP7 has placed its self-interest in recovery above the recovery interests of the putative class, and especially the putative class members who retained Ocwen's shares through the only corrective disclosures still at issue in this case. Not only has AP7 forged multiple subclasses that render the putative class inappropriate for certification, but AP7 also is increasing the chances that the trier of fact would accept a defense that purchasers of stock later in the Class Period were on notice that Ocwen was engaging in the alleged fraud.

AP7's continuing invocation of multiple disclosure dates demonstrates not only its inability to satisfy Rule 23(b)(3)'s predominance requirement, but also highlights AP7's inadequacy as a class representative. A class representative that, like AP7, seeks to benefit itself by jeopardizing the interests of putative class members falls squarely within the ambit of cases denying class certification on account of a failure to satisfy Rule 23(a)'s adequacy requirement. (*See* page 11 above).

### E. Mr. Thren Does Not Satisfy Rule 23(a)'s Adequacy Requirement

On July 20, 2016, two years after this action was commenced, AP7 notified Defendants for the first time that it intended to offer Jay Thren, who purchased 200 shares of Ocwen common stock on April 4, 2014 and sold in mid-2015, as a new plaintiff and an additional class representative. (Coffey Decl. ¶ 6; Ex. F). Mr. Thren—who made no effort to lead this action at the appropriate time for appointing a lead plaintiff, but rather appeared only

after Defendants discovered information undermining severely AP7's fitness to act as a class representative—is disqualified from serving as class representative on account of his striking lack of knowledge concerning the case and his failure to monitor the litigation properly.

Under Rule 23(a), a proposed class representation is disqualified if he or she "abdicates [his] role and blindly rel[ies] on [his] attorneys to prosecute [his] action." *Monroe v. American International Group, Inc.*, No. 04-61621-CIV, at 11 (S.D. Fla. Aug. 9, 2006) (Dimitrouleas, D.J.), *citing Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987). Denial of class certification is appropriate when the class representative has little knowledge of the facts and little involvement in the class action. *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532-38. The Court should appoint a class representative only if doing so is likely to ensure that he or she is able to advocate vigorously to protect the due process rights of the absent class members and protect the interests of the class against the possibly competing interests of the attorneys. *Kirkpatrick*, 827 F.2d 718, 727 (11th Cir. 1987) (citing cases and noting that class representative shall not abdicate conduct of case to his attorneys).

Courts consider several factors in determining whether a proposed class representative's supervision and knowledge of the case satisfies Rule 23(a)'s adequacy requirement, including whether the class representative (i) has adequately supervised or monitored the action, *see, e.g., Shiring v. Tier Tech., Inc.*, 244 F.R.D. 307, 316-17 (E.D. Va. 2007) (rejecting as inadequate class representative who had not monitored action and had generally abdicated supervisory role); (ii) has been involved in settlement considerations, *see, e.g., A Aventura Chiropractic Care Center, Inc. v. BB Franchising LLC*, 2015 WL 11051056, at *3 (S.D. Fla. 2015) (rejecting as inadequate class representative who had reserved decision-making to attorneys regarding appropriate settlement amount); (iii) is knowledgeable concerning the facts of the case, *see, e.g., Ogden*, 225 F.R.D. at 532-38 (rejecting as inadequate class representative who had little understanding of the facts of the case); and (iv) knows anything about the case beyond what counsel had communicated, *see, e.g., id.* at 532-38 (rejecting as inadequate class representative who had no outside knowledge of case beyond what she learned from counsel).

Mr. Thren fails at every level. *First*, Mr. Thren has barely if at all supervised or monitored this action. For example, Mr. Thren:

- received the TAC for the first time in July 2016 (Ex. E (Thren Dep. Tr.) at 14:18-

15

22) and "basically glanced over" it at that time (*id.* 15:2-9);

- has done nothing to check whether the factual allegations in the TAC are accurate (*id.* 16:2-5);

- does not recall whether he received a copy of the class certification motion papers before they were filed (*id.*18:6-8);

- is not even sure what a class certification motion is (*id.* 32:24-36:13);

- has not read the Court's September 4, 2015 decision dismissing this the CAC (*id.* 56:15-24);

- has made no effort to ascertain what discovery has been sought of Ocwen (*id.* 62:6-9);

- has not seen any individual emails or documents in Ocwen's production (*id.* 62:16-25);

- has never spoken to anyone at AP7 (*id.* 57:23-58:18), even though they are charged with coordinating and monitoring this litigation together; and

- is not aware that some investors have opted out to file their own lawsuits (*id.* 61:5-14).

