# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE JPMORGAN CHASE & CO. SECURITIES LITIGATION | Master File No. 1:12-cv-03852-GBD Public Version |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**

Richard C. Pepperman, II
(peppermanr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.:  (212) 558-4000
Fax:  (212) 291-9113

Daryl A. Libow
(libowd@sullcrom.com)
Christopher M. Viapiano
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
Tel.:  (202) 956-7500
Fax:  (202) 956-6973

*Counsel for Defendants*

May 18, 2015

# TABLE OF CONTENTS

                                                                                    **Page**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ....................................................................................................6

      A.    Lead Plaintiffs ................................................................................6

      B.    The Allegedly False and Misleading Statements........................6

      C.    The Three Alleged Corrective Disclosures.................................8

      D.    Relevant Procedural History .......................................................8

ARGUMENT ..........................................................................................................9

I.      **PLAINTIFFS FAIL TO SATISFY THEIR EVIDENTIARY BURDEN UNDER RULE 23(B)(3).** ...............................................................10

      A.    Plaintiffs Cannot Invoke a Classwide Presumption of Reliance Because They Have Not Proven That JPMorgan Stock Traded in an Efficient Market. .............................................................................10

            1.    Plaintiffs' Event Study Suffers from Multiple Fatal Flaws. ......................12

            2.    Plaintiffs' Volatility Tests Cannot Demonstrate That JPMorgan Stock Traded in an Efficient Market...........................................16

      B.    Plaintiffs Do Not Offer a Damages Model That Calculates Damages on a Classwide Basis Consistent With Their Theory of Liability. ...............................18

            1.    Plaintiffs Offer No Customized Methodology for Calculating Damages in This Case.........................................19

            2.    Plaintiffs Fail To Show That Declines in JPMorgan's Stock Price Following the Alleged Corrective Disclosures Can Be Used To Calculate Damages Throughout the Proposed Class Periods. ...................20

            3.    Plaintiffs' Proposed Damages Methodology Does Not Account for Changes in the Amount of Alleged Inflation, If Any, Over Time.............25

II.      **PLAINTIFFS FAIL TO SATISFY RULE 23(A)'S REQUIREMENTS OF ADEQUACY AND TYPICALITY.**..................................................27

      A.    ████████████████████████████ ████████████████████████ ████████████..................................................27

B.  ....................................28

III. .........................................................................................................30

**CONCLUSION** .........................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baffa* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*,
222 F.3d 52 (2d Cir. 2000)................................................................................29

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)...........................................................................................2

*Bentley* v. *Verizon Business Global, LLC*,
2010 WL 1223575 (S.D.N.Y. Mar. 31, 2010) ........................................................31

*Brown* v. *China Integrated Energy, Inc.*,
2014 U.S. Dist. LEXIS 117764 (C.D. Cal. Aug. 4, 2014)..........................................13, 14, 15

*Cammer* v. *Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ........................................................................11, 12

*City of Livonia Emps.' Ret. Sys.* v. *Wyeth*,
284 F.R.D. 173 (S.D.N.Y. 2012), ........................................................................5

*Comcast Corp.* v. *Behrend*,
133 S. Ct. 1426 (2013)................................................................................ *passim*

*Dean* v. *China Agritech*,
2012 WL 1835708 (C.D. Cal. May 3, 2012) ...........................................................3, 17

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
131 S. Ct. 2179 (2011)......................................................................................2

*Fort Worth Emps. Ret. Fund* v. *J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ........................................................................19, 25

*GAMCO Investors, Inc.* v. *Vivendi, S.A.*,
917 F. Supp. 2d 246 (S.D.N.Y. 2013)...................................................................28

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990)...............................................................................27

*George* v. *China Auto. Sys., Inc.*,
2013 WL 3357170 (S.D.N.Y. July 3, 2013) ............................................................1, 10, 28

*Griffith* v. *Fordham Fin. Mgmt., Inc.*,
2015 WL 1097327 (S.D.N.Y. Mar. 12, 2015) ..........................................................26

*Hallet* v. *Li & Fung, Ltd.*,
1997 WL 621111 (S.D.N.Y. Oct. 6, 1997)...............................................................28

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ........................................................................1, 2, 10, 19

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) .........................................................9, 10

*In re BP p.l.c. Sec. Litig.*,
2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ............................................... *passim*

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014) ...........................................4, 19, 20

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ...........................................................................11

*In re JPMorgan Chase & Co. Sec. Litig.*,
2014 WL 1297446 (S.D.N.Y. Mar. 31, 2014) ...................................................7, 9

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................................30

*In re Monster Worldwide, Inc. Sec. Litig.*,
251 F.R.D. 132 (S.D.N.Y. 2008) ...........................................................................30

*In re Smart Techs., Inc. S'holder Litig.*,
295 F.R.D. 50 (S.D.N.Y. 2013) .............................................................................28

*Krogman* v. *Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ..........................................................................11

*Maywalt* v. *Parker & Parsley Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995) ..................................................................................29

*Roach* v. *T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ..........................................................................3, 4, 18

*Scott* v. *New York City Dist. Council of Carpenters Pension Plan*,
224 F.R.D. 353 (S.D.N.Y. 2004) .....................................................................29, 30

*Sicav* v. *Wang*,
2015 WL 268855 (S.D.N.Y. Jan. 21, 2015) ........................................................20

*Sykes* v. *Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) .................................................................................9, 18

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008) .........................................................................1, 2, 11

*Turnbow* v. *Life Partners, Inc.*,
   2013 WL 3479884 (N.D. Tex. July 9, 2013) ..........................................................27

*U.S. Info. Sys., Inc.* v. *IBEW Local Union No. 3*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004).....................................................................13

*Wal-Mart Stores, Inc.* v. *Dukes*,
   131 S. Ct. 2541 (2011)...........................................................................................2, 9

*Wang* v. *Hearst Corp.*,
   293 F.R.D. 489 (S.D.N.Y. 2013) ..............................................................................19

*Warth* v. *Seldin*,
   422 U.S. 490 (1975)....................................................................................................31

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. Rule 23(a)................................................................................ *passim*

Fed. R. Civ. P. Rule 23(b)................................................................................ *passim*

**OTHER AUTHORITIES**

Paul A. Ferrillo, *et al.*, *The "Less Than" Efficient Capital Markets Hypothesis*,
   78 St. John's L. Rev. 81, 121 (2004) ......................................................................18

Steven Feinstein, *Fraud-on-the-Market* (2000).............................................................26

Defendants JPMorgan Chase & Co. ("JPMorgan"), James Dimon and Douglas Braunstein respectfully submit this memorandum in opposition to plaintiffs' motion for class certification (Dkt. No. 131). Plaintiffs seek to certify a putative class of purchasers of JPMorgan common stock between February 13, 2012 and May 21, 2012 or, alternatively, between April 13, 2012 and May 21, 2012. Plaintiffs' attempt to start the class period on February 13 fails if the Court rejects their request to reassert a claim based on a February 13 statement the Court previously held was not actionable and denies their pending motion for leave to amend. Regardless of the Court's decision on that motion, neither proposed class should be certified.

