# EXHIBIT J

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, SJUNDE AP-FONDEN, BOARD OF TRUSTEES OF THE CITY OF FORT LAUDERDALE GENERAL EMPLOYEES' RETIREMENT SYSTEM, EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, AND PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br> GREEN MOUNTAIN COFFEE ROASTERS, INC., LAWRENCE J. BLANFORD and FRANCES G. RATHKE <br> Defendants. | No. 2:11-CV-00289-WKS |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS**
**CERTIFICATION AND APPOINTMENT OF**
<u>**CLASS REPRESENTATIVES AND CLASS COUNSEL**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD.......................................................................................................... 4

ARGUMENT ........................................................................................................................ 5

I.     PLAINTIFFS' PROPOSED DAMAGES METHODOLOGY........................................... 6

II.    PLAINTIFFS FAIL TO SHOW PREDOMINANCE UNDER COMCAST. .................... 7

     A.    Plaintiffs' Proposed Damages Methodology Cannot Be Applied Consistently Across the Entire Proposed Class Period to Measure the Damages Allegedly Caused By the "False Growth Story" Described in the Complaint........................................................................ 7

     B.    Plaintiffs' Proposed Damages Methodology Cannot Be Applied Consistently Across the Entire Proposed Class Period to Measure the Damages Allegedly Associated with Their Newer, Capacity Constrained Theory of Liability Either................................................ 12

         1.    Dr. Tabak's New Capacity Constrained Theory of Liability. ..................................... 12

         2.    Dr. Tabak's Capacity Constrained Theory Ignores Public Statements and Analyst Reports that Directly Contradict His Conclusions. ....................................................... 13

         3.    Plaintiffs' Capacity Constrained Theory Fails Under Comcast... ............................... 17

CONCLUSION.................................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)........................................................................................................4

*In re Bank of Am. Corp. Secs.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ...................................................................................12

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .....................................................................................11

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013).............................................................................................. *passim*

*Dukes v. Wal-Mart*,
564 U.S. 338 (2011)......................................................................................................4, 5

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).............................................................................................5

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
No. 10 Civ. 3461 (PAC), 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015)................................11

*Halliburton Co. v. Erica P. John Fund*,
134 S. Ct. 2398 (2014)....................................................................................................4

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006).............................................................................................4

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)..........................................................................................18

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)..........................................................................................11

*In re Sanofi-Aventis Sec. Litig.*,
293 F.R.D. 449 (S.D.N.Y. 2013) ...................................................................................12

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016) ...................................................................................11

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013).......................................................................................4, 5

## INTRODUCTION

Defendants Keurig Green Mountain, Inc., formerly known as Green Mountain Coffee Roasters, Inc. ("Green Mountain" or the "Company"), Lawrence J. Blanford ("Defendant Blanford"), and Frances G. Rathke ("Defendant Rathke," and together with Defendant Blanford the "Individual Defendants") respectfully submit that Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Motion for Class Certification") should be denied.

Plaintiffs seek to certify a class of those who purchased or acquired Green Mountain's stock between February 2, 2011 and November 9, 2011. Pls.' Class Cert. Mem. at 1 (ECF No. 266). In order to satisfy Rule 23, however, Plaintiffs must show, *inter alia*, that they meet Rule 23(b)(3)'s requirement that common issues predominate over individual issues throughout the entire proposed class period. Fed. R. Civ. P. 23(b)(3). Plaintiffs have failed to meet their burden on this element because they have not identified a damages model corresponding with their theory of liability that can be applied consistently across the entire proposed class period, as required by the Supreme Court's holding in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). As *Comcast* holds, common issues do not predominate where a plaintiff's proposed damages methodology, which must be limited to measuring only those damages that result from a plaintiff's alleged theory of liability, cannot be applied consistently, class-wide across the entire proposed class period. *Id.* at 1433.

Here, with fact discovery now concluded and their expert reports submitted, Plaintiffs seem to be advancing one or maybe two different versions of a "false growth story." First, they seem to press a watered-down version of the "false growth story" articulated in their Complaint. Under this projections version of their alleged false growth story, Plaintiffs assert that Green Mountain made alleged misrepresentations about its growth prospects that were purportedly

revealed as untrue on November 9, 2011, when Green Mountain missed the net sales guidance it had issued for Q4 FY2011 and for the entire fiscal year on July 27, 2011. Second, they seem to advance an entirely new version of their false growth story articulated for the first time in a recently issued report from Plaintiffs' putative damages expert, Dr. David I. Tabak. This new version is premised on the notion that Green Mountain told a "false growth story" by misrepresenting that it was "capacity constrained" throughout the entire proposed class period from February 2, 2011 through November 9, 2011. Under this new version, Green Mountain supposedly misled investors into overestimating the "true demand" for Green Mountain's K-Cups by making allegedly false statements about being unable to produce enough K-Cups to meet current customer demand. Here too, Dr. Tabak says the alleged fraud was purportedly revealed by Green Mountain's Q4 FY2011 sales miss, which he claims revealed the "true demand" for its K-Cups. *See* Expert Report of David I. Tabak, PhD, dated April 13, 2017 at ¶¶ 31-32, 72 (the "2017 Tabak Report"), attached as Exhibit B to the Declaration of John P. Bueker, dated May 1, 2017 (hereinafter "Bueker Decl.").

