```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

PATEL,                                  .
                                        .
        Plaintiff,                      .
                                        .  Case No. 22-cv-04915
vs.                                     .
                                        .  Newark, New Jersey
COINBASE GLOBAL, INC., et               .  November 18, 2022
al.,                                    .
                                        .
        Defendants.                     .
```

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES (the parties appeared via video conference):

For the Movant          CHRISTOPHER A. SEEGER, ESQ.
Rahul Sharaf:           Seeger Weiss LLP
                        55 Challenger Road, 6th Floor
                        Ridgefield Park, NJ 07660
                        (973) 639-9100
                        cseeger@seegerweiss.com

                        DARREN J. ROBBINS, ESQ.
                        Robbins Geller Rudman & Dowd LLP
                        655 W Broadway
                        San Diego, CA 92101
                        (619) 231-1058

                        Also present:  Dr. Rahul Saraf;
                        Michael Dell'Angelo

Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(APPEARANCES continued)

For the Movant          JAMES E. CECCHI, ESQ.
Sjunde AP-Fonden:       Carella Byrne Cecchi Olstein Brody &
                        Agnello, P.C.
                        5 Becker Farm Road
                        Roseland, NJ 07068
                        (973) 994-1700
                        jcecchi@carellabyrne.co

                        NAUMON A. AMJED, ESQ.
                        Kessler Topaz Meltzer & Check, LLP
                        280 King of Prussia Road
                        Radnor, PA 19087
                        (484) 270-1467
                        namjed@ktmc.com


For the Movant          RICHARD F.X. REGAN, ESQ.
Charles Bethune,        Decotiis Fitzpatrick, Cole & Giblin, LLP
III:                    61 South Paramus Road, Suite 250
                        Paramus, NJ 07652
                        (201) 928-1100
                        rregan@decotiislaw.com

                        RAMZI ABADOU, ESQ.
                        Kahn Swick & Foti, LLC
                        580 California St., Suite 1200
                        San Francisco, CA 94104
                        (415) 459-6900
                        ramzi.abadou@ksfcounsel.com


For the Defendants:     KEVIN M. MCDONOUGH, ESQ.
                        Latham & Watkins LLP
                        1271 Avenue of the Americas
                        New York, NY 10020
                        (212) 906-1200
                        Kevin.mcdonough@lw.com

|Hearing
|22-cv-04915, November 18, 2022

(Commencement of proceedings)

THE COURT:  All right.  Good morning.  We are on the record in Patel v. Coinbase, 22-cv-4915.

May I have appearances, please, of the various movants.

MR. CECCHI:  May it please the Court, James Cecchi, Carella Byrne, on behalf of the movant AP7.  With me this morning, Your Honor, is my co-counsel Naumon Amjed from Kessler Topaz.

THE COURT:  Okay.  Good morning to both of you.

MR. REGAN:  Good morning, Judge.  It's Richard Regan from Decotiis Fitzpatrick, Cole & Giblin on behalf of the movant Charles Bethune III.  And with me today pro hac vice admission is Ramzi Abadou.

MR. ABADOU:  Good morning, Your Honor.

THE COURT:  Good morning to both of you.

MR. SEEGER:  Good morning, Your Honor.  Chris Seeger from Seeger Weiss.  How are you?

THE COURT:  Fine.  Thank you.

MR. SEEGER:  Good to see you.

I am here with Darren Robbins from Robbins Geller and Michael Dell'Angelo from Berger and Montague.

And with us is our client, Dr. Saraf.

THE COURT:  Okay.

DR. SARAF:  Good morning, Your Honor.

THE COURT:  Good morning.

All right.  Anyone else?

MR. MCDONOUGH:  Good morning, Your Honor.  For defendants, this is Kevin McDonough from Latham & Watkins LLP.

THE COURT:  Yeah, we forgot about the defendants.

MR. MCDONOUGH:  We don't mind being forgotten about.

MALE SPEAKER:  Where would we be without a defendant?

THE COURT:  It's only temporary, I assure you, Mr. McDonough.

All right.

So I really convened this because I have some questions, and I also wanted to alert you that I plan to decide this outright and not as a report and recommendation because I think the law in Third Circuit allows me to do that.  But since that isn't the matter that was briefed, I wanted to give you -- I wanted to give you the heads-up and give you an opportunity to weigh in on that.

So that said, why don't I hear argument first from AP7 as to why it should be lead plaintiff.

MR. CECCHI:  Thank you, Your Honor.  I'll be very brief and then turn it over to my colleague, Mr. Amjed from

|Hearing
|22-cv-04915, November 18, 2022

Kessler Topaz.

Your Honor is familiar with these types of applications.  You've had a number of them before that you've decided.  In fact, in 2017, you appointed AP7 lead plaintiff in the Allergan case.  And that decision, Your Honor, went all through all the PSLRA factors, albeit it wasn't as vigorously contested as this application, but, nonetheless, Your Honor appointed AP7 in the Allergan case, presided over that case, which was successfully resolved by AP7.

Not particularly unusual for AP7, as our briefing reflects.  It's a sophisticated institutional investor.  It's collected over $1 billion over the last seven actions where it's been appointed lead plaintiff.  In this case -- and I know there'll be some discussion of how you calculate loss -- but under the prevailing standards, which Your Honor is well familiar with, it has the largest loss by far.  And it's clearly the presumptive lead plaintiff here.  Notwithstanding the predictions of doom and gloom by my friends -- my dear friend Mr. Seeger and my friend Mr. Robbins, there was no challenges to standing in the Allergan action.  There were no discovery matters which prevented AP7 from vigorously litigating that to conclusion.  The prevailing case law in the last decade has been that the standing challenge raised here is not meritorious for the prudential standing reasons which we briefed.

