**CARELLA, BYRNE, CECCHI,**
  **BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Matthew L. Mustokoff
Joshua A. Materese
Austin W. Manning
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Lead Plaintiff Sjunde AP-Fonden
and Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE COINBASE GLOBAL, INC., SECURITIES LITIGATION | Case No. 2:22-cv-04915-BRM-LDW |
| | Hon. Brian R. Martinotti District Judge |
| | Hon. Leda D. Wettre Magistrate Judge |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 2

II.   JURISDICTION AND VENUE ............................................................... 9

III.  PARTIES ................................................................................................... 9

      A.    Lead Plaintiff ................................................................................. 9

      B.    Corporate Defendant .................................................................... 10

      C.    Executive Defendants ................................................................... 10

IV.   FACTUAL ALLEGATIONS ................................................................... 12

      A.    Coinbase's Operations, Customer Base, and Custody Services ........................... 12

      B.    Coinbase Generates Almost All of Its Revenue from User
            Transaction Fees, Driven by the Company's Largest Customer
            Base, Retail Users ....................................................................... 16

      C.    Defendants Announce They Will Take Coinbase Public Through a
            Direct Listing, Inviting Mainstream Investors into the Crypto
            Universe ....................................................................................... 17

      D.    Armstrong Knew that by Taking Coinbase Public and Increasing
            the Stock Price, He Would Trigger a Lucrative, Multi-Billion
            Dollar Compensation Package, Substantially Multiplying His
            Wealth .......................................................................................... 19

      E.    On April 6, 2021, to Drive Interest in the Direct Listing,
            Defendants Announce Positive Preliminary First Quarter Results,
            Anchored by Coinbase's Growing Transaction Fee Revenues ........................... 21

      F.    In the Prospectus, Defendants Fail to Disclose that Customers'
            Crypto Assets Are Exposed to Loss if Coinbase Becomes
            Bankrupt—an Undisclosed Risk that Imperiled the Company's
            Revenues ...................................................................................... 23

            1.    In the Years Prior to Coinbase's Direct Listing, the Risk of
                  Digital Asset Loss Was a Major Problem for
                  Cryptocurrency Exchanges ................................................. 23

            2.    Defendants Mislead Investors in the Prospectus About
                  Coinbase's Ability to Protect Digital Assets from Loss ........................... 24

            3.    Defendants Knew or Were Reckless to Disregard that
                  There Was a Material, Undisclosed Risk that Jeopardized
                  Coinbase's Revenues ........................................................... 28

a.  Defendants Investigated and Understood the Risks Arising from and Associated with Commingling Customer Assets ................................................................. 28

b.  The Language in Coinbase's User Agreements Shows that Defendants Understood Customers Were Exposed to the Risk of Loss and that They Could Not Guarantee Asset Protection ......................................... 30

G.  Coinbase Goes Public, and the Executive Defendants Rake in Hundreds of Millions of Dollars by Dumping Shares in the Direct Listing ......................................................................... 34

H.  Following the Direct Listing, Defendants Continue to Conceal the Risk of Asset Loss and the Potential Impact on Coinbase's Revenues ....................................................................... 36

I.  Defendants Falsely Deny that Coinbase Engaged in Proprietary Trading ........................................................................... 39

J.  The Relevant Truth Concealed by Defendants' Material Misrepresentations and Omissions Is Revealed to Investors ................................. 43

V.  DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ......................................... 48

A.  Misrepresentations and Omissions Concerning the Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues ......................................................... 48

1.  April 14, 2021 – Prospectus ................................................. 48

2.  May 13, 2021 – Earnings Conference Call ................................ 51

3.  May 14, 2021 – Form 10-Q .................................................. 53

4.  August 10, 2021 – Form 10-Q .............................................. 53

5.  November 10, 2021 – Form 10-Q .......................................... 54

6.  November 30, 2021 – JP Morgan Crypto Economy Forum ........... 55

7.  December 7, 2021 – Goldman Sachs US Financial Services Conference ..................................................................... 56

8.  February 25, 2022 – 2021 Form 10-K .................................... 57

9.  March 9, 2022 – Morgan Stanley Technology, Media, and Telecom Conference ........................................................ 59

B.  Misrepresentations and Omissions Concerning Coinbase's Proprietary Trading Activities .......................................................... 60

1.  April 14, 2021 – Prospectus ................................................. 60

2.  May 14, 2021 – Form 10-Q .................................................. 62

3. August 10, 2021 – Form 10-Q .................................................................... 63

4. August 19, 2021 – Blog Post ..................................................................... 65

5. November 10, 2021 – Form 10-Q ............................................................... 66

6. December 7, 2021 – Goldman Sachs Financial Services Conference ............................................................................................. 67

7. December 8, 2021 – U.S. House of Representatives Committee on Financial Services ............................................................. 68

8. February 25, 2022 – 2021 Form 10-K ........................................................ 69

9. May 10, 2022 – Form 10-Q ....................................................................... 71

10. August 9, 2022 – Form 10-Q ..................................................................... 73

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ............................................... 74

VII. LOSS CAUSATION ........................................................................................ 80

VIII. CLASS ACTION ALLEGATIONS .................................................................... 84

IX. A PRESUMPTION OF RELIANCE APPLIES .................................................. 85

X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ........................................................................ 87

XI. CLAIMS AGAINST DEFENDANTS ............................................................... 88

XII. PRAYER FOR RELIEF ................................................................................... 90

XIII. DEMAND FOR JURY TRIAL ......................................................................... 91

Court-appointed Lead Plaintiff Sjunde AP-Fonden ("AP7" or "Lead Plaintiff"), by and through its counsel, brings this federal securities class action on behalf of itself and a class consisting of all persons and entities that purchased or otherwise acquired the common stock of Coinbase Global, Inc. ("Coinbase" or the "Company"), from April 14, 2021 through September 21, 2022, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiff asserts claims against Defendants (defined in ¶¶ 30-33) for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. As alleged in this Consolidated Class Action Complaint ("Complaint"), Defendants made statements that they knew or recklessly disregarded were materially false or misleading at the time such statements were made, and omitted material information necessary to make the statements, in light of those material omissions, not materially false or misleading.

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on the ongoing investigation of its undersigned counsel ("Lead Counsel"). This investigation includes review and analysis of, among other things: (i) public filings made by Coinbase with the SEC; (ii) transcripts of the Company's conference calls with analysts and investors; (iii) Coinbase presentations, press releases, and other public statements issued by Defendants; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning Coinbase and Defendants; and (vi) economic analyses of the movement and pricing of Coinbase's publicly traded common stock. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts

are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.   **INTRODUCTION**

1.      Since its launch in 2012, Coinbase has emerged as the most popular consumer-facing cryptocurrency exchange in the United States. This securities fraud class action arises from Defendants' fraudulent concealment of: (1) substantial, material risks associated with Coinbase's ability to safeguard its customers' crypto assets; and (2) Coinbase's decision to bet against its customers and engage in proprietary trading of cryptocurrency on its own exchange.

2.      Founded by Defendant Brian Armstrong, Coinbase primarily makes money from the transaction fees paid by customers to buy and sell cryptocurrency assets, like Bitcoin and Ethereum, on the Coinbase platform, and by serving as a cryptocurrency custodian. As a custodian, Coinbase offers customers various options to store their assets with the Company.

3.      As such, prior to and throughout the Class Period, Coinbase's success hinged almost entirely on its ability to increase and maintain its customer base, particularly its retail customers. For example, leading up to the Class Period, Coinbase generated over $3.4 billion in total revenue, nearly all of which was driven by transaction fees charged to retail customers. Relatedly, the Company boasted that it stored over $90 billion in customer crypto assets, and had seen astronomical growth in its key user metrics, including the number of monthly retail customers using the Coinbase platform to invest, which nearly doubled from 2019 to 2020.

4.      Although Coinbase had been highly successful, cryptocurrency's reputation as an unregulated and precarious "Digital Wild West" remained a deterrent to many would-be retail customers and stood in the way of the Company's ability to grow its retail client base. Contributing to this notoriety, an increasing number of crypto exchanges were responsible for significant losses

of customer assets through insolvency, hacking, and other events. And, unlike traditional bank or brokerage accounts, there is no governmental agency to backstop or guarantee crypto assets from such losses. This made Coinbase's ability to drive its retail transaction fees—the principal source of its revenue—even more contingent on gaining customers' trust.

5.      It was against this backdrop that Armstrong announced his plan in January 2021 to take Coinbase public through a direct listing. An alternative to a traditional initial public offering ("IPO"), in a direct listing, the company's insiders or shareholders, as opposed to the company itself or its underwriters, sell stock directly to the public. In other words, Defendants elected to raise money not for Coinbase, but for themselves.

6.      Armstrong was highly motivated to complete the Direct Listing (defined below). Just months earlier in August 2020, the Coinbase Board of Directors approved a lucrative compensation package for Armstrong that was contingent on a successful public offering. Thus, Armstrong knew that in taking Coinbase public, he would not only sell his own shares (ultimately to the tune of nearly $300 million), but would also lock down his compensation package with a potential value of over *$3.7 billion*.

7.      Market commentators were excited by Coinbase's announcement because it gave investors an opportunity to wade into the world of crypto. The Hustle, a popular business and technology news journal, described Coinbase as "not just an exchange, but a whole crypto ecosystem to buy, store, and use crypto assets safely," and emphasized that the Company offers a service "where customers can safely store their cryptocurrencies."

8.      The Class Period begins on April 14, 2021. That day, Coinbase made history when it became the first cryptocurrency company in the world to go public. Listed on Nasdaq, Coinbase's Direct Listing opened at $350 per share—$100 above its set reference price—with its

valuation soaring as high as $112 billion that day. The Executive Defendants (defined in ¶¶ 31-33) and other Coinbase insiders sold, collectively, over ***$5 billion*** in Coinbase common stock through the Direct Listing.

9. At all times, Defendants knew that the stability and security of Coinbase's transaction fee revenue was an "issue that a lot of investors have been focused on," as CNBC commented on the first day of the Class Period. To that end, in the Prospectus (defined below) filed contemporaneously with the Direct Listing, Defendants made numerous representations about Coinbase's ability to generate revenue and the attendant risks to its business.

10. Front and center was Defendants' generalized warning to investors that "***[o]ur failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***."[1] Defendants expanded on this warning by identifying two specific events or circumstances which could result in the loss of customer assets and adversely impact the Company's business, operating results and financial condition: (1) if Coinbase's trading platform was hacked; or (2) if Coinbase lost the "private keys" necessary to access its customers' crypto assets. Following this warning, Coinbase's Prospectus assured investors that customer assets were, in fact, adequately protected from loss. These and similar representations were repeated by Defendants to analysts, and in every quarterly and annual report Coinbase filed with the SEC during the Class Period.

11. In truth, Defendants' representations were materially false or misleading because they failed to disclose a substantial, material risk that imperiled Coinbase's revenues. Unbeknownst to investors, customers' crypto assets were also exposed to loss in the event that Coinbase filed for bankruptcy. In such an event, the crypto assets held in Coinbase's custody on

---

[1] Unless otherwise indicated, all emphasis is added.

behalf of its customers could be considered the property of the Company's bankruptcy estate—with Coinbase customers left treated as general unsecured creditors, the last category of creditors to recover owed monies (if at all).

12.     Defendants had full knowledge of, or at a minimum were reckless to disregard, this significant uncertainty surrounding the legal treatment of customer assets and the material risk to Coinbase's financial position (in particular, its transaction fee revenues) that flowed from it. As the Company would later admit on May 10, 2022 after belatedly disclosing this risk to investors, Coinbase's inability to protect its customers' crypto assets from loss if it went bankrupt made it highly probable that, if disclosed, customers would find "***custodial services more risky and less attractive***," resulting in a "***discontinuation or reduction in use of [the Company's] platform and products by existing customers***."

13.     Indeed, well before the Class Period, Defendants, in connection with Coinbase's institutional business (Coinbase Custody), specifically investigated whether custodially-held crypto assets would be considered part of Coinbase's bankruptcy estate in the event of insolvency. Defendants Armstrong, Alesia Haas, and Emilie Choi managed Coinbase Custody. This investigation and a comment letter submitted to the SEC following the investigation demonstrate that Defendants understood this uncertainty—yet they never explicitly disclosed the risk to the Company's investors until May 2022.

14.     Defendants also took affirmative steps that further evidence their understanding of the uncertainty of the bankruptcy treatment of customers' crypto assets, and of the substantial risk of loss, seizure, or forfeiture of those assets. For example, Coinbase took specific actions to mitigate adverse bankruptcy treatment of its institutional customers' crypto assets through the contractual language in its user agreements with institutional customers. In these agreements,

Coinbase included provisions invoking certain state law protections over customer assets and expressly agreed not to commingle those assets—a method of storing assets that renders them highly susceptible to being treated as the exchange's assets (as opposed to the customers' assets) in the event of a bankruptcy.

15.     Coinbase did not, however, take any such steps to protect its retail customers, who comprised over 95% of its business. For example, Coinbase **did** commingle the assets of its retail customers, but still assured these customers (falsely) in their respective user agreements that they maintained "ownership" and "control" over their assets.

16.     Defendant Armstrong would later **admit** in a statement on Twitter (on May 10, 2022) that Coinbase "should have updated our retail terms sooner" to provide its retail customers with "***the same protections***" as the Company's institutional customers. Armstrong further admitted that he and Coinbase knew that the purported "legal protections" included in the institutional user agreements "***have not been tested in court for crypto assets***," and, as a result, the Company could not fully and sincerely protect customer assets. Indeed, no court had overseen a U.S. bankruptcy of a cryptocurrency exchange, meaning it was entirely possible that, according to Armstrong, "***a court would decide to consider customer assets as part of the company in bankruptcy proceedings***." Still, Defendants remained silent through most of the Class Period.

17.     At the same time, market commentators were aware that Coinbase was subject to fee compression from competitors and wanted to know how the Company planned to generate profits elsewhere. One potential offset that analysts were highly focused on was proprietary trading—when a bank or firm trades from its own account, using its own money instead of using clients' money. The practice exposes a company to several risks, including financial loss, customer distrust (as such trading introduces conflicts of interest), and potential regulatory pitfalls.

18.     Analysts were concerned that Coinbase might engage in risky, proprietary trading activities as a means of counteracting fee compression. Well aware of this concern, at every turn, Defendants affirmatively told investors that "***[w]e view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***." They also repeatedly denied engaging in any proprietary trading when specifically asked, including during Congressional testimony, when Defendant Haas stated in no uncertain terms that "***Coinbase is an agency-only platform"*** that ***"do[es] not engage in proprietary trading***."

19.     These representations were materially false and misleading because Coinbase had, in fact, always intended to engage in proprietary trading to offset downturns in the crypto markets that hurt its financial position. Indeed, by July 2021, Coinbase formed a proprietary trading unit and hired former Wall Street traders to run it. According to The Wall Street Journal, those at the highest levels of the Company—including Haas—were involved in the unit's creation. And by early 2022, Coinbase's proprietary trading unit was trading on its own platform to generate profit.

20.     Defendants never disclosed any of the foregoing, material facts during the Class Period. All the while, Armstrong took full advantage of Coinbase's artificially inflated stock price. By July 2021, Armstrong successfully maintained the Company's stock price for long enough to trigger nearly ***$700 million*** in performance-based stock options under his compensation plan.

21.     The relevant truth concealed by Defendants' material misrepresentations and omissions was first revealed to investors on May 10, 2022. That day, Coinbase finally disclosed in its quarterly 10-Q report with the SEC what it had known during the entire Class Period: that "***the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors***." The Company further admitted that "this may result in customers finding our custodial services ***more***

*risky and less attractive* and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could ***adversely impact our business, operating results, and financial condition*.**" Later that day, Armstrong admitted that Coinbase "should have updated our retail terms sooner," and that even those self-professed "legal protections have not been tested in court for crypto assets." On this news, Coinbase's common stock dropped more than 26%, or $19.27 per share.

