**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Matthew L. Mustokoff
Stacey M. Kaplan
Joshua A. Materese
Margaret E. Mazzeo
Austin W. Manning
Dylan J. Isenberg
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE COINBASE GLOBAL, INC. SECURITIES LITIGATION | Case No. 2:22-cv-04915-BRM-LDW<br><br>Hon. Brian R. Martinotti<br>District Judge<br><br>Hon. Leda D. Wettre<br>Magistrate Judge<br><br>Oral Argument Requested<br><br>Motion Day: January 16, 2024 |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

I.      Armstrong and Insiders Sell Billions in the Direct Listing ........................... 4

II.     Defendants Mislead Investors About Coinbase's Ability to Protect Customer Assets from Loss ................................................................ 5

III.    Defendants Conceal Coinbase's Foray into Proprietary Trading .................. 8

IV.   Defendants Mislead Investors About Coinbase's Regulatory Risks ............................................................................................................. 9

LEGAL STANDARD ......................................................................................... 12

ARGUMENT ...................................................................................................... 13

I.      The Complaint Adequately Pleads a Section 10(b) Claim .......................... 13

     A.     The Complaint Adequately Alleges Materially False and Misleading Statements ......................................................................... 13

          1.     Defendants Misled Investors About the Risk of Asset Loss in the Event of Bankruptcy ................................... 13

               a.     Defendants' Statements About Asset Security Put "In Play" the Security of Customer Assets in the Event of Bankruptcy ................. 14

               b.     The Omitted Risk Was Material ................................... 17

               c.     The Asset Safety Statements Are Not Immaterial ................................................................... 20

          2.     Defendants Made Materially False and Misleading Statements About Proprietary Trading ................................. 22

          3.     Defendants Made Materially False and Misleading Statements About Regulatory Risk ......................................... 25

     B.     The Complaint Adequately Alleges Defendants' Scienter ................. 30

          1.     Defendants Made Their Asset Safety Statements with Scienter .......................................................................... 31

i

2.    Defendants Made the Proprietary Trading Statements with Scienter ........................................ 34

3.    Defendants Made Their Regulatory Risk Statements with Scienter ........................................ 35

4.    Defendants Were Motivated to Artificially Inflate Coinbase's Stock .................................... 37

C.    The Complaint Adequately Alleges Loss Causation ......................... 41

II.    The Complaint Adequately Pleads Securities Act Claims .......................... 44

A.    The Complaint Adequately Alleges Securities Act Standing .......................... 44

1.    Plaintiffs Plead Section 11 Standing ...................................... 44

2.    Plaintiffs Plead Section 12 Standing ...................................... 46

B.    The Complaint Adequately Alleges a Section 11 Claim ................... 47

C.    The Complaint Adequately Alleges a Section 12 Claim ................... 48

III.    The Complaint Adequately Pleads Control Person Claims ......................... 48

CONCLUSION .................................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Labs. Sec. Litig.*,
2008 WL 1967509 (D.N.J. Mar. 24, 2008) ................................................18, 26

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .......................................................34, 44

*In re Allergan Generic Drug Pricing Sec. Litig.*,
2019 WL 3562134 (D.N.J. Aug. 6, 2019) ........................................................34

*In re Amarin Corp. PLC Sec. Litig.*,
2022 WL 2128560 (3d Cir. June 14, 2022) ......................................................16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................12

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................................13

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...........................................................................43

*In re Bristol-Myers Squibb Sec. Litig.*,
2005 WL 2007004 (D.N.J. Aug. 17, 2005) ......................................................13

*Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) ......................................................................13, 47

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .........................................................................46

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ...........................................................................41

*Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009)......................................................................48

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) .............................................................................16

*Curran v. Freshpet, Inc.*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018)........................................................20

*Curry v. Yelp, Inc.*,
   875 F.3d 1219 (9th Cir. 2017) ......................................................................43

*In re DaimlerChrysler AG Sec. Litig.*,
   197 F. Supp. 2d 42 (D. Del. 2002)................................................................23

*De Vito v. Liquid Hldgs. Grp., Inc.*,
   2018 WL 6891832 (D.N.J. Dec. 31, 2018)...............................................45, 46

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005).......................................................................................41

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ..........................................................................41

*In re Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015)...........................................16, 17, 21

*In re EveryWare Glob., Inc. Sec. Litig.*,
   175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc.
   No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th
   Cir. 2017) ......................................................................................................45

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014)................................................. 26, 35-36

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................40

*In re Galena Biopharma, Inc. Sec. Litig.*,
   2019 WL 5957859 (D.N.J. Nov. 12, 2019) ................................................20, 28

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ..........................................................................42

*In re Gap Stores Sec. Litig.*,
   79 F.R.D. 283 (N.D. Cal. 1978)......................................................................46

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)....................................................41

iv

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019)....................................................15, 44

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
   2009 WL 4798148 (D.N.J. Dec. 7, 2009)...........................................................14

*In re Hertz Glob. Hldgs. Inc.*,
   905 F.3d 106 (3d Cir. 2018) ............................................................................39

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004) ..............................................................................45

*Hull v. Glob. Digital Sols., Inc.*,
   2017 WL 6493148 (D.N.J. Dec. 19, 2017).........................................................43

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
   620 F. Supp. 3d 167 (D.N.J. 2022)..............................................................*passim*

*In re Innocoll Hldgs. Pub. Ltd. Co. Sec. Litig.*,
   2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ................................................32, 33

*Inst. Inv. Grp. v. Avaya*,
   564 F.3d 242 (3d Cir. 2009) ............................................................................34

*McCabe v. Ernst & Young LLP*,
   494 F.3d 418 (3d Cir. 2007) ............................................................................41

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) .....................................................41, 42

*In re Merck & Co., Inc., Sec. Litig.*,
   2015 WL 2250472 (D.N.J. May 13, 2015).........................................................22

*Meyer v. JinkoSolar Hldgs. Co.*,
   761 F.3d 245 (2d Cir. 2014) ............................................................................28

*In re Mylan N.V. Sec. Litig.*,
   2023 WL 3539371 (W.D. Pa. May 18, 2023) ............................................. 22-23

*No. 84 Employer-Teamster Joint Council Pen. Tr. Fund v. Am. W. Hldg Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...........................................................................38

v

*In re Novo Nordisk Sec. Litig.*,
2018 WL 3913912 (D.N.J. Aug. 16, 2018) ...................................... 12, 27-28, 38

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016) ................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).......................................................................22, 30

*In re Optionable Sec. Litig.*,
577 F. Supp. 2d 681 (S.D.N.Y. 2008) ...............................................23

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) ...............................................14, 20, 23

*In re Party City Sec. Litig.*,
147 F. Supp. 2d 282 (D.N.J. 2001)....................................................38

*Pelletier v. Endo Int'l PLC*,
439 F. Supp. 3d 450 (E.D. Pa. Feb. 14, 2020)...................................28

*Rahman v. Kid Brands, Inc.*,
736 F.3d 237 (3d Cir. 2013) .............................................................23

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018) ..................................*passim*

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
351 F. Supp. 3d 874 (E.D. Pa. 2018).........................................*passim*

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ..............................................................32

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992) .................................................13, 15, 21

*Slack Techs., LLC v. Pirani*,
598 U.S. 759 (2023)...........................................................................45

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
2022 WL 17740482 (D.N.J. Dec. 16, 2022).......................................20

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ...........................................................38, 39, 40, 47

*Tanaskovic v. Realogy Hldgs. Corp.*,
    2021 WL 211049 (D.N.J. Jan. 21, 2021)......................................................16, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................31, 34, 35, 37

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ......................................................36

*Ulbricht v. Ternium S.A.*,
    2020 WL 5517313 (E.D.N.Y. Sep. 14, 2020) ......................................................28

*In re Urban Outfitters, Inc., Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015)................................................ 33-34, 39, 40

*In re Vale S.A. Sec. Litig.*,
    2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017).......................................................23

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2015 WL 3755218 (E.D. Pa. June 16, 2015)........................................................21

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996) ...........................................................................29, 48

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ................................................................................19

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ................................................................................14

*In re Worldcom, Inc. Sec. Litig.*,
    2003 WL 22533398 (S.D.N.Y. Nov. 7, 2003)................................................27, 36

**Statutes**

15 U.S.C. § 77k(a) .................................................................................................47

## Other Authorities

17 C.F.R. § 229.303(b)(2)(ii) ..............................................................................................20

Thomas Lee Hazen, *Federal Securities Law* § III.E.2.a n.308 (4th ed. 2022) ...........................................................................................................46

Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint ("Mot.").[1]

## PRELIMINARY STATEMENT

Coinbase is a trading platform for crypto assets. During the Class Period, Defendants misrepresented and concealed a number of significant risks facing the Company's core business. *First*, while touting Coinbase's ability to safeguard customers' crypto assets, Defendants concealed the substantial risk that customers could lose these assets entirely if the Company went bankrupt. *Second*, Defendants denied that Coinbase would engage in risky proprietary trading, while internally readying an entire business unit to do just that. *Third*, Defendants assured investors that Coinbase had a "rigorous process" that ensured it did not list securities, thereby downplaying the risk that the SEC would bring an enforcement action. At the same time, Defendants concealed that: (i) to drive growth, Coinbase had listed assets that its own "process" flagged as likely securities; and (ii) the SEC privately told Defendants that most assets on Coinbase's platform were securities, and indicated

---

[1] Citations to: "Mot. Ex. __" are to the Declaration of Kevin M. McDonough in Support of Defendants' Motion to Dismiss; "Ex. __" are to Declaration of James E. Cecchi in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint; and "¶__" are to the Second Amended Complaint. Unless otherwise noted, all emphasis is added, internal citations and quotations are omitted, and all capitalized terms shall have the meanings set forth in the Second Amended Complaint (ECF No. 68).

that an enforcement action was imminent. With Coinbase's stock price inflated by their misrepresentations, Defendants cashed out, ***pocketing nearly one billion dollars*** through insider sales. Moreover, by keeping Coinbase's stock price elevated, ***Armstrong locked down $697 million in stock options***. Regular investors did not fare so well. When the truth concealed by Defendants' misrepresentations was revealed, Coinbase's stock price sank, causing significant damage to Plaintiffs and the Class. These allegations plausibly state claims for securities fraud violations.

