**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Matthew L. Mustokoff (*pro hac vice*)
Joshua A. Materese
Margaret E. Mazzeo
Austin W. Manning (*pro hac vice*)
Dylan J. Isenberg (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Additional counsel on signature page*

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE COINBASE GLOBAL, INC. SECURITIES LITIGATION | Case No: 2:22-cv-04915-BRM-LDW<br>Hon. Brian R. Martinotti<br>District Judge<br><br>Hon. Leda D. Wettre<br>Magistrate Judge<br><br>Motion Day: May 5, 2025 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

BACKGROUND ....................................................................................................3

ARGUMENT ..........................................................................................................6

I.   PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT AND
     SECURITIES ACT CLAIMS FOR THE BANKRUPTCY RISK
     STATEMENTS .............................................................................................6

     A.   The PSLRA Safe Harbor Does Not Immunize the Bankruptcy
          Statements—Thus, Actual Knowledge Is Not Required ......................6

     B.   Plaintiffs Adequately Allege Actual Knowledge or
          Recklessness.....................................................................................10

II.  PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT
     CLAIMS FOR THE REGULATORY STATEMENTS ...............................20

     A.   Plaintiffs' Allegations About Defendants Downplaying the Risk
          of Regulatory Action Establish Scienter for Each Defendant.............20

     B.   Plaintiffs' Allegations About Defendants' Financial
          Motivations Further Support Scienter For the Regulatory
          Statements ........................................................................................31

     C.   The Regulatory Statements Are Not Forward-Looking, But In
          Any Event, Plaintiffs Adequately Plead Actual Knowledge ..............33

III. DEFENDANTS' SCIENTER IS IMPUTED TO COINBASE.....................36

IV.  PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT
     CLAIMS FOR THE PROPRIETARY TRADING STATEMENTS............36

V.   PLAINTIFFS ADEQUATELY ALLEGE CONTROL-PERSON
     CLAIMS ...................................................................................................37

VI.  PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND .................38

CONCLUSION......................................................................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Vineland Bd. of Educ.*,
  2019 WL 2354609 (D.N.J. June 4, 2019)........................................................11

*In re Able Labs. Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008) .......................................................38

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) ............................................................................20

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) ......................................................................... 8-9

*Alberici v. Recro Pharma, Inc.*,
  2021 WL 798299 (E.D. Pa. Mar. 1, 2021) .......................................................29

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021)................................................................16

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) ...................................... 17-18, 24, 38

*In re AT&T Corp. Sec. Litig.*,
  2002 WL 31190863 (D.N.J. Jan. 30, 2002)..................................................... 6-7

*In re Audible Inc. Securities Litigation*,
  2007 WL 1062986 (D.N.J. Apr. 3, 2007).........................................................32

*Biondolillo v. Roche Holding AG*,
  2019 WL 1468140 (D.N.J. Apr. 3, 2019)..........................................................39

*In re Bristol-Myers Squibb Sec. Litig.*,
  2005 WL 2007004 (D.N.J. Aug. 17, 2005) .......................................................35

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001)...................................................................21

*In re Cell Pathways, Inc., Sec. Litig.*,
  2000 WL 805221 (E.D. Pa. June 20, 2000)................................................18, 27

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
   497 F.3d 546 (5th Cir. 2007) .................................................................32

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ....................................................9

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ...............................................................4, 6

*Curran v. Freshpet, Inc.*,
   2018 WL 394878 (D.N.J. Jan. 12, 2018)..................................................6

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ...............................................................14

*De la Fuente v. DCI Telecomms., Inc.*,
   259 F. Supp. 2d 250 (S.D.N.Y. 2003) ...................................................27

*Dudley v. Haub*,
   2013 WL 1845519 (D.N.J. Apr. 30, 2013)............................... 10-11, 26

*Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ..................................................................32

*In re Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015)........................................35, 37

*In re Eros Int'l PLC Sec. Litig.*,
   2021 WL 1560728 (D.N.J. Apr. 20, 2021)..........................................7, 36

*Feinberg v. Am. Express Co.*,
   2011 WL 4807916 (E.D. Pa. Oct. 7, 2011) ............................................27

*Fergus v. Immunomedics, Inc.*,
   2021 WL 1171636 (D.N.J. Mar. 29, 2021) ......................................10, 26

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) .................................................................30

*Frater v. Hemispherx Biopharma, Inc.*,
   996 F. Supp. 2d 335 (E.D. Pa. 2014)................................................22, 28

iii

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..........................................................14, 32

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
  2014 WL 4064256 (N.D. Ohio Aug. 18, 2014)............................................. 30-31

*Herskowitz v. Nutri/System, Inc.*,
  857 F.2d 179 (3d Cir. 1988) ..........................................................................29

*Huertas v. United States*,
  2005 WL 1719143 (D.N.J. July 21, 2005) ......................................................30

*Inst. Inv'rs Grp. v. Avaya*,
  564 F.3d 242 (3d Cir. 2009) ...................................................................*passim*

*Janus Cap. Grp., Inc. v. First Deriv. Traders*,
  564 U.S. 135 (2011).......................................................................................38

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ......................................................................14, 21

*In re Majesco Sec. Litig.*,
  2006 WL 2846281 (D.N.J. Sept. 29, 2006).......................................................7

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) .........................................................................19

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005) .............................................................................9

*Ong. v. Chipotle Mexican Grill, Inc.*,
  2017 WL 933108 (S.D.N.Y. Mar. 8, 2017)......................................................31

*In re PTC Therapeutics, Inc. Sec. Litig.*,
  2017 WL 3705801 (D.N.J. Aug. 28, 2017) ......................................15, 21, 22, 23

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) ...........................................................................31

*In re Ravisent Techs., Inc.*,
  2004 WL 1563024 (E.D. Pa. July 13, 2004) ................................................ 9-10

*Roofer's Pension Fund v. Papa*,
    687 F. Supp. 3d 604 (D.N.J. 2023)........................................................36

*Roofers' Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018) ................................... 1-2, 6

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ...........................................24

*SC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ................................................................26

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018)..............................................15, 24

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)............................................................................22

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005).................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................13

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)......................................28

*Tomaszewski v. Trevena, Inc.*,
    482 F. Supp. 3d 317 (E.D. Pa. 2020)...................................................29

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018)...............................10, 19, 26

*United States v. Morales*,
    2019 WL 4316539 (D.N.J. Sept. 12, 2019) (Martinotti, J.) ...............27

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014)......................................6, 34, 35

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007).................................................30

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ...............................................................................35

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007) ...............................................................................26

*Wu v. GSX Techedu Inc.*,
    738 F. Supp. 3d 527 (D.N.J. 2024)..............................................................*passim*

**Other Authorities**

15 U.S.C. §§ 78u-4...............................................................................................19

15 U.S.C. § 78u-5.................................................................................................9

Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz respectfully submit this Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings (ECF No. 103-1, "Mot.").

## **PRELIMINARY STATEMENT**

Notwithstanding this Court's thorough fifty-page opinion denying their motion to dismiss (ECF No. 84, "Opinion"), Defendants largely rehash their previous arguments for dismissal of the Second Amended Complaint (ECF No. 68, "SAC").[1] Defendants claim they are entitled to a do-over because the Court did not consider the "forward-looking" nature of their misleading statements and did not address Plaintiffs' scienter allegations on a defendant-by-defendant basis. These arguments do not withstand scrutiny.

