<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE COINBASE GLOBAL, INC. SECURITIES LITIGATION | Case No. 2:22-cv-04915 (BRM) (LDW)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court are Defendants Coinbase Global, Inc. ("Coinbase" or the "Company"), Brian Armstrong ("Armstrong"), Alesia J. Haas ("Haas"), Emilie Choi ("Choi"), Paul Grewal ("Grewal"), Jennifer Jones ("Jones"), Marc Andreessen ("Andreessen"), Frederick Ernest Ehrsam III ("Ehrsam"), Kathryn Haun ("Haun"), Kelly Kramer ("Kramer"), Gokul Rajaram ("Rajaram"), and Fred Wilson's ("Wilson") (collectively, "Defendants")[1] Motion for Judgment on the Pleadings ("12(c) Motion") (ECF No. 103) and Motion to Certify Order for Interlocutory Review ("Interlocutory Motion") (ECF No. 122). Defendants filed the 12(c) Motion on February 10, 2025. (ECF No. 103.) Plaintiffs filed an Opposition on April 8, 2025 (ECF No. 117), and Defendants filed a Reply on May 9, 2025 (ECF No. 129). On September 22, 2025, Defendants filed a notice of supplementary authority, citing *In re Walmart, Inc. Securities Litigation*, Civ. A. No. 24-1818, 2025 WL 2487776 (3d Cir. Aug. 29, 2025) (ECF No. 133), and on September 29, 2025, Plaintiffs filed a reply (ECF No. 134).

---

[1] Defendants Armstrong, Haas, Choi, and Grewal are collectively hereinafter referred to as the "Executive Defendants." Defendants Andreessen, Ehrsam, Haun, Kramer, Rajaram, and Wilson are collectively hereinafter referred to as the "Director Defendants." Defendants Coinbase, Armstrong, Haas, Jones, and the Director Defendants are collectively hereinafter referred to as the "Securities Act Defendants."

Defendants filed the Interlocutory Motion on April 11, 2025. (ECF No. 122.) Plaintiffs filed an Opposition on May 15, 2025 (ECF No. 131), and Defendants filed a Reply on June 5, 2025 (ECF No. 132). Having reviewed and considered the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Defendants' 12(c) Motion (ECF No. 103) is **GRANTED IN PART** and **DENIED IN PART,** Defendants' Interlocutory Motion (ECF No. 122) is **DENIED**, and Plaintiffs' request to file a Third Amended Complaint is **GRANTED.**

## I.    BACKGROUND

"The difference between a motion to dismiss pursuant to Rule 12(b)(6) and Rule 12(c) is only a matter of timing and the Court applies the same standard to a Rule 12(c) motion as it would to a Rule 12(b)(6) motion." *Newton v. Greenwich Twp.*, Civ. A. No. 12-238, 2012 WL 3715947, at *2 (D.N.J. Aug. 27, 2012) (citing *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)). Therefore, for the purposes of the 12(c) Motion, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

The factual and procedural background of this matter are well known to the parties and were previously detailed in the Court's Opinion on September 5, 2024. (*See* ECF No. 84.) Accordingly, the Court will only briefly recount information relevant to the motions.

This case is a federal securities putative class action on behalf of persons and entities that purchased or otherwise acquired: (i) Coinbase common stock from April 14, 2021, through June 5, 2023, inclusive (the "Class Period"), and were damaged thereby; and (ii) Coinbase common stock in or traceable to Coinbase's Registration Statement and/or Prospectus (collectively, the "Offering Materials"). (Sec. Am. Compl. (ECF No. 68) at 1.) Generally, Plaintiffs allege Defendants misrepresented, concealed, and/or omitted significant, material aspects of Coinbase's business during the Class Period which enabled Defendants to reap financial benefits such as cashing out existing shares at inflated values following Coinbase's public listing. (*See generally*, *id.*)

## II.    PROCEDURAL HISTORY

On July 16, 2021, the original class action complaint was filed in this matter, previously bearing the caption *Patel v. Coinbase Global, Inc. et al.*, Case No. 2:22-cv-04915-BRM-LDW. (ECF No. 1.) The original class action complaint named Coinbase, Armstrong, and Haas as defendants and brought two claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). (*Id.*) On September 27, 2022, another prospective plaintiff filed a class action complaint—naming Choi as an additional defendant—in a separate action entitled *Laffoon v. Coinbase Global, Inc. et al.*, Case No. 2:22-cv-05744-BRM-LDW. Thereafter, several Motions for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Counsel were filed. (ECF Nos. 12, 13, 18, 20, 21, 22.) On December 12, 2022, the Honorable Leda D. Wettre, U.S.M.J. consolidated *Patel* and *Laffoon*, appointed Sjunde AP-Fonden as Lead Plaintiff, approved Sjunde AP-Fonden's selection of Lead Counsel and Liaison Counsel, and ordered that Case No. 2:22-cv-04915-BRM-LDW be the Master File bearing the caption *In re Coinbase Global, Inc. Securities Litigation*. (ECF Nos. 49, 50.)

On February 22, 2023, Plaintiffs filed a Consolidated Class Action Complaint naming Coinbase, Armstrong, Haas, and Choi as defendants and bringing two claims pursuant to the Exchange Act. (ECF No. 59.) Thereafter, on May 10, 2023, Plaintiffs filed the First Amended Consolidated Class Action Complaint ("FAC") raising claims against Defendants. (ECF No. 62.) The FAC brought two claims pursuant to the Exchange Act, and three claims pursuant to the Securities Act of 1933 (the "Securities Act"). (*Id.*)

On July 20, 2023, Plaintiffs filed the 193-page, operative Second Amended Complaint ("SAC") raising claims against Defendants. (ECF No. 68.) Specifically, Plaintiffs bring two causes of action under the Exchange Act (the "Exchange Act Claims"): Count I (Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Coinbase and the Executive Defendants); and Count II (Violations of Section 20(a) of the Exchange Act Against the Executive Defendants). Plaintiffs also bring three causes of action under the Securities Act (the "Securities Act Claims"): Count III (Violations of Section 11 of the Securities Act Against the Securities Act Defendants); Count IV (Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants); and Count V (Violations of Section 15 of the Securities Act Against Armstrong, Haas, Jones, and the Director Defendants).

On September 5, 2024, the Court granted in part and denied in part Defendants' prior Motion to Dismiss the SAC. (ECF No. 85.) The Court granted that Motion partly by dismissing "[t]he portions . . . of Count I, to the extent it is premised upon the Proprietary Trading Statements and the Bankruptcy Statements that tout customers' trust in Coinbase," while denying as to the remaining portions. (ECF No. 85.) On September 19, 2024, Defendants filed a Motion for Reconsideration of the Court's Order. (ECF No. 89.) On April 8, 2025, the Court denied Defendants' Motion for Reconsideration. (ECF No. 119.)

Defendants filed the 12(c) Motion on February 10, 2025. (ECF No. 103.) Plaintiffs filed an Opposition on April 8, 2025 (ECF No. 117), and Defendants filed a Reply on May 9, 2025 (ECF No. 129.) Defendants filed the Interlocutory Motion on April 11, 2025. (ECF No. 122.) Plaintiffs filed an Opposition on May 15, 2025 (ECF No. 131), and Defendants filed a Reply on June 5, 2025 (ECF No. 132.)

## III.   LEGAL STANDARD

### A.  Rule 12(c)

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Pursuant to Rule 12(c), the movant for judgment on the pleadings must establish: (1) no material issue of fact remains to be resolved; and (2) the entitlement to judgment as a matter of law. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See id.*

Furthermore, even though a motion for judgment on the pleadings is appropriate after the pleadings have been closed, such a motion is reviewed under the same standards that apply to a motion to dismiss made under Rule 12(b)(6). *See Szczurek v. Pro. Mgmt. Inc.*, 627 F. App'x 57, 60 (3d Cir. 2015) (citing *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)); *see also Muhammad v. Sarkos*, Civ. A. No. 12-7206, 2014 WL 4418059, at *1 (D.N.J. Sept. 8, 2014) (citing *Turbe*, 938 F.2d at 428) ("Where a defendant's motion is one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), it is treated under the same standards as a Rule 12(b)(6) motion where it alleges that a plaintiff has failed to state a claim."); *Gebhart v.*

*Steffen*, 574 F. App'x 156, 157 (3d Cir. 2014). "The difference between Rules 12(b)(6) and 12(c) is purely procedural as [Rule] 12(c) requests for dismissal are governed by the same standards as [Rule] 12(b)(6) motions." *Glob. Naps, Inc. v. Bell Atl.-N.J., Inc.*, 287 F. Supp. 2d 532, 539 (D.N.J. 2003) (citing *Turbe v. Gov't of the V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)). As with a Rule 12(b)(6) motion, in deciding a Rule 12(c) motion, the court must "view[] the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the" nonmovant. *Barnard v. Lackawanna Cnty.*, 696 F. App'x 59, 61 (3d Cir. 2017) (internal quotation marks and citations omitted). A court may only grant a motion for judgment on the pleadings if the moving party "clearly establishes that no material issue of fact remains to be resolved and that [the movant] is entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)).

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her

complaints are plausible. *See id.* at 670.

### B. Heightened Pleading Standard

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides heightened pleading rules that a plaintiff must satisfy in securities class actions. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). "The PSLRA replaced [Federal Rule of Civil Procedure 9(b)] as the applicable pleading standard in private securities class actions. . . . Nonetheless, 'Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [15 U.S.C. § 78u–4(b)(1) of] the PSLRA.'" *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 n.3 (3d Cir. 2013) (alteration in original) (quoting *Avaya*, 564 F.3d at 253).

Pursuant to Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)); *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must . . . support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.'" *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223–24 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557.

Likewise, to properly allege that a defendant made a false or misleading statement under the heightened pleading standard of the PSLRA, a private securities complaint "must: (1) 'specify

each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading' . . . ; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (alteration in original) (quoting 15 U.S.C. §§ 78u-4(b)(1), (b)(2)). Therefore, the PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Rahman*, 736 F.3d at 241–42 (citation and internal quotation marks omitted).

"To plead falsity, Rule 9(b) and the PSLRA each demand specificity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 680 (3d Cir. 2023). "Although the pleading standards in Rule 9(b) and the PSLRA can be generally reconciled harmoniously for allegations of falsity, the PSLRA's requirements for allegations of *scienter* control over the more lenient standard in Rule 9(b) for mental-state allegations." *Id.* at 681 n.1 (emphasis in original) (citing *Avaya*, 564 F.3d at 253 ("The PSLRA's requirement for pleading scienter . . . marks a sharp break with Rule 9(b)."); *Tellabs*, 551 U.S. at 323–24); *compare* Fed. R. Civ. P. 9(b) (permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"), *with* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a particularized statement of the "facts giving rise to a strong inference that the defendant acted with the required state of mind").

### C.  28 U.S.C. § 1292(b)

The statute governing interlocutory appeals, 28 U.S.C. § 1292(b), provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be

taken from such order[.]

28 U.S.C. § 1292(b).

Therefore, a district court may certify a non-final order for interlocutory appeal where the order (1) involves a controlling question of law, (2) there is a "substantial ground for difference of opinion" about that question of law, and (3) where immediate appeal may "materially advance the ultimate termination of the litigation." *See Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974). "The burden is on the movant to demonstrate that all three requirements are met." *F.T.C. v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 633 (D.N.J. 2014) (citations omitted), *aff'd*, 799 F.3d 236 (3d Cir. 2015). However, a district court should certify an interlocutory appeal pursuant to 28 U.S.C. § 1292 "sparingly" and "only in 'exceptional circumstances' that justify a departure from the basic policy of postponing review until the entry of the final order." *See Fiscus v. Combus Finance AG*, No. 03-1328, 2006 WL 2845736, at *1 (D.N.J. Sept. 28, 2006) (citing *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 208 (D.N.J. 1996)). Even if the moving party meets all criteria under § 1292(b), the district court may still deny certification as "permission to appeal is wholly within the discretion of the courts." *Bachowski v. Usery*, 545 F.2d 363, 368 (3d Cir. 1976); *see also United States v. Riddick*, 669 F. App'x 613, 613 n.2 (3d Cir. 2016) (citing *Forsyth v. Kleindienst*, 599 F.2d 1203, 1208 (3d Cir. 1979)) (finding an order denying a request to certify questions for appeal was unreviewable).

## IV.  DECISION

### A.  12(c) Motion for Judgment on the Pleadings

Defendants argue that Plaintiffs fail to "allege particular facts showing that each defendant made each statement with the required state of mind." (ECF No. 103-1 at 1.) They state Plaintiffs "lump[ed] together distinct Defendants and statements," which does not pass muster for forward-looking statements or under PSLRA's actual knowledge standard. (*Id.*) Defendants point out that

the Court previously "deferred consideration of whether Plaintiffs allege scienter on a Defendant-by-Defendant and statement-by-statement basis, and it construed the Securities Act Claims as disavowing knowing misconduct." (*Id.* at 4.) Integral to the 12(c) Motion is Defendants' argument that Plaintiffs impermissibly rely on group pleading in order to allege scienter. (*Id.* at 5.) They state, "[o]nce the statements and Defendants are considered individually, . . . the entire SAC must be dismissed because Plaintiffs do not satisfy the PSLRA's pleading requirements for either the remaining Bankruptcy Risk statements or the Regulatory statements." (*Id.* at 11.)

