**CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Matthew L. Mustokoff (*pro hac vice*)
Joshua A. Materese
Margaret E. Mazzeo
Dylan J. Isenberg
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

[*Additional counsel on signature page*]

*Counsel for Lead Plaintiff Sjunde AP-Fonden
and Additional Plaintiffs Ryan R. Firth and
Zvia Steinmetz, and Lead Counsel for the
Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE COINBASE GLOBAL, INC. SECURITIES LITIGATION | Case No. 2:22-cv-04915-BRM-LDW<br><br>Hon. Brian R. Martinotti<br>District Judge<br><br>Hon. Leda D. Wettre<br>Magistrate Judge<br><br>**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 2

II.   JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT
      CLAIMS .............................................................................................. 13

III.  PARTIES .............................................................................................. 14

      A.   Plaintiffs .................................................................................... 14

      B.   Defendants ................................................................................ 15

           1.   Corporate Defendant Coinbase ................................................ 15

           2.   Executive Defendants .............................................................. 16

IV.   FACTUAL ALLEGATIONS – EXCHANGE ACT CLAIMS ........................ 17

      A.   Coinbase's Operations, Customer Base, Custody Services, and
           Staking Program........................................................................ 17

      B.   Coinbase Generates Almost All of Its Revenue from User
           Transaction Fees, Driven by the Company's Largest Customer
           Base, Retail Users ..................................................................... 24

      C.   Defendants Announce They Will Take Coinbase Public Through a
           Direct Listing, Inviting Mainstream Investors into the Crypto
           Universe .................................................................................... 25

      D.   Armstrong Knew that by Taking Coinbase Public and Increasing
           the Stock Price, He Would Trigger a Lucrative, Multi-Billion
           Dollar Compensation Package, Substantially Multiplying His
           Wealth ....................................................................................... 27

      E.   Defendants Hold an Investor Day and Announce Positive
           Preliminary First Quarter Results, Anchored by Coinbase's
           Growing Transaction Fee Revenues .......................................... 29

      F.   Defendants Fail to Disclose that Customers' Crypto Assets Are
           Exposed to Loss if Coinbase Becomes Bankrupt—an Undisclosed
           Risk that Imperiled the Company's Revenues............................. 32

           1.   In the Years Prior to Coinbase's Direct Listing, the Risk of
                Digital Asset Loss Was a Major Problem for
                Cryptocurrency Exchanges ....................................................... 32

           2.   Defendants Mislead Coinbase Investors About the
                Company's Ability to Protect Digital Assets From Loss............ 34

           3.   Defendants Knew or Were Reckless to Disregard that
                There Was a Material, Undisclosed Risk that Jeopardized
                Coinbase's Revenues ............................................................... 37

a.    Defendants Investigated and Understood the Risks Arising from and Associated with Commingling Customer Assets....................................................38

b.    The Language in Coinbase's User Agreements Shows that Defendants Understood Customers Were Exposed to the Risk of Loss and that They Could Not Guarantee Asset Protection.........................................39

G.    Coinbase Goes Public, and Defendants Rake in Hundreds of Millions of Dollars by Dumping Shares in the Direct Listing............................44

H.    Following the Direct Listing, Defendants Continue to Conceal the Risk of Asset Loss and the Potential Impact on Coinbase's Revenues...........................................................................................47

I.    Defendants Mislead Investors About the Regulatory Risks Facing Coinbase.........................................................................................48

1.    The SEC Has Made Clear that the Majority of Crypto Assets Are Securities Under Existing Federal Securities Laws, and that Exchanges Listing Such Assets Must Register with the SEC..................................................49

2.    The SEC Ramps Up Enforcement Actions Against Crypto Companies for Listing Unregistered Crypto Asset Securities........................................................................57

3.    Coinbase Enables Customers to Trade and Stake Crypto Assets on its Trading Platform Despite Clear Signs that the Assets Are Securities ...................................................59

4.    Defendants Mislead Coinbase Investors About the Existence, Nature, and Extent of the Regulatory Risks Facing the Company ...............................................61

5.    Coinbase's Compliance Failures Contributed to the Undisclosed Bankruptcy and Regulatory Risks..........................79

J.    The Relevant Truth Concealed by Defendants' Material Misrepresentations and Omissions Is Revealed to Investors..............................80

V.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT – EXCHANGE ACT CLAIMS ...........................................................88

A.    Misrepresentations and Omissions Concerning the Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues.................................................................88

1.    April 14, 2021 – Prospectus...............................................88

2.    May 14, 2021 – Form 10-Q ...............................................91

3.    August 10, 2021 – Form 10-Q...........................................92

|   |   | 4. | November 10, 2021 – Form 10-Q | 93 |
|---|---|----|-------------------------------|----|
|   |   | 5. | November 30, 2021 – J.P. Morgan Crypto Economy Forum | 94 |
|   |   | 6. | December 7, 2021 – Goldman Sachs US Financial Services Conference | 95 |
|   |   | 7. | February 25, 2022 – 2021 Form 10-K | 96 |
|   |   | 8. | March 9, 2022 – Morgan Stanley Technology, Media, and Telecom Conference | 98 |
|   | B. | | Misrepresentations and Omissions Concerning Coinbase's Regulatory Risk and Whether Coinbase Listed Unregistered Securities | 98 |
|   |   | 1. | May 10, 2022 – Form 10-Q | 98 |
|   |   | 2. | July 21, 2022 – Coinbase's Blog and Twitter | 100 |
|   |   | 3. | July 25, 2022 – Twitter and Reuters | 101 |
|   |   | 4. | February 8, 2023 – Twitter | 102 |
|   |   | 5. | February 10, 2023 – Coinbase's Blog and Twitter | 104 |
|   |   | 6. | February 12, 2023 – Twitter | 105 |
|   |   | 7. | February 21, 2023 – Earnings Call | 106 |
|   |   | 8. | February 23, 2023 – 2022 Form 10-K | 106 |
|   |   | 9. | March 1, 2023 – Bloomberg Interview | 107 |
|   |   | 10. | March 22, 2023 – Coinbase's Blog | 108 |
| VI. | | | ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER – EXCHANGE ACT CLAIMS | 108 |
| VII. | | | LOSS CAUSATION – EXCHANGE ACT CLAIMS | 119 |
| VIII. | | | A PRESUMPTION OF RELIANCE APPLIES | 124 |
| IX. | | | THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY – EXCHANGE ACT CLAIMS | 125 |
| X. | | | CAUSES OF ACTION UNDER THE EXCHANGE ACT | 126 |
| XI. | | | JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS | 129 |
| XII. | | | PARTIES FOR PLAINTIFFS' SECURITIES ACT CLAIMS | 130 |
|   | A. | | Additional Defendant | 130 |
|   | B. | | Director Defendants | 130 |
| XIII. | | | FACTUAL ALLEGATIONS – SECURITIES ACT CLAIMS | 133 |
|   | A. | | Coinbase's Blockbuster Multi-Billion Dollar Direct Listing and Offering Materials | 134 |

B.   Defendants Fail to Disclose the Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues....................... 137

C.   The Offering Materials Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act ...................................................................................... 142

    1.   The Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues ........................................ 142

D.   The Offering Materials Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K ......................................... 144

    1.   Item 105 ......................................................................... 144

    2.   Item 303 ......................................................................... 144

E.   Events and Disclosures Following the Direct Listing ......................... 147

XIV.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY – SECURITIES ACT CLAIMS ................................ 148

XV.   CAUSES OF ACTION UNDER THE SECURITIES ACT ............................................ 149

XVI.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS ..................... 153

XVII.   PRAYER FOR RELIEF ........................................................................ 156

XVIII.   DEMAND FOR JURY TRIAL ............................................................... 157

Court-appointed Lead Plaintiff Sjunde AP-Fonden ("AP7") and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz (together with AP7, "Plaintiffs"), by and through their counsel, bring this federal securities class action on behalf of themselves and (i) a class consisting of all persons and entities that purchased or otherwise acquired the common stock of Coinbase Global, Inc. ("Coinbase" or the "Company"), from April 14, 2021 through June 5, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class"); and (ii) a subclass consisting of all persons and entities that purchased or otherwise acquired Coinbase common stock in or traceable to the Offering Materials (defined below) (the "Securities Act Subclass").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based on the ongoing investigation of their undersigned counsel ("Lead Counsel"). This investigation includes review and analysis of, among other things: (i) public filings made by Coinbase with the U.S. Securities & Exchange Commission (the "SEC"); (ii) transcripts of the Company's conference calls with analysts and investors; (iii) Coinbase presentations, press releases, and other public statements issued by Defendants; (iv) research reports issued by securities and financial analysts; (v) news, media, and social media reports and other publicly available information concerning Coinbase and Defendants; (vi) economic analyses of the movement and pricing of Coinbase's publicly traded common stock; and (vii) a civil complaint filed by the SEC on June 6, 2023, alleging violations of federal securities laws by Coinbase and related filings from the ensuing action. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    <u>INTRODUCTION</u>

1.      Since its launch in 2012, Coinbase has emerged as the most popular consumer-facing trading platform for cryptocurrency and other crypto assets in the United States. This securities fraud class action arises from Defendants' fraudulent misrepresentation and concealment of: (1) substantial, material risks associated with Coinbase's ability to safeguard its customers' crypto assets; and (2) the true regulatory risk facing Coinbase as the SEC actively investigated the Company for offering and selling, and making available for staking, securities in violation of the federal securities laws.

2.      Founded by Defendant Brian Armstrong, Coinbase's business is premised on an end-to-end financial infrastructure platform, which the Company refers to as its "flywheel"—a self-reinforcing loop in which the platform improves and expands with each new user and each new asset, in turn attracting more users and assets. Coinbase primarily makes money from the transaction fees paid by customers to buy and sell cryptocurrency assets, like Bitcoin and Ethereum, on the Company's platform, and by serving as a cryptocurrency custodian. As a custodian, Coinbase offers customers various options to store their assets with the Company.

3.      Prior to and throughout the Class Period, Coinbase's success hinged on its ability to increase and maintain its customer base, particularly its retail customers. For example, leading up to the Class Period, Coinbase generated over $3.4 billion in total revenue, nearly all of which was driven by transaction fees charged to retail customers. The Company boasted that it stored over $90 billion in customer crypto assets and had seen astronomical growth in its key user metrics, including the number of monthly retail customers using the Coinbase platform to invest, which nearly doubled from 2019 to 2020.

4.      Although Coinbase had been highly successful in its early years, cryptocurrency's reputation as an unregulated and precarious "Digital Wild West" remained a deterrent to many

would-be retail customers, hindering the Company's ability to grow its retail client base. Contributing to this notoriety, an increasing number of crypto exchanges were responsible for significant losses of customer assets through insolvency, hacking, and other events. And, unlike traditional bank or brokerage accounts, there is no governmental agency to backstop or guarantee crypto assets from such losses. This made Coinbase's ability to drive its retail transaction fees— the principal source of its revenue—even more contingent on gaining customers' trust.

5.      Against this backdrop, Armstrong announced his plan in January 2021 to take Coinbase public through a direct listing (the "Direct Listing"). An alternative to a traditional initial public offering ("IPO"), in a direct listing, the company's insiders or existing shareholders sell stock directly to the public.

6.      Armstrong was highly motivated to complete the Direct Listing. Just months earlier in August 2020, Coinbase's Board of Directors (the "Board") approved a lucrative compensation package for Armstrong that was contingent on a successful public offering. Thus, Armstrong knew that if he took Coinbase public, he could not only sell his own shares (ultimately to the tune of over $310 million during the Class Period), but would also lock down his compensation package with a potential value of over *$3.7 billion*.

7.      Market commentators were excited by Coinbase's announcement because it gave investors an opportunity to wade into the world of crypto. The Hustle, a popular business and technology news journal, described Coinbase as "not just an exchange, but a whole crypto ecosystem to buy, store, and use crypto assets safely," and emphasized that the Company offers a service "where customers can safely store their cryptocurrencies."

8.      The Class Period begins on April 14, 2021. That day, Coinbase made history when it became the first cryptocurrency company in the world to go public. Listed on the Nasdaq,

Coinbase's Direct Listing opened at $381 per share—over $100 above its set reference price—with its valuation soaring as high as $112 billion that day. The Executive Defendants (defined in ¶¶ 40-44) and other Coinbase insiders sold, collectively, over ***$5 billion*** in Coinbase common stock through the Direct Listing.

9.      At all times, Defendants knew that the stability and security of Coinbase's transaction fee revenues was an "issue that a lot of investors have been focused on," as CNBC commented on the first day of the Class Period. To that end, Defendants made numerous representations about Coinbase's ability to generate revenue and the attendant risks to its business in the Registration Statement and Prospectus (defined below; collectively, the "Offering Materials") filed contemporaneously with the Direct Listing.

10.     Front and center was Defendants' generalized warning to investors that "***[o]ur failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***."[1] Defendants expanded on this warning by identifying two specific events or circumstances that could result in the loss of customer assets and adversely impact the Company's business, operating results, and financial condition: (i) if Coinbase's trading platform was hacked; or (ii) if Coinbase lost the "private keys" necessary to access its customers' crypto assets. Following this warning, Defendants assured investors that customer assets were, in fact, adequately protected from loss. These and similar representations were repeated by Defendants to analysts, and in every quarterly and annual report Coinbase filed with the SEC during the Class Period.

11.     In truth, Defendants' representations were materially false or misleading because they failed to disclose a substantial, material risk that imperiled Coinbase's revenues.

---

[1]      All emphasis herein is added unless otherwise noted.

Unbeknownst to investors, customers' crypto assets were also exposed to loss in the event that Coinbase filed for bankruptcy. In such an event, the crypto assets held in Coinbase's custody on behalf of its customers could be considered the property of the Company's bankruptcy estate—with Coinbase customers left treated as general unsecured creditors, the last category of creditors to recover owed monies (if at all).

12.    Defendants Armstrong, Alesia Haas (Coinbase's Chief Financial Officer), and Emilie Choi (Coinbase's Chief Operating Officer) knew of, or at a minimum were reckless to disregard, this significant uncertainty surrounding the legal treatment of customer assets and the material risk to Coinbase's financial position (in particular, its transaction fee revenues) that flowed from it. As the Company would later admit on May 10, 2022, after belatedly disclosing this material risk to investors, Coinbase's inability to protect its customers' crypto assets from loss if it went bankrupt made it highly probable that, if disclosed, customers would find "***custodial services more risky and less attractive***," resulting in a "***discontinuation or reduction in use of [the Company's] platform and products by existing customers***."

13.    Indeed, well before the Class Period, Armstrong, Haas, and Choi, in connection with Coinbase's institutional business (Coinbase Custody), specifically investigated whether custodially-held crypto assets would be considered part of Coinbase's bankruptcy estate in the event of insolvency. Armstrong, Haas, and Choi managed or served as Directors for Coinbase Custody. This investigation and a comment letter submitted to the SEC following the investigation demonstrate that Defendants Armstrong, Haas, and Choi understood this uncertainty and the material risks it posed to the Company's investors, but did not disclose these risks until May 2022.

14.    Defendants Armstrong, Haas, and Choi also took affirmative steps that further evidence their knowledge of the uncertainty of the bankruptcy treatment of customers' crypto

assets, and of the substantial risk of loss, seizure, or forfeiture of those assets. For example, Armstrong, Haas, and Choi knew that Coinbase took specific actions to mitigate adverse bankruptcy treatment of its institutional customers' crypto assets through the contractual language in the Company's user agreements with institutional customers. These agreements included provisions invoking certain state law protections over customer assets and expressly agreed not to commingle those assets—a method of storing assets that renders them highly susceptible to being treated as the exchange's assets (as opposed to the customers' assets) in the event of a bankruptcy.

15.     However, Armstrong, Haas, and Choi knew that Coinbase did not take any such steps to protect Coinbase's retail customers, who comprised over 95% of its transaction fee revenues. For example, Coinbase *did* commingle the assets of its retail customers, but still assured these customers (falsely) in their respective user agreements that they maintained "ownership" and "control" over their assets.

16.     Defendant Armstrong would later ***admit*** in a statement on Twitter (on May 10, 2022) that Coinbase "***should have updated our retail terms sooner***" to provide its retail customers with "the same protections" as the Company's institutional customers—thus demonstrating his and the Company's knowledge of the undisclosed risk posed by a bankruptcy. Armstrong further admitted that he and Coinbase knew that the purported "legal protections" included in the institutional user agreements "***have not been tested in court for crypto assets***," and, as a result, the Company could not fully and sincerely protect customer assets. As Armstrong, Haas, and Choi knew, no court had overseen a U.S. bankruptcy of a cryptocurrency exchange, meaning it was entirely possible that, according to Armstrong, "***a court would decide to consider customer assets as part of the company in bankruptcy proceedings***." Still, Defendants remained silent through most of the Class Period—never disclosing this substantial risk.

17.    All the while, Armstrong took full advantage of Coinbase's artificially inflated stock price. By July 2021, Armstrong successfully maintained the Company's stock price for long enough to trigger nearly ***$700 million*** in performance-based stock options under his compensation plan.

18.    During this same period of time, Defendants Coinbase, Armstrong, and Paul Grewal, Coinbase's Chief Legal Officer, continually misled investors about an existential threat looming over the Company's U.S. business, which accounted for the lion's share of Coinbase's revenue (approximately 84% in 2022). Specifically, Coinbase, Armstrong, and Grewal repeatedly misled the market about the true scope of Coinbase's then-existing regulatory risk, and their ability to manage and mitigate that risk.

19.    At all times, Coinbase was subject to laws and regulations at both the federal and state level, including the federal securities laws. Prior to the Direct Listing (and continuing, unabated, throughout the Class Period), the SEC was clear that many digital assets in the marketplace were securities under existing federal law. The SEC also left no doubt that the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*") and its progeny set forth the relevant test for assessing whether a crypto asset was subject to regulation under such laws. Through these repeated assertions, the SEC's message was clear: register with the SEC, or do not allow or offer crypto-based securities on your trading platform.

20.    Given the substantial number of digital assets Coinbase made available on its trading platform, and its increased focus on offering "staking"[2] and its "Coinbase Wallet" product

---

[2]    A "staking program" is one that allows crypto owners to earn financial returns through Coinbase's managerial efforts with respect to certain blockchain protocols. Digital asset owners agree to lock up their crypto asset holdings with Coinbase in order to obtain a reward or earn interest, similar to a certificate of deposit (or "CD"). Through Coinbase's staking program, crypto owners transfer their assets to Coinbase which pools and subsequently "stakes" the assets for

(described below), the Company's susceptibility to adverse regulatory action grew exponentially throughout the Class Period. Fully aware that an SEC enforcement action could derail Coinbase's critical U.S. business, Coinbase, Armstrong, and Grewal falsely assured investors that Coinbase was on the right side of the law, in compliance with existing federal securities laws and guidance, and positively engaged with regulators. For example, for years, Armstrong and Grewal told investors that before making a crypto asset available for trading, Coinbase analyzed the asset under a framework based on *Howey*, and that it never added crypto asset securities to its platform.

21.     In stark contrast to the public message of transparency and compliance that Coinbase, Armstrong, and Grewal painted, when the SEC began to investigate Coinbase for listing securities and potential violations of the federal securities laws in May 2022, they concealed this from investors. And when the market first learned of the SEC's investigation months later—and of its related charges for insider trading against a Coinbase employee— Armstrong and Grewal denied any wrongdoing. Instead, Armstrong and Grewal falsely assured investors that "***Coinbase does not list securities***" and misrepresented that the SEC had blessed Coinbase's framework for making such determinations.

22.     In truth, there were numerous clear indicators that the crypto assets Coinbase made available on its trading platform, and offered and sold to customers, were securities. As revealed by the SEC's extensive investigation into Coinbase and subsequent civil complaint, from late 2019 through 2021, Coinbase added to its platform numerous crypto assets with high "risk" scores under the CRC framework it had adopted. CRC refers to the Crypto Rating Council (the "CRC")—a group that Coinbase and other crypto companies founded to purportedly develop a framework for

---

rewards. The Company takes a commission based on the rewards a customer receives, generally between 15% and 35%.

identifying which crypto assets were securities under existing federal law, and thus required registration with the SEC. Under the CRC framework, each crypto asset was assigned a score ranging from 1 to 5, with a score of 5 meaning than an "asset has many characteristics strongly consistent with treatment as a security." Before making such securities available on its platform, Coinbase was required, but failed, to register with the SEC. Instead, the Company made a brazen business decision to unlawfully list these assets on the platform in order to turbo-boost revenues. The SEC's investigation also revealed that Coinbase actively advised issuers of crypto assets on how to avoid treatment as a security under the Company's framework and the applicable *Howey* analysis.

23.    Well aware of the SEC's ramped-up investigation and the material risks it posed to Coinbase's business—and with investors none the wiser—Armstrong and Grewal continued to deny that Coinbase listed or sold securities on its platform. At the same time, Armstrong and Grewal feigned ignorance regarding the extent of the SEC's pursuit, seeking to position Coinbase as an upstanding corporate citizen operating in a self-styled regulatory wasteland facing the crypto industry. Armstrong and Grewal learned, by no later than January 2023, that the SEC's investigation was in the enforcement phase following months of meetings aimed at resolving the probe, still they continued to fraudulently downplay the true nature and extent of the material risks that Coinbase was staring down. For example, when the SEC shut down a rival's yield program (i.e., staking program) on the basis that it violated the federal securities laws, Grewal claimed that Coinbase's program was "fundamentally different," but concealed from concerned investors that the SEC was, in fact, specifically focused on Coinbase's staking program in an enforcement investigation.

24.    Given these facts, Coinbase's, Armstrong's, and Grewal's public statements—

including their consistent denials that Coinbase listed or made available crypto securities—were materially misleading. These statements gave investors the false impression that Coinbase's staking program remained outside the crosshairs of the SEC, and falsely minimized the scope of the regulatory risks that the Company faced. By repeatedly electing to promote the very digital assets, products, and programs at the heart of the SEC's investigation, and speak on topics directly impacted by this investigation, Coinbase, Armstrong, and Grewal had a duty to speak accurately and completely. Rather than comply with their disclosure obligations, Coinbase, Armstrong, and Grewal falsely minimized the regulatory risk Coinbase faced and recklessly gambled that the SEC would lose interest, or turn its focus elsewhere.

25.    Compounding Defendants' misleading statements to investors, throughout the Class Period, Coinbase was also engaged in a pattern of reckless misconduct that led to rampant money laundering by users of its exchange platform—misconduct that augmented the bankruptcy and regulatory risks facing the Company. An investigation by the New York State Department of Financial Services (the "NYDFS") revealed that Coinbase had repeatedly failed to comply with the Bank Secrecy Act of 1970 (the "Bank Secrecy Act"), 31 U.S.C. §§ 5311-5336, 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-19600, a federal statute enacted to combat money laundering, and related anti-money laundering laws and regulations, at the same time that it was touting the security of its platform and falsely downplaying the risks to the Company's investors. As noted in a consent order dated January 4, 2023 (the "Consent Order"), Coinbase failed to implement compliance systems to detect suspicious trading activity on the exchange, resulting in a colossal backlog of over 100,000 unreviewed transaction monitoring alerts, and failed to conduct due diligence for all of its newly onboarded customers, including known bad actors. The NYDFS found that "Coinbase's compliance system failed to keep up with the dramatic and unexpected growth of its

business" and, by the end of 2021, "was overwhelmed[] with a substantial backlog of unreviewed transaction monitoring alerts ["TMS alerts"], exposing its platform to risk of exploitation by criminals and other bad actors." The NYDFS further noted that Coinbase's reckless compliance policies led to the ***theft of more than $150 million*** from a single customer account in the spring of 2021 and posed a threat to the financial system. To settle the NYDFS's civil charges, Coinbase agreed to a ***$100 million*** settlement—believed to be one of the largest regulatory fines levied on a cryptocurrency company to date.

26.    The truth concealed by Defendants' material misrepresentations and omissions was revealed to investors in a series of disclosures beginning on May 10, 2022. On that day, Coinbase disclosed for the first time, the risk that it had been acutely aware of throughout the Class Period: that "***the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors***." Coinbase further admitted that "this may result in customers finding our custodial services ***more risky and less attractive*** and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could ***adversely impact our business, operating results, and financial condition***." Later that day, Armstrong admitted that Coinbase "should have updated our retail terms sooner," and that even those self-professed "legal protections have not been tested in court for crypto assets." On this news, Coinbase common stock dropped more than 26%, or $19.27 per share.

27.    Analyst and market commentators reacted negatively. As The Financial Times reported, "there are a couple of lines in [Coinbase's] latest 10-Q filing about its responsibilities to safeguard customer assets that really caught our eye," and that "should Coinbase go bankrupt then customers may lose their money they'd entrusted to the exchange for safekeeping." Other analysts

echoed the same uneasiness, with Piper Sandler stating that "investors could be concerned about these new risk disclosures and the safety of their funds," and New Constructs reporting that "[t]he fear of bankruptcy proceedings could drive clients to cash out their investments as quickly as possible."

28.    Then, on July 25, 2022, after the market closed, Bloomberg published an article, *Coinbase Faces SEC Probe on Crypto Listings; Shares Tumble*, which revealed that the SEC was investigating Coinbase's activities as an unregistered exchange. Bloomberg reported that the SEC was looking into whether Coinbase had allowed "Americans [to] trade digital assets that should have been registered as securities," noting that the "[SEC's] scrutiny of Coinbase has increased since the platform expanded the number of tokens in which it offers trading." On this news, the price of Coinbase common stock declined $14.14 per share, or approximately 21%, from a close of $67.07 per share on July 25, 2022, to close at $52.93 per share on July 26, 2022.

29.    Following these damaging revelations, after the market close on March 22, 2023, Coinbase disclosed that it had received a Wells Notice from the SEC earlier that day for potential securities fraud violations (the "Wells Notice"). As revealed that day, the potential charges arose from the Company's spot market, staking service Coinbase Earn, Coinbase Prime, and Coinbase Wallet. The same day, Coinbase disclosed that "[t]he Wells notice comes out of the investigation that we disclosed last summer," with Grewal admitting that he and other Coinbase representatives "met with the SEC more than 30 times over nine months," that Coinbase had produced documents and witnesses to the SEC, and that in January 2023, the SEC had "told us they would be shifting back to an enforcement investigation." As later described by Coinbase, "[d]iscussions were *over* [as of January 2023]" and, following the receipt of the Wells Notice, Defendants knew they were

"[f]aced with an imminent enforcement action." On this news, the price of Coinbase common stock tumbled $10.84 per share, or approximately 14%.

30.    Just over two months later, before the market opened on June 6, 2023, the SEC filed a 101-page complaint against Coinbase in the U.S. District Court for the Southern District of New York (the "SEC Complaint") for violations of the federal securities laws. The SEC alleged that Coinbase had made available on its platform crypto asset securities but failed to register "with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets." The SEC Complaint detailed Coinbase's conduct in "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets." The SEC sought civil money penalties and an order requiring Coinbase to disgorge all ill-gotten gains resulting from its violations of the Exchange Act and the Securities Act. On this news, the Company's stock price plummeted more than 19% during pre-market trading. After closing at $58.71 on June 5, Coinbase's stock opened at just $47.10 on June 6, and ultimately closed at $51.61 on June 6.

31.    This action seeks to compensate Coinbase's shareholders for their losses that resulted from the revelation of Defendants' misleading conduct.

## II.    JURISDICTION AND VENUE FOR PLAINTIFFS' EXCHANGE ACT CLAIMS

32.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (collectively, the "Exchange Act Claims").

33.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

34.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because a substantial number of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false or misleading information, occurred in this District.

35.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.    Plaintiffs

36.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $100 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired Coinbase common stock at artificially inflated prices during the Class Period, including common stock pursuant and/or traceable to the Offering Materials (defined in ¶ 74 below), and suffered damages as a result of the violations of the federal securities laws alleged herein. AP7's Class Period purchases include two purchases totaling 33,696 shares of Coinbase common stock on November 30, 2021 pursuant and/or traceable to the Offering Materials. Based on information provided in the Prospectus and in Coinbase's SEC filings, as of November 2, 2021, 114.9 million of the 155.2 million shares of Coinbase's common stock outstanding, or approximately 74%, were registered.

37.     Additional Plaintiff Ryan R. Firth ("Firth") is a resident of Texas. As set forth in the certification attached hereto as Exhibit B, Firth purchased or otherwise acquired Coinbase common stock at artificially inflated prices during the Class Period, including common stock pursuant and/or traceable to the Offering Materials (defined in ¶ 74 below), and suffered damages

14

as a result of the violations of the federal securities laws alleged herein. Firth's Class Period purchases include a purchase of 100 shares of Coinbase common stock at a price of $381 per share on April 14, 2021 pursuant and/or traceable to the Offering Materials. Based on information provided in the Prospectus, at the time of Firth's April 14, 2021 purchase of 100 shares of Coinbase stock, 114.9 million of the 130.7 million shares of Coinbase's common stock outstanding, or approximately 88%, were registered.

38.    Additional Plaintiff Zvia Steinmetz ("Steinmetz") is a resident of New York. As set forth in the certification attached hereto as Exhibit C, Steinmetz purchased or otherwise acquired Coinbase common stock at artificially inflated prices during the Class Period, including common stock pursuant and/or traceable to the Offering Materials (defined in ¶ 74 below), and suffered damages as a result of the violations of the federal securities laws alleged herein. Steinmetz's Class Period purchases include a purchase of 250 shares of Coinbase common stock at a price of $398.78 per share on April 14, 2021 pursuant and/or traceable to the Offering Materials. Based on information provided in the Prospectus, at the time of Steinmetz's April 14, 2021 purchase of 250 shares of Coinbase stock, 114.9 million of the 130.7 million shares of Coinbase's common stock outstanding, or approximately 88%, were registered.