*Second*, Mr. Thren has not done anything to understand settlement and to date has referred to his attorneys all decision-making concerning settlement. For example, Mr. Thren:

- does not know that the parties had selected a mediator in this action (*id.* 112:24-113:2) [*see* D.E. 99];

- does not know whether a mediation conference has occurred, or whether any demands or offers have been tendered (Ex. E at 113:3-15);

- knows nothing about Defendants' insurance coverage and how that coverage might impact a resolution in this case (*id.* 113:16-19);

- testified that class compensation would be determined "by counsel," and then testified that he was "not sure" whether approval of the class compensation involved anyone other than counsel (*id.* 52:13-53:17); and

- has had no discussions with counsel about their fee (*id.* 48:15-19).

*Third*, Mr. Thren has scant knowledge concerning the allegations in the case. For example, Mr. Thren:

- does not understand mortgage servicing and believes that Ocwen's business concerns mortgage origination (*id.* 76:4-14; 77:14-23);

- does not know what is a "related party transaction" as alleged in this case (*id.* 93:12-16);

- does not understand that the TAC alleges that the related parties are companies Mr. Erbey chaired, but rather thinks that the "related parties" were Ocwen and Messrs. Erbey and Faris (*id.* 93:21-94:4);

16

- knows "nothing" about either HLSS (*id.* 79:19-20); Altisource Residential Corporation (*id.* 80:15-19); or Altisource Asset Management Corporation (*id.* 80:7-8);

- heard of Altisource Portfolio Solutions for the first time a month ago, and does not know what business it conducts (*id.* 78:3-15);

- is not aware of the December 2013 investor conference at which the NMS Compliance Statement and one of the Related Party Transaction Statements were made (*id.* 87:22-88:4);

- has not read any of the SEC filings which contain the other Related Party Transaction Statements (*see id.* 74:20-75:5);

- could not identify the National Mortgage Settlement by name and did not know Ocwen's NMS obligations (*id.* 86:5-7);

- does not know when Ocwen became subject to the NMS (*id.* 86:2-4);

- does not know what the NMS Monitor does (*id.* 86:16-18); and

- does not know which NMS regulations Ocwen allegedly failed to follow (*id.* 27:4-20).

Against this clear-cut record, Mr. Thren's lack of knowledge and involvement are disqualifiers under Rule 23. *Cf. Shiring*, 244 F.R.D. at 316-17 (rejecting as inadequate class representative who could not identify action that inflated stock, could not state how she was harmed, and could not identify role of defendants, and noting that class representatives must know more than that they were involved in "bad business deal"); *A Aventura Chiropractic Care Center, Inc.*, 2015 WL 11051056, at *3 (rejecting as inadequate class representative who, among other things, did not review class complaint or motion for class certification before filing).

**F.      The Class Should Not Be Certified on the Independent Basis that No Class-Wide Price Impact Exists**

Even apart from the defects in Plaintiff's motion described above, the Court should deny class certification on the additional, dispositive ground that the two statements still at issue and the alleged corrective disclosures tied to those two statements did not have a material impact on the price of Ocwen stock.

In *Halliburton II*, the Supreme Court held that "defendants must be afforded an opportunity before class certification" to introduce price impact evidence to "defeat the [fraud-on-the-market] presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." 134 S. Ct. at 2417. If the misrepresentations did not affect the market price, then investors could not have common reliance on the alleged misrepresentations (through those misrepresentations' impact on the company's share price), and

17

individual issues of reliance therefore would predominate. Lack of price impact may be established with testimony, opinions, or an event study from an expert witness that a given disclosure did not cause the stock price to decline. *Halliburton v. Erica P. John Fund, Inc.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) (price impact determination "largely turns on the competing methodologies of the parties' experts;" no price impact as to several corrective disclosures).

As Defendants' expert Dr. Glenn Hubbard demonstrates in his report, neither the Related Party Transaction Statements nor the statement that Ocwen serviced mortgages in compliance with NMS standards had a material impact on the price of Ocwen common stock.