## PRELIMINARY STATEMENT

"[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("*Halliburton II*"). Thus, before certifying a class, "[t]he district court must receive enough evidence, by affidavits, documents or testimony, to be satisfied that each Rule 23 requirement has been met." *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *4 (S.D.N.Y. July 3, 2013) (internal quotation marks omitted). As the Second Circuit has held, "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

Plaintiffs have failed to satisfy their evidentiary burden in this case, instead treating class certification in securities class actions as a rote exercise. The cursory analyses and methodologies offered by plaintiffs and their expert are untethered to the unique facts and theory of liability in this case. If such a perfunctory effort were sufficient to satisfy plaintiffs' evidentiary burden under Rule 23, then class certification would be automatic in *every* securities class action. As the Supreme Court has stressed, "Rule 23 does not set forth a mere pleading

standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011).

*First*, plaintiffs have not shown that reliance, an essential element of their Section 10(b) claim, can be proven with common evidence on a classwide basis as required to satisfy Rule 23(b)(3). Plaintiffs state that they will show reliance "through the fraud-on-the-market presumption" recognized in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). (Pls.' Mem. at 15.) "[T]o invoke the *Basic* presumption," however, plaintiffs "must prove that . . . the stock [at issue] traded in an efficient market" during the class period. *Halliburton II*, 134 S. Ct. at 2413. Plaintiffs have not satisfied that evidentiary burden. Without the benefit of the *Basic* presumption, "'[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would' prevent such plaintiffs 'from proceeding with a class action, since individual issues' would 'overwhelm[] the common ones.'" *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011) (quoting *Basic*, 485 U.S.at 242).

As support for their assertion that JPMorgan stock traded in an efficient market during the proposed class periods, plaintiffs offer a deeply flawed "event study" that is entirely circular and that would guarantee a finding of market efficiency in every securities case. The "essence" of market efficiency is a cause and effect relationship between new information and changes in a company's stock price. *Bombardier*, 546 F.3d at 207. To test whether such a relationship existed during the proposed class periods, plaintiffs' expert chose to examine *only* the three dates on which the "corrective disclosures" alleged in the complaint occurred. Like all securities actions, this case was filed after large, company-specific declines in the stock price on the alleged corrective disclosure dates. By considering only the three dates on which corrective disclosures allegedly occurred and no others, plaintiffs' expert structured his event study in a

-2-

way that was certain to find statistically significant declines in JPMorgan's stock price and therefore "market efficiency." If such a self-fulfilling prophecy were sufficient to satisfy plaintiffs' burden to prove that a company's stock traded in an efficient market, then market efficiency would be found in every securities class action. That is not the law.

The only other evidence offered by plaintiffs on the issue of market efficiency are two volatility tests that purport to show that JPMorgan's stock price was more volatile on earnings and guidance announcement days than on other days over a one-year period. Such tests cannot prove market efficiency because they do not test whether the price of JPMorgan stock moved appropriately on any particular day in response to the release of company-specific news. In fact, in denying class certification, another court in a securities case rejected those same volatility tests conducted by the very same expert, holding that it was "unclear how meaningful" the tests are to the question of market efficiency. *Dean* v. *China Agritech*, 2012 WL 1835708, at *7 (C.D. Cal. May 3, 2012).

*Second*, plaintiffs fail to show that they can calculate damages on a classwide basis in a manner consistent with their theory of liability as required by *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1433 (2013). When a plaintiff attempts to rely on a damages model to satisfy Rule 23(b)(3)'s requirement that common issues predominate, the plaintiff must offer a model that "actually measure[s] damages that result from the class's asserted theory of injury." *Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015). Plaintiffs here contend that defendants made false and misleading statements that concealed the risks of "hedge-fund-like trading" in JPMorgan's Chief Investment Office ("CIO") (Pls.' Mem. at 3-4), but their expert does not explain how he would measure only damages that result from that theory of liability. Instead, he offers only two generic paragraphs at the end of his report that purport to describe what is

-3-

"generally done" in securities class actions "in accordance with widely used and generally accepted methodologies and the statute." (Feinstein Rpt. ¶¶ 149(ii), 150 (Dkt. No. 133-2).) Plaintiffs' expert thus ignores numerous important facts specific to this case, including a decline in market capitalization that far exceeded the CIO trading losses at issue, the release of additional, unrelated information on the alleged corrective disclosure dates and previous disclosures of the allegedly concealed information. Plaintiffs' expert makes no attempt to take these complications into account or to tie his so-called "methodology" to the unique facts of this case. Indeed, the brief summary of a typical damages methodology offered by plaintiffs' expert is so general that it arguably would apply in any securities action without regard to the underlying facts. Because it is not based on the facts of this case, plaintiffs' expert recently offered essentially the same boilerplate summary in another securities case that involves a different industry, very different facts and different theories of liability. Plaintiffs cannot satisfy their evidentiary burden under Rule 23(b)(3) by simply cutting and pasting a highly generalized discussion of a damages methodology that their expert offers in every securities case.

To the extent that the two generic paragraphs offered by plaintiffs' expert constitute a damages "methodology," they do not satisfy plaintiffs' evidentiary burden under *Comcast* and *Roach*. Although plaintiffs' expert assures the Court that he will control for information unrelated to plaintiffs' theory of liability (Feinstein Rpt. ¶ 149(i)), he does not actually explain how he will do so. Plaintiffs' expert instead simply states that he *will* calculate any supposed inflation in JPMorgan's stock price during the alleged class periods by working backwards from the stock price declines that followed each alleged corrective disclosure. (*Id.* ¶ 149(ii).) Plaintiffs cannot satisfy their evidentiary burden under Rule 23(b)(3) by "asking the Court simply to trust them." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20,

2014) ("*BP II*"). Plaintiffs' expert says nothing about how he would isolate any stock price declines attributable to the disclosure of allegedly risky trading by CIO from any declines attributable to the disclosure that those risks actually had resulted in large trading losses. Because such losses were not certain when the alleged misstatements were made, calculating damages based on the entire stock price decline would overcompensate investors for their harm. Plaintiffs' expert also fails to consider whether the market "overreacted" to the disclosure of CIO's trading losses, ██████████████████████ (██████████████████[1]), or whether the release of other negative information on the alleged corrective disclosure dates contributed to the declines. These and other significant holes in plaintiffs' methodology are fatal to plaintiffs' motion.

*Third*, plaintiffs are inadequate class representatives under Rule 23(a). ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ *See City of Livonia Emps.' Ret. Sys.* v. *Wyeth*, 284 F.R.D. 173, 178 (S.D.N.Y. 2012). That defense could become the focus of the litigation to the detriment of absent class members. ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

---

[1] Citations to "Ex. __" are to the Declaration of Richard C. Pepperman, II, filed herewith ("Pepperman Decl."). Exhibit 1 to that declaration is the Class Certification Report of Christopher M. James, Ph.D. dated May 18, 2015, which defendants submit in response to the Report on Market Efficiency authored by Dr. Steven P. Feinstein, dated February 13, 2015, that plaintiffs submitted with their motion for class certification. (Dkt. No. 133-2.)