The problem for Plaintiffs' class certification motion is that, under either version of their alleged "false growth story," Dr. Tabak's proposed damages model cannot be applied consistently to all proposed class members across the entire proposed class period to measure only the damages that they allegedly suffered, as *Comcast* requires. Plaintiffs' first version of the theory drawn from the Complaint and premised on the Company's guidance about its growth prospects fails as a matter of law as to all purchasers of Green Mountain's stock prior to July 27, 2011, because even on the face of Plaintiffs' pleadings, these investors did not rely on any forecast of Green Mountain's sales growth that was false, let alone one that was made with the requisite scienter. At best then, consistent with *Comcast's* mandate, under this version of

Plaintiffs' "false growth story," the Court could certify a class, if at all, only as to the period from July 27, 2011 through November 9, 2011, the period falling *after* Green Mountain issued its only allegedly misleading sales growth guidance.

Plaintiffs' new "capacity constrained" version of the false growth story does not change the class certification analysis one bit. Even under this theory, Dr. Tabak's proffered damages methodology cannot be applied consistently across the entire proposed class period. This theory, which seems to be Plaintiffs' principal – if not sole – theory of liability at this point, fails because it is premised on the notion that Green Mountain misled investors into believing that it was unable to keep up with customer demand for K-Cups throughout the entire proposed class period. But, Green Mountain's disclosures on July 27, 2011 clearly established that exactly the opposite was true. On its July 27, 2011 earnings call, Green Mountain informed investors, analysts, and other market participants that, during its third fiscal quarter, Green Mountain had finally caught up with customer demand and had even been able to fulfill pent-up demand from prior quarters. Both on the call and immediately following it, analysts recognized the significance of what Green Mountain was saying and described the Company as no longer being capacity constrained in reports published on or shortly after July 27, 2011. This theory of liability is thus cut-off completely by the Company's clear disclosures on July 27, 2011, and the analyst reports that followed.

Accordingly, even under this newer version of their false growth story, Dr. Tabak's proposed damages methodology cannot be applied consistently across the entire proposed class period. To the extent that Plaintiffs attempt to prove a false growth story based on allegedly false statements about Green Mountain's being capacity constrained, that theory could not apply to any stock purchase made after July 27, 2011, based on the Company's clear disclosures made

on that day. Any theory based on alleged supply constraints simply cannot run past July 27, 2011. So too must any proposed class period based on this theory end on July 27, 2011. Whatever caused Green Mountain's stock price to drop on November 10, 2011, the day following what Plaintiffs now claim was the sole corrective disclosure at issue in this case, was not the result of any disclosure about Green Mountain's capacity constraints. That disclosure – that Green Mountain was no longer capacity constrained – was made more than three months earlier. And indeed, on July 28, 2011, the day following that disclosure Green Mountain's stock price actually *increased*, not decreased.

## **LEGAL STANDARD**

In order to certify a Rule 23(b)(3) class, Plaintiffs must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation; and the two requirements of Rule 23(b)(3): predominance (*i.e.*, common questions of law and fact predominate over individual questions), and superiority (*i.e.*, a class action is superior to other methods of adjudication). Fed. R. Civ. P. 23(a), (b)(3); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006). The burden of satisfying each of these requirements lies with Plaintiffs. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). As the Supreme Court has held, "Rule 23 does not set forth a mere pleading standard." *Dukes v. Wal-Mart*, 564 U.S. 338, 350 (2011). Instead, it demands a "rigorous analysis," under which Plaintiffs must "prove" that each requirement of the Rule is satisfied. *Id.* at 350-51; *see also Halliburton Co. v. Erica P. John Fund*, 134 S. Ct. 2398, 2412 (2014).

In considering a motion for class certification, a district court must "make a definitive assessment of [these] requirements, notwithstanding their overlap with merits issues[;] . . . must resolve material factual disputes relevant to each Rule 23 requirement[;] and must find that each requirement is established by at least a preponderance of the evidence." *In re U.S. Foodservice*

4

*Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (internal quotation marks omitted). The Court has an "obligation" to resolve factual disputes at class certification in order to determine whether the requirements of Rule 23 have been satisfied for the proposed class as a whole. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 38 (2d Cir. 2009) (internal quotation marks omitted). The Court should therefore "probe behind the pleadings," *Comcast*, 133 S. Ct. at 1432 (internal quotation marks omitted), and it should not refrain from ruling on a particular factor just because it also implicates the merits of the case, *Wal-Mart*, 564 U.S. at 350-51.