So Your Honor has a track record with AP7.  The judges in the Southern District have a track record.  Judges around the country have a track record.  It's clearly the presumptive lead plaintiff.  There's no reason in the record, no proof in the record that it won't prosecute this action professionally, diligently, as it's done in the past in all its other actions.

So that's the overview.  I'll turn it over to Mr. -- my colleague Mr. Naumon Amjed to fill in any more details.

THE COURT:  Okay.  Thank you.

MR. AMJED:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. AMJED:  I think you hit the nail on the head in terms of AP7's experience, its sophistication, and this Court's personal experience in appointing AP7.

In our view, under Cendant, this should be a very straightforward analysis.  It has the largest financial interests.  It's made a prima facie showing of adequacy and typicality.  And there's absolutely no proof provided by the competing movants to suggest that AP7 is subject to any defenses or its standing is somehow in question.

AP7's standing is a settled matter, Your Honor.  In the 12 cases where AP7 has been appointed lead plaintiff, in the five cases where it's been certified and in the seven

cases that it settled, it's always maintained standing under the prudential exception, because as noted by the Court in Ocwen, it is obligated to protect the equity fund, which, as explained by the Ocwen court, is pool of assets who are unable to act on their own.

THE COURT:  May I ask you something, though?  I'm familiar with the prudential standing cases, and I reread them in preparation for this argument.  So I am not asking about the prudential standing cases.

But I was curious about the legal mechanics by which AP7 as an asset manager has the right to bring suit on behalf of the shareholders in Coinbase.  So is there -- if you could walk me through that.  Is there a power of attorney?  Is Swedish law involved?  I just want to understand that a little bit better.

MR. AMJED:  Sure, Your Honor.  Yes, so AP7 is a asset manager under -- it's an arm of the Swedish government.  Under Swedish law, there are two funds.  There's the AP Act and Investment Funds Act.  Those two acts work together to define who, what the responsibilities are of an asset manager like AP7, and what the obligations are of AP7 to protect investments that are made in funds under its jurisdiction.

And I refer to these as "funds" because that's what they're called.  But they're actually pools of assets.  They're similar to bank accounts that have, you know, no

employees, no boards of directors, no capacity to appear in courts of law.  And that's all spelled out under the AP Funds Act and the investment companies act under Swedish law.

THE COURT:  Is that in your papers?  I know you said that I could take judicial notice of prior opinions that went through some of this.  But can you point me to, if I were going to rely on that in an opinion, where I would find the information?

MR. AMJED:  The Ocwen court, which we cite in our brief -- the analysis, as do the other opinions, we didn't put that specifically in there in our papers, just given the number of U.S. district courts that have decided on this issue.  It seemed redundant, but the Ocwen court explains how it got to the conclusion that AP7 did have standing under the prudential exception.

THE COURT:  Okay.  So Ocwen outlines -- so whatever was relied upon in Ocwen is equally applicable here?

MR. AMJED:  Absolutely, Your Honor.

THE COURT:  Okay.  All right.

I had another question for you.  I mean, going through what -- I think it was Mr. Seeger in his papers outlined the assertion of the Hague Convention, but I don't think it was by AP7.  I think, if I understood properly, it was third parties in Sweden that, perhaps, AP7 didn't control that asserted the Hague Convention.

Now, I'm nothing if not diligent in moving my cases along; I'm very focused on that. And I know whenever the Hague Convention rears its head, it results in at least a three-month delay.

So at least as to AP7, is AP7 willing on the record today to waive any rights under the Hague Convention to have discovery served upon it pursuant to the Hague and to participate as if it were an American-based party?

MR. AMJED: Absolutely, Your Honor.

THE COURT: Okay. All right.

Do you anticipate any third parties in Sweden being witnesses? Because, you know, you can't waive the Hague on their behalf.

MR. AMJED: In other cases, I believe defendants have attempted to obtain discovery from third parties in Sweden. I think in one of the cases, there was an arrangement where we allowed -- or the parties allowed their U.S. subsidiaries to be served discovery. So to the extent AP7 has the ability to assist -- certainly will. The defendants, you know, they have the right to pursue discovery that they deem best. And I think the issue in these other cases are pointed out by the competing movants. You know, those were allegations that defendants have made in the course of class certification briefing. I don't believe they have been adjudicated at this point. And I don't believe

there's been motions to compel AP7 to act in a certain way vis-à-vis the third parties.  So it's possible.  But at this point, you know, it's -- I would be speculating, as with anyone else, as to what the scope of discovery would be in this case.

THE COURT:  Okay.  No.  I understand that.  But I just wanted to know if there was anything anticipated now.

Okay.  Good enough.  So, please finish.

MR. AMJED:  Okay.  Getting back to the issue of AP7's standing, you know, Your Honor, as we set forth in our briefing, there's been a number of district court opinions that directly address this issue.  The most recent was the 2020 opinion -- by Judge Liman where he appointed AP7 over challenges raised by Robbins Geller which were virtually identical to the ones before this Court.  For that, the Ocwen decision, which we discussed, AP7 was appointed as the sole lead plaintiff there, after the court analyzed the prudential exception.

The GE opinion from Judge Furman in 2018 is another case where the court appointed AP7 as the sole lead plaintiff there.  And there, Judge Furman's opinion is very specific. He said, "I do conclude that the prudential exception applies to AP7 and standing is not an issue."  Again, in the GE opinion, Judge Furman rejected challenges brought by Robbins Geller, which were, again, virtually identical to the ones

before this Court.

And then the Goldman decision in 2019, Judge Broderick appointed AP7 as the sole lead --

THE COURT:  So do you -- is your position that -- look, all the district judges in the Southern District, they're not bound by one another's opinions, obviously, and they haven't.