22.    Analyst and market commentators reacted negatively, with The Financial Times reporting, "there are a couple of lines in its latest 10-Q filing about its responsibilities to safeguard customer assets that really caught our eye," and that "should Coinbase go bankrupt then customers may lose their money they'd entrusted to the exchange for safekeeping." Other analysts echoed the same uneasiness, with Piper Sandler stating that "investors could be concerned about these new risk disclosures and the safety of their funds," and New Constructs reporting that "[t]he fear of bankruptcy proceedings could drive clients to cash out their investments as quickly as possible."

23.    Then, on September 22, 2022, the truth concerning Coinbase's proprietary trading was revealed to investors when The Wall Street Journal reported that the Company had created a proprietary trading unit and engaged in proprietary trading. On this news, Coinbase common stock fell another $4.70 per share, or 6.9%. Market commentators again reacted negatively, with the Times Square Investment Journal writing, "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors."

24.    This action seeks to compensate Coinbase's shareholders for their losses that resulted from Defendants' fraudulent conduct.

## II.   <u>JURISDICTION AND VENUE</u>

25.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

26.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

27.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial number of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false or misleading information, occurred in this District.

28.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   <u>PARTIES</u>

### A.     **Lead Plaintiff**

29.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $100 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired Coinbase's common stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Corporate Defendant

30.    Defendant Coinbase is a Delaware corporation that, according to its SEC filings, does not maintain a corporate headquarters. Coinbase operates one of the world's largest cryptocurrency exchanges. The Company's platform provides the products and services that enable its retail and institutional customers to buy, sell, and store their crypto assets. Coinbase operates its business through approximately eleven subsidiaries, including Coinbase Custody Trust Company, LLC ("Coinbase Custody"), which is the wholly-owned subsidiary that provides custodial services to Coinbase's institutional customers in the United States. As of February 2022, the Company stored over 11.5% of global cryptocurrency assets, worth over $278 billion. Coinbase's common stock trades on the Nasdaq under the ticker symbol "COIN."

### C.    Executive Defendants

31.    Defendant Brian Armstrong ("Armstrong") co-founded Coinbase in 2012 and served as its Chief Executive Officer ("CEO") and Chairman of its Board of Directors throughout the Class Period. Armstrong, along with Defendant Haas, took and the Company public in April 2021 and was a signatory to the Company's SEC filings during the Class Period. Coinbase identified Armstrong as management for Coinbase Custody as early as 2020.

32.    Defendant Alesia J. Haas ("Haas") served as Coinbase's Chief Financial Officer ("CFO") throughout the Class Period. Haas has served as CFO since April 2018 and was a signatory to the Company's SEC filings during the Class Period. Haas, along with Defendant Choi, served as a Governor of Coinbase Custody throughout the Class Period, according to the Coinbase Custody Foreign Registration Statements filed with the State of Washington on July 7, 2020 and July 21, 2022. In addition to being identified as a Coinbase Custody Governor, Hass certified the July 7, 2020 Foreign Registration Statement as a Coinbase Custody Director.

33.     Defendant Emilie Choi ("Choi") served as Coinbase's Chief Operating Officer ("COO") and President throughout the Class Period. Choi has served as COO since June 2019 and President since November 2020. Previously, Choi served as Coinbase's Vice President of Corporate and Business Development. Choi served on the Board of Governors to Coinbase Custody during the Class Period, according to the Coinbase Custody Foreign Registration Statement filed with the State of Washington on July 7, 2020.

34.     Defendants Armstrong, Haas, and Choi are collectively referred to herein as the "Executive Defendants." Coinbase and the Executive Defendants are collectively referred to herein as "Defendants."

35.     The Executive Defendants, because of their positions within the Company, possessed the power and authority to control, and did in fact control, Coinbase's public statements to the market, including in SEC filings, press releases, the Company's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, each Executive Defendant was directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market.

36.     Each Executive Defendant was provided with copies of the Company's SEC filings alleged herein to contain materially false or misleading statements or omissions of material fact prior to, and shortly after, their issuance, had final executive authority to control what they said, or had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Executive Defendants knew that the adverse facts specified herein were not disclosed to, and/or were being concealed from, the public, and that the positive representations made were materially false and/or misleading.

IV.     FACTUAL ALLEGATIONS

A.     **Coinbase's Operations, Customer Base, and Custody Services**

37.     Since the Company's founding in 2012, Coinbase has emerged as one of the largest cryptocurrency exchanges in the world both in terms of the number of customers on the platform and trading volume. After starting out as a platform to send and receive Bitcoin, the Company now supports over approximately 200 crypto assets, the vast majority of which are tradable on its exchange.

38.     At the most basic level, crypto assets are any digital asset built using blockchain technology, including cryptocurrencies, stablecoins, and security tokens. A blockchain is a secure digital ledger or peer-to-peer database that maintains a record of all transactions that occur on the network.

39.     Crypto assets are held within public blockchain addresses, which are alphanumeric references to where assets can be sent or stored. Each public address is controlled through a corresponding private key and public key that are cryptographically generated. The private key allows the recipient to access any funds belonging to the address and the public key validates the transactions that are broadcasted to and from the address. Because the private key conveys access to the crypto asset, it is often controlled by the asset's owner.

40.     Prior to cryptocurrency exchanges like Coinbase, there was no mechanism to match buyers and sellers of digital assets that have no previous connection. This is because a blockchain's decentralized ledger provides for the secure transfer of an asset, but its peer-to-peer environment makes it difficult to buy and sell beyond two-sided trades. Cryptocurrency exchanges solved this problem by creating marketplaces for crypto transactions that do not require the buyer and seller to know one another—similar to a traditional stock exchange.

41.     Headline-grabbing prices of some crypto assets like Bitcoin, which skyrocketed from $77.00 to $67,617.00 per coin in less than nine years, have led to a dramatic expansion of the crypto markets and crypto traders. A recent survey of crypto investors indicated that 83% had only been investing in crypto for two years or less. Coinbase recognized that many crypto investors were novices, as Haas acknowledged during the May 20, 2021 Barclays Emerging Payments and Fintech Forum (the "Barclays Payments Forum"): "I know many investors are still learning about crypto."

42.     Against this backdrop, Coinbase primarily operates as a cryptocurrency exchange with a focus on retail customers, whom the Company defines as any individual customer with a Coinbase account. Institutional customers like hedge funds, financial institutions, and corporations round out Coinbase's customer-base. Institutional customers have access to the Coinbase Prime platform, which enables them to execute transactions at the "best price" through "deep pools of liquidity across the crypto marketplace."

43.     To attract these users, Coinbase boasted prior to and throughout the Class Period that it provided "safe, trusted, easy-to-use technology and financial infrastructure products and services that enable any person or business with an internet connection to discover, transact, and engage with crypto assets and decentralized applications." Currently, Coinbase reports that it has achieved 108 million verified users in over 100 countries world-wide.

44.     To advance its goal of becoming the customers' "primary financial account"—i.e., the account they use to store, trade, and earn interest on digital assets—the Company offers its retail and institutional customers the ability to store, or "custody," their assets with Coinbase. As noted above, in some senses, a cryptocurrency exchange functions the same way as a stock

exchange, by connecting buyers and sellers. A cryptocurrency exchange is different, however, in that it also operates as the brokerage for the underlying transaction.

45.     Haas described Coinbase's business model during the Barclays Payments Forum as follows:

> We operate a crypto custodian, an exchange, a broker, and we're building additional tools and products to help businesses grow their own crypto businesses. The majority of our revenue today is generated through trading fees. When buyers come to our platform and investors come to our platform[,] [they come] to buy and sell the vast majority of crypto assets that we host on our platform.

46.     Typically to invest, buy, and sell on a cryptocurrency exchange, a user is required to have a digital "wallet" hosted by the exchange. The hosted wallet effectively performs the same function as a brokerage account for securities or commodities, and is the on-ramp to trading on a certain platform.

47.     A wallet hosted by the cryptocurrency exchange also (at least in theory) presents a solution to the quandary of where a crypto investor should store the public and private keys to their crypto asset. While a crypto asset owner can always write down the public and private keys on a piece of paper or record them in a computer file, this runs the risk that the keys could be copied, lost, or even destroyed. Given that it is impossible to access a crypto asset without the private key, most users opt to store their keys in a software or hardware-based wallet. Moreover, to combat the threat of hacking, many cryptocurrency exchanges keep a certain percentage of crypto assets and their corresponding keys offline in what is known as "cold storage."

48.     Throughout the Class Period, Coinbase offered retail users a hosted wallet through their Coinbase.com account. Notably, the creation of a Coinbase.com account was a prerequisite before an individual retail user could use the Coinbase platform to buy and sell crypto assets. The process of creating a Coinbase.com account prompted the retail user to read and sign the Coinbase

14

User Agreement (the "Retail User Agreement"). The Retail User Agreement governed the use of Coinbase's platform, including the hosted wallet and custodial services. Coinbase provided users access to its hosted wallet and custodial services referred to as the "Digital Asset Wallet."[2]

49.     Under the hosted wallet option, Coinbase acts as a digital asset custodian and promises to "securely store" the private keys it holds on behalf of its retail users. To this end, Coinbase's Retail User Agreement (*see* ¶ 96 *infra*) assured retail users that these assets in the hosted wallet "are custodial assets held by Coinbase for your benefit." Alternatively, retail customers could "self-custody" their digital assets using the Company's Coinbase Wallet product. With Coinbase Wallet, "[t]he private keys (that represent ownership of the crypto) are stored directly on your device and not within a centralized exchange like Coinbase.com."

50.     In effect, Coinbase steered its retail users to its custodial hosted wallet on Coinbase.com (and away from Coinbase Wallet), by warning users of Coinbase Wallet that they "are responsible for maintaining the private keys." Coinbase also emphasized the risk of loss to self-custodied assets, warning "if you lose your private keys, Coinbase Wallet *cannot* help recover your account." Coinbase also limited the functionality of Coinbase Wallet by preventing its users from selling crypto assets on the platform unless their assets were first transferred from Coinbase Wallet to a Coinbase.com account. By contrast, Coinbase touted Coinbase.com as the "easiest place to buy, sell, and manage your crypto."

51.     Through Coinbase Prime, institutional investors in the United States have access to Coinbase Custody, which enables them to "both securely and actively participate in crypto networks." As discussed *infra*, Coinbase Custody is a wholly-owned subsidiary of Coinbase and

---

[2] In the earliest version of the Retail User Agreement during the Class Period, updated Dec. 8, 2020, the Digital Asset Wallet was referred to as the "Digital Currency Wallet." However, for all intents and purposes, the two retail offerings and the contractual language used with respect to these two offerings are equivalent. Thus, for simplicity Plaintiff will only refer it as the Digital Asset Wallet.

was at all relevant times managed by Defendants Armstrong, Haas, and Choi, along with other Coinbase employees, and overseen by a Board of Governors that included Haas and Choi during the Class Period.

52. Along with transaction and custody services, Coinbase throughout the Class Period offered users the opportunity to "stake" their crypto assets. Staking is the process by which digital asset owners agree to lock up their holdings with Coinbase in order to obtain a reward or earn interest, similar to a certificate of deposit ("CD"). The Company takes a commission based on the rewards a customer receives, generally between 25% and 35%.

**B. Coinbase Generates Almost All of Its Revenue from User Transaction Fees, Driven by the Company's Largest Customer Base, Retail Users**

53. According to the Company's SEC filings, since inception through December 31, 2020, Coinbase generated over $3.4 billion in total revenue. Prior to and throughout the Class Period, Defendants repeatedly identified transaction fees as Coinbase's primary source of revenue, telling investors that "we generate substantially all of our total revenue from transaction fees on our platform in connection with the purchase, sale, and trading of crypto assets by our customers."

54. Coinbase further disclosed that retail user transaction fees drove nearly all of that revenue, accounting for 95% of all fees for FY 2020 and 2021. More specifically, of Coinbase's $1.14 billion in total net revenue in 2020, total transaction fee revenue accounted for $1.10 billion, which included $1.04 billion in net retail transaction fee revenue (or approximately 91% of total net revenue and 95% of total transaction fee revenue). Of Coinbase's $7.35 billion in total net revenue in 2021, total transaction fee revenue accounted for $6.84 billion, which included $6.50 billion in net retail transaction fee revenue (or approximately 88% of total net revenue and 95% of total transaction fee revenue). As discussed below, the custody fee for retail users was built into Coinbase's transaction fees.

55.     Given the outsized contribution of transaction fees to Coinbase's bottom line, at all times, the Company's ability to maintain and grow its customer base—particularly retail users—was essential to its financial success. As the Company advised in its April 14, 2021 Prospectus (defined at ¶ 62), "[o]ur success depends on our ability to retain existing customers and attract new customers. . . ."

56.     Defendants also represented that Monthly Transacting Users ("MTUs"), meaning the number of monthly retail customers who use the Coinbase platform to invest, drive the number of potential revenue generating transactions, and touted growth in that area. For FY 2019, 2020, and 2021, Coinbase reported increasing annual average MTUs of 1.1 million, 1.9 million, and 8.4 million, respectively.

**C.     Defendants Announce They Will Take Coinbase Public Through a Direct Listing, Inviting Mainstream Investors into the Crypto Universe**

57.     On January 28, 2021, Coinbase announced in a blog post that the Company planned to go public via a direct listing (the "Direct Listing"). The announcement came as Coinbase was in the process of garnering SEC approval for its registration statement, first submitted in October 2020.

58.     By taking Coinbase public through a direct listing, Defendants elected not to raise money for the Company, but for themselves. Unlike a traditional IPO, in a direct listing, no new shares are issued. Rather, it is the company's insiders or shareholders—not the company itself—who sell pre-existing stock directly to the public through an exchange. So when the stock debuts, public investors buy directly from insiders, who inherently have more knowledge about the company than the public.

59.     The traditional route of an IPO requires companies to produce balance sheets, income statements, and cash flow statements for the public to review. Moreover, IPOs usually

come with a "lock-up" period, which restricts insiders from selling until a certain time period (typically 180 days) has passed. A direct listing does not have a lock-up period and insiders can sell their shares the moment that public trading of the company's stock commences.

60.     Because Coinbase was a privately-owned company prior to the Direct Listing—and just prior to the start of the Class Period—the public had yet to see its financial statements, historical or projected. After much anticipation, on February 25, 2021, Coinbase filed a registration statement on Form S-1 with the SEC in connection with its initial listing of common stock on the Nasdaq.

61.     Market analysts reacted immediately, reporting that Coinbase provided stock market investors with an opportunity to invest in the booming cryptocurrency market without directly owning the underlying crypto assets. For example, The Hustle wrote on March 4, 2021 in an article entitled *Coinbase's $100B+ public debut, explained* that the offering "**Brings in new mainstream investors**: Without needing to buy the underlying assets (e.g., Bitcoin, Ether), Coinbase will allow more Wall Street and retail investors to add crypto to their portfolios." (emphasis in original). "Don't want to buy Bitcoin at 50K? Buy the trading exchange where people to go buy Bitcoin: Coinbase, the largest US cryptocurrency exchange," the publication concluded. Reacting to Coinbase's Form S-1, The Hustle further stated: "Coinbase provides not just an exchange, but a whole crypto ecosystem to buy, store, and use crypto assets safely," and that the Company offers a "wallet service[] where customers can safely store their cryptocurrencies." Finally, the article noted that "96% of Coinbase's revenue is from transaction fees." Previously, on February 27, 2021, Yahoo had dubbed Coinbase a "Key Player in Crypto Investing and Storage," reporting that the "[C]ompany has over $90 billion in assets on the platform."