Defendants' arguments to the contrary are meritless; they cannot win dismissal by ignoring Plaintiffs' allegations and their own damning admissions. For example, Defendants' contention that the undisclosed asset safety risk was immaterial because Coinbase was not on the brink of bankruptcy disregards: (i) Defendants' own admissions that had they disclosed the risk sooner, customers would likely have fled; and (ii) the 26% stock price decline and negative market commentary when the risk was belatedly disclosed. Likewise, Defendants' arguments regarding their proprietary trading denials ask this Court to improperly discount detailed allegations stemming from The Wall Street Journal's ("WSJ") in-depth investigation, which make plain that Defendants misled the market.

Defendants also contend that their representations that Coinbase had a rigorous process to ensure that it did not list securities were not misleading. But Defendants outright ignore the allegations that Coinbase was listing assets that its

2

*own review process* flagged as likely securities. Nor can Defendants explain away their own admissions, after the fact, that the SEC had affirmatively told Defendants that most assets on Coinbase's platform were securities. Finally, while arguing that Plaintiffs do not allege a plausible motive, Defendants fail to meaningfully address detailed allegations that Armstrong directly benefitted from the fraud—locking down nearly $700 million in stock options.

In sum, when Plaintiffs' allegations are credited and taken as true, as they must be at this stage, the Complaint adequately alleges all elements of their claims. Plaintiffs respectfully submit that Defendants' Motion should be denied.

## STATEMENT OF FACTS

Coinbase is a cryptocurrency platform that enables its customers to trade and store digital assets. ¶¶1, 43. Originally designed only for Bitcoin, the platform has exponentially expanded in recent years, and now supports over 240 assets. ¶50. Coinbase generates "substantially all" revenues from the transaction fees its retail customers pay to trade crypto. ¶¶2, 68-69. During the Class Period, Coinbase's success hinged on its ability to increase its customer base and, with it, its all-important retail fee revenue. ¶¶3, 70. Yet one of the Company's main obstacles to growth was persuading customers that its exchange was a safe place to invest. ¶¶4, 93. Many were deterred by cryptocurrency's unsafe reputation, underscored by: (i) customers' losses on other crypto exchanges due to insolvency or hacking; and (ii)

the fact that no government entity insures cryptocurrency assets against such losses. ¶¶4, 94-95. Coinbase's ability to grow its customer base thus turned on its ability to assure potential customers that it could and would keep their assets safe. ¶¶4, 93.

## I.    Armstrong and Insiders Sell Billions in the Direct Listing

On January 28, 2021, Coinbase announced plans to go public through a direct listing ("Direct Listing"). ¶¶5, 72.[2] Armstrong was highly motivated to complete the Direct Listing; doing so would: (i) allow him to cash out his shares (ultimately *over $320 million* during the Class Period); and (ii) entitle him to a compensation package valued at *over $3.7 billion*. ¶¶6, 81-82. At the same time, Armstrong knew investors were laser-focused on Coinbase's retail customer growth. ¶¶9, 91-92.

Thus, leading up to the Direct Listing, Defendants repeatedly emphasized Coinbase's status as a "trusted" place to safely store customer assets.  For example, Armstrong touted the Company's ability to "*guard our customers against loss*" and underscored that "*[o]ur customers need to have trust in Coinbase*" and "*the $223 billion in assets on our platform…speaks to the success we've had in building that trust*." ¶89. Defendants also touted Coinbase's "security" as the reason customers were willing to pay fees. ¶129. Commentators took note, pointing to Coinbase's competitive advantage as a "trusted platform with a focus on security." ¶¶91, 76.

---

[2]    In a direct listing, a company's insiders or shareholders sell their stock directly to the public. ¶¶5, 73.

On April 14, 2021, Coinbase "made a rousing debut on Wall Street," with shares opening at $381 per share. ¶¶8, 122-24. Then, the Executive Defendants and other Coinbase insiders cashed out *over $5 billion* in Coinbase common stock. ¶¶8, 125-26.[3] Notably, Armstrong, Choi, and Haas sold over $290 million, $223 million, and $99 million, respectively, in the first two days of the Direct Listing alone. ¶¶125, 387. Following the Direct Listing, Armstrong remained highly motivated to keep Coinbase's stock price inflated. For Armstrong to unlock "tranches" of stock options under his compensation plan, Coinbase had to maintain certain stock prices for 60 trading days. ¶¶81-84, 386. Significantly, just 86 days after the Direct Listing, Armstrong unlocked the first tranche valued at *over $697 million*. ¶386.

## II. Defendants Mislead Investors About Coinbase's Ability to Protect Customer Assets from Loss

During the Class Period, Defendants warned investors that "[o]ur failure to safeguard and manage our customers'…assets could adversely impact our business, operating results and financial condition" and enumerated two main risks that Coinbase faced in safeguarding assets: that it could "experience" (i) "a hack"; or (ii) the "loss or destruction of private keys." ¶¶96-97, 258-59, 270, 273, 276, 284 ("Asset Safety Disclosures"). At the same time, Defendants misleadingly concealed a third

---

[3]   Defendants' decision to pursue a direct listing was made for personal profit. Prior to the Direct Listing, Coinbase management petitioned the Board (whose members also sold in the listing), successfully, to remove lock-up restrictions which would have prevented their ability to profit from the Direct Listing. ¶74.

risk to the security of customer assets: if Coinbase filed bankruptcy, its customers' assets could become part of the bankruptcy estate, rendering those customers as unsecured creditors with little to no chance to recover their deposits. ¶¶11, 98.

Defendants knew of this undisclosed risk prior to the Class Period. In 2019, Coinbase specifically investigated whether its institutional customers' assets would become part of the Company's estate in the event of bankruptcy. ¶¶13, 105-09. Defendants also took affirmative steps, including invoking the protection of the UCC, and not commingling assets, to mitigate the risk to institutional customers' assets in the event of bankruptcy. ¶¶14-15, 112-20. Defendants knew, however, that Coinbase had not taken such steps to protect its retail customers; instead, they had *increased* the risk to retail customers' assets by commingling those assets with others in an omnibus account. *Id*. In fact, after Defendants belatedly disclosed this risk of loss in May 2022, Armstrong *admitted* that Coinbase "should have updated our retail terms sooner" to provide retail customers with "the same protections." ¶¶121, 232. Armstrong also conceded that Coinbase knew even the "protections" included for institutional clients "*have not been tested in court*" and did not guarantee safety. ¶¶101, 111, 232. Defendants knew that the risk was highly material to investors. As Coinbase later admitted, had it disclosed the risk earlier, it was likely that customers would find "custodial services *more risky*," resulting in a "discontinuation or reduction in use of [Coinbase's] platform …." ¶¶103, 121. Yet,

when they discussed Coinbase's ability to safeguard assets, Defendants concealed the bankruptcy risk.

On March 24, 2022, the SEC published Staff Accounting Bulletin 121 ("SAB 121"), which reinforced what Defendants had long known: there were "significant legal questions surrounding" how customers' cryptocurrency would be treated in a bankruptcy and these risks could have "a significant impact on [an] entity's operations and financial condition." ¶¶131-32. Importantly, the SEC stated that this guidance reinforced then-existing disclosure obligations for public companies. *Id.*

Then, on May 10, 2022, Coinbase filed its quarterly Form 10-Q report and revised the Asset Safety Disclosures to finally include and disclose the asset safety risk in the event of bankruptcy. ¶231. On this news, Coinbase's stock price declined more than 26%. ¶233. Analysts attributed the decline to the updated Asset Safety Disclosures. ¶¶234-37. Piper Sandler wrote that "we suspect the [stock price] decline is being driven by language in the 10-Q filing…about the consideration of customer's crypto assets under custody in the event of bankruptcy." ¶234. It further noted that the newly disclosed risk "could negatively impact COIN's financial results as clients could now view COIN's custody services as ***more risky and less attractive***[.]" *Id.* Others called the disclosure "disturbing," and reported that it "could spark fear in the company's clients…driv[ing] clients to cash out their investments as quickly as possible, further weakening Coinbase's business." ¶¶235, 237.

**III.    Defendants Conceal Coinbase's Foray into Proprietary Trading**

Before the Class Period, the market was concerned that Coinbase might engage in risky proprietary trading of crypto (i.e., trading on the firm's money instead of client money) to offset competition. ¶¶17-18. When asked by analysts whether Coinbase did or would proprietarily trade, Defendants issued unequivocal denials. *E.g.*, ¶¶18, 138-39, 142 (Coinbase "does not engage in proprietary trading"), ¶140 ("we do not plan to engage in regular trading of crypto assets."). In truth, by July 2021, Coinbase had already formed a proprietary trading unit and hired Wall Street traders to run it. ¶144. Individuals at Coinbase's highest levels—including Haas—took part in the unit's creation. *Id*. By early 2022, the unit had built sophisticated trading systems and used those systems to trade $100 million raised through a structured note. ¶147. This trade "was profitable for Coinbase." ¶242. All the same, Coinbase "discouraged" employees "from sharing information about the new trading business or discussing it in internal communications." *Id*.