*First*, virtually all of the alleged misstatements were pled—and sustained—as omissions of then-existing material fact, namely, the potential bankruptcy-related risks to safeguarding customers' crypto assets and the true facts regarding the SEC's investigation into unregistered crypto listings. Material omissions are not protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor for forward-looking statements. *See Roofers' Pension Fund v. Papa*, 2018 WL 3601229, at *7 (D.N.J. July 27, 2018) (because "plaintiffs challenge defendants' alleged omission

---

[1] Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted. Citations to "¶" are to the SAC.

of present facts . . . [the] PSLRA's safe harbor does not apply"). Given the inapplicability of the safe harbor, Defendants' argument that the SAC fails to plead "actual knowledge"—as required to pierce the safe harbor's protection—is a straw man. Regardless, actual knowledge is sufficiently pled.

*Second*, there is no group pleading here. The SAC both attributes specific misstatements and omissions to each Defendant and pleads particularized facts establishing each Defendant's scienter, including knowledge of and access to facts contrary to or concealed by the statements, and particularized stock sales and compensation arrangements that plausibly motivated the fraud. Among other things, Defendants disregard the ***admitted-to*** facts considered by the Court in sustaining the SAC, including: (1) Armstrong's concession that Coinbase "should have updated [its] retail terms sooner" to provide retail customers with "the same protections" against asset loss in a bankruptcy event as institutional customers, (2) the Company's acknowledgment that by mid-2022, the SEC had told it that all the crypto assets it listed other than Bitcoin were securities, and (3) Armstrong's admission that the SEC informed Coinbase by January 2023 that it was shifting back to an enforcement investigation, signaling an impending enforcement action. Despite this self-confessed knowledge, Defendants continued to conceal the true risk of loss to customers' digital assets and downplay the likelihood of an SEC action. These admissions, coupled with evidence that the SEC uncovered through its

2

investigation—including that Coinbase listed assets that its own internal process had flagged as "high risk" and likely securities—sufficiently establish scienter at this stage.

In short, Plaintiffs meet the pleading standards of the PSLRA. Defendants' motion should be denied.

## BACKGROUND

On September 5, 2024, the Court denied in large part Defendants' motion to dismiss the SAC. *See generally* Opinion.

*First*, as to the Bankruptcy Risk Statements, the Court held that Plaintiffs sufficiently alleged that Defendants "failed to disclose that, in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets." *Id.* at 21. The Court found that although Defendants "candidly detailed the need to safeguard customers' assets" in their Asset Safety Disclosures, they "specified only two risks—hacking and the loss or destruction of private keys—in safeguarding customers' assets," but "concealed their knowledge of the potential bankruptcy risks to safeguarding customers' assets." *Id.* at 22-23. Thus, the Court held, "Defendants' failure to disclose the known uncertainty of the risks that bankruptcy posed to asset safety in violation of Item 303 rendered the Asset Safety Disclosures materially misleading." *Id.* at 23. The Court further held that, "to the extent [the Bankruptcy Risk Statements] highlight

3

Coinbase's alleged ability to safely store customers' assets," they are "actionable as they contain 'embedded' falsities and concern a central part of Coinbase's business." *Id.* at 24 (quoting *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023)).

The Court also held that Plaintiffs adequately pled scienter based on the allegations that: "(i) Defendants submitted the SEC Comment Letter demonstrating [their] understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy"; "(ii) Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets"; and "(iii) Armstrong eventually conceded that Defendants 'should have updated our retail terms sooner' to provide retail customers with 'the same protections' as institutional customers." Opinion 33 (citing ¶¶ 13-16, 105-09, 112-21, 232). In addition, the Court credited Plaintiffs' allegations that the fraud concerned Coinbase's core operations, which, under Third Circuit precedent, further bolsters a finding of scienter. Opinion 33-34 (citing *Inst. Inv'rs Grp. v. Avaya*, 564 F.3d 242, 268 (3d Cir. 2009)).

*Second*, the Court sustained the claims regarding Defendants' Regulatory Statements, holding that "Plaintiffs have adequately alleged that Defendants misleadingly described a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they

4

listed were not securities," and that Defendants "had an obligation to include the details that would have presented a complete and less favorable one." Opinion at 28. The Court found that (1) "[t]he Regulatory Statements are misleading as Plaintiffs allege Coinbase decided to list crypto assets from late 2019 through 2021, that its own review process determined had high risk scores, and thus were likely to be securities," and (2) "a subset of the statements were [also] misleading in that Defendants concealed that the SEC had indicated to Defendants by mid-2022 that most crypto assets on Coinbase's platform were likely securities." *Id.* at 29.

As to scienter, the Court held that Plaintiffs "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Id.* at 34. These allegations included: (1) Defendants' review of the high risk scores that were generated under the framework created by the Crypto Ratings Council ("CRC") co-founded by Coinbase, (2) the Company's admission following Coinbase's receipt of the SEC Wells Notice that the SEC had told the Company in January 2023 that it would be bringing an enforcement action, (3) Armstrong's admission that Defendants were aware by mid-2022 of the SEC's position that "we think everything other than Bitcoin is a security," and (4) each Defendant's compensation or suspicious stock sales. *Id.* at 34-35 (citing ¶¶ 151, 178-83, 209-15, 342, 345, 357, 378-79).

*Third*, the Court sustained Plaintiffs' Securities Act claims regarding the

5

Proprietary Trading Statements. Opinion at 50. Defendants filed a motion for reconsideration of the Court's Opinion sustaining these claims on September 19, 2024. ECF No. 89.

## ARGUMENT

**I.     Plaintiffs Adequately Allege Exchange Act and Securities Act Claims for the Bankruptcy Risk Statements**

**A.     The PSLRA Safe Harbor Does Not Immunize the Bankruptcy Statements—Thus, Actual Knowledge Is Not Required**

Defendants argue that because the Bankruptcy Risk Statements are forward-looking, Plaintiffs must plead actual knowledge of the concealed risk, or else the statements are protected by the PSLRA safe harbor. Mot. 13-15. This argument fails because the Bankruptcy Risk Statements are false and misleading due to the omission of present facts, and it is well-settled that "omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for the safe harbor protection." *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014); *see Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) ("PSLRA's safe harbor does not apply" to "alleged omission[s] of present facts"); *Roofers' Pension Fund*, 2018 WL 3601229, at *7 (because "plaintiffs challenge defendants' alleged omission of present facts with respect to the challenged statements, PSLRA's safe harbor does not apply"); *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *14 (D.N.J. Jan. 30, 2002) ("the safe harbor provision does not afford corporations a free pass to lie to investors . . . purposeful omission[s] of

6

existing facts . . . do not qualify as forward-looking statements"); *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) ("omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor").