In opposition, Plaintiffs argue Defendants "largely rehash their previous arguments for dismissal of the Second Amended Complaint." (ECF No. 117 at 1.) They state Defendants attempt at a do-over "because the Court did not consider the 'forward-looking' nature of their misleading statements and did not address Plaintiffs' scienter allegations on a defendant-by-defendant basis . . . do not withstand scrutiny." (*Id.*) Plaintiffs claim essentially all of the alleged misstatements "were pled—and sustained—as omissions of then-existing material fact, namely, the potential bankruptcy-related risks to safeguarding customers' crypto assets and the true facts regarding the SEC's investigation into unregistered crypto listings." (*Id.*) They contend such material omissions are not protected by PSLRA's safe harbor for forward-looking statements, which in turn means "Defendants' argument that the SAC fails to plead 'actual knowledge'—as required to pierce the safe harbor's protection—is a straw man." (*Id.* at 1–2 (citing *Roofer's Pension Fund v. Papa*, Civ. A. No. 16-2805, 2018 WL 3601229, at *7 (D.N.J. 2018)).) They likewise state that actual knowledge has been sufficiently pled and no group pleading has occurred because "[t]he SAC both attributes specific misstatements and omissions to each Defendant and pleads particularized facts establishing each Defendant's scienter, including knowledge of and access to facts contrary to or

11

concealed by the statements, and particularized stock sales and compensation arrangements that plausibly motivated the fraud." (*Id.* at 2.)

In reply, Defendants reiterate that Plaintiffs' SAC "does not come close to satisfying PSLRA's heightened pleading requirements" and that Plaintiffs' Opposition does nothing to help them overcome this deficiency. (ECF No. 129 at 1.) They state "Plaintiffs had to plead scienter on a defendant-by-defendant and statement-by-statement basis. And for any forward-looking statements, Plaintiffs had to plead facts showing the speaker had actual knowledge the statement was false or misleading. The SAC does nothing of the sort." (*Id.*) Defendants refute the characterization of the 12(c) Motion as a "do-over" since the Court authorized their filing of a Rule 12(c) motion in order to address open questions such as group pleading and "whether forward-looking statements qualified for the safe harbor and thus require individualized allegations of actual knowledge." Defendants assert these "[t]hese fundamental requirements for pleading a claim under the PSLRA foreclose all three of Plaintiffs' theories." (*Id.*) Accordingly, they argue: (1) "as to Bankruptcy Risk, Plaintiffs' attempts to avoid the safe harbor's scienter standard fail . . . [because n]one of Plaintiffs' allegations suggests that any individual speaker believed that customer assets would be at risk in a bankruptcy that was purely hypothetical at the time they spoke[;]" (2) "as to the Regulatory statements, Plaintiffs contend that the Individual Defendants misrepresented their own beliefs and the SEC's views on Coinbase's compliance with the securities laws. But Plaintiffs do not allege that any Individual Defendant believed that Coinbase was listing crypto assets that qualified as securities[;]" and (3) "as to Plaintiffs' Proprietary Trading claim, Plaintiffs' failure to plead contemporaneous falsity is fatal to both Plaintiffs' Exchange Act and Securities Act claims. Additionally, the Proprietary Trading statements are either forward-

looking statements protected by the safe harbor or classic examples of nonactionable puffery." (*Id.* at 1–3.)

To satisfy the particularity requirement of the PSLRA, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter, "the intent to deceive, manipulate, or defraud either knowingly or recklessly," is the required state of mind. *PAMCAH-UA Loc. 675 Pension Fund v. BT Grp. PLC*, No. 20-2106, 2021 WL 3415060, at *1 (3d Cir. Aug. 5, 2021) (citations omitted); *see also Tellabs*, 551 U.S. at 319 (noting scienter is "a mental state embracing intent to deceive, manipulate, or defraud (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976))). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (emphasis in original). To survive a motion to dismiss, plaintiffs must plead facts that allow "a reasonable person [to] deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "The inference    . . . need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.*

"In the Third Circuit, '[s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud.'" *Roofer's Pension Fund*, 2018 WL 3601229, at *15 (quoting *In re Anadigics, Inc., Sec. Litig.*, Civ. A. No. 08-5572, 2011 WL 4594845, at *32 (D.NJ. Sept 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012)). "Demonstrating that a defendant had a motive, such as personal financial gain, to commit a securities fraud violation is a 'relevant consideration' that 'may weigh heavily in favor of a scienter inference[.]'" *Hertz Glob. Holdings*,

905 F.3d at 119 (quoting *Tellabs*, 551 U.S. at 325); *see also Rahman*, 736 F.3d 237, 245 (3d Cir. 2013) ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when conducting a holistic review of the evidence."). However, "motive and opportunity" do not "serve as an independent route to [establishing] scienter." *Avaya*, 564 F.3d at 277. "[A] plaintiff properly pleads scienter by alleging facts that 'constitute circumstantial evidence of either reckless or conscious behavior.'" *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014) (quoting *Avaya*, 564 F.3d at 276–77). A plaintiff relying upon circumstantial evidence to support a strong inference of scienter "must sufficiently plead 'defendants' knowledge of facts or access to information contradicting their public statements . . . [*i.e.*, that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Roofer's Pension Fund*, 2018 WL 3601229, at *18 (quoting *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001)).

### 1. Bankruptcy Risk Statements

For the first category of statements, Bankruptcy Risk, Defendants claim "[e]ach statement that remains following the Court's motion-to-dismiss ruling is forward looking, thus triggering the 'actual knowledge' standard for either Plaintiffs' Securities Act or Exchange Act claims." (ECF No. 103 at 11.) They also state such claims "are doomed because Plaintiffs' group pleading does not show the knowledge of any particular Defendant about any particular statement." (*Id.* at 12.) Defendants argue that most of the statements left in the matter "are risk disclosure warnings about contingent future risks." (*Id.* at 13.) They highlight Coinbase warning "that any 'loss of private keys' or 'failure to safeguard' customer assets 'could' adversely impact Coinbase or its customers." (*Id.* (citing ECF No. 78-2, Statements 1–3, 6–11, 14–15, 68, 72–74; SAC ¶¶ 258–60,

270–71, 273, 276–77, 284–85, 458, 477–79).) Defendants also claim Coinbase warned its users that the company may be liable to them for certain losses. (*Id.* (citing ECF No. 78-2, Statements 3, 5, 7, 9, 11–13, 15, 17, 74; SAC ¶¶ 260, 268, 271, 274, 277, 279, 281–82, 285, 289–90, 479).) Defendants contend all these statements are "forward-looking within the meaning of the safe harbor" given their use of "may" and "could." (*Id.*)

Defendants further argue "the non-risk disclosure statements are likewise forward-looking. These statements speak in the present tense to describe customers' 'full ownership of their crypto assets' ([ECF No. 78-2,] Statements 4, 16, 75; [SAC] ¶¶ 264, 287, 481) and ability to 'self-custody crypto assets and NFTs in one place' ([ECF No. 78-2,] Statement 16; [SAC] ¶ 287)" (*id.* at 14); however, "Plaintiffs' own theory of falsity assumes that the statements make representations about the future" (*id.*). Defendants therefore characterize Plaintiffs allegations for these statements as having potentially "misrepresented that users would maintain ownership or custody of crypto assets in the future in a hypothetical bankruptcy [and] [b]ecause these statements are challenged only to the extent they speak about the future, they are, like the risk disclosures, subject to the safe harbor." (*Id.* at 14–15.)

Additionally, Defendants contend Plaintiffs cannot show actual knowledge as required by the safe harbor for forward-looking statements for the Securities Act Claims because the Court has accepted Plaintiffs' express allegation that the "Securities Act claims are not based on any knowing or deliberately reckless misconduct on the part of the Securities Act Defendants." (*Id.* at 15–16 (quoting SAC ¶ 441).) Defendants further argue "[i]ndependent of their disavowal, Plaintiffs fail to allege that any particular Defendant had actual knowledge that any Bankruptcy Risk statement was false or misleading—or even that any Defendant acted with deliberate recklessness (the scienter standard that applies in the absence of forward-looking statements)." (*Id* at 16.) They state

Plaintiffs have only asserted "Defendants collectively must have known that investors would be misled." (*Id.* (citing SAC ¶ 377).) Defendants contend this "failure to allege a single fact showing any Individual Defendant was involved in submitting the June 2019 letter—or even had a role at Coinbase Custody *at the time of* the letter" as well as not otherwise tying "any Defendant to the Comment Letter" is fatal to Plaintiffs' claims. (*Id.* at 17.) Defendants state Plaintiffs' allegations regarding steps taken in the User Agreements to mitigate the risk of loss for institutional customers in a potential bankruptcy that were not undertaken for retail customers "do not withstand scrutiny on a Defendant-by Defendant basis either" because "Plaintiffs do not identify who at Coinbase had any role in drafting or revising customer user agreements." (*Id.* at 17–18 (quoting and citing SAC ¶¶ 14, 16, 110–21).) Defendants emphasize "Plaintiffs [do not] allege a single fact suggesting that any Individual Defendant drafted, reviewed, or even was aware of terms in the User Agreements at the time of any challenged statement (which all pre-date the first SEC filing containing the bankruptcy risk factor)." (*Id.* (citing SAC ¶¶ 110–21).) Defendants also take issue with Armstrong's May 10, 2022, statement that Coinbase "should have updated [its] retail terms sooner" because the "statement does not say anything about any other Individual Defendant's actual knowledge." (*Id.* at 18 (quoting SAC ¶¶ 121, 232).) They assert "Armstrong did not suggest that he knew about the discrepancy or the need for a bankruptcy risk factor all along—let alone when the challenged statements were made a year earlier in April 2021." (*Id.* (citing SAC ¶¶ 258–65).)

Defendants further claim Plaintiffs' allegation that Defendants "must have been aware of the risk to customer assets because the challenged statements concerned Coinbase's 'core business operations'" fails because the core-operations doctrine "is insufficient to show *actual* knowledge of a statement's falsity." (*Id.* at 18–19 (citing SAC ¶ 380).) They assert "the core-operations

doctrine supports scienter only where 'there are other, individualized allegations that further suggest that the officer had knowledge of the fact in question.'" (*Id.* at 19 (quoting *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010)).) Defendants state "Plaintiffs lack any allegations (other than group-pled ones) about any particular Defendant's knowledge, let alone any additional allegations of specific information conveyed to any particular Defendant." (*Id.*)

Finally, Defendants argue "[t]he risk to customer assets was so speculative that it cannot have been obviously misleading for any Defendant not to have warned investors about it. And Plaintiffs cannot point to any Defendant's alleged financial motivations as a reason for not warning investors." (*Id.*) Correspondingly, Defendants assert the Exchange Act Defendants' stock sales cannot support an inference of scienter due to financial motivation because, following the Direct Listing, such sales were made pursuant to predetermined 10b5-1 trading plans, nor can Armstrong's August 2020 stock option grant support an inference of scienter. (*Id.* at 19–20 (citing Answer ¶ 125; SAC ¶¶ 81–84, 395, 397).) As a result, Defendants state such group-pleading deficiencies are fatal to the Bankruptcy Risk statements even if under the deliberate-recklessness standard for non-forward-looking statements. (*Id.* at 19.) They claim:

> [W]ithout Plaintiffs' group pleading, the more compelling inference is that no Defendant believed any additional disclosures were needed because (i) the SAC has no allegation suggesting that Coinbase was ever at risk of going bankrupt, and (ii) the first and only SEC guidance on the issue was not published until after the challenged statements – in March 31, 2022. *See* Dkt. 78-26 at 5.

(*Id.* at 20.)