### B.    Defendants

#### 1.    Corporate Defendant Coinbase

39.    Defendant Coinbase is a Delaware corporation that, according to its SEC filings, does not maintain a corporate headquarters. Coinbase operates one of the world's largest cryptocurrency platforms. The Company's platform provides products and services that enable its retail and institutional customers to buy, sell, and store their crypto assets. Coinbase operates its business through approximately eleven subsidiaries, including Coinbase Custody Trust Company, LLC ("Coinbase Custody"), which is the wholly-owned subsidiary that provides custodial services

to Coinbase's institutional customers in the United States. As of February 2022, the Company stored over 11.5% of global cryptocurrency assets, worth over $278 billion. As discussed below, Coinbase's registration statement in connection with its Direct Listing was declared effective by the SEC on April 1, 2021 (the "Registration Statement"). On April 14, 2021, Coinbase commenced the Direct Listing. Since that date, Coinbase common stock has traded on the Nasdaq under the ticker symbol "COIN."

### 2.    Executive Defendants

40.    Defendant Brian Armstrong ("Armstrong") co-founded Coinbase in 2012 and served as its Chief Executive Officer ("CEO") and Chairman of its Board throughout the Class Period. Armstrong took the Company public in April 2021 and was a signatory to the Company's SEC filings during the Class Period, including the Registration Statement. Coinbase identified Armstrong as a member of management for Coinbase Custody as early as 2020.

41.    Defendant Alesia J. Haas ("Haas") served as Coinbase's Chief Financial Officer ("CFO") throughout the Class Period. Haas has served as CFO since April 2018 and was a signatory to the Company's SEC filings during the Class Period, including the Registration Statement. Haas, along with Defendant Choi, served as a Governor of Coinbase Custody throughout the Class Period, according to the Coinbase Custody Foreign Registration Statements filed with the State of Washington on July 7, 2020 and July 21, 2022. In addition to being identified as a Coinbase Custody Governor, Haas certified the July 7, 2020 Foreign Registration Statement as a Coinbase Custody Director.

42.    Defendant Emilie Choi ("Choi") served as Coinbase's Chief Operating Officer ("COO") and President throughout the Class Period. Choi has served as COO since June 2019 and President since November 2020. Previously, Choi served as Coinbase's Vice President of Corporate and Business Development. Choi served on the Board of Governors of Coinbase

16

Custody during the Class Period, according to the Coinbase Custody Foreign Registration Statement filed with the State of Washington on July 7, 2020.

43.    Defendant Paul Grewal ("Grewal") served as Coinbase's Chief Legal Officer ("CLO") from July 2020 through the end of the Class Period. Grewal served on the Board of Managers of Coinbase Custody during the Class Period. In addition, Grewal routinely spoke on behalf of Coinbase throughout the Class Period, including on his Twitter account and the Company's blog.

44.    Defendants Armstrong, Haas, Choi, and Grewal are collectively referred to herein as the "Executive Defendants." Coinbase and the Executive Defendants are collectively referred to herein as "Defendants."

45.    The Executive Defendants, because of their positions within the Company, possessed the power and authority to control, and did in fact control, Coinbase's public statements to the market, including in SEC filings, press releases, the Company's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, each Executive Defendant was directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market.

## IV.    FACTUAL ALLEGATIONS – EXCHANGE ACT CLAIMS

### A.    Coinbase's Operations, Customer Base, Custody Services, and Staking Program

46.    Since the Company's founding in 2012, Coinbase has emerged as one of the largest crypto trading platforms in the world both in terms of the number of customers on the platform and trading volume. After starting out as a platform to send and receive Bitcoin, the Company now supports over approximately 240 crypto assets, the vast majority of which are tradable on its

exchange. In addition, as of December 2022, Coinbase allowed users to trade more than 16,000 crypto assets via Coinbase Wallet.

47.     At the most basic level, "crypto assets" or "digital assets" are the umbrella terms for any asset built using blockchain technology. A blockchain is a secure digital ledger or peer-to-peer database that maintains a record of all transactions that occur on the network. The term "token" is technically also synonymous with crypto asset and digital asset. However, in recent years, "token" has been commonly used to refer to crypto assets other than Bitcoin and Ethereum—the two most popular "cryptocurrencies."

48.     Bitcoin and Ethereum are part of the crypto asset class known as "native coins," meaning that the coin is the native asset of a particular blockchain. For example, Bitcoin runs on the Bitcoin blockchain and Ethereum likewise runs on the Ethereum blockchain. These cryptocurrency coins are used for governance, transactional fees, and similar functions. "Tokens," by contrast, are crypto assets that are built on top of another coin's blockchain and carry out an array of functions. One type of token is a "stablecoin," a digital asset that typically has its price pegged or fixed to a "stable" asset such as fiat currencies or commodities, like gold. Crypto assets are held within public blockchain addresses, which are alphanumeric references where assets can be sent or stored. Each public address is controlled through a corresponding private key and public key that are cryptographically generated. The private key allows the recipient to access any funds belonging to the address and the public key validates the transactions that are broadcasted to and from the address. Because the private key conveys access to the crypto asset, it is often controlled by the asset's owner.

49.     Prior to crypto platforms like Coinbase, there was no mechanism to match buyers and sellers of digital assets that have no previous connection. This is because a blockchain's

18

decentralized ledger provides for the secure transfer of an asset, but its peer-to-peer environment makes it difficult to buy and sell beyond two-sided trades. Crypto platforms solved this problem by creating marketplaces for crypto transactions that do not require the buyer and seller to know one another—similar to a traditional stock exchange.

50.     Headline-grabbing prices of some crypto assets like Bitcoin, which skyrocketed from $77 to $67,617 per coin in less than nine years, have led to a dramatic expansion of the crypto markets and crypto traders. A recent survey of crypto investors indicated that 83% had only been investing in crypto for two years or less. Coinbase recognized that many crypto investors were novices, as Haas acknowledged during the May 20, 2021 Barclays Emerging Payments and Fintech Forum (the "Barclays Payments Forum"): "I know many investors are still learning about crypto."

51.     Against this backdrop, Coinbase primarily operates as a crypto trading platform with a focus on retail customers, whom the Company defines as any individual customer with a Coinbase account. Institutional customers like hedge funds, financial institutions, and corporations round out Coinbase's customer-base. Institutional customers have access to the Coinbase Prime platform, which enables them to execute transactions at the "best price" through "deep pools of liquidity across the crypto marketplace." In other words, as Coinbase describes it, the Company acts as its institutional clients' "prime broker" so they do not have to rely "solely on prices from Coinbase's exchange."

52.     To attract these users, Coinbase boasted prior to and throughout the Class Period that it provided "safe, trusted, easy-to-use technology and financial infrastructure products and services that enable any person or business with an internet connection to discover, transact, and

engage with crypto assets and decentralized applications." As of December 31, 2022, Coinbase reported that it had achieved 110 million verified users in over 100 countries world-wide.

53.     To advance its goal of becoming its customers' "primary financial account"—i.e., the account they use to store, trade, and earn interest on digital assets—the Company offers its retail and institutional customers the ability to store, or "custody," their assets with Coinbase. As noted above, in some senses, a cryptocurrency exchange functions the same way as a stock exchange, by connecting buyers and sellers. A cryptocurrency exchange is different, however, in that it also operates as the brokerage for the underlying transaction.

54.     Haas described Coinbase's business model during the Barclays Payments Forum as follows:

> We operate a crypto custodian, an exchange, a broker, and we're building additional tools and products to help businesses grow their own crypto businesses. The majority of our revenue today is generated through trading fees. When buyers come to our platform and investors come to our platform[,] [they come] to buy and sell the vast majority of crypto assets that we host on our platform.

55.     Typically to invest, buy, and sell on a cryptocurrency exchange, a user is required to have a digital "wallet" hosted by the exchange. The hosted wallet effectively performs the same function as a brokerage account for securities or commodities, and is the on-ramp to trading on a given platform.

56.     A wallet hosted by the cryptocurrency exchange also (at least in theory) presents a solution to the quandary of where a crypto investor should store the public and private keys to their crypto asset. While a crypto asset owner can always write down the public and private keys on a piece of paper or record them in a computer file, this runs the risk that the keys could be copied, lost, or even destroyed. Given that it is impossible to access a crypto asset without the private key, most users opt to store their keys in a software or hardware-based wallet. Moreover, to combat the

threat of hacking, many cryptocurrency exchanges keep a certain percentage of crypto assets and their corresponding keys offline in what is known as "cold storage."

57.     Throughout the Class Period, Coinbase offered retail users a hosted wallet through their Coinbase.com account. Notably, the creation of a Coinbase.com account was a prerequisite before an individual retail user could buy and sell crypto assets on the Coinbase platform. Through the process of creating a Coinbase.com account, retail users were prompted to read and sign the Coinbase User Agreement (the "Retail User Agreement"). The Retail User Agreement governed the use of Coinbase's platform, including the hosted wallet and custodial services. Coinbase provided users access to its hosted wallet and custodial services referred to as the "Digital Asset Wallet."[3]

58.     Under the hosted wallet option, Coinbase acts as a digital asset custodian and promises to "securely store" the private keys it holds on behalf of its retail users. To this end, Coinbase's Retail User Agreement (*see* ¶¶ 110-11 *infra*) assured retail users that these assets in the hosted wallet "are custodial assets held by Coinbase for your benefit." Alternatively, retail customers could "self-custody" their digital assets using the Company's Coinbase Wallet product, which is a free software installed on either the user's internet browser or mobile phone. With Coinbase Wallet, "[t]he private keys (that represent ownership of the crypto) are stored directly on your device and not within a centralized exchange like Coinbase.com."

59.     Coinbase Wallet also connects its users to decentralized applications like decentralized exchanges, or "DEXs" for short, protocols, and other applications, all of which can

---

[3]     In the earliest version of the Retail User Agreement during the Class Period, updated Dec. 8, 2020, the Digital Asset Wallet was referred to as the "Digital Currency Wallet." However, for all intents and purposes, the two retail offerings and the contractual language used with respect to these two offerings are equivalent. Thus, for simplicity Plaintiffs will only refer to this product as the Digital Asset Wallet.

be used to send, receive, and exchange crypto assets. Decentralized exchanges operate as peer-to-peer marketplaces that execute crypto transactions directly between users, without a transfer through an intermediary. The wide array of crypto assets available for exchange is also a distinguishing feature of DEXs. For example, Coinbase Wallet users can buy, sell, and trade over 16,000 crypto assets, as compared to the more than 240 assets available for trading on the Coinbase platform.

60.    In practice, Coinbase steered its retail users to its custodial hosted wallet on Coinbase.com (and away from Coinbase Wallet), by warning users of Coinbase Wallet that they "are responsible for maintaining the private keys." Coinbase also emphasized the risk of loss to self-custodied assets, warning "if you lose your private keys, Coinbase Wallet *cannot* help recover your account." Coinbase also limited the functionality of Coinbase Wallet by preventing its users from selling crypto assets on the platform unless their assets were first transferred from Coinbase Wallet to a Coinbase.com account. By contrast, Coinbase touted Coinbase.com as the "easiest place to buy, sell, and manage your crypto."

61.    Through Coinbase Prime, institutional investors in the United States have access to Coinbase Custody, which enables them to "both securely and actively participate in crypto networks." As discussed *infra*, Coinbase Custody is a wholly-owned subsidiary of Coinbase and was at all relevant times managed by Defendants Armstrong, Haas, and Choi, along with other Coinbase employees, and overseen by a Board of Governors that included Haas and Choi during the Class Period.

62.    Along with transaction and custody services, Coinbase offered users the opportunity to "stake" their crypto assets with the Company throughout the Class Period. Coinbase participated in the "proof-of-stake" mechanism whereby Coinbase operated its own validator

nodes to create or validate blocks on a particular blockchain. In turn, Coinbase received "rewards" for participating in the validation process on the blockchain. The likelihood that Coinbase would be chosen to participate in the validation process, and thus earn a staking reward, increased as the number of assets in Coinbase's staking program increased. To incentivize crypto-asset owners to lock up their assets through Coinbase's staking program, the Company offered no, or low, staking minimums and also distributed a percentage of the rewards to the crypto-asset owner after it took a fixed percentage of the staking reward. Currently, Coinbase's staking fee ranges between 15% and 35% of the reward dependent upon the asset. Operation of a validator node is usually expensive because of the hardware and software needed to stake and the fact that only holders who stake large amounts of assets are likely to be selected as validators. Thus, Coinbase's staking program eliminated the expense of staking for asset owners and made staking accessible to a large number of users, in exchange for its commission.

63.    When Coinbase first launched its staking program in November 2019, it was designed for users to participate in, and profit from, the Tezos ("XTZ") blockchain. Coinbase's staking program has since expanded to include several crypto assets, including: Cosmos ("ATOM"), available for staking as of September 29, 2020; Ethereum ("ETH"), available for staking as of April 16, 2021; Cardano ("ADA"), available for staking as of March 23, 2022; Solana ("SOL"), available for staking as of June 29, 2022; and Polkadot ("DOT"), available for staking as of May 23, 2023. Until recently (i.e., prior to March 2023), users holding certain staking-eligible crypto assets (ADA, ATOM, SOL, and XTZ) were automatically enrolled in Coinbase's staking program if they held the required minimum balance of those specific assets.

**B.    Coinbase Generates Almost All of Its Revenue from User Transaction Fees, Driven by the Company's Largest Customer Base, Retail Users**

64.    According to Coinbase's SEC filings, since inception through December 31, 2020, the Company generated over $3.4 billion in total revenue. Prior to and throughout the Class Period, Defendants repeatedly identified transaction fees as Coinbase's primary source of revenue, telling investors that "we generate substantially all of our total revenue from transaction fees on our platform in connection with the purchase, sale, and trading of crypto assets by our customers."

65.    Coinbase further disclosed that retail user transaction fees drove nearly all of that revenue, accounting for 95% of all fees for FY 2020 and 2021. More specifically, of Coinbase's $1.14 billion in total net revenue in 2020, total transaction fee revenue accounted for $1.10 billion, which included $1.04 billion in net retail transaction fee revenue (or approximately 91% of total net revenue and 95% of total transaction fee revenue). Of Coinbase's $7.35 billion in total net revenue in 2021, total transaction fee revenue accounted for $6.84 billion, which included $6.50 billion in net retail transaction fee revenue (or approximately 88% of total net revenue and 95% of total transaction fee revenue). As discussed below, the custody fee for retail users was built into Coinbase's transaction fees.

66.    Given the outsized contribution of transaction fees to Coinbase's bottom line, at all times, the Company's ability to maintain and grow its customer base—particularly retail users—was essential to its financial success. As Coinbase advised in its April 14, 2021 Prospectus (defined at ¶ 74), "[o]ur success depends on our ability to retain existing customers and attract new customers[.]"

67.    Defendants also represented that Monthly Transacting Users ("MTUs"), or the number of monthly retail customers who use the Coinbase platform to invest, drive the number of potential revenue generating transactions, and touted growth in that area. For FY 2019, 2020, and

2021, Coinbase reported increasing annual average MTUs of 1.1 million, 1.9 million, and 8.4 million, respectively.

> **C.     Defendants Announce They Will Take Coinbase Public Through a Direct Listing, Inviting Mainstream Investors into the Crypto Universe**

68.     On January 28, 2021, Coinbase announced in a blog post that the Company planned to go public via a direct listing. The announcement came as Coinbase was in the process of garnering SEC approval for its Registration Statement, first submitted in October 2020.

69.     Unlike a traditional IPO, in a direct listing, no new shares are issued. Rather, it is the company's insiders or shareholders who sell pre-existing stock directly to the public through an exchange. So when the stock debuts, public investors buy directly from insiders, who inherently have more knowledge about the company than the public.

70.     The traditional route of an IPO requires companies to produce balance sheets, income statements, and cash flow statements for the public to review. Because Coinbase was a privately-owned company prior to the Direct Listing—and just prior to the start of the Class Period—the public had yet to see its financial statements, historical or projected. Moreover, IPOs usually come with a "lock-up" period, which restricts insiders from selling until a certain time period (typically 180 days) has passed, both to minimize concerns that corporate insiders might be selling shares shortly after the listing on the basis of material, nonpublic information, and to signal incentive alignment to other market participants. In a direct listing, the company's board of directors decides for itself whether to enforce a lock-up period on corporate insiders. Here, Coinbase management requested on multiple occasions that the Board remove the lock-up period restricting their ability to sell in the Direct Listing, with the Board eventually acquiescing. Indeed, during a Board meeting on February 23, 2021, which Defendants Armstrong, Choi, and Haas attended, Haas provided the Board with an update on the Direct Listing. During this discussion,

the Board learned that the "[e]xecutive team [is] aligned on no lock-ups for all stockholders (investors and employees)." Shortly thereafter, the Board elected to proceed with no lock-up period, thus permitting directors and officers to sell immediately into the Direct Listing despite having access to material, nonpublic information.

71.    After much anticipation, on February 25, 2021, Coinbase filed its Registration Statement on Form S-1 with the SEC in connection with its initial listing of common stock on the Nasdaq.

72.    Market analysts reacted immediately, reporting that Coinbase provided stock market investors with an opportunity to invest in the booming cryptocurrency market without directly owning the underlying crypto assets. For example, The Hustle wrote on March 4, 2021 in an article entitled *Coinbase's $100B+ public debut, explained* that the offering "**Brings in new mainstream investors**: Without needing to buy the underlying assets (e.g., Bitcoin, Ether), Coinbase will allow more Wall Street and retail investors to add crypto to their portfolios." (Emphasis in original). "Don't want to buy Bitcoin at 50K? Buy the trading exchange where people go to buy Bitcoin: Coinbase, the largest US cryptocurrency exchange," the publication concluded. Reacting to Coinbase's Form S-1, The Hustle further stated: "Coinbase provides not just an exchange, but a whole crypto ecosystem to buy, store, and use crypto assets safely," and that the Company offers a "wallet service[] where customers can safely store their cryptocurrencies." Finally, the article noted that "96% of Coinbase's revenue is from transaction fees." Previously, on February 27, 2021, Yahoo had dubbed Coinbase a "Key Player in Crypto Investing and Storage," reporting that the "[C]ompany has over $90 billion in assets on the platform."

73.    After amendments, Coinbase's Registration Statement was declared effective by the SEC on April 1, 2021. The Form S-1 was signed by Defendants Armstrong and Haas, among others.

74.    On April 14, 2021, Coinbase filed its Prospectus on Form 424B4 with the SEC in connection with the Direct Listing, incorporating and forming part of the Registration Statement (i.e., the "Prospectus"). The Registration Statement also incorporated each "free writing prospectus" the Company had filed with the SEC leading up to the Direct Listing, including the March 24, 2021 Free Writing Prospectus (defined below). Specifically, the Company stated:

> You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission, or SEC. Neither we nor the registered stockholders have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. Neither we nor the registered stockholders take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. The registered stockholders are offering to sell, and seeking offers to buy, shares of their Class A common stock only in jurisdictions where it is lawful to do so. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, financial condition, operating results, and prospects may have changed since that date.

The Registration Statement, Prospectus, and Free Writing Prospectus are referred to herein as the "Offering Materials."

**D.    Armstrong Knew that by Taking Coinbase Public and Increasing the Stock Price, He Would Trigger a Lucrative, Multi-Billion Dollar Compensation Package, Substantially Multiplying His Wealth**

75.    As the Direct Listing approached, the Executive Defendants laid the groundwork to make a fortune selling their shares to the public. At the time, Armstrong was Coinbase's largest individual shareholder, owning nearly 40 million shares that gave him control of roughly 21% of

the Company's equity, according to the Prospectus.

76.    In the Prospectus, Defendants made several representations to condition investors that the available supply of shares may be limited, stating that "there can be no assurance that any registered stockholders or other existing stockholders will sell any of their shares of Class A common stock" and, therefore, "there may initially be a lack of supply, or demand for, shares of Class A common stock." In reality, however, in the days leading up to the Direct Listing, both Armstrong and Choi conveniently increased their beneficial holdings. As discussed below (*see* ¶¶ 121-22 *infra*), between April 1 and April 14, 2021, Armstrong and Choi increased their beneficial holdings by 1,050,357 and 776,282 shares, respectively, and ultimately sold 749,999 and 614,170 shares, respectively, during the first two days of the Direct Listing at prices between $312 and $423 per share. Haas also acquired and sold 255,500 shares in a same-day transaction on April 14, 2021, selling those shares at prices between $381 and $424 per share.

77.    Armstrong was not only motivated to take Coinbase public in order to sell his own shares in the Direct Listing—***to the tune of over $290 million dollars*** (*see* ¶ 121 *infra*)—but also because he would unlock an incredibly lucrative performance-based compensation package. Prior to Coinbase's announcement that the Company would go public, in August 2020, Coinbase's Board of Directors approved the framework for a new compensation package that provided Armstrong with the opportunity to rake in ***billions*** of dollars through stock option grants.

78.    ***Step one*** to unlocking Armstrong's billions was a performance-based condition that Coinbase successfully have a registration statement declared effective by the SEC. ***Step two*** was satisfaction of market-based milestones that enabled Armstrong to unlock different stock option awards (or "tranches") if Coinbase maintained a certain stock price for 60 consecutive trading days. For example, the initial tranche of the option package, which accounted for 34% of the total

package, would unlock if the Company maintained a $200 stock price for 60 consecutive trading days. Additional tranches would open up at $40 stock-price intervals up to $400 for a total stock option award of 9,293,911 shares at a potential value of ***$3.7 billion***.

79.     Prior to the Direct Listing, Armstrong earned an annual base salary of $1,000,000—which meant that at an exercise price of just $23.46, and a total fair value at the time of $56.67 million, Armstrong was poised to increase his compensation by billions if he could maintain the stock price for the one-year holding period upon exercising the options. For example, just by maintaining a stock price of $200 for a mere 60 consecutive trading days after the Direct Listing, Armstrong could boost the value of his compensation and Coinbase holdings by nearly ***$700 million*** in cash and equity. Thus, prior to the Direct Listing, Armstrong was highly motivated and incentivized to artificially inflate the price of and demand for Coinbase common stock, and to maintain such inflation throughout the entire Class Period.

80.     And that is exactly what he did. Armstrong unlocked the first tranche on July 8, 2021, just 86 days after Coinbase's Direct Listing went live on April 14, 2021. Because Coinbase's stock had maintained a $200 per-share price for 60 consecutive days following the Direct Listing, he was awarded 3,159,930 in stock options. Coinbase's closing stock price on the achievement date was $244.29, placing the value of these options at just over ***$697 million*** as of July 8, 2021.

**E.      Defendants Hold an Investor Day and Announce Positive Preliminary First Quarter Results, Anchored by Coinbase's Growing Transaction Fee Revenues**

81.     To drive widespread interest in the Direct Listing, on or around March 17, 2021, Armstrong announced on Reddit—a social news aggregation, content rating, and discussion website—that he and his executive team were soliciting "questions about our business, the cryptoeconomy, and more" over a three-day period in connection with the Company's fast-approaching Direct Listing. Armstrong noted that as "part of that process [the Direct Listing], we'll

be spending a lot of time educating large, institutional investors about Coinbase and crypto in general," but that Defendants "want[ed] a process where all investors, regardless of affiliation or size, have equal access to information and have the opportunity to engage with us." Coinbase ultimately received over 1,300 questions.

82.     On March 23, 2021, Coinbase then held an "Investor Day," during which Defendants Armstrong and Haas hosted a YouTube video and responded to 20 of the questions the Company had solicited. These questions covering key issues at the top of investors' minds included: (1) "What is the Coinbase criteria for adding altcoins to be exchanged on the platform?"; (2) "What would you say is Coinbase's biggest existential threat, i.e., the one that most concerns you?"; (3) "How secure is my Bitcoin?"; (4) "Who are your biggest competitors?" and why chose Coinbase?; and (5) whether there were "conflicts of interest" in Coinbase operating as both a broker and an exchange.

83.     The next day, Coinbase filed a free writing prospectus with the SEC, attaching a transcript of the YouTube video and incorporating it into the Company's Registration Statement (the "Free Writing Prospectus").

84.     Two weeks later, on April 6, 2021, Defendants announced preliminary results for the first quarter of FY 2021 and an outlook for the full FY 2021. The Company's first-quarter revenue surged to $1.8 billion, a year-over-year nine-fold increase, and net income climbed from $32 million to between $730 and $800 million. Because Coinbase's revenue was largely dependent on its ability to attract and maintain retail users and, in turn, generate transaction fees, the Company also disclosed to investors impressive growth in MTUs, reporting 6.1 million MTUs—a significant increase from 2.8 million just three months earlier. Looking ahead, Coinbase projected between 4 million and 7 million MTUs for FY 2021.

85.     The same day, Armstrong and Haas participated in a conference call to discuss these results. The call was moderated by Anil K. Gupta ("Gupta"), Coinbase's Vice President of Investor Relations, who asked Armstrong: "Can you highlight what you think are Coinbase's key competitive advantages?" In response, Armstrong pointed to the Company's custody service and ability to "guard our customers against loss" stating: "***Storing crypto safely is complex, and we've created a lot of intellectual property in this area to help guard our customers against loss***." From there, Armstrong identified the size of Coinbase's assets under custody as a key indicator of customers' trust in the platform:

> All of these investments support an underlying and essential goal, trust. Our customers need to have trust in Coinbase, and we think that the $223 billion in assets on our platform, up from $90 billion at the end of 2020, speaks to the success we've had in building that trust. ***These are the key competitive advantages that we think will differentiate us***.

86.     Gupta also asked Haas, "As CFO, how do you forecast and plan for the future?" Haas reaffirmed that "***[r]evenue from our retail users and specifically retail transaction revenues are our largest revenue stream today***."

87.     Following the earnings announcement and conference call, the market was dialed in on Coinbase's retail-reliant revenue model. For example, on April 6, 2021, Compass Point analysts reported on Coinbase's "retail driven financial model," noting that "transaction revenues accounted for 96% of FY20 net revenues and retail accounted for 95%" and identifying the addition of customers as the Company's number one opportunity. The Compass Point analysts anticipated "competition on a number of vectors (pricing, product, market structure, etc.) moving forward" from other cryptocurrency exchanges, but opined that Coinbase had a key competitive advantage as a "trusted platform with a focus on security and culture of regulatory compliance."

88.     On April 14, 2021, Armstrong appeared on CNBC's Squawk Box with Andrew Ross Sorkin, where he was asked to address the outsized contribution of transaction fees to Coinbase's revenue. Sorkin noted that 96% of Coinbase's 2020 revenue was generated through transaction fees, commenting that it was an "issue that a lot of investors have been focused on" leading into the Direct Listing. In response, Armstrong explained that there is a "custody fee that is baked into the transaction fee," and pointed to Coinbase's custody business as providing "steady streams of revenue."

### F.     Defendants Fail to Disclose that Customers' Crypto Assets Are Exposed to Loss if Coinbase Becomes Bankrupt—an Undisclosed Risk that Imperiled the Company's Revenues

#### 1.     In the Years Prior to Coinbase's Direct Listing, the Risk of Digital Asset Loss Was a Major Problem for Cryptocurrency Exchanges

89.     Coinbase's success in driving retail transaction fees depended on its ability to convince the public that the Company could properly manage and safeguard from loss the staggering customer balances that were fueled by cryptocurrency's new-found popularity. By the start of the Class Period, Coinbase held over $90 billion in custodial fiat currencies and cryptocurrencies on behalf of customers, and that figure rose to as much as $278 billion during the Class Period—evidencing the trust that customers placed in Coinbase as a custodian.

90.     By way of background, cryptocurrency exchanges are thinly-regulated for safety-and-soundness and face major insolvency risks—so much so, that cryptocurrency investing was dubbed the "online Wild West where sheriffs are largely absent" by Reuters. Prior to Coinbase's Direct Listing in April 2021, at least 75 cryptocurrency exchanges collapsed, leaving many customers unable to recover their crypto assets. Most infamously, the Tokyo-based cryptocurrency exchange Mt. Gox declared bankruptcy in early 2014 after hackers stole 850,000 Bitcoins—worth more than $460 million—from the exchange. Hacking is the act of exploiting weaknesses in a

computer system or network, generally to gain unauthorized access to the data it holds. At its peak, Mt. Gox was responsible for nearly 80% of Bitcoin trading world-wide but was fraught with internal control and security issues. Hackers had skimmed Bitcoin from Mt. Gox for years, and at the time of its bankruptcy, the exchange was unable to locate nearly $30 million. Mt. Gox's bankruptcy quickly became an example of the dangers of investing in cryptocurrency as its creditors filed competing claims and the value of digital assets remained in flux. Three years into the Japanese bankruptcy proceedings, not a single customer of Mt. Gox had recouped the value of their digital assets.

91.     Following the Mt. Gox bankruptcy saga, numerous cryptocurrency exchanges collapsed as a result of hacking, scams, or other undisclosed reasons. For example:

- U.K.-based Moolah filed for bankruptcy in October 2014. In its bankruptcy announcement, Moolah assured customers that their funds were secure and the platform would process withdrawals in the following weeks. Moolah's CEO, Ryan Kennedy, explained that the exchange had "quite simply, [run] out of cash." Shortly thereafter, Kennedy was charged with fraud and arrested for stealing nearly $2 million worth of Bitcoin from the exchange.

- In 2019, New Zealand-based exchange Cryptopia was "hacked to death" and forced to file for bankruptcy after the hackers stole over $16 million of customer assets from digital wallets stored by the exchange. Like many other exchanges, Cryptopia stored its users' private keys in a pooled wallet. Reportedly, this "co-mingling" of the private keys has made it difficult to identify the asset's rightful owners.