### 1. Related Party Transaction Statements

The Related Party Transaction Statements were purportedly corrected on December 22, 2014 by the DFS Consent Order. But the Order announced a number of other significant developments beyond describing supposed Related Party Transactions, including that (i) Mr. Erbey would resign as chairman of Ocwen and other entities; (ii) Ocwen would not be allowed to purchase any MSRs for a period of time; and (iii) Ocwen would be required to pay a $150 million penalty. [*See* D.E. 74-2]. As Dr. Hubbard explains, those developments were more likely to have had an impact on the price of Ocwen common stock price that day than any disclosure in the Consent Order concerning recusal. (*See* Ex. D (Hubbard Rep.) at ¶¶ 44-58). To begin with, analyst commentary following December 22 focused on aspects in the DFS Consent Order other than recusal (*see id.* at ¶¶ 48-57 (citing analyst reports addressing issues other than recusal)). Notably, Plaintiff's expert agreed that analysts are critical conduits for determining what information disclosed by a company is important and what information will be assimilated into the market. (*See* Ex. J at 99:24-100:23). The lack of analyst commentary concerning Mr. Erbey's alleged non-recusals confirms that the DFS disclosure did not have a price impact on December 22, 2014. *See also Halliburton*, 309 F.R.D. at 275 (absence of analyst coverage on particular issue is indicative of lack of corresponding price impact).

In addition, and as Dr. Hubbard also explains, even were the August 4, 2014 alleged corrective disclosure relevant here, that statement only serves to demonstrate that the Related Party Transaction Statements could not have had an impact on the price of Ocwen stock on December 22, 2014. That is because information concerning Mr. Erbey's purported non-recusals had already been announced to the public, and prominently so in the DFS Letter of August 4, 2014, to no statistically significant effect. "Disclosure of information known to the

18

market, confirmatory information, will not cause a change in the stock price" – and cannot constitute a corrective disclosure – "because that information already has been assimilated by the market and incorporated into the stock price." *Sapssov v. Health Management Associates, Inc.*, 608 Fed. Appx. 855, 862 (11th Cir. 2015). Here, DFS on August 4, 2014 announced to the market "a growing body of evidence that Mr. Erbey has approved a number of transactions with related companies." [*See* D.E. 74 at ¶¶ 115-17] Yet as set forth in Dr. Hubbard's report, despite the disclosure that Mr. Erbey had not been recusing himself, Ocwen's stock price did not show a statistically significant drop on that date. (Ex. D. at ¶¶ 43, 47).

While Plaintiff's expert may claim that Ocwen's stock movement on August 4, 2014 was statistically significant, [*see* D.E. 112-10 at Exhibit 11A], his regression analysis and event study are flawed to the core. To establish statistical significance, Dr. Nye compared Ocwen's stock price movements to a cherry-picked index of companies, most of which had no connection to Ocwen's business. Ocwen is a mortgage servicer. Yet Dr. Nye strained to include in his industry index companies whose businesses were far removed from Ocwen's: container leasing, ATM operations, aircraft leasing and even payment services in Russia. [*See* D.E. 112-10 at Exhibit 11C; Explanation of Company Industries]. These companies bear no relevance to Ocwen and are not appropriate markers for assessing whether Ocwen's stock moved materially on a particular date. (*See* Ex. D at ¶¶ 91-97).

Dr. Nye's own work in a prior case underscores the flaws in his customized Ocwen index. In *Thorpe v. Walter Inv. Mgmt.*, No. 1:14-cv-20880-UU (S.D. Fla. 2015), another securities class action brought against a non-bank mortgage servicer like Ocwen, Dr. Nye used an industry index consisting of five companies that were participants in or closely related to the non-bank mortgage servicing business. (*See* Nye Report in *Walter Inv.*, No. 1:14-cv-20880-UU, D.E. 114-2 at ¶ 79 n.116). Dr. Nye sharply departed from that approach here, using a very different industry index. By contrast. Dr. Hubbard's event study used an industry index composed exclusively of mortgage servicers. *Cf. Halliburton*, 309 F.R.D. at 267-68 (it is appropriate to construct an "index composed of companies identified by analysts as being . . . peers").

### 2. Statement Concerning NMS Servicing Standards

There likewise was no price impact in connection with the December 2013 statement that Ocwen serviced mortgages in compliance with NMS standards. As Plaintiff's

19

own expert Dr. Nye recognized, the principal subject of the December 16, 2014 alleged corrective disclosure – composition of the Ocwen Internal Review Group – did not relate to Ocwen's alleged misstatement in December 2013 concerning compliance with mortgage servicing standards. (Ex. J at 114:24-121:2). "To qualify as corrective, the disclosure must share the same subject matter as the prior misstatement." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1312 n.28 (11th Cir. 2011). That standard has not been met here. *See also In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure . . . must at least relate back to the misrepresentation"). And although the December 2014 Monitor Report also referenced back-dating as a potential violation that the Monitor intended to review, the Court has already dismissed all claims addressed to Ocwen statements about that subject. *See*, *supra*, at 4-5.[9]

In short, and under *Halliburton II,* the Court should reject class certification on the independent ground that neither the Related Party Transaction Statements nor the statement concerning mortgage servicing in compliance with NMS standards had an impact on the price of Ocwen common stock: Putative class members are not entitled to a class-wide presumption of reliance through the fraud-on-the-market theory and therefore individual issues of reliance will overwhelm common ones.[10]

## IV. CONCLUSION

The Court should deny Plaintiff's motion.