## BACKGROUND

### A.     Lead Plaintiffs

Plaintiffs Arkansas Teacher Retirement System ("ATRS") and Ohio Public Employees Retirement System ("OPERS") are "public pension fund[s]." (Compl. ¶¶ 30-31.)[2] Plaintiff Sjunde AP-Fonden ("AP7") "is part of the Swedish national pension system." (*Id.* ¶ 32.) Plaintiff State of Oregon sues on behalf of two state investment funds, the Public Employee Retirement Fund ("OPERF") and the Common School Fund ("OCSF"). (*Id.* ¶ 33.)

Plaintiffs allege that they purchased shares of JPMorgan stock between February 13 and May 21, 2012. (*Id.* ¶¶ 30-33.) ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

### B.     The Allegedly False and Misleading Statements

According to plaintiffs, their claims arise out of defendants' alleged concealment of "proprietary trading activities" in CIO and "exposure to risks and losses" resulting from CIO's "trading in speculative, highly volatile derivative instruments." (Pls.' Mem. at 3.) Plaintiffs allege that by February 13, 2012, the start of the longer proposed class period, JPMorgan had "secretly transformed the CIO from a risk management unit into a propriety trading desk." (Compl. ¶ 5.) Although plaintiffs talk generally about CIO, their allegations focus on a single CIO portfolio, the Synthetic Credit Portfolio ("SCP"). (*Id.* ¶¶ 20, 91.) During the first quarter of 2012, the traders responsible for the SCP allegedly tried to "balance" that portfolio's credit risk

---

[2] Citations to "Compl." are to plaintiffs' proposed third amended complaint (filed January 16, 2015).

by adding positions (*id*. ¶ 142), causing the notional size of the portfolio to grow threefold (*id*. ¶ 341(b)). When this attempt to balance the portfolio proved unsuccessful, the SCP started to suffer large losses in April 2012. (*Id*. ¶ 189-90.) These losses ultimately totaled over $6 billion. Plaintiffs assert that defendants made false and misleading statements on February 13 and April 13 that hid the risks being taken in the SCP.

In their proposed amended complaint, plaintiffs attempt to reassert a claim based on a February 13 statement by JPMorgan CEO James Dimon during a *Fox Business News* interview. The Court previously dismissed all claims based on that statement. *In re JPMorgan Chase & Co. Sec. Litig.*, 2014 WL 1297446, at *6 n.3 (S.D.N.Y. Mar. 31, 2014). Plaintiffs' proposed amended complaint alleges that Mr. Dimon, when asked by a reporter what he thought should be different about the then-proposed Volcker Rule, falsely stated as part of a lengthy response that "we don't make huge bets." (Compl. ¶¶ 278-79.) Ignoring that Mr. Dimon was addressing the JPMorgan Investment Bank's market-making activities and thus said absolutely nothing about the separate CIO (*see* Dkt. No. 135 at 13-14), plaintiffs contend that this statement was false because the SCP supposedly was making "huge bets" (Compl. ¶ 246).

Plaintiffs next allege that articles in *Bloomberg* and *The Wall Street Journal* on April 5 and 6 reported on "rumors . . . about the 'London Whale,'" disclosing that "a CIO trader was taking enormous positions in the credit-derivatives market." (*Id*. ¶ 184.) Plaintiffs contend that defendants responded to these reports by making false and misleading statements on April 13 "describing the SCP 'as a risk-reducing hedge that was transparent to the bank's regulators." (Pls.' Mem. at 7.) In particular, plaintiffs allege that JPMorgan's then-CFO Douglas Braunstein falsely stated on JPMorgan's April 13 first-quarter earnings conference call that "all of the positions reporters have been writing about are part of a credit book meant to hedge other risks."

(Compl. ¶ 291.) Plaintiffs also allege that Mr. Dimon, during the same earnings call, responded to an analyst's question by mischaracterizing reports about the SCP's trading as a "tempest in a teapot." (*Id*. ¶ 283.) Lastly, plaintiffs assert that JPMorgan failed to disclose in its first-quarter earnings release filed on April 13 that it had changed the value-at-risk ("VaR") model used to measure certain risk in CIO, which allegedly concealed a doubling of CIO VaR. (*Id*. ¶ 293.)

### C. The Three Alleged Corrective Disclosures

Plaintiffs assert that "the truth was revealed" on three dates—May 10, 16 and 21, 2012.

- **May 10**: During a conference call with investors and analysts after the market closed, Mr. Dimon disclosed that the SCP had incurred $2 billion in mark-to-market losses to date (*id*. ¶ 350) and warned that those losses could increase by "$1 billion or more" (Ex. 8 at 3 (5/10/12 Call Tr.); *see also id*. at 9 ("volatility could easily be [$1 billion]. Obviously, it could be worse than that.")). He also said that JPMorgan had changed a CIO VaR model during the first quarter of 2012, that the new model was "inadequate," and that JPMorgan "went back to the old one," which produced a higher VaR. (*Id*. at 2.)

- **May 16**: After the close of trading, the *New York Times* "reported that JPMorgan's trading losses had already ballooned by 'at least $1 billion' in only four trading days" and that the Federal Reserve was investigating the losses. (Compl. ¶ 358.)

- **May 21**: Mr. Dimon announced that JPMorgan temporarily was halting the share buyback program it had announced in March 2012. (*Id*. ¶ 360.)

Plaintiffs assert that these three alleged corrective disclosures caused the price of JPMorgan stock to decline by over 20%. (*Id*. ¶ 362.)

### D. Relevant Procedural History

This Court previously dismissed all claims based on statements before April 13, 2012 and thus limited the potential class period in this case to April 13, 2012 (the date of the first alleged

-8-

misstatement) to May 21, 2012 (the date of the last alleged corrective disclosure). *See In re JPMorgan*, 2014 WL 1297446, at *6 n.3. Undeterred, plaintiffs filed a motion for leave to amend seeking to reassert a claim based on a February 13, 2012 statement this Court previously rejected, which would more than double the length of the alleged class period. (Dkt. No. 126.) Defendants opposed that motion, which is now fully briefed and pending before the Court.

In the instant motion, plaintiffs seek to certify a class of investors that purchased JPMorgan common stock between February 13, 2012 and May 21, 2012. Alternatively, if their motion for leave to amend is denied, they seek to certify a class of purchasers from April 13, 2012 to May 21, 2012. (Pls.' Mem. at 1.) In support of their motion, plaintiffs filed a Report on Market Efficiency by Dr. Steven P. Feinstein.

**ARGUMENT**

A class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation marks omitted). Under Rule 23(a), plaintiffs must prove by a preponderance of the evidence that they satisfy four requirements: numerosity, commonality, typicality and adequacy of representation. *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at *17 (S.D.N.Y. Oct. 29, 2013). Under Rule 23(b), plaintiffs also must prove by a preponderance of the evidence that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "'Rule 23(b)(3)'s predominance criterion is even more demanding' than the 'rigorous analysis' mandated under Rule 23(a), and requires a 'close look at whether common issues predominate over individual ones.'" *Sykes* v. *Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 103 (2d Cir. 2015) (quoting *Comcast*, 133 S. Ct. at 1432).