*Comcast* holds that in determining whether common issues predominate, courts must examine the purported class's proposed damages methodology. 133 S. Ct. at 1433. As *Comcast* explained, it is an "unremarkable premise" that plaintiffs are "entitled only to damages resulting" from their theory of liability. "[A] model purporting to serve as evidence of damages in th[e] class action must measure only those damages attributable to that theory." *Id.* Under *Comcast*, the Court must evaluate: (i) whether the damages model is consistent with the class-wide theory of liability; and (ii) whether damages are capable of measurement on a class-wide basis. *In re U.S. Foodservice*, 729 F.3d at 123 n.8 (citing *Comcast*, 133 S. Ct. at 1433-35). Where plaintiffs do not present a methodology for measuring damages on a class-wide basis for the entire duration of the proposed class period that meets these standards, "[plaintiffs] cannot show Rule 23(b)(3) predominance." *Comcast*, 133 S. Ct. at 1433.

## ARGUMENT

Plaintiffs' Motion for Class Certification should be denied. Plaintiffs have not proposed a damages methodology consistent with either of their two versions of a "false growth story" that can be applied on a class-wide basis across the entire proposed class period. Thus, they fail to satisfy Rule 23(b)(3)'s predominance requirement under *Comcast*.

5

I.        **PLAINTIFFS' PROPOSED DAMAGES METHODOLOGY.**

Plaintiffs' putative damages expert (and presumably by extension Plaintiffs) now assert

that there was only one so-called "corrective disclosure" that revealed the purported truth about

Defendants' alleged "false growth story," regardless of which version of that story Plaintiffs

prefer to tell.  That sole corrective disclosure, according to Dr. Tabak, occurred on November 9,

2011, when Green Mountain released its Q4 FY2011 financial results and announced that it had

missed the sales guidance it had issued on July 27, 2011.[1]

Dr. Tabak purports to use the decline in Green Mountain's stock price on the next trading

day – November 10, 2011 – to calculate the degree by which Green Mountain's stock price was

supposedly artificially inflated during the entire proposed class period.  2017 Tabak Report ¶¶

29, 48, 57, 72.[2]  After adjusting for movements in the broader stock market, Dr. Tabak asserts

that $26.29 per share of the November 10 stock price drop would be recoverable as inflation

attributable to the alleged fraud.  *Id.* ¶¶ 19, 46–48.  Dr. Tabak proposes to "back-cast" this

alleged price inflation by applying it proportionately across all stock purchases during the entire

---

[1] As the Court may recall, in their Complaint, Plaintiffs relied heavily on allegations first made in a presentation given by notorious hedge fund manager and short-seller, David Einhorn.  On October 17, 2011, Einhorn launched a now totally discredited attack on Green Mountain's stock by making a highly publicized presentation, entitled "GAAP-uccino" at the Value Investors Conference, which was republished two days later on October 19, 2011, in the *Wall Street Journal*.  The Complaint and Plaintiffs' Memorandum of Law in support of their Motion for Class Certification (the "Class Certification Memorandum") asserted that the Einhorn Presentation and its republication in the *Wall Street Journal* constituted partial corrective disclosures, but the 2017 Tabak Report rejects that premise. *See* Compl. ¶¶ 6-7, 133; Pls.' Class Cert. Mem. at 8; 2017 Tabak Report ¶ 65.  As Dr. Tabak puts it, "[w]hile the Complaint alleges that some truth 'began to be revealed' with the Einhorn Presentation, that was not the way that many market participants reacted to that presentation."  2017 Tabak Report ¶ 65.  To the contrary, Tabak notes that analysts dismissed the report as a summary of previously known information, and concludes that it would be inappropriate to "treat the Einhorn Presentation as a revelation of new information, much less a revelation of truth, to the market." *Id.*

[2] In moving for class certification, Plaintiffs relied on an earlier report by David Tabak, Ph.D. ("2016 Tabak Report").  Although Dr. Tabak asserted in that report that damages could be calculated on a class-wide basis, he provided nothing more than a generic description of a damages methodology that could be applied to any securities class action involving alleged price inflation.  He offered no insight into how that calculation could actually be carried out, nor any explanation of how it would purportedly correspond to the facts at issue in this case. *See* 2016 Tabak Report ¶¶ 57-61, attached as Exhibit A to the Declaration of Joshua E. D'Ancona, dated December 12, 2016.