So I think Judge Pauley had two decisions that went against you, and maybe there was one from Judge Caproni.

MR. AMJED:  Yes.

THE COURT:  But are there any other decisions that were adverse to AP7 on the prudential exception?

MR. AMJED:  It was just the Judge Pauley decision from 2011.  And it wasn't just the Southern District judges; it was the -- Ocwen is from the Southern District of Florida. So that's another district court that looked at Judge Pauley's decision and said that didn't it comport with the PSLRA.

In addition to those specific decisions that talk about AP7's standing, there's Judge Andrews' decision in OFI from the District of Delaware which also looked at the analysis Judge Pauley applied in Baydale, which was the precursor to Pipefitters AP7 decision.  And Judge Andrews said the approach taken by Judge Pauley in Baydale and then by extension Pipefitters, didn't follow the appropriate law

because it reversed the standards of proof that are required to rebut the presumption.  And he concluded that Judge Pauley's analysis relied on speculation.

So not only -- not only does the law clearly support AP7's standing, which four separate federal judges looking at the issue and concluding AP7 does have standing under the PSLRA, but the facts don't support the issue either.  As Mr. Cecchi pointed out, in all of the cases where AP7 has been appointed where it's been certified as a class rep and where it settled, it never once has been successfully challenged by defendants as to its standing.

The Luckin court and the Goldman court both noted -- in their opinions, and that continues to be the case.  So despite the doom-and-gloom scenarios that's been painted, it's, one, not supported by the law; two, not supported by the facts.

You know, my colleagues pointed to a, quote, recent trilogy of authorities to make the suggestion that courts were increasingly rejecting European asset managers.  If I could just quickly run through these cases to show why they don't apply, Your Honor.

The first case, Gross v. AT&T rejected a Belgian asset manager's claim of standing under the prudential exception because there was no barrier to the fund's ability to protect itself.  That's not what's happening here, because

the equity fund, as pointed out by <u>Ocwen</u>, cannot act and cannot protect itself.

The second and third cases, <u>Purecycle</u> and <u>Array</u>, both involve the same asset --

THE COURT:  Say that again.

MR. AMJED:  <u>Purecycle</u> and <u>Array</u>, A-r-r-a-y, both involve the same entity, Erste, E-r-s-t-e.  It's an Austrian asset manager that claimed assignment-based standing under Austrian law.  AP7 has been [sic] claiming assignment-based standing, and, again, the prudential exception is analyzed under U.S. law.

I think the interesting point about this trilogy is the court that authored the <u>Array</u> opinion, Judge Marrero in 2021, a year later also authored the <u>New Oriental</u> opinion. In <u>New Oriental</u>, he appointed as the sole lead plaintiff the German manager, who claimed standing under the prudential exception because, like AP7, it was the only entity able to protect the funds, and the funds were not able to protect itself.

Another opinion from 2022, <u>DocuSign</u>, from the Northern District of California, Judge Orrick appointed a Luxembourgian fund who claimed standing under the prudential exception.  And there, he noted that "courts routinely recognize the exception articulated in <u>Huff</u> when faced with facts similar to these."

New Oriental and DocuSign confirmed that the exception continues to provide managers who fall into its scope the ability to act as lead plaintiff.  The purported trilogy of cases, Your Honor, is just a series of distinguishable cases where courts made rulings based on the particular plaintiffs before them.  They have nothing to do with AP7 or the four on-point district court opinions that specifically allowed AP7 to proceed as lead plaintiff under the PSLRA.

THE COURT:  Okay.  All right.

Can I ask you briefly -- and I'm sorry that I didn't give you a heads-up beforehand, but at this point, without having researched it, any opinion on my ability to issue an outright opinion as opposed to a report and recommendation on this?

MR. AMJED:  I don't believe so, Your Honor.  I think that's fine.

THE COURT:  Okay.

MR. CECCHI:  No, Judge.  We don't.

THE COURT:  Okay.

Yeah, I just don't want to mess up Judge Martinotti and create confusion that if the parties contend -- I'd rather know now if there's going to be an objection.

So ...

All right.  Why don't I turn to counsel for

Dr. Saraf, and I'm happy to hear their arguments.

MR. SEEGER: Sorry. I didn't mean to talk over you, Judge. Good morning. Mr. Robbins is going to take the lead on the argument for our group.

THE COURT: Okay. Great. Thank you.

MR. ROBBINS: Thank you, Your Honor. Darren Robbins on behalf of Dr. Saraf.

And I'd like to address your questions, and then, perhaps, address some of the case law that has been touched upon in your colloquy with Mr. Amjed.

As Your Honor is intimately familiar with, Cendant provides guidance not just to the judges in the Third Circuit but actually is the seminal opinion on this issue penned almost 20 years ago. And I've read --

THE COURT: Oh, I know. Both my children were born during Cendant. It's remarkable how long that case lasted. It was fun to be involved in it.

MR. ROBBINS: It was incredible. And Chief Judge Becker did a wonderful job laying out the standards. And Your Honor has been very specific in addressing those provisions, primarily pages 263 to 265, which walk through the standards. And it set kind of the benchmarks for courts to determine these issues.

And in the Third Circuit, the financial interest, obviously, drives the decisions. But there's the second

provision, which is included, that in the words of the statute in determination of the court will determine who is the presumptive plaintiff. And I want to get very specific on those words with Your Honor. When the Third Circuit addressed this at page 263, the court said that judges must ensure that a movant satisfies both the typicality and adequacy requirements of Rule 23 before conferring the presumption.

And went on in assessing this -- it's interesting -- the court cited Hassine, H-a-s-s-i-n-e, in that section as to the Rule 23 standards before the presumption attaches and actually said, "Courts should consider" -- I quote, "should consider whether the circumstances of the movant with the largest losses are markedly different," from the rest of the class.