62.     After amendments, Coinbase's registration statement was declared effective by the SEC on April 1, 2021 (the "Registration Statement"). The Form S-1 was signed by Defendants Armstrong and Haas. On April 14, 2021, Coinbase filed its Prospectus on Form 424B4 with the SEC in connection with the Direct Listing, incorporating and forming part of the Registration Statement (i.e., the "Prospectus").

**D.     Armstrong Knew that by Taking Coinbase Public and Increasing the Stock Price, He Would Trigger a Lucrative, Multi-Billion Dollar Compensation Package, Substantially Multiplying His Wealth**

63.     As the Direct Listing approached, the Executive Defendants laid the groundwork to make a fortune selling their shares to the public. At the time, Armstrong was Coinbase's largest individual shareholder, owning nearly 40 million shares that gave him control of roughly 21% of the Company's equity, according to the Prospectus.

64.     In the Prospectus, Defendants made several representations to condition investors that the available supply of shares may be limited, stating that "there can be no assurance that any registered stockholders or other existing stockholders will sell any of their shares of Class A common stock" and, therefore, "there may initially be a lack of supply, or demand for, shares of Class A common stock." In reality, however, in the days leading up to the Direct Listing, both Armstrong and Choi conveniently increased their beneficial holdings. As discussed below (*see* ¶¶ 106-07 *infra*), between April 1 and April 14, 2021, Armstrong and Choi increased their beneficial holdings by 1,050,357 and 776,282 shares, respectively, and ultimately sold 749,999 and 602,158 shares, respectively, in the Direct Listing at prices between $312 and $423 per share. Haas also acquired and sold 255,500 shares in a same-day transaction on April 14, 2021, selling those shares at prices between $381 and $424 per share.

65.     Armstrong was not only motivated to take Coinbase public in order to sell his own shares in the Direct Listing—***to the tune of over $290 million dollars*** (*see* ¶ 106 *infra*)—but

because he would unlock an incredibly lucrative performance-based compensation package. Prior to Coinbase's announcement that the Company would go public, in August 2020, Coinbase's Board of Directors approved the framework for a new compensation package that provided Armstrong with the opportunity to rake in ***billions*** of dollars through stock option grants.

66.     ***Step one*** to unlocking Armstrong's billions was a performance-based condition that Coinbase successfully have a registration statement declared effective by the SEC. ***Step two*** was satisfaction of market-based milestones that enabled Armstrong to unlock different stock option awards (or "tranches") if Coinbase maintained a certain stock price for 60 consecutive trading days. For example, the initial tranche of the option package, which accounted for 34% of the total package, would unlock if the Company maintained a $200 stock price for 60 trading days. Additional tranches would open up at $40 stock-price intervals up to $400 for a total stock option award of 9,293,911 shares at a potential value of ***$3.7 billion***.

67.     Prior to the Direct Listing, Armstrong earned an annual base salary of $1,000,000— which meant that at an exercise price of just $23.46, and a total fair value at the time of $56.67 million, Armstrong was poised to increase his compensation by billions if he could maintain the stock price for the one-year holding period upon exercising the options. Indeed, just by maintaining a stock price of $200 for a mere 60 trading days after the Direct Listing, Armstrong could boost the value of his compensation and Coinbase holdings by nearly ***$700 million*** in cash and equity. Thus, prior to the Direct Listing, Armstrong was highly motivated and incentivized to artificially inflate the price of and demand for Coinbase common stock, and to maintain such inflation throughout the entire Class Period.

68.     And that is exactly what he did. Armstrong unlocked the first tranche on July 8, 2021, after Coinbase's Direct Listing went live on April 14, 2021. Because Coinbase's stock had

maintained a $200 per-share price for 60 days following the Direct Listing, he was awarded 3,159,930 in stock options. Coinbase's closing stock price on the achievement date was $244.29, placing the value of these options as of July 8, 2021 at just over ***$697 million***.

E.   **On April 6, 2021, to Drive Interest in the Direct Listing, Defendants Announce Positive Preliminary First Quarter Results, Anchored by Coinbase's Growing Transaction Fee Revenues**

69.   On April 6, 2021, Defendants announced preliminary results for the first quarter of FY 2021 and an outlook for the full FY 2021. The Company's first-quarter revenue surged to $1.8 billion, a year-over-year increase of nine times, and net income climbed from $32 million to between $730 and $800 million. Because Coinbase's revenue was largely dependent on its ability to attract and maintain retail users and, in turn, generate transaction fees, the Company also disclosed to investors impressive growth in MTUs, reporting 6.1 million MTUs—an increase from 2.8 million just three months earlier. Looking ahead, Coinbase projected between 4 million and 7 million MTUs for FY 2021.

70.   The same day, Armstrong and Haas participated in a conference call to discuss these results. The call was moderated by Anil K. Gupta ("Gupta"), Coinbase's Vice President of Investor Relations, who asked Armstrong: "Can you highlight what you think are Coinbase's key competitive advantages?" In response, Armstrong pointed to the Company's custody service and ability to "guard our customers against loss" stating: "***Storing crypto safely is complex, and we've created a lot of intellectual property in this area to help guard our customers against loss***." From there, Armstrong identified the size of Coinbase's assets under custody as a key indicator of customers' trust in the platform:

> All of these investments support an underlying and essential goal, trust. Our customers need to have trust in Coinbase, and we think that the $223 billion in assets on our platform, up from $90 billion at the end of 2020, speaks to the success we've had in building that

trust. ***These are the key competitive advantages that we think will differentiate us***.

71.     Gupta also asked Haas, "As CFO, how do you forecast and plan for the future?" Haas reaffirmed that "***[r]evenue from our retail users and specifically retail transaction revenues are our largest revenue stream today***."

72.     Following the earnings announcement and conference call, the market was dialed in on Coinbase's retail-reliant revenue model. For example, on April 6, 2021, Compass Point analysts reported on Coinbase's "retail driven financial model," noting that "transaction revenues accounted for 96% of FY20 net revenues and retail accounted for 95%" and identifying the addition of customers as the Company's number one opportunity. The Compass Point analysts anticipated "competition on a number of vectors (pricing, product, market structure, etc.) moving forward" from other cryptocurrency exchanges, but opined that Coinbase had a key competitive advantage as a "trusted platform with a focus on security and culture of regulatory compliance."

73.     On April 14, 2021, Armstrong appeared on CNBC's Squawk Box with Andrew Ross Sorkin, where he was asked to address the outsized contribution of transaction fees to Coinbase's revenue. Sorkin noted that 96% of Coinbase's 2020 revenue was generated through transaction fees, commenting that it was an "issue that a lot of investors have been focused on" leading into the Direct Listing. In response, Armstrong explained that there is a "custody fee that is baked into the transaction fee," and pointed to Coinbase's custody business as providing "steady streams of revenue."

**F.** **In the Prospectus, Defendants Fail to Disclose that Customers' Crypto Assets Are Exposed to Loss if Coinbase Becomes Bankrupt—an Undisclosed Risk that Imperiled the Company's Revenues**

**1.** **In the Years Prior to Coinbase's Direct Listing, the Risk of Digital Asset Loss Was a Major Problem for Cryptocurrency Exchanges**

74. Coinbase's success in driving retail transaction fees depended on its ability to convince the public that the Company could properly manage and safeguard from loss the staggering customer balances that were fueled by cryptocurrency's new-found popularity. By the start of the Class Period, Coinbase held over $90 billion in custodial fiat currencies and cryptocurrencies on behalf of customers, and that figure rose to as much as $278 billion during the Class Period—evidencing the trust that customers placed in Coinbase as a custodian.

75. By way of background, cryptocurrency exchanges are thinly-regulated for safety-and-soundness and face major insolvency risks—so much so, that cryptocurrency investing was dubbed the "online Wild West where sheriffs are largely absent" by Reuters. Prior to Coinbase's Direct Listing in April 2021, at least 75 cryptocurrency exchanges collapsed, leaving many customers unable to recover their crypto assets. Most infamously, the Tokyo-based cryptocurrency exchange Mt. Gox declared bankruptcy in early 2014 after hackers stole 850,000 Bitcoins—worth more than $460 million—from the exchange. Hacking is the act of exploiting weaknesses in a computer system or network, generally to gain unauthorized access to the data it holds. At its peak, Mt. Gox was responsible for nearly 80% of Bitcoin trading world-wide but was fraught with internal control and security issues. Hackers had skimmed Bitcoin from Mt. Gox for years, and at the time of its bankruptcy, the exchange was unable to locate nearly $30 million. Mt. Gox's bankruptcy quickly became an example of the dangers of investing in cryptocurrency as its creditors filed competing claims and the value of digital assets remained in flux. Three years into

the Japanese bankruptcy proceedings, not a single customer of Mt. Gox had recouped the value of

their digital assets.

76.     Following the Mt. Gox bankruptcy saga, numerous cryptocurrency exchanges

collapsed as a result of hacking, scams, or other undisclosed reasons. For example:

- U.K.-based Moolah filed for bankruptcy in October 2014. In its bankruptcy announcement, Moolah assured customers that their funds were secure and the platform would process withdrawals in the following weeks. Moolah's CEO, Ryan Kennedy, explained that the exchange had "quite simply, [run] out of cash." Shortly thereafter, Kennedy was charged with fraud and arrested for stealing nearly $2 million worth of Bitcoin from the exchange.

- In 2019, New Zealand-based exchange Cryptopia was "hacked to death" and forced to file for bankruptcy after the hackers stole over $16 million of customer assets from digital wallets stored by the exchange. Like many other exchanges, Cryptopia stored its users' private keys in a pooled wallet. Reportedly, this "co-mingling" of the private keys has made it difficult to identify the asset's rightful owners.

- In 2020, Australia's "most-liquid exchange," ACX, unexpectedly froze its platform. Unbeknownst to ACX users, the exchange was not as liquid as promoted and had resorted to using over $20 million worth of customers' Bitcoins as a loan to its parent company. ACX withdrew the customer funds from a pooled account in which customer assets were co-mingled with ACX assets. Now bankrupt, ACX owes creditors around $50 million and is unable to distinguish ownership between the crypto assets of one customer from another.

**2.      Defendants Mislead Investors in the Prospectus About Coinbase's Ability to Protect Digital Assets from Loss**

77.     Against this backdrop of failed cryptocurrency exchanges, in the Prospectus (and

subsequently throughout the Class Period), Defendants purported to warn prospective investors

about the risks arising from Coinbase's safeguarding of customers' assets and potential for loss,

stating: "***Our failure to safeguard and manage our customers' fiat currencies and crypto assets***

***could adversely impact our business, operating results and financial condition***." More

specifically, Defendants honed in on two risks: "If we are unable to access our private keys or if

we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses."

78.     These representations were materially misleading by omission. By choosing to speak about the risks arising from Coinbase's "failure to safeguard and manage [its] customers' fiat currencies and crypto assets," Defendants had a duty to speak completely and accurately, including to disclose the material facts necessary to make these statements not misleading. Defendants also had a duty under SEC Regulation S-K, Item 303 to disclose this known uncertainty (and the attendant risks), as it was reasonably likely to have a material impact on the Company's financial condition, including its revenues.

79.     In violation of these duties, as Coinbase later admitted, Defendants failed to inform investors of the heightened risk that in the event of a bankruptcy, the crypto assets held in custody by Coinbase on its customers' behalf may be considered the property of the Company's bankruptcy estate. Accordingly, Coinbase's retail customers could be treated as general unsecured creditors. As unsecured creditors, these customers would be the last category of creditors to recover owed monies in a bankruptcy and may only recover pennies on the dollar, if anything.

80.     Unlike a bank or a registered securities broker-dealer, as a digital-asset exchange platform, in the event of a bankruptcy the Company would be liquidated under the U.S. Bankruptcy Code. Thus, while Coinbase customers could make claims as unsecured creditors to recover the value of their crypto assets, they would not have the protections afforded more traditional investment accounts. And unlike traditional bank accounts or brokerage accounts, crypto assets are not backstopped or guaranteed by any governmental or other agency, like the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC"). If a bank fails due to an inability to meet obligations to depositors, the FDIC steps in to ensure

depositors get prompt access to their insured deposits and acts as a receiver by selling the failed bank's assets and settling its debts. FDIC deposit insurance covers the balance of each depositor's account, dollar-for-dollar, up to the insurance limit. Claims for deposits in excess of the insured limit are addressed through the receivership. Similarly, the SIPC is a federally mandated, member-funded nonprofit whose purpose is to expedite the recovery and return of assets during the liquidation of a failed broker-dealer. With liquidations overseen by the SIPC, customer accounts are segregated from those of the brokerage's assets, meaning that customer assets cannot be used to satisfy debts of other creditors in bankruptcy proceedings.

81.     These complexities made the complete and accurate disclosure of risks associated with cryptocurrency exchange accounts even more necessary, particularly in connection with Coinbase going public. As explained by Professor Adam J. Levitin, Anne Fleming Research Professor of Law at the Georgetown University Law Center, in a draft Texas Law Review article entitled *Not Your Keys, Not Your Coins*, "[c]ryptocurrency investors are unlikely to understand their legal treatment in the event of an exchange bankruptcy" given that "the technical workings of bankruptcy law are not well understood by most laypersons or even attorneys (it is not a bar exam topic, for example)." Adam J. Levitin, *Not Your Keys, Not Your Coins*, 102 U. Tex. L. Rev. (forthcoming Mar. 2023). Professor Levitin emphasized that the application of the U.S. Bankruptcy Code to assets held in the custody of a cryptocurrency exchange remains an open, "untested" question: "***Because cryptocurrency is untested American bankruptcy law, it is impossible to say with certainty how any particular United States bankruptcy court would treat custodial holdings of cryptocurrency***."

82.     Defendants knew this, as Armstrong would later admit in May 2022 that any purported "***legal protections***" available to safeguard crypto assets "***ha[d] not been tested in court***

*for crypto assets specifically*," leaving wide open the possibility that "*a court would decide to consider customer assets as part of the company in bankruptcy proceedings*." Given Defendants' knowledge of this uncertainty, they lacked a reasonable basis to conclusively and categorically tell Coinbase's customers (much less its investors) that the crypto assets held in its custody were safe and insulated from seizure in the event of bankruptcy. Nevertheless, Defendants failed to include any discussion or analysis regarding the availability of customers' crypto assets to satisfy creditor claims in the event of a bankruptcy in the Prospectus.

83.     Professor Levitin further observed that the ambiguous bankruptcy treatment of crypto-exchange customers' assets is almost certain to result in expense and delay:

> The lack of legal clarity makes [it] impossible for cryptocurrency exchange customers to have confidence in their treatment in the event of the exchange's bankruptcy. Moreover, the lack of legal clarity almost assuredly means that there will be litigation in the bankruptcy regarding who "owns" the custodially held cryptocurrency and in what capacity. While that litigation is pending—which could be for significant time—exchange customers will not to have access to the custodially held cryptocurrency. This means that even if the customers prevail, they will bear exposure to market swings during the duration of the litigation and may also bear the costs of the litigation.

84.     Of particular importance to investors, Coinbase's inability to protect its customers' crypto assets from this risk of loss made it highly probable that, if disclosed, customers would find "*custodial services more risky and less attractive*," causing a "*discontinuation or reduction in use of [the Company's] platform and products by existing customers*," as the Company ultimately admitted on May 10, 2022. This posed a substantial, material risk to Coinbase's financial position, in particular, its revenue from transaction fees. Yet, despite including nearly sixty pages of "Risk Factors" within the Prospectus, Defendants did not disclose these material facts and risks.