Then, on September 22, 2022, the WSJ revealed Coinbase's proprietary trading venture and, on this news, Coinbase's stock price fell 6.9%. ¶¶32, 241-42. Right after, Coinbase issued a statement conceding "Coinbase does, from time to time, purchase cryptocurrency as principal." ¶244. Commentators reacted negatively, reporting that "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors." ¶¶32, 245-46.

**IV.    Defendants Mislead Investors About Coinbase's Regulatory Risks**

Since 2017, the SEC has made clear its position that many crypto assets are "securities," that any platform where such securities trade must "register with the commission," and that failure to register "may result in the SEC taking action to enforce" the securities laws. ¶¶154-66, 169-70. Indeed, the SEC has since brought multiple enforcement actions for failing to register crypto asset securities. ¶¶172-76. Defendants thus knew that crypto assets could qualify as securities. ¶178.

In 2019, Coinbase co-founded the Crypto Rating Council ("CRC") to create a framework for assessing whether a crypto asset was likely a security, with a high score indicating that an asset is likely a security. ¶¶179-81. Coinbase said that it examined each asset before it was listed to confirm that it was not a security. *Id.* In reality, from 2019 through 2021, to grow its business and boost revenues, Coinbase listed "crypto assets with high 'risk' scores"; in other words, as the SEC investigation later revealed, Coinbase added assets "even where it recognized [they] had the characteristics of securities." ¶¶25, 182-83, 379. Defendants did so despite knowing that the stakes for Coinbase were high—an enforcement action could result in substantial penalties or limit the digital assets the Company could offer. ¶184. At the same time, Coinbase told investors that it was doing exactly the opposite: rigorously applying the framework and only "permit[ting] trading…of those crypto assets for which we determine ***there are reasonably strong arguments to conclude***

9

*that the crypto asset is not a security*." ¶188. Analysts latched on to these statements, calling Coinbase's "rigorous[] adher[ence]" "a key competitive advantage[]" and lauding its "compliance infrastructure." ¶¶189-90.

In July 2022, the SEC and the DOJ charged a former Coinbase manager with insider trading of crypto securities on Coinbase's platform. ¶196. Defendants immediately sought to quell concerns, unequivocally stating on July 21, 2022, that "*Coinbase does not list securities. End of story*," and assuring the market that "*Coinbase has a rigorous process to analyze and review each digital asset*…that the SEC itself has reviewed" and "*we remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform*." ¶197. While making these assurances, Defendants concealed that Coinbase had been listing assets that its own "review process" indicated were likely securities. ¶¶25, 182-83, 379. Nor had the SEC blessed or approved Coinbase's process. Rather, by May 2022, unbeknownst to investors, the SEC had begun actively investigating Coinbase for securities law violations. ¶150.

Just four days after the Company's denials, on July 25, 2022, Bloomberg reported that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities." ¶¶31, 200, 238. On this news, Coinbase's stock price declined 21%. ¶201. In response, Defendants doubled down on their misleading denials, assuring investors that "*we are confident that our*

10

***rigorous diligence process—a process the SEC has already reviewed—keeps securities off our platform***." ¶202. Defendants again concealed that Coinbase had listed assets on its platform that its own "diligence process" had indicated were likely securities. ¶¶182-83, 379. Moreover, while touting the SEC's purported "review" of Coinbase's process, Defendants concealed that, by mid-2022, the SEC had begun to take a "totally different tone," and told Defendants that "we think everything other than Bitcoin is a security." ¶¶151, 378. Defendants—who between June 2022 and March 2023 met with the SEC over 30 times and provided witnesses for testimony, including one to address Coinbase's staking services[4]—later conceded that they were clearly aware of the SEC's position by around mid-2022. ¶¶209, 378.

In January 2023, the SEC privately informed Defendants that it was moving into an enforcement investigation. *Id.* As Defendants later admitted, at that moment, they knew "discussions were over" and Coinbase faced "an imminent enforcement action." ¶209. Yet Defendants continued to minimize the risks of regulatory action. In particular, when the SEC shut down a rival's staking program, Coinbase claimed that its staking services were "fundamentally different" and that "Coinbase's staking services are not securities." ¶¶210-15. Defendants made these statements despite knowing that the SEC had already decided to proceed with an enforcement action

---

[4]    In a "staking program," digital asset owners agree to lock up their crypto holdings with Coinbase to obtain a reward or earn interest, similar to a certificate of deposit (or "CD"). ¶23, n.1.

11

and had specifically focused on Coinbase's staking program. ¶27. Indeed, just one month later, on March 22, 2023, Coinbase disclosed that it had received a Wells Notice from the SEC and the potential securities fraud violations related to a "portion of our listed digital assets" and "our staking service." ¶¶33, 219, 247-48. On this news, Coinbase's stock price fell 14%. ¶249.

Then, before market open on June 6, 2023, the SEC filed a complaint alleging that Coinbase had made crypto securities available on its platform but failed to register "with the SEC…thus evading the disclosure regime that Congress has established for our securities markets." ¶¶221-25, 253-54. The SEC Complaint detailed Coinbase's conduct in "elevat[ing] its interest in increasing its profits over investors' interests." *Id.* On this news, Coinbase's stock fell more than 12%. ¶255.

## LEGAL STANDARD

A Rule 12(b)(6) motion must be denied if the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] district court is required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the plaintiff." *In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *4 (D.N.J. Aug. 16, 2018) (Martinotti, J.).

12

## ARGUMENT

### I.     The Complaint Adequately Pleads a Section 10(b) Claim

#### A.     The Complaint Adequately Alleges Materially False and Misleading Statements

To plead falsity under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). Under Rule 10b-5, when a defendant chooses to speak, he is "bound to speak truthfully." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992). In other words, "a defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *23 (D.N.J. Aug. 17, 2005). An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

##### 1.     Defendants Misled Investors About the Risk of Asset Loss in the Event of Bankruptcy

Throughout the Class Period, Defendants warned investors that Coinbase's failure to "safeguard" customers' "crypto assets could adversely impact our business, operating results and financial condition" but specified just two main risks that the Company faced in safeguarding these assets: (i) loss or destruction of private

13

keys; or (ii) a hack. ¶¶96-97, 258, 259, 270, 273, 276, 284. Defendants failed to disclose that customers' assets were *also* subject to a third substantial, material risk: if Coinbase filed for bankruptcy, these assets could become part of the estate. ¶¶11, 89-104. Retail customers' assets were at even greater risk in the event of bankruptcy because Defendants had commingled them with other assets and failed to invoke UCC Article 8 in the retail agreement. ¶¶14-15, 112-20. While concealing these risks from investors, Defendants represented that "customers choose us because they trust us to keep their assets safe" and "consumers are more than willing to pay a certain fee percentage for…the security we offer." ¶¶260, 268, 271, 274, 277, 282, 285. These and related statements gave investors the misleading impression that, but for the risks Coinbase had disclosed, customer assets were protected from loss. *See Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000) (defendants have a duty to disclose when there is "an inaccurate, incomplete or misleading prior disclosure"); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 894 (E.D. Pa. 2018) (same).[5]

          a.       **Defendants' Statements About Asset Security Put "In Play" the Security of Customer Assets in the Event of Bankruptcy**

Defendants' main rejoinder—that they had no duty to disclose the risk that

---

[5] In Defendants' authorities (Mot. 15-16), unlike here, the plaintiffs failed to plead how omissions rendered statements misleading. *See Winer Family Tr. v. Queen*, 503 F.3d 319, 329-30 (3d Cir. 2007) (plaintiffs failed to plead how statements about renovation plans were rendered misleading by a failure to disclose who would perform renovations); *In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *6 (D.N.J. Dec. 7, 2009) (one security breach did not make description of "how [] security system functioned in a general way" misleading).

customers could lose their assets in the event of bankruptcy because none of the challenged statements "mentioned bankruptcy"—cannot be squared with the law or the facts. Mot. 2, 14-15. The law is clear that once a defendant makes an affirmative statement or characterization about a material aspect of its business, it puts that subject "in play" and assumes a duty not to deal in half-truths. *Shapiro*, 964 F.2d at 282. Here, the statements at issue all concerned the security of Coinbase customers' assets, which Defendants themselves conceded was critical to the Company's ability to retain customers. By affirmatively choosing to speak on the circumstances in which customers' assets were at risk of loss, Defendants put the issue of asset security in play and had a duty to speak completely and accurately. But Defendants did neither and instead chose a half-truth, disclosing hacking and lost keys as risks, but concealing the significant asset safety risk in the event of bankruptcy. *See Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018) ("The law does not permit [defendants] to mislead investors through half-truths.").