To be sure, the Court held that the Bankruptcy Risk Statements are actionable on account of Defendants' "***failure to disclose the known uncertainty*** of the risks that bankruptcy posed to asset safety" which "rendered the Asset Safety Disclosures materially misleading." Opinion 23. As the Court explained: "In noting that hacking and lost keys were risks to safeguarding customers' assets, Coinbase and the Executive Defendants had a ***duty to provide the complete picture of known risks*** to customer's assets. Instead, Coinbase and the Executive Defendants ***concealed their knowledge*** of the potential bankruptcy risks to safeguarding customers' assets." *Id.* at 22-23. Defendants' statements omitting these "known risks" (*id.*) to customers' assets were therefore materially false and misleading.

Even if the Bankruptcy Risk Statements are not omissions of existing fact (they are), the safe harbor still does not apply because the challenged statements are not forward-looking. *See In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021) ("the Safe Harbor is not applicable to Defendants' alleged misrepresentations" about "a current, not future, state"); *see also Avaya*, 564 F.3d at 255 ("A mixed present/future statement is not entitled to the safe harbor with respect

7

to the part of the statement that refers to the present.").

Defendants unconvincingly attempt to transform their present-tense statements about the Company's ability to protect customers' digital assets into statements about the future. Mot. 14-15. Indeed, Defendants **concede** that the makers of the statements "s[poke] in the ***present tense*** to describe customers' full ownership of their crypto assets and ability to self-custody crypto assets." *Id.* at 14. The fact that a Coinbase bankruptcy was a contingent event does not render Defendants' misleading statements and omissions about the Company's ability to safeguard its customers' assets forward-looking. As the Court previously determined, although "Defendants repeatedly emphasized the security Coinbase offered . . . [they] knew they had not taken steps to protect the Company's retail customers' assets from potential bankruptcy risks." Opinion 22. Thus, Defendants' argument that their sanguine statements about Coinbase's ability to protect customers' assets depended entirely on future events cannot be squared with the fact that Coinbase took deliberate steps to alter its institutional customer agreement to protect those clients' assets in bankruptcy but made no such change to the retail user agreement. *See id.* at 33; *see also* ¶¶ 121, 232.[2]

---

[2] Defendants' reliance on *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272 (3d Cir. 2010) is misplaced. In *Aetna*, as to the defendants' challenged statements regarding "disciplined" pricing, the court explained that "'disciplined' pricing describes a policy of setting prices in relation to ***future*** medical costs." *Id.* at 281. The *Aetna* court concluded that these statements were forward-looking because "[a]t the time

8

Finally, because "[t]he safe harbor of the PSLRA specifically does not apply to statements made in connection with an IPO," *In re Ravisent Techs., Inc.*, 2004 WL 1563024, at *11 n.27 (E.D. Pa. July 13, 2004), the Bankruptcy Risk Statements published in Coinbase's Prospectus and Registration Statement issued just before the Direct Listing (¶¶ 258-60, 264) are not insulated by the safe harbor. The drafters of the PSLRA included a statutory carve-out for "statements made in connection with an initial public offering." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (quoting 15 U.S.C. § 78u-5(b)(2)(D)); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020) ("[T]he safe harbor does not apply to statements made in connection with an initial public offering, such as an IPO prospectus."). Because all of the Bankruptcy Risk Statements in the Prospectus and the Registration Statement were made in connection with the Direct Listing, Defendants cannot invoke the safe harbor to shield themselves from liability. *See Merck*, 432 F.3d at 272 ("statements made in a registration statement and prospectus filed for an IPO" not protected by safe harbor); *Ravisent*, 2004 WL 1563024, at *11 n.27 ("statements made in the

---

the statements were made, the medical costs had not yet been incurred and could not be ascertained until later" and, therefore, "whether Aetna's pricing was, in fact, disciplined could not have been determined." *Id.* Here, by contrast, at the time of Defendants' statements, there was a known, existing risk to customers' crypto assets.

9

Registration Statement cannot be saved by the safe harbor").[3]

## B.  Plaintiffs Adequately Allege Actual Knowledge or Recklessness

Despite the Court having previously held that Plaintiffs adequately pled scienter (Opinion 34-35), Defendants now argue that Plaintiffs engaged in "group pleading" by failing to allege the scienter of any particular Defendant. Mot. 16-20. Defendants are wrong. Plaintiffs have not engaged in group pleading—the SAC is replete with particularized allegations of scienter with respect to each Defendant.

Courts routinely reject arguments that a complaint improperly relies on group pleading where, as here, it "identifie[s] particularly which statements are attributable to which Defendants and which scienter arguments are applicable to which Defendants." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *14 (D.N.J. Dec. 6, 2018); *see also Fergus v. Immunomedics, Inc.*, 2021 WL 1171636, at *3 (D.N.J. Mar. 29, 2021) (complaint did not rely on "group pleading" where it "alleged [defendant's] involvement in making at least one of the challenged statements and his knowledge of, or reckless disregard for, information that made that statement allegedly false"); *Dudley v. Haub*, 2013 WL 1845519, at *17 n.3 (D.N.J. Apr. 30, 2013) (rejecting argument that "Plaintiffs engaged in group

---

[3] Because the safe harbor does not apply to the Bankruptcy Risk Statements, Plaintiffs are not required to plead actual knowledge. Thus, Defendants' argument regarding Plaintiffs' disavowal of knowledge for the Securities Act claims is a red herring. Mot. 15-16.

pleading by referring to Defendants as a single unit" because "[t]he Amended Complaint explains how each alleged misstatement is linked to a particular Defendant, either because that misstatement is specifically attributed to that Defendant or because that Defendant signed the SEC filing in question").[4]

Moreover, the fact that the SAC contains common allegations that apply to more than one Defendant does not preclude a finding that each Defendant is liable for the same or similar reasons. *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 559-60 (D.N.J. 2024) (scienter adequately pled notwithstanding that "the allegations as to the CEO's scienter and the CFO's scienter are largely baked together"). Here, the SAC both (1) attributes specific misstatements and omissions to each defendant, and (2) pleads particularized facts for each Defendant's scienter.

In holding that Plaintiffs "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements," Opinion 33, the Court found persuasive evidence that "Defendants submitted the SEC Comment Letter demonstrating [their] understanding that the commingling of customers'

---

[4] *A.B. v. Vineland Bd. of Educ.*, 2019 WL 2354609 (D.N.J. June 4, 2019) (Mot. 16) is inapposite. *Vineland* was a sexual misconduct case brought against public school officials for failure to monitor a teacher who allegedly engaged in an inappropriate student relationship. Judge Kugler found that the complaint contained "bald assertions that one or all of [the defendants] knew of [the teacher's] sexual misconduct." *Id.* at *8. Given "the totality of the facts" alleged by Plaintiffs, *Avaya*, 564 F.3d at 269, *Vineland* is readily distinguishable. *See id.* ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.").