In opposition, Plaintiffs argue they have adequately alleged Exchange Act and Securities Act claims for the Bankruptcy Risk Statements. (ECF No. 117 at 6.) They state Defendants' argument that these statements are forward-looking, requiring Plaintiffs to "plead actual

knowledge of the concealed risk, or else the statements are protected by the PSLRA safe harbor," fails because the alleged statements "are false and misleading due to the omission of present facts, and it is well-settled that 'omissions of existing facts or circumstances are not forward-looking, and thus do not qualify for the safe harbor protection.'" (*Id.* (citations omitted).) Plaintiffs assert "the Court held that the Bankruptcy Risk Statements are actionable on account of Defendants' '*failure to disclose the known uncertainty* of the risks that bankruptcy posed to asset safety' which 'rendered the Asset Safety Disclosures materially misleading.'" (*Id.* at 7 (quoting ECF No. 84 at 23).) Plaintiffs highlight the Court's determination that by detailing hacking and lost keys as risks to safeguarding customers' assets, "Coinbase and the Executive Defendants had *a duty to provide the complete picture of known risks* to customer's assets" as well as that "Coinbase and the Executive Defendants *concealed their knowledge* of the potential bankruptcy risks to safeguarding customers' assets." (*Id.* (quoting ECF No. 84 at 22–23).) As such, Plaintiffs contend the Defendants' statements omitting such "known risks" are materially false and misleading. (*Id.*)

Moreover, Plaintiffs assert that even if the Bankruptcy Risk statements are now deemed not omissions of existing fact, the safe harbor should still not apply because the Statements are not forward-looking. (*Id.* (citing *In re Eros Int'l PLC Sec. Litig.*, No. 19-14125, 2021 WL 1560728, at *7 (D.N.J. Apr. 20, 2021).) Plaintiffs argue Defendants have conceded in their 12(c) Motion that such statements were made in the present tense and "[t]he fact that a Coinbase bankruptcy was a contingent event does not render Defendants' misleading statements and omissions about the Company's ability to safeguard its customers' assets forward-looking." (*Id.* at 8 (citing ECF No. 103-1 at 14).) Plaintiffs look to this Court's prior Opinion for further support: "Defendants repeatedly emphasized the security Coinbase offered . . . [they] knew they had not taken steps to protect the Company's retail customers' assets from potential bankruptcy risks." (*Id.* (quoting ECF

No. 84 at 22).) Plaintiffs argue the safe harbor does not apply to statements made in connection with an IPO, citing to *In re Ravisent Techs., Inc.*, No. 00-1014, 2004 WL 1563024, at *11 n.27 (E.D. Pa. July 13, 2004), to claim "the Bankruptcy Risk Statements published in Coinbase's Prospectus and Registration Statement issued just before the Direct Listing ([SAC] ¶¶ 258-60, 264) are not insulated by the safe harbor." (*Id.* at 9.) Plaintiffs further state they are not required to plead actual knowledge because the safe harbor should not apply. (*Id.* at 10 n.3.)

Regardless, Plaintiffs contend they have adequately alleged actual knowledge or recklessness. (*Id.* at 10.) They state the Court previously found Plaintiffs had adequately pled scienter, but Defendants now attempt to circumvent this by stating Plaintiffs have engaged in group pleading. (*Id.* (citing ECF Nos. 84 at 34–35; 103-1 at 16–20).) Plaintiffs provide various citations in support of their assertion that "Courts routinely reject arguments that a complaint improperly relies on group pleading where, as here, it 'identifie[s] particularly which statements are attributable to which Defendants and which scienter arguments are applicable to which Defendants.'" (*Id.* (citations omitted).) They claim "the SAC is replete with particularized allegations of scienter with respect to each Defendant." (*Id.*) Plaintiffs also argue "the SAC both (1) attributes specific misstatements and omissions to each defendant, and (2) pleads particularized facts for each Defendant's scienter," but still common allegations can apply to more than one Defendant and support liability findings for the same or similar reasons. (*Id.* at 11 (citing *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 559–60 (D.N.J. 2024).) Plaintiffs again cite to the prior Opinion where the Court held "Plaintiffs 'specifically alleged defendants' knowledge of facts or access to information contradicting their public statements,' because "Defendants submitted the SEC Comment Letter demonstrating [their] understanding that the commingling of customers'

assets could lead to adverse consequences in the event of bankruptcy." (*Id.* at 11–12 (quoting ECF No. 84 at 33) (citing SAC ¶¶ 105–09).)

Plaintiffs argue even though the "individual Defendants did not personally draft the letter[, this] does not defeat the reasonable inference that they were aware of it," because such Defendants served in executive positions, which leads to finding scienter.[2] (*Id.* at 12.) Plaintiffs assert "courts routinely look to a person's position in a given company to determine whether the person's statements were made with scienter. ***This is the approach in the Third Circuit***." (*Id.* (quoting *Wu*, 738 F. Supp. 3d at 562) (citing *Avaya*, 564 F.3d at 271).) Plaintiffs contend the Court had merited their allegations supporting such inferences "regarding the 'affirmative steps' Defendants took 'to "to mitigate the potential bankruptcy risks to institutional customers' assets,' including the revisions to the Company's Institutional User Agreements to mitigate the risk of loss." (*Id.* 12–13 (quoting ECF No. 84 at 33) (citing SAC ¶¶ 14–16, 112–21).) In this vein, Plaintiffs argue they do not need to have a smoking gun conclusively proving Defendants' roles in drafting or revising the User Agreement given "commonsense." (*Id.* at 13 (citations omitted).) They further state Defendants have "disregard[ed] Armstrong's admission following the May 10, 2022, corrective disclosure that the Company 'should have updated [its] retail terms sooner' to provide retail customers with 'the same protections' as institutional customers." (*Id.* at 13 (quoting ECF No. 84 at 33) (quoting SAC ¶¶ 121, 232).) Beyond this specific admission the Court acknowledged, Plaintiffs assert that "speaking 'explicitly and repeatedly' about asset safety" made it so "Defendants each held themselves out to investors as knowledgeable about Coinbase's ability

---

[2] The Court notes Plaintiffs' contention that "Defendants erroneously claim that the only misstatements attributed to Choi are the Proprietary Trading Statements. [ECF No. 103-1 at] 3 n.1. Choi made one of the Bankruptcy Risk Statements on December 7, 2021 when speaking on Coinbase's behalf at the Goldman Sachs US Financial Services Conference. *See* [SAC] ¶¶ 281–83." (ECF No. 117 at 12 n.5.)

to safeguard customer assets," and that "Defendants' statements themselves—many of them made in response to specific questions from analysts—'implied that they had first-hand knowledge' of the matter at issue." (*Id.* at 15 (quoting *In re PTC Therapeutics, Inc. Sec. Litig.*, No. 16-1124, 2017 WL 3705801, at *16-17 (D.N.J. Aug. 28, 2017).) Accordingly, "Defendants' repeated public statements about Coinbase's custodial safeguards, often in response to inquiring analysts, indicated that they were knowledgeable about the risks posed to Coinbase's customers' assets and actively involved in Coinbase's core business of custodying these assets." (*Id.* at 17 (citing *Avaya*, 564 F.3d at 269).)

Additionally, Plaintiffs state "this Court previously found, because 'asset security was vital to [Coinbase's] efforts in retaining retail clients' (ECF No. 84 at 33), a 'core operations' inference supports scienter for each Defendant for their statements regarding Coinbase's ability to safeguard assets." (*Id.* (citations omitted).) Plaintiffs identify various cases to bolster their argument that "even absent evidence of direct knowledge by an individual defendant, . . . statements made by an individual defendant may give rise to a strong inference of scienter when the statements touch on the company's core business." (*Id.* at 18 (citing *Avaya*, 564 F.3d at 268–69).) Plaintiffs claim Defendants have not refuted that nearly all revenue comes from transaction fees, that such fees were primarily generated by retail users, and that they had been told that Coinbase's "ability to maintain and grow such revenues was anchored by its ability to increase (and maintain) customers[.]" (*Id* at 18–19 (quoting SAC ¶ 380).) Moreover, Plaintiffs contend Defendants have wrongly "suggest[ed] that core operations allegations are insufficient to defeat a group-pleading argument." (*Id.* at 19 (citing *In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665, 2018 WL 6381882, at *14 (D.N.J. Dec. 6, 2018).) Lastly, Plaintiffs claim Defendants have ignored their allegations pertaining to Armstrong's financial motivations, "which the Court previously found []

'further support' scienter." (*Id.* at 19–20 (quoting ECF No. 84 at 34–35) (citing SAC ¶¶ 6, 81–82).)

In reply, Defendants argue the Bankruptcy Risk theory fails because Plaintiffs do not plead actual knowledge. (ECF No. 129 at 3.) They continue to claim the challenged statements are under the protection of the safe harbor. (*Id.*) Defendants state these statements are forward-looking despite Plaintiffs' assertions because "there was no *present* risk to disclose." (*Id.* at 4.) Defendants state "Plaintiffs have never alleged or argued that Coinbase was at any immediate risk of bankruptcy, let alone a material one that had to be disclosed." (*Id.*) Defendants also refute Plaintiffs' argument "that forward-looking statements fall outside the safe harbor whenever a plaintiff alleges 'omissions of existing facts or circumstances.'" (*Id.* at 5 (quoting ECF No. 117 at 6).) They claim safe-harbor eligibility is dependent on whether the challenged statement is forward-looking and not whether it omits present facts. (*Id.*). Defendants therefore state that, "[i]n other words, the safe harbor applies to forward-looking statements that are 'allegedly rendered misleading by . . . omission.'" (*Id.* at 5–6 (quoting *Golub v. Gigamon, Inc.*, 847 F. App'x 368, 373 (9th Cir. 2021).) Defendants further assert the safe harbor can apply to direct listings as Coinbase had undertaken since it was not an IPO. (*Id.* at 6–7 (citations omitted).)

Finally, Defendants argue that Plaintiffs have failed to plead that any specific Defendant had actual knowledge that any Bankruptcy Risk Statement was false or misleading. (*Id.* at 7.) Defendants claim Plaintiffs "rely heavily on Coinbase Custody's June 2019 letter to the SEC[,]" but they "do not allege that Haas, Armstrong, Choi, or Grewal had a role at Coinbase Custody as of June 2019." (*Id.* at 8.) Defendants assert Plaintiffs cannot impute knowledge to Defendants when they joined a company years after the event and that "[a] '[g]eneralized imputation of knowledge' based on a leadership role is insufficient under the PSLRA and Rule 9(b)." (*Id.*

(quoting *Patel v. Zoompass Holdings, Inc.*, No. 17-3831, 2018 WL 10154207, at *9 (D.N.J. Aug. 8, 2018); *In re Amarin Corp. PLC*, No. 13-6663, 2015 WL 3954190, at *12 (D.N.J. 2015).) Defendants contend that the Executive Roles of the Individual Defendants do not demonstrate actual knowledge of the differences in the User Agreements. (*Id.*). They state that for Plaintiffs' assertion to work, "the Individual Defendants had to have known the Institutional User Agreement's terms at the time of the challenged statements and known that the Retail User Agreement's terms would affect the outcome of a hypothetical bankruptcy. Pleading the Individual Defendants' job titles does not show 'aware[ness]' of these facts." (*Id.* at 9 (quoting ECF No. 117 at 13). They likewise argue Armstrong's May 2022 comments are not admissions, and that general statements about asset safety are not a substitute for specific knowledge about Bankruptcy Risk. (*Id.* at 9–10). Defendants lastly claim there were no suspicious stock sales and core operations allegations alone are insufficient to demonstrate scienter. (*Id.* at 11.)

The Court finds Plaintiffs have adequately alleged Defendants made the Bankruptcy Risk Statements with scienter. Previously, the Court determined that Plaintiffs had "alleged reckless and/or conscious behavior that supports a strong inference of scienter as plaintiffs 'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" (ECF No. 84 at 33 (quoting *Campbell Soup*, 145 F. Supp. 2d at 699 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000))).) Likewise, the Court determined Plaintiffs "established a strong inference of scienter by alleging 'defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.' (*Id.* (quoting *Campbell Soup*, 145 F. Supp. 2d at 699 (quoting *Novak*, 216 F.3d at 308)).) In making

such a determination, the Court relied upon the allegations and circumstantial evidence put forth

by the Plaintiffs, including allegations such as:

> (i) Defendants submitted the SEC Comment Letter demonstrating Defendants' understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy ([SAC] ¶¶ 13, 105–09); (ii) Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets ([SAC] ¶¶ 14–16, 112–20); [and] (iii) Armstrong eventually conceded that Defendants "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers ([SAC] ¶¶ 121, 232).

(*Id.*) The Court additionally credited the allegations pertaining to the retail fees making up a

substantial portion of Coinbase's revenue along with Defendants acknowledgment that asset

security was vital to their efforts in retaining retail clients. (*Id.* (citing *Avaya*, 564 F.3d at 268

(acknowledging that "since competition, pricing policies, and pricing concessions are 'core

matters' of central importance to [defendant] and its principal executives, a 'core operations

inference' supports scienter"); *In re Allergan Generic Drug Pricing Sec. Litig.*, No. 16-9449, 2019

WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (finding scienter was supported when challenged

statements were on a subject that constituted a "substantial portion" of the defendant's revenue);

*In re Cell Pathways, Inc.*, *Sec. Litig.*, No. 99-725, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000)

(finding "where the alleged fraud relates to the core business of the company, knowledge of the

fraud may be imputed to the individual defendants" (citation omitted)).)