- In 2020, Australia's "most-liquid exchange," ACX, unexpectedly froze its platform. Unbeknownst to ACX users, the exchange was not as liquid as promoted and had resorted to using over $20 million worth of customers' Bitcoins as a loan to its parent company. ACX withdrew the customer funds from a pooled account in which customer assets were co-mingled with ACX assets. Now bankrupt, ACX owes creditors around $50 million and is unable to distinguish ownership between the crypto assets of one customer from another.

### 2.    Defendants Mislead Coinbase Investors About the Company's Ability to Protect Digital Assets from Loss

92.    Against this backdrop of failed cryptocurrency exchanges, in the Offering Materials (and subsequently throughout the Class Period), Defendants Coinbase, Armstrong, and Haas purported to warn prospective investors about the risks arising from Coinbase's safeguarding of customers' assets and potential for loss, stating: "***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***." More specifically, Coinbase, Armstrong, and Haas honed in on two risks: "If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses."

93.    These representations were materially misleading by omission. By choosing to speak about the risks arising from Coinbase's "failure to safeguard and manage [its] customers' fiat currencies and crypto assets," Coinbase, Armstrong, and Haas had a duty to speak completely and accurately, including to disclose the material facts necessary to make these statements not misleading. Coinbase, Armstrong, and Haas also had a duty under SEC Regulation S-K Item 303 to disclose any known uncertainty (and the attendant risks) that was reasonably likely to have a material impact on the Company's financial condition, including its revenues.

94.    In violation of these duties, as Coinbase later admitted, Coinbase, Armstrong, and Haas failed to inform investors of the heightened risk that in the event of a bankruptcy, the crypto assets held in custody by Coinbase on its customers' behalf may be considered the property of the Company's bankruptcy estate. Accordingly, Coinbase's retail customers could be treated as general unsecured creditors. As unsecured creditors, these customers would be the last category of

creditors to recover owed monies in a bankruptcy and may only recover pennies on the dollar, if anything.

95.     Unlike a bank or a registered securities broker-dealer, as a digital-asset exchange platform, the Company would be liquidated under the U.S. Bankruptcy Code in the event of a bankruptcy. Thus, while Coinbase customers could make claims as unsecured creditors to recover the value of their crypto assets, they would not have the protections afforded more traditional investment accounts. And unlike traditional bank accounts or brokerage accounts, crypto assets are not backstopped or guaranteed by any governmental or other agency, like the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC"). If a bank fails due to an inability to meet obligations to depositors, the FDIC steps in to ensure depositors get prompt access to their insured deposits and acts as a receiver by selling the failed bank's assets and settling its debts. FDIC deposit insurance covers the balance of each depositor's account, dollar-for-dollar, up to the insurance limit. Claims for deposits in excess of the insured limit are addressed through the receivership. Similarly, the SIPC is a federally mandated, member-funded nonprofit whose purpose is to expedite the recovery and return of assets during the liquidation of a failed broker-dealer. With liquidations overseen by the SIPC, customer accounts are segregated from those of the brokerage's assets, meaning that customer assets cannot be used to satisfy debts of other creditors in bankruptcy proceedings.

96.     These complexities made the complete and accurate disclosure of risks associated with cryptocurrency exchange accounts even more necessary, particularly in connection with Coinbase going public. As explained by Professor Adam J. Levitin, Anne Fleming Research Professor of Law at the Georgetown University Law Center, in the Texas Law Review article entitled *Not Your Keys, Not Your Coins*, "[c]ryptocurrency investors are unlikely to understand

their legal treatment in the event of an exchange bankruptcy" given that "the technical workings of bankruptcy law are not well understood by most laypersons or even attorneys (it is not a bar exam topic, for example)." Adam J. Levitin, *Not Your Keys, Not Your Coins*, 101 U. TEX. L. REV. 877 (2023). Professor Levitin emphasized that the application of the U.S. Bankruptcy Code to assets held in the custody of a cryptocurrency exchange remains an open, "untested" question: "*Because cryptocurrency is untested American bankruptcy law, it is impossible to say with certainty how any particular United States bankruptcy court would treat custodial holdings of cryptocurrency*."

97.     Armstrong, Haas, and Choi knew this, as Armstrong would later admit in May 2022 that any purported "*legal protections*" available to safeguard crypto assets "*ha[d] not been tested in court for crypto assets specifically*," leaving wide open the possibility that "*a court would decide to consider customer assets as part of the company in bankruptcy proceedings*." Nevertheless, Coinbase, Armstrong, and Haas failed to include any discussion or analysis regarding the availability of customers' crypto assets to satisfy creditor claims in the event of a bankruptcy in the Prospectus.

98.     Professor Levitin further observed that the ambiguous bankruptcy treatment of crypto-exchange customers' assets is almost certain to result in expense and delay:

> The lack of legal clarity makes [it] impossible for cryptocurrency exchange customers to have confidence in their treatment in the event of the exchange's bankruptcy. Moreover, the lack of legal clarity almost assuredly means that there will be litigation in the bankruptcy regarding who "owns" the custodially held cryptocurrency and in what capacity. While that litigation is pending—which could be for significant time—exchange customers will not to have access to the custodially held cryptocurrency. This means that even if the customers prevail, they will bear exposure to market swings during the duration of the litigation and may also bear the costs of the litigation.

99.    Of particular importance to investors, Coinbase's inability to protect its customers' crypto assets from this risk of loss made it highly probable that, if disclosed, customers would find "***custodial services more risky and less attractive***," causing a "***discontinuation or reduction in use of [the Company's] platform and products by existing customers***," as the Company ultimately admitted on May 10, 2022. This posed a substantial, material risk to Coinbase's financial position, in particular, its revenue from transaction fees. Yet, despite including nearly sixty pages of "Risk Factors" within the Offering Materials, Coinbase, Armstrong, and Haas did not disclose these material facts and risks.

100.    Making matters worse for investors, Coinbase, Armstrong, and Haas then made numerous material misrepresentations about the Company's custodial services, including that it adequately safeguarded customers' crypto assets, protected them against various forms of loss, and enabled customers to maintain control over their assets stored with Coinbase. All told, Coinbase, Armstrong, and Haas misled investors in the Offering Materials about the Company's financial prospects, which were purportedly anchored by its ability to protect customers' crypto assets from loss, by failing to disclose one of the most salient risks to those assets.

### 3.    Defendants Knew or Were Reckless to Disregard that There Was a Material, Undisclosed Risk that Jeopardized Coinbase's Revenues

101.    Defendants Armstrong, Haas, and Choi knew of the foregoing, undisclosed material risk to Coinbase's exchange customers, and in turn, its shareholders. First, Armstrong, Haas, and Choi conducted an investigation into the bankruptcy treatment of custodial crypto assets. Second, the language of Coinbase's retail and institutional customer agreements demonstrates that Armstrong, Haas, and Choi understood that the treatment of customers' crypto assets in the event of a corporate bankruptcy was far from certain and imposed a substantial risk of loss, seizure, or forfeiture.

a. **Defendants Investigated and Understood the Risks Arising from and Associated with Commingling Customer Assets**

102.    Coinbase's statements in a comment letter to the SEC indicate that Armstrong, Haas, and Choi understood there was uncertainty regarding how customer assets would be treated in a bankruptcy and the material risks associated with the commingling of various customers' assets.

103.    Prior to the Class Period, on June 11, 2019, Coinbase Custody, the Coinbase wholly-owned subsidiary responsible for institutional asset storage, specifically addressed the bankruptcy risk in the context of its custodial services to institutional investors. That day, Sam McIngvale, the Chief Executive Officer of Coinbase Custody, submitted a comment letter to the SEC regarding a proposal by another exchange to list shares of a certain crypto asset (the "June 2019 Comment Letter"). As the Head of the Coinbase Custody product, McIngvale was an employee of Coinbase throughout the Class Period, as were other Coinbase employees who were responsible for the legal, compliance, and regulatory oversight of Coinbase Custody. Armstrong and Haas were identified as Coinbase Custody management on information prepared for institutional customers, and Haas and Choi were Governors of Coinbase Custody during the Class Period.

104.    The June 2019 Comment Letter affirmed that McIngvale, along with Coinbase Custody's Chief Compliance Officer, Chief Information Security Officer, Chief Operating Officer, and members of the company's legal team "***review[ed] all custodied digital assets for adherence to appropriate regulatory and risk criteria.***" With respect to segregating assets in custodial storage, the June 2019 Comment Letter stated that "Coinbase Custody wallet addresses are completely segregated per client" and that "[a]ll client digital assets are held in trust for the benefit of clients and are segregated from both (i) the proprietary property of Coinbase Custody and its

affiliates, and (ii) the assets of any other Coinbase Custody client."

105.    The import of these statements is that Armstrong, Haas, and Choi understood the potential adverse consequences of commingling customer assets in the event of a bankruptcy. Specifically, to the extent the custodial relationship between a customer and Coinbase is considered a constructive trust, U.S. bankruptcy law requires the imposition of tracing principles as a limitation on the scope of the trust. This means if the trust's assets are kept in an omnibus account with the assets of the debtor, the commingling could potentially destroy or limit the trust depending on how tracing rules would apply, thereby affecting a customer's right to recover from the bankruptcy estate. The commingling of custodial holdings also renders the application of other potential bankruptcy scenarios uncertain. For example, a U.S.-based cryptocurrency exchange may be considered a bailee with no equitable or legal interest in the asset and must return the identical property to the bailor. There is the probability, however, that a bankruptcy court will find that the commingling of assets defeats a bailment and thus a customer is merely an unsecured creditor (i.e., last in line to recover from the bankrupt estate).

> **b.    The Language in Coinbase's User Agreements Shows that Defendants Understood Customers Were Exposed to the Risk of Loss and that They Could Not Guarantee Asset Protection**

106.    Coinbase's custodial agreements (i.e., User Agreements) with its customers are *private* contracts and, thus, cannot override *public* bankruptcy law, notwithstanding the intentions of the exchange operator and its customer. Indeed, these purported legal protections (or any similar ones in private contracts) had never been tested in a U.S. court prior to or during the Class Period, thus necessitating disclosure of the attendant material risks and uncertainties to investors associated with a Coinbase bankruptcy. As explained by Professor Levitin:

> [E]ven if an exchange tells its customers in a passive construction that the custodied assets "are not treated as general assets" of the exchange, *it can only definitively make such a statement regarding*

> *how __it__ will treat the assets, not how the assets would be treated by a bankruptcy court*.

107.    In other words, significant uncertainty existed during the Class Period (and still exists today) with respect to the treatment of assets held by Coinbase (or Coinbase Custody) regardless of the contractual provisions Coinbase included, as the enforcement of such language by a bankruptcy court was far from certain or reliable. Defendants Armstrong, Haas, and Choi knew this during the Class Period, as Armstrong admitted on Twitter on May 10, 2022, following the Company's belated disclosure of this risk in an SEC filing earlier that day. *See* ¶ 212 *infra*.

108.    Inexplicably, Coinbase took steps in its User Agreements to mitigate the risk of loss for institutional customers arising from this known uncertainty, but did not take those steps for retail customers (which comprised over 95% of its customers during the Class Period).

109.    For example, Coinbase did not commingle the assets of its institutional customers. As described in the 2019 Comment Letter, the Coinbase Custody Trust Custodial Services Agreement (the "Institutional User Agreement") explicitly provided institutional customers with a "*segregated custody account* controlled and secured by [Coinbase Custody] to store certain supported digital currencies and utility tokens ("Digital Assets"), on [the] Client's behalf," and stated that Coinbase Custody "will safekeep the Digital Assets and *segregate all Digital Assets from both the (a) property of [Coinbase Custody]*, and (b) assets of other customers of [Coinbase Custody]."

110.    Conversely, Coinbase *did* commingle the assets of its retail customers, but nevertheless made representations to those customers which gave the false impression that their assets were properly safeguarded. The Retail User Agreement provided that "*[i]n order to more securely custody assets*, *Coinbase may use shared blockchain addresses*, controlled by Coinbase, to hold Digital Assets held on behalf of customers and/or held on behalf of Coinbase." The Retail

User Agreement further stated that "***Coinbase shall have no obligation to segregate by blockchain address Digital Assets owned by you from Digital Assets owned by other customers or by Coinbase***."

111.     Despite the commingling of customer and Company assets, the Retail User Agreement nonetheless affirmatively stated that the assets "held in your [i.e., the user's] Digital Wallet are custodial assets held by Coinbase ***for your benefit***." Coinbase further assured retail users of their "ownership" and "control" over the assets. Specifically, in the Section entitled "Ownership," the Retail User Agreement stated: "***Title in Digital Assets shall at all times remain with you*** and shall not transfer to Coinbase." And, despite the fact that "Coinbase shall retain control over electronic private keys associated with blockchain addresses . . . including the blockchain addresses that hold your Digital Assets," Coinbase promised retail users that "***You control*** the Digital Assets held in your Digital Asset Wallet."

112.     The import of this language is that Coinbase could commingle the assets of one retail user with those of another, or with Coinbase's own assets, in an omnibus digital wallet controlled by Coinbase. The Retail User Agreement did so under the guise of "more secur[ity]," but, in reality, the commingling of custodially-held crypto assets had implications beyond physical security in the event Coinbase became insolvent.

113.     The Retail User Agreement further complicated the protection of user assets in bankruptcy by automatically opting-in customers to Coinbase's staking services by default for digital assets where staking functionality was available on Coinbase. In contrast to the affirmative language in Coinbase's Prospectus that the Company's retail staking program "***allows our retail users to maintain full ownership of their crypto assets***" (*see* ¶ 238 *infra*), this arrangement may in fact support a finding that the digital asset is property of Coinbase's bankruptcy estate. As

Professor Levitin explained:

> Coinbase offers a staking arrangement in which it shares the profit with a 25% cut of the staking rewards as a "commission" and agrees to indemnif[y] [sic] the customer for any slashing losses if the stake is awarded the mining rights, but fails to successfully mine the block within the allotted time. The shared gains and internalized losses suggest an investment partnership in which **the exchange has a property interest** beyond the possessory interest in the underlying cryptocurrency.

114.    These statements about retail customers' continued control and ownership of their crypto assets were therefore misleading—lulling customers into a false sense of security. As noted by Professor Levitin:

> Many exchanges emphasize that they only hold the cryptocurrency in a custodial capacity and that the customers continue to "own" the cryptocurrency, suggesting that there would be no risk in the event of an exchange failure. **This is misleading and self-serving**. The lay concept of "ownership" does not neatly track onto a potential legal treatment of custodial holdings of cryptocurrency in bankruptcy, which is that it would be treated as property of the exchange, rather than property of the customers.

115.    In addition, Coinbase included what is known as an "Article 8" provision in its Institutional User Agreement, but **not** in the Retail User Agreement. This is further indicia that Armstrong, Haas, and Choi knew of, but did not disclose, the risks and uncertainties to customers' crypto assets posed by a Coinbase bankruptcy. Here, the Custodial Services Section of the Institutional User Agreement contained an "Opt-in to Division 8 of the California Commercial Code" throughout the Class Period. Division 8 is the State of California's codification of the Uniform Commercial Code Article 8 ("Article 8"). Article 8 protects "financial assets" held by a securities intermediary in the event of bankruptcy by explicitly stating that financial assets "are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary." To be considered a "financial asset" within the meaning of Article 8, an asset must meet one of the following definitions:

(i) a security;

(ii) an obligation of a person or a share, participation, or other interest in a person or in property or an enterprise of a person, which is, or is of a type, dealt in or traded on financial markets, or which is recognized in any area in which it is issued or dealt in as a medium for investment; or

(iii) *any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this Article*.

116.    Scholars agree that digital assets are unlikely to fall within the safe harbors of subsection 8-102(a)(9)(i) or 8-102(a)(9)(ii). Therefore, to receive Article 8 protection, the crypto-custodian must have "*expressly agreed with the other person that the property is to be treated as a financial asset under [Article 8]*." The Institutional User Agreement included a provision that explicitly deemed Coinbase Custody a "securities intermediary" and an institutional user the "entitlement holder" as those terms are defined in Division 8 of the California Commercial Code ("Division 8"). Further, the Institutional User Agreement stated that "*Under Division 8, the Digital Assets in Client's Custodial Account* are not general assets of Trust Company and *are not available to satisfy claims of creditors of Trust Company*."

117.    Conversely, however, as Armstrong, Haas, and Choi knew, Coinbase's Retail User Agreement did not contain a similar Article 8 provision during the Class Period, leaving retail customers—who accounted for approximately 95% of Coinbase's revenue—with an even greater risk of loss. Armstrong admitted as much on May 10, 2022—*after* the Company had finally disclosed the risks and uncertainties surrounding customer assets in the event of a Coinbase bankruptcy. Armstrong also conceded that the Company "*should have updated [its] retail terms sooner*" so as to, at a minimum, provide the same protections Coinbase had purportedly afforded its institutional client base, and acknowledged that the Company "*didn't communicate*

*proactively*" about the risk to users in the event of a bankruptcy. Had Coinbase done so, it was entirely plausible that its most important customer base, retail users, would have found the Company's "***custodial services more risky and less attractive***," causing a "***discontinuation or reduction in use of [the Company's] platform and products by existing customers***"—as Coinbase ultimately disclosed. With the Direct Listing fast-approaching, however, Defendants were apparently unwilling to make these disclosures.

> **G.     Coinbase Goes Public, and Defendants Rake in Hundreds of Millions of Dollars by Dumping Shares in the Direct Listing**

118.     Defendants successfully misled investors in the Direct Listing about the safety of transacting on Coinbase's exchange. For example, on April 14, 2021, the day of the Direct Listing, The New York Times hailed Coinbase as a safe alternative to directly investing in cryptocurrency and a lucrative opportunity for investors to take positions aligned with crypto without the traditional risks. In an article entitled *Coinbase's Public Listing Is a Cryptocurrency Coming-Out Party*, The New York Times wrote that "[t]he listing gives mainstream investors who may be wary of directly buying risky digital currencies the ability to own stock in a Securities and Exchange Commission-approved business that facilitates the transactions." CNN Business likewise reported on April 11, 2021 that "Coinbase is ready for its market closeup," predicted on the day of the Direct Listing that the stock would rise sharply above the reference price because of "a growing number of customers." Industry participants also hailed the Direct Listing, characterizing Coinbase's debut as a watershed moment for the cryptocurrency world. For example, Rachid Ajaja, CEO of AllianceBlock, a blockchain capital markets firm, told CNN that "[t]he Coinbase listing should bring further attention to cryptocurrencies and will help further legitimize it."

119.     On the back of Defendants' misrepresentations in the Offering Materials, on April 14, 2021, Coinbase made history, becoming the first cryptocurrency company in the world to go

public. That day, the Company commenced its Direct Listing, and its common stock began trading on the Nasdaq under the ticker symbol "COIN."

120.     Despite an initial reference price of $250, the stock opened at a staggering $381 per share and quickly reached $429.54 per share. The stock ultimately closed at $328.28— approximately $78 above the reference price. Excluding options and restricted stock units, Coinbase closed the day with a market capitalization of about $62 billion. As the Associated Press News ("AP News") wrote in a same day article, "Coinbase made a rousing debut on Wall Street."

121.     Armstrong and the other Executive and Director Defendants (defined below) quickly capitalized on the moment and reaped ***billions of dollars*** in proceeds from insider sales of their Coinbase common stock during just the first two days that the Company's stock was listed, and continued to garner substantial additional proceeds through their sales over the remainder of the Class Period:

| Defendant | Shares Sold Between April 14, 2021 and April 15, 2021 | Gross Proceeds from Shares Sold Between April 14, 2021 and April 15, 2021 | Shares Sold During the Class Period | Gross Proceeds from Shares Sold During the Class Period |
|---|---|---|---|---|
| Armstrong | 749,999 | >$291,800,000 | 1,300,029 | >$323,000,000 |
| Choi | 614,170 | >$223,900,000 | 649,888 | >$429,000,000 |
| Haas | 255,500 | >$99,000,000 | 646,108 | >$115,000,000 |
| Grewal | | | 252,688 | >$65,000,000 |
| Jones | 110,000 | >$43,000,000 | 150,911 | >$51,000,000 |
| Andreessen | 314,024 | >$118,000,000 | 1,057,984 | >$311,000,000 |
| Ehrsam | 298,789 | >111,000,000 | 1,500,139 | >492,000,000 |
| Haun | 150,000 | >$52,000,000 | 183,835 | >$61,000,000 |

| Defendant | Shares Sold Between April 14, 2021 and April 15, 2021 | Gross Proceeds from Shares Sold Between April 14, 2021 and April 15, 2021 | Shares Sold During the Class Period | Gross Proceeds from Shares Sold During the Class Period |
|---|---|---|---|---|
| Wilson | | >$1,800,000,000 | | |

122.    Between April 14 and April 15, 2021, the Executive Defendants sold a total of 1,619,669 shares of their common stock to the public at prices ranging from $312 to $424 per share. Notably, all of the shares that Armstrong and Haas sold over these two days were sold at or above the market opening price of $381 per share, or *$131 above the reference price*. Moreover, all trades by the Coinbase insiders over these two days were open-market trades and were not made pursuant to a 10b5-1 plan.

123.    Following the start of the Direct Listing, market commentators again hailed Coinbase as an attractive opportunity to investors. For example, in an April 14, 2021 article entitled *Coinbase Went Public. What—and Why—Is Coinbase?*, Slate, like the publications before it, wrote that Coinbase "allows investors who might not normally touch cryptocurrency get some indirect exposure to the industry" and "could even inspire some of those investors, who might see Coinbase's debut as an extra layer of validation for cryptocurrencies in general, to also become involved in the market." In another same-day article entitled *Coinbase soars in market debut, valued near $86 billion*, Lule Demmissie, President of Ally Invest, told the AP News that "shares of Coinbase should attract investors who want to get into the cryptocurrency space in addition to, or without buying any coins at all." Demmissie continued that "it could also be a less volatile security than the coins themselves."

**H.** **Following the Direct Listing, Defendants Continue to Conceal the Risk of Asset Loss and the Potential Impact on Coinbase's Revenues**

124.    After the commencement of the Direct Listing, Defendants continued to conceal the material risk associated with the treatment of customers' crypto assets held in Coinbase's custody and to tout its ability to withstand competitive pricing pressure in the retail space. To this end, Defendants Coinbase, Armstrong, and Haas repeated in substantially the same form the materially false and misleading statements set forth in the Offering Materials within Coinbase's SEC filings during the Class Period, including its Form 10-Qs filed in May, August, and November of 2021, and Form 10-K filed in February of 2022.

125.    At the same time, when pressed by analysts for information about Coinbase's ability to maintain its transaction fee revenues and attract customers, Defendants repeatedly touted the Company's custody services as a competitive advantage and long-term revenue driver. For example, on December 7, 2021, Defendant Choi assured investors at the Goldman Sachs US Financial Services Conference that "*[w]e haven't changed our fee structure on the retail side yet. I think that consumers are more than willing to pay a certain fee percentage for the services we offer, particularly the security we offer*." Doubling-down, Choi boasted "*[w]e have world-class security in custody when you purchase assets with Coinbase and hold them in Coinbase*." Then, during the March 9, 2022 Morgan Stanley Technology, Media, and Telecom Conference, Haas repeated this refrain, stating "*we know what we're good at. We know that we're a great, safe place to buy your first Bitcoin[,] to trade[,] to safely store*."

126.    All of these statements continued to conceal the material risk of loss to exchange customers in the event of a bankruptcy, and the risk to investors that customers would flee, endangering the Company's revenues.

127.    On March 24, 2022, the SEC published Staff Accounting Bulletin No. 121 ("SAB

121"), which expressed the SEC's views regarding the accounting for an exchange's obligations to safeguard crypto-assets for platform users. At bottom, SAB 121 reflected what Coinbase had long known: that "***due to the unique characteristics of the assets and the lack of legal precedent, there are significant legal questions surrounding how such arrangements would be treated in a court proceeding arising from an adverse event (e.g., fraud, loss, theft, or bankruptcy)***." The SEC advised that "[t]hese risks can have a significant impact on the entity's operations and financial condition."

128.    Significantly, the SEC stated that this guidance served to ***reinforce*** then-existing disclosure obligations for publicly-traded companies like Coinbase, including under Item 303 of Regulation S-K, stating that "[d]isclosures regarding the significant risks and uncertainties associated with the entity holding crypto-assets for its platform users may also be required outside the financial statements under existing Commission rules, such as in the description of business, risk factors, or management's discussion and analysis of financial condition and results of operation."

## I.    Defendants Mislead Investors About the Regulatory Risks Facing Coinbase

129.    Throughout the Class Period, the Company's exposure to adverse regulatory action, primarily from the SEC, grew exponentially. But when investors sought information on this very topic, Coinbase, Armstrong, and Grewal materially misled them about the true extent of regulatory risks that the Company faced.

130.    In particular, by the spring of 2022, the SEC was actively investigating Coinbase for potential violations of the federal securities laws, including whether the Company listed or permitted securities on its platform without registering with the SEC. At every turn, Armstrong and Grewal steadfastly denied doing so. Armstrong and Grewal further denied that Coinbase's staking business implicated potential violations of the securities laws. These statements—

purportedly based on Coinbase's self-directed legal analysis of the digital assets that it listed, which the Company misleadingly represented that the SEC had fully reviewed and signed-off on—lacked a reasonable basis in fact.

131.    At the same time, Armstrong and Grewal sought to portray Coinbase as a victim of "regulatory uncertainty" in the crypto industry, and as an upstanding corporate citizen working cooperatively with the SEC to clear the air. In reality, as Armstrong admitted in a June 10, 2023 interview with the Wall Street Journal, "something shifted about a year ago" and a "totally different tone started to happen [in the SEC's communications] and we kind of got this information from the SEC that, well actually, we think everything other than Bitcoin is a security." Indeed, Coinbase confirmed that "since July 2022, [SEC Chairman Gensler's] office has referred all meeting requests [from Coinbase] to Enforcement" and Grewal subsequently admitted that Coinbase knew the SEC was going to file an action against the Company for a long time, stating: "*[T]his was a day we knew that would come. And so, we've been preparing for it for a very, very long time*." Despite this "shift" in mid-2022 and their knowledge that an enforcement action was coming, Defendants Coinbase, Armstrong, and Grewal continued to materially downplay the nature, scope, and direction of the SEC's investigation throughout the Class Period, as discussed below.

> **1.    The SEC Has Made Clear that the Majority of Crypto Assets Are Securities Under Existing Federal Securities Laws, and that Exchanges Listing Such Assets Must Register with the SEC**

132.    Coinbase made the calculated business decision to make digital assets available for trading or staking through its platform. As a result, the Company had a legal obligation under existing federal laws and regulations to ensure that it did not list or make available on its platform crypto assets that were securities. Otherwise, Coinbase was likely to become the subject of an SEC investigation or enforcement action.

133.    Under the federal securities laws, the term "security" is broadly defined to encompass a variety of assets, including "investment contracts." The Supreme Court first articulated the test for determining if a particular asset or transaction falls within the meaning of "investment contract" in 1946 in the *Howey* decision: "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301. Since then, courts have applied the *Howey* test to find that a wide range of investment vehicles are, in fact, investment contracts subject to the federal securities laws.

134.    Beginning as early as 2017, and continuing to the present, the SEC has addressed the application of the federal securities laws to distributed ledger technology and digital assets through the release of numerous official publications and statements, including guidance documents, reports, and speeches. In these publications and statements, the SEC has been unwavering in its message that the majority of crypto assets are securities within the meaning of the federal securities laws, and that all activities involving crypto asset securities, including the offer and sale of these assets and the operation of crypto exchanges, must comply with these laws.

135.    One of the SEC's earliest statements on cryptocurrency came on July 25, 2017, when it released its Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (the "DAO Report"). The DAO was a digital decentralized autonomous organization and a form of investor-directed venture capital fund. While the SEC ultimately determined not to pursue an enforcement action against the DAO based on its sale of DAO crypto tokens to investors, the SEC:

> [D]eem[ed] it appropriate and in the public interest to issue this report of investigation [ ] pursuant to Section 21(a) of the Exchange Act to advise those who would use a Decentralized Autonomous Organization [ ], or other distributed ledger or blockchain-enabled means for capital raising, **to take appropriate steps to ensure compliance with the U.S. federal securities laws**.

136.     The SEC further explained that the DAO Report:

> [R]eiterates the[] fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm—virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investments and the related offer and sale of securities.

137.     Put differently, the SEC made clear that the federal securities laws applied and must be adhered to by companies engaging in a wide range of activities involving digital assets. To this end, the SEC stated in the DAO Report that a "security" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act includes "an investment contract." Citing to the U.S. Supreme Court's decisions in *Howey*, *SEC v. Edwards*, 540 U.S. 389 (2004), and *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975), the SEC explained that "[a]n investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." The SEC then applied this definition articulated in *Howey* and the other decisions to determine that the DAO tokens at issue were, in fact, securities. Therefore, the DAO was required (but had failed) to register the offer and sale of DAO tokens absent a valid exemption. The SEC also stated that Section 5 of the Exchange Act requires any broker, dealer, or exchange that is directly or indirectly effecting any transaction in a security or reporting any such transaction, in interstate commerce, to register as a national securities exchange or otherwise qualify for an exemption. Under Section 3(a)(1) of the Exchange Act, an "exchange" is:

> [A]ny organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood . . . .

138.    The SEC concluded that the platforms that traded DAO tokens qualified as exchanges. In closing, the SEC reiterated that "[t]hose who offer and sell securities in the United States must comply with the federal securities laws" and that "any entity or person engaging in the activities of an exchange . . . must register as a national securities exchange or operate pursuant to an exemption from such registration."

139.    On April 3, 2019, the SEC reinforced its pronouncements in the DAO Report. On that date, the SEC's Strategic Hub for Innovation and Financial Technology ("FinHub") published the "Framework for 'Investment Contract' Analysis of Digital Assets" (the "SEC's Digital Asset Framework"). The SEC stated that in publishing this guidance, it intended to set out a "framework for analyzing whether a digital asset has the characteristics of . . . an 'investment contract.'" As the starting point for analyzing a given asset, the SEC again invoked the U.S. Supreme Court's decision in *Howey*, noting that the *Howey* analysis should be applied to determine whether an asset is a security and emphasizing that the "focus of the *Howey* analysis is not only on the form and terms of the instrument itself . . . but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold[.]"