Dated:    October 11, 2016

---

[9] Significantly, analysts did not take any note of Ocwen's December 2013 statement (*See* Ex. D. at ¶ 68 (citing analyst reports following December 3, 2013, none of which mention Ocwen's NMS compliance)). The NMS Monitor's ultimate conclusion that there was a concern with letter dating was not made public until May 2015, well after the Class Period and thus there is no Class Period corrective disclosure on this issue.

[10] Indeed, Plaintiff alleges that Ocwen's December 2013 Statement was corrected more than a year later by the NMS Monitor's Report dated December 16, 2014. Yet that Report found only "potential violations" during the first two quarters of 2014—*i.e.*, **after** Ocwen's December 2013 Statement and concerning the dating of loan-modification letters and Ocwen's Internal Review Group. The December 2014 Report thus could not constitute a corrective disclosure because a report concerning Ocwen's compliance during the year 2014 could not possibly correct a statement concerning Ocwen's performance in 2013.

GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone:      (954) 765-0500
Facsimile:      (954) 765-1477

*/s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH
Florida Bar No. 199850
Email: hirschj@gtlaw.com

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456

*/s/ John P. Coffey*
John P. Coffey
Jonathan M. Wagner
Jason M. Moff
Email: scoffey@kramerlevin.com
Email: jwagner@kramerlevin.com
Email: jmoff@kramerlevin.com


*Attorneys for Defendants*

21

910

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of October, 2016, I served the foregoing on

all counsel of record identified on the attached Service List **via CM/ECF.**

                *s/ Jeffrey Allan Hirsch*
                JEFFREY ALLAN HIRSCH

# SERVICE LIST

## IN RE OCWEN FINANCIAL CORPORATION SECURITIES LITIGATION
### Case 14-81057 CIV-WPD

***Lead Counsel for Lead Plaintiff AP7 and the Class***
Joshua A. Katz, Esquire
James Sallah, Esquire
Jeffrey Cox, Esquire
SALLAH AST ARITA & COX, LLC
2255 Glades Road, Suite 300E
Boca Raton, Florida 33431
Telephone: 561-989-9080
Facsimile: 561-989-9020
Email: jak@sallahlaw.com
jlc@sallahlaw.com; jds@sallahlaw.com

and

David Kessler, Esquire
Lee Rudy, Esquire
Sharan Nirmul, Esquire, Esquire
Richard A. Russo, Jr. , Esquire
Michelle M. Newcomer, Esquire
Meredith L. Lambert, Esquire
Nathan Hasiuk, Esquire
KESSLER TOPAZ
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056
Email:  dkessler@ktmc.com;
lrudy@ktmc.com; snirmul@ktmc.com;
rrusso@ktmc.com; mnewcomer@ktmc.com;
mlambert@ktmc.com; nhasiuk@ktmc.com

Jennifer L. Joost (admitted *pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: 415-400-3000
Facsimile: 415-400-3001
Email: jjoost@ktmc.com

***Counsel for all Defendants***
Jeffrey Allan Hirsch, Esquire
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Facsimile: 954-765-1477
Email: hirschj@GTLAW.com

John P. Coffey, Esquire
Jonathan M. Wagner, Esquire
Jason M. Moff, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL
LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456
Email: scoffey@kramerlevin.com;
jwagner@kramerlevin.com;
jmoff@kramerlevin.com

***Counsel for Plaintiffs United Union of Roofers Waterproofers & Allied Works Local Union No. 8***

Joseph E. White , III, Esquire
Lester Rene Hooker, Esquire
SAXENA WHITE, P.A.
Boca Center
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone:  561-394-3399
Facsimile: 561-394-3382
Email: jwhite@saxenawhite.com and
lhooker@saxenawhite.com

***Counsel for New Jersey Building Laborers
Pension Fund***
Emily Cornelia Komlossy, Esquire
KOMLOSSY LAW, P.A.
2131 Hollywood Boulevard
Suite 408
Hollywood, FL 33020
Telephone: 954-842-2021
Facsimile: 954-416-6223
Email:  eck@komlossylaw.com

*WDC 373418528v1 023223.010700*