Notwithstanding plaintiffs' effort to characterize class certification as routine in securities cases (Pls.' Mem. at 15), "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23] have been satisfied." *Comcast*, 133 S. Ct. at 1432 (internal quotation marks omitted). Here, plaintiffs fail to meet their evidentiary burden of satisfying (i) Rule 23(b)(3)'s requirement that common issues predominate over individual ones and (ii) Rule 23(a)'s requirement that their claims are typical of those of the class and that they are adequate class representatives. If the Court denies plaintiffs' motion for leave to amend,

████████████████████████████████████████████████████

████████████████████████████████████

## I.     Plaintiffs Fail To Satisfy Their Evidentiary Burden Under Rule 23(b)(3).

### A.     Plaintiffs Cannot Invoke a Classwide Presumption of Reliance Because They Have Not Proven That JPMorgan Stock Traded in an Efficient Market.

In a securities action, "[c]lass certification is only warranted if plaintiffs can establish by a preponderance of the evidence a class-wide presumption of reliance by virtue of the presence of an efficient market critical to the fraud-on-the-market theory." *George*, 2013 WL 3357170, at *7. Absent this presumption of reliance, "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Halliburton II*, 134 S. Ct. at 2416. To invoke the presumption, plaintiffs "must prove that . . . the stock traded in an efficient market." *Id*. at 2413. Because plaintiffs bear the burden of proof under Rule 23, "[t]o defeat the presumption of reliance, defendants do not . . . have to show an inefficient market. Instead, they must demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark." *Deutsche Bank*, 2013 WL 5815472, at *20.

In an attempt to satisfy their burden to show that JPMorgan stock traded in an efficient market during the alleged class periods, plaintiffs purport to address the five factors identified in

-10-

the *Cammer* case.[3]  (Pls.' Mem. at 17-19.)  But the Second Circuit has held that the fifth *Cammer* factor—"the demonstration of a cause and effect relationship between unexpected, material disclosures" and "an immediate response in the price of a security"—is "the most important" test for market efficiency.  *Bombardier*, 546 F.3d at 200, 207; *see also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) (fifth *Cammer* factor is "critical factor—the sine qua non of efficiency").  Indeed, "[o]nly the fifth *Cammer* factor . . . can demonstrate market efficiency to a financial economist."  (James Rpt. ¶ 35.)  Although the other factors can "support an inference of efficiency," they "cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price."  *Freddie Mac*, 281 F.R.D. at 182; *see also* Ex. 9 at 51, 53, 64-65 (Feinstein Dep.).

Market efficiency also cannot be "'presumed'" (Pls.' Mem. at 19) merely because the stock in question traded on the New York Stock Exchange.  (James Rpt. ¶ 29; Ex. 9 at 60 (Feinstein Dep.) (admitting that he could not "mak[e] a blanket statement that all the stocks [traded on the New York Stock Exchange] are efficient all of the time").)

Whether the market for JPMorgan stock was efficient during the specific alleged class periods at issue in this case is an "empirical question that must be evaluated . . . 'with judgment and care' for the particular security in question during the relevant time period."  (James Rpt. ¶ 29.)  Plaintiffs' reliance on a flawed allegation-related event study and two tests that purport to analyze the volatility of JPMorgan's stock price on "earnings and guidance announcement dates" (Feinstein Rpt. ¶¶ 79-84) do not satisfy their evidentiary burden under the critical fifth *Cammer* factor.

---

[3] *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  Plaintiffs also briefly walk through the three additional factors identified in *Krogman* v. *Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).  (Pls.' Mem. at 20-21.)

### 1. Plaintiffs' Event Study Suffers from Multiple Fatal Flaws.

Plaintiffs' event study supposedly tested "whether the market for JPMorgan stock was efficient specifically with respect to the particular information at issue in this case" by determining whether the stock price exhibited "[s]ignificant and appropriate reactions to disclosures of information that corrected or revealed the risks concealed by the alleged misrepresentations." (*Id.* ¶ 82.) Based on a purported "review of publicly reported news and events during the Class Period," plaintiffs' expert identified "three dates on which new, Company-specific information related to the alleged misrepresentations . . . was disseminated" and "would reasonably have been expected to elicit a stock price reaction over the threshold of statistical significance." (*Id.* ¶ 95.) Significantly, these three days are the same dates alleged in the complaint to be corrective disclosures. (*Compare id.* ¶ 96, *with* Compl. ¶¶ 347, 359, 362.) After conducting a regression analysis, plaintiffs' expert not surprisingly concludes that JPMorgan's stock price exhibited a "statistically significant price reaction to Company news" on each alleged corrective disclosure day. (Feinstein Rpt. ¶ 127.)

The fundamental flaw in this event study is obvious. By examining only the three dates on which corrective disclosures allegedly occurred, plaintiffs' expert practically guaranteed that his event study would find a statistically significant price reaction. Securities fraud lawsuits are filed only in response to large company-specific stock drops on alleged corrective disclosure days. As a result, "it is not at all surprising to observe statistically significant price declines" on those dates. (James Rpt. ¶ 41.) The decision of plaintiffs' expert to include only the three corrective disclosure dates in his event study infected his analysis with hindsight bias, which arises when "knowledge of what has actually occurred informs . . . a researcher's construction of a hypothesis to test." (*Id.*) Because he already had reviewed the complaint when he conducted his event study (Ex. 9 at 18 (Feinstein Dep.)), plaintiffs' expert knew that there were large,

company-specific declines in JPMorgan's stock price on the three alleged corrective disclosure days, and thus chose to include only those three dates in his event study. Courts have rejected studies that similarly rely on flawed data sets. *See, e.g.*, *U.S. Info. Sys., Inc.* v. *IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004) (rejecting analysis of sample of lost bids drawn overwhelmingly from those alleged to be tainted). Indeed, if an analysis of stock price movements only on alleged corrective disclosure dates were sufficient to prove market efficiency, then market efficiency could be assumed in every securities class action because such actions are filed only after large, company-specific stock price declines.

Plaintiffs' event study also suffers from selection bias, which "arises from studying a subset of data that is not representative of the entire population." (James Rpt. ¶ 43.) Plaintiffs' expert claims to have tested for efficiency on dates on which allegation-related information was disclosed. (Feinstein Rpt. ¶ 82.) The only scientifically sound way to determine which dates to test is to establish objective criteria before conducting the review for such information. (James Rpt. ¶ 43.) "Absent a predefined protocol, the researcher's identification of [events] becomes ad hoc and risks introducing subjective bias into what should be an objective analysis." *Brown* v. *China Integrated Energy, Inc.*, 2014 U.S. Dist. LEXIS 117764, at *21 (C.D. Cal. Aug. 4, 2014). Plaintiffs' expert had no such predefined protocol.

This selection bias is exemplified by plaintiffs' expert's failure to consider three dates in April 2012 involving the release of "information related to the alleged misrepresentations." (Feinstein Rpt. ¶ 95.) On April 5 and 6, *Bloomberg* and *The Wall Street Journal* published articles identifying the London Whale as a JPMorgan trader and describing his oversized trading positions. (Compl. ¶ 184.) At his deposition, plaintiffs' expert admitted that he did not include those dates in his event study despite their obvious relevance because JPMorgan supposedly

-13-

made "reassuring statements" about the SCP's trading.  (Ex. 9 at 135-40 (Feinstein Dep.).)  Plaintiffs' expert also admittedly failed to consider April 13, when JPMorgan released positive first-quarter earnings news and made alleged misstatements at issue in this case, again stating that there was "mixed" news on that day.  (*Id*. at 140.)