6

proposed class period, running from February 2, 2011 to November 9, 2011. *Id.*; *see also id.* at Exs. 7a, 7b. In other words, he asserts that the "inflation" revealed in the November 10 stock price drop can be used to calculate the damages suffered by an investor who purchased Green Mountain's stock on any given day between February 2, 2011 and November 9, 2011. *Id.* ¶¶ 19, 46–48. Subject to certain statutory caps set forth in the PSLRA, Dr. Tabak asserts that each proposed class member would be able to recover the difference between the "true value" of Green Mountain's stock on the date of purchase (*i.e.* value after the alleged inflation is removed) and the price that class member actually paid. *Id.*

As explained more fully below, Dr. Tabak's "back-casting" damages model violates *Comcast*'s holding that a valid damages model may only assess damages allegedly suffered under a plaintiff's theory of liability. 133 S. Ct. at 1433. Under neither of Plaintiffs' versions of their "false growth story" can a single stock price drop occurring on November 10, 2011 be used to calculate damages consistently across the entire proposed class period (from February 2, 2011 through November 9, 2011). Nevertheless, that is precisely what Dr. Tabak proposes to do. Accordingly, Plaintiffs' Motion for Class Certification should be denied because Plaintiffs have not come forward with a proposed damages methodology that satisfies *Comcast*'s mandate and, thus, they have not met their burden of establishing predominance under Rule 23(b)(3).

## II. PLAINTIFFS FAIL TO SHOW PREDOMINANCE UNDER *COMCAST*.

### A. Plaintiffs' Proposed Damages Methodology Cannot Be Applied Consistently Across the Entire Proposed Class Period to Measure the Damages Allegedly Caused By the "False Growth Story" Described in the Complaint.

Dr. Tabak's proposed method for back-casting damages across the entire class period is inappropriate because it assigns damages to purchasers who have none. As explained in Defendants' Motion for Partial Judgment on the Pleadings, filed concurrently herewith, the *only* forecast that Green Mountain missed during the entire proposed class period was the sales

7

guidance issued by the Company on July 27, 2011. As a result, under the first version of Plaintiffs' alleged "false growth story," premised on allegedly misleading sales growth guidance, damages simply cannot be ascribed to those investors who bought Green Mountain stock before July 27, 2011, because those purchasers would not have relied on any sales growth forecast that was missed.

Each time Green Mountain announced its financial results for a fiscal quarter, it issued guidance on its expected net sales for the coming quarter and for the entire fiscal year. *See* Defs.' Mot. Partial J. on Pleadings at 5-6 (hereinafter, "Rule 12(c) Motion"). Specifically, on February 2, 2011, the Company reported its actual results from Q1 FY2011 and forecasted quarterly sales growth for Q2 of 92%-97%; it subsequently achieved 101% sales growth for that quarter. *See id.* at 5. In that same February public announcement, the Company projected 75%-80% annual sales growth for all of FY2011, and ultimately achieved 95% sales growth on the year. *See id.* Similarly, on May 3, 2011, the Company announced its actual results for Q2 FY2011 and issued Q3 quarterly sales growth guidance of 90%-95%; it subsequently achieved 127% sales growth for that quarter. *See id.* at 5-6. At the same time, the Company raised its earlier guidance for sales growth for the entire fiscal year to 82%-87% over FY2010; again, the Company ultimately achieved 95% actual annual sales growth. *See id.*[3]

---

[3] The Company's actual performance relative to its guidance for Q2 and Q3 FY2011 is summarized in the following table:

**Sales Growth Guidance and Results**

|  | Quarterly Guidance | Actual Results | Fiscal Year Guidance | Actual Results |
|---|---|---|---|---|
| **February 2011 Guidance** | Q2: 92%-97% | Q2: 101% | 75%-80% | 95% |
| **May 2011 Guidance** | Q3: 90%-95% | Q3: 127% | 82%-87% | 95% |

8

In other words, Green Mountain exceeded all of the quarterly and annual sales growth guidance it issued in releasing its Q1 FY2011 financial results in February 2011, and its Q2 FY2011 financial results in May 2011. Only on July 27, 2011, when Green Mountain announced its Q3 FY2011 financial results and provided guidance for Q4 FY2011 and revised guidance for FY2011, did the Company forecast growth that it ultimately did not exceed. Specifically, on July 27, 2011, the Company issued sales growth guidance for Q4 FY2011 of 100-105% and raised is sales growth guidance for the year to 97-98%. On November 9, 2011, the Company reported actual results that fell slightly short of this guidance – sales growth of 91% for Q4 FY2011 and year-over-year sales growth of 95% for the entire FY2011. *Id.* at 6.