And the Hassine -- and I think this case bears on this issue. So it's not just adequacy and typicality, but Hassine dealt with -- it was a prisoner case and dealt with the standing issue, calling it a "threshold inquiry." You know, the Warth v. Seldin, Valley Forge, the notion that a litigant must show an injury and redressability and all this applies before the presumption attaches.

So with that in mind, I'd like to go through the cases that were cited to you. You know, when AP7's standing -- when they tried to make the showing -- because

you had a colloquy where it's been discussed about Swedish law and the Acts, and Your Honor asked the question about "Is that before me?  You can cite me some cases and district judges who had an evidentiary record about the showing that was made in those cases."

And you asked the question very directly:  What's before me?

And there was no answer as to the showing.

But the Third Circuit was clear that before a presumption attaches, a showing must be made in each of the regards we just discussed.

That did not occur here.  It was attempt before Judge Pauley in the case that you read, the Pipefitters case -- what I call the "B of A" case.  And Judge Pauley said that's not adequate.  That is not going to trigger the presumption.

And then you heard about --

THE COURT:  What did he say was not adequate?

MR. ROBBINS:  He pointed out that because AP7 did not own the securities, it was not able to make the showing required of it under Rule 23, even on a prima facie basis.  That was followed up by another decision from Judge Pauley which you touched on.

And then you asked about the Southern District cases.  And although the Southern District judges, obviously,

are not bound by Cendant, I think the principles articulated in Cendant have guided them, but they don't rigidly adhere to them. And those judges in the what Mr. Amjed referred to as the "trilogy" are a recent series of cases -- interesting enough, two of the three of them had both a decision -- the one from judge Caproni is Gross v. AT&T, which we cite in our opposition, which is Docket 28 at page 7. Judge Caproni decided the issue, and then had a reconsideration brought on, and she issued another opinion.

And on reconsideration, she said -- and I quote -- "here, the risk that KBC may lack standing to pursue the action under controlling precedent is serious." And with that, she was unwilling to budge and appoint a Belgian fund manager, just like AP7.

That was followed a couple of years later in 2021, just last year -- a couple of these decisions are very recent -- by Magistrate Judge Kelly in the Middle District of Florida, who appointed a movant with one tenth the losses of another European fund manager, and that judge, Judge Kelly, said -- and it just touches on your colloquy earlier that "Erste AM does not state that it bought Purecycle shares; it states that its funding incurred a loss."

Well, when Your Honor looks at the evidentiary record here and you look at the certification, which is the only evidence that was put before you of AP7, you saw, I'm

sure, Your Honor, the footnote.  And going back to Judge Kelly in the Purecycle case, which is 2021 WL 5259840, he concludes, "Erste AM thus fails to demonstrate that it has any financial interests in the relief sought in this litigation."

So when you queried Mr. Amjed, you had a discussion and it was explained to you in argument that there were these Acts, which are not before the Court, and they work in a certain way under Swedish law.  You've received no translations of those Acts.  You've received no explanation that the Court can make its own assessment of the showing here.

And, instead, you're told, "Look at Ocwen.  There was a judge 10 years ago that looked at this, and it was fine.  So don't worry about it because a district judge looked at this."  And, again, a district judge outside the --

THE COURT:  Mr. Robbins, what -- am I to ignore that AP7 has actually never had, hasn't litigated a successful standing challenge.  I mean, if it were such a weakness, why wouldn't it have manifested in these cases where there's so much at stake?

MR. ROBBINS:  First question to be asked.  It's a great question, Your Honor.

And as we all know --

THE COURT:  Thank you.

MR. ROBBINS:  -- well, I just -- I think that it is instinctively -- you've been shown a chart.  And I'd like to walk through that chart.  It's Exhibit 3.  It's Docket 31-3.  You were given a chart in the reply brief, which says, "Look, Your Honor.  AP7 has this long history of success."

Well, there's more than meets the eye.  If we walk through that chart --

THE COURT:  Let me find.  I have it here, I think.  I've got a lot of briefs.

Can you call out the ECF Number on top banner?  Is it 20?

MR. ROBBINS:  31-3.

THE COURT:  Oh.  31.

MR. ROBBINS:  In the reply brief filed by AP7.

THE COURT:  Yup.

MR. ROBBINS:  And this is not a complete chart, Your Honor.  In trying to go through this, there seems to be dozens of cases that AP7 has filed or sought lead plaintiff.  This is about a dozen of them.

THE COURT:  Okay.

MR. ROBBINS:  There was another one filed in Delaware.  So I -- I find somewhat interesting the criticism that Dr. Saraf has one another case when I see dozens here.  And Dr. Saraf is obviously participating in the hearing, and Dr. Saraf, not to put too fine a point on it, that $7 million

|Hearing
|22-cv-04915, November 18, 2022

is his own money.  He built a phenomenal --

THE COURT:  What's the answer to my question about whether I should factor in that there's never been a successful standing challenge against AP7?

MR. ROBBINS:  I'd like to go down the chart.  Do you have it in front of you, Your Honor?

THE COURT:  No.  I don't.  You know, I guess I didn't print out that one thing.  I can pull it up on docket.

But why don't you describe it to me.  I know I looked at it.

MR. ROBBINS:  Sure.  Sure.  And I'll go -- I'll start in reverse order with the cases that AP7's counsel --

THE COURT:  Give me a general -- I don't have it in front of me.  If it's worth -- I could do a screen sharing if -- oh, I guess you're not -- set up for that.

MR. ROBBINS:  No.  Sorry.

It's okay, Your Honor.  There's -- there are only two cases in the last five years in which AP7 has been certified and these issues that you raised about discovery and these issues about standing and adequacy -- you know, the concern is how do they manifest?