85.     Making matters worse for investors, Defendants then made numerous material misrepresentations about Coinbase's custodial services, including that it adequately safeguarded

customers' crypto assets, protected them against various forms of loss, and enabled customers to maintain control over their assets stored with Coinbase. All told, Defendants misled investors in the Prospectus about Coinbase's financial prospects, which were purportedly anchored by the Company's ability to protect customers' crypto assets from loss, by failing to disclose one of the most salient risks to those assets.

### 3. Defendants Knew or Were Reckless to Disregard that There Was a Material, Undisclosed Risk that Jeopardized Coinbase's Revenues

86. Defendants knew of the foregoing, undisclosed material risk to Coinbase's exchange customers, and in turn, its shareholders. First, Defendants conducted an investigation into the bankruptcy treatment of custodial crypto assets. Second, the language of Coinbase's retail and institutional customer agreements demonstrates that Defendants understood that the treatment of customers' crypto assets in the event of a corporate bankruptcy was far from certain and imposed a substantial risk of loss, seizure, or forfeiture.

### a. Defendants Investigated and Understood the Risks Arising from and Associated with Commingling Customer Assets

87. Coinbase's statements in a comment letter to the SEC indicate that Defendants understood the uncertainty in how customer assets would be treated in a bankruptcy and the material risks associated with the commingling of various customers' assets.

88. Prior to the Class Period, on June 11, 2019, Coinbase Custody, the Coinbase wholly-owned subsidiary responsible for institutional asset storage, specifically addressed the bankruptcy risk in the context of its custodial services to institutional investors. That day, Sam McIngvale, the Chief Executive Officer of Coinbase Custody, submitted a comment letter to the SEC regarding a proposal by another exchange to list shares of a certain crypto asset (the "June 2019 Comment Letter"). As the Head of the Coinbase Custody product, McIngvale was an employee of Coinbase throughout the Class Period, as were other Coinbase employees who were

responsible for the legal, compliance, and regulatory oversight of Coinbase Custody. Defendants Armstrong and Haas were identified as Coinbase Custody management on information prepared for institutional customers, and Defendants Haas and Choi were Governors of Coinbase Custody during the Class Period.

89.     The June 2019 Comment Letter affirmed that McIngvale, along with Coinbase Custody's Chief Compliance Officer, Chief Information Security Officer, COO, and members of the company's legal team "***review[ed] all custodied digital assets for adherence to appropriate regulatory and risk criteria***." With respect to segregating assets in custodial storage, the June 2019 Comment Letter stated that "Coinbase Custody wallet addresses are completely segregated per client" and that "[a]ll client digital assets are held in trust for the benefit of clients and are segregated from both (i) the proprietary property of Coinbase Custody and its affiliates, and (ii) the assets of any other Coinbase Custody client."

90.     The import of these statements is that Defendants understood the potential adverse consequences of commingling customer assets in the event of a bankruptcy. Specifically, to the extent the custodial relationship between a customer and Coinbase is considered a constructive trust, U.S. bankruptcy law requires the imposition of tracing principles as a limitation on the scope of the trust. This means if the trust's assets are kept in an omnibus account with the assets of the debtor, the commingling could potentially destroy or limit the trust depending on how tracing rules would apply, thereby affecting a customer's right to recover from the bankruptcy estate. The commingling of custodial holdings also renders the application of other potential bankruptcy scenarios uncertain. For example, a U.S.-based cryptocurrency exchange may be considered a bailee with no equitable or legal interest in the asset and must return the identical property to the bailor. There is the probability, however, that a bankruptcy court will find that the commingling

of assets defeats a bailment and thus a customer is merely an unsecured creditor (i.e., last in line to recover from the bankrupt estate).

> **b.** **The Language in Coinbase's User Agreements Shows that Defendants Understood Customers Were Exposed to the Risk of Loss and that They Could Not Guarantee Asset Protection**

91.     Coinbase's custodial agreements (i.e., User Agreements) with its customers are *private* contracts and, thus, cannot override *public* bankruptcy law, notwithstanding the intentions of the exchange operator and its customer. Indeed, these purported legal protections (or any similar ones in private contracts) had never been tested in a U.S. court prior to or during the Class Period, thus necessitating disclosure of the attendant material risks and uncertainties to investors associated with a Coinbase bankruptcy. As explained by Professor Levitin:

> [E]ven if an exchange tells its customers in a passive construction that the custodied assets "are not treated as general assets" of the exchange, *it can only definitively make such a statement regarding how it will treat the assets, not how the assets would be treated by a bankruptcy court*.

92.     In other words, significant uncertainty existed during the Class Period (and still exists today) with respect to the treatment of assets held by Coinbase (or Coinbase Custody) regardless of the contractual provisions Coinbase included, as the enforcement of such language by a bankruptcy court was far from certain or reliable. Defendants knew this during the Class Period, as Armstrong admitted on Twitter on May 10, 2022, following the Company's belated disclosure of this risk in an SEC filing earlier that day. *See* ¶ 130 *supra*.

93.     Inexplicably, Coinbase took steps in its User Agreements to mitigate the risk of loss for institutional customers arising from this known uncertainty, but did not take those steps for retail customers (which comprised over 95% of its customers during the Class Period).

94.     For example, Coinbase did not commingle the assets of its institutional customers. As described in the 2019 Comment Letter, the Coinbase Custody Trust Custodial Services

Agreement (the "Institutional User Agreement") explicitly provided institutional customers with a "*segregated custody account* controlled and secured by [Coinbase Custody] to store certain supported digital currencies and utility tokens ("Digital Assets"), on [the] Client's behalf," and stated that Coinbase Custody "will safekeep the Digital Assets and *segregate all Digital Assets from both the (a) property of [Coinbase Custody]*, and (b) assets of other customers of [Coinbase Custody]."

95.     Conversely, Coinbase *did* commingle the assets of its retail customers, but nevertheless made representations to those customers which gave the false impression that their assets were properly safeguarded. The Retail User Agreement provided that "*[i]n order to more securely custody assets*, *Coinbase may use shared blockchain addresses*, controlled by Coinbase, to hold Digital Assets held on behalf of customers and/or held on behalf of Coinbase." The Retail User Agreement further stated that "*Coinbase shall have no obligation to segregate by blockchain address Digital Assets owned by you from Digital Assets owned by other customers or by Coinbase*."

96.     Despite the commingling of customer and Company assets, the Retail User Agreement nonetheless affirmatively stated that the assets "held in your [i.e., the user's] Digital Wallet are custodial assets held by Coinbase *for your benefit*." Coinbase further assured retail users of their "ownership" and "control" over the assets. Specifically, in the Section entitled "Ownership," the Retail User Agreement stated: "*Title in Digital Assets shall at all times remain with you* and shall not transfer to Coinbase." And, despite the fact that "Coinbase shall retain control over electronic private keys associated with blockchain addresses . . . including the blockchain addresses that hold your Digital Assets," Coinbase promised retail users that "*You control* the Digital Assets held in your Digital Asset Wallet."

97.     The import of this language is that Coinbase could commingle the assets of one retail user with those of another, or with Coinbase's own assets, in an omnibus digital wallet controlled by Coinbase. The Retail User Agreement did so under the guise of "more secur[ity]," but, in reality, the commingling of custodially-held crypto assets had implications beyond physical security in the event Coinbase became insolvent.

98.     The Retail User Agreement further complicated the protection of user assets in bankruptcy by automatically opting-in customers to Coinbase's staking services by default for digital assets where staking functionality is available on Coinbase. In contrast to the affirmative language in Coinbase's Prospectus that the Company's retail staking program "***allows our retail users to maintain full ownership of their crypto assets***" (*see* ¶ 149 *infra*), this arrangement may in fact support a finding that the digital asset is property of Coinbase's bankruptcy estate. As Professor Levitin explains:

> Coinbase offers a staking arrangement in which it shares the profit with a 25% cut of the staking rewards as a "commission" and agrees to indemnif[y] [sic] the customer for any slashing losses if the stake is awarded the mining rights, but fails to successfully mine the block within the allotted time. The shared gains and internalized losses suggest an investment partnership in which ***the exchange has a property interest*** beyond the possessory interest in the underlying cryptocurrency.

99.     These statements about retail customers' continued control and ownership of their crypto assets were therefore misleading—lulling customers into a false sense of security. As noted by Professor Levitin:

> Many exchanges emphasize that they only hold the cryptocurrency in a custodial capacity and that the customers continue to "own" the cryptocurrency, suggesting that there would be no risk in the event of an exchange failure. ***This is misleading and self-serving***. The lay concept of "ownership" does not neatly track onto a potential legal treatment of custodial holdings of cryptocurrency in bankruptcy, which is that it would be treated as property of the exchange, rather than property of the customers.

100.    In addition, Coinbase included what is known as an "Article 8" provision in its Institutional User Agreement, but **not** in the Retail User Agreement. This is further indicia that Defendants knew of, but did not disclose, the risks and uncertainties to customers' crypto assets posed by a Coinbase bankruptcy. Here, the Custodial Services Section of the Institutional User Agreement contained an "Opt-in to Division 8 of the California Commercial Code" throughout the Class Period. Division 8 is the State of California's codification of the Uniform Commercial Code Article 8 ("Article 8"). Article 8 protects "financial assets" held by a securities intermediary in the event of bankruptcy by explicitly stating that financial assets "are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary." To be considered a "financial asset" within the meaning of Article 8, an asset must meet one of the following definitions:

> (i) a security;
>
> (ii) an obligation of a person or a share, participation, or other interest in a person or in property or an enterprise of a person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or
>
> (iii) *any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this Article*.

101.    Scholars agree that digital assets are unlikely to fall within the safe harbors of subsection 8-102(a)(9)(i) or 8-102(a)(9)(ii). Therefore, to receive Article 8 protection, the crypto-custodian must have "*expressly agreed with the other person that the property is to be treated as a financial asset under [Article 8]*." The Institutional User Agreement included a provision that explicitly deemed Coinbase Custody a "securities intermediary" and an institutional user the "entitlement holder" as those terms are defined in Division 8 of the California Commercial Code

33

("Division 8"). Further, the Institutional User Agreement stated that "***Under Division 8, the Digital Assets in Client's Custodial Account*** are not general assets of Trust Company and ***are not available to satisfy claims of creditors of Trust Company***."

102.    Conversely, however, Coinbase's Retail User Agreement did not contain a similar Article 8 provision during the Class Period, leaving retail customers—who accounted for approximately 95% of Coinbase's revenue—with an even greater risk of loss. Armstrong admitted as much on May 10, 2022—***after*** the Company had finally disclosed the risks and uncertainties surrounding customer assets in the event of a Coinbase bankruptcy. Armstrong conceded that the Company "***should have updated [its] retail terms sooner***" so as to, at a minimum, provide the same protections Coinbase had purportedly afforded its institutional client base, and acknowledged that the Company "***didn't communicate proactively***" about the risk to users in the event of a bankruptcy. Had Coinbase done so, it was entirely plausible that its most important customer base, retail users, would have found the Company's "***custodial services more risky and less attractive***," causing a "***discontinuation or reduction in use of [the Company's] platform and products by existing customers***"—as Coinbase ultimately disclosed. With the Direct Listing fast-approaching, however, Defendants were apparently unwilling to make these disclosures.

**G.    Coinbase Goes Public, and the Executive Defendants Rake in Hundreds of Millions of Dollars by Dumping Shares in the Direct Listing**

103.    Defendants successfully misled investors in the Direct Listing about the safety of transacting on Coinbase's exchange. For example, on April 14, 2020, the day of the Direct Listing, The New York Times hailed Coinbase as a safe alternative to directly investing in cryptocurrency and a lucrative opportunity for investors to take positions aligned with crypto without the traditional risks. In an article entitled *Coinbase's Public Listing Is a Cryptocurrency Coming-Out Party*, The New York Times wrote that "[t]he listing gives mainstream investors who may be wary

of directly buying risky digital currencies the ability to own stock in a Securities and Exchange Commission-approved business that facilitates the transactions." CNN Business likewise reported on April 14, 2021 that "Coinbase is ready for its market closeup," predicting that the stock would rise sharply above the reference price because of "a growing number of customers." Industry participants also hailed the Direct Listing, characterizing Coinbase's debut as a watershed moment for the cryptocurrency world. For example, Rachid Ajaja, CEO of AllianceBlock, a blockchain capital markets firm, told CNN that "[t]he Coinbase listing should bring further attention to cryptocurrencies and will help further legitimize it."

104.    On the back of Defendants' misrepresentations in the Prospectus, on April 14, 2021, Coinbase made history, becoming the first cryptocurrency company in the world to go public. That day, the Company commenced its Direct Listing, and its Class A common stock began trading on the Nasdaq under the ticker symbol "COIN."

105.    Despite an initial reference price of $250, the stock opened at a staggering $381 per share and quickly reached $429.54 per share. The stock ultimately closed at $328.28—approximately $78 above the reference price. Excluding options and restricted stock units, Coinbase closed the day with a market capitalization of about $62 billion. As the Associated Press News ("AP News") wrote in a same day article, "Coinbase made a rousing debut on Wall Street."

106.    Armstrong and the other Executive Defendants quickly capitalized on the moment and reaped *hundreds of millions of dollars* in proceeds from insider sales of their Coinbase stock:

| Defendant | Shares Sold | Gross Proceeds ($M) |
|---|---|---|
| Armstrong | 749,999 | >$291,000,000 |
| Choi | 602,158 | >$219,000,000 |
| Haas | 255,500 | >$99,000,000 |

107. When the Direct Listing concluded, the Executive Defendants had sold a total of 1,607,657 shares of their Class A common stock to the public at prices ranging from $312 to $424 per share. Notably, the all of shares that Armstrong and Haas sold in the Direct Listing were sold at or above the market opening price of $381 per share, or *$131 above the reference price*.

108. Following the Direct Listing, market commentators again hailed Coinbase as an attractive opportunity to investors. For example, in an April 14, 2021 article entitled *Coinbase Went Public. What—and Why—Is Coinbase?*, Slate, like the publications before it, wrote that Coinbase "allows investors who might not normally touch cryptocurrency get some indirect exposure to the industry" and "could even inspire some of those investors, who might see Coinbase's debut as an extra layer of validation for cryptocurrencies in general, to also become involved in the market." In another same-day article entitled *Coinbase soars in market debut, valued near $86 billion*, Lule Demmissie, President of Ally Invest, told the AP News that "shares of Coinbase should attract investors who want to get into the cryptocurrency space in addition to, or without buying any coins at all." Demmissie continued that "it could also be a less volatile security than the coins themselves."

## H. Following the Direct Listing, Defendants Continue to Conceal the Risk of Asset Loss and the Potential Impact on Coinbase's Revenues

109. After the Direct Listing, Defendants continued to conceal the material risk associated with the treatment of customers' crypto assets held in Coinbase's custody and to tout its ability to withstand competitive pricing pressure in the retail space. To this end, Defendants repeated in substantially the same form the materially false and misleading statements set forth in the Prospectus within Coinbase's SEC filings during the Class Period, including its Form 10-Qs filed in May, August, and November of 2021, and Form 10-K filed in February of 2022.