Likewise, by choosing to tout Coinbase's ability to keep customer assets safe, and thus putting that subject "in play, Defendants were also required to disclose certain facts contradicting those representations." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019); *see also Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe 'a favorable picture' of a material issue 'without

15

including the details that would have presented a complete and less favorable one.'"). Critically, Defendants' own internal review revealed this risk and how to mitigate it before the Class Period. ¶¶106-09. Yet Defendants did not disclose that Coinbase had exposed its largest revenue stream, retail customers, to greater risk of loss by commingling assets and omitting protections from its retail user agreement. ¶¶105-21. It was misleading for Defendants to "routinely and publicly highlight[]" Coinbase's ability to protect customer assets, while concealing the risk of asset loss in bankruptcy. *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *14-15 (D.N.J. Dec. 15, 2015).[6]

Defendants' tag-a-long argument—that they had no duty to disclose the bankruptcy risk in the Asset Safety Disclosures because they only involved "warnings about physical risks" and not "legal risk[s]" (Mot. 16, emphasis omitted)—fails for the same reason. Indeed, nowhere do those disclosures indicate that they are limited to physical risks. Nor can this argument be squared with Defendants' own conduct. When Defendants finally disclosed the bankruptcy risk,

---

[6]    In *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174-76 (3d Cir. 2014), by contrast, the defendants "made no affirmative statement about the strength of the [drug trial] nor characterized those results in any manner" and instead "explicit[ly] caution[ed]" against drawing conclusions about the trial. In *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022), unlike here, the defendants "warned of the exact risk [the] [p]laintiffs argue they failed to disclose." In *Tanaskovic v. Realogy Hldgs. Corp.*, 2021 WL 211049, at *8 (D.N.J. Jan. 21, 2021), plaintiff offered "no factual basis" for its conclusion that defendants knew contrary information. Mot. 15-16.

they included it in the Asset Safety Disclosures and admitted they had long known of the uncertainty in treatment, making clear it should have been there all along. ¶¶231-32. In all events, "whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact." *Enzymotec*, 2015 WL 8784065, at *15.

### b.      The Omitted Risk Was Material

Defendants' argument that they had no duty to disclose because "Coinbase had no risk of bankruptcy" is a red herring.  Mot. 2, 5, 16-18. Plaintiffs' claim is ***not*** that Coinbase failed to disclose an imminent risk of bankruptcy. Rather, Defendants failed to disclose that, in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets.  ¶¶12, 94-95.

Defendants knew this concealed risk was material to investors, whether or not bankruptcy was imminent. In fact, Defendants admitted in May 2022 that had Coinbase earlier disclosed the asset safety risks associated with bankruptcy, customers would find "custodial services more risky and less attractive," resulting in a "discontinuation or reduction in use of [the Company's] platform[.]" ¶¶103, 121. The market also understood the risk to be significant even if Coinbase was not on the brink of bankruptcy, as shown by the 26% stock drop when the information was disclosed, and negative market commentary, including that the newly disclosed risk

17

was "disturbing," "could negatively impact COIN's financial results" and "***could spark fear in the company's clients***…***driv[ing] clients to cash out their investments***…." ¶¶233-38. *See In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *15 (D.N.J. Mar. 24, 2008) ("the significant decrease in stock price immediately following the disclosure…satisfies the…standard for pleading materiality").

Defendants also point to the fact that, as more crypto exchanges have gone belly-up, some bankruptcy courts have ruled that certain assets may remain customer assets. Mot. 18-19. But as Defendants concede, those opinions have come down "[s]ince the challenged statements were made" and "have nothing to do with Coinbase." *Id.* at 18. Thus, they have no bearing on whether Defendants' statements were materially false or misleading ***when made***, which is the pertinent inquiry here. And Defendants clearly knew there was significant risk to customer assets in the event of bankruptcy. In fact, they had taken affirmative steps to try to protect institutional customers in the event of bankruptcy, but did not take those same steps to protect retail customers. ¶¶13-16, 105-21. Defendants later admitted that they should have done so sooner but, importantly, also conceded that even the "protections" for institutional customers "ha[d] not been tested in court," leaving open the possibility that "that a court would decide to consider customer assets as part of the company in bankruptcy proceedings." ¶¶16, 101, 111, 232. Simply put, at the time they spoke, Defendants knew there was a significant risk to customer

18

assets in the event of bankruptcy, but concealed that risk from investors. In all events, the cases Defendants cite are not controlling law and their application to Coinbase's particular agreements and commingling of assets remains unclear. Indeed, ***to this day*** Coinbase continues to include the same bankruptcy risk disclosure in the Asset Safety Disclosures, making clear that the risk still exists notwithstanding those post-Class Period opinions. *See* Ex. A at 109.

Defendants' final argument—that Plaintiffs allege only "fraud by hindsight" based on SAB 121—fares no better. Mot. 16. SAB 121 did ***not*** create a new disclosure obligation. ¶¶131-32. Rather, the release itself made clear that the guidance only provided a reminder of preexisting disclosure obligations "under ***existing*** Commission rules." *Id.* Defendants effectively argue that information is not material until the SEC explicitly says it is, which is not the standard—Defendants must disclose material risks as they become known, as well as any information necessary to make their statements not misleading. Here, there is no real question that Defendants knew about the bankruptcy risk when they spoke.[7] Thus, Plaintiffs have alleged contemporaneous falsity, not "fraud by hindsight."[8]

---

[7]    Defendants claim if they are held liable, it would "deter companies from responding proactively to SEC guidance." Mot. 17. To the contrary, holding Defendants liable would reinforce the duty to disclose material risks in real time.

[8]    In Defendants' cases (Mot. 17), plaintiffs failed to allege the defendants knew the adverse information when they spoke. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (no allegations showing defendants had information when they spoke and instead only "conjecture based on subsequent events"); *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 496-97 (3d Cir. 2016) (statement

Likewise, Item 303 of SEC Regulation S-K—which requires disclosure of "any known trends *or uncertainties* that have had or that are reasonably likely to have a material…unfavorable impact on net sales or revenues or income from continuing operations"—reinforces the misleading nature of Defendants' statements here. 17 C.F.R. § 229.303(b)(2)(ii). Defendants claim that Item 303 could not give rise to a "duty to disclose" the bankruptcy risk. Mot. 15, n.3. But courts in this District have held "*an omission in the context of Item 303 can give rise to a Rule 10b-5 claim if the Item 303 omission renders other statements materially misleading*." *In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *11 (D.N.J. Nov. 12, 2019); *see, e.g., Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *11 (D.N.J. Dec. 16, 2022). Here, Defendants failed to disclose the known uncertainty surrounding asset safety in the event of bankruptcy and its likely impact on fees in violation of Item 303, and their failure to do so rendered their asset safety risk statements misleading.[9]

### c. The Asset Safety Statements Are Not Immaterial

Defendants claim that four statements touting Coinbase's ability to keep

---

that labor strikes were not "pending or threatened" not misleading because plaintiffs did not plead that defendants knew action was "pending or threatened").

[9]    *Cf. Oran*, 226 F.3d at 288 ("Because plaintiffs have failed to plead any actionable misrepresentation or omission under [Rule 10b-5], SK-303 cannot provide a basis for liability."); *see also Curran v. Freshpet, Inc.*, 2018 WL 394878, at *8 (D.N.J. Jan. 12, 2018) (denying motion to dismiss Item 303 claim because plaintiffs alleged that defendants were aware "of the alleged undisclosed relevant [event] or uncertainty").

customer assets safe are "non-actionable puffery." Mot. 19. "[A] statement is considered puffery only when it is immaterial," and materiality determinations "are peculiarly for the trier of fact." *Enzymotec*, 2015 WL 8784065, at *14. Defendants' statements here, which involved asset security for users who made up 90% of the Company's revenue (¶¶58, 68-70), made clear that asset safety was a core competitive advantage, and the reason "customers choose us" and "are more than willing to pay a certain fee." ¶¶89, 91, 129, 268, 282; *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) ("Far from being a vague statement of intention or optimism, fraudulent comments regarding [] a fundamental aspect of [defendant's] business are of vital importance to investors."). Moreover, many of these statements were made in direct response to analyst questions on the topic (¶¶267-68, 281-82) which confirms their importance to investors. *See Becton*, 620 F. Supp. 3d at 196 (that analysts frequently asked about a topic "underscor[ed] the importance" of it). Regardless, as discussed above, Defendants' positive statements put these topic "in play" and they then omitted material facts that rendered those statements misleading.[10]

---

[10]    *See Shapiro*, 964 F.2d at 282 (where positive statements put subjects that are material to investors "in play," but "omit[] certain facts contradicting these representations," they are not puffery); *Endo*, 351 F. Supp. 3d at 900 (statements touting study data as "encouraging" and "robust" not puffery where defendants "claimed that the abuse rates decreased when in fact the intravenous abuse rate increased"). In *Tanaskovic*, 2021 WL 211049, at *7, the plaintiffs offered only "generic and conclusory" allegations that statements were misleading. Mot. 19.

21

Defendants are also wrong that these statements are nonactionable opinions. Mot. 19-20. Defendants "ma[d]e direct assertions" about, for example, why customers "choose [Coinbase]" over competitors (¶268) rendering *Omnicare* inapplicable. *In re Merck & Co., Inc., Sec. Litig.*, 2015 WL 2250472, at *11 n.7 (D.N.J. May 13, 2015). Even if treated as opinions, the statements are still actionable because they omitted then-existing facts that rendered them misleading. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (opinions are actionable if they omit material facts "conflict[ing] with what a reasonable investor would take from the statement itself.").

### 2. Defendants Made Materially False and Misleading Statements About Proprietary Trading

During the Class Period, analysts repeatedly grilled Defendants about Coinbase's intent to engage in proprietary trading. ¶¶138-42. In response, Defendants unequivocally denied that Coinbase did or would proprietarily trade. ¶¶292-339. In reality, by 2021, Coinbase had formed a unit to engage in proprietary trading and hired traders to run it. ¶144. By early 2022, the unit had executed and profited on a $100 million proprietary trade, and Coinbase made affirmative efforts to keep this information concealed. ¶147. These allegations adequately allege falsity.