11

assets could lead to adverse consequences in the event of bankruptcy." *Id.* (citing ¶¶ 105-09). The fact that the individual Defendants did not personally draft the letter does not defeat the reasonable inference that they were aware of it—Armstrong served as Coinbase's CEO, Haas served as Coinbase's CFO, and Choi served as its COO at the time that the Comment Letter was submitted in June 2019. ¶¶ 44-46.[5] Moreover, Haas and Choi served on the Board of Governors of Coinbase Custody, Coinbase's wholly-owned subsidiary responsible for storing the crypto-assets of institutional clients throughout the Class Period, and they, along with Armstrong, were listed as members of Coinbase Custody management as early as 2020. *Id.*

Defendants improperly discount these allegations about their senior executive roles. Indeed, "courts routinely look to a person's position in a given company to determine whether the person's statements were made with scienter. **This is the approach in the Third Circuit**." *Wu*, 738 F. Supp. 3d at 562 (citing *Avaya*, 564 F.3d at 271); *see also In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005) ("The financial strength of the Company was undoubtedly a matter of principal concern to its Chief Executive Officer and Chief Financial Officer.").

The Court also merited Plaintiffs' allegations regarding the "affirmative

---

[5] Defendants erroneously claim that the only misstatements attributed to Choi are the Proprietary Trading Statements. Mot. 3 n.1. Choi made one of the Bankruptcy Risk Statements on December 7, 2021 when speaking on Coinbase's behalf at the Goldman Sachs US Financial Services Conference. *See* ¶¶ 281-83.

12

steps" Defendants took "to mitigate the potential bankruptcy risks to institutional customers' assets," including the revisions to the Company's Institutional User Agreements to mitigate the risk of loss. Opinion 33 (citing ¶¶ 14-16, 112-21). While Plaintiffs may not have a "smoking gun" evidencing Defendants' roles in "drafting or revising" the User Agreement (Mot. 18)—which *Tellabs* does not require[6]—it takes little more than "commonsense" to infer that Coinbase's CEO (Armstrong), CFO (Haas), and COO (Choi) were aware of the terms of the Company's User Agreements, particularly given the frequency with which they discussed the custodial services provided under the agreement. *Avaya*, 564 F.3d at 272-73 ("In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and commonsense perspective."). And if they spoke publicly without such knowledge, they were at a minimum speaking recklessly. *Id.* at 270 ("[T]he possibility that [the CFO] was ignorant is not necessarily exculpatory.").

Defendants also disregard Armstrong's admission following the May 10, 2022 corrective disclosure that the Company "'should have updated [its] retail terms sooner' to provide retail customers with 'the same protections' as institutional customers." Opinion 33 (quoting ¶¶ 121, 232). But the law clearly recognizes that

---

[6] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or 'even the most plausible of competing inferences.'").

13

such admissions can establish scienter. *See, e.g.*, *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) ("the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (scienter supported by "specific admissions from top executives"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (scienter adequately alleged based on "subsequent admissions" that established defendants' "present knowledge of the [concealed] risk"). Defendants' conjecture that Armstrong may not have known about the bankruptcy-related risk to customer assets until May 2022 when the Company finally disclosed the risk factor is pure speculation—such arguments are best reserved for discovery. *See* Opinion 2 ("For the purposes of the Motion to Dismiss, the Court accepts the factual allegations in the SAC as true and draws all inferences in the light most favorable to Plaintiffs.") (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)).

These allegations permit a compelling inference that Armstrong, Haas, and Choi had access to the facts regarding Coinbase's custodial services about which they routinely spoke to investors. Given their positions as Coinbase's highest-ranking executives, it is illogical to suggest that Defendants were unaware that "in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets." Opinion 21.

14

Indeed, by speaking "explicitly and repeatedly" about asset safety, Defendants each held themselves out to investors as knowledgeable about Coinbase's ability to safeguard customer assets. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017) (speaking "explicitly and repeatedly" about results and company's talks with FDA supported scienter). Defendants' statements themselves—many of them made in response to specific questions from analysts—"implied that they had first-hand knowledge" of the matter at issue. *Id.*; *see also SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (defendants' public comments "confirm they had intimate knowledge of the data. Indeed, that is what they wanted the public, particularly investors, to think. ***These officers were speaking as authoritative sources who possessed the information to support their statements*.**"). For example:

- Armstrong's statement emphasizing Coinbase's alleged ability to safely store customers' assets was made in response to a question at a JP Morgan investor conference about protecting customer assets. ¶ 279 (Q. "How do you think about custody and self-custody?" A. ". . . . [W]e're [a] qualified custodian . . . . "***I make sure [customer assets are]***

15

*never going to be seized* . . . .").[7]

- Haas's statement that Coinbase is a "great safe place to buy your first Bitcoin to trade ***to safely store***" was made in response to a question at a Morgan Stanley conference about revenue potential from investing in the Company. ¶¶ 289-90.

- Choi's statement that "consumers are more than willing to pay . . . for the services we offer, particularly the ***security*** we offer," and her touting of "world-class security in custody when you purchase assets with Coinbase and hold them with Coinbase," were made in response to a Goldman Sachs analyst's question about how Coinbase is able to withstand pricing pressure in the crypto industry. ¶¶ 281-82.[8]

---

[7] "Armstrong also regularly spoke about Coinbase's custodial hosted wallet, and the critical differences between the hosted wallet and Coinbase Wallet, including their relative risks to retail users," ¶ 382, further demonstrating his awareness and knowledge of Coinbase's custodial services, abilities, and limitations. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 228 (E.D. Pa. 2021) (inferring scienter where executive "held himself out to investors as knowledgeable" by speaking "in detail" about project).

[8] Defendants incorrectly claim that the Court dismissed the Bankruptcy Risk Statements quoted above (¶¶ 279, 281-82, and 289-90). Mot. 13 n.5. In actuality, the Court held that "to the extent [Defendants' statements] highlight Coinbase's alleged ability to safely store customers' assets, [they] are actionable as they contain 'embedded' falsities and concern a central part of Coinbase's business." Opinion 24 (quoting *City of Warren*, 70 F.4th at 686). These statements clearly fall into that category as they all emphasize the Company's custodial abilities. By contrast, the Court held that "to the extent the subject statements emphasize customers' trust in Coinbase, . . . [they] are non-actionable puffery . . . ." *Id.*

16

Defendants' repeated public statements about Coinbase's custodial safeguards, often in response to inquiring analysts, indicated that they were knowledgeable about the risks posed to Coinbase's customers' assets and actively involved in Coinbase's core business of custodying these assets. *Avaya*, 564 F.3d at 269 (statements made in direct response to analyst can constitute "powerful evidence of scienter"). As Judge Farbiarz recently explained:

> Bottom line: sharp, detailed, and recurring questions that challenge the company's position on important matters can strongly bear on scienter. Why? Because it stands to reason that such questions can ordinarily be expected to be a goad to further inquiry. And if after being pushed by such questions, a person nonetheless provides false information, a possible inference is that the person (a) did not investigate before providing the false information (which might establish recklessness) or (b) investigated, determined the truth, but made a false statement anyway (which might establish intent).

*Wu*, 738 F. Supp. 3d at 561. Defendants' regular fielding of questions and consistent invocation of Coinbase's custodial safeguards in response support scienter.

In addition, as this Court previously found, because "asset security was vital to [Coinbase's] efforts in retaining retail clients" (Opinion 33), a "core operations" inference supports scienter for each Defendant for their statements regarding Coinbase's ability to safeguard assets. *See Avaya*, 564 F.3d at 268 (acknowledging that "since competition, pricing policies, and pricing concessions are 'core matters' of central importance to [defendant] and its principal executives, a 'core operations' inference' supports scienter"); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019

17

WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (scienter supported when challenged statements were on a subject that constituted a "substantial portion" of defendant's revenue); *In re Cell Pathways, Inc.*, *Sec. Litig.*, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000) ("[W]here the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants.").