Similarly, "[i]n the Asset Safety Disclosures, Coinbase and the Executive Defendants

candidly detailed the need to safeguard customers' assets." (*Id.* at 22 (citing SAC ¶¶ 96–97, 258–

59, 270, 273, 276, 284).) "By placing the safety of customers' assets 'in play,' through the

statements described above, Coinbase was 'bound to speak truthfully' and disclose the risks that

its retail customers' assets faced." (*Id.* (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d

Cir. 1992), *cert. denied*, 506 U.S. 934 (1992)) (citing *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe 'a favorable picture' of a material issue 'without including the details that would have presented a complete and less favorable one.'" (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018)))).) Moreover, the Court maintains the Statements in question are actionable and allege known or present risks as the time such Statements were made. As previously held, "the Bankruptcy Risk Statements are actionable on account of Defendants' failure to disclose the known uncertainty of the risks that bankruptcy posed to asset safety'[,]" which "rendered the Asset Safety Disclosures materially misleading." (ECF No. 84 at 23.) The Court previously determined "[i]n noting that hacking and lost keys were risks to safeguarding customers' assets, Coinbase and the Executive Defendants had a duty to provide the complete picture of known risks to customer' assets." (*Id.* at 22–23.) Likewise, "Defendants knew they had not taken steps to protect the Company's retail customers' assets from potential bankruptcy risks." (*Id.* at 22 (citing SAC ¶¶ 14–16, 112–20).)

The Court further held the allegations adequately asserted that "Coinbase and the Executive Defendants concealed their knowledge of the potential bankruptcy risks to safeguarding customers' assets." (*Id.* at 23.) By finding the allegations sufficiently demonstrated Defendants had known of the Bankruptcy Risk at the time of the Statements and that they failed to disclose such risk and even went as far as to conceal their knowledge of this issue, *i.e.* made knowing material misstatements or omissions, the logical conclusion of such determinations is that Defendants had actual knowledge that the statement was false or misleading. *See In re Aetna, Inc. Securities Litigation*, 617 F.3d 272, 285 (3d Cir. 2010); *but see In re PayPal Holdings Inc. Securities Litigation*, No. 22-5864, 2025 WL 325603, at *14, *19 (D.N.J. 2025) (finding the safe

harbor applied since plaintiffs had failed to show the defendants had actual knowledge of the improper websites, account manipulation, or fraudulent accounts when making the protected statements). As such, the safe harbor does not apply to the remaining Bankruptcy Risk Statements.

Moving beyond finding there is no applicable safe harbor protection, the Court agrees with Defendants' argument regarding group pleading, as Plaintiffs cannot rely on group pleading in order to make their allegations. *See Winer Family Trust v. Queen*, 503 F.3d 319, 335–337 (3d Cir. 2007) ("The group pleading doctrine is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations. Under the doctrine, where defendants are insiders with such control or involvement, their specific connection to fraudulent statements in group-published documents is unnecessary. . . . Accordingly, the group pleading doctrine allows a plaintiff to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud. . . . We agree and hold the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA.") This Court had previously found credible various allegations by Plaintiffs asserting statements made both at a group or company level as well as by individuals such as Armstrong or other Defendants. (*See* ECF No. 84 at 22–25 (citing SAC ¶¶ 14–16, 89, 96–97, 112–121, 232, 258–59, 270, 273, 276, 284).) To the extent any portion of the SAC does not provide specific allegations against a Defendant, in this case where Plaintiffs only attribute a Statement to a Defendant simply by virtue of a group-published document that they are attached to, such Statements must be dismissed. *See Winer*, 503 F.3d at 337; *City of Southfield Fire and Police Retirement System v. Hayward Holdings, Inc.*, No. 23-04146, 2024 WL 4370833, at *7 (D.N.J. 2024) ("Here, the CCC attributes misstatements to all Defendants without showing each

Defendant's involvement in those misstatements."); *see also In re Focus Financial Partners*, No. 23-1466, 2025 WL 961488, at *11 (D. Del. 2025) ("Here, Plaintiffs broadly say that Defendants – without specifying which ones – were 'privy to confidential information' that 'reflect[ed] the true facts' of the Merger process, 'well aware of Stone Point's unique position as a significant private equity investor,' and cognizant that 'it was a challenging market [in which] to execute a deal.' . . . They do not extrapolate, however, on specifically who knew these things, specifically what information they were privy to, or specifically why it impacted the alleged misstatements and omissions at issue here. Such '[g]eneralized imputations of knowledge,' made 'regardless of the defendants' positions within the company,' are the type of 'blanket allegations against numerous different defendants' that the Third Circuit has routinely found 'runs afoul of the particularity requirements of the PSLRA.'") (citations omitted).

However, where the SAC does not "rely solely on the group pleading doctrine because the [SAC] directly attribute[s] misstatements and omissions of material fact" to the Defendant, such Statements are allowed. *Winer*, 503 F.3d at 337, n.8; *see Barnard v. Verizon Communications, Inc.*, 451 F. App'x 80, 85 n.6 (3d Cir. 2011) ("[T]he complaint fails to ascribe *any* given statement to either defendant particularly." (emphasis added)); *In re Bio-Technology General Corp. Securities Litigation*, 380 F. Supp. 2d 574, 584 (D.N.J. 2005) ("Accordingly, this Court concludes that the PSLRA has abolished group pleading, and that *allegations premised solely on group pleading* fail to create a strong inference of scienter.") (emphasis added); *see also Toronto-Dominion Bank*, 2018 WL 6381882, at *14 ("Plaintiffs have offered particularized allegations as to motive and opportunity where appropriate in the FAC. Plaintiffs have made particular allegations as to scienter stemming from insider sales and SOX certifications. Nor are the other bases for scienter deficient. For example, the core operations doctrine is sufficiently pleaded.

Plaintiffs have alleged the importance of the Canadian retail segment and Individual Defendants position within TD Bank, which is enough to allow the core operations doctrine pleading to survive a motion to dismiss. The Court will not ignore any allegations on the basis of this argument.").

Accordingly, the portion of Defendants' 12(c) Motion for judgment on claims related to the Bankruptcy Risk Statements is **GRANTED** to the extent any Statement is attributed to a Defendant solely by group pleading, but **DENIED** elsewhere.[3]

### 2. Regulatory Statements

As to the second category of statements, Regulatory Disclosures, Defendants assert "Plaintiffs again rely on group pleading, tainting their attempt to show that any Defendant believed either that Coinbase was listing securities or that disagreeing publicly with the SEC was likely to deceive investors about the likelihood of an enforcement action." (ECF No. 103-1 at 12.) Defendants also argue "Plaintiffs cannot fall back on their motive allegations either, because the Direct Listing stock sales were made over a year before any of the Regulatory statements." (*Id.*) Defendants assert "[t]he Regulatory statements consist of a variety of statements in SEC filings, Tweets, blog posts, and interviews that were made by different Defendants from May 10, 2022, to March 22, 2023. Yet Plaintiffs' scienter allegations again lump speakers and statements together in advancing a single theory of fraud." (*Id.* at 21.) They argue Plaintiffs' allegations must fail under

---

[3] The Court will not go through the entire SAC and denote which Statements are explicitly dismissed or maintained. Neither party has provided the Court with a comprehensive list detailing which assertions are claimed to be impermissible group pleading versus particular assertions to a specific defendant. Given the outsized proportion of allegations in the SAC, the Court is providing a general ruling as to what has been dismissed just as it did in its prior Opinion for the Motion to Dismiss. (*See* ECF No. 84; *see also United States v. Hoffecker*, 530 F.3d 137, 162 (3d Cir. 2008) ("Judges are not like pigs, hunting for truffles buried in briefs." (alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

the deliberate recklessness standard for non-forward-looking statements and the actual-knowledge standard for the three forward-looking Regulatory Statements. (*Id.*)

For the deliberate recklessness standard, Defendants claim Plaintiffs have relied heavily on allegations of Defendants' knowledge of risk scores regarding Coinbase-listed securities but have not alleged any Defendant "knew about these scores, believed the scores indicated that an asset was a security, or thought the scores contradicted any of their statements." (*Id.* at 21–22.) They also state Plaintiffs have ignored the context of "each statement about the SEC's investigation occurred in direct response to the SEC's publicly expressed views," which "cuts *against* the inference that any Defendant somehow thought they were hiding the SEC's views." (*Id.* at 22.) They likewise argue Plaintiffs' use of stock sales to establish motive do not focus on any particular statement, and while the direct listing sales are alleged with particularity, such "sales occurred over a year *before* the Regulatory statements and so cannot have motivated them." (*Id.*)

Defendants assert the use of Crypto Rating Council ("CRC") fail because such allegations "rely entirely on group pleading and ignore the particular statements challenged and their context." (*Id.*) They claim:

> the risk-score allegations are copied and pasted from the SEC's complaint asserting that Coinbase was operating an unlawful securities exchange by allowing trading in thirteen particular assets. But none of the copied SEC allegations against Coinbase as a company tie any of the Individual Defendants to the founding of the CRC, its asset scoring framework, or particular CRC scores. No facts suggest that CEO Armstrong, CFO Haas, or CLO Grewal (who only joined Coinbase in 2020) knew whether Coinbase listed assets with a high CRC score—or that a high CRC score supposedly "signal[ed]" that an asset was likely a security.

(*Id.* at 23.) Defendants also contend "Plaintiffs do not explain how any Defendant could have been deliberately reckless as to whether each individual statement was either contradicted by a high CRC score or rendered misleading by the omission of a CRC score. No statement even talks about

CRC scores," rather it is Coinbase's own review process, which was reviewed by the SEC, that Defendants argue is referenced in several statements. (*Id.* at 23–24 (citing ECF No. 78-2, Statements 53–55; SAC ¶¶ 343, 346, 347).) Defendants assert Plaintiffs have not alleged Coinbase determined under its own SEC-reviewed process that any digital asset was a security but still listed it, nor do Plaintiffs claim any Individual Defendant "was aware of the details of that review process and whether it was ever breached." (*Id.* at 24.) Defendants likewise contend the statements about Coinbase's stalking product have not been alleged to be related to the CRC scores. (*Id.* (citing SAC ¶¶ 354, 359–60).) Defendants instead argue the Court should draw the inference that genuinely-held views regarding the SEC's view of securities laws were expressed since "[n]othing in the SAC suggests any Defendant, in making challenged statements about regulatory risks, staking and secondary market trading on Coinbase's platform, was deliberately concealing CRC scores." (*Id.*)

Defendants likewise assert Plaintiffs' reliance on allegations that Defendants were aware of the SEC's position on pertinent crypto asset listings being securities and the related risks of regulatory action fail because "[b]reaking down Plaintiffs' allegations by Defendant and by statement again dispels any inference that any Defendant made any challenged statement with an intent to deceive investors." (*Id.* at 25.) Defendants claim their statements "allegedly downplaying the risk of regulatory action consist of responses to the SEC's publicly stated views about crypto." (*Id.* at 25.) Moreover, Defendants refute any characterization that the Regulatory Statements in Coinbase's SEC filings concealed the risk of an enforcement action, because such statements acknowledged SEC actions against Coinbase "to date and warned of the risk of further enforcement in the future, including advising that the company had 'received investigative subpoenas and requests from the SEC' and that the 'outcomes' of that investigation 'remain[ed]

uncertain,' as did the 'potential impact, if any, on [Coinbase's] business or financial statements.'" (*Id.* at 27 (citing ECF No. 78-2, Statements 51, 52, 64; SAC ¶¶ 340, 341, 368).) Defendants argue this context is important as they actually provided investors with appropriate information that would be inconsistent with a state of mind going toward illicit actions since "Plaintiffs do not allege a single fact suggesting Armstrong or Haas (who signed the SEC filings) were attempting to conceal the extent of the SEC's views about crypto and its investigation of Coinbase—rather than publicly disagreeing on an issue that is indisputably novel and subject to different opinions." (*Id.* at 27–28). They likewise claim Plaintiffs have failed to provide any motive to hide such knowledge regarding an "imminent . . . and public . . . filing of the enforcement action" by the SEC. (*Id.* at 28.)

Further, on financial motivations, Defendants argue Plaintiffs' reliance on stock sales by several Defendants fails to support scienter here because the time of those sales were more than a year before the first Regulatory Statement in May 2022. (*Id.* (citing SAC ¶ 126).) Defendants claim a similar issue can be found with the allegations around Armstrong's option award package. (*Id.* at 29 (citing SAC ¶¶ 81–84).) Likewise, Defendants assert the Individual Exchange Act Defendants' stock sales were made pursuant to 10b5-1 trading plans, which should insulate them from having had any financial motivation to commit the alleged fraud. (*Id.*)

As for the actual-knowledge standard for the three challenged forward-looking Regulatory Statements, Defendants argue they are immunized from liability "unless [] Plaintiff[s] provide[] particular allegations showing the speaker had actual knowledge of its falsity. Yet Plaintiffs do not allege a single fact suggesting that Armstrong and Haas (who signed the SEC filings containing these statements) had actual knowledge the risk disclosures were false or misleading when made." (*Id.* at 30.) They state "Defendants were expressing strongly-held opinions about the legality of

Coinbase's platform and responding to a publicly aggressive SEC Enforcement Division—too aggressive, as the SEC now acknowledges" and so without the group-pled allegations, "there are no facts suggesting any Defendant had any reason to or did in fact believe they were misleading investors." (*Id.* at 30–31.) Defendants assert "Coinbase disclosed in its SEC filings the concrete steps the SEC had taken in its investigation [and] Coinbase also warned that it couldn't predict whether the SEC would actually sue Coinbase." (*Id.* at 31.)