140.    The SEC's Digital Asset Framework then addressed the specific application of each element of the *Howey* test to digital assets, citing additional case law as well as relevant SEC reports and speeches. The SEC once more made clear its determination that digital assets generally satisfy both the first "investment of money" and second "common enterprise" prongs of the *Howey* test and that usually the "main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others." The SEC's Digital Asset Framework then provided a non-exhaustive list of the characteristics that could be relevant to the last part of the analysis as applied to digital assets—

i.e., whether the purchaser of the asset has a reasonable expectation of profits derived from the efforts of others. Included on this list of characteristics were: (i) "[p]urchasers would reasonably expect [a promoter, sponsor, or other third party] to undertake efforts to promote its own interests and enhance the value of the network or digital asset"; and (ii) "[t]he digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future."

141.    Amplifying and further solidifying its determination set forth in these guidance documents that digital assets will typically qualify as securities, the current Chairman of the SEC, Gensler, has repeatedly reaffirmed that the SEC views the majority of crypto assets as securities. For example, in testifying before Congress on May 26, 2021, Gensler stated with respect to cryptocurrency: "Many of these tokens are investment contracts under the securities laws." Gensler emphasized that the "SEC has been *consistent* in its communication to market participants that those who use initial coin offerings to raise capital or to engage in securities transactions must comply with the federal securities laws." Gensler further noted that "[t]okens currently on the market that are securities may be offered, sold, and traded in non-compliance with the federal securities laws."

142.    During an August 3, 2021 speech, after reiterating that "[m]any of these tokens are offered and sold as securities," Gensler rejected the notion that the definition of a security was unclear, stating:

> *There's actually a lot of clarity on that front*. In the 1930s, Congress established the definition of a security, which included about 20 items, like stock, bonds, and notes. One of the items is an investment contract.
>
> The following decade, the Supreme Court took up the definition of an investment contract. This case said an investment contract exists when "a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." The Supreme Court has repeatedly reaffirmed this Howey Test.

143.    Gensler emphasized that: "*Certain rules related to crypto assets are well-settled. The test to determine whether a crypto asset is a security is clear*." He also stated with respect to crypto trading platforms that "these platforms . . . can implicate the securities laws." Underscoring the applicability of the securities laws to digital asset securities and trading platforms, Gensler declared: "*Make no mistake: To the extent that there are securities on these trading platforms, under our laws they have to register with the Commission unless they meet an exemption. Make no mistake: If a lending platform is offering securities, it also falls into SEC jurisdiction*." Gensler also invoked the testimony of his predecessor, former SEC Chairman Jay Clayton, stating: "I think former SEC Chairman Jay Clayton said it well when he testified in 2018: 'To the extent that digital assets . . . are securities — and I believe every [Initial Coin Offering] I have seen is a security — we have jurisdiction, and our federal securities laws apply.'"

144.    On April 4, 2022, Gensler specifically addressed crypto trading platforms in his remarks at the Penn Law Capital Markets Association Annual Conference. During this speech, Gensler observed that "[t]he crypto market is highly concentrated, with the bulk of trading taking place on only a handful of platforms" and that "these platforms likely are trading securities." As Gensler explained:

> A typical trading platform has dozens of tokens on it, at least. In fact, many have well in excess of 100 tokens. As I'll address later, many of the tokens trading on these platforms may well meet the definition of "securities." . . . [W]ith so many tokens trading, the probability is quite remote that any given platform has zero securities.

145.    Turning to crypto tokens, Gensler noted that "most crypto tokens involve a group of entrepreneurs raising money from the public in anticipation of profits — the hallmark of an investment contract or a security under our jurisdiction." Gensler stated with respect to these tokens, "*[w]hen a new technology comes along, our existing laws don't just go away*," and

reviewed the basic contours of the *Howey* test, reiterating that most crypto tokens are securities under this test. As Gensler emphasized, "[a]ny token that is a security must play by the same market integrity rulebook as other securities under our laws."

146.    In a September 8, 2022 speech, Gensler again reiterated that most crypto tokens are securities: "Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities. Offers and sales of these thousands of crypto security tokens are covered under the securities laws." Explaining the basis for this belief, Gensler focused on the fact that "the investing public is buying or selling crypto security tokens because they're expecting profits derived from the efforts of others in a common enterprise," which he referred to as the "core considerations" under *Howey*.

147.    Like the SEC, the NYDFS has also provided guidance to cryptocurrency companies regarding the applicability and interpretation of New York's securities regulations with respect to digital assets. For example, on December 11, 2019, the NYDFS published its "Proposed Guidance Regarding Adoption or Listing of Virtual Currencies." The NYDFS sought comment on the proposed guidance and explained its purpose was as follows: "[t]o provide regulatory clarity and efficiency, and to ensure that our approach to regulating virtual currency businesses reflects the realities of an evolving market, we are reviewing our virtual currency regulations and the manner in which they are implemented." The proposed guidance included a framework whereby virtual currency companies that held BitLicenses issued by the NYDFS, like Coinbase's subsidiary, Coinbase, Inc., or trust charters, could propose a coin-listing or adoption policy to be approved by the NYDFS that would then allow each virtual currency licensee to self-certify the listing or adoption of new coins without specific approval from the NYDFS for each coin.

148.    On January 27, 2020, the SEC's FinHub submitted comments on the NYDFS's proposed framework. In these comments, the SEC acknowledged the important role of state regulation but suggested that the NYDFS remind digital asset companies that they also need to comply with federal securities laws, stating:

> The SEC staff . . . would suggest that the financial guidance caution market participants that reliance on the guidance or on a DFS VC license alone does not ensure that market participants are adhering to federal securities laws that apply when their activities involve digital assets that are securities.

149.    Critically, the SEC warned that so-called "***model frameworks***" for evaluating the regulatory risks associated with trading or holding particular digital assets had not been endorsed or approved by the SEC. The SEC stated that:

> The SEC staff is concerned that certain market participants are already engaging in, and in the future will continue to engage in, illegal activity in trading digital assets that are securities, based on this type of risk assessment and their own business considerations, rather than an accurate classification of the digital asset under the federal securities laws.

Thus, the SEC noted it had "significant concerns that many digital assets continue to be issued and traded in potential violation of the federal securities laws, and that market participants involved in the issuance or trading of such assets may be acting in violation of the federal securities laws."

150.    The SEC further reminded digital asset companies:

> The failure of issuers of digital asset securities or other market participants transacting in such securities to follow the federal securities laws may result in the SEC taking action to enforce these laws. The SEC's Division of Enforcement has been and will remain active in pursuing misconduct involving offerings and trading of digital asset securities[.]

151.    Gensler appeared to specifically target Coinbase when he remarked during his September 8, 2022 speech that "[s]ome in the crypto industry have called for greater 'guidance' with respect to crypto tokens." Emphatically rejecting this premise, Gensler continued:

> *For the past five years . . . the Commission has spoken with a pretty*
> *clear voice here*: through the DAO Report, the Munchee Order, and
> dozens of Enforcement actions, all voted on by the Commission.
> Chairman Clayton often spoke to the applicability of the securities
> laws in the crypto space. *Not liking the message isn't the same*
> *thing as not receiving it.*

**2.    The SEC Ramps Up Enforcement Actions Against Crypto Companies for Listing Unregistered Crypto Asset Securities**

152.    In recent years, including those leading up to the Direct Listing, the SEC has ramped up its focus on crypto companies and enforcement of the laws and regulations governing the registration of securities. In particular, the SEC has increasingly investigated securities law violations in areas such as coin offerings, lending, and decentralized finance, targeting crypto companies for failing to register with regulators before offering digital tokens.

153.    Between July 2013 and December 2022, for example, the SEC brought 82 court actions and 45 administrative proceedings related to cryptocurrency. In 2022 alone, the SEC brought 30 enforcement actions related to cryptocurrency against 79 defendants. Of these 30 actions, 73% alleged an unregistered securities offering violation. These SEC enforcement actions, including the actions against two high-profile crypto exchanges (Ripple and LBRY, described below) filed in the lead-up to Coinbase's Direct Listing, made all the more clear the SEC's unwavering view that the vast majority of digital assets are securities, and that the SEC intended to take action against crypto companies that failed to comply with the federal securities laws.

154.    On December 22, 2020, the SEC filed an action against Ripple Labs, Inc. ("Ripple") for offering unregistered securities in contravention of Section 5 of the Securities Act. In its complaint, the SEC alleged that Ripple sold over 14.6 billion units of a digital asset security called "XRP" without registering its offers and sales with the SEC or qualifying for a registration exemption. The SEC further alleged that, under an application of the *Howey* test, "[a]t all relevant times . . . XRP was an investment contract and therefore a security subject to the registration

57

requirements of the federal securities laws." Notwithstanding the fact that XRP was a security, Ripple failed to file a registration statement with the SEC for XRP, in violation of the securities laws. Notably, XRP tokens were listed for trading on Coinbase's platform **_prior_** to the SEC's enforcement action, which raises questions about Coinbase's self-dubbed "rigorous process" for determining whether the token is a security. In the wake of the SEC's complaint against Ripple, Coinbase delisted XRP.

155.    On March 29, 2021, just weeks before Coinbase's Direct Listing, the SEC formally charged LBRY—a blockchain-based file-sharing and payment network—with conducting an unregistered offering of digital asset securities in violation of Section 5 of the Securities Act. As set forth in the SEC's complaint filed in the U.S. District Court for the District of New Hampshire, from at least July 2016 to February 2021, LBRY sold digital assets called LBRY Credits ("LBC") to investors in the U.S. without filing a registration statement or otherwise qualifying for an exemption from registration. The SEC alleged that LBRY "offered and sold investment contracts and, thus, securities, when it offered and sold LBC." As the SEC explained, each prong of the _Howey_ test was satisfied with respect to LBC, including the third prong, as investors reasonably expected a profit from LBRY's efforts.

156.    On November 7, 2022, the court granted summary judgment against LBRY, holding that LBRY offered and sold LBC as a security in violation of the registration requirements. In so holding, the court rejected LBRY's fair notice defense. LBRY had argued that the court should deny summary judgment because the company did not receive fair notice that its offerings were subject to the securities laws. However, the court found this argument unpersuasive, holding:

> **_The SEC has not based its enforcement action here on a novel interpretation of a rule that by its terms does not expressly prohibit the relevant conduct_**. Instead, the SEC has based its claim on a straightforward application of a venerable Supreme Court precedent

that has been applied by hundreds of federal courts across the country over more than 70 years. . . . ***LBRY is in no position to claim that it did not receive fair notice that its conduct was unlawful***.

157. These enforcement actions confirm that by the start of the Class Period (and continuing throughout), the SEC was cracking down on the crypto markets, specifically targeting digital assets that were not registered as securities as required by Section 5 of the Securities Act.

### 3. Coinbase Enables Customers to Trade and Stake Crypto Assets on its Trading Platform Despite Clear Signs that the Assets Are Securities

158. By as early as December 2016, Coinbase clearly understood that crypto assets could qualify as securities under the federal securities laws. On December 7, 2016, the Company released a guide on its website entitled, *A Securities Law Framework for Blockchain Tokens* (the "Coinbase Securities Law Framework"). Part one of the Coinbase Securities Law Framework addressed "[h]ow to determine if a token is a security," explaining: "The US Supreme Court case of *SEC v Howey* established the test for whether an arrangement involves an investment contract. An investment contract is a type of security." It further advised that "[f]or many blockchain tokens, the first two elements of the *Howey* test are likely to be met."

159. On September 25, 2018, Coinbase announced its "New Asset Listing Process." As part of this new process, crypto issuers were directed to fill out a listing application which Coinbase would evaluate against its "digital asset framework" to determine if the crypto asset would be made available on the Coinbase platform. Aware that the Company's ability to make available certain assets was dependent upon a determination that the assets were not securities, this framework assessed, "[c]an Coinbase legally offer this asset?" and required that "[t]he asset is not classified as a security using Coinbase's Securities Law Framework."

160. According to the facts unearthed through the SEC's investigation, Coinbase's listing application required issuers to provide information about their crypto assets including: "(i)

the 'project team' and its involvement in the 'development, promotion or function of the [relevant] network'; (ii) any 'token sale'; (iii) 'the allocation of tokens' to 'founders, advisors, employees, a foundation' and others; (iv) 'any statements . . . made about the token/network noting the potential to realize returns, profits or other financial gain'; and (v) 'any efforts to affect the token supply or impact token price (including supply caps, buybacks, repurchases, [and] burning[]).'"

161.    In September 2019, Coinbase, along with other crypto businesses, founded the CRC (i.e., the Crypto Rating Council) for the purpose of "creat[ing] a framework to consistently and objectively assess whether any given crypto asset has characteristics that make it more or less likely to be classified as a security under the U.S. federal securities laws" (the "CRC Framework"). Armstrong later characterized the CRC as one of "our own self regulatory frameworks" that Coinbase "proactively created." The CRC described its framework as a "distilled a set of yes or no questions which are designed to plainly address each of the four, Howey test factors," and further explained that "[e]ach question in the framework is assigned a points-based weighting to reflect its relative importance, the sum of which create scores for each Howey factor" which are "then scaled into a final rating between 1 and 5." According to the CRC, "[a] score of 5 results when an asset appears to have many characteristics that are consistent with the Howey-test factors"—i.e., the asset is likely to be a security. The CRC's Asset Score Card similarly describes an asset with a score of 5 as "most likely to be deemed a security." The scoring system places the most emphasis on "Prongs 3 and 4" of the *Howey* test—i.e., "reasonable expectation of profit" and "solely from the efforts of others."

162.    In explaining "[h]ow Coinbase thinks about the legal review of new assets[,]" the Company discussed the CRC "framework . . . for analyzing the factors most likely to play a role in determining whether an asset will be deemed to be a security," confirming that Coinbase utilized

this framework and the resulting scores in "conduct[ing] a legal review that analyzes potential assets under applicable securities laws."

163.    Coinbase's Listings Team, also called the Digital Asset Listing Group, is purportedly charged with approving each token that the Company intends to list, including confirming that a particular token is not a security. But as described in the June 6, 2023 SEC Complaint against Coinbase, from late 2019 through 2021, "Coinbase made available on the Coinbase Platform crypto assets with high 'risk' scores under the CRC framework it had adopted," and the Company made a brash business decision to add these assets to the Coinbase platform "even where it recognized the crypto assets had the characteristics of securities."

164.    The SEC's investigation further revealed that Coinbase actively advised issuers of crypto assets on how to avoid classification as a security under the Company's framework. According to the SEC Complaint, Coinbase's Listings Team dialogued with issuers looking to identify potential "roadblocks" under *Howey*. As alleged by the SEC, in one such instance, "Coinbase identified 'problematic statements' by an issuer that described its crypto asset 'with language traditionally associated with securities,' 'imply[ing] that the asset is an investment or way to earn profit,' 'emphasizing the profitability of a project and/or the historic or potential appreciation of the value of [the] asset[s],' 'attempts by the project team to have the asset listed on exchanges,' and 'using terms referring to the asset[s] that are commonly associated with securities such as 'dividend,' 'interest,' 'investment' or 'investors.'" The SEC Complaint further noted that "as 'possible mitigation,' Coinbase suggested that the issuer '[r]emove any existing problematic statements, and refrain from making problematic statements in the future.'"

### 4.    Defendants Mislead Coinbase Investors About the Existence, Nature, and Extent of the Regulatory Risks Facing the Company

165.    Against the backdrop of heightened SEC scrutiny and enforcement, the stakes for

Coinbase were extremely high leading up to and throughout the Class Period—an SEC investigation or enforcement action could result in substantial penalties, or even require Coinbase to drastically limit the number of digital assets it offers in the U.S. As noted above, the vast majority of Coinbase's revenue is derived from its U.S. operations. These and other consequences had the potential to adversely impact Coinbase's business operations by damaging its ability to increase its stable of listed assets and maintain its competitive position vis-à-vis other cryptocurrency exchanges, and by scaring away its customers and investors. Indeed, prior to the Direct Listing, Armstrong acknowledged during Coinbase's Investor Day, that an SEC enforcement action would materially harm the Company's business: "*[W]e don't want to get any enforcement actions or anything like that that'll set us back*."

166.    Thus, it was critical that Defendants convince investors that Coinbase was, and would remain, in compliance with existing laws and regulations. To accomplish this objective, Defendants repeatedly assured investors that "[w]e invest heavily in regulatory compliance by working with regulators around the world to shape policy." From there, Defendants promised investors: "[W]e want to make sure we're following the law. . . . *We're 100% focused on crypto, but we are following a trusted, regulated approach*."

167.    At the same time, Coinbase's success prior to and throughout the Class Period hinged in large measure on its "flywheel" propelled by the Company's ability to introduce and incorporate a vast array of new digital assets and products. As of the Direct Listing, nearly 96% of the Company's total revenues were derived from transaction fees driven by retail investors. To increase transaction fees, grow its user base, and support its custody services, Coinbase needed to continuously expand the digital assets available for customers to trade, stake, and store. And the

Company promised to do just that, identifying "[e]xpanding the depth and breadth of assets" as a key component of Coinbase's "Growth Strategy" in the Offering Materials.

168.    The intersection of these two competing investor concerns—rapidly growing Coinbase's suite of products and offerings, while avoiding regulatory pitfalls—was front and center during the Company's Investor Day for the Direct Listing. The very first question Coinbase received and responded to was: "What is the Coinbase criteria for adding altcoins to be exchanged on the platform?" In response, Haas made clear that Coinbase's intent was to satisfy customers' desire for more and more assets on its exchange, but again assured investors that the Company was doing so with full knowledge of its regulatory obligations:

> So, first of all, we look to be the platform that lists all of our assets that the customer would like to trade in, ***assuming that they're legal, assuming that we feel good about the [digital asset] and that they are compliant***. And so those are the criteria.

169.    As for those criteria, Defendants lauded Coinbase's in-house framework for considering whether assets were securities or not. The Prospectus touted the Company's "risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a 'security' under applicable laws" as "comprehensive," "thoughtful," and "reasonably designed to facilitate consistent application of available legal guidance to crypto assets ***to facilitate informed risk-based business judgment***." Coinbase further promised investors in the Prospectus that "we only permit trading on our core platform of those crypto assets for which we determine ***there are reasonably strong arguments to conclude that the crypto asset is not a security***."

170.    These and other statements from Defendants conveyed to the market that Coinbase knew the laws and was following them, reinforcing investor confidence in the Company's ability to stay on the right side of the securities laws and avoid adverse action from the SEC.

171.    In connection with their coverage of the Direct Listing, market analysts seized on

Defendants' purported compliance. For example, on April 15, 2021, BTIG analysts reported that Coinbase's "rigorous[] adher[ence]" was "a key differentiating factor." Likewise, among the "key competitive advantages" identified by Rosenblatt analysts in their April 2021 report were Coinbase's "compliance infrastructure" and its close coordination with regulators and law enforcement.

172.    In the months that followed, Coinbase made good on its growth promise, flooding the market with new listed digital assets and products. At the time of the Direct Listing, Coinbase had 51 crypto assets for trading on its platform. In the Company's 10-Q filed in August of 2021, Coinbase reported that it had increased the number of assets available for trading to 83 total and boasted that "[i]n 2Q alone, we added more assets for trading than we added in all of 2020." In November 2021, Coinbase touted that "[i]n Q3, we accelerated our pace of asset additions, adding 30 new assets for trading." Significantly, it was during these two quarters of "accelerated" growth that Coinbase added digital assets that would later become the focus of the SEC's initial investigation—AMP, RLY, DDX, XYO, and RGT—to its platform for trading. Shortly thereafter, on October 27, 2021 and November 15, 2021, respectively, Coinbase added LCX and POWR— two more digital assets in the SEC's crosshairs—to the platform for trading. By the end of 2021, Coinbase supported a total of 139 crypto assets for trading.

173.    Analysts hailed Coinbase's continued diversification of its trading business. For example, Canaccord Genuity reported in November 2021 that "[w]e like that Coinbase is aggressively adding new digital assets to its platform to further diversify its trading business away from Bitcoin and Ethereum" and further noted, "[t]he importance of adding new assets to the platform is evident by the fact that trading volume from crypto assets outside of Bitcoin and Ethereum comprised of 59% of the total volume in Q3." Morningstar similarly commented:

During the quarter, Coinbase's reliance on bitcoin and Ethereum trading continued to decrease, with other crypto assets now making up 57% of the company's transaction revenue. We view this trend as a favorable sign for the company as the breadth of its asset offerings is a competitive strength versus offerings from other U.S.-listed providers. . . . ***Sharp spikes in the price and volatility of lesserknown crypto assets . . . draw in new users to the platform, drive higher volume, and give the company more space to continue charging higher fees than its competitors***.

174.    As of May 31, 2022, Coinbase offered 172 assets for trading on its platform and that number continued to grow throughout 2022.



175.    Unbeknownst to investors, however, amidst market excitement about Coinbase's apparent growth, the risk of regulatory enforcement facing the Company became a reality in the spring of 2022. By no later than May 2022, Armstrong and Grewal knew that the SEC had turned its focus to Coinbase and, in particular, on whether it was listing unregistered securities in violation of the federal securities laws. Specifically, the SEC had served Coinbase with "a request for information about its asset listings process"—a fact Armstrong would not disclose until August 2022—***and*** was actively investigating a Coinbase employee for insider trading, i.e., illegally

sharing and trading on material nonpublic information about digital assets the SEC had determined were "securities" under existing securities laws.

176.    Yet, in the Company's quarterly report for the first quarter of 2022, filed on May 10, 2022, Coinbase and Armstrong failed to disclose these material facts, instead portraying the regulatory scrutiny, inquiries, and investigations by the SEC arising from Coinbase's listing of digital assets as a purely *contingent* risk:

> [A] particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, *we may be* subject to regulatory scrutiny, inquiries, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition.

In subsequent disclosures concerning ongoing legal and regulatory proceedings, Coinbase, Armstrong, and Grewal similarly failed to specifically disclose that this risk had, in fact, come to fruition, in part because Coinbase had made available on its platform crypto assets with high risk scores under the CRC framework it had adopted indicating that the assets were securities, and because the SEC was actively investigating the Company's asset listings process.

177.    Then, on July 21, 2022, the SEC and the Department of Justice (the "DOJ") both filed charges against a former Coinbase manager (Ishan Wahi), his brother (Nikhil Wahi), and his friend (Sameer Ramani). The SEC alleged that from at least June 2021 to April 2022, Ishan tipped Nikhil and Ramani about the timing and content of crypto assets Coinbase was planning to list. During this span, they collectively purchased 25 or more crypto assets, at least nine of which the SEC alleged were securities (e.g., POWR, AMP, RLY, DDX, XYO, RGT, LCX, DFX, KROM), and then sold them after the listing announcements for more than $1.1 million in profit. The SEC charged each with violating the federal securities laws. The same day, the DOJ announced the first ever insider trading case involving crypto assets, charging the Wahi brothers and Ramani with

"wire fraud conspiracy and wire fraud in connection with a scheme to commit insider trading in cryptocurrency assets by using confidential Coinbase information." Ishan Wahi and Nikhil Wahi have since been sentenced to 24 months and 10 months in prison, respectively, for their roles in the tipping scheme and have settled the civil claims brought by the SEC. Ramani remains at large. And, as discussed *infra*, the SEC charged Coinbase on June 6, 2023, for operating as an unregistered securities exchange, broker, and clearing agency, and for the unregistered offer and sale of securities in connection with its staking-as-a-service program for numerous crypto assets.

178.    Immediately, investors clamored for information, and Coinbase sought to quell their concerns over the potential for SEC enforcement against the Company itself. Across various platforms—including through Coinbase's blog, the Twitter accounts of Armstrong and Grewal, and other major publications and news outlets—Armstrong and Grewal unequivocally stated that "***Coinbase does not list securities. End of story***." Defendants acknowledged the SEC's position that at least nine of the crypto coins at issue were securities, and that seven of those coins were listed on Coinbase's platform at the time, but Grewal nonetheless reiterated to investors on Coinbase's blog that "***[n]one of these assets are securities. Coinbase has a rigorous process to analyze and review each digital asset before making it available on our exchange — a process that the SEC itself has reviewed***." Grewal then concluded, "***we remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform***."

179.    These affirmative denials gave investors the materially false and misleading impression that the regulatory risks related to Coinbase's listing of unregistered securities were minimal, and that the SEC had approved or blessed the Company's framework for keeping such securities off its exchange. In reality, unbeknownst to investors, the SEC had already been investigating Coinbase for months, specifically seeking "information about Coinbase's asset

listings process," and meeting with Company representatives *almost weekly* (ultimately, over 30 times between June 2022 and March 2023). Coinbase, Armstrong, and Grewal did not disclose any of these facts. Moreover, despite Grewal's misleading statements to the contrary, the SEC had never approved or ratified the Company's purported "rigorous diligence process" for determining whether a particular digital asset is a security subject to registration. Nor did the SEC give Coinbase any indication that it approved of Coinbase's staking services—another target of the regulator's investigation. Indeed, with respect to Coinbase's process for purportedly ensuring that its staking activities complied with the federal securities laws, the SEC specifically advised Coinbase that "the [SEC] Staff neither agreed nor disagreed with the legal analysis." This was consistent with the SEC's previous statements beginning as early as January 2022 that so-called "*model frameworks*" for evaluating the regulatory risks associated with trading or holding particular digital assets have not been endorsed or approved by the SEC.

180.    Given these facts, Coinbase's, Armstrong's, and Grewal's statements gave investors the false and misleading impression that the SEC had blessed or approved Coinbase's process for determining whether a digital asset is a security under existing laws and regulations and, by extension, that their unequivocal representations that Coinbase did not list securities had a reasonable basis in fact, when in actuality they did not.

181.    However, just four days later, on July 25, 2022, after the market closed, Bloomberg reported that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities." Bloomberg noted that "after taking a relatively cautious approach for years, Coinbase has boosted its token offerings," explaining:

> The US Securities and Exchange Commission's scrutiny of Coinbase has increased since the platform expanded the number of tokens in which it offers trading, said two of the people, who asked not to be named because the inquiry hasn't been disclosed publicly.

> The probe by the SEC's enforcement unit predates the agency's investigation into an alleged insider trading scheme that led the regulator last week to sue a former Coinbase manager and two other people.

182.    On this news, Coinbase's stock price declined approximately 21%. Analysts reacted negatively, including Morningstar, which wrote: "This carries risk for Coinbase as the firm cannot allow its users to trade unregistered securities, and is not an official securities exchange." Morningstar concluded that this "could lead to a further loss of revenue for Coinbase, which the firm can ill afford . . . or lead to outright fines."

183.    Despite this sizable stock drop, Coinbase's stock price remained inflated. This was because Defendants doubled-down on their false and misleading statements and denials. This time, they again denied that Coinbase listed any securities and downplayed the nature and extent of the regulatory risk it faced. Grewal, speaking on behalf of the Company, declared: "***I'm happy to say it again and again: we are confident that our rigorous diligence process—a process the SEC has already reviewed—keeps securities off our platform, and we look forward to engaging with the SEC on the matter***."

184.    Alongside their affirmative denials, Armstrong and Grewal sought to rally the public behind the Company. Specifically, they embarked on a public relations campaign to sow doubt about the clarity of existing federal law and regulations (*see* Section IV.I.1-2 *supra*) as applied to Coinbase's crypto assets. Across numerous forums, Armstrong and Grewal cried foul and strained to portray Coinbase as the victim, claiming they lacked "fair notice" of the application of the securities laws and regulations to Coinbase's business, and criticizing the "regulatory uncertainty" in the crypto industry. In essence, Armstrong and Grewal sought to publicly paint Coinbase as an upstanding corporate citizen that was breaking no laws by listing or making

available unregistered digital assets, and fault the SEC for failing to provide fair notice about the regulation of crypto generally and, as applied to Coinbase, specifically.

185.    But as Gensler previously stated in no uncertain terms:

> Some in the crypto industry have called for greater "guidance" with respect to crypto tokens . . . For the past five years . . . the Commission has spoken with a pretty clear voice here: through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission. Chairman Clayton often spoke to the applicability of the securities laws in the crypto space. ***Not liking the message isn't the same thing as not receiving it***.

186.    Defendants knew their public discourse would be entirely one-sided, and that they could take advantage of the SEC's longstanding policy that it does not comment on ongoing investigations or provide advisory opinions on whether specific companies are violating the law. As stated by the founder and former chief of the SEC Office of Internet Enforcement, John Reed Stark:

> Securities regulation is rarely proscriptive but is a principles-based regulatory framework, much like other U.S. laws. For example, ***U.S. laws do not specify that one cannot steal a neighbor's lawnmower from their garage, but rather prohibits the theft of someone else's property, which covers all things, including lawnmowers. The same goes for securities regulation.***

187.    Nevertheless, Defendants' reckless gamble—hoping that the regulatory framework would shift in the Company's favor or the SEC would focus its enforcement efforts elsewhere—initially paid off. Investors were placated by Defendants' repeated reassurances and believed that Coinbase was cooperating with the SEC and managing and navigating through any regulatory risks facing the business. For example, Canaccord reported on August 24, 2022, that it was "cognizant of heightened regulatory scrutiny industry wide," but its "view remains that COIN has always embraced regulation and helped with its evolution in this new industry" and described the recent updates as "shorter-term headlines" as "bumps along the road[.]"