Instead of simply ignoring these dates, plaintiffs' expert should have assessed "the expected valuation implications of each piece of news" on these three dates, "determine[d] the expected aggregate effect" of each piece of news, and then tested that hypothesis.  (James Rpt. ¶ 45.)  For example, had plaintiffs' expert engaged in such an analysis, he might have determined that the positive earnings news and alleged misstatements on April 13 outweighed any alleged negative news released on that date, and thus he might have concluded that the price of JPMorgan's stock should have *increased*.  Plaintiffs' expert then would have had to consider whether the actual *decline* in the stock price on April 13 undermines his conclusion that JPMorgan's stock was trading in an efficient market at that time.  Plaintiffs' expert did none of this—instead, he simply *assumed* that there would be no statistically significant price reaction on April 13 (and April 5 and 6) and ignored these days entirely.

Plaintiffs' expert "never articulate[d] any objective criteria that he used to identify the events used in his study."  *Brown*, 2014 U.S. Dist. LEXIS 117764, at *21.  Having reviewed the complaint at the outset of his engagement (Ex. 9 at 18 (Feinstein Dep.)), plaintiffs' expert simply selected for his event study the three alleged corrective disclosure dates on which he knew there were large price declines.  Plaintiffs' event study thus reflects "selection bias stem[ming] from [the] omission of several obvious examples of [days on which] new information about the nature of alleged risks CIO was taking" allegedly was disclosed to the market.  (James Rpt. ¶ 43.)  Indeed, the only "objective" selection criterion employed by plaintiffs' expert appears to be

whether a date involved an alleged corrective disclosure, an inherently biased criterion. This Court therefore should reject plaintiffs' proffered event study as scientifically unsound. *See Brown*, 2014 U.S. Dist. LEXIS 117764, at \*21 (finding event study that suffered from selection bias unreliable and denying class certification).[4]

Plaintiffs' event study suffers from yet another flaw. In an efficient market, the price of a security "*fully* reflects all available public information." (James Rpt. ¶ 31 (emphasis added & brackets omitted).) Plaintiffs' event study is incomplete because it does not assess whether the magnitude of the change in the price of JPMorgan stock on the alleged corrective disclosure dates was appropriate. For example, after JPMorgan announced on May 10 that the SCP had incurred $2 billion in mark-to-market losses, JPMorgan's market capitalization declined by approximately $12.5 billion—over six times the disclosed loss. (*Id.* ¶ 52.) Although a $2 billion trading loss would not necessarily be expected to result in a $2 billion decline in market capitalization, plaintiffs' expert does not assess at all whether the $12.5 billion decline accurately reflects all available public information.

Plaintiffs' expert also ignores comments from analysts that the market had overreacted to the disclosure of the SCP's losses ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████ When JPMorgan announced in July 2012 that the SCP's losses had increased to

---

[4] In limiting his event study to allegation-related information, plaintiffs' expert also excluded dates on which other significant JPMorgan-related information was released. For example, on March 12, 2012, the U.S. government announced that JPMorgan was resolving long-running investigations into its mortgage-servicing operations and would both pay a significant penalty and commit billions of dollars to relief for borrowers. In response, JPMorgan's stock price increased 7%. (Pepperman Decl. ¶ 9.) Plaintiffs' expert did not examine whether such a reaction was consistent with an efficient market.

$5.8 billion and, in an "extreme" scenario, could increase an additional $1.7 billion (Ex. 10 at 4-5 (7/13/12 Call Tr.)), the price of JPMorgan's stock *increased* (Pepperman Decl. ¶ 11). Plaintiffs' expert did not consider whether such an increase further suggests that the market had overreacted on May 10 and how such an overreaction affects his opinion on market efficiency.

## 2. Plaintiffs' Volatility Tests Cannot Demonstrate That JPMorgan Stock Traded in an Efficient Market.

Plaintiffs' expert also offers two other statistical tests: an F-test and an Ansari-Bradley test. (Pls.' Mem. at 20.) These tests supposedly examined whether "JPMorgan's common stock price generally exhibited larger movements on earnings and guidance days" than on days when there were no such announcements. (Feinstein Rpt. ¶ 133.) Plaintiffs' expert asserts that these tests are evidence of market efficiency because they supposedly assess whether JPMorgan's stock price "responded to the increased flow of information that generally transpires on" earnings and guidance dates. (*Id*. ¶ 83.) That assertion is incorrect.

"[F]or the market to be efficient and prices to fully reflect all public information," price movements in "response to new material information must be both in the proper direction (*i.e.,* the price should decline in response to negative news and rise in response to positive news) and of the right magnitude (*i.e.,* not a clear over- or under-reaction)." (James Rpt. ¶ 35.) But unlike an event study, plaintiffs' volatility tests do *not* assess whether JPMorgan's stock price moved in a statistically significant manner on any specific day in response to company-specific news and in "the correct direction given the totality of news released." (*Id*. ¶ 58.) Instead, the tests simply examine whether, in the *aggregate*, JPMorgan's stock price moved more on five earnings and guidance announcement days than on other days over a one-year period. The tests thus treat any share price movement on a selection of days, even movements in the wrong direction, as evidence of efficiency. The volatility tests thus "skirt[] the key question: whether JPMorgan's

-16-

stock price quickly and fully incorporated new information by moving in the appropriate direction and by the appropriate amount given the news released." (James Rpt. ¶ 58.)

For this very reason, when confronted with these same volatility tests by the very same expert, another court denied class certification. In rejecting these tests, the court observed:

> Dr. Feinstein's studies found that, in the aggregate, there was a statistically significant level of correlation between Agritech's disclosures and movement in the price of its stock. However, it is unclear how meaningful this finding is, as the level of correlation was measured in the aggregate.

*China Agritech*, 2012 WL 1835708, at *7. Despite this ruling, plaintiffs' expert offers the exact same analysis of aggregate price movements as evidence of market efficiency in this case.