Therefore, as a matter of law, Plaintiffs have not pled a viable securities fraud claim for any date prior to July 27, 2011. On every day before that point, those who purchased Green Mountain stock did so in reliance on a sales growth projection that the Company actually exceeded. As explained in Defendants' Rule 12(c) motion, courts consistently find that forward-looking financial projections cannot be false when the defendant actually achieves or exceeds its guidance. *See id.* at 7-8. Thus, at the most fundamental level, Plaintiffs have failed for those purchases made before July 27, 2011, to identify a statement about growth that was materially false. *Id.* Nor have Plaintiffs pled the requisite compelling inference of scienter where Green Mountain's executives provided forward-looking guidance that ultimately *underestimated* the Company's actual performance. *Id.* at 9-12. Had Mr. Blanford or Ms. Rathke wanted to inflate the price of Green Mountain stock, their incentive would have been to issue overly ambitious sales growth guidance, not the other way around. *Id.* And finally, Plaintiffs have failed to plausibly allege loss causation where the supposed "corrective disclosure" – the announcement of Green Mountain's Q4 FY2011 financial results – revealed that the Company had actually

9

*exceeded* the annual net sales guidance it issued in February and May. *Id.* at 12-14. Under those circumstances, Plaintiffs cannot plausibly claim that the February or May guidance created a risk that caused the November 10, 2011 price drop when the Q4 FY2011 results were announced. *Id.* Those putative class members who purchased Green Mountain stock before July 27, 2011 have therefore failed even to state a claim for securities fraud and are not entitled to any "back-casted" damages.[4]

The disconnect between the false guidance version of Plaintiffs' "false growth story" and Dr. Tabak's damages model is more than a mere pleading deficiency, although that would be enough to fatally doom Plaintiffs' motion. At this stage of the litigation, the Court must "probe behind the pleadings," *Comcast*, 133 S. Ct. at 1432, and consider the evidence itself. Gone from this case are the confidential witnesses referred to anonymously in the Complaint, or any of the Complaint's earlier allegations concerning a fabricated sale of 500,000 brewers to QVC, piles of obsolete inventory, or phantom truck movements that those witnesses were supposedly prepared to substantiate and that Plaintiffs touted before the Second Circuit on appeal. Likewise, Plaintiffs have developed no evidence, much less submitted an expert report, challenging the accuracy of Green Mountain's financial statements throughout the entire proposed class period. Accordingly, Plaintiffs have not even mounted a challenge that calls into question in any way the accuracy of the Company's publicly-reported sales figures, its reported inventory levels, or its reserves for any obsolete inventory between February 2, 2011 and November 9, 2011. *See* Gompers Report ¶ 6. Instead, all that remains of the case alleged in Plaintiffs' Complaint is a

---

[4] Moreover, as detailed in the report of Defendants' expert, Professor Paul Gompers, not only did Green Mountain achieve all of the quarterly and annual sales guidance it issued prior to July 27, 2011, it also met or exceeded *all* of the quarterly and annual earnings per share ("EPS") guidance it issued throughout the class period – including on July 27, 2011. *See* Expert Report of Prof. Paul Gompers, dated May 1, 2015 at ¶¶ 18-21 (hereinafter "Gompers Report"), Bueker Decl. Ex. A; Rule 12(c) Motion at 6. The Q4 FY2011 corrective disclosure was also confined to events occurring in Q4 FY2011, as Professor Gompers explains. *Id.* at ¶ 22.

single missed projection that was communicated to investors in Green Mountain's July 27, 2011 Form 8-K. [5]

For all purchases prior to that point, back-casting the alleged inflation from the November 10 stock price drop is inappropriate because, as Professor Gompers explains, pre-July purchasers could not have been injured by the allegedly false forecast issued on July 27, 2011 about the Company's growth prospects. *See id.* ¶¶ 25-27. By asserting that the alleged inflation should be back-casted proportionately across the entire class period (from February 2, 2011 through November 9, 2011), Plaintiffs seek to recover damages that are wholly divorced from their "false growth story" allegations. Those who bought before July 27, 2011 have no damages under this theory, but Dr. Tabak's proposed model improperly seeks to award them anyway. This result is prohibited by *Comcast*, as it goes far beyond "measur[ing] only those damages attributable to [Plaintiffs'] theory." *Comcast*, 133 S. Ct. at 1433.[6] Plaintiffs therefore fall short of demonstrating Rule 23(b)(3) predominance, and class certification should be denied.