Well, I'll show you how they manifest.  The last one is Luckin.  That was a judge -- a case before Judge Liman in the Southern District.

THE COURT:  Right.

MR. ROBBINS:  And on the chart, it shows that this was a great success, $175 million settlement, earlier this year.  And that's touted in the papers as part of this billion dollars' worth of recovery, and there's much more that meets the eye as to that billion, I will tell you.

So in this case, in Luckin, what you don't know, Your Honor, is that there were a billion and three-quarters of newly issued securities that were sold.  There were major investment banks in New York -- like Credit Suisse and Morgan Stanley as defendants.  So these securities that were sold for a billion and three quarters became worthless.  The damages in the case approximated $2 billion.  So $175 million is hardly anything to write home about.

And I can tell you that getting five or ten cents on the dollar is not something that Dr. Saraf aspires to with respect to this case.  So that case --

THE COURT:  It doesn't address my question.  I understand you want to make points, but I asked a question.

MR. ROBBINS:  Okay.  Your Honor, the answer to the question is under the rubric of Rule 408, neither you nor the members of the class are entitled to see what goes on in the darkness of settlement.  That's the way it's set up.  And when are defendants going to exploit these --

THE COURT:  No, no, no.  All right.  Okay.  But, I mean, I'm talking about a challenge to standing that was

successful against AP7 in the life of the litigation after they were appointed lead plaintiff.  And there hasn't been one.  Right?

MR. ROBBINS:  Why would someone -- if you go to the beginning of this chart, there's a settlement, Your Honor, in a Johnson & Johnson case in the District of New Jersey which was settled for 23 million --

THE COURT:  The point is they settled out before they came -- before the standing challenges could be asserted.  And they -- they accepted a poor settlement in order to avoid facing that challenge.  Is that the point you're trying to make?

MR. ROBBINS:  That is the point I'm trying to make.

THE COURT:  Okay.

MR. ROBBINS:  In that case, there was an unopposed lead plaintiff motion.  The case was settled -- I mean, just the facts.  The case was settled for $23 million.  The notice in that case said that shareholders could expect to get five cents a share.  Five cents a share.  The AP7 itself had 84,000 shares.  So it got $20,000, and the class, after fees got four cents a share.

Dr. Saraf has not sought to be lead plaintiff to get five cents a share in this case.  There is real money at stake here, Your Honor.  That is my point.

THE COURT:  I have a couple of questions -- I have

a couple of questions about Dr. Saraf.

MR. ROBBINS:  Yes.

THE COURT:  You make this argument about his relative percentage of loss should make him the presumptive lead plaintiff.

What is the authority for the relative percentage of loss being the factor that I should consider?

MR. ROBBINS:  The Campbell Soup case, Your Honor, from Judge Irenas.

THE COURT:  So Judge Irenas's decision in Campbell Soup.

Anything else?

MR. ROBBINS:  That is the principal authority which we rely on.

THE COURT:  Okay.

Another question I had was if Dr. Saraf was engaging in some 500 trades a day, that would be difficult physically to do.  I'm wondering if he, perhaps, used some kind of program to effect those trades.  Do you know?

MR. ROBBINS:  No.  He did not.  Your Honor, those trades -- and I can give you some examples -- when trades are made, oftentimes they're broken down.  I can give you several days where it looks like there's seven or eight trades that take place where they're just broken down by Ameritrade or the trading house.

THE COURT:  Okay.  So he wasn't using some computer program to effect the trades.  He was watching the market?  He was relying on statements that were made?

MR. ROBBINS:  He relied on --

THE COURT:  -- and all his trading?

MR. ROBBINS:  Yes, he relied on the integrity of the market.  And my authority -- first of all, the cases -- and I'd be glad to walk through the cases that were cited by AP7 and how they do not apply even close; mainly, JC Penney and a case called Apache, one from Texas -- actually both of the cases are from Texas.  And they didn't apply here at all.  The big focus on those cases is someone who buys and sells their entire position.

In fact, Dr. Saraf bought shares and held the entirety of some of his accounts till the end, and others, he did buy and sell, but he held to the end and was holding shares.  So he is not engaged in any kind of programmatic trading.

THE COURT:  Okay.

MR. ROBBINS:  Yeah, this was -- again, the hard-earned money of his endodontics practice over a 20-year period -- that was invested in a traditional way.

And I'd be glad, if you would like, to walk through the rest of their cases that they cite for this notion that somehow, because he traded -- in fact, I'd say almost half of

his trading, he traded less on the days he bought than did AP7. AP7 effected three trades on the day it bought, and he bought three or less times in about -- I think he traded about -- I think he traded on 60, 70 -- 60 or 70 days during the period. And about third or 40 percent of the time, it was one or two trades. Other times, it was broken down. And if you want to walk through those, I can show you --

THE COURT: Okay. It's not a major point, but, you know, it did strike me that there could be a problem with reliance -- with that many trades, depending on how he engaged in the trades. But -- okay. But you've answered the question that he was -- he was busy. But he was paying attention to the market.

MR. ROBBINS: Their lead case on that --

(Simultaneous conversation)

MR. ROBBINS: Their lead case on that, Your Honor, was Apache. And in that case, the plaintiff was a net seller and net gainer and, you know, had trades where they liquidated their position entirely. So it's somebody moving and trading not on the integrity market.

And Mr. Saraf is not that; not even close.

THE COURT: Okay. All right.

Anything further?

MR. ROBBINS: Well, I wanted to maybe touch on Judge Marrero's decision where he too rejected a European

asset manager --

THE COURT:  The case?

MR. ROBBINS:  The case is called Array Plymouth County?  Would you like the cite?

THE COURT:  It's probably in your table of contents, so let me just see that I have it there.

Yeah, go ahead and give me the cite, if you would.