110.    At the same time, when pressed by analysts for information about Coinbase's ability to maintain its transaction fee revenues and attract customers, Defendants repeatedly touted the Company's custody services as a competitive advantage and long-term revenue driver. For example, on May 13, 2021, Defendant Haas assured investors that Coinbase was "trying to win on being the most trusted, easiest to use, on providing all the assets that our customers want to transact with" and that ***"[o]n the retail side, we're bundling custody and storage services into our trading fee. And our customers really see value in the fees that we provide based on the services***." On December 7, 2021, Choi too assured investors at the Goldman Sachs US Financial Services Conference that "***[w]e haven't changed our fee structure on the retail side yet. I think that consumers are more than willing to pay a certain fee percentage for the services we offer, particularly the security we offer***." Doubling-down, Choi boasted "***[w]e have world-class security in custody when you purchase assets with Coinbase and hold them in Coinbase***." Then, during the March 9, 2022 Morgan Stanley Technology, Media, and Telecom Conference, Haas repeated this refrain, stating "***we know what we're good at. We know that we're a great, safe place to buy your first Bitcoin[,] to trade[,] to safely store***."

111.    None of these statements were fully true or complete because Defendants continued to conceal the material risk of loss to exchange customers in the event of a bankruptcy, and the risk to investors that customers would flee, endangering the Company's revenues.

112.    On March 24, 2022, the SEC published Staff Accounting Bulletin No. 121 ("SAB 121"), which expressed the SEC's views regarding the accounting for an exchange's obligations to safeguard crypto-assets for platform users. At bottom, SAB 121 reflected what Coinbase had long known: that "***due to the unique characteristics of the assets and the lack of legal precedent, there are significant legal questions surrounding how such arrangements would be treated in a***

*court proceeding arising from an adverse event (e.g., fraud, loss, theft, or bankruptcy)*." From there, the SEC advised that "[t]hese risks can have a significant impact on the entity's operations and financial condition." The SEC further stated that this guidance served to reinforce then-existing disclosure obligations for publicly-traded companies like Coinbase, including under Item 303 of Regulation S-K, stating that "[d]isclosures regarding the significant risks and uncertainties associated with the entity holding crypto-assets for its platform users may also be required outside the financial statements under existing Commission rules, such as in the description of business, risk factors, or management's discussion and analysis of financial condition and results of operation."

113.    Tellingly, throughout this entire period, Coinbase was also engaged in a pattern of misconduct behind the scenes that recklessly contributed to any bankruptcy risk that the Company may face. Following a years' long examination of Coinbase, in 2021, the New York Department of Financial Services ("NYDFS") began an enforcement investigation into the Company's various compliance issues. The NYDFS subsequently found that "Coinbase's compliance system failed to keep up with the dramatic and unexpected growth of its business" and, by the end of 2021, "was overwhelmed[] with a substantial backlog of unreviewed transaction monitoring alerts ["TMS alerts"], exposing its platform to risk of exploitation by criminals and other bad actions." By February 22, 2022, the Company had agreed to retain an Independent Monitor to review Coinbase's compliance shortcomings which revealed *over 100,000 unreviewed TMS alerts*. The investigation further revealed that "the risks to the financial system due to this weakness are not merely theoretical," and in one case, led to theft of *more than $150 million from a customer's account* in the Spring of 2021.

I.      **Defendants Falsely Deny that Coinbase Engaged in Proprietary Trading**

114.    Regulators, analysts, and market commentators were also laser-focused on whether Coinbase engaged in proprietary trading, a practice which exposed Coinbase to several risks, including financial loss, customer distrust, and potential regulatory scrutiny.

115.    Proprietary trading occurs when a bank or firm trades financial instruments in its own account, using its own money instead of using clients' money. This enables the firm to earn full profits from a trade rather than just the commission it receives from processing trades for clients. Banks and other financial institutions engage in this type of trading with the aim of making excess profits.

116.    Coinbase's core business is the safeguarding of customer assets and money. Thus, if the Company makes a bad bet, it risks those assets. And, unlike a bank, the FDIC does not guarantee customer funds or assets on the Coinbase exchange. Moreover, Coinbase, as the exchange, often has an edge over the average investor in terms of the market information it has. As a result, proprietary trading is fraught with conflicts of interest. As SEC Chair Gensler explained during the Class Period: "Crypto's got a lot of those challenges–of platforms trading ahead of their customers. . . . In fact, they're trading against their customers often because they're market-marking against their customers."

117.    In addition, because Coinbase functions as an exchange for digital currency, the Volcker Rule could apply to any foray into proprietary trading. The Volcker Rule is a regulation approved in 2010, in the wake of the financial crisis, to stop banks from making speculative investments in securities, commodities, and derivatives trading.

118.    Well aware of the market's concerns about proprietary trading, in connection with the Direct Listing, Defendants made material misrepresentations about Coinbase's proprietary

trading operations and intentions. These misrepresentations further concealed from investors the risks associated with purchasing and holding the Company's stock.

119.    Specifically, in Coinbase's Prospectus (and every subsequent quarterly and annual SEC filing published during the Class Period), Defendants stated: "***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***." From there, Defendants claimed that the only circumstances in which Coinbase would directly engage in transactions with customers was as an "accommodation," stating: "***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***." Defendants then told investors that such trading activity occurred in the event of "system disruptions" (i.e., when an order had been placed but not filled as a result of an exchange-related issue), or when orders placed did not meet minimal requirements (such as quantity). In a letter to shareholders within the Prospectus, Armstrong also declared that "[m]ost important, we built a culture that doesn't take shortcuts to try and make a quick buck." Defendants repeated these and related misrepresentations in each of the Company's Class Period Forms 10-Q and Form 10-K following the Direct Listing.

120.    Defendants were also asked specifically to affirm that Coinbase had not and would not engage in proprietary trading at numerous points during the Class Period. For example, during the Goldman Sachs Financial Services Conference on December 7, 2021, a Goldman Sachs analyst characterized the fact that the Company did not "take proprietary risk on the institutional side" as "one of the hallmarks of [Coinbase's] business" relative to its competitors. The analyst asked Defendant Choi why Coinbase's refusal to engage in proprietary trading was important for the Company's business. In response, Choi emphasized Coinbase's firm policy against proprietary trading, explaining:

> *I mean I think it's kind of obvious in a way. It's just people don't want to feel like you're trading -- institutions don't want to feel like you're going to be trading against them. And so we've always had a clear line about not doing that.*

121. The next day, on December 8, 2021, Defendant Haas echoed Choi's statements when she testified before the United States House of Representatives Committee on Financial Services (the "Committee"), at a hearing entitled "Digital Assets and the Future of Finance: Understanding the Challenges and Benefits of Financial Innovation in the United States." There, Haas stated that "*Coinbase is an agency-only platform" that "do[es] not engage in proprietary trading*."

122. When Representative Alexandria Ocasio-Cortez specifically asked Haas whether Coinbase traded its own corporate funds on the crypto asset exchanges it operates, Haas falsely assured the Committee that Coinbase does not actively trade crypto assets for profit and, instead, only buys crypto assets for long-term investment purposes, stating:

> *There are a few things that we do in our business. One is, we do have a corporate investment portfolio that every month we make an investment in crypto and add to our balance sheet. We have not sold that. We don't trade it actively, but we do increase the investment on a monthly basis on pre-established investment protocols. We do buy those on our exchange.*

123. In truth, and unbeknownst to investors, Coinbase had long planned to engage in proprietary trading. As The Wall Street Journal reported, in an effort to develop new business amid the lingering 2021 market downturn, in July 2021, Coinbase hired at least four Wall Street traders and launched the so-called "Coinbase Risk Solutions" group. The intent behind the Coinbase Risk Solutions group was to use the Company's own cash to trade crypto on behalf of clients. The Wall Street Journal reported that Defendant Haas was involved in creating this unit, and "[e]mployees

were discouraged from sharing information about the new trading business or discussing it in internal communications."

124.    The timing around the creation of this group coincides with sharp declines in the price of Bitcoin. As noted above, transactions in Bitcoin and Ethereum accounted for 45% to 56% of Coinbase's annual revenues during the Class Period. Around March 12, 2021, the price of Bitcoin reached prices exceeding $61,000. Shortly thereafter, however, in May 2021, that price began to sink dramatically and reached lows of around $34,000 by month's end.

125.    By November 2021, the "crypto winter" was fast approaching. A cryptocurrency winter is an industry term for a long downturn in cryptocurrency prices. Such winters impact well-known currencies like Bitcoin and Ethereum—transactions in which accounted for 45% to 56% of Coinbase's annual revenues during the Class Period—as well as lesser-known crypto coins and tokens. The price of Bitcoin had climbed up to over $68,000 by November 2021, but then began to plummet, bottoming out at around $32,000 in January 2022. As reported in the Company's 2021 Form 10-K, Coinbase saw a corresponding drop in its total transaction revenue generated by Bitcoin from 44% to 25% year-over-year from 2020 to 2021.

126.    To combat this downturn, Coinbase's proprietary trading unit took action and turned to trading on its own platform to generate profits. First, the unit built sophisticated systems to facilitate such transactions, according to numerous sources who spoke with beincrypto.com. Then, Coinbase used those system to facilitate trades and stake cryptocurrencies using cash that the Company raised by guaranteeing a $100 million "structured note," which it then sold to Invesco Ltd. at a fixed-rate of 4.01%. The lucrative trade prompted Brett Tejpaul, Coinbase's Head of Institutional Sales, Trading, Custody, and Prime Services, to "praise[] the executives who worked

on the transaction in internal communications and expressed eagerness to make additional such transactions."

127.   Despite these actions, Defendants did not disclose Coinbase's intent to engage in proprietary trading, its formation of the proprietary trading unit, or its actual trading during the Class Period in the Prospectus, in SEC filings, or in response to specific questions from analysts and Congress. As a result, Defendants' statements misled investors regarding material risks attendant to Coinbase's operations, including the conflicts of interest with customers that can arise from the Company's proprietary trading, the likelihood that Coinbase's customers would respond negatively to the possibility of unknowingly trading with the it (which can also impact the price of various cryptocurrencies), and the potential regulatory risks triggered by a proprietary trading operation.

**J.     The Relevant Truth Concealed by Defendants' Material Misrepresentations and Omissions Is Revealed to Investors**

128.   As a result of Defendants' materially false or misleading statements and omissions of material facts, Coinbase's common stock traded at artificially inflated prices during the Class Period.

129.   On May 10, 2022, Defendants finally disclosed what they had known the entire Class Period: the crypto assets held in custody by the Company on behalf of customers could be treated as the Company's assets in the event of bankruptcy such that customers could lose the ownership interest in their assets. That day, Coinbase filed its Form 10-Q for the period ending March 31, 2022. In the 10-Q, Coinbase amended the Company's quarterly warning concerning its "failure to safeguard and manage our customers' fiat currencies and crypto assets" to disclose, for the first time, that "***the crypto assets we hold in custody on behalf of our customers could be***

*subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors*." In relevant part, Coinbase disclosed that:

> *Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition.*
>
> As of March 31, 2022, we held $256 billion in custodial fiat currencies and cryptocurrencies on behalf of customers. Supported crypto assets are not insured or guaranteed by any government or government agency. . . . Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds.
>
> \* \* \*
>
> Moreover, *because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition*.

130. Later that day, Defendant Armstrong *admitted* on Twitter that Coinbase had failed to appropriately communicate this risk to investors, stating:

> *For our retail customers, we're taking further steps to update our user terms such that we offer the same protections to those customers in a black swan event. We should have had these in place previously, so let me apologize for that.*
>
> *This disclosure makes sense in that these legal protections have not been tested in court for crypto assets specifically, and it is possible, however unlikely, that a court would decide to consider customer assets as part of the company in bankruptcy proceedings.*
>
> *We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My*

> *deepest apologies, and a good learning moment for us as we make*
> *future changes.*

131.     On this news, the price of Coinbase common stock declined $19.27 per share, or more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on May 11, 2022.

132.     The market reacted swiftly and negatively to this news. On May 11, 2022, for example, Piper Sandler published a report entitled *Shares Take Another Leg Down On New SEC Custody Risk Disclosure Requirements*. Piper Sandler stated the following:

> COIN shares trading down ~23% this morning. Along with a 1Q22 earnings miss reported last night, we suspect the decline is being driven by language in the 10-Q filing (also released last night) about the consideration of customer's crypto assets under custody in the event of bankruptcy. Late last night, a twitter thread was posted from the account of CEO Brian Armstrong addressing the updated disclosures and reassuring the public that COIN is not at risk of bankruptcy and that customer funds are safe. . . .

> COIN included this new risk disclosure in its 10-Q filing. It goes on to say that this fact could negatively impact COIN's financial results as clients could now view COIN's custody services as more risky and less attractive. . . .

133.     On May 13, 2022, New Constructs published a report entitled *1Q22 Earnings Shows Coinbase's Struggles* in which it warned, "Don't Ignore New Bankruptcy & Regulatory Risk." New Constructs further stated:

> As noted in Coinbase's latest 10-Q, the company has to address the real risk of bankruptcy. The following statement was added this quarter: ***"in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors."***

> This public acknowledgement could spark fear in the company's clients. The fear of bankruptcy proceedings could drive clients to cash out their investments as quickly as possible, further weakening Coinbase's business, and bringing the company even closer to bankruptcy. . . .

45

134.    As The Financial Times reported on May 11, 2022 in an article entitled *Move along, says Coinbase's Armstrong*: "[T]here are a couple of lines in [Coinbase's] latest 10-Q filing about its responsibilities to safeguard customer assets that really caught our eye . . . . [S]hould Coinbase go bankrupt then customers may lose their money they'd entrusted to the exchange for safekeeping."

135.    On May 11, 2022, Protocol, a technology-focused news organization, published an article entitled *Coinbase's disturbing disclosure:* '*If we go bankrupt….*' The article noted Armstrong's *mea culpa* and apologies to retail customers, quoting one market observer, Alex Johnson—author of the Fintech Takes newsletter—who called it a "bizarre lapse," stating, "***I don't understand how they possibly could have forgotten to do that, but apparently they did***."

136.    Then, on September 22, 2022, the truth about Coinbase's proprietary trading exploits was disclosed for the first time. The Wall Street Journal reported that Coinbase had created a unit, Coinbase Risk Solutions, in July 2021 "to generate profit, in part, by using the [C]ompany's cash to trade and 'stake,' or lock up, cryptocurrencies"—a practice that sources at the Company characterized as "'proprietary' trading."

137.    Among other things, The Wall Street Journal detailed a 2022 transaction in which Coinbase invested $100 million raised from the sale of a structured note in order to "profit in cryptocurrency markets" and explained that "[t]he trade occurred after the crypto market started to fall from its all-time high, eating into Coinbase's business." The trade "was profitable for Coinbase," leading Tejpaul, Coinbase's Head of Institutional Sales, Trading, Custody, and Prime Services, to "praise[] the executives who worked on the transaction in internal communications and expressed eagerness to make additional such transactions." The Wall Street Journal revealed that those in the highest levels of the Company—including Defendant Haas—were involved in

Coinbase Risk Solutions' creation, and that "[e]mployees were discouraged from sharing information about the new trading business or discussing it in internal communications."

138.    On this news, the price of Coinbase common stock declined $4.70 per share, or 6.9%, from a close of $67.64 per share on September 21, 2022, to close at $62.94 per share on September 22, 2022.

139.    Immediately following the bombshell report in The Wall Street Journal, after years of denying any form of proprietary trading, Coinbase quickly shifted gears and admitted in a blog post that "Coinbase does, from time to time, purchase cryptocurrency as principal, including for our corporate treasury and operational purposes." Critically, Coinbase's blog post did *not* deny the $100 million cryptocurrency proprietary trade described in The Wall Street Journal, the assertions that the transaction had been used to generate profit for Coinbase, or the claims that the Company had discouraged employees from sharing information about Coinbase's trading activity.