Defendants claim the Court should not credit the WSJ exposé because it relies on unnamed sources. Mot. 21-22. But "[t]he Court can credit articles 'published in industry journals…and reputable newspapers' based on detailed reporting…because

they 'meet the requirements of being independent and reliable.'" *In re Mylan N.V. Sec. Litig.*, 2023 WL 3539371, *7 (W.D. Pa. May 18, 2023) (quoting *In re Loewen Grp. Inc. Sec. Litig.*, 2004 WL 1853137, at *6 (S.D.N.Y. 2004) (articles from "reputable newspapers" (e.g., the WSJ) satisfy the PSLRA's particularity requirements if they are "sufficiently detailed" and based on the journalist's "independent investigative effort")).[11]

Defendants also contend that the WSJ did not report that Defendants engaged in proprietary trading because the Risk Solutions unit was initially formed "to trade crypto for clients." Mot. 23. But the WSJ reported that the group *also* made plans to begin making trades with Coinbase's cash, including hiring traders and building sophisticated trading systems to enable proprietary trading, and that it ultimately engaged in a profitable proprietary trade. Mot. Ex. 1.[12] Defendants' assertions that

---

[11]    *See also In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 42, 80-81 (D. Del. 2002) (same). Defendants' authorities are not to the contrary. Mot. 21-22. In *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017), the plaintiffs pled statements from a news article as actionable false statements, but the article did not identify "the speaker of the [allegedly false] statements." In *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008), the court found the article "lack[ed] specificity" but nevertheless "assum[ed] that plaintiffs have identified an adequate source for their claim." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013), did not involve the reliability of news articles.

[12]    Given these internal acts, it was misleading for Defendants to assure the market that they did not, and would not, engage in proprietary trading. The fact that Defendants had not yet engaged in that proprietary trade when they made certain statements is beside the point. Mot. 24-25. While Plaintiffs do not oppose Defendants' request to judicially notice documents for the limited purpose of ascertaining "what the documents state[]," they should not be used "to prove the truth of their contents." *Oran*, 226 F.3d at 289.

23

the WSJ did not report details about the trade (Mot. 23) are similarly meritless. The WSJ reported the exact size of the trade, that it was "profitable" for Coinbase, internal reaction to the trade, approximately when it took place, how Coinbase raised money for it, and even who it sold the note to and at what interest rate. Mot. Ex. 1. That Coinbase raised the money for its own trade through a third-party loan does not, as Defendants' claim, mean that it was made on behalf of a client or was not proprietary. Mot. 23. That assertion finds no support in the Complaint or the article, which states that the trade was profitable **for Coinbase** and that Company insiders described the trade as "proprietary." Mot. Ex. 1.[13]

Finally, Defendants assert that certain misstatements are protected by the PSLRA safe harbor for forward-looking statements. Mot. 25. But, the "PSLRA's safe harbor does not apply," where, as here, Plaintiffs "challenge [D]efendants' alleged omission of present facts with respect to the challenged statements," *Roofers*, 2018 WL 3601229, at *7,[14] including that Coinbase had internally readied a unit to proprietarily trade and had engaged in such trading. ¶¶144, 147, 299. Even if the safe harbor did apply, Defendants had no reasonable basis to deny plans to engage in proprietary trading while omitting the plans they had made to do just that. *Becton*,

---

[13]    Defendants' claim that the article did not contradict their statements is also belied by the market's reaction, calling its disclosures "a big deal" "for investor perception" and reporting that "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors." ¶¶245-46.
[14]    *See also Endo*, 351 F. Supp. 3d at 901.

24

620 F. Supp. 3d at 192 (no reasonable basis for statements where it "was unmoored from the Company's immediate reality").

### 3. Defendants Made Materially False and Misleading Statements About Regulatory Risk

From May 2022 to March 2023, to quell investor concern about the potential for an SEC enforcement action, Defendants told investors that "***Coinbase does not list securities. End of story***." ¶343; *see also, e.g.*, ¶373 ("Coinbase does not list securities"), ¶348 ("the company does not list securities"). As support for these statements, Defendants assured investors that "***Coinbase has a rigorous process to analyze and review each digital asset*** before making it available on our exchange—a process that the SEC itself has reviewed." ¶343. Defendants said that Coinbase then only listed assets "for which we determine there are ***reasonably strong arguments to conclude that the crypto asset is not a security***." ¶188. Thus, they represented that "***[w]e are confident that our rigorous diligence process***—a process the SEC has already reviewed—***keeps securities off our platform***." ¶346.

These statements were materially false and misleading. Unbeknownst to investors, from late 2019 through 2021, to rapidly grow its business, Coinbase decided to list crypto assets that its ***own review process*** determined had "high 'risk' scores," and thus were likely to be securities. ¶¶25, 182-83, 379. In other words, contrary to Defendants' assurances, Coinbase added assets "even where it recognized [they] had the characteristics of securities." ¶182. These statements were

also misleading because Defendants concealed that the SEC itself had indicated behind closed doors to Defendants that most assets on Coinbase's platform were securities—thereby heightening the likelihood of enforcement action. Indeed, by mid-2022, Defendants had received "information from the SEC that…we think everything other than Bitcoin is a security." ¶¶151, 378. By January 2023, Defendants have admitted they knew that "discussions were over" with the SEC and Coinbase faced "an imminent enforcement action." ¶209. *See Becton*, 620 F. Supp. 3d at 187 ("The fact that the FDA had not issued a formal warning letter…does not mean that the Company was free to issue misleading statements that failed to recognize the serious, immediate, and known risks posed by a near-certain enforcement action."); *see Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("When the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity."); *Able Labs.*, 2008 WL 1967509, at *3, *16 (sustaining statements that company had "instituted operational procedures that enforce cGMP compliance" because the FDA "provided notice to the defendants that serious problems existed in the manufacturing process").

Tellingly, Defendants do not mention, let alone challenge, the allegations regarding their decision to list assets even though Coinbase's own review process had determined that they were likely to be securities. This is despite the fact that the

26

Complaint mentions these facts no less than ten times and pleads that nearly every regulatory risk statement was misleading as a result of them. *E.g.*, ¶¶181-82, 195, 222, 342, 345, 349, 353, 356, 361, 363, 367, 371, 375, 379. For that reason alone, falsity is adequately alleged. *In re Worldcom, Inc. Sec. Litig.*, 2003 WL 22533398, at *10 (S.D.N.Y. Nov. 7, 2003) (unchallenged allegations should be sustained).

Instead, Defendants devote pages to arguing that they had no duty to disclose the SEC investigation, "unadjudicated wrongdoing," or the Wells Notice. Mot. 25-27. This misses the point. While Defendants may not have had a freestanding duty to disclose "unadjudicated wrongdoing," Defendants may not describe "a favorable picture" of a material issue "without including the details that would have presented a complete and less favorable one." *Endo*, 351 F. Supp. 3d at 900. Simply put, "once a company has chosen to speak on an issue, even one it had no independent obligation to discuss, it cannot omit material facts related to that issue." *Id*. at 897. Rather than remain silent, Defendants chose to minimize the risk by telling investors that Coinbase did not list securities, and that it had a "rigorous process," purportedly signed off on by the SEC, to ensure it was not listing securities. Their decision to downplay this risk, while concealing that Coinbase had listed assets that its own process indicated were likely to be securities, and that the SEC had told the Company that most assets it listed were securities was highly misleading. *See Novo Nordisk*, 2018 WL 3913912, at *2 (falsity pled where, despite government inquiries into

27

whether drug manufacturers' rebates to PBMs are illegal, defendants concealed "the details of their relationship" with PBMs).[15]

Nor are Defendants immunized by their disclosures of "regulatory uncertainty" or of the risk that the SEC "could disagree with Coinbase's listing determinations" and take action. Mot. 28.[16] As the Second Circuit explained in *Meyer v. JinkoSolar Hldgs. Co.*, 761 F.3d 245 (2d Cir. 2014):

> A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability…One cannot, for example, disclose…a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors.

*Id.* at 251. Here, Defendants' warnings were misleading because they concealed the fact that Coinbase had listed assets its own process indicated were likely securities. ¶¶182-83, 379. Defendants' warnings that the SEC "***could*** disagree with Coinbase's

---

[15]    By contrast, in *Galena*, 2019 WL 5957859, at *16, and *Ulbricht v. Ternium S.A.*, 2020 WL 5517313, at *7 (E.D.N.Y. Sep. 14, 2020), the plaintiffs failed to alleged that defendants made representations that were rendered misleading by their omissions. In *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 465 (E.D. Pa. Feb. 14, 2020), plaintiffs failed to allege that defendants "were engaged in price fixing… and thus Defendants did not have any facts to disclose on this topic."

[16]    Plaintiffs' claim is not that Defendants had a duty to "speculate" about the SEC's next steps, as Defendants suggest. Mot. 27. Plaintiffs' claim is that Defendants' statements were misleading because they concealed that the Company had listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that most assets it listed were likely securities, thus increasing the risk that the SEC would bring an enforcement action. In all events, given that Defendants themselves understood by January 2023 that an enforcement action was imminent (¶209), "***[f]uture action against the Company could hardly at this time be considered mere speculation***." *Becton*, 620 F. Supp. 3d at 187-188.

listing determinations" or ***could*** bring action were similarly misleading because the SEC had already indicated to Defendants that most assets on Coinbase's platform were securities and an enforcement action was imminent. Mot. 28. "[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996).[17]

Defendants also argue that their May 10, 2022 statements were not misleading because the Complaint does not allege that the SEC investigation had started at that time. Mot. 28. But Coinbase was listing assets on its platform that its own process had flagged as likely securities from 2019 to 2021, well before those statements were made. It was thus misleading to tell investors that Coinbase "may be subject to regulatory scrutiny" "if we are unable to properly characterize a crypto asset" (¶341), when the Company was not trying to "properly characterize" assets but instead was overriding those characterizations to drive growth.