As the Third Circuit held in *Avaya*, even absent evidence of direct knowledge by an individual defendant, such as a "particular document or conversation," statements made by an individual defendant may give rise to a strong inference of scienter when the statements touch on the company's core business. 564 F.3d at 268-69; *see also Wu*, 738 F. Supp. 3d at 563-64 ("[I]n assessing . . . scienter . . . , courts frequently look to whether alleged misstatements (a) relate to critical parts of a company's operations or (b) are especially large. The law in this area tracks common sense. Even amidst competing pulls on their time and attention, company leaders are more likely to be focused on the heart of the venture—and also on any serious, large-scale problems that are eating at the company, even if they do not arise in its operational core. Moreover, because of the likely importance to investors of statements about central corporate matters, company leaders can be expected to be especially thoughtful when speaking about them.").

Defendants do not refute that they "(i) identified transaction fee revenues as the source of nearly all of Coinbase's net revenues (96% in 2020 leading into the

18

Direct Listing); (ii) disclosed that such fees were primarily generated by retail users (as much as 95% in 2020); and (iii) told investors that the Company's ability to maintain and grow such revenues was anchored by its ability to increase (and maintain) customers [.]" ¶ 380. These allegations give rise to "strong inference," 15 U.S.C. §§ 78u-4(b)(2), that Armstrong, Haas, and Choi—the Company's senior-most executives and public spokespersons to investors—each spoke about the security of their customers' assets with knowledge (or at a minimum, reckless disregard) of the unique risk posed by a Coinbase bankruptcy. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 709, 711 (7th Cir. 2008) (finding it "exceedingly unlikely" that CEO was unaware of problems with the company's major products about which he made numerous false statements). Moreover, Defendants are wrong to suggest that core operations allegations are insufficient to defeat a group-pleading argument. *See, e.g.*, *Toronto-Dominion*, 2018 WL 6381882, at *14 (rejecting group pleading argument; holding that "the core operations doctrine [was] sufficiently pleaded" where plaintiffs "alleged the importance of the Canadian retail segment and Individual Defendants' position within TD Bank, which is enough to allow the core operations doctrine pleading to survive a motion to dismiss").

Finally, Defendants ignore Plaintiffs' allegations regarding "Armstrong's financial motivations," which the Court previously found to "further support"

19

scienter. Opinion 34-35 (citing ¶¶ 6, 81-82 (alleging Armstrong was highly motivated to complete the Direct Listing as doing so would entitle him to a compensation package valued at over $3.7 billion); ¶¶ 81-84, 386 (noting Armstrong was entitled to stock options if Coinbase maintained stock prices following Direct Listing)). They also ignore the allegations that during the first two days that Coinbase's stock was listed, Armstrong, Haas, and Choi collectively sold over 1.6 million shares, netting gross proceeds over **$600 million**, none of which were sold pursuant to a 10b5-1 trading plan, and that during the Class Period, these three Defendants collectively reaped gross proceeds of $867 million through their insider sales. ¶¶ 125-26. These stock sales—"unusual in [both] scope [and] timing"— provide additional evidence of scienter. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999).

## II.    Plaintiffs Adequately Allege Exchange Act Claims for the Regulatory Statements

### A.    Plaintiffs' Allegations About Defendants Downplaying the Risk of Regulatory Action Establish Scienter for Each Defendant

Defendants also seek to relitigate this Court's holding that Plaintiffs adequately pled scienter for the Regulatory Statements, arguing for the second time in fourteen months that the SAC "does not show the knowledge of any particular Defendant about any particular statement." Mot. 12; *cf.* ECF No. 78-1 at 37-40. Their arguments fare no better this go-round.

20

To start, Defendants have ***admitted*** their knowledge of many of the concealed facts. For example, Armstrong admitted in a June 2023 interview that Defendants knew by mid-2022 that the SEC was taking a "totally different tone" and the SEC told Coinbase that "everything other than Bitcoin is a security." ¶¶ 151, 378. Likewise, the Company admitted that in January 2023, "the day before our scheduled meeting" with the SEC, the SEC "canceled on us and told us they would be shifting back to an enforcement investigation," and that at that moment, Defendants knew "discussions were over" with the SEC and Coinbase faced "an imminent enforcement action." ¶ 209. These post-statement admissions confirm Defendants' scienter. *See, e.g., Lormand*, 565 F.3d at 254-55 (defendants' "post-period admissions . . . directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions").

Even if Defendants had not directly admitted their knowledge, there is a strong inference that a company's highest-ranking executives—like Armstrong (CEO), Grewal (Chief Legal Officer/General Counsel), and Haas (CFO)—are kept informed about critical communications with its primary regulator. *See PTC Therapeutics*, 2017 WL 3705801, at \*17 ("It seems implausible that [the CEO and CFO] were not paying close attention" to critical regulatory event involving core product); *see also In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("the Company's CEO and CFO . . . are presumed to have had pertinent knowledge").

It is implausible that Armstrong, Grewal and Haas were unaware of the substance of these crucial meetings with the SEC, particularly given that Company executives met with the SEC over 30 times between June 2022 and March 2023, and made over a dozen presentations to and had more than 27 phone calls with the SEC. ¶ 378. Armstrong and Grewal both admitted that they participated in meetings with the SEC and publicly led the charge against the SEC's investigation. ¶¶ 383-84 (Armstrong discussing his "proactive" approach to engaging with regulators and his meetings with the SEC). *See Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014) (defendants' statements "impl[ied]" that they knew "the FDA's feedback"); *PTC Therapeutics*, 2017 WL 3705801, at *16-17 (speaking "explicitly and repeatedly" about company's talks with FDA supported scienter).

Plaintiffs also allege Defendants' knowledge or reckless disregard of the fact that Coinbase was listing assets that its own internal processes had flagged as "likely securities." Opinion 34. In particular, Plaintiffs allege that in 2019, Coinbase co-founded the CRC for the purpose of "creating a framework to consistently and objectively assess whether any given crypto asset has characteristics that make it more or less likely to be classified as a security under the U.S. federal securities laws" and, specifically, under the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). ¶ 181. Under this framework, "a score of 5 results when an asset appears to have many characteristics that are consistent with the Howey-test factors—i.e.,

the asset is likely to be a security." *Id.* Coinbase "adopted" the CRC framework, and "from late 2019 through 2021, Coinbase made available on the Coinbase Platform crypto assets with high 'risk' scores under the CRC framework it had adopted." ¶¶ 182-83, 379. In other words, to grow its business, Coinbase made the decision to add these assets to its platform "even where it recognized the crypto assets had the characteristics of securities." *Id.*

Defendants cannot seriously dispute their knowledge of these principal facts. Indeed, Defendants' statements themselves "implied that they had first-hand knowledge" of the matter at issue. *PTC Therapeutics*, 2017 WL 3705801, at *17. As the basis for their unequivocal assurances that Coinbase was not listing securities on its platform—which served to downplay the likelihood of an SEC enforcement action—each Defendant explicitly referred to Coinbase's internal review process. *See, e.g.*, ¶ 343 (Grewal: "Coinbase has a ***rigorous process to analyze and review each digital asset*** before making it available on our exchange" and "we remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform"); ¶¶ 197, 346-47 (Grewal: "We are confident that our rigorous diligence process . . . keeps securities off our platform"); ¶ 352 (Haas: assets are "not securities" "based on our assessment"); ¶¶ 359-60 (Armstrong and Grewal: "Staking is not a security under the US Securities Act nor under the *Howey* test"); ¶ 374 (Grewal: "our staking services are not securities under any legal standard[.]").