In opposition, Plaintiffs claim Defendants are attempting to "relitigate this Court's holding that Plaintiffs adequately pled scienter for the Regulatory Statements, arguing for the second time in fourteen months that the SAC 'does not show the knowledge of any particular Defendant about any particular statement.'" (ECF No. 117 at 20 (quoting ECF No. 103 at 12).) They assert "Defendants have ***admitted*** their knowledge of many of the concealed facts." (*Id.* at 21.) They provide examples such as Coinbase's January 2023 statement that the SEC was shifting its focus back to an enforcement investigation and the company faced "an imminent enforcement action," and Armstrong's June 2023 interview discussing the SEC's tone and viewpoint on crypto assets other than Bitcoin being a security to demonstrate post-statement admissions that confirm scienter. (*Id.* at 21 (quoting SAC ¶¶ 151, 209, 378).) Plaintiffs argue that "[e]ven if Defendants had not directly admitted their knowledge, there is a strong inference that a company's highest-ranking executives—like Armstrong (CEO), Grewal (Chief Legal Officer/General Counsel), and Haas (CFO)—are kept informed about critical communications with its primary regulator." (*Id.* (citations omitted).) They further contend it would be implausible that such executives would be unaware of important meetings with the SEC, "particularly given that Company executives met with the SEC over 30 times between June 2022 and March 2023, and made over a dozen presentations to and had more than 27 phone calls with the SEC," as well as "Armstrong and

Grewal both admit[ting] that they participated in meetings with the SEC and publicly led the charge against the SEC's investigation." (*Id.* at 22 (citing SAC ¶¶ 378, 383–84).)

Plaintiffs also point to the Court's Opinion where it found they had sufficiently alleged "Defendants' knowledge or reckless disregard of the fact that Coinbase was listing assets that its own internal processes had flagged as 'likely securities.'" (*Id.* (quoting ECF No. 84 at 34).) Plaintiffs reemphasize "that in 2019, Coinbase co-founded the CRC for the purpose of 'creating a framework to consistently and objectively assess whether any given crypto asset has characteristics that make it more or less likely to be classified as a security under the U.S. federal securities laws.'" (*Id.* (quoting SAC ¶ 181).) Accordingly, Plaintiffs reassert Coinbase not only adopted the CRC framework that they helped develop but also made available on its platform crypto assets with high CRC risk scores in order to grow its business, "even where it recognized the crypto assets had the characteristics of securities." (*Id.* at 22–23 (quoting SAC ¶¶ 182–83, 379).) Plaintiffs contend "Defendants cannot seriously dispute their knowledge of these principal facts[,]" which implied first-hand knowledge of this matter. (*Id.* at 23 (quoting *PTC Therapeutics*, 2017 WL 3705801, at *17.) They argue by giving "unequivocal assurances that Coinbase was not listing securities on its platform—which served to downplay the likelihood of an SEC enforcement action—each Defendant explicitly referred to Coinbase's internal review process." (*Id.* (citing SAC ¶¶ 197, 343, 346–47, 359–60, 374).) As further support, they claim "[s]cienter is further bolstered by the fact that several of these statements were made in direct response to analyst questions focused on the SEC investigation." (*Id.* at 24 (citing SAC ¶¶ 352, 366).) Plaintiffs state these statements "'confirm they had intimate knowledge' of the SEC investigation and the assets under SEC scrutiny and 'were speaking as authoritative sources who possessed the information to support their statements.'" (*Id.* (quoting *SEB*, 351 F. Supp. 3d at 906).) In turn, they argue Defendants were at

a minimum deliberately reckless in making such repeated representations "to analysts and investors if they had not at least verified the results of their internal review process." (*Id.* (citing *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).)

Additionally, Plaintiffs cite to this Court's Opinion in arguing "Defendants' statements concerned a matter of the most central importance to Coinbase's business—whether it could legally list crypto assets on its platform." (*Id.* (citing ECF No. 84 at 33–34 (citing *Avaya*, 564 F.3d at 269); SAC ¶¶ 178–79, 380).) They claim "even absent evidence of direct knowledge, Defendants' statements give rise to a strong inference of scienter as they directly addressed the essential regulatory viability of the Company's core business." (*Id.* (citations omitted).) Plaintiffs assert this must be especially true here because the subject matter at issue dealt with critical matters directly within the purview of the individual Defendants. (*Id.* at 25.) Looking to Grewal and his knowledge as the CLO, Plaintiffs contend their "allegations establish that when Defendants downplayed the danger of SEC action and assured the market they were not listing securities, they had 'knowledge of facts or access to information contradicting their public statements.'" (*Id.* (quoting ECF No. 84 at 32–33).)

Moreover, Plaintiffs refute Defendants' characterization as to group pleading in making such allegations. (*Id.*) They claim Defendants citation to *Winer*, 503 F.3d at 319, fails because "'group pleading' is a narrow 'judicial presumption' that top corporate officers made statements in 'group-published' corporate documents, even in the absence of allegations that those officers made those statements." (*Id.* at 25–26 (quoting *Winer*, 503 F.3d at 335).) Plaintiffs therefore argue the doctrine does not apply here because the SAC "clearly lays out which Defendant made each statement." (*Id.* at 26 (citing SAC ¶¶ 340–74).) Likewise, Plaintiffs claim they have adequately alleged scienter for each individual Defendant and, contrary to Defendants' suggestion "that the

same facts cannot support scienter for multiple corporate executives, they are mistaken—courts find scienter adequately pled where allegations about corporate executives' knowledge are 'largely baked together.'" (*Id.* (quoting *Wu*, 738 F. Supp. 3d at 559–60).)

Plaintiffs also take issue with "Defendants['] attempt to insert their own version of the facts—arguing that CRC scores were merely 'third party "risk scores"' that were separate from Coinbase's 'own rigorous review process.'" (*Id.* (quoting ECF No. 103-1 at 23–24).) They state "it is inappropriate to grant a motion to dismiss based on a defendant's 'insistence on their version of contested issues in [the] case[,]'" and, at this stage, the Court must accept all factual allegations in the SAC as true and draw all inferences in their favor. (*Id.* at 26–27 (quoting ECF No. 84 at 2; *Cell Pathways*, 2000 WL 805221, at *8).) Plaintiffs therefore contend that, although Defendants have attempted to now distance themselves from the CRC framework, they have adequately alleged, with support from the allegations in the SEC Complaint, "that Coinbase (1) co-founded the CRC, (2) ultimately 'adopted' the CRC framework to determine whether an asset was likely a security, and (3) subsequently listed securities 'with high risk scores under the CRC framework,' 'even where it recognized the crypto assets had the characteristics of securities.'" (*Id.* at 27 (quoting SAC ¶¶ 182–83).)

Further, Plaintiffs claim Defendants cannot use the context of the SEC investigation or a desire to provide information about an investigation as a defense to finding scienter. (*Id.* at 28.) They point to the Court's prior Opinion where it held that by painting "'a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities,' Defendants 'had an obligation to include the details that would have presented a complete and less favorable one.'" (*Id.* (quoting ECF No. 84 at 28).) Plaintiffs argue Defendants have failed this obligation, instead deciding "to not disclose the fact

35

that the SEC had explicitly told them that all assets other than Bitcoin were securities, that an enforcement action was imminent, and that Coinbase's own internal process had determined that assets it listed were likely securities[,]" and which this Court held was sufficient for alleging scienter. (*Id.* (citing ECF No. 84 at 34).) Plaintiffs similarly dispute Defendants' argument that they did not act with scienter because the outcome of the SEC investigation was uncertain by pointing to the Court's explanation that "generic warnings of a risk do 'not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.'" (*Id.* at 28–29 (quoting ECF No. 84 at 29 n.19) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014)).) To this end, Plaintiffs contend "the fact that the SEC has recently taken a different view is irrelevant—those facts happened two years **after** Defendants' statements." (*Id.* at 29 (citations omitted).) They claim this Court cannot infer innocence by hindsight nor should it be swayed by "Defendants' argument that a court later ruled that there was room for difference of opinion on whether assets are securities fails for the same reason." (*Id.* at 30 (citations omitted).) Similarly, Plaintiffs argue the Court should not find a competing inference of Defendants expressing genuinely held views. (*Id.* (citation omitted).)

Moreover, Plaintiffs take issue with Defendants' arguments that financial motivations do not support scienter for the Regulatory Statements. (*Id.* at 31.) They claim "the Court already held that Plaintiffs' allegations regarding Defendants' stock sales and Armstrong's compensation package support scienter for the Regulatory Statements . . . . Defendants' attempts to relitigate that holding are meritless." (*Id.* (citing ECF No. 84 at 34–35).) Plaintiffs acknowledge Defendants' contention that many stock sales occurred before the Regulatory Statements but note Defendants do not "dispute that they continued to unload shares throughout the Class Period, while continuing to make alleged false and misleading statements that inflated Coinbase's stock price." (*Id.*)

Plaintiffs also state Defendants' attempt to rehash the argument that they are insulated from liability because of their Rule 10b5-1 Plans fails because "the Court previously considered this argument . . ., but still found that Plaintiffs' insider trading allegations supported scienter." (*Id.* at 31–32 (citing ECF No. 84 at 31, 34–35).) Further, Plaintiffs refute Defendants "claim that the SAC fails to allege the underlying facts necessary to establish that their sales were suspicious, including the profit made, amount of shares sold, portion of holdings sold, and profits relative to ordinary compensation." (*Id.* at 33 (citing ECF No. 103-1 at 29).) Plaintiffs assert "[t]o the contrary, the Court cited many of these exact allegations in previously holding that Defendants' sales supported scienter. (*Id.* (citing ECF No. 84 at 35; SAC ¶ 387).) Plaintiffs also emphasize Armstrong's compensation package further bolsters the scienter inference. (*Id.*)

Finally, Plaintiffs claim the Regulatory Statements are not forward-looking, but even if any were found to be, they have adequately pled actual knowledge. (*Id.*) Plaintiffs argue Defendants' assertion that three of the Statements are forward-looking and shielded by the safe harbor fails because each Regulatory Statement "is alleged to be misleading due to Defendants' omission of existing facts." (*Id.* 33–34 (citing SAC ¶¶ 342, 369).) Plaintiffs assert the Court already characterized these statements as omissions of present fact. (*Id.* at 34 (citing ECF No. 84 at 29–30).) To the extent there is any mixed present/future statement, Plaintiffs contend such statements still contain embedded false statements of present fact and argue "Courts have consistently held that the safe harbor cannot immunize a defendant for warning of risks and contingencies that have 'already come to pass.'" (*Id.* at 34–35 (citations omitted).)

In reply, Defendants assert Plaintiffs' Regulatory Theory fails because they have not pled defendant-by-defendant scienter. (ECF No. 129 at 12.) Defendants argue trading plans were entered into during the Class Period and long before the Regulatory Statements as well as

"Plaintiffs also fail to provide details about the timing, amount, and price of sales, which makes it impossible to assess scienter for a particular statement." (*Id.* (citing *Hertz*, 905 F.3d at 119).) Defendants also state a recycling of the SEC's Risk Score allegations is insufficient to prove scienter here. (*Id.*) They contend Plaintiffs' argument conflates Coinbase's own internal review process of crypto assets "with the framework developed by the CRC, which included "other crypto companies," and such "allegations about Coinbase's diligence process rely on assertions in the SEC's now-dismissed complaint." (*Id.* (quoting ECF No. 117 at 23; SAC ¶ 25); (citing SAC ¶ 182; ECF No. 117 at 22–23).)

Defendants likewise argue Plaintiffs have failed to plead that any specific Defendant had acted recklessly by not providing more detail regarding the SEC's investigation into the Company. (*Id.* at 13.) Defendants rely on "the SEC's dismissal of its case against Coinbase and new stance on crypto-asset regulation" as proving no scienter should be found. (*Id.* at 14.) Defendants finally contend Statements 51, 52, and 64 should be held as protected by the safe harbor because "the SEC's enforcement action had not 'already come to pass,' and no Individual Defendant actually knew contrary facts." (*Id.*)[4]

Similar to the Bankruptcy Risk Statements, the Court still finds Plaintiffs have adequately alleged Defendants made the Regulatory Statements with scienter where the allegations do not

---

[4] On September 22, 2025, Defendants filed a notice of supplementary authority, arguing that the Third Circuit's recent decision in *In re Walmart, Inc. Securities Litigation*, Civ. A. No. 24-1818, 2025 WL 2487776 (3d Cir. Aug. 29, 2025), supports Defendants' argument that Plaintiffs have not pleaded individual defendants' scienter of in relation to the Regulatory Statements. (ECF No. 133.) Specifically, Defendants argue *Walmart* supports their position on scienter in regard to the Regulatory Statements because (1) "as in *Walmart*, . . . Plaintiffs have not pleaded that any Individual Defendant 'was in a position to "predict the outcome of [the SEC's] investigation[]," or any resulting litigation' when any of the Regulatory Statements were made," and (2) "a defendant does 'enough by disclosing [a company's] involvement' in the investigation [sic] and

solely rely on group pleading. *See supra* Section IV.A.1. Much of Defendants' arguments here do appear to be a rehashing of their Motion to Dismiss. In the Court's prior opinion, Plaintiffs' assertions regarding the CRC, potential/imminent SEC enforcement action, and Defendant statements on the topic were acknowledged as sufficiently pled over Defendants' objections:

> Relevant to the Regulatory Statements, Plaintiffs allege: Coinbase co-founded the CRC ([SAC] ¶¶ 179–81); Defendants knew that Coinbase listed crypto assets which were likely securities (*id.* ¶¶ 25, 182–83, 379); Defendants knowingly downplayed the likelihood that the SEC would bring an enforcement action (*id.* ¶¶ 178, 342, 345, 357); the SEC told Defendants that "we think everything other than Bitcoin is a security" (*id.* ¶¶ 151, 378); Armstrong conceded Defendants were aware of the SEC's position by mid-2022 (*id.*

---

'indicating that its involvement could expose it to substantial penalties,'—as Defendants did in this case." (*Id.* at 1–2 (internal citations omitted).)