188.    But behind the scenes, as the SEC inched closer to bringing an enforcement action against Coinbase throughout the second half of 2022 and into 2023, the state of affairs was far different. Defendants have since revealed that Coinbase met with the SEC over 30 times between June 2022 and March 2023 (almost weekly) following the commencement of the SEC's investigation. In addition, Defendants have revealed that as Coinbase continued to engage with the SEC throughout late 2022 and into early 2023, Coinbase made over a dozen presentations and had more than 27 phone calls with the SEC. During that time, Coinbase produced documents to the SEC and provided two witnesses for testimony, including one to specifically address Coinbase's staking services.

189.    Defendants have also acknowledged that by no later than January 2023, ***they knew the SEC was pursuing an enforcement investigation***, and as early as mid-2022, they were engaged in discussions with the SEC's Enforcement Division. As Grewal admitted following the public disclosure of the Wells Notice on March 22, 2023, "[i]n January, the day before our scheduled meeting, the SEC canceled on us ***and told us they would be shifting back to an enforcement investigation***." Coinbase later confirmed that as of that moment in January 2023, Defendants knew that "[d]iscussions were over" with the SEC and that the Company faced "an imminent enforcement action." In April 2023, Coinbase revealed in its response to the Wells Notice that the SEC began "referr[ing] all meeting requests [from Coinbase] to Enforcement" in July 2022. Then, in June 2023, Armstrong admitted that the SEC's "tone" had changed approximately a year ago—***several months before the January 2023 meeting Armstrong previously disclosed***. Grewal similarly admitted that Coinbase knew the SEC was going to file an action against it for a long time, stating: "***[T]his was a day we knew that would come. And so, we've been preparing for it for a very, very long time***." It is thus implausible that Armstrong and

Grewal were completely in the dark about the nature and extent of the regulatory risk it faced. Still, at no point during this period did Armstrong and Grewal disclose to the market that the SEC's scrutiny had intensified.

190.    On February 9, 2023, the SEC filed and resolved charges against one of the Company's rivals, Payward Ventures, Inc. and Payward Trading Ltd. (d/b/a Kraken) ("Kraken"). Specifically, the SEC charged Kraken with failing to register the offer and sale of the company's staking program. This staking program allowed investors to transfer their crypto assets to Kraken for staking in exchange for annual investment returns of up to 21%. When investors staked their digital assets with Kraken, they lost control of the tokens and assumed the risks associated with the digital asset platforms. The SEC alleged that Kraken advertised its staking service as an easy-to-use platform that provided benefits to investors based on Kraken's efforts, including its strategies to obtain regular investment returns and payouts. The same day the SEC filed its charges, Kraken settled with the SEC, agreeing to discontinue its staking services and pay $30 million in disgorgement, prejudgment interest, and civil penalties. Kraken also consented to entry of a final judgment, subject to court approval, that would permanently enjoin the company from offering or selling securities through crypto asset staking services or staking programs.

191.     Commenting on the SEC's allegations, Gensler stated:

> Whether it's through staking-as-a-service, lending, or other means, crypto intermediaries, when offering investment contracts in exchange for investors' tokens, need to provide the proper disclosures and safeguards required by our securities laws. . . . Today's action should make clear to the marketplace that staking-as-a-service providers must register and provide full, fair, and truthful disclosure and investor protection.

192.    Just one day earlier, Armstrong had ominously tweeted that Coinbase was "hearing rumors that the SEC would like to get rid of crypto staking in the U.S. for retail customers" and

that this "would be a terrible path for the U.S. if that was allowed to happen." In the same tweet, Armstrong assured Coinbase investors that "[s]taking is not a security."

193.    In the wake of the Kraken settlement, the market immediately expressed concern about the fate of Coinbase's staking program and, more specifically, its susceptibility to enforcement action. This question was particularly important at this point in time because the market expected Coinbase to benefit massively from the pending "Shanghai Fork Split," which referred to upcoming changes to Ethereum. The key outcome of the Shanghai Fork Split was that it would allow users who staked their Ethereum to either partially or fully withdrawal their staked Ethereum—some of which had been staked since December 2020. Once withdrawals were enabled and Ethereum staking became more liquid, it was expected that Ethereum staking would become a more attractive alternative to lending options. The Shanghai Fork Split, which was anticipated to occur in the coming weeks around the time the SEC shut down Kraken's staking program, promised to increase Coinbase's profits as users flocked to the Coinbase platform to stake Ethereum given its newfound liquidity. In fact, many analysts, including Needham and J.P. Morgan, modeled their forecasts to include growth in Coinbase's staking business as a result of the Shanghai Fork Split. By some reports in January 2023, the Shanghai Fork Split was expected to increase Coinbase's staking revenues from approximately $50 million to *$550 million*. Any perceived threat to Coinbase's ability to offer Ethereum staking would be detrimental.

194.    Knowing this, Defendants offered a series of unwavering denials throughout February and March 2023, all of which sought to portray Coinbase's staking services as "fundamentally different" from Kraken's and thus outside the crosshairs of the SEC. For example, Coinbase published a blog post authored by Grewal entitled, "***Coinbase's staking services are not securities***." Speaking on behalf of the Company, Armstrong and Grewal stated repeatedly on

Coinbase's blog, through Twitter, and in discussion with investors that "*[s]taking is not a security*." Coinbase also continued to encourage its users to stake their Ethereum with Coinbase as late as March 2023 (months after Armstrong and Grewal knew that the SEC was shifting back to an enforcement investigation), touting that users could "get" or "earn 4.07% APY on all staked ETH" in addition to a 10% bonus for staking at least $100 in Ethereum with Coinbase.

195.    Coinbase's, Armstrong's and Grewal's misleading statements had their intended effect, which was to reassure the market that they were confident that the Company's staking services did not violate securities laws. For example, Needham reported on February 9, 2023 that "[w]e are not adjusting estimates yet in light of Mr. Armstrong's staking comments [on Twitter]." Likewise, when analyzing the effects of the Kraken settlement on Coinbase, J.P. Morgan reported that "Coinbase CLO Paul Grewal tweeted that 'true on-chain staking services like ours are *different*,' suggesting that maybe Kraken is including more than just on-chain staking."

196.    Notably, despite Grewal's confident assurances to the market that Coinbase's staking services were "fundamentally different," on March 10, 2023, Coinbase suddenly announced changes to the User Agreement's staking terms in an email to customers titled *An update about staking with Coinbase*. The updated terms of the User Agreement advised users they would "need to request for your staked assets to be unstaked before they can be sold or transferred." Under the new terms, "[w]hen you request to unstake, Coinbase will take blockchain operations on your behalf to wind-down your assets' participation in the validations process of the relevant protocol." The User Agreement added that "[d]epending on the protocol, you may or may not receive staking rewards during the unstaking process."

197.    Effectively, the changes to the User Agreement were Coinbase's attempt to differentiate the Company's staking services from the aspects of Kraken's which the SEC took

issue with, in part, because Kraken acted as an intermediary in the staking process. Coinbase's email emphasized its differentiated staking services by telling users that "Coinbase acts *only* as a service provider connecting you, the validators, and the protocol." To drive home the point that contrary to Kraken's practice, Coinbase users, rather than Coinbase, earn rewards through protocols, the email to users noted that Coinbase simply acts to "*pass along* any rewards earned from staking, minus a transparent Coinbase fee."

198.    Then, on February 21, 2023, in the Company's 2022 Form 10-K, Coinbase and Armstrong purported to disclose the status of the SEC investigation, stating: "Based on the ongoing nature of these matters, ***the outcomes remain uncertain and the Company cannot estimate the potential impact, if any, on its business or financial statements at this time***." This was materially misleading, because, among other things, Defendants once again failed to disclose that as early as mid-2022 and by no later than January 2023, the SEC was moving toward an enforcement action. Thus, it was misleading to represent that "the outcome[] remain[s] uncertain" or that "the Company cannot estimate the potential impact, if any."

199.    One month later, on March 22, 2023, Coinbase filed a Form 8-K with the SEC disclosing that it had received a Wells Notice from the SEC earlier that day. In the Wells Notice, the SEC advised Coinbase "that the staff of the [SEC] has made a preliminary determination to recommend that the Commission file an enforcement action against [Coinbase]" for violations of the Exchange Act and the Securities Act. According to Coinbase, the Wells Notice related to a purportedly "unspecified portion of our listed digital assets, our staking service Coinbase Earn, Coinbase Prime, and Coinbase Wallet."

200.    That same day, Coinbase publicly responded to the Wells Notice in a blog post entitled, *We asked the SEC for reasonable crypto rules for Americans. We got legal threats instead.*

In the blog post, Coinbase continued to deny culpability, stating that "Coinbase does not list securities" and that "*[t]he bottom line remains: Coinbase does not list securities or offer products to our customers that are securities*." The blog post was another example of Coinbase rejecting the SEC's guidance in favor of its own "rigorous process to analyze and review each digital asset before making it available on our exchange." In addition, Coinbase continued to assert that "our staking services are not securities *under any legal standard, including the Howey test which assesses whether a product is an investment contract*."

201.    On June 6, 2023, the SEC officially charged Coinbase for operating as an unregistered securities exchange, broker, and clearing agency, and for the unregistered offer and sale of securities in connection with its staking-as-a-service program. The SEC Complaint was filed in the U.S. District Court for the Southern District of New York and specifically charged Coinbase with violations of Sections 5, 15(a), and 17A(b) of the Exchange Act and Sections 5(a) and 5(c) of the Securities Act.

202.    According to the SEC Complaint, Coinbase profited to the tune of billions of dollars over the course of the prior four years by unlawfully facilitating the buying and selling of crypto asset that are, in fact, securities under *Howey*. Such securities include, but are not limited to, crypto assets with trading symbols SOL, ADA, MATIC, FIL, SAND, AXS, CHZ, FLOW, ICP, NEAR, VGX, DASH, and NEXO. The SEC determined through its investigation that Coinbase was "aware of the risk that it could be making available for trading on the Coinbase Platform crypto assets that were being offered and sold as securities," but nonetheless "made the strategic business decision to add crypto assets to the Coinbase Platform even where it recognized the crypto assets had the characteristics of securities" through the scoring system Coinbase had devised as part of the CRC framework. The SEC Complaint further detailed how the Listings Team would identify

"problematic statements," i.e., language traditionally associated with securities, like dividend, interest, investment, or investors, and would then recommend that the issuer remove such language.

203.    In addition, with respect to Coinbase's staking program, the SEC found that the Company illegally offered and sold at least five crypto asset securities without registering those securities, as required under the Securities Act. In support of this claim, the SEC detailed key aspects of Coinbase's staking program, including the facts that: (i) asset owners must give up control of the asset to Coinbase while staking; (ii) Coinbase pools the stakeable assets in order to increase the likelihood that the blockchain will validate the transactions, and thus earn rewards; and (iii) participants in Coinbase's staking program reasonable expect to profit, as evidenced by Coinbase's advertisement of staking rewards.

204.    Following the filing of the SEC Complaint, Gurbir S. Grewal, Director of the SEC's Division of Enforcement, stated:

> Coinbase was fully aware of the applicability of the federal securities laws to its business activities, but deliberately refused to follow them. While Coinbase's calculated decisions may have allowed it to earn billions, it's done so at the expense of investors by depriving them of the protections which they are entitled. Today's action seeks to hold Coinbase accountable for its choices.

205.    Echoing Chairman Gensler's earlier statements, Gurbir S. Grewal likewise stated:

"***You simply can't ignore the rules because you don't like them or because you'd prefer different ones***: the consequences for the investing public are far too great."

206.    On June 6, 2023, the same day that the SEC Complaint was filed, news broke of a multi-state task force comprised of securities regulators from ten states, including Alabama, California, Illinois, Kentucky, Maryland, New Jersey, South Carolina, Vermont, Washington, and Wisconsin. Each state simultaneously announced that it had taken action against Coinbase in one

form or another. Alabama, for example, filed a Show Cause Order (Administrative Order No. SC-2023-0009) against Coinbase giving the Company 28 days to "show cause why [Coinbase] should not be ordered to cease and desist from any further violations of the Alabama Securities Act." Other states, like California and New Jersey, filed cease and desist orders directing Coinbase to immediately desist and refrain from offering for sale any securities, including those associated with the Company's staking program.

| State | Penalties |
|---|---|
| Alabama | Sanctions may include, inter alia, an administrative assessment imposed and an additional administrative assessment for investigative costs arising from the investigation of the violations of the Alabama Securities Act. |
| California | Administrative penalties for the statutory amount of not more than $1,000 for the first violation, and not more than $2,500 for each subsequent violation, or according to proof, for repeated willful violations of California's Corporations Code section 25252(a). |
| Illinois | Relief including but not limited to imposition of a monetary fine in the maximum amount of $10,000 per violation pursuant to the Illinois Securities Law of 1953. |
| Kentucky | A civil fine not to exceed $20,000 per violation. |
| Maryland | A monetary penalty in the amount of $5,000 for each violation of the Maryland Securities Act, Corporations and Associations Article. |
| New Jersey | Civil monetary penalties in the amount of $5,000,000 for violations of New Jersey's Uniform Securities Law. |
| South Carolina | A civil penalty in the amount of $4,370,300, or a civil penalty in an amount not to exceed $10,000 for each violation of the South Carolina Uniform Securities Act of 2005. |
| Vermont | Conditions include the payment of restitution as the Vermont Commissioner of Financial Regulation deems appropriate including, but not limited to, a civil penalty of not more than $15,000 for each violation. |
| Washington | Liable for a fine in the amount of $4,000,000, and the costs, fees, and other expenses incurred in the administrative investigation and hearing of the matter, in an amount not less than $10,000. |
| Wisconsin | A civil penalty in the amount of $500,000 for violations of the Wisconsin Uniform Securities Law. |

### 5. Coinbase's Compliance Failures Contributed to the Undisclosed Bankruptcy and Regulatory Risks

207.    Throughout the Class Period, Coinbase was also engaged in a pattern of misconduct behind the scenes that recklessly contributed to the bankruptcy and regulatory risks that the Company faced. In September 2020, Coinbase leadership received the results of the NYDFS safety and soundness examination. According to the Consent Order, the NYDFS examination revealed "serious deficiencies in Coinbase's compliance function across multiple areas." Coinbase acknowledged that it had been aware of these issues—which included the Company's failure to comply with the Bank Secrecy Act, reporting requirements, and recordkeeping requirements— since at least 2018.

208.    Following an extensive examination of Coinbase, in early 2021, the NYDFS launched an official enforcement investigation into the Company's various compliance practices. The investigation revealed that Coinbase's decision to implement a "risk-based" compliance program was ineffective because, as NYDFS observed, "a risk-based system . . . is only effective if the risk rating is conducted rationally, and that simply did not happen at Coinbase." Indeed, by late 2021, Coinbase had a backlog of over 100,000 unreviewed transaction monitoring alerts and had not conducted full due diligence for all of its newly on-boarded customers. The NYDFS subsequently found that "Coinbase's compliance system failed to keep up with the dramatic and unexpected growth of Coinbase's business" and, by the end of 2021, "was overwhelmed[] with a substantial backlog of unreviewed transaction monitoring alerts ["TMS alerts"], exposing its platform to risk of exploitation by criminals and other bad actors." The investigation further revealed that "the risks to the financial system due to this weakness are not merely theoretical," and in one case, led to the theft of *more than $150 million from a customer's account* in the spring of 2021. By February 22, 2022, Coinbase had agreed to retain an Independent Monitor to

review the Company's many compliance shortcomings.

209.    The NYDFS ultimately issued the Consent Order on January 4, 2023 and announced that Coinbase had agreed to a staggering ***$100 million*** settlement—believed to be the largest regulatory fine levied on a cryptocurrency company to date—to address Coinbase's violations, and to ensure that further compliance remediation efforts are completed. Nonetheless, as of the date of the Consent Order, Coinbase still had not placed restrictions on all of the historical accounts that had yet to be re-reviewed.

**J.      The Relevant Truth Concealed by Defendants' Material Misrepresentations and Omissions Is Revealed to Investors**

210.    As a result of Defendants' materially false or misleading statements and omissions of material fact, Coinbase common stock traded at artificially inflated prices during the Class Period.

211.    On May 10, 2022, Defendants finally disclosed what they had known the entire Class Period: the crypto assets held in custody by the Company on behalf of customers could be treated as the Company's assets in the event of bankruptcy such that customers could lose the ownership interest in their assets. That day, Coinbase filed its Form 10-Q for the period ending March 31, 2022. In the 10-Q, Coinbase amended the Company's quarterly warning concerning its "failure to safeguard and manage our customers' fiat currencies and crypto assets" to disclose, for the first time, that "***the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors***." In relevant part, Coinbase disclosed that:

> ***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition.***
>
> As of March 31, 2022, we held $256 billion in custodial fiat currencies and cryptocurrencies on behalf of customers. Supported

crypto assets are not insured or guaranteed by any government or government agency. . . . Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds.

* * *

Moreover, *because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition*.

212.    Later that day, Defendant Armstrong *admitted* on Twitter that Coinbase had failed to appropriately communicate this risk to investors, stating:

> *For our retail customers, we're taking further steps to update our user terms such that we offer the same protections to those customers in a black swan event. We should have had these in place previously, so let me apologize for that.*
>
> *This disclosure makes sense in that these legal protections have not been tested in court for crypto assets specifically, and it is possible, however unlikely, that a court would decide to consider customer assets as part of the company in bankruptcy proceedings.*
>
> *We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My deepest apologies, and a good learning moment for us as we make future changes.*

213.    On this news, the price of Coinbase common stock declined $19.27 per share, or more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on May 11, 2022.

214.    The market reacted swiftly and negatively to this news. On May 11, 2022, for example, Piper Sandler published a report entitled *Shares Take Another Leg Down On New SEC Custody Risk Disclosure Requirements*. Piper Sandler stated the following:

> COIN shares trading down ~23% this morning. Along with a 1Q22 earnings miss reported last night, we suspect the decline is being driven by language in the 10-Q filing (also released last night) about the consideration of customer's crypto assets under custody in the event of bankruptcy. Late last night, a twitter thread was posted from the account of CEO Brian Armstrong addressing the updated disclosures and reassuring the public that COIN is not at risk of bankruptcy and that customer funds are safe. . . .

> COIN included this new risk disclosure in its 10-Q filing. It goes on to say that this fact could negatively impact COIN's financial results as clients could now view COIN's custody services as more risky and less attractive[.]

215.    On May 13, 2022, New Constructs published a report entitled *1Q22 Earnings Shows Coinbase's Struggles* in which it warned, "Don't Ignore New Bankruptcy & Regulatory Risk." New Constructs further stated:

> As noted in Coinbase's latest 10-Q, the company has to address the real risk of bankruptcy. The following statement was added this quarter: ***"in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors."***

> This public acknowledgement could spark fear in the company's clients. The fear of bankruptcy proceedings could drive clients to cash out their investments as quickly as possible, further weakening Coinbase's business, and bringing the company even closer to bankruptcy[.]

216.    As The Financial Times reported on May 11, 2022 in an article entitled *Move along, says Coinbase's Armstrong*: "[T]here are a couple of lines in [Coinbase's] latest 10-Q filing about its responsibilities to safeguard customer assets that really caught our eye . . . . [S]hould Coinbase

go bankrupt then customers may lose their money they'd entrusted to the exchange for safekeeping."

217.    On May 11, 2022, Protocol, a technology-focused news organization, published an article entitled *Coinbase's disturbing disclosure:* '*If we go bankrupt….*' The article noted Armstrong's *mea culpa* and apologies to retail customers, quoting one market observer, Alex Johnson—author of the Fintech Takes newsletter—who called it a "bizarre lapse," stating, "***I don't understand how they possibly could have forgotten to do that, but apparently they did***."

218.    On July 25, 2022, after the market closed, Bloomberg published an article entitled *Coinbase Faces SEC Probe on Crypto Listings; Shares Tumble*. This article revealed that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities. . . ." As Bloomberg explained:

> The US Securities and Exchange Commission's scrutiny of Coinbase has increased since the platform expanded the number of tokens in which it offers trading, said two of the people, who asked not to be named because the inquiry hasn't been disclosed publicly. The probe by the SEC's enforcement unit predates the agency's investigation into an alleged insider trading scheme that led the regulator last week to sue a former Coinbase manager and two other people.
>
> ***
>
> As the largest US trading platform, Coinbase lets Americans trade more than 150 tokens. If those products were deemed securities, the firm could need to register as an exchange with the SEC. . . .
>
> Coinbase has repeatedly sparred with the agency over how it oversees the industry, and the firm last week called on the SEC to propose clearer rules. Meanwhile, after taking a relatively cautious approach for years, Coinbase has boosted its token offerings.

219.    On this news, the price of Coinbase common stock declined $14.14 per share, or approximately 21%, from a close of $67.07 per share on July 25, 2022, to close at $52.93 per share on July 26, 2022.

220.    Market commentators attributed the steep decline in Coinbase's share price to the news of the SEC's investigation into whether Coinbase was allowing users to trade unregistered securities. For example, in a July 26, 2022 report titled *Reports of Regulatory Scrutiny from the SEC Send Coinbase Shares Lower*, Morningstar stated: "Coinbase has fallen further on reports in Bloomberg and other media that the SEC is investigating the company over whether some of the cryptocurrencies that have been listed on its platform should have been registered as securities before issuance." As Morningstar explained, "[t]his carries risk for Coinbase as the firm cannot allow its users to trade unregistered securities, and is not an official securities exchange." Morningstar observed that since delisting Ripple's XRP token in 2020, the Company "has substantially increased the breadth of its listing, currently offering trading in over 200 tokens, adding to the risk that many of the assets on its platform could run foul of the SEC." Morningstar concluded that if the SEC determined that certain of the Company's listed cryptocurrencies were securities, this "could lead to a further loss of revenue for Coinbase, which the firm can ill afford . . . or lead to outright fines."

221.    Next, after the market closed on March 22, 2023, Coinbase filed a Form 8-K with the SEC disclosing that it had received a Wells Notice from the SEC earlier that day. In this 8-K, Coinbase stated:

> On March 22, 2023, Coinbase Global, Inc. and Coinbase, Inc. (collectively, the "Company") received a "Wells Notice" from the Staff ("Staff") of the Securities and Exchange Commission ("SEC") stating that the Staff has advised the Company that it made a "preliminary determination" to recommend that the SEC file an enforcement action against the Company alleging violations of the federal securities laws, including the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the Securities Act of 1933, as amended (the "Securities Act"). Based on discussions with the Staff, the Company believes these potential enforcement actions would relate to aspects of the Company's spot market, staking service Coinbase Earn, Coinbase Prime and Coinbase Wallet.

222.    Coinbase also published a lengthy blog post regarding the Wells Notice on March 22, 2023. In this post, Coinbase stated:

> The Wells notice comes out of the investigation that we disclosed last summer. Shortly after that investigation began, the SEC asked us if we would be interested in discussing a potential resolution that would include registering some portion of our business with the SEC. . . .
>
> *We met with the SEC more than 30 times over nine months*, but we were doing all of the talking. In December 2022, we asked the SEC again for some feedback on our proposals. The SEC staff agreed to provide feedback in January 2023. *In January, the day before our scheduled meeting, the SEC canceled on us and told us they would be shifting back to an enforcement investigation*. . . .
>
> The investigation is still at a very early stage. We have produced documents and provided two witnesses for testimony, one on the basic aspects of our staking services and one on the basic operation of our trading platform. . . .

223.    On this news, the price of Coinbase common stock declined $10.84 per share, or approximately 14%, falling from $77.14 at market close on March 22, 2023, to $66.30 at market close on March 23, 2023, with high trading volume.

224.    Analysts expressed surprise and concern in the wake of Coinbase's disclosure of the Wells Notice. For example, Needham wrote in a March 23, 2023 report that "the concerns over asset listings" in the notice were not anticipated. In analyzing the potential impact of the Wells Notice and subsequent SEC action, Needham concluded that Bitcoin was "unlikely to be under scrutiny" and instead noted: "We suspect the notice is targeted more at alt-coins Coinbase lists." As Needham explained, "Coinbase offers 549 pairs for trading and 240 unique tokens" and "Bitcoin is unlikely to be considered a security vs the many other alt-coins Coinbase lists." According to Needham's analysis, these alt-coins accounted for 46% of the total volume on Coinbase in 2022 and 49% of Coinbase's 2022 transaction revenues were tied to "other crypto

assets." Needham further explained the significance to alt-coins to Coinbase's business and revenues, stating:

> [E]ven if the universe of tokens under regulatory scrutiny is small, we believe de-listings would be a notable negative to COIN's business model. By having a large number of asset listings, Coinbase was able to attract a larger customer base--even if that customer base today primarily trades bitcoin. In other words, even if bitcoin is the highest volume asset on Coinbase, we believe customers that now choose to trade bitcoin on COIN were brought to the platform for another crypto, such as dogecoin or shiba inu which were not offered by as many platforms.

225.    Thus, Needham concluded, "asset de-listings would call into question COIN's ability to gain new customers in the future" and would compromise Coinbase's ability to compete with decentralized exchanges that are "less likely to see regulations. . . ."

226.    In a March 24, 2023 report, TD Cowen downgraded Coinbase to "Underperform [ ] on incremental risk to operations for the SEC Wells Notice and crypto banking crackdown." TD Cowen echoed Needham's concerns, stating: "[T]here is risk to a material portion of COIN's non-[Bitcoin and Ethereum] trading volumes (32% in Q4:22) and assets under custody (26% in Q4:22) that could be deemed securities by regulators, exacerbating trading volume deterioration."

227.    Finally, before the market opened on June 6, 2023, the SEC filed a complaint against Coinbase. The SEC alleged, based on its investigation, that the Company had violated the federal securities laws by [1] making available on its platform unregistered crypto asset securities and [2] failing to register "with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets." As discussed above, the SEC Complaint detailed Coinbase's conduct in "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets." Among other relief, the SEC sought civil money penalties and an order

requiring Coinbase to disgorge all ill-gotten gains resulting from its Exchange Act and Securities Act violations, with prejudgment interest thereon.

228.    Media outlets quickly reported on the filing of the SEC Complaint. For example, in an article published at 8:14am EDT, Bloomberg reported: "In a 101-page lawsuit filed Tuesday in federal court in New York, the SEC alleged that Coinbase for years evaded its rules by letting users trade numerous crypto tokens that were actually unregistered securities." Bloomberg further noted: "The SEC also accused Coinbase of breaking the agency's rules with its 'staking' service. That product offers customers a return in exchange for providing their tokens to be used to facilitate transactions on a blockchain."

229.    On this news, the Company's stock price plummeted more than 19% during pre-market trading. After closing at $58.71 on June 5, 2023, Coinbase's stock opened at just $47.10 on June 6, 2023, and ultimately closed at $51.61 on June 6, 2023.

230.    Following the disclosure of the SEC Complaint, analysts expressed concern about the potential implications of the action on Coinbase's financial condition. In a June 6, 2023 report, Barclays stated that the "SEC Suit Suggests Potentially Meaningful Penalties," further reporting that "today's filing suggests potential penalties could be quite meaningful versus our prior expectations" and noting that the SEC action "quantifies sizeable potential penalties." As Barclays reported:

> [I]n the suit, the SEC also orders Coinbase to 'disgorge . . . all ill-gotten gains' resulting from the alleged violations, with interest – in other words, the company would be required to pay a penalty totaling the entirety of revenues generated from trading in digital asset securities. If we were to just assume the SEC is referring to trading in all non-BTC/ETH securities, based on data we have going back to 1Q20, and including the staking program, we estimate the total of these revenues would be just over $6B. This would be in addition to unspecified civil penalties.

231.    Barclays also reported that the "State 'Show Cause' order adds to regulatory uncertainty," specifically referencing the Alabama Show Cause order, and noted that while the "order was issued by [Alabama], . . . [it] was the result of a multi-state task force of ten state securities regulators, including CA, IL, KY, MD, NJ, SC, VT, WA, and WI."

## V.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT – EXCHANGE ACT CLAIMS

### A.    Misrepresentations and Omissions Concerning the Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues

#### 1.    April 14, 2021 – Prospectus

232.    On March 23, 2021, Coinbase filed its Form S-1 Registration Statement with the SEC, which was deemed effective by the SEC on April 1, 2021. The Form S-1 was signed by Defendants Armstrong and Haas. On April 14, 2021, Coinbase filed the Prospectus, incorporating and forming part of the Registration Statement. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "*failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition*."

233.    Defendants Coinbase, Armstrong, and Haas similarly represented that:

> *The loss or destruction of private keys required to access any crypto asset held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses*. . . Crypto assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. *Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' crypto assets could adversely affect our customers' ability to access or sell their crypto assets*, require us to reimburse our customers for their losses, and subject us to significant financial losses in addition to losing customer trust in us and our products.

234.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas further stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

235.    Defendants' statements set forth in ¶¶ 232-34 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading. As set forth in Section IV.F.2 *supra*, by choosing to speak about the material risks arising from Coinbase's "***failure to safeguard and manage [its] customers' fiat currencies and crypto assets***," Defendants had a duty to speak completely and accurately, including to disclose material facts necessary to make these statements not misleading. Notwithstanding this duty, Defendants failed to disclose that customers could lose some or all of their crypto assets in the event of Coinbase's bankruptcy. As Armstrong admitted on May 11, 2022, any purported "***legal protections***" available to safeguard crypto assets during the Class Period "***ha[d] not been tested in court for crypto assets specifically***," leaving wide open the possibility that "***that a court would decide to consider customer assets as part of the company in bankruptcy proceedings***."