The flaws in the volatility tests used by plaintiffs' expert become even more apparent when applied to the facts in this case. For instance, one of the earnings announcement dates included in the volatility tests is April 13, 2012. On that day, JPMorgan's stock price *declined* despite the announcement of positive earnings news, as well as the alleged misstatements that plaintiffs contend *inflated* the stock price. (James Rpt. ¶ 61.) Plaintiffs' volatility tests do not account for this movement in the wrong direction, notwithstanding that the "direction of a stock price reaction to material news is essential to an assessment of market efficiency." (*Id.* ¶ 62.) Plaintiffs' expert instead treats this price movement as evidence of market efficiency simply because JPMorgan's stock price moved on April 13 in response to news about earnings. Because plaintiffs' volatility tests do not measure "whether a stock fully and accurately reflects new value-relevant information," they cannot show market efficiency. (*Id.* ¶ 59.)[5]

Notably, "[t]he academic literature generally assesses market efficiency through the use of event studies" and not the kind of volatility tests that plaintiffs' expert used in *China Agritech* and this case. (*Id.*) Plaintiffs' expert does not cite in his report a single peer-reviewed article

---

[5] The volatility tests also suffer from a calculation error. (James Rpt. ¶ 63.) When calculated properly, the Ansari-Bradley test does "not even support a conclusion of market efficiency." (*Id.*)

that supports the use of such volatility tests to show market efficiency, and when asked at his deposition whether he was aware of any such articles, he could point only to a single law review article. (Ex. 9 at 175-78 (Feinstein Dep.).) That article does not support the conclusion drawn by plaintiffs' expert, describing the volatility tests as only "a threshold step, not a sufficient condition, to show" market efficiency. Paul A. Ferrillo, *et al.*, *The "Less Than" Efficient Capital Markets Hypothesis*, 78 St. John's L. Rev. 81, 121 (2004).

### B. Plaintiffs Do Not Offer a Damages Model That Calculates Damages on a Classwide Basis Consistent With Their Theory of Liability.

Under Rule 23(b)(3), plaintiffs bear the burden of proving that common issues predominate over individual ones, including on the issue of damages. *Comcast*, 133 S. Ct. at 1432. Where plaintiffs propose a methodology to calculate damages on a classwide basis, that methodology must "actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407; *see also Sykes*, 780 F.3d at 82 ("plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability") (internal quotation marks omitted). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)." *Comcast*, 133 S. Ct. at 1433.[6]

Plaintiffs assertion that their "damages methodology easily satisfies *Comcast*" (Pls.' Mem. at 23) is wrong. Indeed, if it were correct, *Comcast* would be a dead letter. Plaintiffs attempt to satisfy their evidentiary burden on this issue by submitting a cursory, two-paragraph discussion by their expert of a hypothetical damages calculation (Feinstein Rpt. ¶¶ 149-50) that

---

[6] *Comcast* applies to all motions for class certification under Rule 23(b)(3), including in securities actions. *See*, *e.g.*, *Fort Worth Emps. Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 140-42 (S.D.N.Y. 2014). The out-of-district cases that plaintiffs cite (Pls.' Mem. at 23) declined to apply *Comcast* without any explanation and in disregard of *Comcast* itself, which "explicitly rejected" the idea that it was applying a rule of law unique to one type of case. *Wang* v. *Hearst Corp.*, 293 F.R.D. 489, 497 (S.D.N.Y. 2013). Contrary to plaintiffs' assertion (Pls.' Mem. at 22-23), *Halliburton II* also did not hold that plaintiffs can satisfy *Comcast* merely by invoking the fraud-on-the-market presumption of *reliance*, which is not a presumption regarding *damages*. 134 S. Ct. at 2412.

is so generic and undeveloped and so untethered to the facts of this case that it amounts to no methodology at all. Their expert's boilerplate discussion of damages also is flawed because (i) it mistakenly assumes without any analysis or consideration of plaintiffs' theory of liability—that defendants hid allegedly risky trading in CIO—that the share price declines on May 11, 17 and 21 (after disclosure of the losses resulting from the allegedly concealed risks) can be used to measure the amount of alleged inflation in JPMorgan's stock price throughout the class periods and (ii) plaintiffs' expert proposes no method at all to account for how that supposed inflation would have changed over time. Because plaintiffs have offered nothing more than a "conclusory assertion that damages will be calculated on a class-wide basis," they have failed to prove that common issues will predominate over individual ones. *BP II*, 2014 WL 2112823, at *12.

### 1. Plaintiffs Offer No Customized Methodology for Calculating Damages in This Case.

Although plaintiffs' expert purports to explain "how per share damages would be measured for each member of the proposed class," he does not actually say how damages could be measured *in this case*. (Feinstein Rpt. ¶ 149.) He instead states in the abstract that he would attempt to do what is "generally done" in securities fraud cases "in accordance with widely used and generally accepted methodologies." (*Id.* ¶¶ 149(ii), 150.) At his deposition, plaintiffs' expert offered no opinion on whether what generally is done is the "right way" to calculate damages in this case, and he admitted that it might be necessary to do something else. (Ex. 9 at 234-35, 239 (Feinstein Dep.).) Plaintiffs' expert also admitted that he recently offered the same two-paragraph, boilerplate discussion of damages in another case with completely different facts,

confirming that this discussion is "so general and undeveloped that it could apply in nearly any securities fraud case." (James Rpt. ¶ 69.)[7]

After *Comcast*, it is not enough for plaintiffs merely to assert that they *will* calculate damages on a classwide basis in a manner consistent with their theory of liability. *BP II*, 2014 WL 2112823, at *12 (plaintiffs cannot just "ask[] the Court simply to trust them."). Plaintiffs must actually prove that they can do so. Plaintiffs have not made such an evidentiary showing here, and class certification therefore should be denied. *Sicav* v. *Wang*, 2015 WL 268855, at *4-7 (S.D.N.Y. Jan. 21, 2015) (denying class certification in part because opinion offered by Dr. Feinstein—plaintiffs' expert here—made "no attempt . . . to show that common proof *in this case* could establish" injury in fact or damages); *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("*BP I*") (denying class certification because plaintiffs did "not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast*").

### 2. Plaintiffs Fail To Show That Declines in JPMorgan's Stock Price Following the Alleged Corrective Disclosures Can Be Used To Calculate Damages Throughout the Proposed Class Periods.

To the extent that plaintiffs have offered any damages methodology at all, they have not proven by a preponderance of the evidence that it "measure[s] only those damages attributable" to their theory of liability, as required by *Comcast*. 133 S. Ct. at 1433. Damages in a securities case are generally the difference between the allegedly inflated price at which the stock was purchased and the "but for" price that would have prevailed absent the alleged misstatements. Without offering any details, plaintiffs' expert states that he will use an event study to determine how much the alleged corrective disclosures caused the price of JPMorgan stock to decline and

---

[7] Ex. 11 is a blackline that compares Dr. Feinstein's February 13, 2015 discussion of damages in this case with his March 5, 2015 discussion of damages in *Reese* v. *BP p.l.c., et al.*, No. C08-1008 MJP (W.D. Wash.). The court in *Reese* has not yet considered Dr. Feinstein's discussion of damages.

then work "backwards from the last corrective disclosure to the start of the Class Period" to calculate the amount of inflation in the stock price at any given time. (Feinstein Rpt. ¶¶ 149(i)-(ii).) Although plaintiffs' expert acknowledges that he must "control[] for potentially non-fraud related information" also disclosed on corrective disclosure days in order to avoid overstating the damages attributable to plaintiffs' liability theory, his report offers not one word of explanation as to how he proposes to do so. (*Id.* ¶ 149(i).)

Courts have rejected the notion that a securities plaintiff can satisfy its evidentiary burden under *Comcast* simply by stating that its expert will use an event study to measure damages:

> Simply invoking the event study methodology may have been sufficient to indicate that this case would fall into the category of cases in which individual damages calculations are "mathematical or formulaic." In other words, it likely satisfies the first half of *Comcast*'s tests: that damages be measurable on a class-wide basis. But it does not satisfy the second half of the test. It does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* before a class may be certified.