Furthermore, the lack of any actionable claim before July 27, 2011 means that, even if the Court concludes that a class should be certified – and it should not – that class should be defined to begin no earlier than July 27, 2011. It is well-established that the class period cannot start

---

[5] Insofar as Plaintiffs attempt to argue that the Company's single miss of its revenue projections in Q4 FY2011 somehow revealed a "false growth story," that claim is further belied by the Company's results in the very next quarter. In Q1 FY2012, Green Mountain once again significantly surpassed its quarterly sales growth and earnings guidance. *Compare* GMCR FY2011 Q4 Form 8-K at Ex. 99.1, attached as Exhibit D to the Declaration of Anne Johnson Palmer in Support of Rule 12(c) Motion, dated May 1, 2017 (announcing quarterly guidance for Q1 FY2012 of 85% to 90% net sales growth and $0.35 to $0.40 EPS), *with* GMCR FY2012 Q1 Form 8-K at Ex. 99.1, Bueker Decl. Ex. C (announcing Q1 FY2012 actual net sales growth of 102% and quarterly EPS of $0.66).

[6] This conclusion is entirely consistent with other decisions in the Second Circuit applying *Comcast*. *See, e.g.*, *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 327 (S.D.N.Y. 2016); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2015 WL 5613150, at *7-8 (S.D.N.Y. Sept. 24, 2015); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015).The flaw in Plaintiffs' proposed damages methodology here is not that the Court will have to conduct plaintiff-specific damages calculations or sort out other factors that allegedly caused the stock price to decline but that affected all class members equally, but rather that Plaintiffs seek to recoup damages for pre-July purchasers through a damages model that is untethered from Plaintiffs' theory of liability.

11

before the date of the first actionable misstatement. *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013) (courts set the start of the class period on the date of the first alleged misstatement "as it is the injection of misinformation into the marketplace that distorts the price of the stock"); *see also In re Bank of Am. Corp. Secs.*, 281 F.R.D. 134, 148 (S.D.N.Y. 2012) (beginning the class period in a securities class action on the date of the first alleged misstatement). Because both the pleadings and the evidence developed by Plaintiffs establish that no pre-July 27 purchasers could conceivably state a claim for securities fraud premised on a missed forecast, any class that might be certified under such a theory could at most run from July 27, 2011 to November 9, 2011.

**B.** **Plaintiffs' Proposed Damages Methodology Cannot Be Applied Consistently Across the Entire Proposed Class Period to Measure the Damages Allegedly Associated with Their Newer, Capacity Constrained Theory of Liability Either.**

The 2017 Tabak Report submitted by Plaintiffs announces a new "capacity constrained" theory of liability. Under this theory too, Plaintiffs' proposal to back-cast damages across the entire class period violates *Comcast*.

**1.** *Dr. Tabak's New Capacity Constrained Theory of Liability.*

In his 2017 Report, Dr. Tabak theorizes that Green Mountain misled investors regarding its future growth prospects by making allegedly false statements about its inability to meet customer demand throughout the entire proposed class period from February 2, 2011 through November 9, 2011. Dr. Tabak "assumes" that Green Mountain supposedly lied to investors when it told them that it was unable to produce enough K-Cups to fill all the orders it was receiving. 2017 Tabak Report ¶¶ 31, 46. Relying on that assumption, Dr. Tabak claims the market inferred that the "true demand" for K-Cups in a given quarter was actually higher than the sales results that Green Mountain reported for that quarter (and, by the same token, higher

12

than the Company's forward-looking sales guidance for the next quarter), since the Company would have been able to sell more K-Cups if only it could have produced them. *Id.* ¶¶ 33-37. In contrast, if the Company had not represented that it was capacity constrained, investors would have seen the reported sales numbers for the quarter (and the sales guidance for the next quarter) as representing the "true demand" for K-Cups, and they would have adjusted their assessment of Green Mountain's growth potential downward accordingly, says Dr. Tabak. *Id.*

Under Dr. Tabak's capacity constrained theory, Plaintiffs claim that, by allegedly misstating that Green Mountain could not produce enough K-Cups to satisfy customers' current demand, Green Mountain supposedly misled investors into thinking that "true demand" was well above Green Mountain's current levels of sales and projections. Upon failing to make its Q4 FY2011 revenue projections, so says Dr. Tabak, Green Mountain's statements up to that point were revealed as false. For purposes of class certification, the problem with Dr. Tabak's capacity constrained theory is, quite simply, that Green Mountain expressly disclosed *on July 27, 2011* – well before the end of the proposed class period and well before the single corrective disclosure that Dr. Tabak cites – that the Company had not been capacity constrained during Q3 and would not be capacity constrained in Q4..