MR. ROBBINS:  It's 2021 WL 4298191.

THE COURT:  Okay.  Court?

MR. ROBBINS:  And it's at pages 4 and 5 -- Southern District of New York.  And the reconsideration, which was also denied when the evidence was attempted to be put in to support triggering the presumption and meeting the standards under the prudential exception is 2021 WL 5051649.

THE COURT:  Okay.

MR. ROBBINS:  And that's just last year.

And in all of those cases, just like here, there was no showing made about the mechanics of foreign law and whether the Article III standards, the prudential exception to satisfy Article III, were made.  And so Judge Marrero, again, articulated that they not only failed to meet the standard, but also failed to establish that there were any barriers preventing the underlying fund to bring the claims, because you're getting a lot of argument, but there's been no showing made.

The only showing, of course, is in the certification that was attached to AP7's motion, which says that AP7 has no injury in fact.  That's what it establishes, unequivocally.

THE COURT:  Okay.

Do you have an opinion on my ability to issue this as an opinion as opposed to report and recommendation?

MR. ROBBINS:  It's not something that I've looked at --

THE COURT:  -- the point being whether it's a dispositive decision or not.

MR. ROBBINS:  Your Honor, I leave that to my colleague Chris Seeger.  I don't -- I don't have a view of the applicable law in the Third Circuit on that issue.

THE COURT:  Okay.

MR. SEEGER:  Since it's been bumped to me, Judge, we don't -- we have no issue with you issuing an outright opinion.

THE COURT:  Okay.  Thank you.

All right.  Anything further?

MR. ROBBINS:  There was some discussion -- I guess, I'd like to end, Your Honor, with the discussion about the other cases and the diversion and Your Honor's request of AP7 to participate as if it were in the U.S.  Obviously, it goes unstated, that we're willing to submit -- and the real key in

each of the cases that we highlighted in the briefing was third parties, which AP7 states that it's unable to control, even though its investment managers, who have been given hundreds of millions or billions of dollars of AP7's money, their assertion is that the discovery process should not be streamlined because they don't control the investment managers.  And you asked about Sweden.  Eleven of thirteen investment managers, I believe, in the Qualcomm case were either in Sweden or many of them were in London, and there was no access to those documents.  So the defendants felt prejudiced.  And I am not carrying any water for defendants. I don't ever want to be accused of that.

But the --

THE COURT:  Well, the interesting thing is these motions are like the equivalent of a political primary where the other party is sitting there watching you attack one another and taking notes.

MR. ROBBINS:  It certainly is the case, and -- but I think the standard, you know, in the Third Circuit is -- under Beck v. Maximus, is does these -- do these diversions become a major focus of the litigation?  And here, that's clearly, as you see in the briefing, become a focus in AP7's litigation.  And, again, I think that the results that have been obtained, either via stipulated search or very modest relief show -- because Your Honor's participated in many

settlement conferences and I have too -- and under the cloak of 408, we all know that everybody exploits every argument. And defendants --

THE COURT:  Right.

MR. ROBBINS:  -- most assuredly will do that.

THE COURT:  Yeah.  I mean, most of the discovery in these cases does come from the defendant, though.  So -- but that -- you know, I'm weighing that in, given that there are Hague Convention issues.

I've also anecdotally -- and it's really anecdotal, but I've had a couple of Hague Convention issues with Sweden. And it's been pretty expedited.  UK is a little bit different.  A little bit harder.

MR. ROBBINS:  Right --

(Simultaneous conversation)

MR. ROBBINS:  Well, in the end, what's clear, Your Honor is the Third Circuit has spoken and that Cendant, you know, has a threshold showing that needs to be made. That showing was not made here.  And in Hassine, the Third Circuit talked about standing be a threshold inquiry, and neither of those thresholds have been made.

So the presumption is, in fact, Dr. Saraf's, and nobody has made any argument other than the trading.  And the trading is nowhere near any of the case law that has been used to undermine his adequacy or typicality.

And so Dr. Saraf should be appointed lead plaintiff.

THE COURT:  Thank you, Mr. Robbins.

MR. ROBBINS:  Thank you.

THE COURT:  All right.

Finally, for Mr. Bethune.

MR. REGAN:  Good morning, Judge.

THE COURT:  Good morning.

MR. REGAN:  Ramzi Abadou is going to take the argument for our client, Mr. Bethune.

But I would bring to the Court's attention, we have worked effectively as liaison counsel with Mr. Abadou's firm recently in a class action, Kanefsky v. Honeywell.  That was before Judge Martini and was resolved this summer.  And in the past, we have also worked effectively as co-lead liaison counsel with Mr. Chapman.

So we just bring that to your Court's attention.

I'll let Mr. Abadou take over.

THE COURT:  Okay.  Thank you.

MR. ABADOU:  Good morning, Your Honor.  May it please the Court, we appreciate the opportunity to provide our arguments.  I spoke to Mr. Bethune earlier this week about this argument, and he also is grateful for the opportunity.  I'll keep my comments short due in large measure to the fact that, obviously, Mr. Bethune has kind of

emerged from this scrum unscathed.  No attacks with respect to his adequacy.  No attacks with respect to his typicality.

And with that in mind, I would like to raise one issue of kind of statutory construction that I think the Court should be curious about in this case because -- because when Congress enacted the PSLRA in 1995 over President Clinton's veto, the term "financial interest" and the relief sought by the class was not defined by Congress.  It could have used the word "loss," but instead it used the word "financial interest."  And courts over the years, in looking at that, have taken different approaches to analyzing what that term means, what that phrase means, and what it should mean in the context of these contests.

And I think the Campbell Soup decision by Judge Irenas really hits the nail on the head when it comes to Mr. Bethune's financial interests in this case.