140.    Market commentators reacted negatively. For example, on September 27, 2022, Digital Wealth News published an article entitled, *The Wall Street Journal & Coinbase 'Have Words' . . . Whose [sic]Right?*, in which it wrote: "When is proprietary trading not proprietary trading? It seems the venerable Wall Street Journal defines the practice one way and cryptocurrency exchange Coinbase has a different view. Is it really a big deal? Well yes, it kind of is, especially for investor perception." After noting Coinbase's position—i.e., that "[w]e do not view this as proprietary trading because its purpose is not for Coinbase to benefit from short-term increases in value of the cryptocurrency being traded"—Digital Wealth News concluded: "That statement sure doesn't sound like the true definition of proprietary trading."

141.    On October 10, 2022, in an article entitled, *Coinbase's Stock Drops As Proprietary Trading Experiment Exposes Potential Conflicts Of Interest*, Times Square Investment Journal

reported that a protracted cryptocurrency downturn had "kneecap[ed] Coinbase's core revenue stream and compelling the company to experiment with prop trading in a bid to bring in more money." Times Square Investment Journal went on to note that "the practice is not without risks," stating that "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors." The publication then quoted Sheraz Ahmed, an analyst at STORM Partners, who stated that "Coinbase's decision to engage in prop trading is clearly a reaction to the company's declining stock price over the past year, as a crypto market contagion plunged several exchanges like Celsius and Genesis into insolvency." Ahmed was further quoted as stating: "I understand that Coinbase's stock price has fallen significantly, but it's against the ethos [of decentralized finance] to operate against the communities' interest or without involving them, and [Coinbase's decision to proprietary trade] won't allow them to benefit from the decisions made."

## V.   DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A.   Misrepresentations and Omissions Concerning the Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues

#### 1.   April 14, 2021 – Prospectus

142.   On March 23, 2021, Coinbase filed its Form S-1 Registration Statement with the SEC, which was deemed effective by the SEC on April 1, 2021. The Form S-1 was signed by Defendants Armstrong and Haas. On April 14, 2021, Coinbase filed the Prospectus, incorporating and forming part of the Registration Statement. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "*failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition*."

143.   Defendants Coinbase, Armstrong, and Haas similarly represented that:

> *The loss or destruction of private keys required to access any crypto asset held in custody for our own account or for our*

48

*customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses*. . . Crypto assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. *Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' crypto assets could adversely affect our customers' ability to access or sell their crypto assets*, require us to reimburse our customers for their losses, and subject us to significant financial losses in addition to losing customer trust in us and our products.

144.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas further stated: "*The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys*."

145.    Defendants' statements set forth in ¶¶ 142-44 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading. As set forth in Section IV.F.2 *supra*, by choosing to speak about the material risks arising from Coinbase's "*failure to safeguard and manage [its] customers' fiat currencies and crypto assets*," Defendants had a duty to speak completely and accurately, including to disclose material facts necessary to make these statements not misleading. Notwithstanding this duty, Defendants failed to disclose that customers could lose some or all of their crypto assets in the event of Coinbase's bankruptcy. Indeed, as Armstrong admitted on May 11, 2022, any purported "*legal protections*" available to safeguard crypto assets during the Class Period "*ha[d] not been tested in court for crypto assets specifically*," leaving wide open the possibility that "*that a court would decide to consider customer assets as part of the company in bankruptcy proceedings*."

146.    Thus, while Defendants purported to identify the circumstances in which customer assets in Coinbase's custody were susceptible to loss, and assured that the Company "*securely*

*store[d] all crypto assets it holds on behalf of users*," by failing to disclose the risk to customers of asset loss or seizure in the event of Coinbase's bankruptcy, they gave investors the false impression that the digital assets held in Coinbase's custody on behalf of customers were safe and insulated from seizure, thus rendering the statements set forth in ¶¶ 142-44 materially misleading. In truth, Coinbase's inability to protect its customers' crypto assets from this loss made it highly probable that its customers would find the Company's custodial services "more risky and less attractive," as Coinbase later admitted. The risks posed to Coinbase's exchange customers in turn posed a substantial, material risk to Coinbase's financial position, particularly, its revenue from transaction fees, which accounted for nearly all of the Company's revenue and was the focus of analysts and investors alike in the run up to the Direct Listing and during the Class Period.

147.    In addition, separate and apart from Defendants' duty to disclose any material facts required to make their statements not misleading, Defendants were under a duty to disclose the risk of customer asset loss or seizure in the event of Coinbase's bankruptcy pursuant to Item 303 of SEC Regulation S-K. Specifically, in the Management Discussion and Analysis ("MD&A") section of its Forms 10-K and 10-Q filed with the SEC, Defendants were required to describe any known trends or uncertainties that have had or that were reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Even if Defendants were unable to determine the effect of the "uncertainty" on Coinbase's future revenues and income, Defendants were still required under Item 303 to disclose the manner in which that uncertainty might reasonably be expected to materially impact Coinbase's future revenues and income. By omitting these facts, Defendants violated Item 303, further rendering the statements set forth in ¶¶ 142-44 materially misleading.

148.    In a Section entitled "Business: Retail," Defendants Coinbase, Armstrong, and Haas stated:

> Stake. Certain blockchain protocols, such as Tezos, rely on staking, an alternative way to validate blockchain transactions. Network participants can designate a certain amount of their crypto assets on the network as a stake (similar to a security deposit) to validate transactions and get rewarded in kind from the network. Today, staking crypto assets is a technical challenge for most users. Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time. We provide a service known as "Delegated Proof of Stake," which reduces the complexities of staking and ***allows our retail users to maintain full ownership of their crypto assets while earnings staking rewards.*** In return, we earn a commission on all staking rewards received.

149.    Defendants' statement identified in ¶ 148 was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-47. These statements were also materially false or misleading because while Defendants claimed that retail users would "***maintain full ownership of their crypto assets while earning staking rewards***," they lacked a reasonable basis to make such a claim given the uncertain legal treatment of such assets in bankruptcy, particularly in the staking capacity, where the fact that Coinbase shared in the profits by taking a 25% commission increased the likelihood that the assets are considered part of Coinbase's bankruptcy estate.

## 2.    May 13, 2021 – Earnings Conference Call

150.    On May 13, 2021, Coinbase held an earnings call to announce the Company's 1Q2021 financial results, which Gupta, moderated. Defendants Armstrong and Haas both participated.

151.    During the call, Gupta asked: "Our next question comes from Yashasvi A, who asks: what is Coinbase's strategy to deal with other exchanges with cheaper fees? Apart from pricing, what other levers can you pull to attract more customers?"

152.    Defendant Haas responded:

Why don't I take this one? So just to be clear, our biggest focus right now is to keep up with the current demand. We are not focused on competing with fees. We are not trying to even win on fees. We're trying to win on being the most trusted, easiest to use, on providing all the assets that our customers want to transact with. On being able to provide to yield on crypto assets, the opportunity to engage in DeFi, as Brian just talked about. ***Our customers choose us because they trust us to keep their assets safe***. We provide an easy-to-use platform and a growing number of ways to transact and use crypto assets. Our institutions are choosing us for our secure storage as well, offered by our custody solution, the deep liquidity we offer on our exchange, and our best trading execution, where we are able to route orders across more than 10 liquidity venues, including other exchanges, to find the best price to execute client orders. ***On the retail side, we're bundling custody and storage services into our trading fee. And our customers really see value in the fees that we provide based on the services.***

153.    Defendants' statements set forth in ¶ 152 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-46. In addition, these statements gave investors the false impression that Coinbase's trading fees (accounting for 96% of the Company's total revenue) were stable and sustainable because of Coinbase's custody and storage services, a purported competitive advantage for the Company. While Haas touted that "***[o]ur customers choose us because they trust us to keep their assets safe***" and "***our customers really see value in the fees that [Coinbase] provide[s]***," including custody and storage services, the undisclosed risk and uncertainty surrounding the treatment of customers' crypto assets held in Coinbase's custody posed a material adverse risk to Coinbase's ability to both maintain its existing retail customer base (which accounted for over 95% of the Company's transaction fee revenues) and to attract new retail customers.

### 3.      May 14, 2021 – Form 10-Q

154.     On May 14, 2021, Coinbase filed its Form 10-Q with the SEC for the period ending March 31, 2021 ("1Q2021 Form 10-Q"). The 1Q2021 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***," identifying, specifically that:

> ***The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses***.

155.     In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

156.     Defendants' statements set forth in ¶¶ 154-55 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-47.

### 4.      August 10, 2021 – Form 10-Q

157.     On August 10, 2021, Coinbase filed its Form 10-Q with the SEC for the period ending June 30, 2021 ("2Q2021 Form 10-Q"). The 2Q2021 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto***

*assets could adversely impact our business, operating results and financial condition*," identifying, specifically that:

> *The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses*.

158.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "*The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys*."

159.    Defendants' statements set forth in ¶¶ 157-58 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-47.

**5.    November 10, 2021 – Form 10-Q**

160.    On November 10, 2021, Coinbase filed its Form 10-Q with the SEC for the period ending September 30, 2021 ("3Q2021 Form 10-Q"). The 3Q2021 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "*failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition*," identifying, specifically that:

> *The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses*.

161.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

162.    Defendants' statements set forth in ¶¶ 160-61 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-47.

### 6.    November 30, 2021 – JP Morgan Crypto Economy Forum

163.    On November 30, 2021, Defendant Armstrong represented Coinbase at the JP Morgan Crypto Economy Forum. During the conference, Union Square Ventures, LLC partner Frederick R. Wilson ("Wilson") and Armstrong had the following exchange:

> [Wilson:] How do you think about custody and self-custody? When we first invested in Coinbase, one of the first conversations you and I had was about cold storage and securing the Bitcoin that our customers had with us.
>
> [Armstrong:] Yes. So you're right. The early on people were all worried about, how do you store crypto? And people were losing it accidentally. There was famously things like Mt. Gox, where some exchanges got hacked and funds were lost….
>
> [Wilson:] Something like 10% of all crypto in the world is stored at Coinbase?
>
> [Armstrong:] Yes. Yes, a little over 10% now. So that's a great indication of trust that people have in centralized custody. Especially for our institutional customers, by the way. Most of them today seem to really want to have someone like us, we're qualified custodian, so they can store it with us.
>
> ***Now there has been this really -- this segment has always been there, but I think it's going to keep growing over time. It's largely retail, but it's the self-custodial preference that people have, which is 'Hey, I want to store my own crypto.' And there's some nice properties of that. It's not just – I make sure it's never going to be seized or something like that***….

164.    Defendant Armstrong's statements set forth in ¶ 163 above, including those purporting to identify the benefits of utilizing Coinbase's custody services and specifically addressing the advantages and disadvantages of self-custody wallets, were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-46. In addition, by choosing to speak about Coinbase's self-custodial services, Defendant Armstrong had a duty to speak completely and accurately on that topic, including to disclose that the self-custodial services would, in fact, protect users against the risk of loss in the event of a Coinbase bankruptcy. This was particularly true in the context here, where Defendant Armstrong elected to highlight the customer losses resulting from Mt. Gox's bankruptcy (*see* ¶ 75 *supra*).

   **7.    December 7, 2021 – Goldman Sachs US Financial Services Conference**

165.    On December 7, 2021, Defendant Choi represented Coinbase at the Goldman Sachs US Financial Services Conference hosted by William Alfred Nance ("Nance"), Goldman Sachs Group, Inc. Research Analyst. During the conference, Nance asked Choi about industry pressure placed on Coinbase's fees. Specifically, Nance asked:

> Got it. Pricing usually comes up with investors as one of the biggest concerns for the business, just given the concentration of retail commissions in the P&L. The company has been pretty upfront that trading fees will likely come down over time, but probably not in the near term. What do you think of the catalyst for seeing more significant pricing pressure in the industry? And I guess, as a management team, how do you ensure that Coinbase is ready for that?

166.    Defendant Choi responded:

> I mean I know this is like the #1 question and probably top of mind for everybody in the room. We – it's one of those things where we know at some point there will be compression, but we aren't seeing any signs of it yet. And so we're ready for that day whenever it is. But we -- and the way that we think about it is, we want to control our own destiny. And so the things that we're investing in are

subscription and services revenue streams that are much more predictable. The more that the subscription and services revenue streams can pay off our operating expenses such that the trading revenue is gravy on top, that's a great situation to be in. And we're at the beginning of that. But that -- I think we feel very good about the trajectory in the subscription services revenue, if you have a look at that.

So I guess the TLDR is that I think many of you have probably seen that the retail and institutional volumes will vary, and so that can contribute to the take rate that we get. But we haven't yet seen the actual compression. ***We haven't changed our fee structure on the retail side yet. I think that consumers are more than willing to pay a certain fee percentage for the services we offer, particularly the security we offer. We have world-class security in custody when you purchase assets with Coinbase and hold them in Coinbase***. So I guess it's a long-winded way of saying like, yes, it will come at some point, but we haven't seen any signs of it yet. And I think we're making the right investments in subscription services to get to that place where it shouldn't be that much of a concern over the longer term

167.    Defendants' statements set forth in ¶ 166 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-46, 153.

**8.      February 25, 2022 – 2021 Form 10-K**

168.    On February 25, 2022, Coinbase filed its Form 10-K with the SEC for the period ending December 31, 2021 ("2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***," identifying, specifically that:

> ***[T]he theft, loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating***

> *to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses*.

169.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

170.    Defendants' statements set forth in ¶¶ 168-69 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-47.

171.    In a Section entitled "Our Products: Retail," Defendants Coinbase, Armstrong, and Haas stated:

> We serve as the users' primary crypto account, both hosted and self-hosted – providing safe, trusted, and easy-to-use tools to discover, invest, stake, store, spend, earn, borrow, and use crypto assets.
>
> We provide our retail users a hosted wallet which allows them to securely and easily discover, buy, sell, send and receive 139 crypto assets with a growing number of fiat currencies or to trade one crypto asset for another crypto asset. In our hosted wallet, we provide custody services on our customer's behalf. We charge a fee when users buy, sell, or convert crypto assets in either a fiat-to-crypto or crypto-to-crypto trade….We also provide services to allow our customers to participate in blockchain rewards paid by underlying protocols. The largest of these is staking where we offer a service known as Delegated Proof of Stake, ***which reduces the complexities of staking and allows our retail users to maintain full ownership of their crypto assets while earning staking rewards.*** In return, we receive a commission on all staking rewards earned.
>
> ***Coinbase Wallet, a separately managed retail software product, allows users to self-custody crypto assets and NFTs in one place and interact with the cryptoeconomy and Web3***, including an expanded set of approximately 5,500 crypto assets and decentralized applications. A fee is charged for select activities executed in the self-hosted wallet.

172.     Defendants' statements set forth in ¶ 171 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-47, 149, 164.

### 9.     March 9, 2022 – Morgan Stanley Technology, Media, and Telecom Conference

173.     On March 9, 2022, Defendants Armstrong and Haas represented Coinbase at the virtual Morgan Stanley Technology, Media, and Telecom Conference. During the conference, an unidentified analyst asked:

> It'd be great to hear, #1, where you're investing and then #2, I know there was a lot of discussion around earnings call about kind of what's the near -- how should investors think about near-term revenue potential for some of these significant 2022 investments? So feel free to address. . . .

174.     Defendant Hass responded:

> Yes. That would be the #1 question we've had as follow-up from earnings, so I also had the opportunity to share with you all. So one of the things that we think about is, we want to be a company of repeatable innovation, which means that we're always investing on the frontier. We're always taking measured bets, and we want to have a lot of bets, because we don't know exactly how the shape of the future of crypto economy will emerge. ***So, we know what we're good at. We know that we're a great, safe place to buy your first Bitcoin to trade to safely store.***

175.     Defendants' statements set forth in ¶ 174, including that "***we're a great, safe place to buy your first Bitcoin to trade and to safely store,***" were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 145-46.