Defendants' argument that they "sincerely believed" that the assets were not securities (which is based on nothing more than their say so) likewise fails. Mot. 30-

---

[17]    *See also Becton*, 620 F. Supp. 3d at 190 (misleading for company to warn that risk could occur when company had been "put on notice of the FDA's intention" and knew that risk of "imminent" consequences was "manifest."). The fact that Coinbase immediately disclosed the Wells Notice does not excuse their earlier failures to disclose. Mot. 28. By that point Defendants had known for ***months*** that SEC action was imminent. *Becton*, 620 F. Supp. 3d at 189, n.18 ("[w]hile Defendants push the narrative that 'BD learned of FDA's determination on February 3, 2020 and disclosed it three days later' Plaintiff has sufficiently alleged that this impending determination was conveyed to BD during the Fall 2019 Meeting").

31. By the time they spoke, Coinbase's internal process had told them that assets on the platform were likely securities, and so had the SEC. Defendants could not unequivocally tell investors that Coinbase was not listing securities without disclosing these adverse facts that cut the other way. *See Endo*, 351 F. Supp. 3d at 897 ("Affirmative statements about a [product's] safety may be actionable if the underlying clinical data contradicts or does not support them"). Their contention that other courts have found, **post**-Class Period, that certain unrelated assets are not securities fails for the same reason. Mot. 30-31. Those opinions also came down well after the Class Period and thus have no bearing on the time when Defendants spoke.

Finally, Defendants wrongly argue that their direct assertions like "Coinbase does not list securities. End of story," or "Coinbase has a rigorous process to analyze…each digital asset before [listing] on our exchange," were inactionable opinions. Even if they were opinions, they are actionable because Defendants had no reasonable basis to make them and they did not "fairly align[] with the information in [their] possession." *Omnicare*, 575 U.S. at 189.

B.      **The Complaint Adequately Alleges Defendants' Scienter**

"In the Third Circuit, [s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud." *Roofers*, 2018 WL 3601229, at *15. A plaintiff "must sufficiently plead defendants' knowledge of

30

facts or access to information contradicting their public statements…[i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* at *18. Scienter allegations must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "The inference…need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.*

### 1. Defendants Made Their Asset Safety Statements with Scienter

Plaintiffs adequately allege that Defendants knew, or at the very least were reckless to disregard, information indicating that Coinbase's customers were at risk of asset loss in the event of bankruptcy. ¶¶105-21. As Plaintiffs specifically alleged, the 2019 Comment Letter details the "review" Coinbase conducted of whether customers' crypto assets would become part of the bankruptcy estate in the event of insolvency. ¶¶13, 105-09; *see also* Ex. B at 2 (2019 Comment Letter discussing review of the security of assets "[i]n the event of insolvency or bankruptcy"). Defendants also took affirmative actions that evidence their knowledge of the asset safety risks in bankruptcy, including adding language to Coinbase's institutional user agreement that invoked Article 8 of the UCC, and making efforts not to commingle those customers' assets. ¶¶14-15, 112-20. Defendants also knew that

31

Coinbase had not taken these steps to protect retail customers' assets,[18] but had

***increased*** the risk to those assets by commingling them. *Id*. In May 2022, Armstrong

conceded this knowledge, admitting that Coinbase "should have updated our retail

terms sooner" to provide retail customers with "the same protections." ¶¶16, 121.

Armstrong also admitted that the "protections" Coinbase had included for

institutional clients "have not been tested in court for crypto assets" and were not a

guarantee of asset safety. ¶¶16, 101, 111, 232. Thus, Plaintiffs have "specifically

allege[d]…defendants' knowledge of facts" that "contradict[ed] their public

statements" regarding Coinbase's ability to safeguard customer assets. *In re Innocoll

Hldgs. Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *8 (E.D. Pa. Mar. 25, 2020).

Defendants respond that there is no allegation that they "intend[ed] to

mislead" investors. Mot. 34. The Third Circuit rejected this argument in *Semerenko

v. Cendant Corp.*, explaining that "the purpose underlying… Rule 10b-5 is to ensure

that investors obtain fair and full disclosure of material facts," so "it is irrelevant that

the misrepresentations were not made for the purpose or the object of influencing

the investment decisions of market participants." 223 F.3d 165, 176 (3d Cir. 2000).

Defendants' other scienter challenges misconstrue Plaintiffs' allegations.

---

[18]    Defendants assert that the Complaint does not allege that the UCC "would ***not*** apply just because Coinbase did not cite it in the retail user agreement." Mot. 36. But the issue is whether UCC ***Article 8*** would apply, not the UCC. To be sure, the Complaint ***does*** allege that UCC Article 8 must be "expressly agreed" to receive protection and that the retail user agreement ***did not*** contain this provision during the relevant portion of the Class Period. ¶¶119-21.

They contend that there are no allegations Defendants "knew about" SAB 121 (Mot. 34-35), but this again erroneously tries to reframe the duty to disclose as emanating from SAB 121 which, as discussed *supra* at §I.A.1.b, it does not. They also argue that there is no allegation that Defendants knew Coinbase faced a risk of bankruptcy. Mot. 35. As discussed above, (*see supra* at §I.A.1.b), Plaintiffs' allegation is ***not*** that Defendants concealed an imminent risk of bankruptcy, but rather that they concealed a risk to customer assets in the event of bankruptcy. And nowhere do Defendants dispute their knowledge of that risk. Their scienter challenge thus fails. *See Innocoll*, 2020 WL 1479128, at \*12 (complaints plead "recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").[19]

The strong inference of scienter is further bolstered by the fact that retail fees made up over 90% of Coinbase's revenues, and by Defendants' admission that asset security was key to retaining retail clients. ¶¶68-69, 268, 282, 380. "[M]isstatements and omissions made on core matters of central importance to the company and its high-level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In*

---

[19] Defendants argue that there were only "modest differences" (Mot. 36) between the retail and institutional user agreements, entirely ignoring their own admission that "***we should have updated our retail terms sooner***." ¶232. They also contend that the Comment Letter does not mention bankruptcy (Mot. 35-36), but the letter states that Coinbase investigated the risks "[i]n the event of insolvency or bankruptcy." ¶¶108-10; Ex. B at 2.

*re Urban Outfitters, Inc., Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015).[20]

Defendants repeatedly spoke about retail revenues, asset safety, and the value retail

customers saw in their "secure" storage, which adds to the scienter inference. *See*

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228

(E.D. Pa. 2021).[21]

Finally, Defendants' competing inference, that they "disclosed the risks

related to custodial assets…known at the time of the challenged statements" (Mot.

36-37), cannot be squared with the Complaint, which plausibly alleges that

Defendants knew of the risks associated with bankruptcy far earlier. *Tellabs*, 551

U.S. at 326-27 (scienter evaluation requires "comparative assessment of plausible

inferences, ***while constantly assuming the plaintiff's allegations to be true***").

### 2. Defendants Made the Proprietary Trading Statements with Scienter

While denying that Coinbase would engage in proprietary trading, the

Company set up an entire infrastructure to engage in proprietary trades, including

structuring nine figure loans to fund the trades. ¶¶19, 144-47, 242. Coinbase's senior

executives, including Haas, created the proprietary trading unit. ¶144. Coinbase

---

[20]   *See also In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at \*12 (D.N.J. Aug. 6, 2019) (scienter supported where statements concerned drugs constituting "substantial portion" of revenues).

[21]   This is especially true here, where many statements were made in response to analyst questions regarding Coinbase's ability to attract retail customers and generate fee revenue. *See Inst. Inv. Grp. v. Avaya*, 564 F.3d 242, 269 (3d Cir. 2009) (false statements in response to analyst questions "powerful evidence of scienter").

sought to conceal this information, "discourag[ing] [employees] from sharing information about the new trading business or discussing it in internal communications." *Id*. Defendants thus knew, or at the least, "should have known," facts that contradicted their statements. *Roofers*, 2018 WL 3601229, at *18.

Defendants do not seriously contend that they were unaware that an entirely new unit in the Company (and a new trading system) had been created, staffed, and funded with a $100 million note. Instead, they argue that there is no allegation they believed the unit's planned trading was proprietary trading. Mot. 37. This argument cannot be squared with the allegations that: (i) the unit's purpose was for Coinbase to trade crypto with its own cash to turn a profit, thereby offsetting losses from the crypto downturn; and (ii) Coinbase's top executives lauded the success of at least one such highly profitable trade. ¶¶144-47, 242.

### 3. Defendants Made Their Regulatory Risk Statements with Scienter

At the same time Defendants made their statements assuring investors that Coinbase did not list securities, and that it had a rigorous process that ensured that the Company did not list securities, they knew (or at least recklessly disregarded) that, for years, Coinbase had boosted growth by listing assets that its own process indicated were likely securities. ¶¶182, 379. Defendants also knew and concealed that the SEC had told them that it viewed almost all the assets on Coinbase's platform as unregistered securities. ¶378. This is enough to plead scienter. *See Frater*, 996 F.

Supp. 2d at 350; *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*12-14 (C.D. Cal. Apr. 12, 2016) (scienter alleged for statements of FDA compliance where FDA inspector reported potential violations to management during routine inspection).

Defendants do not dispute their knowledge that Coinbase was listing assets that its own internal process had flagged as "high risk" and likely securities. Nor do they argue that these allegations are not enough to plead scienter. For that reason alone, scienter is adequately alleged. *Worldcom*, 2003 WL 22533398, at \*10.