23

Scienter is further bolstered by the fact that several of these statements were made in direct response to analyst questions focused on the SEC investigation. ¶¶ 352, 366; *see supra* at 17-18; *Avaya*, 564 F.3d at 269; *Wu*, 738 F. Supp. 3d at 562.

Simply put, Defendants' statements "confirm they had intimate knowledge" of the SEC investigation and the assets under SEC scrutiny and "were speaking as authoritative sources who possessed the information to support their statements." *SEB Inv. Mgmt.*, 351 F. Supp. 3d at 906. At a minimum, it was deliberately reckless for Defendants to repeatedly make these representations to analysts and investors if they had not at least verified the results of their internal review process. *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (holding because "[defendant] maintained that he knew what he was talking about[,] . . . . [i]f he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all"); *accord Avaya*, 564 F.3d at 269-70.

Additionally, as this Court previously found (Opinion 33-34, citing *Avaya*, 564 F.3d at 269), Defendants' statements concerned a matter of the most central importance to Coinbase's business—whether it could legally list crypto assets on its platform. ¶¶ 178-79, 380. Under the circumstances, even absent evidence of direct knowledge, Defendants' statements give rise to a strong inference of scienter as they directly addressed the essential regulatory viability of the Company's core business. *See also Wu*, 738 F. Supp. 3d at 563-64; *Allergan*, 2019 WL 3562134, at *11-12.

24

This is particularly true here, where the subject matter at issue concerned critical matters within the direct purview of the individual Defendants. For instance, as Coinbase's top legal officer, it can be inferred that Grewal had direct knowledge of the Company's discussions with the SEC and the results of its analysis regarding the legality of listing these assets. As explained by one court in this District:

> This approach makes sense. Imagine an executive at a car manufacturer who falsely describes a new model's attributes—the stopping power of its brakes, for example, or its turning radius and safety features. It stands to reason that such a false description is more likely to have been offered with scienter by the company engineer (who probably knows a great deal about brakes, etc.) than by the company's controller (who likely knows less about a given car's performance specs).

*Wu*, 738 F. Supp. 3d at 562; *see also Avaya*, 564 F.3d at 272-73 ("[T]he federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and commonsense perspective."). In sum, Plaintiffs' allegations establish that when Defendants downplayed the danger of SEC action and assured the market they were not listing securities, they had "knowledge of facts or access to information contradicting their public statements." Opinion 32-33.

None of Defendants' arguments to the contrary hold up. *First*, Defendants contend that the SAC's detailed allegations amount to nothing more than "group pleading." Mot. 23. But as their own authority makes clear, "group pleading" is a narrow "judicial presumption" that top corporate officers made statements in "group-published" corporate documents, even in the absence of allegations that

25

those officers made those statements. *Winer Family Trust v. Queen*, 503 F.3d 319, 335 (3d Cir. 2007). The doctrine has no application here—where the complaint clearly lays out which Defendant made each statement. ¶¶ 340-74; *see, e.g.*, *Toronto-Dominion*, 2018 WL 6381882, at *14 (rejecting group pleading argument); *Fergus*, 2021 WL 1171636, at *3 (same); *Dudley*, 2013 WL 1845519, at *17 n.3 (same).

Moreover, as discussed above, Plaintiffs adequately allege scienter for each individual Defendant. To the extent Defendants suggest that the same facts cannot support scienter for multiple corporate executives, they are mistaken—courts find scienter adequately pled where allegations about corporate executives' knowledge are "largely baked together." *Wu*, 738 F. Supp. 3d at 559-60. This makes sense, because the knowledge of senior executives at a company often stems from the same source.[9]

*Second*, Defendants attempt to insert their own version of the facts—arguing that CRC scores were merely "third party 'risk scores'" that were separate from Coinbase's "own rigorous review process." Mot. 23-24. At this stage, however, "the Court accepts the factual allegations in the SAC as true and draws all inferences in

---

[9] *SC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004) (Mot. 8), is distinguishable. There, the court rejected plaintiffs' attempt to plead scienter for the corporate defendants' outside auditor "by grouping [it] with the [corporate] defendants." *Id.* at 246. It did not hold, however, that the same allegations could not support scienter for all of the corporate defendants.

the light most favorable to Plaintiffs." Opinion 2. Indeed, it is inappropriate to grant a motion to dismiss based on a defendant's "insistence on their version of contested issues in [the] case." *Cell Pathways*, 2000 WL 805221, at *8. Despite Defendants' sudden attempts to distance themselves from the CRC framework, Plaintiffs allege—based on the allegations in the SEC Complaint[10]—that Coinbase (1) co-founded the CRC, (2) ultimately "adopted" the CRC framework to determine whether an asset was likely a security, and (3) subsequently listed securities "with high risk scores under the CRC framework," "even where it recognized the crypto assets had the characteristics of securities." ¶¶ 182-83. At best, Defendants raise fact questions that cannot be resolved here. *See Feinberg v. Am. Express Co.*, 2011 WL 4807916, at *3 (E.D. Pa. Oct. 7, 2011) ("the Court may not consider defendant's version of the facts at the motion-to-dismiss stage").[11]

---

[10] *See De la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("[T]here is nothing improper about utilizing information from the SEC [complaint] as evidence to support private claims. Indeed . . . it would have been irresponsible for plaintiff to have ignored the SEC's highly relevant allegations and findings.").

[11] For the same reason, the Court should reject Defendants' suggestion that—despite having spoken at length about Coinbase's rigorous process—they were somehow ignorant to what a high-risk score meant under that process. Mot. 23. At best, this raises a fact question that weighs against granting Defendants' Motion. *United States v. Morales*, 2019 WL 4316539, at *1-2 (D.N.J. Sept. 12, 2019) (Martinotti, J.) (judgment on the pleadings is appropriate only where "no material issue of fact remains to be resolved" and "only questions of law remain").

27

*Third*, that Defendants made their statements in the "context" of the SEC investigation or to purportedly "provide information" about that investigation does not negate scienter. Mot. 25-28. As this Court already held, having chosen to paint "a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities," Defendants "had an obligation to include the details that would have presented a complete and less favorable one." Opinion 28. They failed to do so. Instead, Defendants opted to not disclose the fact that the SEC had explicitly told them that all assets other than Bitcoin were securities, that an enforcement action was imminent, and that Coinbase's own internal process had determined that assets it listed were likely securities. On these facts, the Court correctly found that scienter was sufficiently alleged. *Id.* at 34 (citing *Frater*, 996 F. Supp. 2d at 350 (when "FDA tells a company about problems with a product, and [it] nonetheless continues to make confident predictions about a product . . . courts have inferred scienter and falsity")); *see also Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *12-14 (C.D. Cal. Apr. 12, 2016) (scienter alleged for statements of FDA compliance where FDA inspector reported potential violations to management during routine inspection).