    Plaintiffs replied that the *Walmart* decision is inapplicable, because the court "explicitly d[id] not consider scienter in affirming [the district court's] dismissal." (ECF No. 134 at 1 (citing *In re Walmart*, Civ. A. No. 24-1818, 2025 WL 2487776, at *13).) The Court agrees with Plaintiffs and finds *Walmart* does not impact this Court's decision.

    In *Walmart*, the plaintiffs alleged that the company's statement on its 10-K—that it disclosed all "reasonably possible material liabilities"—was misleading because it knew of a federal prosecutor's intent to bring an indictment against it under the Controlled Substances Act. *Walmart*, 2025 WL 2487776 at *4. Plaintiffs there also alleged that "Walmart's failure to disclose the investigations violated ASC 450, a Generally Accepted Accounting Principles ('GAAP') rule mandating the disclosure of 'loss contingencies' in financial statements." *Id.*

    The Third Circuit affirmed the dismissal of the plaintiffs' complaint because it found no misrepresentation or omission of material fact. *Id.* at *1. The Court found that plaintiffs did not plausibly allege (1) the investigations constituted a "reasonably possible liability," or (2) the investigations were a "loss contingency" under ASC 450. *Id.* at *7, *10. Indeed, in reviewing the district court's decision, the Third Circuit found the district court "assessed only the first element [of Section 10(b)]"—a material misrepresentation or omission—and did not assess the others, such as scienter. *Id.* at *5. Therefore, the Third Circuit limited its review to material misrepresentation or omission. *Id.* that "explicitly d[id] not consider scienter in affirming [the district court's] dismissal." *Id.* at *13.

    Because it was decided on the issue of material misrepresentation or omission, *Walmart* is of limited value to Defendants, who are advancing an argument against Plaintiff's allegations of scienter. The Third Circuit held that Walmart's failure to disclose the investigation did not run afoul of ASC 450 or its own assurance that it had disclosed all "reasonably possible material liabilities." Defendants, on the other hand, are using *Walmart* against Plaintiffs' allegations of scienter, which is a different inquiry. To the extent Defendants were highlighting the alleged lack of allegations against "individual defendants," group pleading is addressed elsewhere in this opinion.

¶¶ 209, 378); despite Defendants knowledge of "an imminent enforcement action," they continued to minimize the risks of a regulatory action (*id.* ¶¶ 209–215).

(ECF No. 84 at 34.) With these allegations and any overlapping ones relied upon in the Bankruptcy Risk Statements having been accepted by the Court, it was previously determined Plaintiffs have adequately alleged Defendants' actions support a strong inference of scienter as "[P]laintiffs 'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'" (*Id.* at 33 (quoting *Campbell Soup*, 145 F. Supp. 2d at 699) (citing *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("When the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.").) The Court made clear that "Plaintiffs have adequately alleged that Defendants misleadingly described a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities." (*Id.* at 28.) It was similarly determined that the Regulatory Statements were misleading because, as alleged, Coinbase had "decided to list crypto assets from late 2019 through 2021, that its own review process determined had 'high "risk" scores,' and thus were likely to be securities," and further that "a subset of the statements were misleading in that Defendants concealed that the SEC had indicated to Defendants by mid-2022 that most crypto assets on Coinbase's platform were likely securities." (*Id.* at 29 (citing SAC ¶¶ 25, 151, 182–83, 378–79).) As such, the Court again holds "that Plaintiffs have adequately pled Defendants had a duty to disclose material facts related to the likelihood that the crypto assets listed were securities and, as a result, the likelihood that the SEC would file an enforcement action." (*Id.* (citing *Becton*, 620 F. Supp. 3d at 187 ("The fact that the FDA had not issued a formal warning letter . . . does not mean that the [defendant] was free to issue misleading statements that failed to recognize the serious, immediate, and known risks posed by a near-certain

enforcement action."); *Frater*, 996 F. Supp. 2d at 350).) Just as with the Bankruptcy Statement analysis of finding actual knowledge, Defendants' own admissions and this Court's findings of adequate assertions regarding presently known facts surrounding Coinbase's application of the CRC and interactions with the SEC mean no safe harbor should apply to any statement. *See supra* IV.A.1.

Likewise, the Court credited the allegations that Defendants were financially motivated to artificially inflate Coinbase's stock as further support for having found a strong inference of scienter. (*Id.*) The Court had specifically highlighted Armstrong's alleged financial motivations as support for finding Plaintiffs had sufficiently alleged the Bankruptcy risk and Regulatory Statements were made with scienter. (*Id.* at 34–35 (citing SAC ¶¶ 6, 81–84, 386).) In the same vein, the Court had determined that Executive Defendants selling over 1.6 million shares and netting gross proceeds over $600 million in the first two days after Coinbase's stock was listed added additional evidence for a finding of scienter. (*Id.* at 35 (citing SAC ¶ 125).)

However, as explained in Section IV.A.1, Defendants are correct that group pleading is impermissible. *See Winer*, 503 F.3d at 335–37. To this end, any Regulatory Statement that solely relies on group pleading to make the allegation against an Individual Defendant must be dismissed, but where Plaintiffs have appropriately provided defendant-by-defendant particularity, the claims must remain. Additionally, the Court agrees with Plaintiffs that the same facts can be used to support scienter for multiple corporate executives, however, such allegations must still designate the executives in question to not run afoul of group pleading. *See Wu*, 738 F. Supp. 3d at 559

("[T]he allegations as to the CEO's scienter and the CFO's scienter are largely baked together in this case.").

Accordingly, the portion of Defendants' 12(c) Motion for judgment on claims related to the Regulatory Statements is **GRANTED** to the extent Plaintiffs rely solely on group pleading to attribute the Regulatory Statement to a Defendant, but **DENIED** elsewise.

### 3.  Proprietary Trading Statements

For the final category of statements, Proprietary Trading, Defendants contend Plaintiffs rely on impermissible group pleading and cannot overcome any applicable safe harbor protection or actual knowledge requirement. (ECF No. 103-1 at 12.) Defendants reference their denied Motion for Reconsideration (ECF No. 89) and claim that, in addition to the Court's prior dismissal of Plaintiffs' Exchange Act claims based on Proprietary Trading statements, the Securities Act claims also must be dismissed due to "Plaintiffs' failure to plead contemporaneous falsity." (ECF No. 103-1 at 31–32.) They state the "Proprietary Trading statements were all made in March or April 2021. But Plaintiffs rely on a Wall Street Journal article that reports on a 'Risk Solutions group' created later in July 2021 and a single test trade in early 2022." (*Id.* at 31 (citing ECF No. 89-1 at 11.) Regardless of whether that trade constituted proprietary trading, Defendants claim "it occurred too late to make the Proprietary Trading statements contemporaneously false." (*Id.*)

More than just the asserted failure to plead contemporaneous falsity, Defendants argue "all but one of the Proprietary Trading statements are forward-looking and thus subject to the PSLRA's actual-knowledge requirement." (*Id.*) They contend statements describing Coinbase's plans for the future, such as "we do not plan to engage in regular trading of crypto assets" and "Coinbase 'may fulfill customer transactions using our own crypto assets,'" are forward-looking in addition to SEC filings expressly stating this. (*Id.* (quoting ECF No. 78-2, Statements 70, 77-80; SAC ¶¶ 473, 485–

88).) Likewise, Defendants claim "[a]nother statement (repeated twice in both [ECF No. 78-2,] Statements 69 and 76, [SAC] ¶¶ 471–72, 483–84), is likewise forward-looking insofar as Plaintiffs challenge it as misrepresenting Coinbase's intent to trade in the future." (*Id.* at 32–33.)

Defendants acknowledge the Court's acceptance of "Plaintiffs' disavowal of knowing misconduct in allowing the Securities Act claims to proceed on a negligence theory," but argue "the SAC has no particularized allegations showing any Defendant had actual knowledge that any Proprietary Trading statement was false or misleading." (*Id.* at 33.) They emphasize "[t]he SAC barely mentions any of the Director Defendants, all of whom are named in the Securities Act claims," and "[t]he closest that Plaintiffs come to alleging any Individual Defendant's involvement with the Proprietary Trading statements is their assertion that 'those in the highest levels of the Company—including Defendant Haas—had been involved in Coinbase Risk Solutions' creation.'" (*Id.* (quoting SAC ¶ 503).) With regard to this specific allegation, Defendants assert "nothing about *when* Haas allegedly learned anything about proprietary trading" is set forth, and, if the statement is deemed not forward-looking, "it cannot be false or misleading: Haas said on an Investor Day call on March 23, 2021, that, 'we do not proprietarily trade against our clients,'" since "the SAC does not allege any facts suggesting that any 'proprietary trading' was happening at the time—let alone that Haas knew about it." (*Id.*) Defendants further argue Plaintiffs' allegation of motive based on stock sales is insufficient to allege scienter. (*Id.*)

Finally, Defendants claim "[t]he only non-forward looking [sic] statement (repeated twice in Statements 71 and 81, [SAC] ¶¶ 471, 489), also fails" because the "Court recognized in

dismissing certain Bankruptcy Risk statements, a statement saying 'we built a culture that doesn't take shortcuts to try and make a quick buck' is inactionable puffery on its face." (*Id.* at 34.)

In opposition, Plaintiffs argue Defendants are attempting to rehash their assertions from their Motion for Reconsideration (ECF No. 89), and "[a]s set forth in Plaintiffs' opposition to that motion, these statements were false and misleading at the time they were made." (ECF No. 117 at 36 (citing ECF No. 103-1 at 31–32).) Plaintiffs also dispute "that all but one of these statements are forward-looking and protected by the PSLRA safe harbor because Plaintiffs fail to plead actual knowledge." (*Id.*). Instead, Plaintiffs assert "each of these statements was made in connection with Coinbase's direct listing such that the safe harbor does not apply." (*Id.*) Plaintiffs argue the challenged statements are those of existing fact, which means there is no safe harbor protection, and, if anything, are at best mixed present and future statements with the portion referring to the present not protected. (*Id.* at 36–37 (citing *Eros*, 2021 WL 1560728, at *7; *Avaya*, 564 F.3d at 255; SAC ¶¶ 471–73, 487).) Plaintiffs additionally argue "Defendants erroneously claim that two Proprietary Trading Statements are 'inactionable puffery.'" (*Id.* at 37 (quoting ECF No. 103-1 at 34).) Plaintiffs assert "statements emphasizing that 'we built a culture that doesn't take shortcuts to try and make a quick buck' were not immaterial puffery because they reassured investors that Coinbase would not trade crypto assets to turn a profit when, in actuality, the Company already intended to engage in for-profit proprietary trading." (*Id.* (quoting SAC ¶¶ 473, 489–91); (citing see *In re Enzymotec Sec. Litig.*, No. 14-5556, 2015 WL 8784065, at *1 (D.N.J. Dec. 15, 2015)).)

In reply, Defendants continue to argue the Proprietary Trading theory fails because of "Plaintiffs' failure to plead contemporaneous falsity required for dismissal of the Exchange Act Proprietary Trading claims," which they state "applies equally to the Securities Act claims, . . . as

well as arguments based on the safe harbor and puffery." (ECF No. 129 at 15 (citing ECF Nos. 89-1 at 9–13; 103-1 at 31–34).)

The Court previously held "Plaintiffs have not adequately pled that the Proprietary Trading Statements are material misstatements and omissions because the WSJ Article does not provide the sufficient level of detail required by the heightened pleading standard and does not indicate an independent investigative effort." (ECF No. 84 at 27.) As such, the Court dismissed any claims under Count I (Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5). (*Id.*) However, the Court found Plaintiffs had sufficiently alleged Section 11 violations (Count III) and specified it would be held to the liberal Rule 8 pleading standard. (*Id.* at 42–45.) In allowing these claims to proceed beyond the Motion to Dismiss stage, the Court noted the parties had not properly addressed "whether Plaintiffs' allegations that the Offering Materials omitted material facts as to Coinbase's involvement in proprietary trading of cryptocurrency on its own exchange adequately support the Securities Act Claims under the liberal pleading standard of Rule 8." (*Id.* at 45.) Through the present 12(c) Motion and the parties' prior briefing from the Motion to Reconsider, the Court has now been presented with more fulsome arguments to properly consider whether the Section 11 claims should remain.