236.    Thus, while Defendants purported to identify the circumstances in which customer assets in Coinbase's custody were susceptible to loss, and assured that the Company "***securely store[d] all crypto assets it holds on behalf of users***," by failing to disclose the risk to customers of asset loss or seizure in the event of Coinbase's bankruptcy, they gave investors the false impression that the digital assets held in Coinbase's custody on behalf of customers were safe and insulated from seizure, thus rendering the statements set forth in ¶¶ 232-34 materially misleading. In truth, Coinbase's inability to protect its customers' crypto assets from this loss made it highly probable that its customers would find the Company's custodial services "more risky and less

attractive," as Coinbase later admitted. The risks posed to Coinbase's exchange customers in turn posed a substantial, material risk to Coinbase's financial position, particularly, its revenue from transaction fees, which accounted for 96% of the Company's revenue and was the focus of analysts and investors alike in the run up to the Direct Listing and during the Class Period. Indeed, these statements gave investors the false impression that Coinbase's trading fees (accounting for almost all of the Company's total revenue) were stable and sustainable because of Coinbase's custody and storage services, a purported competitive advantage for the Company.

237.    In addition, separate and apart from Defendants' duty to disclose any material facts required to make their statements not misleading, Defendants were under a duty to disclose the risk of customer asset loss or seizure in the event of Coinbase's bankruptcy pursuant to Item 303 of SEC Regulation S-K. Specifically, in the Management Discussion and Analysis ("MD&A") section of its Forms 10-K and 10-Q filed with the SEC, Defendants were required to describe any known trends or uncertainties that have had or that were reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Even if Defendants were unable to determine the effect of the "uncertainty" on Coinbase's future revenues and income, Defendants were still required under Item 303 to disclose the manner in which that uncertainty might reasonably be expected to materially impact Coinbase's future revenues and income. By omitting these facts, Defendants violated Item 303, further rendering the statements set forth in ¶¶ 232-34 materially misleading.

238.    In a Section entitled "Business: Retail," Defendants Coinbase, Armstrong, and Haas stated:

> Stake. Certain blockchain protocols, such as Tezos, rely on staking, an alternative way to validate blockchain transactions. Network participants can designate a certain amount of their crypto assets on the network as a stake (similar to a security deposit) to validate

transactions and get rewarded in kind from the network. Today, staking crypto assets is a technical challenge for most users. Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time. We provide a service known as "Delegated Proof of Stake," which reduces the complexities of staking and ***allows our retail users to maintain full ownership of their crypto assets while earnings staking rewards.*** In return, we earn a commission on all staking rewards received.

239.    Defendants' statements identified in ¶ 238 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-37. These statements were also materially false or misleading because while Defendants claimed that retail users would "***maintain full ownership of their crypto assets while earning staking rewards***," they lacked a reasonable basis to make such a claim given the uncertain legal treatment of such assets in bankruptcy, particularly in the staking capacity, where the fact that Coinbase shared in the profits by taking a 15% to 35% commission increased the likelihood that the assets would be considered part of Coinbase's bankruptcy estate.

### 2.    May 14, 2021 – Form 10-Q

240.    On May 14, 2021, Coinbase filed its Form 10-Q with the SEC for the period ending March 31, 2021 ("1Q2021 Form 10-Q"). The 1Q2021 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***," identifying, specifically that:

> ***The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses***.

241.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

242.    Defendants' statements set forth in ¶¶ 240-41 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-37.

### 3.    August 10, 2021 – Form 10-Q

243.    On August 10, 2021, Coinbase filed its Form 10-Q with the SEC for the period ending June 30, 2021 ("2Q2021 Form 10-Q"). The 2Q2021 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***," identifying, specifically that:

> ***The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses***.

244.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

245.    Defendants' statements set forth in ¶¶ 243-44 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-37.

### 4.    November 10, 2021 – Form 10-Q

246.    On November 10, 2021, Coinbase filed its Form 10-Q with the SEC for the period ending September 30, 2021 ("3Q2021 Form 10-Q"). The 3Q2021 Form 10-Q was signed by Defendants Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***," identifying, specifically that:

> ***The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses***.

247.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and Haas stated: "***The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys***."

248.    Defendants' statements set forth in ¶¶ 246-47 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-37.

5.    **November 30, 2021 – J.P. Morgan Crypto Economy Forum**

249.    On November 30, 2021, Defendant Armstrong represented Coinbase at the J.P. Morgan Crypto Economy Forum. During the conference, Union Square Ventures, LLC partner Frederick R. Wilson ("Wilson") and Armstrong had the following exchange:

> [Wilson:] How do you think about custody and self-custody? When we first invested in Coinbase, one of the first conversations you and I had was about cold storage and securing the Bitcoin that our customers had with us.
>
> [Armstrong:] Yes. So you're right. The early on people were all worried about, how do you store crypto? And people were losing it accidentally. There was famously things like Mt. Gox, where some exchanges got hacked and funds were lost….
>
> [Wilson:] Something like 10% of all crypto in the world is stored at Coinbase?
>
> [Armstrong:] Yes. Yes, a little over 10% now. So that's a great indication of trust that people have in centralized custody. Especially for our institutional customers, by the way. Most of them today seem to really want to have someone like us, we're qualified custodian, so they can store it with us.
>
> ***Now there has been this really -- this segment has always been there, but I think it's going to keep growing over time. It's largely retail, but it's the self-custodial preference that people have, which is 'Hey, I want to store my own crypto.' And there's some nice properties of that. It's not just – I make sure it's never going to be seized or something like that***….

250.    Defendant Armstrong's statements set forth in ¶ 249 above, including those purporting to identify the benefits of utilizing Coinbase's custody services and specifically addressing the advantages and disadvantages of self-custody wallets, were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-36. In addition, by choosing to speak about Coinbase's self-custodial services, Defendant Armstrong had a duty to speak completely and accurately on that topic, including to disclose that the self-custodial services would, in fact, protect

users against the risk of loss in the event of a Coinbase bankruptcy. This was particularly true in the context here, where Defendant Armstrong elected to highlight the customer losses resulting from Mt. Gox's bankruptcy (*see* ¶ 90 *supra*).

### 6.    December 7, 2021 – Goldman Sachs US Financial Services Conference

251.    On December 7, 2021, Defendant Choi represented Coinbase at the Goldman Sachs US Financial Services Conference hosted by William Alfred Nance ("Nance"), Goldman Sachs Group, Inc. Research Analyst. During the conference, Nance asked Choi about industry pressure placed on Coinbase's fees. Specifically, Nance asked:

> Got it. Pricing usually comes up with investors as one of the biggest concerns for the business, just given the concentration of retail commissions in the P&L. The company has been pretty upfront that trading fees will likely come down over time, but probably not in the near term. What do you think of the catalyst for seeing more significant pricing pressure in the industry? And I guess, as a management team, how do you ensure that Coinbase is ready for that?

252.    Defendant Choi responded:

> I mean I know this is like the #1 question and probably top of mind for everybody in the room. We – it's one of those things where we know at some point there will be compression, but we aren't seeing any signs of it yet. And so we're ready for that day whenever it is. But we -- and the way that we think about it is, we want to control our own destiny. And so the things that we're investing in are subscription and services revenue streams that are much more predictable. The more that the subscription and services revenue streams can pay off our operating expenses such that the trading revenue is gravy on top, that's a great situation to be in. And we're at the beginning of that. But that -- I think we feel very good about the trajectory in the subscription services revenue, if you have a look at that.
>
> So I guess the TLDR is that I think many of you have probably seen that the retail and institutional volumes will vary, and so that can contribute to the take rate that we get. But we haven't yet seen the actual compression. ***We haven't changed our fee structure on the retail side yet. I think that consumers are more than willing to pay a certain fee percentage for the services we offer, particularly the***

> *security we offer. We have world-class security in custody when
> you purchase assets with Coinbase and hold them in Coinbase*. So
> I guess it's a long-winded way of saying like, yes, it will come at
> some point, but we haven't seen any signs of it yet. And I think
> we're making the right investments in subscription services to get to
> that place where it shouldn't be that much of a concern over the
> longer term

253.    Defendant Choi's statements set forth in ¶ 252 above were materially false or

misleading when made, or omitted material facts necessary to render such statements not

misleading, for the reasons set forth in ¶¶ 235-36.

### 7.    February 25, 2022 – 2021 Form 10-K

254.    On February 25, 2022, Coinbase filed its Form 10-K with the SEC for the period

ending December 31, 2021 ("2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants

Armstrong and Haas. Defendants Coinbase, Armstrong, and Haas purported to warn investors that

the Company's "*failure to safeguard and manage our customers' fiat currencies and crypto*

*assets could adversely impact our business, operating results and financial condition*,"

identifying, specifically that:

> *[T]he theft, loss or destruction of private keys required to access
> any crypto assets held in custody for our own account or for our
> customers may be irreversible. If we are unable to access our
> private keys or if we experience a hack or other data loss relating
> to our ability to access any crypto assets, it could cause regulatory
> scrutiny, reputational harm, and other losses*.

255.    In a Section entitled "Crypto asset wallets," Defendants Coinbase, Armstrong, and

Haas stated: "*The Company has committed to securely store all crypto assets it holds on behalf*

*of users. As such, the Company may be liable to its users for losses arising from theft or loss of*

*user private keys*."

256.    Defendants' statements set forth in ¶¶ 254-55 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-37.

257.    In a Section entitled "Our Products: Retail," Defendants Coinbase, Armstrong, and Haas stated:

> We serve as the users' primary crypto account, both hosted and self-hosted – providing safe, trusted, and easy-to-use tools to discover, invest, stake, store, spend, earn, borrow, and use crypto assets.
>
> We provide our retail users a hosted wallet which allows them to securely and easily discover, buy, sell, send and receive 139 crypto assets with a growing number of fiat currencies or to trade one crypto asset for another crypto asset. In our hosted wallet, we provide custody services on our customer's behalf. We charge a fee when users buy, sell, or convert crypto assets in either a fiat-to-crypto or crypto-to-crypto trade. . . . We also provide services to allow our customers to participate in blockchain rewards paid by underlying protocols. The largest of these is staking where we offer a service known as Delegated Proof of Stake, ***which reduces the complexities of staking and allows our retail users to maintain full ownership of their crypto assets while earning staking rewards.*** In return, we receive a commission on all staking rewards earned.
>
> ***Coinbase Wallet, a separately managed retail software product, allows users to self-custody crypto assets and NFTs in one place and interact with the cryptoeconomy and Web3***, including an expanded set of approximately 5,500 crypto assets and decentralized applications. A fee is charged for select activities executed in the self-hosted wallet.

258.    Defendants' statements set forth in ¶ 257 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-37, 239, 250.

8. **March 9, 2022 – Morgan Stanley Technology, Media, and Telecom Conference**

259.    On March 9, 2022, Defendants Armstrong and Haas represented Coinbase at the virtual Morgan Stanley Technology, Media, and Telecom Conference. During the conference, an unidentified analyst asked:

> It'd be great to hear, #1, where you're investing and then #2, I know there was a lot of discussion around earnings call about kind of what's the near -- how should investors think about near-term revenue potential for some of these significant 2022 investments? So feel free to address. . . .

260.    Defendant Haas responded:

> Yes. That would be the #1 question we've had as follow-up from earnings, so I also had the opportunity to share with you all. So one of the things that we think about is, we want to be a company of repeatable innovation, which means that we're always investing on the frontier. We're always taking measured bets, and we want to have a lot of bets, because we don't know exactly how the shape of the future of crypto economy will emerge. ***So, we know what we're good at. We know that we're a great, safe place to buy your first Bitcoin to trade to safely store.***

261.    Defendant Haas's statements set forth in ¶ 260, including that "***we're a great, safe place to buy your first Bitcoin to trade and to safely store***," were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 235-36.

**B.    Misrepresentations and Omissions Concerning Coinbase's Regulatory Risk and Whether Coinbase Listed Unregistered Securities**

1. **May 10, 2022 – Form 10-Q**

262.    On May 10, 2022, in the Company's 1Q2022 Form 10-Q, signed by Defendant Armstrong, Defendants Coinbase and Armstrong stated the following in a section titled "Legal and regulatory proceedings" in the Notes to Condensed Consolidated Financial Statements:

> ***The Company has received investigative subpoenas from the SEC for documents and information about certain customer programs,***

*operations, and intended future products, including the Company's stablecoin and yield-generating products*. Based on the ongoing nature of this matter, the outcome remains uncertain and the Company cannot estimate the potential impact, if any, on its business or financial statements at this time.

263.    Defendants Coinbase and Armstrong also stated:

[A] particular crypto asset's status as a 'security' in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, *we may be* subject to regulatory scrutiny, inquiries, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition.

264.    Defendants' statements set forth in ¶¶ 262-63 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading. By no later than May 2022, Armstrong knew that the SEC had turned its focus to Coinbase and, in particular, to whether it was listing unregistered securities in violation of the federal securities laws. The SEC had served Coinbase with "a request for information about its asset listings process," *and* was also actively investigating a Coinbase employee for insider trading—i.e., illegally sharing and trading on material nonpublic information about digital assets the SEC had determined were "securities" under existing securities laws. As the SEC's investigation has now revealed, during the Class Period Coinbase made available on the Coinbase platform crypto assets with high "risk" scores under the CRC framework it had adopted, signaling that these assets were securities. In addition, Coinbase created and deployed its Listings Team to identify language traditionally associated with securities like dividend, interest, investment, or investors, and recommend that the issuer remove such language, regardless of whether the relevant crypto asset was in all likelihood a security. In light of these facts, Defendants failed to disclose that the purported contingent risk of regulatory action had, in fact, come to fruition, that the SEC

was actively investigating the Company's asset listings process, or that Coinbase had unlawfully made crypto securities available on its platform.

### 2.    July 21, 2022 – Coinbase's Blog and Twitter

265.    On July 21, 2022, in the wake of the SEC and the DOJ's insider trading charges against a Coinbase employee, the Company published a blog post entitled, *Coinbase does not list securities. End of story*. Speaking on behalf of the Company, Grewal made the following statements in the blog post, which he tweeted the same day:

    a.   "***Coinbase does not list securities. End of story***."

    b.   "***TLDR: Coinbase does not list securities on its platform. Period. We have said it before, but given today's events, it bears repeating***.

    c.   "Seven of the nine assets included in the SEC's charges are listed on Coinbase's platform. ***None of these assets are securities. Coinbase has a rigorous process to analyze and review each digital asset before making it available on our exchange — a process that the SEC itself has reviewed***."

    d.   "But in the absence of a concrete digital asset securities regulatory framework from the SEC, ***we remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform***."

266.    Defendant Grewal's statements set forth in ¶ 265 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading. Grewal's affirmative denials that "***Coinbase does not list securities***," purportedly backed by the Company's "***rigorous process . . . that the SEC itself has reviewed***," gave investors the materially false and misleading impression that the regulatory risks related to Coinbase's listing of unregistered securities were minimal, and that the SEC had approved or blessed the Company's framework for keeping such securities off its exchange and, thus, that Grewal's unequivocal representations had a reasonable basis in fact. In reality, by no later than May 2022, the SEC was actively investigating Coinbase's operations, had specifically sought "information about Coinbase's asset listings process," as Armstrong would later reveal in August 2022, and was

meeting with Company representatives *almost weekly* (ultimately, over 30 times between June 2022 and March 2023). Defendants did not disclose any of these material facts.

267.    Moreover, despite Defendant Grewal's misleading statements to the contrary, the SEC had never approved or ratified the Company's purported "rigorous diligence process" for determining whether a particular digital asset is a security subject to registration. Defendant Grewal also did not disclose that during the Class Period Coinbase made available on its trading platform crypto assets with high "risk" scores under the CRC framework it had adopted, signaling that these assets were securities. In addition, Coinbase created and deployed its Listings Team to identify language traditionally associated with securities like dividend, interest, and investment, and recommend that the issuer remove such language, regardless of whether the relevant crypto asset was in all likelihood a security. Furthermore, the SEC did not give Coinbase any indication that it approved of Coinbase's staking services—another target of the SEC's investigation. Indeed, with respect to Coinbase's process for purportedly ensuring that its staking activities complied with the federal securities laws, the SEC specifically advised Coinbase that "the [SEC] Staff neither agreed nor disagreed with the legal analysis." By misrepresenting and omitting these adverse material facts, Grewal materially downplayed the regulatory risk facing Coinbase at a time when the threat of increased regulatory action was ever-present as a headwind to Coinbase's financial success, including because Coinbase continued to flood the market with new digital assets and promote its staking services, actions that further exposed the Company to regulatory enforcement action.

### 3.    July 25, 2022 – Twitter and Reuters

268.    On July 25, 2022, speaking on behalf of Coinbase, Grewal made the following statement on his Twitter account: "I'm happy to say it again and again: *we are confident that our*

*rigorous diligence process—a process the SEC has already reviewed—keeps securities off our platform*."

269.    On July 25, 2022, Reuters published an article entitled, *Crypto Exchange Coinbase Faces SEC Probe Over Securities*. Therein, Reuters published the following statement made by Grewal on behalf of the Company: "***We are confident that our rigorous diligence process — a process the SEC has already reviewed — keeps securities off our platform***."

270.    Defendant Grewal's statements set forth in ¶¶ 268-69 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 266-67.

### 4.    February 8, 2023 – Twitter

271.    On February 8, 2023, speaking on behalf of the Company, Grewal made the following statement on his Twitter account: "***Staking is not a security***."

272.    The same day, Armstrong stated the following on his Twitter account:

> ***We're hearing rumors that the SEC would like to get rid of crypto staking in the U.S. for retail customers***. I hope that's not the case as I believe it would be a terrible path for the U.S. if that was allowed to happen.

273.    Defendant Grewal's statement set forth in ¶ 271 that "***[s]taking is not a security***" was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading. By choosing to speak about staking and whether it constituted a security under existing federal law and guidelines, Grewal had a duty to speak completely and accurately, and to not omit any material facts, regarding that subject. In violation of this duty, Grewal failed to disclose that the SEC was actively investigating whether Coinbase illegally listed securities on its trading platform, including with respect to its staking services, and was meeting with Company representatives ***almost weekly*** (ultimately, over 30 times between June 2022 and March 2023). In

connection with that investigation, Coinbase had already produced documents to the SEC and provided two witnesses for testimony, including one specifically to address Coinbase's staking services. Moreover, unbeknownst to the market, by no later than January 2023, **the SEC was pursuing an enforcement investigation**. As the Company itself admitted following the public disclosure of the Wells Notice on March 22, 2023, "[i]n January, the day before our scheduled meeting, the SEC canceled on us **and told us they would be shifting back to an enforcement investigation**." Indeed, Armstrong has since admitted that Coinbase knew even earlier that the SEC's "tone" had shifted. Grewal similarly admitted that Coinbase knew the SEC was going to file an action against the Company for a long time, stating: "**[T]his was a day we knew that would come. And so, we've been preparing for it for a very, very long time**." By misrepresenting and omitting these adverse material facts, Grewal materially downplayed the regulatory risk facing Coinbase and its staking services business, and associated revenues, giving investors the false and misleading impression that Coinbase's staking platform was outside the crosshairs of the SEC. Moreover, Grewal did not disclose that, as the SEC's investigation has now revealed, during the Class Period Coinbase made available on the Coinbase Platform crypto assets with high "risk" scores under the CRC framework it had adopted, signaling that these assets were securities. In addition, Coinbase created and deployed its Listings Team to identify language traditionally associated with securities like dividend, interest, and investment, and recommend that the issuer remove such language, regardless of whether the relevant crypto asset was in all likelihood a security

274.     Defendant Armstrong's statement on Twitter set forth in ¶ 272 that "**we're hearing rumors that the SEC would like to get rid of crypto staking in the U.S. for retail customers**" was materially false or misleading when made, or omitted material facts necessary to render such

statements not misleading. Having chosen to speak about the SEC's position concerning "crypto staking in the U.S. for retail customers"—purportedly responding to news arising from the SEC's enforcement action against Coinbase's crypto exchange rival, Kraken—Armstrong had a duty to speak completely and accurately, and to not omit any material facts, regarding that subject. In violation of that duty, Armstrong failed to disclose that by no later than January 2023, the SEC investigation into Coinbase's own business and staking services was an enforcement investigation, and moving toward an enforcement action, as was ultimately revealed a short time later on March 22, 2023, when the SEC served a Wells Notice on Coinbase. Armstrong's omission of these facts rendered Defendants' statements materially false and misleading.

### 5.    February 10, 2023 – Coinbase's Blog and Twitter

275.    On February 10, 2023, in response to news that rival Kraken had agreed to discontinue its crypto asset staking business and pay a $30 million fine to settle the SEC's charges against it, Coinbase published a blog post entitled, *Coinbase's staking services are not securities. And here's why*.

276.    Speaking on behalf of the Company, Grewal made the following statements in the blog post:

    a.    "Tldr: ***Staking is not a security under the US Securities Act, nor under the Howey test***. Trying to superimpose securities law onto a process like staking doesn't help consumers at all and instead imposes unnecessarily aggressive mandates that will prevent US consumers from accessing basic crypto services and push users to offshore, unregulated platforms."

    b.    "***[O]ur staking products are not securities***."

    c.    "***Is staking a security? To put it simply, no. Staking is not a security under the US Securities Act, nor under the Howey test***, which the SEC uses to determine whether an investment contract is a security[.]"

277.    The same day, Defendants Armstrong and Grewal both retweeted these statements on their Twitter accounts.

278.     Defendant Armstrong's and Defendant Grewal's statements set forth in ¶¶ 276-77 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 273-74. In addition, Defendants' affirmative denials and statements concerning the purported legal analysis on which they were based, coupled with their failure to disclose the heightened regulatory risk to Coinbase, gave investors the materially false and misleading impression that the SEC had blessed or approved Coinbase's process for determining whether staking implicated digital assets that were securities under existing laws and regulations, and, thus, that Defendants' unequivocal representations had a reasonable basis in fact. In actuality, the SEC had never approved that process, and was actively investigating it. Indeed, the SEC specifically advised Defendants prior to the Direct Listing that after reviewing Coinbase's process through the registration statement comment period, "*the Staff neither agreed nor disagreed with the legal analysis presented*[.]" Moreover, Defendants' misrepresentations and omissions gave investors the false impression that Coinbase's staking services were well-positioned in relation to Kraken, and outside the crosshairs of the SEC's active and increasing scrutiny of such services.

### 6.     February 12, 2023 – Twitter

279.     On February 12, 2023, speaking on behalf of the Company, Defendant Armstrong made the following statements on his Twitter account: "*Coinbase's staking services are not securities. We will happily defend this in court if needed*."

280.     Defendant Armstrong's statement set forth in ¶ 279 was materially false or misleading when made, or omitted material facts necessary to render such statement not misleading for the reasons set forth in ¶¶ 273-74, 278.

7.      **February 21, 2023 – Earnings Call**

281.     On February 21, 2023, Coinbase held an earnings call to announce the Company's fiscal year 2022 financial results, which Gupta moderated. Defendants Armstrong and Grewal participated.

282.     During the call, the following question was asked and directed by Gupta to Grewal for a response:

> Our next question is, with Kraken staking as a service being cracked down upon by the SEC, what differentiates Coinbase staking as a service from theirs? And what assurances can you give investors that their funds will not be affected? Paul?

283.     Grewal stated:

> *[] Coinbase's staking products are not securities*, and so they are not affected by this news. Staking on Coinbase continues to be available to our customers and stake assets continue to earn rewards. *The staking products that we offer on Coinbase are fundamentally different from the yield products that were described in the reinforcement action against Kraken*.

284.     Defendant Grewal's statements set forth in ¶ 283 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the reasons set forth in ¶¶ 273-74, 278.

8.      **February 23, 2023 – 2022 Form 10-K**

285.     On February 23, 2023, Coinbase filed its 2022 Form 10-K, which was signed by Defendant Armstrong. Defendants Coinbase and Armstrong stated the following:

> The Company has received investigative subpoenas and requests from the SEC for documents and information about certain customer programs, operations, and existing and intended future products, including the Company's processes for listing assets, the classification of certain listed assets, its staking programs, and its stablecoin and yield-generating products. Based on the ongoing nature of these matters, *the outcomes remain uncertain and the Company cannot estimate the potential impact, if any, on its business or financial statements at this time*.

286.    Defendants' statements set forth in ¶ 285 above were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading. Having chosen to speak on the topic of the SEC's ongoing inquiry into its business, Coinbase and Armstrong had a duty to speak completely and accurately, and to not omit any material facts, regarding that subject. In violation of that duty, Coinbase and Armstrong failed to disclose that by no later than January 2023, the outcome of the SEC's investigation first revealed in July 2022 was not uncertain: the SEC was moving toward an enforcement action, as was ultimately revealed a short time later on March 22, 2023 when the SEC served a Wells Notice on Coinbase. As the Company stated following the public disclosure of the Wells Notice, "[i]n January, the day before our scheduled meeting, the SEC canceled on us and told us they would be shifting back to an enforcement investigation." Grewal similarly admitted in June 2022 that Coinbase knew the SEC was going to file an action against the Company for a long time, stating: "*[T]his was a day we knew that would come. And so, we've been preparing for it for a very, very long time*." Thus, it was materially misleading to represent that "the outcome[] remain[s] uncertain" or that "the Company cannot estimate the potential impact, if any."

### 9.    March 1, 2023 – Bloomberg Interview

287.    On March 1, 2023, Defendant Armstrong participated in an interview with Bloomberg Television. During that interview, Armstrong stated: "*Our staking product is not a security*[.]"

288.    Defendant Armstrong's statement set forth in ¶ 287 was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading for the reasons set forth in ¶¶ 273-74, 278.

107

10. **March 22, 2023 – Coinbase's Blog**

289. On March 22, 2023, in response to the Wells Notice Coinbase had received that same day, Coinbase published a blog post entitled, *We asked the SEC for reasonable crypto rules for Americans. We got legal threats instead*.

290. Speaking on behalf of the Company, Grewal made the following statements in the blog post: "***Coinbase does not list securities***" and "***[t]he bottom line remains: Coinbase does not list securities or offer products to our customers that are securities***."

291. In addition, Grewal stated that "our staking services are not securities ***under any legal standard, including the Howey test which assesses whether a product is an investment contract***."

292. Defendant Grewal's statements set forth in ¶¶ 290-91 were materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 273-74, 278.

## VI.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER – EXCHANGE ACT CLAIMS

293. Coinbase and the Executive Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or control over the alleged materially false or misleading statements and omissions. Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V *supra* were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the facts set forth above, including in Section IV *supra*, Coinbase and the Executive Defendants' scienter is evidenced by the following facts, among others.

294.    **First**, Defendants had actual knowledge of undisclosed, material adverse facts contrary to their alleged misrepresentations and omissions. Defendants Armstrong, Haas, and Choi knew, but did not disclose, the risk to customers of asset loss or seizure in the event of Coinbase's bankruptcy and the lack of protections the Company provided in such an event, particularly for retail customers. *See* ¶¶ 92-100. Armstrong admitted this on May 11, 2022 when he apologized to investors for Coinbase's failure to previously disclose this risk and its potential impact on the Company's financial condition and revenues. In actuality, long before then, in June 2019, Coinbase Custody—which Armstrong, Haas, and Choi oversaw—investigated the risk to customer assets in the event of a bankruptcy and therefore understood the risks associated with commingling crypto assets owned by customers and the Company. *See* ¶¶ 101-05. The subsequent decision by Defendants Armstrong, Haas, and Choi to omit the purported contractual protections provided to Coinbase's institutional customers from Coinbase's Retail User Agreement is further indicia of their knowledge that the status of customers' crypto assets in the event of Coinbase's bankruptcy was an uncertainty and that there was a substantial risk that such assets would be treated as property of the bankruptcy estate. *See* ¶¶ 106-17.

295.    Defendants also had actual knowledge of, but did not disclose or materially downplayed, material facts concerning the existence, nature, and scope of the SEC's investigation. Defendants Armstrong and Grewal knew, unbeknownst to investors, that the SEC had been investigating the Company since the spring of 2022, specifically seeking "information about Coinbase's asset listings process," that Coinbase's representatives met with the SEC ***almost weekly*** (ultimately, over 30 times between June 2022 and March 2023), and that Coinbase had produced documents to the SEC and provided two witnesses for testimony, including one to specifically address Coinbase's staking services. In addition, Defendants have revealed that as Coinbase

continued to engage with the SEC throughout late 2022 and into early 2023, Coinbase made over a dozen presentations and had more than 27 phone calls with the SEC, which included discussions of a structure for registered digital asset securities trading platforms.

296.    Defendants Coinbase, Armstrong, and Grewal have confirmed the number and frequency of the Company's meetings and communications with the SEC during the Class Period through multiple admissions. Specifically, in a September 8, 2021 post on Coinbase's blog, Armstrong wrote: "I spent most of [the week of May 14, 2021] in DC meeting with members of Congress and heads of various federal agencies, along with Ron Conway, Kathryn Haun and Paul Grewal." During his testimony before the U.S. House Committee on Financial Services, Subcommittee on Digital Assets, Financial Technology and Inclusion Subcommittee on March 9, 2023, Grewal admitted that Coinbase representatives met frequently with the SEC beginning in mid-2022, stating: "Following our [July 2022 petition] submission, we began weekly meetings with the SEC. The meetings, which have included staff from the Divisions of Trading & markets and Corporation Finance, have resulted in wide ranging policy discussions about market structure, custody, issuer disclosure, the definition of securities, staking, and registration." Less than two weeks later, in a March 22, 2023 post on Coinbase's blog, Grewal again confirmed that Coinbase representatives had met frequently with the SEC during the preceding months, stating: "We met with the SEC more than 30 times over nine months, but we were doing all of the talking."

297.    In Coinbase's April 19, 2023 response to the SEC's Wells Notice, the Company reiterated that "[b]etween 2019 and the present, Coinbase met with Commissioners or Staff [from the SEC] regarding registration-related topics at least 24 times[.]" The appendix attached to the submission identified over seventy communications between Coinbase and the SEC from January 18, 2018 to March 20, 2023.

298.    In a video with Armstrong posted to YouTube on April 27, 2023, Grewal again

confirmed that "Coinbase has been talking to the SEC about our business for many years now . . .