*BP I*, 2013 WL 6388408, at *17.

After the close of trading on May 10, 2012, JPMorgan disclosed "a $2 billion trading loss" in the SCP and restated CIO VaR for the first quarter of 2012. (Compl. ¶ 350.) JPMorgan also made clear that the losses could increase significantly. (Ex. 8 at 3, 6 (5/10/12 Call Tr.).) After the close of trading on May 16, the *New York Times* reported that mark-to-market losses in the SCP had increased "by at least $1 billion." (Compl. ¶ 358.) And on May 21, Mr. Dimon announced the temporary suspension of JPMorgan's share buyback program. (*Id.* ¶ 360.) Plaintiffs contend that the price of JPMorgan stock fell in response to each of these alleged corrective disclosures, closing roughly 20% lower on May 21 than it had on May 10 and reducing JPMorgan's market capitalization by a total of $31.4 billion. (*Id.* ¶ 362.) Using the

highly generalized damages methodology outlined by plaintiffs' expert, $21 billion of that decline supposedly is attributable to the alleged corrective disclosures.[8]  (James Rpt. ¶ 78.)

Without considering plaintiffs' theory of liability, plaintiffs' expert argues that the collective share price declines on May 11, 17 and 21 can be used to calculate the inflation in JPMorgan's stock price going back to the beginning of the alleged class periods.  But the disclosure of the SCP's trading losses on May 10 and 16 "revealed more than the allegedly hidden risks that Defendants' allegedly false statements supposedly concealed."  (*Id*. ¶ 81.)  The disclosures revealed both that the SCP had entered into risky trades—the allegedly hidden risk— and that those "risky positions had proven unprofitable."  (*Id*.)  When a misstatement conceals a risk, using the "full value of the stock price drop from the materialization of that risk"—here, the trading losses—"overcompensates investors for their harm" unless it was certain that the risk would result in the losses.[9]  *BP I*, 2013 WL 6388408, at *16.  That is not the case here.

Because risky trades can yield both large profits and large losses, disclosures that merely reveal the existence of those risks do not produce the same stock price reactions that result from

---

[8] Using the regression model of plaintiffs' expert to control for the effect of non-JPMorgan specific news (*e.g.*, market- or industry-wide news) on JPMorgan's share price on the alleged corrective disclosure days, $21 billion of the $31.4 billion decline in market capitalization on these days supposedly is attributable to JPMorgan-specific news.  (James Rpt. ¶ 78.)  Defendants do not endorse this regression model, but use it here solely to illustrate the significant problems with the so-called damages methodology offered by plaintiffs' expert.

[9] As one court pointed out, this phenomena can be illustrated through a simple hypothetical:

Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red.  If the company drew a red marble, it would have to pay $1 million.  Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000.  If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information— the certainty of a $1 million loss.  If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would *still* have fallen when the company drew a red marble.  In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been, prior to the drawing, had the company told the truth.  In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, *not* the $990,000 less that would be implied by looking at the reaction to the drawing of a red marble.

*BP I*, 2013 WL 6388408, at *16 n.15 (internal quotation marks omitted).

disclosure of actual losses. (James Rpt. ¶¶ 82-83.) Thus, had defendants disclosed in February, March or April 2012 the allegedly risky positions in the SCP, as plaintiffs argue they should have, the price of JPMorgan's stock would not have decreased by the full amount it did after May 10, when the market learned not only that the SCP had entered into risky trades, but also that those trades had produced large losses. As one court observed, measuring inflation based on price drops that occurred after losses were realized necessarily "overcompensates investors for their harm."[10] *BP I*, 2013 WL 6388408, at *16.

Moreover, the large unexplained gap between the SCP's announced mark-to-market losses and the decline in JPMorgan's share price suggests a possible disconnect between plaintiffs' theory of liability and their proposed damages methodology, which plaintiffs' expert never addresses. After JPMorgan disclosed on May 10 that the SCP had suffered $2 billion in mark-to-market losses, JPMorgan's market capitalization declined by $12.5 billion on May 11, *six times more than the losses*. (James Rpt. ¶ 52, 84.) Under plaintiffs' proposed methodology, the three alleged corrective disclosures together supposedly caused a $21 billion decline in JPMorgan's market capitalization, notwithstanding that the disclosed trading losses were a fraction of that amount. (*Id.* ¶ 78.) Plaintiffs' expert has done nothing to eliminate the possibility that this gap between the disclosed losses and the declines in JPMorgan's share price on the alleged corrective disclosure days can be explained by "non-fraud related information" that adversely affected JPMorgan's stock price on those days. For instance, on May 10, analysts predicted revenue declines in certain JPMorgan business lines and suggested that another had started the year with weak results. (*Id.* ¶ 85.) On May 21, the press reported that the Federal

---

[10] To the extent that plaintiffs attribute any of the price declines that occurred between May 10 and May 21 to reported reputational harm or reports of increased regulatory scrutiny, their expert's proposed methodology is similarly flawed because their expert does not explain how an earlier disclosure of the positions in the SCP would have been certain to result in such consequences. (*See* James Rpt. ¶¶ 86-89.)

Deposit Insurance Corporation filed suit against JPMorgan regarding mortgage-backed securities. (*Id*. ¶ 99.) Plaintiffs' expert ignores these potential complications by offering only a highly generalized methodology that is not customized at all to the facts of this case.

Plaintiffs' failure to articulate a viable damages methodology that applies to the facts of this case is even more apparent when the price declines on May 17 and 21 are considered. Plaintiffs assert that disclosure of an additional $1 billion in losses after the market closed on May 16 caused JPMorgan's share price to decline on May 17. (Compl. ¶ 359.) But on May 10, Mr. Dimon warned the market that the SCP's positions were volatile, that price swings "could cost us as much as $1 billion or more," and that it "could be worse than that." (Ex. 8 at 3, 9 (5/10/12 Call Tr.).) Plaintiffs do not explain how the disclosure of additional losses on May 16 provided the market with any new information about the nature of the allegedly concealed *risks* the SCP had taken (as opposed to the amount of the ultimate losses). (James Rpt. ¶¶ 91-94.) Plaintiffs also do not explain how the share price decline that occurred after the announcement of the temporary suspension of JPMorgan's share buyback program on May 21 is connected to the supposedly undisclosed *risks* in the SCP that are at issue in this litigation. (*Id*. ¶¶ 96-98.) Because the allegedly undisclosed trading in the SCP never was certain to cause the suspension of the buyback program (*Id*. ¶¶ 97-98), plaintiffs cannot use the full amount of the share price decline that occurred on May 21 as a measure of inflation throughout the Class Periods without overcompensating investors. *BP I*, 2013 WL 6388408, at *16. Plaintiffs thus fail to prove that "there is a damages calculation method that will be usable for all class members' claims" and that "is in fact linked with [their] theory of liability." *Fort Worth*, 301 F.R.D. at 141-42.[11]

---

[11] For many of the same reasons, plaintiffs will be unable to prove that the disclosures on May 16 and 21 corrected any alleged misstatement in this action as they must to demonstrate loss causation, an essential element of their Section 10(b) claim. If a class ultimately is certified, defendants intend to seek summary judgment on those two alleged corrective disclosure dates, which would end the class period on May 10.