### 2. *Dr. Tabak's Capacity Constrained Theory Ignores Public Statements and Analyst Reports that Directly Contradict His Conclusions.*

Dr. Tabak's capacity constrained theory overlooks clear public disclosures made by the Company well before the end of the proposed class period and that directly contradict the very premise underlying his theory. Specifically, Dr. Tabak fails to acknowledge Green Mountain's statements on its July 27, 2011 earnings call that it had caught up with unmet demand from prior quarters, was well-positioned to meet the orders it expected to receive over the next six months, and therefore was no longer capacity constrained. Gompers Report ¶¶ 29, 39-41. Just as one

would expect, analyst reports demonstrate that analysts, investors, and other market participants understood these statements to mean that the Company had not been capacity constrained in Q3 FY2011 and would not be capacity constrained heading into Q4 FY2011.  Thus, at the very latest, the market knew the "true" level of demand as of July 27, 2011.[7]

Mr. Blanford and Ms. Rathke made several clear and direct statements during Green Mountain's Q3 FY2011 earnings call on July 27, 2011, explaining that the Company had caught up with pent-up demand during the third quarter and had sufficient manufacturing capacity to meet the orders it expected to receive over the next six months.  For example, Mr. Blanford stated:

> "While difficult to quantify, we also believe we saw a bit of catch-up effect from Q1 and Q2 in our fiscal Q3. [As we] have continued to add portion pack production capacity in Q3, we were able to fulfill customer demand that had pent-up in the system over the prior two quarters."

*Id.* ¶ 40.  Similarly, when an analyst asked Ms. Rathke about whether Green Mountain had been able to fulfill the backlog of unmet orders from prior quarters and return to appropriate inventory levels during the course of Q3 FY2011, she confirmed that they had done just that:

> FRAN RATHKE: […] Second, I think coming off of Q2 we definitely had shortages or outages of certain products.  So … [we] had a backlog that we fulfilled in Q3 on -- so that was a piece of it.  So I feel what we've been seeing and hearing from all of our accounts is that during Q3 we got back into a place where we knew we had appropriate inventory levels, and they felt comfortable they were getting appropriate inventory levels for the products.  So I think we're in good shape.  So we don't have any of that anticipated to happen in Q4. And then I think that's why I gave the guidance into Q4 that I don't expect as strong a growth rate.

---

[7] As Professor Gompers notes (but does not rely on in rendering his class certification opinions), there is no evidentiary basis for Dr. Tabak's assumption that Green Mountain's statements about being capacity constrained during Q1 and Q2 FY2011 were untrue.  *See* Gompers Report ¶¶ 30-36.  If necessary, Defendants will establish this fact beyond any dispute at summary judgment.

*Id.* ¶ 41.  A different analyst then asked Mr. Blanford whether Green Mountain had added enough capacity to feel confident about its ability to fill orders in the upcoming holiday season (which corresponded with the Company's Q1 FY2012):

> [Analyst] BRYAN SPILLANE: Do you feel like you have the capacity that you need for the orders that they're expecting to place over the next six months?  I'm just trying to get a sense for – there's a lot of the marketing at the holidays.  Are you going to be able to actually deliver on all the demand that could be there?
>
> LARRY BLANFORD: Yes, Bryan, this is Larry.  Right now, as we said, with the catch-up that – a little bit of the catch-up in Q3, I think our customers are at appropriate inventories, we're [at] appropriate inventories, and we're working to make sure we're well positioned going into the holidays. As I indicated earlier, in referencing the planning – the detailed planning we do with our major customers, as John was referencing, we have their numbers, we are committed to trying to deliver those forecast numbers, but it will be – Q1 and Q2 will be tight.  We don't have a lot of room for any upside.
>
> So we're working very carefully with all of our customers, we have good communications, we have plans as to rolling in inventories appropriately to get them ready for the holidays in front of our television advertising that will kick in in the US and Canada.  But we will be tight Q1, Q2 as we continue to add capacity pretty aggressively now and into – well through fiscal 2012.

*Id.* ¶ 42.  Taken together, these disclosures communicated quite clearly that Green Mountain did not believe on July 27, 2011 that the sales results it was reporting for Q3 FY2011 or the net sales guidance it was issuing for Q4 FY2011 and the fiscal year were limited by capacity constraints.

Assuming the market for Green Mountain's stock was efficient, as Dr. Tabak opines it was and as Plaintiffs argue in seeking class certification it was, Pls.' Class Cert. Mem. at 16; 2016 Tabak Report ¶¶ 14-56, then even on Dr. Tabak's theory, investors would have had full visibility into the "true demand" for K-Cups after these statements.  As Professor Gompers'

15

report details, comments by several market participants confirm just that. *See* Gompers Report ¶ 43.

On the July 27 earnings call itself, one analyst commented, "I understand the pent-up demand being alleviated with capacity . . . ." *See id.* Many expressed similar views in their subsequent reports about the call, observing for example: (i) "[m]anagement indicated that it has been racing to meet retailer demand since the 2010 holidays and was finally able to replenish those accounts in 3Q"; (ii) "[Green Mountain] believes it was able to catch up on 'pent up' demand from earlier in the year as additional K-Cup capacity was brought online"; (iii) William Blair & Company and Canaccord Genuity both reported on "added production capacity, which enabled the company to satisfy pent-up K-Cup demand"; and that (iv) "capacity caught up to pent-up demand during Q3." *See id.*

As Professor Gompers explains, these comments confirm that analysts, investors, and other market participants understood on July 27, 2011, that Green Mountain had overcome its K-Cup production capacity constraints. *Id.* ¶ 45. To the extent investors, analysts, or other market participants had previously believed that "true demand" lay somewhere above the sales guidance the Company issued, by July 27, 2011, the Company's clear disclosures disabused them of that notion. *Id.* Accordingly, they would have viewed the forward-looking sales guidance issued on July 27, 2011, as representing the true level of demand. *Id.* ¶¶ 45, 47.