THE COURT:  He is a very great man.  A Princeton man.  I have great respect for Judge Irenas.  I just don't know that many courts share that -- that view.

MR. ABADOU:  Sure, Your Honor.  And --

THE COURT:  And, of course, he was part of our court.

MR. ABADOU:  I'm aware.  And I'd like to, perhaps, convince you that maybe you should take that view.  And this is the reason why.  Mr. Bethune lost $477,000 in this case.

I spoke to him about his loss. And that constitutes about nearly sixty percent of his 401(k). All right? There's no standing issues with respect to Mr. Bethune. He's not been attacked on any issues.

When I look at a firm like AP7, sure, they claim to have lost $10 million. It's an $80 billion fund. So what's its financial interest in the relief sought by the class here? What motivates it to be lead plaintiff in yet another case?

By my math, at 0.0125 percent --

THE COURT: All right. Can I ask you --

MR. ABADOU: Sure.

THE COURT: -- I mean -- I guess there is a preference for institutional investors, because an individual, I think -- this is my own opinion -- is likely to be busy, overwhelmed by the significance of this kind of litigation. And it guarantees, in my view, that the lawyers run the entire show. And that is a concern. Not that I have anything against lawyers; they know what they're doing and so forth. But the client should be involved.

And I have found that when there are institutional investors, they are involved. Sometimes to my chagrin, but they are involved.

MR. ABADOU: I would say this, Your Honor. I disagree with that premise. First of all, there is a

preference for institutional investors in the legislative history of the statute.  But there's no mention whatsoever of institutional investors in the statute itself.

And that's what governs here.  It's the statute. It's not the legislative history.  In fact, in the legislative history, there's comments about the risk of appointing institutional investors because of the conflicts of interest that can occur between large funds and the banks that are oftentimes defendants in these cases and entities like Blackstone here, which, I believe, is one of the money managers for AP7, has a relationship with Coinbase.  So I disagree with that premise.

If you look at the papers that were presented to the Court, Mr. Bethune is the only applicant, the only applicant before the Court who submitted a declaration attesting to, under penalty of perjury, his commitment to this case.  So I disagree that the legislative presumption for institutional investors should in any way suggest that Mr. Bethune, who's an Air Force veteran, who's been working at NASA for over 30 years, is going to let me run this case without his involvement, and that's precisely what he said in his declaration.

THE COURT:  He seems to be an honorable man, but maybe his expertise is not in running securities litigation.

MR. ABADOU:  And the expertise absolutely comes

from the lawyers.  I don't think AP7 has any expertise in running securities litigation.  That's why they hire a law firm to do it for them.

My question and my curiosity is why a fund that's already involved in so many cases, which has a 0.0125 percent financial interest in this case is so motivated to be involved in yet another case.  And so when you talk about lawyer-driven litigation, I think, you know, perhaps, it works the other way around here with AP7 and its counsel.  So that's -- that would be my response to the Court's -- to the Court's view there.

You know, we share Mr. Robbins' concern about standing.  I've watched Mr. McDonough during this hearing, and as the arguments about standing were taking place, he was vigorously taking notes.  Just because that argument hasn't been raised in a previous case, doesn't mean Latham & Watkins isn't going to take an opportunity to raise the argument here.

And so I would end with safety in numbers, Your Honor.  You know, these litigations are significant.  They're vigorous.  They're zealously litigated.  And if there is some risk that AP7 is going to let the class down at class certification, I think there is some benefit to having a co-lead plaintiff structure, which Judge Martinotti has done in other cases.

THE COURT:  Who would your "co" be?

MR. ABADOU:  I would be happy to work with Robbins Geller, Your Honor, and Dr. Saraf.  You know, I don't think he suffering from any of the issues that afflict AP7.  But we would be working -- open to working with anybody and everybody in this case.

THE COURT:  But even if you combined your interests, you wouldn't necessarily have the greatest loss.  Right?

MR. ABADOU:  I am not.

THE COURT:  -- financially.

MR. ABADOU:  I think we do have the largest financial interests because, from my perspective, AP7 has no financial interests.

THE COURT:  Okay.

MR. ABADOU:  And to the extent it does, it's extremely minuscule.

THE COURT:  All right.

Thank you.

Any opinion on whether the decision on the plaintiff is dispositive or nondispositive?

MR. ABADOU:  We have no objection to you issuing that opinion, Your Honor, and having it be dispositive.

THE COURT:  Okay.  Can still be appealed to Judge Martinotti.  It's just under a different standard.

MR. ABADOU:  Sure.

THE COURT:  All right.

Does anyone want to respond now to arguments that others made?

Why don't I let each party -- come back to AP7.

MR. AMJED:  Sure.  Thank Your Honor.

The Cendant opinion clearly lays out the analysis that we need to go through, and I think the arguments that we've heard from the -- my opposing counsel have all been speculation, what's happening behind closed doors, what might happen, and that's not proof, Your Honor.  That's just musings by lawyers about what could happen, and the law in the Third Circuit is absolutely clear that if you want to rebut AP7's presumptions, you have to provide proof of inadequacy or you need defenses.  There's absolutely no proof presented to this Court.

And in terms of the Southern District of New York cases, not following Cendant, Your Honor, the OFI opinions from Judge Andrews from the District of Delaware is subject to Cendant.  In that, the court, it rejects Pipefitters and essentially adopts the analysis of -- suggesting the Court follow here, which is if there is an asset manager that has standing under the prudential exception, has made a prima facie showing of adequacy and typicality, and to the extent other parties want to rebut that, they need to come forward

with some proof.

And in none of the cases where AP7 has been the lead plaintiff has there been any suggestion that it doesn't have standing.  And to the extent people are speculating about what happens in closed rooms, that's just utter speculation without any factual basis whatsoever.