**B.     Misrepresentations and Omissions Concerning Coinbase's Proprietary Trading Activities**

**1.      April 14, 2021 – Prospectus**

176.    In the Prospectus, Defendants Coinbase, Armstrong, and Haas stated within a section entitled "Liquidity and Capital Resources" that:

> ***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. Therefore, we do not anticipate material variability to our earnings or cash flows from the monetization of these investments. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Realized gains and impairment losses related to crypto assets held for investment did not have a material impact on our consolidated statements of operations for all years presented. ***Customer accommodations are fulfilled with crypto assets held for operational purposes and we do not expect material variability in our earnings from these crypto assets.***

177.    Within a section entitled "Other operating expense," Defendants Coinbase, Armstrong, and Haas stated: "Other operating expense includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***."

178.    Defendants Coinbase, Armstrong, and Haas similarly stated within a section entitled "Other revenue" that:

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions***. We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total

value of the sale as revenue and the cost of the crypto asset in other operating expense. Transactions involving our sale of crypto assets represented less than 11% of our total revenue for the fiscal year ended December 31, 2020.

179.    Defendants Coinbase, Armstrong, and Haas made the following similar statement in a section also entitled "Other revenue":

> Other revenue includes sale of crypto assets and corporate interest income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in other operating expense within the consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $131.9 million and $38.6 million for the years ended December 31, 2020 and December 31, 2019, respectively.

180.    In letter to shareholders within the Prospectus, Defendant Armstrong stated that "*[m]ost importantly, we built a culture that doesn't take shortcuts to try and make a quick buck*."

181.    Defendants' statements set forth in ¶¶ 176-80 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, because Coinbase had, in fact, already intended to engage in proprietary trading. Indeed, by July 2021, the Company formed Coinbase Risk Solutions, hiring former Wall Street traders to run the unit and engage in for-profit trading on Coinbase's exchange—not just trading for "*operational purposes*" or as an "*accommodation*" to customers during "system disruptions." By choosing to speak about the nature of and intent behind Company's trading activity, including that, at the time, Defendants "*view[ed] our crypto asset investments as long term holdings*" and "*d[id] not plan to engage in regular trading of crypto assets*," and that the Company "*doesn't take shortcuts to try and make a quick buck*," Defendants had a duty to speak completely and accurately and to disclose all material facts, which they did not.

2. **May 14, 2021 – Form 10-Q**

182. On May 14, 2021, Coinbase filed its 1Q2021 Form 10-Q, which was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Liquidity and Capital Resources":

> ***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. Therefore, we do not anticipate material variability to our earnings or cash flows from the monetization of these investments. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Realized gains and impairment losses related to crypto assets held for investment did not have a material impact on our consolidated statements of operations for the periods presented. ***Customer accommodations are fulfilled with crypto assets held for operational purposes and we do not expect material variability in our earnings from these crypto assets.***

183. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other operating expense": "Other operating expense includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***."

184. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*** We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in other

operating expense. Transactions involving our sale of crypto assets represented less than 12% of our total revenue for the three months ended March 31, 2021.

185.    Defendants made a similar representation in within a section also entitled "Other revenue":

> Other revenue includes sale of crypto assets and corporate interest income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in other operating expense within the consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $186.3 million and $10.2 million for the three months ended March 31, 2021 and March 31, 2020, respectively.

186.    Defendants' statements set forth in ¶¶ 182-85 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181.

### 3.    August 10, 2021 – Form 10-Q

187.    On August 10, 2021, Coinbase filed its 2Q2021 Form 10-Q, which was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Liquidity and Capital Resources":

> ***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. Therefore, we do not anticipate material variability to our earnings or cash flows from the monetization of these investments. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Customer accommodations are fulfilled with crypto assets held for operational purposes and we do not expect material variability in our earnings from these crypto assets.

188.    Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other operating expense (income), net": "Other operating expense (income), net includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***."

189.    Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions***. We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in other operating expense. Transactions involving our sale of crypto assets represented less than 10% of our total revenue for the three and six months ended June 30, 2021.

190.    Defendants Coinbase, Armstrong, and Haas made a similar representation in within a section also entitled "Other revenue":

> Other revenue includes the sale of crypto assets and corporate interest income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in other operating expense within the condensed consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $178.8 million and $7.9 million for the three months ended June 30, 2021 and June 30, 2020, respectively, and $365.2 million and $18.1 million for the six months ended June 30, 2021 and June 30, 2020, respectively.

191.    Defendants' statements set forth in ¶¶ 187-90 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181.

### 4.      August 19, 2021 – Blog Post

192.    On August 19, 2021, Coinbase published a blog post titled "Coinbase updates investment policy to increase investments in crypto assets." In the post, the Company stated:

> Our crypto asset investment allocation will be driven by our aggregate custodial crypto balances — meaning our customers will drive our investment strategy. Our investments will be continually deployed over a multi-year window using a dollar cost averaging strategy. ***We are long term investors and will only divest under select circumstances, such as an asset delisting from our platform. All trades will be executed via our over the counter desk or away from our exchange to avoid any conflict of interest with our customers.***
>
> ***We may increase our allocation over time as the cryptoeconomy matures.*** We believe that in the future, more and more companies will hold crypto assets on their balance sheet. We hope by incorporating more crypto assets into our own corporate financial practices, we can take another step towards building a more open cryptoeconomy.

193.    Defendants' statements set forth in ¶ 192 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181. In addition, Defendants' statement that "***[a]ll trades will be executed via our over the counter desk or away from our exchange to avoid any conflict of interest with our customers***" was materially false or misleading because, as Defendant Haas would later admit in December 2021 when pressed by Representative Ocasio-Cortez, Coinbase did, in fact, execute trades on the Company's behalf on its own exchange.

**5.     November 10, 2021 – Form 10-Q**

194.    On November 10, 2021, Coinbase filed its 3Q2021 Form 10-Q, which was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Liquidity and Capital Resources":

> ***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Customer accommodations are fulfilled with crypto assets held for operational purposes. We recognized $32.0 million and $39.8 million of impairment expense on the Company's crypto asset investment portfolio for the three and nine months ended September 30, 2021, respectively.

195.    Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other operating expense, net": "Other operating expense, net includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***."

196.    Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*** We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in other operating expense, net. Transactions involving our sale of crypto assets represented less than 10% of our total revenue for the three and nine months ended September 30, 2021.

197.    Defendants Coinbase, Armstrong, and Haas stated made a similar representation in within a section also entitled "Other revenue":

> Other revenue includes the sale of crypto assets and corporate interest and other income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets held for operating purposes.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in Other operating expense, net within the condensed consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $68.6 million and $27.4 million for the three months ended September 30, 2021 and September 30, 2020, respectively, and $433.8 million and $45.5 million for the nine months ended September 30, 2021 and September 30, 2020, respectively.

198.    Defendants' statements set forth in ¶¶ 194-97 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181.

### 6.    December 7, 2021 – Goldman Sachs Financial Services Conference

199.    On December 7, 2021, Defendant Choi represented the Company at the Goldman Sachs US Financial Services Conference. During the conference, a Goldman Sachs analyst, Nance, asked the following:

> And Coinbase doesn't take proprietary risk on the institutional side. I think that's been one of the – that's been one of the hallmarks of your business relative to some of the competitors. Why is that important for your business? How is that a competitive advantage?

200.    In response, Defendant Choi stated:

> I mean I think it's kind of obvious in a way. It's just people don't want to feel like you're trading -- institutions don't want to feel like you're going to be trading against them. ***And so we've always had a clear line about not doing that***.

201.    Defendant Choi's statement set forth in ¶ 200 above was materially false or misleading when made, or omitted material facts necessary to render such statement not misleading, for the reasons set forth in ¶ 181. In fact, far from Defendant Choi's assurance that "***we've always had a clear line about not doing that***"—i.e., trading against customers on Coinbase's exchange—the Company had already formed a proprietary trading unit for that purpose.

### 7.    December 8, 2021 – U.S. House of Representatives Committee on Financial Services

202.    On December 8, 2021, Defendant Haas testified before the U.S. House of Representatives Committee on Financial Services, at a hearing entitled "Digital Assets and the Future of Finance: Understanding the Challenges and Benefits of Financial Innovation in the United States." During the hearing, Congresswoman Nydia M. Velazquez asked the following question:

> Ms. Haas, and Mr. Bankman-Fried, digital asset trading plat- forms like yours play an important role in the current functioning of stablecoins, and therefore, also raise the broader question about digital market regulations, supervision, and enforcement. Can each of you describe the method your platforms use to determine the price for exchanging digital currency for fiat currency?

203.    In response, Defendant Haas stated the following:

> ***Coinbase is an agency-only platform. We do not engage in proprietary trading on our platform***. All prices established in our platform are due to market makers, so we offer a platform for our customers to come together and offer bids and asks on a variety of currencies that we offer on our platform. So, the market price is determined by the market participants.

204.    Representative Alexandria Ocasio-Cortez then asked Haas the following:

> Before I get into the heart of my questions today, there was a slight discrepancy in some of the testimony and questioning from earlier today that I wanted Ms. Haas to clarify very quickly. Earlier in the hearing, Representative Velazquez asked about proprietary trading

on the Coinbase platform, and in that moment, I believe you told her that, "Coinbase does not engage in proprietary trading on our platform. All prices are established, et cetera." However, in looking at the Coinbase rules under Section 3.21 of Coinbase corporate ops, it says that Coinbase, Inc., which owns and operates Coinbase Pro and Exchange, also trades its own corporate funds on Coinbase Pro and Exchange, and I just wanted to give you, briefly, the opportunity to clarify.

205.    In response, Defendant Haas stated:

Thank you so much for the opportunity to clarify. ***There are a few things that we do in our business. One is, we do have a corporate investment portfolio that every month we make an investment in crypto and add to our balance sheet. We have not sold that. We don't trade it actively, but we do increase the investment on a monthly basis on pre-established investment protocols. We do buy those on our exchange***.

206.    Defendant Haas's statements set forth in ¶¶ 203, 205 above, including the Haas's affirmative denial that "***[w]e do not engage in proprietary trading on our platform***" and "***we don't trade it [the Company's investment portfolio] actively***," were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181.

**8.    February 25, 2022 – 2021 Form 10-K**

207.    On February 25, 2022, Coinbase filed its 2021 Form 10-K, which was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Liquidity and Capital Resources":

***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Customer accommodations are fulfilled with crypto assets held for operational purposes. We recognized $43.1 million and $0.4 million of impairment expense on our crypto asset investment portfolio for the

years ended December 31, 2021 and December 31, 2020, respectively.

208. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other operating expense, net": "Other operating expense, net includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***."

209. Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*** We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in other operating expense, net. Transactions involving our sale of crypto assets represented 6.2% of our total revenue for the year ended December 31, 2021.

210. Defendants Coinbase, Armstrong, and Haas made a similar representation in within a section also entitled "Other revenue":

> Other revenue includes the sale of crypto assets and corporate interest and other income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets held for operating purposes.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in Other operating expense, net within the consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $436.0 million, $131.9 million and $38.6 million for the years ended December 31, 2021, 2020 and 2019, respectively.

211.    Defendants' statements set forth in ¶¶ 207-10 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181, and because by early 2022, Coinbase's proprietary trading unit began trading on its own platform to generate profit. Specifically, the unit was building sophisticated systems to facilitate such transactions, and completed a $100 million transaction in early 2022 by guaranteeing a $100 million "structured note," which it then sold to Invesco Ltd. at a fixed-rate of 4.01%. Coinbase then used the $100 million in profit to trade in the crypto markets.

**9.      May 10, 2022 – Form 10-Q**

212.    On May 10, 2022, Coinbase filed its Form 10-Q with the SEC for the period ending March 31, 2022 ("1Q2022 Form 10-Q"). The 1Q2022 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas stated  the following within a section entitled "Liquidity and Capital Resources":

> ***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Customer accommodations are fulfilled with crypto assets held for operational purposes. We recognized $141.7 million of impairment expense on our crypto asset investment portfolio for the three months ended March 31, 2022.

213.    Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other operating expense, net": "Other operating expense, net also includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets held for operating purposes***."

214.     Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*** We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in Other operating expense, net. Transactions involving our sale of crypto assets represented less than 0.1% of our total revenue for the three months ended March 31, 2022.

215.     Defendants Coinbase, Armstrong, and Haas made a similar representation in within a section also entitled "Other revenue":

> Other revenue includes the sale of crypto assets and Corporate interest and other income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets held for operating purposes***. The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in Other revenue and the cost of the crypto assets in Other operating expense, net within the condensed consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $0.4 million and $186.3 million for the three months ended March 31, 2022 and March 31, 2021, respectively.

216.     Defendants' statements set forth in ¶¶ 212-15 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 181.

### 10.    August 9, 2022 – Form 10-Q

217.    On August 9, 2022, Coinbase filed its Form 10-Q with the SEC for the period ending June 30, 2022 ("2Q2022 Form 10-Q"). The 2Q2022 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas stated  the following within a section entitled "Liquidity and Capital Resources":

> ***We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets***. During times of instability in the market of crypto assets, we may not be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto assets are less liquid than our existing cash and cash equivalents and may not be able to serve as a source of liquidity for us to the same extent as cash and cash equivalents. Customer accommodations and corporate expenses denominated in crypto assets are fulfilled with crypto assets held for operational purposes. We recognized $295.3 million and $436.3 million of impairment expense on our crypto asset investment portfolio for the three and six months ended June 30, 2022, respectively.

218.    Defendants stated the following within a section entitled "Other operating expense, net": "Other operating expense, net also includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets held for operating purposes***."

219.    Defendants Coinbase, Armstrong, and Haas stated the following within a section entitled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*** We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in Other operating expense, net. Transactions involving our sale of crypto

assets represented less than 1% of our total revenue for the three and six months ended June 30, 2022.

220.    Defendants Coinbase, Armstrong, and Haas made a similar representation in within a section also entitled "Other revenue":

> Other revenue includes the sale of crypto assets and Corporate interest and other income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets held for operating purposes.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in Other revenue and the cost of the crypto assets in Other operating expense, net within the condensed consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $0 and $178.8 million for the three months ended June 30, 2022 and June 30, 2021, respectively, and $0.3 million and $365.2 million for the six months ended June 30, 2022 and June 30, 2021, respectively.

221.    Defendants' statements set forth in ¶¶ 217-20 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 181, 211.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

222.    Coinbase and the Executive Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over the alleged materially false or misleading statements and omissions. Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V *supra* were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the facts set forth above, including in Section IV, Coinbase and the Executive Defendants' scienter is evidenced by the following facts, among others.

223.  *First*, Defendants had actual knowledge of, but did not disclose, the risk of asset loss or seizure to customers in the event of Coinbase's bankruptcy and the lack of protections the Company provided in such an event, particularly to retail customers. *See* ¶¶ 77-85. Armstrong admitted this on May 11, 2022 when he apologized to investors for Coinbase's failure to disclose this risk and its potential impact on the Company's financial condition and revenues previously. Of course, long before then, in June 2019, Coinbase Custody—which the Executive Defendants oversaw—investigated the risk to customer assets in the event of a bankruptcy and understood the risks associated with commingling crypto assets owned by customers and the Company. *See* ¶¶ 86-90. Defendants' subsequent decision to omit from Coinbase's Retail User Agreement the purported contractual protections provided to Coinbase's institutional customers is further indicia of Defendants' knowledge that the status of customers' crypto assets in the event of Coinbase's bankruptcy was an uncertainty and that there was a substantial risk that such assets would treated as property of the bankrupt estate. *See* ¶¶ 91-102.