Defendants contend that they had no scienter because they disclosed the possibility of an SEC enforcement action. Mot. 38-39. But as discussed above in §I.A.3, the fact that Coinbase disclosed a risk did not excuse it from disclosing known, material adverse facts, including that: (i) it was listing assets that its internal process indicated were likely securities; (ii) the SEC had told Coinbase that it believed most of these assets were securities; and (iii) Defendants understood based on discussions with the SEC that an enforcement action was imminent.

Defendants also argue that it still is not clear that any assets on Coinbase's platform were securities. Mot. 38. Plaintiffs' claim, however, does ***not*** turn on whether Defendants knew, with 100% certainty, that the assets were securities. Rather, it turns on whether, at the time Defendants assured investors that Coinbase did not list securities, they knew of facts indicating that it was more likely that assets listed on Coinbase's platform were securities, thus increasing the risk that the SEC

36

would bring an enforcement action. Plaintiffs clearly plead that Defendants did know (or at least were reckless in not knowing). ¶¶378-79, 390. And while Defendants argue that they did not know for certain that the SEC would bring an enforcement action (Mot. 38), they **admitted** that at the time of their January 2023 discussion with the SEC, they knew that "[d]iscussions [with the SEC] were over" and that Coinbase faced "an imminent enforcement action." ¶209. More to the point, Defendants could not unequivocally tell the market that "our staking product is not a security," assure investors that Coinbase's products were "fundamentally different" from companies the SEC had brought enforcement actions against, or represent that the "outcome" of the investigation "remain[ed] uncertain" without disclosing that the SEC had indicated that an enforcement action was imminent. ¶¶358-59, 362, 366, 368, 370.

### 4. Defendants Were Motivated to Artificially Inflate Coinbase's Stock

Plaintiffs allege that Defendants were motivated to inflate Coinbase's stock price for their own personal gain. These particularized motive allegations further bolster the Complaint's already strong inference of scienter. *Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference").

**Armstrong's Compensation.** By completing the Direct Listing, Armstrong earned a compensation package with a potential value **over $3.7 billion**. ¶¶6, 81-82. Armstrong remained highly motivated to keep Coinbase's stock price inflated because to unlock "tranches" of stock options under his compensation package,

Coinbase had to maintain certain stock prices for 60 consecutive trading days. ¶¶81-84, 386. By keeping Coinbase's stock artificially inflated, Armstrong unlocked the first tranche valued at **_over $697 million_** on July 8, 2021—just 86 days after the Direct Listing—after Coinbase maintained a stock price of $200 for 60 days. ¶386. By contrast, Armstrong's base salary was just $1 million. ¶84. These allegations, which show how Defendants' fraud directly led to hundreds of millions of dollars in increased compensation, support a strong inference of scienter.[22] Indeed, this Court has found allegations that executives were motivated to make false statements to earn bonuses that merely doubled their salaries "contribute[d] to a finding of scienter." *Novo Nordisk*, 2018 WL 3913912, at *8; *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (a factor relevant to inferring scienter is "whether the profits were substantial relative to the seller's ordinary compensation"); *No. 84 Employer-Teamster Joint Council Pen. Tr. Fund v. Am. W. Hldg Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (crediting allegation that executives were "motivated to inflate [] financial results and stock prices because their eligibility for stock options and [] bonuses were based principally on the company's financial performance"). Tellingly, Defendants' Motion barely mentions these allegations, relegating their discussion to a footnote. Mot. 34, n.11.

---

[22] Thus, unlike in *In re Party City Sec. Litig.* (Mot. 34), Defendants' fraud here did not "hurt[] managerial compensation." 147 F. Supp. 2d 282, 312, 314 (D.N.J. 2001).

38

**Defendants' Insider Sales.** Where stock sales are "unusual in scope or timing…[they] may support an inference of scienter." *Suprema*, 438 F.3d at 277. Here, after making misleading statements that artificially inflated Coinbase's stock price, Defendants ***sold nearly one billion dollars of Coinbase stock***. During the Class Period, Armstrong, Choi, Haas, and Grewal pocketed $323 million, $429 million, $115 million, and $65 million, respectively. ¶125. Stock sales may not always weigh in favor of scienter, but individual earnings eclipsing eight digits do. *Cf. Urban Outfitters*, 103 F. Supp. 3d at 655 (scienter where executive raked in $50 million through class period sales).

None of Defendants' arguments to the contrary has merit. *First*, Defendants claim that the insider sales they made in the Direct Listing were "inherently… unsuspicious" but cite zero authority to support that contention. Mot. 32-33. *Second*, Defendants argue that the timing of their sales somehow "defeats" scienter. Mot. 33. But the authority they cite supports the opposite. In *In re Hertz Glob. Hldgs. Inc.*, 905 F.3d 106 (3d Cir. 2018), the Third Circuit found that stock sales of $4 million and $3.1 million were suspiciously large enough to "add to the inference of scienter." *Id.* at 119. On the other hand, it held that "the timing of the [] trades" "lessen[ed]" the scienter inference because the sales were made at prices well below the Class Period high. *Id.* at 120. Here, by contrast, in the first two days of the Direct Listing, Defendants Armstrong, Choi, and Haas collectively sold approximately $614

39

million worth of shares at prices ranging from $312 to $424. ¶126. These prices are close to or even above the Class Period high (close) of $342.98 per share and significantly higher than the $51.61 share price after the final corrective disclosure, making clear that Defendants timed their sales to seize on the artificial inflation caused by their misrepresentations. ¶¶392, 406. *Third*, Choi, Haas, and Grewal sold 57%, 52%, and 16%, respectively, of their holdings during the Class Period, amounts that are sufficiently suspicious to show motive. *Suprema*, 438 F.3d at 278 (inferring scienter based in part on defendants selling over 30% of their holdings).[23]

*Fourth*, Defendants are not immunized by their Rule 10b5-1 trading plans. Most of Defendants' sales, including sales made in the Direct Listing, were not made pursuant to a Rule 10b5-1 trading plan. Mot. 33. Regardless, all four Defendants entered into their 10b5-1 plans during the Class Period, after they had artificially inflated Coinbase's stock price with their misleading statements. *See e.g.*, Mot. Ex. 21 at 7, 57, 79, 112. As courts have explained, "a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010). Here, for example,

---

[23]    That Armstrong's hundreds of millions of dollars of trades represented a smaller percentage of his overall holdings does not detract from scienter. Courts infer scienter from large insider sales even where executives "continued to hold a substantial percentage of [] stock." *Urban Outfitters*, 103 F. Supp. 3d at 654-55.

Armstrong and Haas entered into their 10b5-1 plans in August and September 2022, months after the SEC had begun investigating Coinbase. *See*, *e.g.*, Mot. Ex. 21 at 7, 112. In these circumstances, Rule 10b5-1 plans provide "no defense to scienter." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).[24]

### C.      The Complaint Adequately Alleges Loss Causation

A plaintiff pleads loss causation under Rule 8(a) by providing a "short and plain statement" giving defendants "some indication of the loss and the causal connection that [it] has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). The Third Circuit has adopted a "practical approach [to loss causation], in effect applying general causation principles." *McCabe v. Ernst & Young LLP*, 494 F.3d 418, 426 (3d Cir. 2007). Under this standard, a plaintiff need only show that "the misrepresentation touches upon the reasons for the investment's decline in value." *Id.* at 428. This "highly factual" inquiry is "often unsuited to disposition…on the pleadings." *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199, at *29 (D.N.J. Aug. 8, 2011).

**Bankruptcy Risk.** Plaintiffs allege that the concealed risk to asset safety in the event of bankruptcy was revealed on May 10, 2022, when Coinbase updated the

---

[24]      *See also, e.g.*, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (rejecting argument that 10b5–1 plan rendered trading non-suspicious because, *inter alia*, defendant entered into the plan during the class period); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (not crediting 10b5-1 plan where it was "entered into—or strategically amended—to take advantage of…insider information").

41

Asset Safety Disclosure to include that risk and, in response, Coinbase's stock price fell by 26%. ¶¶231-32. Defendants' retort, that the bankruptcy risk had "already been disclosed" prior to May 10, 2022 (Mot. 40-41) is a premature, fact-intensive "truth on the market" defense that is inappropriate for resolution at this stage.[25] Defendants cannot establish that SAB 121, which did not mention Coinbase, "conveyed to the public" the true risk to *Coinbase* customers in the event of bankruptcy or the effect it could have on the Company's business at all, let alone "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by [Defendants'] alleged misstatements." *Merck*, 2011 WL 3444199, at *35. Indeed, the significant stock price decline following the May 10, 2022 disclosure, and analyst commentary attributing this decline to the newly-added risk disclosure (¶¶230-37) confirms that this was new information and not simply a "recharacterization of previously disclosed facts." Mot. 41. Surely analysts would not have called the disclosure "disturbing," say that it "really caught our eye," or note that it could "spark fear" and "negatively impact" the Company (¶¶234-37) if they were already previously aware of it.

**Proprietary Trading.** On September 22, 2022, the WSJ reported that Coinbase had created a proprietary trading unit and engaged in proprietary trading,

---

[25]    *See Roofers*, 2018 WL 3601229, at *9 ("[T]he truth on the market defense is 'intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint.'"); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

causing Coinbase stock to fall 6.9%. ¶¶241-43. Defendants argue that the article did

not reveal the truth because it was based on anonymous sources. Mot. 41. But "the

Supreme Court does not require that [a] corrective disclosure take any particular

format; so long as the plaintiff alleges that the public disclosure reveals that the

defendant company made false claims, and…a corresponding drop in stock price

occurred, loss causation is adequately pled." *Hull v. Glob. Digital Sols., Inc.*, 2017

WL 6493148, at *14-15 (D.N.J. Dec. 19, 2017). Thus, even "unproven" allegations

can serve as a corrective disclosure. *Id*. As the Ninth Circuit has explained:

> [T]he relevant question for loss causation purposes is ***whether the market reasonably perceived [the disclosure] as true and acted upon [it] accordingly***. If the market recalibrated [the company's] stock price on the assumption that [the disclosure] [was] true—and thus that [the company's] prior misstatements were false—then the drop in [the company's] stock price represented dissipation of inflation.