Likewise, Defendants' claim that they did not act with scienter because they said that the outcome of the SEC investigation was "uncertain" or that Coinbase would defend itself in court "if needed" misses the mark. Mot. 26-27. As this Court

28

explained, "generic warnings of a risk do 'not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.'" Opinion 29, n.19 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014)). By the point Defendants made these statements, they knew that an SEC enforcement action was imminent, yet concealed that fact. ¶ 209.

*Fourth*, the fact that the SEC has recently taken a different view is irrelevant—those facts happened two years **after** Defendants' statements. *See, e.g.*, *Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *7-8 (E.D. Pa. Mar. 1, 2021) (FDA approval "two years after the end of the class period does not indicate that the statements were not false or misleading at the time they were made . . . . The FDA's actions in 2020 do not obviate Plaintiff's allegations regarding 2017 or 2018, nor do they render any allegedly false statements from that time true."); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 n.100 (E.D. Pa. 2020) (post-class period FDA approval of drug "has no bearing on Plaintiffs' allegation that during the class period Defendants deceived investors"); *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188 (3d Cir. 1988) (on appeal from trial of Section 10(b) claim, affirming exclusion under Fed. R. Evid. 403 of company's "post-merger performance" after preparation of proxy statement as evidence of "management's pre-merger intentions or expectations").

At the time Defendants spoke, however, they knew (but concealed) that the

29

SEC had told them all crypto assets but Bitcoin were securities and that it was readying an enforcement action. "Just as [this Court] cannot countenance pleading fraud by hindsight, **neither can [it] infer innocence by hindsight**." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001). Defendants' argument that a court later ruled that there was room for difference of opinion on whether assets are securities fails for the same reason. Mot. 25. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (when determining relevance in securities fraud cases, "the securities law approaches matters from an **ex ante** perspective").

These facts are also outside the pleadings and thus should not be considered on a Rule 12(c) motion. *Huertas v. United States*, 2005 WL 1719143, at *7 (D.N.J. July 21, 2005) ("Judgment on the pleadings is appropriate only when 'all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided . . . .'") (quoting 5C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1367 (4th ed. 2023)).

*Finally*, Defendants' competing inference that they were merely "expressing genuinely held views" (which is based only on their say so) does not negate the plethora of facts in their possession that cut the other way. *See Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *7 (N.D. Ohio Aug. 18, 2014) (rejecting defendants' competing inference that they "honestly believed" their

30

statements because a "sampling of allegations, and the [complaint] viewed as a whole, demonstrate that Defendants appreciated the gravity of the FDA's concerns, knew the risks facing the Company, yet downplayed and mischaracterized them in disclosures to the investing public").

### B. Plaintiffs' Allegations About Defendants' Financial Motivations Further Support Scienter For the Regulatory Statements

"Though it is not necessary to plead motive" to establish scienter, motive allegations "can be can be persuasive when conducting a holistic review of the evidence." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013). Here, the Court already held that Plaintiffs' allegations regarding Defendants' stock sales and Armstrong's compensation package support scienter for the Regulatory Statements. Opinion 34-35. Defendants' attempts to relitigate that holding are meritless.

*First*, Defendants argue that stock sales cannot support scienter because many occurred before the Regulatory Statements. Mot. 28-29. But Defendants do not (and cannot) dispute that they continued to unload shares throughout the Class Period, while continuing to make alleged false and misleading statements that inflated Coinbase's stock price.[12]

*Second*, Defendants again argue—as they did in their motion to dismiss (ECF

---

[12] In Defendants' authority, by contrast, all of the stock sales were concluded before any alleged misrepresentation. *See Ong. v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *16 (S.D.N.Y. Mar. 8, 2017).

No. 78-1 at 33-34)—that they are insulated by their Rule 10b5-1 plans. Mot. 29-30. But all of the Defendants entered into their 10b5-1 plans during the Class Period, after they had artificially inflated Coinbase's stock price with their misleading statements. *See, e.g.*, ECF No. 78-24 (Ex. 21) at 7, 57, 79, 112. As courts have explained, "a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan." *Freudenberg*, 712 F. Supp. 2d at 200. Here, for example, Armstrong and Haas entered into their 10b5-1 plans in August and September 2022, months after the SEC had begun investigating Coinbase. *See, e.g.*, ECF No. 78-24 (Ex. 21) at 7, 112. In these circumstances, Rule 10b5-1 plans provide "no defense to scienter." *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *see also, e.g.*, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) (rejecting argument that 10b5-1 plan rendered trading non-suspicious because, *inter alia*, defendant entered into the plan during the class period).[13] Indeed, the Court previously considered this argument (Opinion 31), but still found that Plaintiffs' insider trading allegations supported scienter. *Id.* at 34-35.

---

[13] Defendants' authority is not to the contrary. Rather, *In re Audible Inc. Securities Litigation*, 2007 WL 1062986 (D.N.J. Apr. 3, 2007), makes clear that to provide any "defense to an allegation of insider trading," "the plan must have been adopted prior to the person becoming aware of the material, non-public information." *Id.* at *3 n.7.

*Third*, Defendants incorrectly claim that the SAC fails to allege the underlying facts necessary to establish that their sales were suspicious, including the profit made, amount of shares sold, portion of holdings sold, and profits relative to ordinary compensation. Mot. 29. To the contrary, the Court cited many of these exact allegations in previously holding that Defendants' sales supported scienter. Opinion 35 (crediting allegations that Defendants "sold over 2.8 million shares of Coinbase netting gross proceeds of nearly one billion dollars" and that Armstrong's ordinary compensation "was just $1 million"); *see also* ¶ 387 ("during the Class Period, Defendants Choi, Haas, and Grewal sold approximately 57%, 52%, and 16%, respectively, of their Coinbase common stock holdings").

*Finally*, contrary to Defendants' argument, allegations regarding Armstrong's compensation package also bolster the scienter inference. Mot. 29. While Defendants contend that the SAC "tie[d] the package to the stock price only for 60 trading days after the Direct Listing," *id.*, in truth, it alleges that Armstrong was motivated to drive up the stock price "for one year" after the Direct Listing to unlock "the final tranche[s] of options" for potential profit of "over $3.7 billion." ¶ 386.

### C.    The Regulatory Statements Are Not Forward-Looking, But In Any Event, Plaintiffs Adequately Plead Actual Knowledge

Defendants contend that three of the Regulatory Statements are forward-looking and thus shielded by the safe harbor. Mot. 30. This argument also fails.