The Court now finds Plaintiffs have failed to plead contemporaneous falsity as is required, and therefore Count III of the SAC, to the extent it is premised upon the Proprietary Trading Statements, must be dismissed. *See Castlerock Management Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 n.5 (D.N.J. 2000) ("This Court disagrees with Plaintiffs' contention that they need not plead contemporaneous facts when they bring their Section 11 claim under a negligence theory. To be sure, statements and facts can neither be fraudulently nor negligently omitted if they are unknown or unknowable at the time the Offering Documents came into effect and were

disseminated. Plaintiffs appear to confuse Fed. R. Civ. P. 9(b)'s particularity requirements, implicated in fraud actions, with the requirements of Section 11 itself, which by the plain statutory language require that the registration statement contain a material misstatement or omission 'when such part became effective.' 15 U.S.C. § 77k; *see also In re MobileMedia Sec. Litig.,* 28 F. Supp. 2d at 924 (D.N.J.1998). That liability cannot be imposed on the basis solely of subsequent events is no less the case when a plaintiff proceeds under a negligence theory."). "To state a claim under either Section 11 or Section 12, Plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *Castlerock*, 114 F. Supp. 2d at 323. (citing *Castlerock Management, Ltd. v. Ultralife Batteries, Inc.*, 68 F. Supp. 2d 480, 487–88 (D.N.J. 1999)).

As Defendants argued in their Motion for Reconsideration (ECF No. 89-1 at 11–13), when the Court dismissed Count I (Exchange Act Claims), to the extent it was premised upon the Proprietary Trading Statements, it specified:

> Defendants identified another basis that warrants dismissal of Plaintiffs' claims premised upon a subset of the Proprietary Trading Statements. Plaintiffs did not raise allegations as to when the plans for Coinbase's proprietary trading venture were supposedly made. Therefore, Plaintiffs did not adequately allege the point at which the Proprietary Trading Statements actually were false. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("[W]ithout contemporaneous falsity, there can be no fraud." (citation omitted).) As Defendants state, "a test trade made at some point in 2022 cannot show contemporaneous falsity for any statements that came before it including all of the 2021 statements." (ECF No. 78-1 at 24.)

(ECF No. 84 at 27 n.18.) In other words, the Court previously determined Plaintiffs failed to adequately allege contemporaneous falsity for the Proprietary Trading Statements. Accordingly, Defendants' 12(c) Motion for judgment on Count III, to the extent it is premised upon the

Proprietary Trading Statements, is **GRANTED**.

### 4. <u>Control Claims and Corporate Scienter</u>

Defendants argue "Plaintiffs' efforts to plead control claims . . . and corporate scienter . . . fall along with their failure to plead a primary violation and the scienter of any Individual Defendant." (ECF No. 103-1 at 12.) They claim "[w]ithout a primary violation, Plaintiffs' control-person claims under the Exchange Act and Securities Act also fail." (*Id.* at 34 (citing ECF No. 84 ("[F]or a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws . . . .") (quoting *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 280 (D.N.J. 2007))).) Defendants also assert the control-person claims "independently fail to the extent Plaintiffs seek to hold a *non-speaker* liable for the challenged statements" since such a claim "requires that the alleged control person be 'a culpable participant in the act or acts constituting the violation or cause of actions.'" (*Id.* (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013) (internal citation omitted); (citing ECF No. 84 at 49).) To this end, Defendants argue Plaintiffs have failed to allege "any of the *non-speakers* were culpable participants in making the challenged statements. In other words, Plaintiffs do not allege that anyone had 'actual knowledge of the fraudulent activity taking place' such that there is any reason to 'impute[]' knowledge to any Defendant." (*Id.* at 34–35 (quoting *Belmont*, 708 F.3d at 485 (internal citation omitted).) Defendants specify "[f]or Choi in particular, Plaintiffs do not allege that she made any of the remaining Bankruptcy Risk or Regulatory statements, nor is she plausibly alleged to have had ultimate authority over any other Defendant's statements." (*Id.* at 35.) They claim Plaintiffs have only made a boilerplate attempt at group pleading and so irrespective of the Court's decision, "any remaining claims should be dismissed as to Ms. Choi."

(*Id.* (citing SAC ¶ 49; *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)).)

As for corporate scienter, Defendants state "[g]iven that Plaintiffs have failed to allege scienter as to any of the Individual Defendants—or the spokesperson who made the statement alleged in Paragraph 348 or anyone else—they cannot allege scienter as to Coinbase." (*Id.* (citing *In re Hertz Glob. Holdings, Inc.*, 905 F.3d 106, 122 & n.6 (3d Cir. 2018).)

In opposition, Plaintiffs argue they have adequately alleged "the scienter of Armstrong, Haas, Choi, and Grewal, which is imputed to Coinbase." (ECF No. 117 at 36 (citing *Avaya*, 564 F.3d at 251–52; *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 630–31 (D.N.J. 2023)).) Plaintiffs likewise claim they have adequately alleged control-person claims. (*Id.* at 37.) They state Defendants "misstate[d] the applicable legal framework for control person claims and ignore[d] Plaintiffs' allegations." (*Id.*) Plaintiffs contend Defendants' reliance on *Belmont* in asserting they must plead actual knowledge of fraudulent activity for "a Section 20(a) claim is misplaced" because *Belmont* only addressed the standard at the summary judgment stage, "not on a motion to dismiss, and the Third Circuit expressly recognized that 'a difference of opinion has emerged among district courts of this Circuit as to the pleading requirements for a § 20(a) claim,' specifically, whether a plaintiff must allege culpable participation." (*Id.* at 37–38 (quoting *Belmont*, 708 F.3d 470, 484-85 & n.20).) Regardless, Plaintiffs argue they adequately alleged scienter for each individual Defendant, therefore sufficiently pleading culpable participation. (*Id.* at 38 (citing *Allergan*, 2019 WL 3562134, at *14).)

Plaintiffs additionally argue Defendants are mistaken in their assertion that the Section 20(a) claim against Choi must be dismissed. (*Id.*). They contend "Defendants misstate the applicable standard by insisting that a 'control person' must be a maker of a challenged statement

or have ultimate authority over such statement to be liable under Section 20(a), improperly relying on *Janus*[], which addressed Section 10(b) primary liability." (*Id.*) Accordingly, Plaintiffs argue they have "adequately allege[d] Choi's control over primary violator Coinbase" and "[n]othing more is required." (*Id.* (citing SAC ¶¶ 46, 385, 421–44).)

In reply, Defendants argue "without individualized scienter or wrongdoing, the corporate and control-person claims fail." (ECF No. 129 at 15.) Defendants claim Plaintiffs have not disputed that the corporate claim would be defeated if no Individual Defendant scienter is alleged and "Plaintiffs' failure to sufficiently allege culpable participation at the pleading stage requires dismissal of Plaintiffs' claims against non-speakers." (*Id.* (citations omitted).)

The Court previously held "Plaintiffs have sufficiently pled underlying violations of Section 10(b) against the Executive Defendants in Count I of the SAC premised upon the Bankruptcy Risk Statements and the Regulatory Statements" in upholding the control person liability claims (Count II). (ECF No. 84 at 39.) The Court again finds Plaintiffs to have sufficiently alleged Bankruptcy Risk Statements and Regulatory Statements to the extent they are not premised upon impermissible group pleading. *See supra* Sections IV.A.1; IV.A.2. Likewise, given that scienter has been upheld for Individual Defendants, corporate scienter can be imputed to Coinbase. Finally, as to the arguments regarding Choi, the Court finds numerous statements are asserted directly against her. (*See e.g.*, SAC ¶¶ 129, 141–42, 281– 82, 317–18, 350, 364, 387, 451.)

Accordingly, Defendants' 12(c) Motion regarding Count II of the SAC (violations of Section 20(a) of the Exchange Act) is **DENIED**.

**B.  Motion to Certify Order for Interlocutory Appeal**

Defendants argue "[t]his is the paradigmatic case in which interlocutory review is warranted" because:

> This Court's Order involved two important questions that are unsettled in the Third Circuit and have divided other courts: (1) whether the "traceability requirement" of Section 11 of the Securities Act of 1933 ("Securities Act") means, as it says, that a plaintiff must plead that he actually purchased and "held" registered shares by "trac[ing] the chain of title for [his] shares back to the . . . offering," or, as Plaintiffs urge, that the traceability requirement can be established via "statistical inference," *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1188, 1190, 1192 (9th Cir. 2025) (citation omitted); and (2) whether the same traceability requirement applies to Section 12(a)(2) of the Securities Act.

(ECF No. 122-1 at 1.) They contend "[a]ll three criteria for interlocutory review are easily satisfied." (*Id.* at 2.) Defendants state: (1) "the requirements for establishing traceability under Section 11 and Section 12(a)(2) are 'controlling question[s] of law,'" (2) "there is a 'substantial ground for difference of opinion' with the Order's holdings," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." (*Id.* at 2–4 (quoting 28 U.S.C. § 1292(b).)

Defendants claim "[t]he question of whether the traceability requirement applies to Section 12(a)(2) is undeniably a 'controlling question of law'—indeed, it is essentially the same controlling question on which the Ninth Circuit granted interlocutory review in *Slack* itself." (*Id.* at 14.) They state "[t]he statistical inference question is likewise a controlling question of law. The Fifth and Ninth Circuits have held that, as a matter of law, a plaintiff cannot rely on statistical inference to satisfy the traceability requirement." (*Id.* (citing *Slack III*, 127 F.4th at 1190 (citation omitted)).) Defendants further argue "there are substantial grounds for difference of opinion on the questions presented" because "courts within the Third Circuit have recognized, a conflict between the challenged decision and decisions of courts of appeals in other circuits necessarily

50

demonstrates a 'substantial ground for difference of opinion.'" (*Id.* at 18 (citations omitted).) Defendants assert in support of this second prong that "multiple three-judge panels across two courts of appeals have rejected the traceability theory that this Court accepted" and "[t]his split among district courts continues to grow." (*Id.* at 19, 23.) Defendants claim for the third prong that "an immediate appeal may materially advance the ultimate termination of this litigation" because "it could dispose of (1) most of Plaintiffs' claims and (2) most of the Defendants." (*Id.* at 25–26.) Finally, Defendants argue in the alternative that "this Court should exercise its inherent authority to reconsider the Order and dismiss Plaintiffs' Securities Act Claims." (*Id.* at 31.)

In opposition, Plaintiffs contend: (1) "Defendants cannot demonstrate a dispute over a controlling question of law" because "this litigation will proceed to trial regardless of the resolution of this dispute," (2) "Defendants cannot establish a substantial ground for difference of opinion" because "[t]he Third Circuit has squarely addressed the pleading requirements for traceability under Section 11, and Plaintiffs' allegations suffice under that controlling precedent," and (3) "Defendants cannot demonstrate that the narrow interlocutory review they seek here will materially advance the termination of the litigation" because, regardless "of the fate of the Securities Act claims, the lion's share of the case—the Exchange Act claims—will proceed, and the scope of merits discovery will not be meaningfully narrowed. Any additional discovery needed to establish traceability will be far eclipsed by the primary discovery on liability issues." (ECF No. 131 at 2–3.)

Plaintiffs argue "the Supreme Court has instructed that certification of a case for immediate appeal 'should be reserved for the infrequent harsh case.'" (*Id.* at 6 (quoting *Advanced Orthopedics & Sports Med. Inst. v. Int'l Union of Operating Eng'rs*, No. 19-5076, 2020 WL 4345301, at *4 (D.N.J. July 29, 2020) (quoting *Curtiss-Wright v. Gen. Elec. Co.*, 446 U.S. 1, 5 (1980))).) Plaintiffs

state "this Court has stated, '[m]ere disagreement with a district court's ruling is not a substantial ground for difference of opinion for Section 1292(b) purposes[,]'" and "a 'mixed question of law and fact' is 'inappropriate for interlocutory appeal.'" (*Id.* at 7 (quoting *Advanced Orthopedics*, 2020 WL 4345301, at *7; *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 16-6509, 2021 WL 1016111, at *4 (D.N.J. Mar. 17, 2021)).) To this end, Plaintiffs assert "the validity of statistical tracing does not present a 'controlling' question on Plaintiffs' Section 11 Claim." (*Id.*) They also claim the question in this case is not "essentially the same" as the one in which the Ninth Circuit dealt with because Plaintiffs here "plainly alleged that they purchased Coinbase stock 'pursuant and/or traceable to the Offering Materials' and alleged additional detail in the form of timing of purchase and purchase price, as well as a high statistical inference that the shares were registered." (*Id.* at 12 (quoting ECF No. 122-1 at 14; ECF No. 84 at 40–41).) Likewise, Plaintiffs argue "the traceability requirement does not present a 'controlling' question on Plaintiffs' Section 12(a)(2) Claim" because they "sufficiently alleged standing under Section 12(a)(2) by alleging that they purchased Coinbase shares pursuant and/or traceable to the Prospectus[,]" and "[b]ecause the Court 'sidestepped the choice of standard by holding that, even under the strictest pleading standard, Plaintiffs had adequately pled [standing] . . . . selecting among the [two] standards . . . is not controlling because it would not change the outcome of the Court's decision.'" (*Id.* at 13 (quoting ECF No. 84 at 47; *Cognizant*, 2021 WL 1016111, at *3).) Moreover, on the first prong, Plaintiffs claim Defendants have not satisfied the requirement because "the question of whether statistical tracing allegations, in conjunction with other tracing allegations, are sufficient to plead standing is a 'mixed question of law and fact' that 'indisputably involves the Court's application

of the law to the allegations in the [complaint]' and is therefore 'inappropriate for interlocutory appeal.'" (*Id.* (quoting *Cognizant*, 2021 WL 1016111, at *4).)