." Also on April 27, 2023, Grewal was interviewed on the Bankless podcast where he reiterated:

> We have engaged in private conversations going back to last
> September with the SEC in an attempt to lay out our ideas for what
> a registration framework might look like, what a pathway to
> registration for exchanges, like us, might involve. Over the course
> of those 30 or more separate engagements that we've had with
> them—30 or more—we have laid out everything we think about all
> these topics that we were just discussing and we have been waiting
> patiently for any response by the Commission. . . . Frankly, we'd
> run out of things to say because after 30 engagements or more, you
> start to run out of room.

299.    Echoing Grewal's statements, Armstrong confirmed during a June 6, 2023

interview at the Piper Sandler Global Exchange & FinTech Conference that Coinbase "met with

[the SEC] about 30 times over the last year."

300.    After receiving the Wells Notice, Defendants engaged in additional discussions and

meetings with the SEC. As Grewal disclosed in an April 27, 2023 post on Coinbase's blog,

Coinbase "discussed" the Company's submission in response to the Wells Notice "with the SEC

a few days ago." Grewal also confirmed during his April 27, 2023 Bankless interview that, after

receiving the Wells Notice, "[w]e've had face-to-face conversations as part of this engagement,

including meeting in person."

301.    Armstrong and Grewal either personally participated in each of the meetings and

communications with the SEC throughout the Class Period or otherwise received reports regarding

these meetings and communications such that they knew at the time those communications

occurred, or shortly thereafter, what had been discussed with the SEC.

302.    Defendants Armstrong and Grewal have also admitted that by no later than January

2023, they knew the SEC was pursuing an enforcement investigation. As Grewal revealed on the

Company's blog following the public disclosure of the Wells Notice on March 22, 2023, "[i]n January [2023], the day before our scheduled meeting, the SEC canceled on us *and told us they would be shifting back to an enforcement investigation*." Coinbase's answer to the SEC complaint, filed on June 28, 2023 similarly confirmed that "[t]he day before a scheduled meeting" with the SEC in January 2023, "the [SEC] Staff canceled the meeting and told Coinbase it would proceed to enforcement instead." As of that moment, "[d]iscussions were over."

303.     In fact, during numerous interviews following the filing of the SEC Complaint in June 2023, Armstrong admitted that the SEC's "tone" shifted even earlier, by mid-2022. In the Company's April 19, 2023 submission in response to the Wells Notice, Coinbase similarly admitted that "since July 2022, [Chairman Gensler's] office has referred all meeting requests [from Coinbase] to Enforcement." Then during an interview on the Bankless podcast on June 6, 2023, the day after the SEC action was filed, Grewal admitted that he and Coinbase knew the SEC was going to file an action against the Company for a long time, stating: "*[T]his was a day we knew that would come. And so, we've been preparing for it for a very, very long time*." On June 8, 2023, during an interview on the Chain Reaction podcast, Grewal represented with respect to the SEC enforcement action that "we weren't blindsided by anything," stating: "This is a lawsuit that we've been preparing for now, for a while. Because, of course, *the SEC told us back in March that it intended to pursue litigation. And even well before March, it became abundantly clear to us that the SEC had no serious interest in dialogue or conversation around what sensible regulation might look like*." Despite knowing as early as mid-2022 that an SEC enforcement action was likely, Grewal and Armstrong deceived investors about the increased risk of an enforcement action, which was all but certain by January 2023. *See* ¶¶ 179-80, 189 *supra*.

304.    Defendants also knew that the SEC had never approved or ratified the Company's purported "rigorous diligence" process for determining whether a particular digital asset is a security subject to registration. Nor did the SEC give Coinbase any indication that it approved of Coinbase's staking services. On the contrary, the SEC specifically advised Coinbase that "the [SEC] Staff neither agreed nor disagreed with the legal analysis."

305.    In addition, even before the Class Period, Defendants were aware of facts indicating that the crypto assets Coinbase made available on its platform were at high "risk" of being deemed securities, such that Coinbase was required to register with the SEC or else be in violation of the federal securities laws. In 2019, Coinbase formed the CRC, along with other crypto-related companies, and jointly released the CRC's framework for analyzing the likelihood that a particular crypto asset would be deemed a security under *Howey*. The SEC's investigation revealed that from 2018 through 2021, Coinbase listed, permitted, or offered products utilizing crypto assets that were considered high "risk" under the CRC framework, i.e., with a score indicating that the asset is a security. *See* ¶¶ 161-63 *supra*. The SEC's investigation also revealed that Coinbase advised issuers of crypto assets on how to avoid treatment as a security under the Company's framework. Coinbase's Listings Team dialogued with issuers looking to identify potential "roadblocks" under *Howey* and flagged "problematic statements" by issuers that described their crypto assets with language traditionally associated with securities. *See* ¶ 164 *supra*. Grewal, as Coinbase's senior-most legal officer, oversaw Coinbase's asset listing review, including, but not limited to the Company's analysis of whether an asset was likely to be deemed a security. Indeed, Grewal authored a post on Coinbase's blog dated January 22, 2022 detailing the asset review process. Moreover, through their roles as Coinbase's CEO and CLO, respectively, Defendants Armstrong and Grewal received or had access to the CRC risk scores and other analyses for the crypto assets

that Coinbase listed, permitted, or offered on its exchange throughout the Class Period.

306.    **Second**, the alleged fraud directly concerned Coinbase's core business operation—a specialized cryptocurrency platform that enabled customers to trade, invest in, and store crypto assets. *See* ¶¶ 46-63. Prior to and throughout the Class Period, Defendants repeatedly: (i) identified transaction fee revenues as the source of nearly all of Coinbase's net revenues (96% in 2020 leading into the Direct Listing); (ii) disclosed that such fees were primarily generated by retail users (as much as 95% in 2020); and (iii) told investors that the Company's ability to maintain and grow such revenues was anchored by its ability to increase (and maintain) customers, including the number of MTUs. *See* ¶¶ 64-67, 87-88. Thus, it is implausible that Defendants Armstrong, Haas and Choi, as the Company's senior-most officers (CEO, CFO, and COO, respectively), and members of Coinbase Custody's management and/or Board of Governors, were not aware that Coinbase's inability to protect customers from loss in the event of a bankruptcy posed a material risk to those revenues. This is particularly true given Defendants' laser-focus on the Company's custody services, which they touted throughout the Class Period as a competitive advantage, and their regular assurances to investors regarding Coinbase's ability to safeguard assets and protect customers from loss. *See* ¶¶ 52-61, 124-26. In addition, Defendants Armstrong and Grewal knew at all times the true nature and scope of the SEC's investigation and the regulatory risk it posed to Coinbase's core operation of offering and storing digital assets on its platform.

307.    **Third**, the Executive Defendants' public statements during the Class Period strongly and plausibly suggest that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed by Defendants, or that they were reckless in failing to investigate the very issues on which they spoke publicly. As alleged in Section V *supra*, Defendants' misrepresentations and omissions explicitly pertain to: (i) the Company's revenue

derived from its retail customers, the related custody and safeguarding of customers' assets, and the purported identification of risks of asset loss or seizure to customers; and (ii) the SEC's ongoing investigation and attendant regulatory risks facing Coinbase, including whether the Company had offered securities, or made securities available for trading. The Executive Defendants made such statements and fielded questions regarding these subjects during earnings calls, investor conferences, congressional testimony, media appearances, and on social media, among other forums.

308.    Furthermore, Defendants regularly spoke about the importance of the retail business segment and acknowledged that Coinbase's retail users accounted for nearly 95% of Coinbase's transaction fee revenues. Armstrong also regularly spoke about Coinbase's custodial hosted wallet, and the critical differences between the hosted wallet and Coinbase Wallet, including their relative risks to retail users. For example, on February 14, 2022, it was reported via Twitter that Canadian banks could freeze or suspend bank accounts without a court order under Canada's Emergencies Act. The next day, Armstrong tweeted in response: "Concerning to see stuff like this happening in any country, especially such an economically free place like Canada. Self-custodial wallets are important! - > Coinbase. com/wallet." In addition to demonstrating his close attention to issues regarding the ownership and protection of digital assets, this shows Armstrong's awareness that Coinbase could not guarantee protection of customer assets held in hosted wallets—and his knowledge that these risks and uncertainties did not apply to self-custodial wallets. Indeed, according to a Wired report, Armstrong split with his original Coinbase co-founder, Ben Reeves, over a disagreement regarding the best storage method for users. As reported by Wired, Armstrong believed that the Company needed to retain access to users' private keys in order for the platform to achieve broader user appeal.

309.    **Fourth**, Armstrong and Grewal were intimately involved with and knowledgeable about the crypto-regulatory environment, including its impact on Coinbase operations. Throughout the Class Period, Armstrong touted his "proactive" approach to regulation despite the uncertain regulatory environment. For example, on the 1Q2021 Coinbase earnings call, Armstrong boasted that Coinbase was ahead of the competition when it came to the Company's regulatory approach, when he stated that "from the earliest days of Coinbase, we actually proactively reached out to regulators . . . even if it wasn't necessarily required yet in the law." Armstrong then told investors that "[i]n fact, this week, I was actually in DC meeting with a number of policymakers in the United States." Armstrong differentiated Coinbase's approach from "traditional tech companies" again during the 2Q2021 Coinbase earnings call when he told investors:

> And I think **unlike maybe some traditional tech companies that sort of have waited for something bad to happen then they like reluctantly go engage with the government. I think we view it as our role to kind of go out there proactively before a kind of issue comes up** that educational resource and kind of advise world leaders and finance ministers on how they can adapt their economies to capture the opportunity environment with the crypto economy.

310.    During the September 9, 2021 Deutsche Bank Tech Conference, Armstrong updated investors on the recent attention that crypto was receiving from regulators but assured them that Coinbase was focused on how to "achieve clarity" in regulation. Armstrong further emphasized: "[W]hat I would just leave you with is that **Coinbase remains highly committed to proactively engaging with global regulators and to drive this clarity so that none of the industry, including us, is left guessing**." On the 3Q2021 Coinbase earnings call, Armstrong again reiterated that "regulation and [] policy efforts are certainly top of mind for us" and touted: "We've met with a number of different regulators out there on a regular basis. I had a meeting last week with the Chairman of the SEC, Chair Gensler, which I think was very productive."

311.    **Fifth**, the Executive Defendants' control over the entire Company and access to

116

material nonpublic information supports a strong inference of scienter. As Coinbase's top executives during the Class Period, Defendants Armstrong, Haas, Choi, and Grewal (CEO, CFO, COO, and CLO, respectively) controlled the Company's day-to-day operations and were informed of, and intimately involved with, the factors underlying Coinbase's performance, as indicated above. Because of their high-level positions and involvement with Coinbase's core operation of running a specialized cryptocurrency platform, each of the Executive Defendants: (i) controlled the contents of the material misstatements alleged in Section V; (ii) was provided with, or had access to, copies of the statements alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected; and (iii) knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations made to investors were materially false, misleading, and incomplete. Because of their positions and access to material nonpublic information, each of the Executive Defendants knew that the adverse facts specified herein were not disclosed to, and/or were being concealed from, the public, and that the positive representations made were materially false and/or misleading.

312. *Sixth*, Armstrong's lucrative performance-based stock option compensation plan supports a strong inference that Armstrong was highly motivated to inflate and maintain the inflation in Coinbase common stock price during the Class Period. As noted in ¶¶ 77-80 *supra*, as part of Armstrong's compensation package, Coinbase awarded him market-based options that would vest when Coinbase's common stock maintained certain prices for a defined time period (60 consecutive trading days) for a potential total of 9,293,911 shares. At the time, this incentive package had a fair value of $56.7 million, given Armstrong's exercise price of $23.46. However,

if Armstrong unlocked the final tranche of options and maintained Coinbase's common stock price at or above $400 for one year, he would profit over ***$3.7 billion*** upon sale of the shares. "[This] windfall would even put Armstrong on Bloomberg's billionaire index, which tracks the richest 500 people in the world[,]" according to a report from Protos, an independent crypto-journal, that was published after Coinbase filed its Registration Statement. The magnitude of Armstrong's compensation plan puts it beyond the realm of garden-variety corporate stock incentive plans. Thus, Armstrong was uniquely motivated to drive up the price of Coinbase common stock and maintain inflation in the stock price through the alleged misrepresentations and omissions. As noted above, Armstrong unlocked the first tranche on July 8, 2021 after Coinbase maintained a $200 price-per-share for 60 consecutive days following the direct offering, and was awarded 3,159,930 in Company stock options, which at the time were valued at over ***$697 million***. *See* ¶ 80.

313.   ***Seventh***, the Executive Defendants, along with the Director Defendants (defined below), collectively reaped billions of dollars in proceeds from insider sales in the Direct Listing and throughout the Class Period, as reflected in ¶¶ 121-22. These stock dispositions were executed at artificially inflated prices under suspicious circumstances. For example, in just the first two days of public trading, Armstrong sold 749,999 shares for proceeds of over $290 million. During that same period, Choi unloaded 614,170 shares for proceeds of over $223 million. All told, Choi pulled in over $429 million in proceeds from sales during the Class Period. In total, during the Class Period, Defendants Choi, Haas, and Grewal sold approximately 57%, 52%, and 16%, respectively, of their Coinbase common stock holdings, reaping substantial proceeds.

314.   ***Eighth***, the temporal proximity between Defendants' alleged misstatements and subsequent disclosures exposing the truth bolsters the strong inference that Defendants knew, or

118

were deliberately reckless in not knowing, the false and/or misleading nature of their statements. Throughout the Class Period, Defendants failed to disclose that in the event of a bankruptcy, Coinbase customers could lose their crypto assets, and the attendant risks to the Company's revenues. As late as March 9, 2022, Defendant Haas continued to claim—falsely—that the Company was a "great safe place to buy your first Bitcoin to trade and to safety store." Then, as alleged in ¶¶ 211-12 *supra*, just weeks later, on May 10, 2022, Defendants revealed that crypto assets stored for Coinbase's customers could be considered corporate assets in the event of the Company's bankruptcy. Armstrong admitted on Twitter later that day that Coinbase knew of this material risk prior to May 10, 2022, but never disclosed it.

315.    In addition, on July 21, 2022, Defendant Grewal affirmatively denied that Coinbase listed securities, failing to disclose, for example, the existence, nature, and extent of the SEC's investigation into that very question. Just four days later, on July 25, 2022, the existence of the SEC's investigation was revealed. Similarly, in February and March 2023, Defendants Armstrong and Grewal denied that the Company's staking programs involved unregistered securities. Defendants Armstrong and Grewal have since admitted that they knew, but concealed, that ***the SEC was pursuing an enforcement investigation***. Just a few weeks later, on March 22, 2023, investors learned this very fact when the SEC served the Wells Notice on Coinbase, which referenced potential violations of the federal securities laws arising from its staking programs.

## VII.    <u>LOSS CAUSATION – EXCHANGE ACT CLAIMS</u>

316.    As a result of Defendants' materially false or misleading statements and omissions of material fact, Coinbase common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Coinbase common stock and public information related to Coinbase, Plaintiffs and other Class members purchased or otherwise acquired Coinbase common stock at prices that incorporated and reflected Defendants'

misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Coinbase common stock during the Class Period at artificially inflated prices, and the removal of that inflation upon the disclosures set forth below, Plaintiffs and the Class suffered economic losses (i.e., damages) under the federal securities laws.

317.    Defendants' materially false or misleading statements and omissions of material fact had their intended effect, directly and proximately causing Coinbase common stock to trade at artificially inflated prices during the Class Period, closing as high as $342.98 per share on November 12, 2021. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Coinbase common stock served to maintain the price of Coinbase common stock at an artificially inflated level.

318.    Absent Defendants' misrepresentations and omissions of material fact, Plaintiffs and other Class members would not have purchased or otherwise acquired their Coinbase common stock at the artificially inflated prices at which it traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Coinbase common stock and/or maintain artificial inflation in Coinbase's stock price. The economic losses (i.e., damages suffered by Plaintiffs and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false or misleading statements and omissions of material fact, which artificially inflated the price of, or maintained artificial inflation in, Coinbase's stock price, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions materialized.

319.    Plaintiffs and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by

Defendants' misrepresentations and omissions were revealed and/or materialized through the disclosure of new information concerning Coinbase on the dates listed below. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the foreseeable risks concealed by Defendants' fraud directly and proximately caused foreseeable declines in the price of Coinbase common stock by removing the artificial inflation in the price of Coinbase common stock that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Coinbase common stock, as detailed herein, negate any inference that the loss suffered by Plaintiffs and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

320.    Plaintiffs and other members of the Class began to learn the truth on May 10, 2022, when the Company filed its 1Q2022 Form 10-Q, signed by Defendants Armstrong and Haas, with the SEC. Defendants disclosed for the first time that crypto assets the Company held in custody on behalf of customers could be treated as the Company's assets in the event of bankruptcy. Specifically, Defendants Coinbase, Armstrong, and Haas explained:

> ***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition*** . . . .
>
> * * *
>
> Moreover, ***because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition***.

321.    Later that day, Defendant Armstrong admitted on Twitter that Coinbase had failed to appropriately communicate this risk to investors, stating:

> We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My deepest apologies, and a good learning moment for us as we make future changes.

322.    On this news, the price of Coinbase common stock declined $19.27 per share, or more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on May 11, 2022.

323.    On July 25, 2022, following market close, an article Bloomberg published entitled, *Coinbase Faces SEC Probe on Crypto Listings; Shares Tumble*, revealed that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities." As Bloomberg explained:

> The US Securities and Exchange Commission's scrutiny of Coinbase has increased since the platform expanded the number of tokens in which it offers trading, said two of the people, who asked not to be named because the inquiry hasn't been disclosed publicly. The probe by the SEC's enforcement unit predates the agency's investigation into an alleged insider trading scheme that led the regulator last week to sue a former Coinbase manager and two other people.

>                                    \*\*\*

> As the largest US trading platform, Coinbase lets Americans trade more than 150 tokens. If those products were deemed securities, the firm could need to register as an exchange with the SEC. . . .

> Coinbase has repeatedly sparred with the agency over how it oversees the industry, and the firm last week called on the SEC to propose clearer rules. Meanwhile, after taking a relatively cautious approach for years, Coinbase has boosted its token offerings.

324. On this news, the price of Coinbase common stock declined $14.14 per share, or approximately 21%, from a close of $67.07 per share on July 25, 2022, to close at $52.93 per share on July 26, 2022.

325. Next, after market close on March 22, 2023, the Company filed a Form 8-K with the SEC, signed by Haas, disclosing that it had received a Wells Notice from the SEC earlier that day. In this 8-K, Coinbase specifically stated:

> On March 22, 2023, Coinbase Global, Inc. and Coinbase, Inc. (collectively, the "Company") received a "Wells Notice" from the Staff ("Staff") of the Securities and Exchange Commission ("SEC") stating that the Staff has advised the Company that it made a "preliminary determination" to recommend that the SEC file an enforcement action against the Company alleging violations of the federal securities laws, including the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the Securities Act of 1933, as amended (the "Securities Act"). Based on discussions with the Staff, the Company believes these potential enforcement actions would relate to aspects of the Company's spot market, staking service Coinbase Earn, Coinbase Prime and Coinbase Wallet.

326. The same day, Coinbase also published a blog post, authored by Grewal, about the Wells Notice, stating:

> The Wells notice comes out of the investigation that we disclosed last summer. Shortly after that investigation began, the SEC asked us if we would be interested in discussing a potential resolution that would include registering some portion of our business with the SEC. . . .
>
> We met with the SEC more than 30 times over nine months, but we were doing all of the talking. In December 2022, we asked the SEC again for some feedback on our proposals. The SEC staff agreed to provide feedback in January 2023. In January, the day before our scheduled meeting, the SEC canceled on us and told us they would be shifting back to an enforcement investigation. . . .
>
> The investigation is still at a very early stage. We have produced documents and provided two witnesses for testimony, one on the basic aspects of our staking services and one on the basic operation of our trading platform. . . .

327.    On this news, the price of Coinbase common stock declined $10.84 per share, or approximately 14%, falling from $77.14 at market close on March 22, 2023, to $66.30 at market close on March 23, 2023, with high trading volume.

328.    Finally, before the market opened on June 6, 2023, the SEC filed a complaint against Coinbase. The SEC alleged, based on its investigation, that the Company had violated the federal securities laws by making available on its platform unregistered crypto asset securities and failing to register "with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets." As discussed above, the SEC Complaint detailed Coinbase's conduct in "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets." Among other relief, the SEC sought civil money penalties and an order requiring Coinbase to disgorge all ill-gotten gains resulting from its Exchange Act and Securities Act violations, with prejudgment interest thereon.

329.    On this news, the Company's stock price fell more than 19% during pre-market trading. After closing at $58.71 on June 5, 2023 Coinbase's stock opened at just $47.10 on June 6, 2023 and ultimately closed at $51.61 on June 6, 2023.

## VIII.    A PRESUMPTION OF RELIANCE APPLIES

330.    At all relevant times, the market for Coinbase common stock was efficient for the following reasons, among others:

    a.    Coinbase's stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

    b.    As a regulated issuer, Coinbase filed periodic reports with the SEC;

    c.    Coinbase regularly communicated with public investors via established market communication mechanisms, including through regular

dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Coinbase was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

331.    As a result of the foregoing, the market for Coinbase common stock reasonably and promptly digested current information regarding Coinbase from all publicly available sources and reflected such information in the price of Coinbase common stock. Purchasers and acquirers of Coinbase common stock during the Class Period suffered similar injury through their purchases and acquisitions of Coinbase common stock at artificially inflated prices, and a presumption of reliance applies.

332.    Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to timely disclose material information as required by law. Plaintiffs and other Class members would not have purchased or otherwise acquired Coinbase common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning Coinbase and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY – EXCHANGE ACT CLAIMS

333.    The statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements alleged herein. None of the statements complained of herein was a

forward-looking statement. Rather, they were either: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; or (ii) omitted to state material, current or historical facts necessary to make the statements not misleading.

334.    To the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Coinbase were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

335.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the accuracy of the statements.

## X.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

### COUNT I

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against Coinbase and the Executive Defendants**

336.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This Count is brought against Defendants Coinbase, Armstrong, Haas, Choi, and Grewal pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on behalf of Plaintiffs and all other members of the Class.

337.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class; and (ii) cause Plaintiffs and the Class to purchase or otherwise acquire Coinbase common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

338.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Coinbase common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

339.    During the Class Period, Defendants made the false statements specified above, which they knew or severely recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

340.    Defendants had actual knowledge of the misrepresentations and omissions of material fact as set forth herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Coinbase's true condition from the investing public and to support the artificially inflated prices of Coinbase common stock.

341.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Coinbase common stock at inflated prices. Plaintiffs and the Class would not have purchased or otherwise acquired Coinbase common stock

at such prices, or at all, had they been aware that the market prices for Coinbase common stock had been artificially inflated by Defendants' fraudulent course of conduct.

342.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases or acquisitions of Coinbase common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants

343.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This Count is asserted against Defendants Armstrong, Haas, Choi, and Grewal pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiffs and all other members of the Class.

344.    The Executive Defendants acted as controlling persons of Coinbase within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

128

345.     In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

346.     As described above, the Company and the Executive Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

## XI.    JURISDICTION AND VENUE FOR PLAINTIFFS' SECURITIES ACT CLAIMS

347.     Plaintiffs' claims arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o (collectively, the "Securities Act Claims").

348.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

349.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) because a substantial number of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false or misleading information, occurred in this District.

350.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## XII.    PARTIES FOR PLAINTIFFS' SECURITIES ACT CLAIMS

### A.    Additional Defendant

351.    Defendant Jennifer N. Jones ("Jones") served as Coinbase's Chief Accounting Officer ("CAO") throughout the Class Period. She has served as CAO since July 2018. Jones participated in the review, approval, and making of the statements in the Offering Materials and signed the Registration Statement. During the first two trading days following the commencement of the Direct Listing, Jones sold 110,000 shares of Coinbase common stock for gross proceeds of more than $43,000,000. Over the course of the Class Period, Jones sold more than 150,000 shares of Coinbase common stock for gross proceeds of more than $51,000,000.

### B.    Director Defendants

352.    Marc L. Andreessen ("Andreessen") is, and was at the time of the Direct Listing, a Coinbase Director. Andreessen joined Coinbase's Board of Directors in December 2020. Andreessen participated in the review, approval, and making of the statements in the Offering Materials, and signed the Registration Statement. During the first two trading days following the commencement of the Direct Listing, Andreessen sold over 314,000 shares of Coinbase common stock for gross proceeds of more than $118,000,000. Over the course of the Class Period, Andreessen sold more than 1,000,000 shares of Coinbase common stock for gross proceeds of more than $311,000,000.

353.    Frederick Ernest Ehrsam III ("Ehrsam") is, and was at the time of the Direct Listing, a Coinbase Director. Ehrsam is a Coinbase co-founder and joined Coinbase's Board of Directors in March 2013. At the time of the Direct Listing, Ehrsam was a member of the Board of Director's Audit and Compliance Committee (the "Compliance Committee"), along with Fred Wilson and Kelly Kramer. As a member of the Compliance Committee, Ehrsam was, among other things, responsible for the adequacy of Coinbase's internal controls, inquiring about significant risks,

130

reviewing Coinbase's policies for risk assessment, and reviewing and overseeing Coinbase's policies related to compliance risks. Additionally, Ehrsam participated in the review, approval, and making of the statements in the Offering Materials, and signed the Registration Statement. During the first two trading days following the commencement of the Direct Listing, Ehrsam sold nearly 300,000 shares of Coinbase common stock for gross proceeds of close to $112,000,000. Over the course of the Class Period, Ehrsam sold more than 1,500,000 shares of Coinbase common stock for gross proceeds of nearly $500,000,000.

354.    Kathryn Haun ("Haun") is, and was at the time of the Direct Listing, a Coinbase Director. Haun joined the Coinbase Board of Directors in May 2017. At the time of the Direct Listing, Haun was a member of the Board of Director's Nominating and Corporate Governance Committee (the "Governance Committee"), as well as the Compensation Committee. Haun participated in the review, approval, and making of the statements in the Offering Materials, and signed the Registration Statement. During the first two trading days following the commencement of the Direct Listing, Haun sold 150,000 shares of Coinbase common stock for gross proceeds of more than $52,000,000. Over the course of the Class Period, Haun sold nearly 180,000 shares of Coinbase common stock for gross proceeds of more than $61,000,000.

355.    Kelly Kramer ("Kramer") is, and was at the time of the Direct Listing, a Coinbase Director. Kramer joined the Coinbase Board of Directors in December 2020. At the time of the Direct Listing, Kramer was a member and the Chairperson of the Compliance Committee, along with Frederick Ehrsam and Fred Wilson. As the Chairperson of the Compliance Committee, Kramer was, among other things, responsible for the adequacy of Coinbase's internal controls, inquiring about significant risks, reviewing Coinbase's policies for risk assessment, and reviewing and overseeing Coinbase's policies related to compliance risks. The Board of the Directors also

131

determined that Kramer was qualified under Item 470(d) of Regulation S-K as an "audit committee financial expert." Kramer participated in the review, approval, and making of the statements in the Offering Materials, and signed the Registration Statement.

356.    Gokul Rajaram ("Rajaram") is, and was at the time of the Direct Listing, a Coinbase Director. Rajaram joined the Coinbase Board of Directors in August 2020. At the time of the Direct Listing, Rajaram was a member of the Compensation Committee, along with Kathryn Haun and Fred Wilson. Rajaram participated in the review, approval, and making of the statements in the Offering Materials, and signed the Registration Statement.

357.    Fred Wilson ("Wilson") is, and was at the time of the Direct Listing, a Coinbase Director. Wilson joined the Coinbase Board of Directors in January 2017. At the time of the Direct Listing, Wilson had been appointed by the Board of Directors as the Lead Independent Director and was a member of the Compliance Committee, the Compensation Committee, and the Governance Committee. As a member of the Compliance Committee, Wilson was, among other things, responsible for the adequacy of Coinbase's internal controls, inquiring about significant risks, reviewing Coinbase's policies for risk assessment, and reviewing and overseeing Coinbase's policies related to compliance risks. Wilson participated in the review, approval, and making of the statements in the Offering Materials, and signed the Registration Statement. During the first two trading days following the commencement of the Direct Listing, Wilson secured gross proceeds of more than $1,800,000,000 in connection with his sales of Coinbase common stock.

358.    Defendants Andreessen, Ehrsam, Haun, Kramer, Rajaram, and Wilson are collectively referred to herein as the "Director Defendants." Defendants Coinbase, Armstrong, Haas, Jones, and the Director Defendants, are collectively referred to herein as the "Securities Act Defendants."

359.    In the run-up to the Direct Listing, the Securities Act Defendants: (i) assisted in the preparation and presentation of materials designed to induce investment in the Company; and (ii) purportedly conducted adequate due diligence on the Company, including accessing confidential corporate information concerning Coinbase's business operations unknown to the investing public. Moreover, the Securities Act Defendants planned the Direct Listing, determining, among other things: (i) the terms of the Direct Listing; (ii) the strategy to best accomplish the Direct Listing; (iii) the information to be included in the Offering Materials; and (iv) what responses would be made to the SEC in connection with its review of the Offering Materials.

## XIII.  FACTUAL ALLEGATIONS – SECURITIES ACT CLAIMS

360.    In this section of the Complaint, Plaintiffs assert strict-liability and negligence claims under Sections 11, 12, and 15 of the Securities Act. The Section 11, 12, and 15 claims are brought on behalf of the Securities Act Subclass.

361.    Each of the Securities Act Defendants is statutorily liable under Sections 11 and 12(a)(2) of the Securities Act for the materially inaccurate statements contained in the Offering Materials. In addition, Plaintiffs assert control person liability under Section 15 of the Securities Act against Defendants Armstrong, Haas, Jones, and the Director Defendants.