### 3.     Plaintiffs' Proposed Damages Methodology Does Not Account for Changes in the Amount of Alleged Inflation, If Any, Over Time.

Plaintiffs' proposed damages methodology also is flawed because their expert provides no "specificity" as to how that methodology would "provide a reliable calculation of [inflation] at different points in time." *Fort Worth*, 301 F.R.D. at 141.  Plaintiffs acknowledge that both the SCP's positions (and accompanying risk) and the amount of publicly available information about the SCP's trading changed over the alleged class periods.  (Compl. ¶¶ 184, 259-60, 271, 341(b).) Plaintiffs' expert also admits that the amount of inflation in a stock's price can vary over time depending on the nature of the allegedly concealed information.  (Ex. 9 at 229-32 (Feinstein Dep.).)  Plaintiffs' expert nevertheless makes no attempt to explain how he would determine the variation in the alleged inflation over the proposed class periods as the SCP's positions changed and new information entered the public record about CIO's trading.[12]  Absent a reliable method for determining inflation on each day of the alleged class periods, plaintiffs' methodology will "overcompensate some class members and undercompensate others." *Griffith* v. *Fordham Fin. Mgmt., Inc.*, 2015 WL 1097327, at *5 (S.D.N.Y. Mar. 12, 2015).

Three examples are illustrative.  First, plaintiffs allege that the size of the SCP tripled during the first quarter of 2012.  (Compl. ¶ 341(b).)  They also allege that the SCP's long and short credit positions and the potential for those positions to result in gains or losses changed over time.  (*Id*. ¶¶ 259-60.)  Any calculation of inflation thus "must take into account the degree to which the market was misled about the expected possible outcomes of CIO's trading, including the probabilities of both possible gains and possible losses and the possible magnitude

---

[12] Plaintiffs' expert illustrated this concept in an article he authored with a hypothetical:  "suppose a company misstates revenue in one period, and in a subsequent period they misstate it by even more. . . . Under this scenario, the inflation ribbon will likely grow.  Alternatively, suppose they fraudulently overstate recent earnings, but over time earnings do indeed catch up to the overly optimistic levels.  As the actual earnings approach the reported levels, the inflation ribbon declines."  (Ex. 12 (Steven Feinstein, *Fraud-on-the-Market* (2000)).)

of those gains and losses." (James Rpt. ¶ 108.)  Plaintiffs' expert, however, does not explain how he would account for these changing probabilities over the proposed class periods.

Second, plaintiffs contend that the announcement on May 21 that JPMorgan temporarily was suspending its share buyback program caused the stock price to decline.  (Compl. ¶¶ 360-62.)  But plaintiffs and their expert fail to consider (or even mention) that JPMorgan did not announce its share buyback program until March 13, 2012.  (James Rpt. ¶ 110.)  As a result, during the first month of plaintiffs' longer proposed class period (from February 13 to March 13), JPMorgan's stock price could not possibly have been inflated for any reason associated with the then-unannounced share buyback program.  Plaintiffs' expert is silent on how he would determine when such alleged inflation was introduced into JPMorgan's share price and how it varied over time.

Third, multiple news articles in widely read publications such as *The Wall Street Journal* in early April 2012 reported on the SCP's supposedly risky trades.  (Compl. ¶ 184.)  These articles also reported that hedge funds were aware of and were trading against the SCP since February 2012.  (James Rpt. ¶ 115 (citing articles).)  In the efficient market that plaintiffs posit, the information in these articles and the information previously known by hedge funds would have been incorporated into JPMorgan's share price immediately and thus would have reduced the amount of any inflation.  (*Id.* ¶¶ 116.)  Although plaintiffs' expert acknowledges that such changes in the mix of publicly available information can affect the amount of inflation in a company's stock price (Ex. 9 at 231-32 (Feinstein Dep.)), his damages methodology makes no effort to account for these changes in publicly available information in this case.

Because the highly generalized methodology described by plaintiffs' expert fails to account for "[n]umerous factors that affect the amount of damages, if any, to any given class

-26-

member," plaintiffs have not satisfied their evidentiary burden under *Comcast*. *Turnbow* v. *Life Partners Inc.*, 2013 WL 3479884, at *17 (N.D. Tex. July 9, 2013).

## II. Plaintiffs Fail to Satisfy Rule 23(a)'s Requirements of Adequacy and Typicality.

■ ██████████████████████████████████████
██████████████████████████████████████
████████████

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990). "Regardless of whether the issue is framed in terms of the typicality of the representative's claims, or the adequacy of representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (internal citations omitted). "The defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to 'devote considerable time to rebut the unique defense.'" *Hallet* v. *Li & Fung, Ltd.*, 1997 WL 621111, at *3 (S.D.N.Y. Oct. 6, 1997).

Courts repeatedly have recognized that plaintiffs in securities class actions may be subject to a unique defense if their claims arise in substantial part from purchases made after the disclosure of an alleged fraud. *See, e.g., George*, 2013 WL 3357170, at *6 ("A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision.").[13] ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[13] *See also In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 58 (S.D.N.Y. 2013) (claims of post-disclosure purchasers atypical of class that includes pre-disclosure purchasers).

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

   ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

   ██   ████████████████████████████████

      ██████████████████████████████

"An essential element of adequacy of representation is that the class representative be sufficiently familiar with the case as to exercise independent control over the attorney." *Scott* v. *New York City Dist. Council of Carpenters Pension Plan*, 224 F.R.D. 353, 355 (S.D.N.Y. 2004). While "attacks on the adequacy of a class representative based on the representative's ignorance" generally are disfavored, *Baffa* v. *Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000), "class certification may properly be denied 'where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys,'" *Maywalt* v. *Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995).

-28-

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████  To be an adequate class representative, the required knowledge of the case is, to be

sure, "modest," but it is "not so low as to be meaningless." *In re Monster Worldwide, Inc. Sec.*

*Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008). ████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██  ████████████████████████████████████████████

"It is axiomatic that a putative class representative must be able to individually state a

claim against defendants, even though he or she purports to act on behalf of a class." *In re*

*Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y.

2003). ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████  *Bentley*

v. *Verizon Business Global, LLC*, 2010 WL 1223575, at *4 (S.D.N.Y. Mar. 31, 2010) (plaintiff

"not an appropriate class representative because she is not a member of the class"); *see also*

*Warth* v. *Seldin*, 422 U.S. 490, 502 (1975) (lead plaintiffs "must allege and show that they

personally have been injured, not that injury has been suffered by other, unidentified members of

the class").

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for class certification.

Dated:  May 18, 2015

Respectfully submitted,


s/ Richard C. Pepperman, II
Richard C. Pepperman, II
(peppermanr@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel.:  (212) 558-4000
Fax:  (212) 291-9113

Daryl A. Libow
(libowd@sullcrom.com)
Christopher M. Viapiano
(viapianoc@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
Tel.:  (202) 956-7500
Fax:  (202) 956-6973

*Counsel for Defendants*

-31-