Again, this assessment is corroborated by comments from analysts themselves. For example, one noted on July 28, 2011 that, "[a] significant K-cup acceleration [in demand] probably doesn't recur in Q4 as capacity caught up to pent-up demand during Q3, but the K-cup outlook is enhanced as demand is now more obvious." *Id.* ¶ 46. Then on September 13, another observed that "[d]emand is not a problem . . . Management was comfortable that it has enough

16

capacity to meet the demand over the next six months so we don't expect it to face the same supply constraints/out of stocks that negatively impacted earnings in 4Q10 and 1Q11."*Id.* Dr. Tabak notably makes no mention of any of these analyst reports.

As Professor Gompers observes, even assuming for the sake of argument that Green Mountain overstated its capacity constraints between February 2, 2011 and July 27, 2011, the market knew long before the end of the proposed class period that no capacity constraints existed. *Id.* ¶ 47. Again, assuming that the market for Green Mountain stock was efficient, this means that the stock price from July 27, 2011 onward would have accounted for the "true" level of demand. *Id.* Therefore, the drop in Green Mountain's stock price on November 10, 2011 cannot be attributed to any statements about Green Mountain being capacity constrained; instead, these statements could only have affected Green Mountain's stock price, if at all, between February 2, 2011 and July 27, 2011. *Id.* ¶¶ 47-48. Accordingly, the stock price decrease associated with the fourth quarter earnings announcement on November 9, 2011 could not have been corrective of Plaintiffs' allegations related to Green Mountain's capacity constraints because that information was already known to investors long before – on July 27, 2011. *Id.*

### 3.    *Plaintiffs' Capacity Constrained Theory Fails Under Comcast.*

Under *Comcast* then, applying the Plaintiffs' newly-created constrained capacity theory, this Court cannot certify a class for any period of time *after* July 27, 2011. Any class period premised on alleged capacity constraints necessarily and unavoidably ended on July 27, 2011, when Green Mountain disclosed to investors that it was no longer capacity constrained, months before the end of the proposed class period on November 9. What's more, a stock price drop occurring months later (on November 10, 2011) for apparently unrelated reasons cannot be used to measure damages consistently across even the shorter February 2, 2011 to July 27, 2011 period.

17

Beyond that, no class should be certified prior to July 27, 2011, because, as the Plaintiffs' themselves allege, Green Mountain's stock price went *up*, not down (from a closing price of $88.11 on July 27, 2011, to $102.57 on July 28, 2011), s*ee* Compl. ¶ 130, following Green Mountain's July 27, 2011 disclosure about its ability to supply customers' current demand. Without being able to show any stock price drop on the date of the actual disclosure, Plaintiffs would necessarily fail to establish loss causation, and their claims could not be sustained. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (securities fraud claim is subject to dismissal where plaintiff cannot "show that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security" (internal quotes omitted)). For that reason too, the Court should decline to certify a class in this case for any period of time.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that Plaintiffs' Motion for Class Certification should be denied.

18

Dated:   May 1, 2017

**COUNSEL FOR DEFENDANT KEURIG GREEN MOUNTAIN, INC.**

/s/ Randall W. Bodner

Randall W. Bodner
John P. Bueker
(admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 235-7050
randall.bodner@ropesgray.com
john.bueker@ropesgray.com

Robert B. Luce
Matthew S. Borick
DOWNS RACHLIN MARTIN PLLC
Courthouse Plaza
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190
Telephone: 802-863-2375
Facsimile: 802-862-7512
bluce@drm.com
mborick@drm.com

**COUNSEL FOR DEFENDANTS LAWRENCE J. BLANFORD AND FRANCES G. RATHKE**

/s/ Matthew B. Byrne

Matthew B. Byrne
GRAVEL AND SHEA
76 St. Paul Street, 7th Floor
P. O. Box 369
Burlington, VT 05402-0369
rhemley@gravelshea.com
mbyrne@gravelshea.com
Telephone: (802) 658-0220
Facsimile: (802) 658-1456

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was sent electronically to counsel for Plaintiffs on May 1, 2017.

Dated: May 1, 2017

/s/ Randall W. Bodner

Randall W. Bodner

20