In terms of the financial interests analysis, Cendant does put forward what courts should look at when assessing financial interests.  It's total shares.  It's net funds.  And it's loss.  And district courts throughout the country look at loss as the dispositive factor.  The ocean --

THE COURT:  -- LIFO basis -- preferred?

MR. AMJED:  Absolutely, Your Honor.  And that suggestion that we should now turn the attention to -- to loss relative to assets, I think the Court hit it on the head.  I mean, that would fundamentally change the way securities cases are led.  That would undermine the very purpose of the PSLRA, and in very few cases would institutional investors ever have the largest financial interests.

My colleagues often move with large -- with large pension funds.  You know, Robbins just moved with calPERS this week that they -- calPERS -- $400 billion in assets.

So does that mean they have to have a $250 billion loss to be a lead plaintiff in the case?  That would just be

completely inconsistent with PSLRA and the cases we cite in our brief, Netflix and Cloudera both talk about that.  Both reject the notion that you look at losses relative to assets because of the impact it would have on institutional investors being excluded.  Cloudera specifically analyzes the Campbell Soup opinion as being inconsistent with the purpose of the PSLRA and adopts the analysis in Netflix.

So I think the approach that is being offered here, I understand that's the avenue competing with -- believe will get them to the largest financial interests.  But it would be a -- a sea change and a fundamental disruption of the way securities cases are led in litigation, Your Honor.

THE COURT:  Okay.  Thank you.

Anything further?

MR. ROBBINS:  Your Honor, I just wanted to add that AP7 --

THE COURT:  Just state who you are for the record.  Okay?

MR. ROBBINS:  Sorry.  Darren Robbins on behalf of Dr. Saraf.

AP7 -- and I refer back to this chart, Docket 31 --

THE COURT:  May I just stop you for one second.  I just want to make sure we finished with Mr. Amjed.

Mr. Amjed, were you finished?  Because when I asked anything further, I meant from you.  I wasn't clear about

that.

MR. AMJED:  Yes, I'm finished, Your Honor.  Thank you.

THE COURT:  Okay.  Great.

Go ahead, Mr. Robbins?

MR. ROBBINS:  I apologize, Your Honor.

THE COURT:  No.  That's okay.  I was unclear.

MR. ROBBINS:  Docket 31-3, which we talked about before -- and I know you don't have before you, but that --

THE COURT:  I will be looking at it.  Don't worry.

MR. ROBBINS:  Okay.  It shows that AP7 has never been certified as its own, on its own.  In every single case, it's either been agglomerated with other institutions, or when it was the sole lead, inexplicably it would add individuals, I believe some with modest shares of 100 or 200 or some other institution that was not a lead plaintiff.  And I think it highlights the point I made earlier.

In addition, beyond that, you were told that there was a more recent case from Judge Marrero called New Oriental, which is not in the briefing.  That case, they said Judge Marrero appointed a European asset manager.  And in that case, just like the questions you asked earlier, all of the showing was made in the papers, an evidentiary showing, to satisfy the prudential exception standard -- because there's two components to it:  a barrier to the actual

injured party's ability to litigate, which would be determined under Swedish law; and, of course, then, the actual harm.

And, here, that was not done. And instead they cite to Ocwen, which we talked about earlier, and Ocwen, Your Honor, you were just told about Judge Andrews' decision, which, I believe, is one of the only decisions from within the Third Circuit. And Judge Andrews in the OFI Risk case, in that decision cites and relies on Vivendi. Vivendi, again, Your Honor -- it's in the papers -- the Vivendi case, the 2008 or 2009 decision has a detailed showing of what is required before the trial judge to trigger the presumption -- because we keep hearing about how there's no evidence, there's no evidence.

There's no evidence; that's true. There's no evidence that's being shown to trigger the presumption. And so all of the authority that they're citing on -- citing, relying on, has not -- either did not allocate the burden appropriately to the movant or there was a showing that was made that is not been made here, as Your Honor pointed out in the questions about what in the papers -- what in your moving papers have you shown? And that -- you know, they've had three opportunities, Your Honor: the moving papers, which the only evidence is the certification which shows that, in fact, there's no injury to AP7; and the opposition and in the

reply -- there was an extensive submission, Docket 31, that AP7 put in.  But there was no evidence.  There was no showing made to trigger the prudential exception.

THE COURT:  Thank you, Mr. Robbins.

Anything further from you, Mr. Robbins?

MR. ROBBINS:  No, Your Honor.

THE COURT:  Okay.  Last word to Mr. Bethune's counsel.

MR. ABADOU:  Nothing from me, Your Honor.  Thank you for the opportunity to be heard.

THE COURT:  Okay.  Thank you all.

So I'll get to this as soon as I can.  And it won't be months or anything.  Possibly weeks.  But I'm pretty certain this calendar year.  All right?

MALE SPEAKER:  Thank Your Honor.

THE COURT:  All right, everyone.  Thank you very much.  Have a very happy Thanksgiving.  I appreciate it.

UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

THE COURT:  Bye.

(Conclusion of proceedings)

Certification

I, SARA L. KERN, Transcriptionist, do hereby certify that the 43 pages contained herein constitute a full, true, and accurate transcript from the official electronic recording of the proceedings had in the above-entitled matter; that research was performed on the spelling of proper names and utilizing the information provided, but that in many cases the spellings were educated guesses; that the transcript was prepared by me or under my direction and was done to the best of my skill and ability.

I further certify that I am in no way related to any of the parties hereto nor am I in any way interested in the outcome hereof.

s/ *Sara L. Kern*                          25th of November, 2022
_____   _____
Signature of Approved Transcriber                Date


Sara L. Kern, CET**D-338
King Transcription Services
3 South Corporate Drive, Suite 203
Riverdale, NJ  07457
(973) 237-6080