224.  *Second*, the alleged fraud directly concerned Coinbase's core business operation— a specialized cryptocurrency platform that enabled customers to trade, invest in, and store crypto assets. *See* ¶¶ 37-52. Prior to and throughout the Class Period, Defendants repeatedly: (i) identified transaction fee revenues as the source of nearly all of Coinbase's net revenues (96% in 2020 leading into the Direct Listing); (ii) disclosed that such fees were primarily generated by retail users (as much as 95% in 2020); and (iii) told investors that the Company's ability to maintain and grow such revenues was anchored by its ability to increase (and maintain) customers, including the number of MTUs. *See* ¶¶ 53-56, 72-73. Thus, it is implausible that Defendants were not aware that Coinbase's inability to protect customers from loss in the event of a bankruptcy posed a material risk to those revenues. This is particularly true given Defendants' laser-focus on the

Company's custody services, which they touted throughout the Class Period as a competitive advantage, and their regular assurances to investors regarding Coinbase's ability to safeguard assets and protect customers from loss. *See* ¶¶ 43-51, 109-11. It is equally implausible that Defendants were unaware that the Company had taken steps to, and in fact, did, engage in proprietary trading on its Coinbase's own exchange. Indeed, according to the Wall Street Journal, Defendant Haas was specifically aware of the creation of the purported proprietary trading unit created in or around July 2021. *See* ¶¶ 114-27.

225.   ***Third***, public statements made by the Executive Defendants during the Class Period strongly and plausibly suggest that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed by Defendants, or that they were reckless in failing to investigate the very issues on which they spoke publicly. As alleged in Section V *supra*, Defendants' misrepresentations and omissions explicitly pertain to: (1) the Company's revenue derived from its retail customers, the related custody and safeguarding of customers' assets, and the purported identification of risks of asset loss or seizure to customers; and (2) proprietary trading, which Defendants steadfastly denied Coinbase engaged in throughout the Class Period. The Executive Defendants made such statements and fielded questions regarding these subjects during earnings calls, investor conferences, congressional testimony, media appearances, and on social media, among other forums.

226.   Furthermore, Defendants regularly spoke about the importance of the retail business segment and acknowledged that Coinbase's retail users accounted for nearly 95% of Coinbase's transaction fee revenues. Armstrong also regularly spoke about Coinbase's custodial hosted wallet, and the critical differences between the hosted wallet and Coinbase Wallet, including their related risks to retail users. For example, on February 14, 2022, it was reported via

Twitter that Canadian banks could freeze or suspend bank accounts without a court order under Canada's Emergencies Act. The next day, Armstrong tweeted in response: "Concerning to see stuff like this happening in any country, especially such an economically free place like Canada. Self-custodial wallets are important! - > Coinbase. com/wallet." In addition to demonstrating his close attention to issues regarding the ownership and protection of digital assets, this shows Armstrong's awareness that Coinbase could not guarantee protection of customer assets held in hosted wallets—and that he knew these risks and uncertainties did not apply to self-custodial wallets. Indeed, according to a Wired report, Armstrong split with his original Coinbase co-founder, Ben Reeves, over a disagreement regarding the best storage method for users. As reported by Wired, Armstrong believed that the Company needed to retain access to users' private keys in order for the platform to achieve broader user appeal.

227.     **Fourth**, Armstrong was intimately involved with and knowledgeable about the crypto-regulatory environment, including its impact on Coinbase operations. Throughout the Class Period, Armstrong touted his "proactive" approach to regulation despite the uncertain regulatory environment. For example, on the 1Q2021 Coinbase Earnings Call, Armstrong boasted that Coinbase was ahead of the competition when it came to the Company's regulatory approach, when he stated that "from the earliest days of Coinbase, we actually proactively reached out to regulators…even if it wasn't necessarily required yet in the law." Armstrong then told investors that "[i]n fact, this week, I was actually in DC meeting with a number of policymakers in the United States." Armstrong differentiated Coinbase's approach from "traditional tech companies" again on the 2Q2021 Coinbase Earnings Call when he told investors:

> And I think **unlike maybe some traditional tech companies that sort of have waited for something bad to happen then they like reluctantly go engage with the government. I think we view it as our role to kind of go out there proactively before a kind of issue**

> *comes up* that educational resource and kind of advise world leaders and finance ministers on how they can adapt their economies to capture the opportunity environment with the crypto economy.

228.    During the September 9, 2021 Deutsche Bank Tech Conference, Armstrong updated investors on the recent attention that crypto was receiving from regulators but assured them that Coinbase was focused on how to "achieve clarity" in regulation. Armstrong further emphasized: "what I would just leave you with is that ***Coinbase remains highly committed to proactively engaging with global regulators and to drive this clarity so that none of the industry, including us, is left guessing***." On the 3Q2021 Coinbase Earnings Call, Armstrong again reiterated that "regulation and [] policy efforts are certainly top of mind for us" and touted that: "We've met with a number of different regulators out there on a regular basis. I had a meeting last week with the Chairman of the SEC, Chair Gensler, which I think was very productive."

229.    ***Fifth***, the Executive Defendants' control over the entire Company and access to non-public information supports a strong inference of scienter. As Coinbase's top executives during the Class Period, Defendants Armstrong, Haas, and Choi (CEO, CFO, and COO, respectively) controlled the Company's day-to-day operations and were informed of, and intimately involved with, the factors underlying Coinbase's performance, as indicated above. Because of their high-level positions and involvement with Coinbase's core operation, each of the Executive Defendants: (i) controlled the contents of the material misstatements alleged in Section V; (ii) was provided with, or had access to, copies of the statements alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected; and (iii) knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made to investors were materially false, misleading, and incomplete.

230.    **Sixth**, Armstrong's lucrative performance-based stock option compensation plan supports a strong inference that Armstrong was highly motivated to inflate and maintain the inflation in Coinbase's common stock price during the Class Period. As noted in ¶¶ 65-68 *supra*, as part of Armstrong's compensation package, Coinbase awarded him market-based options that would vest when Coinbase's common stock maintained certain prices for a defined time period (60 consecutive trading days) for a potential total of 9,293,911 shares. All told, this incentive package had a fair value of $56.67 million, given Armstrong's exercise price of $23.46. However, if Armstrong unlocked the final tranche of options and maintained Coinbase's common stock price at or above $400 for one year, he would profit over ***$3.7 billion*** upon sale of the shares. "[This] windfall would even put Armstrong on Bloomberg's billionaire index, which tracks the richest 500 people in the world[,]" according to a Protos report, an independent crypto-journal, that was published after Coinbase filed its registration statement. The magnitude of Armstrong's compensation plan puts it beyond the realm of garden-variety corporate stock incentive plans.

231.    Armstrong was thus uniquely motivated to drive up the price of Coinbase common stock and maintain inflation in the stock price through the alleged misrepresentations and omissions. As noted above, Armstrong unlocked the first tranche on July 8, 2021 after Coinbase maintained a $200 price-per-share for 60 days following the direct offering, and was awarded 3,159,930 in Company stock options, which at the time were valued at over ***$697 million***. *See* ¶ 68.

232.    **Finally**, the temporal proximity between Defendants' alleged misstatements and subsequent disclosures exposing the truth bolsters the strong inference that Defendants knew, or were deliberately reckless in not knowing, the false and/or misleading nature of their statements. Throughout the Class Period, Defendants failed to disclose that in the event of a bankruptcy,

Coinbase customers could lose their crypto assets, and the attendant risks to the Company's revenues. As late as March 9, 2022, Defendants continued to claim—falsely—that the Company was a "great safe place to buy your first Bitcoin to trade and to safety store." Then, as alleged in ¶¶ 129-30 *supra*, just weeks later, on May 10, 2022, Defendants revealed that crypto assets stored for Coinbase's customers could be considered corporate assets in the event of the Company's bankruptcy. Armstrong admitted on Twitter later that day that Coinbase knew of this material risk prior to May 10, 2022, but never disclosed it.

233.    Similarly, from the start of the Class Period up through August 11, 2022, Defendants affirmatively stated in Coinbase's public SEC filings that "*[w]e view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets.*" At the same time, Defendants falsely assured investors that Coinbase traded its own assets in extremely limited circumstances, such as "*for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*" Yet, just two weeks later, on September 22, 2022, The Wall Street Journal revealed that Coinbase had, in fact, formed a proprietary trading unit and engaged in for-profit trading. *See* ¶¶ 136-37. It is implausible that the Executive Defendants, who were responsible for and controlled these corporate statements, were unaware of this undisclosed activity just weeks earlier.

## VII.    LOSS CAUSATION

234.    As a result of Defendants' materially false or misleading statements and omissions of material facts, Coinbase's common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Coinbase common stock and public information related to Coinbase, Lead Plaintiff and other Class members purchased or otherwise acquired Coinbase common stock at prices that incorporated and reflected Defendants'

misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Coinbase common stock during the Class Period at artificially inflated prices, and the removal of that inflation upon the disclosures set forth below, Lead Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

235.    Defendants' materially false or misleading statements and omissions of material fact had their intended effect, directly and proximately causing Coinbase common stock to trade at artificially inflated prices during the Class Period, closing as high as $342.98 per share on November 12, 2021. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Coinbase common stock served to maintain the price of Coinbase common stock at an artificially inflated level.

236.    Absent Defendants' misrepresentations and omissions of material fact, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Coinbase common stock at the artificially inflated prices at which it traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Coinbase common stock and/or maintain artificial inflation in Coinbase's stock price. The economic losses (i.e., damages suffered by Lead Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false or misleading statements and omissions of material fact, which artificially inflated the price of or maintained artificial inflation in Coinbase's stock price, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

237.    Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by

Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information concerning Coinbase on May 10, 2022, and September 22, 2022. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately caused foreseeable declines in the price of Coinbase common stock by removing the artificial inflation in the price of Coinbase common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Coinbase common stock, as detailed herein, negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

238.    Lead Plaintiff and other members of the Class began to learn the truth on May 10, 2022, when the Company filed its 1Q2022 Form 10-Q with the SEC. Defendants disclosed for the first time that crypto assets the Company holds in custody on behalf of customers could be treated as the Company's assets in the event of bankruptcy. Specifically, Defendants explained:

> *Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition* . . . .
>
> * * *
>
> Moreover, *because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition*.

239.    Later that day, Defendant Armstrong admitted on Twitter that Coinbase had failed to appropriately communicate this risk to investors, stating:

We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My deepest apologies, and a good learning moment for us as we make future changes.

240. On this news, the price of Coinbase common stock declined $19.27 per share, or more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on May 11, 2022.

241. On September 22, 2022, The Wall Street Journal reported that Coinbase had created a unit, Coinbase Risk Solutions, in July 2021 "to generate profit, in part, by using the [C]ompany's cash to trade and 'stake,' or lock up, cryptocurrencies," a practice that sources at the Company characterized as "'proprietary' trading." Among other things, The Wall Street Journal detailed a 2022 transaction wherein Coinbase invested $100 million raised from the sale of a structured note in order to "profit in cryptocurrency markets" and explained that "[t]he trade occurred after the crypto market started to fall from its all-time high, eating into Coinbase's business." The trade "was profitable for Coinbase"—prompting Coinbase's Head of Institutional Sales, Trading, Custody, and Prime Services to "praise[] the executives who worked on the transaction in internal communications and expressed eagerness to make additional such transactions." The Wall Street Journal also revealed that those in the highest levels of the Company—including Defendant Haas—had been involved in Coinbase Risk Solutions' creation, and that "[e]mployees were discouraged from sharing information about the new trading business or discussing it in internal communications."

242. On this news, the price of Coinbase common stock declined $4.70 per share, or 6.9%, from a close of $67.64 per share on September 21, 2022, to close at $62.94 per share on September 22, 2022.

## VIII.   CLASS ACTION ALLEGATIONS

243.   Lead Plaintiff brings this action on behalf of itself and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired publicly traded Coinbase stock and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Coinbase, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

244.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Coinbase's common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "COIN." During the Class Period, millions of Coinbase shares were publicly traded and Coinbase had more than 200 million shares of common stock outstanding. Record owners and the other Class members may be identified from records maintained by Coinbase and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

245.   Lead Plaintiff's claims are typical of the claims of the other Class members, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

246.     Lead Plaintiff will fairly and adequately protect the interests of the other Class members and has retained counsel competent and experienced in prosecuting class actions and securities litigation.

247.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein; (ii) whether Defendants participated in and pursued the common course of conduct complained of herein; (iii) whether documents, press releases, and other statements disseminated to the investing public and to the Company's shareholders during the Class Period misrepresented material facts; (iv) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts; (v) whether the market price of Coinbase's common stock during the Class Period was artificially inflated due to the material misrepresentations alleged herein; and (vi) the extent to which the members of the Class have sustained damages and the proper measure of damages.

248.     A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## IX.     A PRESUMPTION OF RELIANCE APPLIES

249.     At all relevant times, the market for Coinbase's common stock was efficient for the following reasons, among others:

a. Coinbase's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b. As a regulated issuer, Coinbase filed periodic reports with the SEC;

c. Coinbase regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Coinbase was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

250. As a result of the foregoing, the market for Coinbase common stock reasonably promptly digested current information regarding Coinbase from all publicly available sources and reflected such information in the price of Coinbase common stock. Purchasers and acquirers of Coinbase common stock during the Class Period suffered similar injury through their purchases and acquisitions of Coinbase common stock at artificially inflated prices, and a presumption of reliance applies.

251. Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired Coinbase common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning Coinbase and its business, Lead Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.  THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

252.  The statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements alleged herein. None of the statements complained of herein was a forward-looking statement. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; or (ii) or omitted to state material, current or historical facts necessary to make the statements not misleading.

253.  To the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Coinbase were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

254.  To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XI.    CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against All Defendants**

255.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This Count is brought against Coinbase and the Executive Defendants pursuant to Section 10(b) of the Exchange Act, 15 U. S. C. § 78j(b), and Rule 10b 5(b) promulgated thereunder, 17 C. F. R. § 240. 10b-5, on behalf of Lead Plaintiff and all other members of the Class.

256.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) cause Lead Plaintiff and the Class to purchase or otherwise acquire Coinbase common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

257.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Coinbase common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

258.    During the Class Period, Defendants made the false statements specified above, which they knew or severely recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

259.     Defendants had actual knowledge of the misrepresentations and omissions of material fact as set forth herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Coinbase's true condition from the investing public and to support the artificially inflated prices of Coinbase's common stock.

260.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Coinbase common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired Coinbase's common stock at such prices, or at all, had they been aware that the market prices for Coinbase's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

261.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of Coinbase's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants

262.     Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This Count is asserted against the Executive Defendants pursuant to Section 20(a) of the Exchange Act, 15 U. S. C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class.

263.     The Executive Defendants acted as controlling persons of Coinbase within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and

control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

264.    In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

265.    As described above, the Company and the Executive Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

   a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

   b.    Awarding compensatory damages and equitable relief in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   c.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      d.     Such other and further relief as the Court may deem just and proper.

## XIII.  **DEMAND FOR JURY TRIAL**

Lead Plaintiff hereby demands a trial by jury.

Dated: February 22, 2023              Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P. C.**

*s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Matthew L. Mustokoff
Joshua A. Materese
Austin W. Manning
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
jmaterese@ktmc.com
amanning@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden
and Lead Counsel for the Putative Class*

## CERTIFICATE OF SERVICE

I, James E. Cecchi, hereby certify that on February 22, 2023, I caused a true and correct copy of the foregoing Consolidated Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: February 22, 2023

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI**
**OLSTEIN BRODY & AGNELLO, PC**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative Class*