*In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020).[26] Here,

Coinbase's stock price declined following the disclosure, and market commentators

called the disclosure "a big deal" "for investor perception," making clear that they

"reasonably perceived [the disclosure] as true." ¶¶32, 245-46; *BofI*, 977 F.3d at 792.

**Regulatory Risk.** Defendants' attempt to recast the July 25, 2022, March 22,

2023, and June 6, 2023 disclosures as merely representing the materialization of an

already-disclosed risk should be rejected. Mot. 41-42. Through each of these

---

[26]   The *BofI* court distinguished *Curry v. Yelp, Inc.*, 875 F.3d 1219 (9th Cir. 2017) (cited at Mot. 41), noting that the complainants "in *Curry* were outsiders who lacked any firsthand knowledge of Yelp's practices." *BofI*, 977 F.3d at 793.

disclosures, investors learned new, material facts that Defendants had previously misrepresented or concealed. *See Hall*, 2019 WL 7207491, at *27 (loss causation adequately pled where "each [of the disclosures] provided new information as to the seriousness and extent of the Company's alleged fraud"). On July 25, 2022, investors learned that for months, the SEC had been actively investigating whether Coinbase allowed users to trade in unregistered securities. ¶¶200, 398-99. Investors learned on March 22, 2023, that Coinbase had received a Wells Notice, and that Defendants knew at least as of January 2023 that the SEC was "shifting back to an enforcement action." ¶¶402-04. And on June 6, 2023, investors learned that the SEC had charged Coinbase through a 100-page complaint detailing Coinbase's conduct in listing assets that its own framework indicated were likely to be securities. ¶¶221-22, 405.[27]

## II.    The Complaint Adequately Pleads Securities Act Claims

### A.    The Complaint Adequately Alleges Securities Act Standing

#### 1.    Plaintiffs Plead Section 11 Standing

Plaintiffs plausibly allege that they purchased Coinbase stock "pursuant [to] or traceable to" the misleading Offering Materials. *See* ¶518. Plaintiffs Firth and Steinmetz purchased Coinbase stock on April 14, 2021—the first day of Coinbase's

---

[27]    Defendants' claim that the June 6 disclosure is inactionable in light of the Wells Notice is baseless. Courts routinely uphold loss causation allegations based on the filing of charges subsequent to the initial announcement of an investigation. *E.g.*, *Allegheny Cnty.*, 532 F. Supp. 3d at 242 (sustaining loss causation allegations based on filing of criminal charges weeks after announcement of investigation).

44

Direct Listing—at prices near that day's opening price. ¶¶41-43.[28] When they purchased, 88% of shares outstanding were registered pursuant to the Offering Materials. ¶¶41-42. When AP7 purchased on November 30, 2021, 74% of the shares outstanding were registered pursuant to the Offering Materials. ¶40. These allegations create a plausible inference that Plaintiffs purchased shares pursuant or traceable to the Offering Materials. *See In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 866 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) (standing sufficiently pled where plaintiffs purchased on first day of secondary offering and "1,7500,000 [sic] shares were sold in the Secondary Offering in comparison to the pre-existing public float of 2,023,000 shares"—i.e., just *46%* of the shares outstanding).[29]

Defendants' authorities are readily distinguishable. In *De Vito v. Liquid Hldgs. Grp., Inc.*, unlike here, "the offering in question was an IPO and ***the shares were purchased in the aftermarket following <u>subsequent</u> offerings***" such that "the alleged connection to the Secondary Offering by purchasing on the same day" was absent. 2018 WL 6891832, at *17 n.17 (D.N.J. Dec. 31, 2018). In addition, "the IPO

---

[28]   Defendants' suggestion that the addition of Firth and Steinmetz was somehow improper should be rejected out of hand. "[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004).

[29]   Although *Slack* held that plaintiffs must plead that they purchased shares "traceable to the allegedly defective registration statement," the Court remanded the case without specifying what allegations would be deemed sufficient to plead standing. *See Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023).

involved 3.175 million shares while the aftermarket included approximately 34 million additional shares, making the likelihood of traceability to the IPO…far less probable"—in other words, just **8.5%** of the shares outstanding were issued pursuant to the challenged IPO offering materials, a far cry from the 74% to 88% of registered Coinbase shares outstanding when Plaintiffs made their purchases. *Id.*[30] Thus, the *De Vito* court expressly acknowledged that the facts in *EveryWare*—which are much more akin to the facts here—"are distinguishable from the present case." 2018 WL 6891832, at *17 n.17.  Plaintiffs' allegations about the timing of their purchases and the amount of registered shares outstanding at the time plausibly establish that they purchased Coinbase shares pursuant or traceable to the Offering Materials.

### 2.    Plaintiffs Plead Section 12 Standing

Defendants erroneously claim that Section 12 applies only to registered shares. Mot. 45. Section 12(a)(2) extends to **any** share offered or sold by means of a misleading prospectus, regardless of whether the share is registered. *See* Thomas Lee Hazen, *Federal Securities Law* § III.E.2.a n.308 (4th ed.) (§12(a)(2) "**is not limited to registered offerings**"); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 306 (N.D. Cal. 1978) (Section 12(a)(2) "applies to the sale of all securities, **registered and unregistered**"). Indeed, as Justice Kagan noted during the *Slack* oral argument,

---

[30]    Similarly, in *In re Century Aluminum Co. Sec. Litig.*, less than 33% of the shares outstanding at the time of the plaintiffs' purchases were issued through the offering. 729 F.3d 1104, 1106 (9th Cir. 2013).

"***there's really nothing in Section 12 that makes it like Section 11***." Transcript of Oral Argument, *Slack Techs., LLC v. Pirani*, No. 22-200 (Apr. 17, 2023) at 16-17.

### B.    The Complaint Adequately Alleges a Section 11 Claim

To plead a Section 11 claim, a plaintiff "need only show a material misstatement or omission." *Suprema*, 438 F.3d at 269. "Section 11 is a virtually absolute liability provision, which does not require plaintiffs to allege that defendants possessed any scienter." *Id.* Where—as here—Plaintiffs "expressly ple[ad] negligence in connection with" their Section 11 claims "the liberal notice pleading requirements of Rule 8 apply," not Rule 9 as Defendants argue. *Id.* at 270-73; ¶¶437 ("Plaintiffs assert…negligence claims under Sections 11"), 440.[31] Regardless, for the reasons set forth in Sections I.A.1-3, *supra*, the Complaint pleads that Defendants made material misstatements under either standard.

Moreover, Defendants are liable under Section 11 because they "omitted to state a material fact required to be stated therein" (15 U.S.C. § 77k(a)), including by Items 303 and 105 of Regulation S-K. ¶¶492-99. Defendants argue they are not liable because they did not know about the bankruptcy risks in April 2021, but, in truth, they knew by 2019, when they conducted an internal study about that risk and instituted changes to specifically mitigate it for institutional customers. ¶107.

---

[31]    *Suprema*, 438 F.3d at 272, distinguished Defendants' authority (Mot. 46), *Chubb*, 394 F.3d at 160-61, because the complaint there was "devoid of any allegations that Defendants acted negligently."

47

### C.    The Complaint Adequately Alleges a Section 12 Claim

The Complaint pleads solicitation by alleging that Defendants signed the Offering Materials (¶¶428-34, 445), actively solicited buyers through the Investor Day (¶444), sold significant amounts of shares (¶¶428-31, 434, 451), and were personally financially motivated (¶¶74, 81, 428-31, 434, 451). *See Westinghouse*, 90 F.3d at 717; *Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009) (solicitation pled where defendant "signed offering documents" and "participated in the marketing of the fund" including "written or oral communications").[32]

### III.    The Complaint Adequately Pleads Control Person Claims

Defendants concede that the Executive and Director Defendants were control persons of Coinbase. They argue only that Plaintiffs have failed to allege predicate violations, which is incorrect for the reasons set forth above.

### CONCLUSION

Plaintiffs respectfully submit that Defendants' Motion should be denied. Should the Court grant the Motion in full or part, Plaintiffs request leave to amend.

---

[32]    Plaintiffs also allege privity under Rule 8(a). Unlike in traditional underwritten IPOs, here Defendants sold shares directly to Plaintiffs. ¶¶73-74.

48

Dated: November 20, 2023

Respectfully submitted,

**CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P. C.**

s/ *James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Matthew L. Mustokoff
Joshua A. Materese
Margaret E. Mazzeo
Austin W. Manning
Dylan J. Isenberg
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
mmustokoff@ktmc.com
jmaterese@ktmc.com
mmazzeo@ktmc.com
amanning@ktmc.com
disenberg@ktmc.com

–and–

Stacey M. Kaplan
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
skaplan@ktmc.com

49

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

50

## <u>CERTIFICATE OF SERVICE</u>

I, Austin W. Manning, hereby certify that on November 20, 2023, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint to be served on counsel of record via electronic mail. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 20, 2023                 *s/ Austin W. Manning*
                                         Austin W. Manning
                                         **KESSLER TOPAZ**
                                         **MELTZER & CHECK, LLP**
                                         280 King of Prussia Road
                                         Radnor, PA 19087
                                         Telephone: (610) 667-7706
                                         Facsimile: (610) 667-7056
                                         amanning@ktmc.com

                                         *Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

51