*First*, each of these statements is alleged to be misleading due to Defendants'

33

omission of existing facts. *See* ¶¶ 342, 369 (alleging statements in ¶¶ 340-41 were misleading because Coinbase failed to disclose high risk scores indicating that listed assets were securities); ¶ 369 (alleging statement in ¶ 368 was misleading because Armstrong and Haas "failed to disclose" that the SEC had informed Coinbase it "was moving toward an enforcement action"). Moreover, the Court characterized these statements as omissions of present fact. *See* Opinion 29 (certain "statements were misleading in that Defendants ***concealed*** that the SEC had indicated to Defendants by mid-2022 that most crypto assets on Coinbase's platform were likely securities"); *id.* at 30 ("Plaintiffs' claim is better qualified as seeking recourse for the misleading nature of the Regulatory Statements in ***concealing*** that the Company had listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that most assets it listed were likely securities, thus increasing the risk that the SEC would bring an enforcement action."). As discussed above (at § I.A), "omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for the safe harbor protection." *Viropharma*, 21 F. Supp. 3d at 471.

*Second*, "[a] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Avaya*, 564 F.3d at 255. Here, Defendants' statements contained embedded false statements of present fact. For example, on February 23, 2023, Armstrong and Haas represented that "outcomes remain uncertain" regarding the SEC investigation and Coinbase

34

"cannot estimate the potential impact" of the investigation "at this time." ¶ 368. Yet, *at that time*, Defendants knew that an SEC enforcement action was forthcoming, but concealed that fact. ¶¶ 209, 369.

Courts have consistently held that the safe harbor cannot immunize a defendant for warning of risks and contingencies that have "already come to pass." *Viropharma*, 21 F. Supp. 3d at 471; *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 241-42 (3d Cir. 2017) ("[A] company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition."); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *7, 11 (D.N.J. Dec. 15, 2015) (same). In other words, the "safe harbor . . . provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead *when he knows with near certainty that the Grand Canyon is one foot away*." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *52 (D.N.J. Aug. 17, 2005). Here, the Grand Canyon was in plain sight—the SEC told Coinbase just weeks prior that an SEC enforcement action was imminent.

*Finally*, even if the safe harbor did apply to Defendants' omissions of present fact (it does not), Plaintiffs allege Defendants' actual knowledge of the concealed facts—particularly through the admissions of Armstrong and the Company. *See supra*.

35

**III.      Defendants' Scienter Is Imputed to Coinbase**

Plaintiffs adequately allege the scienter of Armstrong, Haas, Choi, and Grewal, which is imputed to Coinbase. *See Avaya*, 564 F.3d at 251-52; *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 630-31 (D.N.J. 2023) ("The most straightforward way to impute scienter to a corporation is to impute it from an individual defendant who made the challenged misstatement.").

**IV.      Plaintiffs Adequately Allege Securities Act Claims for the Proprietary Trading Statements**

Defendants contest the sufficiency of the claims based on the Proprietary Trading Statements by rehashing the arguments from their Motion for Reconsideration. Mot. 31-32. As set forth in Plaintiffs' opposition to that motion, these statements were false and misleading at the time they were made. ECF No. 90 at 10-14. Defendants also assert that all but one of these statements are forward-looking and protected by the PSLRA safe harbor because Plaintiffs fail to plead actual knowledge. However, each of these statements was made in connection with Coinbase's direct listing such that the safe harbor does not apply. *See supra* at § I.A.

In any event, the challenged statements are statements of existing fact that are not entitled to safe harbor protection. *See Eros*, 2021 WL 1560728, at *7 (safe harbor inapplicable to statements about "a current, not future, state"). For example, Defendants told investors that "[w]e do not proprietarily trade against our clients" (¶¶ 471-72)—a clear statement of present fact. And while Defendants assert that

36

their misrepresentations regarding Coinbase's "plans" are forward-looking, these statements are, at best, mixed present and future statements, and the portion referring to the present is not protected. *Avaya*, 564 F.3d at 255, *See, e.g.*, ¶ 473 ("We view our crypto asset investments as long term holdings and we do not plan to engage in regular trading of crypto assets."); *see also* ¶ 487.

Finally, Defendants erroneously claim that two Proprietary Trading Statements are "inactionable puffery." Mot. 34. These statements emphasizing that "we built a culture that doesn't take shortcuts to try and make a quick buck" were not immaterial puffery because they reassured investors that Coinbase would not trade crypto assets to turn a profit when, in actuality, the Company already intended to engage in for-profit proprietary trading. *E.g.*, ¶¶ 473, 489-91; *see Enzymotec*, 2015 WL 8784065, at *1 ("a statement is considered puffery only when it is immaterial").

## V.    Plaintiffs Adequately Allege Control-Person Claims

Defendants misstate the applicable legal framework for control person claims and ignore Plaintiffs' allegations. *First*, Defendants' reliance on *Belmont v. MB Partners, Inc.* to argue that Plaintiffs must allege "actual knowledge of the fraudulent activity" to plead a Section 20(a) claim is misplaced. Mot. 34-35 (quoting *Belmont*, 708 F.3d 470, 484-85 (3d Cir. 2013)). *Belmont* addressed the standard for Section 20(a) claims at summary judgment, not on a motion to dismiss, and the Third Circuit expressly recognized that "a difference of opinion has emerged among district courts

37

of this Circuit as to the pleading requirements for a § 20(a) claim," specifically, whether a plaintiff must allege culpable participation. *Id.* at 484 n.20. However, the court stated: "Because we hold that the Investors have failed to satisfy the culpable participation requirement for purposes of summary judgment, we need not, and do not, resolve the pleading issue at this time." *Id.*; *see also In re Able Labs. Sec. Litig.*, 2008 WL 1967509, at *29 (D.N.J. Mar. 24, 2008) ("the Third Circuit does not require [] culpable participation"). But even assuming culpable participation is required, Plaintiffs adequately allege scienter for each individual Defendant and thus sufficiently plead culpable participation. *Allergan*, 2019 WL 3562134, at *14.

*Second*, in arguing that Plaintiffs' Section 20(a) claim against Choi should be dismissed because she did not "ma[k]e any of the remaining [alleged [mis]statements," Defendants misstate the applicable standard by insisting that a "control person" must be a maker of a challenged statement or have ultimate authority over such statement to be liable under Section 20(a), improperly relying on *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011), which addressed Section 10(b) primary liability. Mot. 35. Here, Plaintiffs adequately allege Choi's control over primary violator Coinbase. ¶¶ 46, 385, 421-44. Nothing more is required.

## VI. Plaintiffs Should Be Granted Leave to Amend

Should the Court grant any portion of Defendants' motion, Plaintiffs

38

respectfully request leave to amend. *See, e.g.*, *Biondolillo v. Roche Holding AG*, 2019 WL 1468140, at *5 (D.N.J. Apr. 3, 2019).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion in full.

Dated: April 8, 2025

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P. C.**

*s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ MELTZER & CHECK, LLP**

Matthew L. Mustokoff (*pro hac vice*)
Joshua A. Materese
Margaret E. Mazzeo
Austin W. Manning (*pro hac vice*)
Dylan J. Isenberg (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7756
mmustokoff@ktmc.com
jmaterese@ktmc.com

39

mmazzeo@ktmc.com
amanning@ktmc.com
disenberg@ktmc.com

–and–

Stacey M. Kaplan (*pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
skaplan@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

40

# CERTIFICATE OF SERVICE

I, James Cecchi, hereby certify that on April 8, 2025, I caused a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's Electronic Filing System. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated: April 8, 2025

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI
  BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative
Class*

41