As for the second prong, Plaintiffs argue "[w]here, as here, there is controlling Third Circuit authority, this second requirement for § 1292(b) review is not met, and pointing to conflicting out-of-circuit authorities, as Defendants do, is not sufficient." (*Id.* at 15.) Plaintiffs point to *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006), as having already "addressed the Section 11 pleading requirements in the analogous context of a secondary offering, and found allegations regarding timing and purchase price sufficient to allege standing." (*Id.*) Plaintiffs assert "this Court's Order is consistent with *Suprema* and its progeny. Plaintiffs pled the dates and prices of their purchases which, standing alone, is sufficient under Third Circuit precedent to allege standing[,]" especially since "Plaintiffs' purchase price and timing and statistical tracing allegations amount to more than 'bare allegations of traceability' ([ECF No. 122-2] at 25) and set this case apart from Defendants' cited cases." (*Id.* at 16; *id.* n.8.) Plaintiffs further contend that "even without *Suprema*, conflicting out-of-circuit authority does not warrant review" because Defendants' relied upon cases are "insufficient to give rise to a substantial ground for difference of opinion." (*Id.* at 19 (citing *Freedom Med., Inc. v. Gillespie*, No. 06-3195, 2013 WL 3819366, at *5 (E.D. Pa. July 24, 2013).)

As for the third prong, Plaintiffs argue the litigation won't be materially advanced by certifying an interlocutory appeal because, contrary to Defendants' assertion that both the Securities Act and the Exchange Act Claims are implicated here, only the Securities Act Claims would be addressed. (*Id.* at 22.)  "Thus, because the '***litigation will go forward in any event***' and discovery will proceed on Plaintiffs' Exchange Act claims regardless of the fate of their Securities Act claims." (*Id.* at 23 (quoting *ADP, LLC v. Ultimate Software Grp., Inc.*, No. 16-8664, 2018 WL

1838003, at *5 (D.N.J. Apr. 17, 2018)).) In further support of this argument, Plaintiffs state "the Exchange Act claims for the Bankruptcy Risk Statements are predicated on the same underlying facts and theory of liability as the Securities Act claims and, therefore, will involve the same discovery such that dismissal of the Securities Act claims would not 'make discovery easier and less costly.'" (*Id.* (quoting *In re Direct Purchaser Insulin Pricing Litig.*, No. 20-3426, 2023 WL 3431213, at *5-6 (D.N.J. May 12, 2023)).) Further, Plaintiffs claim that although some "Individual Defendants could be dismissed if the Third Circuit were to find Plaintiffs' standing allegations insufficient" such a result "does not compel a different conclusion—the Exchange Act claims based on the Bankruptcy Statements and the Regulatory Statements will nevertheless go forward against Defendants Armstrong, Choi, Grewal, Haas, and Coinbase." (*Id.* at 24 (citing *Bush v. Adams*, 629 F. Supp. 2d 468, 475 (E.D. Pa. 2009)).) Likewise, Plaintiffs argue "although Defendants assert that 'resolving the Securities Act claims would obviate the need for any discovery into the issue of traceability[,]'" such additional discovery that would be "needed to prove traceability will be limited in comparison to the merits-based discovery that will proceed regardless of whether the Securities Act claims are certified for appellate review." (*Id.* at 25.) Finally, Plaintiffs assert "certification of the Order would not materially advance the termination of the litigation because Defendants will be free to challenge Plaintiffs' standing at summary judgment, on a full evidentiary record." (*Id.* at 26 (citing *Advanced Orthopedics*, 2020 WL 4345301, at *7).)

Additionally, Plaintiffs argue that Defendants' Interlocutory Motion is untimely because they filed it five months after the Order. Further, they contend reconsideration is not warranted because Defendants do not point to a change in controlling law nor any new evidence that merits reconsideration, and, "given that the Order is wholly consistent with Third Circuit law, there is no

'clear error of law.'" (*Id.* at 26–28 (quoting *Cherry v. Borough of Tuckerton*, No. 16-0505, 2016 WL 7030428, at *2).)

In reply, Defendants state "[s]ooner or later, . . . Plaintiffs will have to establish in the appellate courts that the traceability rule in the Ninth Circuit (and the Fifth Circuit) is wrong." (ECF No. 132 at 1.) They assert Plaintiffs' reliance and recitation of *Suprema* is incorrect as "[t]he *Suprema* plaintiffs relied on exactly the kind of allegation lacking here: that they purchased registered shares from specific underwriters—*i.e.*, entities that 'buy[] the[] new *registered* shares at a negotiated price and then sell[] them to investors at a higher price.'" (*Id.* at 2 (quoting *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 763 (2023) ("*Slack II*") (emphasis added).) Defendants reiterate that all three prongs have been met because "the Order implicates controlling questions of law," "there are substantial grounds for difference of opinion," and "an immediate appeal may materially advance the ultimate termination of this litigation." (*Id.* at 4, 9, 11.) Defendants also refute Plaintiffs' characterization of the Interlocutory Motion as being untimely, arguing there is no such requirement for seeking certification that Plaintiffs try to impose, and that "Defendants promptly—and appropriately—sought review after Slack III made clear that this exact case would be dismissed if it had been brought in the Ninth Circuit" should be positively understood as being "judicious in seeking review." (*Id.* at 14–15.)

The Court finds Defendants fail to meet the first prong required for certification of an order for interlocutory appeal because "[h]ere, the determination as to whether Plaintiffs' Complaint properly stated a claim involves an interplay between law and facts, and thus is within the discretion of this Court." *In re Schering-Plough Corp.*, No. 08-397, 2010 WL 2546054, at *4 (D.N.J. 2010) "An interlocutory appeal 'is not designed for review of factual matters but addresses itself to a "controlling question of law."'" *Krishanthi v. Rajaratnam*, No. 09-5395, 2011 WL

1885707, at *3 (D.N.J. 2011) (quoting *Link v. Mercedes–Benz of N. Amer., Inc.,* 550 F.2d 860, 863 (3d Cir. 1977). "Certification to appeal the interlocutory Order is inappropriate when the underlying order involve[s] mixed questions of fact and law because 'Section 1292(b) was not designed to secure appellate review of "factual matters" or of the application of the acknowledged law to the facts of a particular case, matters which are within the sound discretion of the trial court.'" *Partners II, L.P. v. Aronson,* No. 05-1983, 2006 WL 3782656, at *2 (D.N.J. Dec.22, 2006) (quoting *Hulmes* 936 F. Supp. at 210).

Plaintiffs' arguments on the first prong are salient because Defendants' contentions pertaining to the controlling law of this case for the Securities Acts Claims tie into the sufficiency of the allegations, *i.e.*, the adequacy of the facts (such as the purchase price, the percentage of registered shares in the market at the time of purchase, and the timing of the purchases) asserted regarding tracing the purchased shares to the misleading offering. Similar to what the court in *Cognizant* stated, which is quite instructive, "[i]n other words, it is the Court's *application* of the various legal standards which is controlling in this case, not the selection of a legal standard." 2021 WL 1016111, at *3; *see id.* ("But that issue—whether Plaintiffs failed to plead scienter against Cognizant with particularity—is not a purely legal question. Instead, that issue is '"necessarily intertwined" with the Court's understanding of the facts of the case.'") (quoting *Ebert v. Twp. of Hamilton*, No. 15-7331, 2020 WL 948774, at *3 (D.N.J. Feb. 27, 2020)).

As to the second requirement for an interlocutory appeal to be granted, "the potential for disagreement over the district court's application of law to the facts of a case is not 'the type of substantial difference of opinion contemplated for the purposes of § 1292.'" *Cognizant*, 2021 WL 1016111, at *4 (quoting *Kassin v. AR Res., Inc.*, No. 16-4171, 2017 WL 4316391, at *3 (D.N.J. Sept. 28, 2017); *see also Sabree v. Williams*, No. 06-2164, 2008 WL 4534073, at *2 (D.N.J. Oct.

2, 2008) ("Plaintiff's arguments demonstrate disagreement with the Court's decision and with the Court's application of the cases cited by Plaintiff . . . . In both her papers and during oral argument, Plaintiff advocated her position artfully and thoroughly. The fact that Plaintiff disagrees with the Court, however, does not demonstrate a substantial ground for difference of opinion within the meaning of § 1292(b)." (internal quotation marks omitted)). Defendants are essentially seeking precisely that by taking issue with this Court's application of the law to the facts of the case and how it has viewed the sufficiency of the allegations surrounding tracing to assert Section 11 and 12 Claims. Either way, this Court is guided by the principle that "interlocutory certification should be used sparingly and . . . the District Court should serve as a diligent gatekeeper to prevent premature and piecemeal appeals." *Bais Yaakov of Spring Valley, v. Peterson's Nelnet, LLC*, No. 11-0011, 2013 WL 663301, at *5 (D.N.J. Feb. 21, 2013); *see Bachowski*, 545 F.2d at 368 ("The certification procedure is not mandatory; indeed, permission to appeal is wholly within the discretion of the courts, even if the criteria are present.").

Accordingly, Defendants' Interlocutory Motion is **DENIED**.[5]

## C. REQUEST FOR LEAVE TO AMEND

In opposition to the 12(c) Motion, Plaintiffs have requested that if the Court should grant any portion of Defendants' 12(c) Motion, they be given leave to amend. (ECF No. 117 at 38–39 (citing *Biondolillo v. Roche Holding AG*, No. 17-4056, 2019 WL 1468140, at *5 (D.N.J. Apr. 3, 2019)).)

---

[5] Because the Court is denying the motion for failure to satisfy the first prong, the Court will not discuss the second requirement further or the third requirement at all—whether an interlocutory appeal is likely to advance the termination of this litigation. *See Cognizant*, 2021 WL 1016111, at *5 n.7 (citing *Krishanthi*, 2011 WL 1885707, at *3).

In their 12(c) Motion, Defendants preemptively argued Plaintiffs should not be granted leave to amend because they have already declined to amend. (ECF No. 103-1 at 36.) They state "Plaintiffs have already filed three amended complaints in this lawsuit" and "[t]he Court granted . . . leave to amend a fourth time . . . but Plaintiffs declined. (*Id.* (citing ECF No. 84 at 50).) Defendants contend the Court should not allow further amendment after Plaintiffs made the intentional choice to not file a Third Amended Complaint. (*Id.* (citing *In re AGS, Inc. Sec. Litig.*, No. 20-1209, 2024 WL 581124 (D. Nev. Feb. 12, 2024), *aff'd sub nom Oklahoma Police Pension & Ret. Sys. v. PlayAGS, Inc.*, No. 24-1701, 2025 WL 927296, at *5 (9th Cir. Mar. 27, 2025)).)

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings after obtaining the Court's leave or the written consent of its adversary. Under this liberal rule, the Court must "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Court finds, in light of this opinion (specifically, but not limited to, the decision regarding Proprietary Trading Statements) and for good cause appearing, justice requires the Court grant Plaintiffs' request to file a third amended complaint.

Accordingly, Plaintiffs request for leave to amend the SAC is **GRANTED**.

## V.    CONCLUSION

For the reasons set forth above, Defendants' 12(c) Motion (ECF No. 103) is **GRANTED IN PART** and **DENIED IN PART** as follows: The portions of Defendants' 12(c) Motion related to the Bankruptcy Risk Statements and the Regulatory Statements is **GRANTED** to the extent any Statement is attributed to a Defendant solely by group pleading, and Defendants' 12(c) Motion regarding Count III, to the extent it is premised upon the Proprietary Trading Statements, is **GRANTED**. The remaining portions of Defendants' 12(c) Motion (ECF No. 103) are **DENIED**.

Defendants' Interlocutory Motion (ECF No. 122) is **DENIED**, and Plaintiffs' request to file a Third Amended Complaint is **GRANTED**. An appropriate order follows.


Date: September 30, 2025                    */s/ Brian R. Martinotti*
                                           **HON. BRIAN R. MARTINOTTI**
                                           **UNITED STATES DISTRICT JUDGE**