362.    The Securities Act Claims against the Securities Act Defendants are based on the fact that the Offering Materials (including the Prospectus) contained untrue statements of material fact, and omitted material facts, about the Company's business and operations, including substantial, material risks associated with Coinbase's ability to safeguard its customers' crypto assets.

363.    The Securities Act Claims against the Securities Act Defendants are also premised upon the Securities Act Defendants' negligent failure to conduct a reasonable due diligence investigation into the accuracy and completeness of the representations contained in the Offering

Materials. Had the Securities Act Defendants not acted negligently, and had they conducted reasonable due diligence investigations before the Direct Listing, they would have uncovered that the Offering Materials contained untrue statements of fact and omitted material facts.

364.    Plaintiffs' Securities Act Claims are not based on any knowing or deliberately reckless misconduct on the part of the Securities Act Defendants. Thus, for purposes of Counts III-V below, Plaintiffs' claims do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act Claims.

A.    **Coinbase's Blockbuster Multi-Billion Dollar Direct Listing and Offering Materials**

365.    On January 28, 2021, Coinbase announced in a blog post that the Company planned to go public via the Direct Listing. The announcement came as Coinbase was in the process of garnering SEC approval for its Registration Statement, first submitted on October 9, 2020.

366.    Unlike a traditional IPO, in a direct listing, no new shares are issued. Rather, it is the company's insiders or shareholders who sell pre-existing stock directly to the public through an exchange. Because Coinbase was a privately-owned company prior to the Direct Listing—and just prior to the start of the Class Period—the public had yet to see its financial statements, historical or projected.

367.    On February 25, 2021, Coinbase filed its initial Registration Statement on Form S-1. On March 23, 2021, Coinbase filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The next day, Coinbase filed the Free Writing Prospectus with the SEC, which was incorporated by referenced into the Registration Statement. Attached to the Free Writing Prospectus was a transcript of the YouTube video Coinbase's "Investor Day." In this Investor Day video, which was intended to generate

investor interest in the Direct Listing, Armstrong and Haas responded to questions related to the Company's proposed offering which were submitted by the public through Reddit. Coinbase also posted the Investor Day video on YouTube and issued both a Reddit blog post and a Twitter post to announce the YouTube posting.

368.    Coinbase's Registration Statement was declared effective by the SEC on April 1, 2021. The Form S-1 was signed by Defendants Armstrong, Haas, Jones, and the Director Defendants.

369.    On April 14, 2021, in connection with the Direct Listing, Coinbase filed its Prospectus on Form 424B4 with the SEC, incorporating and forming part of the Registration Statement.

370.    Coinbase expressly stated: "You should read this prospectus and any prospectus supplement before deciding to invest in our Class A common stock." The Company further represented:

> This prospectus is a part of a registration statement on Form S-1 that we filed with the SEC using a "shelf" registration or continuous offering process. Under this shelf process, the registered stockholders may, from time to time, sell the Class A common stock covered by this prospectus in the manner described in the section titled "Plan of Distribution."

371.    The Securities Act Defendants explicitly told investors to rely only on the information in the Registration Statement and Prospectus, and any free writing prospectus, stating:

> You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission, or SEC. Neither we nor the registered stockholders have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. Neither we nor the registered stockholders take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you.

372.    The Company registered for the resale of up to 114,850,769 shares of Class A common stock then held by registered shareholders, with a reference price of $250, as determined by the Nasdaq Global Select Market ("NMX") prior to the Direct Listing.

373.    On or about April 14, 2021, Coinbase commenced its Direct Listing, and its common stock began trading on the Nasdaq the same day, with an opening price of $381 per share, and traded as high as $429.54, but closed at $328.28.

374.    As reflected below, during the first two days of trading following the commencement of the Direct Listing, the Executive Defendants and the Director Defendants sold substantial amounts of Coinbase common stock, reaping astronomical proceeds. These Defendants continued to sell stock throughout the Class Period, garnering significant additional proceeds.

| Defendant | Shares Sold Between April 14, 2021 and April 15, 2021 | Gross Proceeds from Shares Sold Between April 14, 2021 and April 15, 2021 | Shares Sold During the Class Period | Gross Proceeds from Shares Sold During the Class Period |
|---|---|---|---|---|
| Armstrong | 749,999 | >$291,800,000 | 1,300,029 | >$323,000,000 |
| Choi | 614,170 | >$223,900,000 | 649,888 | >$429,000,000 |
| Haas | 255,500 | >$99,000,000 | 646,108 | >$115,000,000 |
| Grewal | | | 252,688 | >$65,000,000 |
| Jones | 110,000 | >$43,000,000 | 150,911 | >$51,000,000 |
| Andreessen | 314,024 | >$118,000,000 | 1,057,984 | >$311,000,000 |
| Ehrsam | 298,789 | >111,000,000 | 1,500,139 | >492,000,000 |
| Haun | 150,000 | >$52,000,000 | 183,835 | >$61,000,000 |
| Wilson | | >$1,800,000,000 | | |

**B.      Defendants Fail to Disclose the Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues**

375.      According to the Company's SEC filings, since inception through December 31, 2020, Coinbase generated over $3.4 billion in total revenue. Prior to and throughout the Class Period, Defendants repeatedly identified transaction fees as Coinbase's primary source of revenue, telling investors that "we generate substantially all of our total revenue from transaction fees on our platform in connection with the purchase, sale, and trading of crypto assets by our customers."

376.      Coinbase further disclosed that retail user transaction fees drove nearly all of that revenue, accounting for 95% of all fees for FY 2020 and 2021. More specifically, of Coinbase's $1.14 billion in total net revenue in 2020, total transaction fee revenue accounted for $1.10 billion, which included $1.04 billion in net retail transaction fee revenue (or approximately 91% of total net revenue and 95% of total transaction fee revenue). Of Coinbase's $7.35 billion in total net revenue in 2021, total transaction fee revenue accounted for $6.84 billion, which included $6.50 billion in net retail transaction fee revenue (or approximately 88% of total net revenue and 95% of total transaction fee revenue). As discussed below, the custody fee for retail users was built into Coinbase's transaction fees.

377.      Given the outsized contribution of transaction fees to Coinbase's bottom line, at all times, the Company's ability to maintain and grow its customer base—particularly retail users—was essential to its financial success. As the Company advised in its April 14, 2021 Prospectus, "[o]ur success depends on our ability to retain existing customers and attract new customers. . . ."

378.      Defendants also represented that MTUs, or the number of monthly retail customers who use the Coinbase platform to invest, drive the number of potential revenue generating transactions, and touted growth in that area. For FY 2019, 2020, and 2021, Coinbase reported increasing annual average MTUs of 1.1 million, 1.9 million, and 8.4 million, respectively.

379.    Coinbase's success in driving retail transaction fees likewise depended on its ability to convince the public that the Company could properly manage and safeguard from loss the staggering customer balances that were fueled by cryptocurrency's new-found popularity. By the start of the Class Period, Coinbase held over $90 billion in custodial fiat currencies and cryptocurrencies on behalf of customers, and that figure rose to as much as $278 billion during the Class Period—evidencing the trust that customers placed in Coinbase as a custodian.

380.    Cryptocurrency exchanges are thinly-regulated for safety-and-soundness and face major insolvency risks—so much so, that cryptocurrency investing was dubbed the "online Wild West where sheriffs are largely absent" by Reuters. Prior to Coinbase's Direct Listing in April 2021, at least 75 cryptocurrency exchanges collapsed, leaving many customers unable to recover their crypto assets. Most infamously, the Tokyo-based cryptocurrency exchange Mt. Gox declared bankruptcy in early 2014 after hackers stole 850,000 Bitcoins—worth more than $460 million—from the exchange. Three years into the Japanese bankruptcy proceedings, not a single customer of Mt. Gox had recouped the value of their digital assets.

381.    In the Offering Materials, Defendants purported to warn prospective investors about the risks arising from Coinbase's safeguarding of customers' assets and potential for loss, stating: "***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***." More specifically, Defendants honed in on two risks: "If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses."

382.    These representations contained untrue statements and omissions of material fact that rendered the statements misleading. Indeed, by choosing to speak about the risks arising from

Coinbase's "failure to safeguard and manage [its] customers' fiat currencies and crypto assets," the Securities Act Defendants had a duty to speak completely and accurately, including to disclose the material facts necessary to make these statements not misleading. The Securities Act Defendants also had a duty under SEC Regulation S-K, Items 303 and 105, to disclose this known uncertainty (and the attendant risks), as it was reasonably likely to have a material impact on the Company's financial condition, including its revenues.

383.    In violation of these duties, the Securities Act Defendants failed to inform investors of the heightened risk that in the event of a bankruptcy, the crypto assets held in custody by Coinbase on its customers' behalf may be considered the property of the Company's bankruptcy estate. Accordingly, Coinbase's retail customers could be treated as general unsecured creditors. As unsecured creditors, these customers would be the last category of creditors to recover owed monies in a bankruptcy and may only recover pennies on the dollar, if anything.

384.    Unlike a bank or a registered securities broker-dealer, as a digital-asset exchange platform, in the event of a bankruptcy the Company would be liquidated under the U.S. Bankruptcy Code. Thus, while Coinbase customers could make claims as unsecured creditors to recover the value of their crypto assets, they would not have the protections afforded to more traditional investment accounts. And unlike traditional bank accounts or brokerage accounts, crypto assets are not backstopped or guaranteed by any governmental or other agency, like the FDIC or the SIPC. If a bank fails due to an inability to meet obligations to depositors, the FDIC steps in to ensure depositors get prompt access to their insured deposits and acts as a receiver by selling the failed bank's assets and settling its debts. FDIC deposit insurance covers the balance of each depositor's account, dollar-for-dollar, up to the insurance limit. Claims for deposits in excess of the insured limit are addressed through the receivership. Similarly, the SIPC is a federally

mandated, member-funded nonprofit whose purpose is to expedite the recovery and return of assets during the liquidation of a failed broker-dealer. With liquidations overseen by the SIPC, customer accounts are segregated from those of the brokerage's assets, meaning that customer assets cannot be used to satisfy debts of other creditors in bankruptcy proceedings.

385.    These complexities made the complete and accurate disclosure of risks associated with cryptocurrency exchange accounts even more necessary, particularly in connection with Coinbase going public. As explained by Professor Levitin, "[c]ryptocurrency investors are unlikely to understand their legal treatment in the event of an exchange bankruptcy" given that "[t]he technical workings of bankruptcy law are not well understood by most laypersons or even attorneys (it is not a bar exam topic, for example)." Professor Levitin emphasized that the application of the U.S. Bankruptcy Code to assets held in the custody of a cryptocurrency exchange remains an open, "untested" question: "*Because cryptocurrency is untested American bankruptcy law, it is impossible to say with certainty how any particular United States bankruptcy court would treat custodial holdings of cryptocurrency*."

386.    As Defendant Armstrong would later admit in May 2022—and as was true at the time of the Direct Listing—any purported "*legal protections*" available to safeguard crypto assets "*ha[d] not been tested in court for crypto assets specifically*," leaving wide open the possibility that "*a court would decide to consider customer assets as part of the company in bankruptcy proceedings*." Nevertheless, the Securities Act Defendants failed to include any discussion or analysis regarding the availability of customers' crypto assets to satisfy creditor claims in the event of a bankruptcy in the Offering Materials.

387.    Professor Levitin further observed that the ambiguous bankruptcy treatment of crypto-exchange customers' assets is almost certain to result in expense and delay:

The lack of legal clarity makes [it] impossible for cryptocurrency exchange customers to have confidence in their treatment in the event of the exchange's bankruptcy. Moreover, the lack of legal clarity almost assuredly means that there will be litigation in the bankruptcy regarding who "owns" the custodially held cryptocurrency and in what capacity. While that litigation is pending—which could be for significant time—exchange customers will not to have access to the custodially held cryptocurrency. This means that even if the customers prevail, they will bear exposure to market swings during the duration of the litigation and may also bear the costs of the litigation.

388.    Of particular importance to investors, Coinbase's inability to protect its customers' crypto assets from this risk of loss made it highly probable that, if disclosed, customers would find "***custodial services more risky and less attractive***," causing a "***discontinuation or reduction in use of [the Company's] platform and products by existing customers***," as the Company ultimately admitted on May 10, 2022. This posed a substantial, material risk to Coinbase's financial position, in particular, its revenue from transaction fees. Yet, despite including nearly sixty pages of "Risk Factors" within the Prospectus, Defendants did not disclose these material facts and risks.

389.    Making matters worse for investors, the Securities Act Defendants then made numerous untrue statements of material fact about Coinbase's custodial services, including that it adequately safeguarded customers' crypto assets, protected them against various forms of loss, and enabled customers to maintain control over their assets stored with Coinbase. All told, the Securities Act Defendants misled investors in the Prospectus about Coinbase's financial prospects, which were purportedly anchored by the Company's ability to protect customers' crypto assets from loss, by failing to disclose one of the most salient risks to those assets.

C.    **The Offering Materials Contained Untrue Statements of Material Fact and Material Omissions in Violation of Section 11 of the Securities Act**

1.    **The Risk of Asset Loss in the Event of a Bankruptcy and the Potential Impact on Coinbase's Revenues**

390.    In the Offering Materials, the Securities Act Defendants purported to warn investors that the Company's "*failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition*."

391.    The Securities Act Defendants similarly represented that:

> *The loss or destruction of private keys required to access any crypto asset held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses*. . . Crypto assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. *Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' crypto assets could adversely affect our customers' ability to access or sell their crypto assets*, require us to reimburse our customers for their losses, and subject us to significant financial losses in addition to losing customer trust in us and our products.

392.    In a Section in the Registration Statement entitled "Crypto asset wallets," the Securities Act Defendants stated: "*The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys*."

393.    The statements set forth in ¶¶ 390-92 contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading. The Offering Materials purported to identify the circumstances in which customer assets in Coinbase's custody were susceptible to loss, and assured that the Company "*securely store[d] all crypto assets it holds*

142

***on behalf of users***," but failed to disclose the risk to customers of asset loss or seizure in the event of Coinbase's bankruptcy. Indeed, at the time these statements were made, any purported legal protections available to safeguard crypto assets during the Class Period had never been tested in courts within the United States. Accordingly, any such court could decide to consider customer assets as part of the company in bankruptcy proceedings, putting the customer's ability to recover their assets at severe risk. This omission left investors with the impression that the digital assets held in Coinbase's custody on behalf of customers were safe and insulated from seizure. Coinbase's inability to protect its customers' crypto assets from this loss made it highly probable that its customers would find the Company's custodial services "more risky and less attractive," as Coinbase later admitted. The risks posed to Coinbase's exchange customers in turn posed a substantial, material risk to Coinbase's financial position, particularly, its revenue from transaction fees, which accounted for nearly all of the Company's revenue and was the focus of analysts and investors alike in the run up to the Direct Listing and during the Class Period.

394.    In a Section entitled "Business: Retail," in the Registration Statement the Securities Act Defendants stated:

> Stake. Certain blockchain protocols, such as Tezos, rely on staking, an alternative way to validate blockchain transactions. Network participants can designate a certain amount of their crypto assets on the network as a stake (similar to a security deposit) to validate transactions and get rewarded in kind from the network. Today, staking crypto assets is a technical challenge for most users. Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time. We provide a service known as "Delegated Proof of Stake," which reduces the complexities of staking and ***allows our retail users to maintain full ownership of their crypto assets while earnings staking rewards.*** In return, we earn a commission on all staking rewards received.

395.    The statements set forth in ¶ 394 contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading: (1) for the reasons

set forth in ¶ 393; and (2) because the assertion that retail users would "***maintain full ownership***

***of their crypto assets while earning staking rewards***" lacked a reasonable basis given the

uncertain legal treatment of such assets in bankruptcy, particularly in the staking capacity, where

the fact that Coinbase shared in the profits by taking a 15% to 35% commission increased the

likelihood that the assets are considered part of Coinbase's bankruptcy estate.

     **D.**    **The Offering Materials Failed to Disclose Information Required to Be Disclosed Under SEC Regulation S-K**

     **1.**    **Item 105**

396.    The Offering Materials were required to furnish the information required by Item

105 of Regulation S-K, which requires the registrant to disclose under the caption "Risk Factors"

"a discussion of the material factors that make an investment in the registrant or offering

speculative or risky" and "[c]oncisely explain how each risk affects the registrant or the securities

being offered." 17 C.F.R. § 229.105. Nevertheless, the Offering Materials failed to disclose

information regarding material risks pursuant to Item 105. The disclosures in the Offering

Materials therefore failed to adequately alert investors to the actual risks associated with an

investment in Coinbase.

397.    For example, the Securities Act Defendants had a duty to disclose the following

adverse factor that made Coinbase's Direct Listing risky—customers could lose some or all of

their assets stored with Coinbase in the event of a bankruptcy. Because the Offering Materials

failed to make the requisite disclosures, the Securities Act Defendants violated Item 105.

     **2.**    **Item 303**

398.    Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer

is required to identify (i) "any known trends or any known demands, commitments, events or

uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity

increasing or decreasing in any material way," and "[i]f a material deficiency is identified, indicate

the course of action that the registrant has taken or proposes to take to remedy the deficiency;" and

(ii) "any known trends or uncertainties that have had or that are reasonably likely to have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations."

17 C.F.R. § 229.303(b)(1)(i), (b)(2)(ii). Such disclosures are required to be made by an issuing

company in registration statements filed in connection with public stock offerings.

399.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989

Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract. (Emphasis in original).
>
> . . . .
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

400.    Furthermore, the 1989 Interpretive Release provided the following test to determine

if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

401.    On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule"), and modified it on May 7, 2003. It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show *and do not show*, as well as *important trends and risks* that have shaped the past *or are reasonably likely to shape the future*."

402.    The "Objective" of Item 303 is as follows:

> The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.

17 C.F.R. § 229.303(a).

403.    Thus, the Securities Act Defendants were required to describe any known trends or uncertainties that have had, or that were reasonably likely to have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. In particular, the Securities Act Defendants had a duty to disclose the uncertainty of the bankruptcy treatment of Coinbase customers' crypto assets, and of the substantial risk of loss, seizure, or forfeiture of those assets, all of which were reasonably likely to have a material unfavorable impact on

Coinbase's revenues, income, or financial position. Even if the Securities Act Defendants were unable to determine the effect of any known trends or uncertainties on Coinbase's future revenues, income, or financial position, the Securities Act Defendants were still required under Item 303 to disclose the manner in which that uncertainty might reasonably be expected to materially impact Coinbase's future revenues, income, or financial position. Because the Offering Materials failed to make the required disclosures, the Securities Act Defendants violated Item 303.

E.    **Events and Disclosures Following the Direct Listing**

404.    On May 10, 2022, Defendants disclosed for the first time, in the Company's 1Q2022 Form 10-Q filed with the SEC, that crypto assets the Company holds in custody on behalf of customers could be treated as the Company's assets in the event of bankruptcy. Specifically, Defendants Coinbase, Armstrong, and Haas explained:

> *Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition* . . . .
>
> * * *
>
> Moreover, *because custodially held crypto assets may be considered to be the property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition*.

405.    Later that day, Defendant Armstrong admitted on Twitter that Coinbase had failed to appropriately communicate this risk to investors, stating:

> We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My

deepest apologies, and a good learning moment for us as we make
future changes.

406.    On this news, the price of Coinbase common stock declined $19.27 per share, or
more than 26%, from a close of $72.99 per share on May 10, 2022, to close at $53.72 per share on
May 11, 2022.

## XIV.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY – SECURITIES ACT CLAIMS

407.    The Private Securities Litigation Reform Act's statutory safe harbor and the
bespeaks caution doctrine applicable to forward-looking statements, under certain circumstances,
does not apply to any of the untrue statements of material fact alleged herein.

408.    None of the statements complained of herein was a forward-looking statement.
Rather, each was a historical statement or a statement of purportedly current facts and conditions
at the time such statement was made.

409.    To the extent that any of the materially false and misleading statements alleged
herein can be construed as forward-looking, any such statement was not accompanied by
meaningful cautionary language identifying important facts that could cause actual results to differ
materially from those in the statement.

410.    To the extent that the statutory safe harbor does apply to any forward-looking
statement alleged herein, the Securities Act Defendants are liable for any such statement because
at the time such statement was made, the particular speaker actually knew that the statement was
false or misleading, and/or the statement was authorized and/or approved by an executive officer
of Coinbase who actually knew that such statement was false when made.

411.    Moreover, to the extent that any Securities Act Defendant issued any disclosures
purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were
also materially false or misleading when made because they did not disclose that the risks that

were the subject of such warnings had already materialized and/or because such Defendant had the requisite state of mind.

## XV.    CAUSES OF ACTION UNDER THE SECURITIES ACT

### COUNT III

**Violations of Section 11 of the Securities Act
Against the Securities Act Defendants**

412.    Plaintiffs incorporate by reference the allegations in the paragraphs in Section XIII by reference. This claim is premised on the remedies available under Section 11 of the Securities Act and does not assert that the Securities Act Defendants acted with fraudulent intent. This claim is asserted by Plaintiffs against the Securities Act Defendants on behalf of the Securities Act Subclass.

413.    The Offering Materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted facts required to be stated therein.

414.    Each of the Securities Act Defendants signed the Registration Statement and caused it to be declared effective by the SEC on or about April 1, 2021. The Registration Statement incorporated by reference the Prospectus and the Free Writing Prospectus.

415.    Coinbase is the registrant for the Direct Listing and, as issuer of the common stock sold in the Direct Listing, is strictly liable to Plaintiffs and the Securities Act Subclass for the untrue and misleading statements and omissions of material fact contained in the Offering Materials.

416.    Each of the Securities Act Defendants named in this Count is responsible for, and is liable for, the contents and dissemination of the Offering Materials.

417.    As a result of their roles with Coinbase and their direct access to information contradicting the statements in the Offering Materials, the Securities Act Defendants reasonably should have known of the untrue and misleading statements of material fact contained in the Offering Materials.

418.    Together, the Securities Act Defendants named in this Count caused the Offering Materials to be filed with the SEC and to be declared effective, resulting in the issuance and sale of Coinbase common stock, which was purchased by Plaintiffs and other members of the Securities Act Subclass.

419.    None of the Securities Act Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, and did not omit any material facts required to be stated in the Offering Materials or facts that were necessary to make the statements made in the Offering Materials not false or misleading. By reason of the conduct alleged in this Count, each Securities Act Defendant named in this Count violated Section 11 of the Securities Act.

420.    Plaintiffs acquired Coinbase common stock pursuant and/or traceable to the Offering Materials.

421.    Plaintiffs and the Securities Act Subclass have sustained damages as a result of the Securities Act violations alleged in this Count.

422.    At the time of Plaintiffs' purchases or acquisitions of Coinbase common stock, Plaintiffs and other members of the Securities Act Subclass were without knowledge of the facts concerning the wrongful conduct alleged in this Count and could not have reasonably discovered those facts.

423.    Less than one year elapsed from the time that Plaintiffs discovered, or reasonably

could have discovered, the facts upon which the initial complaint filed in this action is based and the time that complaint was filed. Less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## COUNT IV

### Violations of Section 12(a)(2) of the Securities Act
### Against the Securities Act Defendants

424.    Plaintiffs incorporate by reference the allegations in the paragraphs in Section XIII by reference. This claim is premised on the remedies available under Section 12(a)(2) of the Securities Act and does not assert that the Securities Act Defendants acted with fraudulent intent for the purposes of this claim.

425.    This claim is asserted by Plaintiffs Firth and Steinmetz against the Securities Act Defendants, on behalf of the Securities Act Subclass.

426.    The Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock offered pursuant to the Direct Listing. The Offering Materials were used to induce investors, such as Plaintiffs Firth and Steinmetz and other members of the Securities Act Subclass, to purchase in Coinbase's common stock in the Direct Listing.

427.    The Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. The Securities Act Defendants' acts of solicitation included participating in the preparation of the false and misleading Offering Materials. Thus, the Securities Act Defendants solicited Plaintiffs Firth and Steinmetz, and other Securities Act Subclass members, to buy Coinbase common stock.

428.    The Securities Act Defendants owed Plaintiffs Firth and Steinmetz, and other Securities Act Subclass members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Securities Act Defendants did not make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were accurate and complete in material respects. Had they done so, the Securities Act Defendants would have known of the material misstatements and omissions alleged herein

429.    At the time of their purchases of Coinbase common stock pursuant and/or traceable to the Offering Materials, Plaintiffs Firth and Steinmetz and the Securities Act Subclass members, were without knowledge of the wrongful conduct alleged in this Count and could not have reasonably discovered those facts more than one year before the filing of the initial complaint in this action.

430.    By reason of the conduct alleged in this Count, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act.

431.    As a direct and proximate result of such violations, Plaintiffs Firth and Steinmetz and the other Securities Act Subclass members who purchased Coinbase common stock pursuant and/or traceable to the Offering Materials, sustained substantial damages in connection with their purchases of stock.

432.    This claim is brought within three years from the time that the shares upon which this Count is brought were sold to the public, and within one year from the time when Plaintiffs

Firth and Steinmetz discovered, or reasonably could have discovered, the facts upon which this Count is based.

## COUNT V

### Violations of Section 15 of the Securities Act
### Against Defendants Armstrong, Haas, Jones, and the Director Defendants

433.    Plaintiffs incorporate by reference the allegations in the Section XIII by reference. This claim is premised on the remedies available under Section 15 of the Securities Act and does not assert that Defendants Armstrong, Haas, Jones, and the Director Defendants acted with fraudulent intent.

434.    This Count is brought by Plaintiffs on behalf of the Securities Act Subclass under Section 15 of the Securities Act against Defendants Armstrong, Haas, Jones, and the Director Defendants.

435.    Each of these Defendants was a control person of Coinbase by virtue of his or her position at Coinbase. Each oversaw all operations at Coinbase and Coinbase could not have completed the Direct Listing without these Defendants signing or authorizing their signatures on the Registration Statement.

436.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which the initial complaint filed in this action is based and the time that this Complaint was filed. Less than three years has elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time that the initial complaint and this Complaint were filed.

## XVI.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

437.    Plaintiffs bring the Exchange Act Claims on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the

Class. Plaintiffs bring the Securities Act claims under Section 11 on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Securities Act Subclass. Plaintiffs Firth and Steinmetz bring the Securities Act claims under Section 12 on behalf of themselves and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Securities Act Subclass. Excluded from the Class are Defendants and the Securities Act Defendants, the officers and directors of Coinbase, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' and the Securities Act Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants and the Securities Act Defendants or their immediate families have or had a controlling interest.

438.    The members of the Class and Securities Act Subclass are so numerous that joinder of all members is impracticable. While the exact numbers of Class and Subclass members are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members. Throughout the Class Period, Coinbase's common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "COIN." During the Class Period, millions of Coinbase shares were publicly traded and Coinbase had more than 200 million shares of common stock outstanding. Record owners and the other Class and Subclass members may be identified from records maintained by Coinbase and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

439.    Plaintiffs' Exchange Act Claims are typical of those of the other Class members, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

440.    Plaintiffs' Securities Act claims under Section 11 and Section 15 claims are typical of those of the other Securities Act Subclass members, as all such members are similarly affected by the Securities Act Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

441.    Plaintiff Firth's and Plaintiff Steinmetz's Securities Act claims under Section 12 are typical of those of the other Securities Act Subclass members, as all such members are similarly affected by the Securities Act Defendants' wrongful conduct in violation of the federal laws that is complained of herein.

442.    Plaintiffs will thus fairly and adequately protect the interests of the Class and Securities Act Subclass members and have retained counsel competent and experienced in prosecuting class actions and securities litigation.

443.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to each member of the Class are: (i) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein; (ii) whether Defendants participated in and pursued the common course of conduct complained of herein; (iii) whether documents, press releases, and other statements disseminated to the investing public and to the Company's shareholders during the Class Period misrepresented material facts; (iv) whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts; and (v) the extent to which the members of the Class have sustained damages and the proper measure of damages.

444.    Common questions of law and fact exist as to all members of the Securities Act Subclass and predominate over any questions solely affecting individual Securities Act Subclass

members. Among the questions of law and fact common to each member of the Securities Act Subclass are: (i) whether the federal securities laws were violated by the Securities Act Defendants' acts and omissions as alleged herein; (ii) whether the Securities Act Defendants participated in and pursued the common course of conduct complained of herein; (iii) whether documents, press releases, and other statements disseminated to the investing public and to the Company's shareholders misrepresented material facts; (iv) whether statements made by the Securities Act Defendants to the investing public misrepresented and/or omitted to disclose material facts; and (v) the extent to which the members of the Subclass have sustained damages and the proper measure of damages.

445.    A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class and Securities Act Subclass may be relatively small, the expense and burden of individual litigation make it impracticable for class members to seek redress for the wrongful conduct alleged herein. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude their maintenance as a class action.

## XVII.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages and equitable relief in favor of Plaintiffs and other members of the Class and the Securities Act Subclass against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs, the Class, and the Securities Act Subclass their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XVIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: October 21, 2025                    Respectfully submitted,

**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P. C.**

*s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Matthew L. Mustokoff (*pro hac vice*)
Joshua A. Materese
Margaret E. Mazzeo
Dylan J. Isenberg
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
jmaterese@ktmc.com
mmazzeo@ktmc.com
disenberg@ktmc.com

–and–

Stacey M. Kaplan (*pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
skaplan@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

<u>**CERTIFICATE OF SERVICE**</u>

I, James E. Cecchi, hereby certify that on October 21, 2025, I caused a true and correct copy of the foregoing Third Amended Consolidated Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 21, 2025

*s/ James E. Cecchi*
James E. Cecchi
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, PC**
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com

*Liaison Counsel for the Putative Class*