**CARELLA, BYRNE, CECCHI,
  BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Matthew L. Mustokoff
Margaret E. Mazzeo
Marianne Assunta Dy Uy
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

[*Additional counsel on signature page*]

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE COINBASE GLOBAL, INC. SECURITIES LITIGATION | Case No. 2:22-cv-04915-BRM-LDW<br><br>Hon. Brian R. Martinotti<br>District Judge<br><br>Hon. Leda D. Wettre<br>Magistrate Judge<br><br>Motion Day: April 20, 2026 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

BACKGROUND ..................................................................................................6

LEGAL STANDARD...........................................................................................9

ARGUMENT .....................................................................................................9

I.    THE REGULATORY STATEMENTS ARE ACTIONABLE ......................9

      A.    The Court Has Twice Sustained the Regulatory Statements, and Defendants' New Authority Does Not Disturb Those Rulings ............9

            1.    The Enforcement Statements Were False or Misleading ...........9

            2.    The Listing Statements Were False or Misleading...................14

            3.    The Staking Statements Were False or Misleading..................18

            4.    The Review Process Statements Were False or Misleading..................................................................................19

      B.    The TAC Adequately Pleads Scienter for the Regulatory Statements ................................................................................21

            1.    Plaintiffs Adequately Allege Armstrong's Scienter .................21

            2.    Plaintiffs Adequately Allege Grewal's Scienter......................24

II.   THE BANKRUPTCY RISK STATEMENTS ARE ACTIONABLE ..........26

      A.    The Bankruptcy Risk Statements Were False or Misleading .............26

            1.    The Court Has Twice Sustained the Bankruptcy Risk Statements, and *Handal* Does Not Disturb That Ruling...........26

            2.    The Bankruptcy Risk Statements Are Not Protected by the PSLRA Safe Harbor.........................................................32

      B.    The TAC Adequately Pleads Scienter for the Bankruptcy Risk Statements ................................................................................34

i

      1.     Plaintiffs Adequately Allege Armstrong's Scienter ..................35

      2.     Plaintiffs Adequately Allege Haas's Scienter..........................37

      3.     Plaintiffs Adequately Allege Choi's Scienter..........................38

      4.     Plaintiffs' Core Operations Allegations....................................39

III.    PLAINTIFFS ADEQUATELY PLEAD TRACEABILITY.........................40

CONCLUSION.................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ...................................................................................15

*Alberici v. Recro Pharma, Inc.*,
2021 WL 798299 (E.D. Pa. Mar. 1, 2021) .......................................................17, 22

*In re Amarin Corp. PLC Sec. Litig.*,
2022 WL 2128560 (3d Cir. June 14, 2022).............................................................29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................9

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ..................................................................................16

*In re AT&T Corp. Sec. Litig.*,
2002 WL 31190863 (D.N.J. Jan. 30, 2002).............................................................33

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ..................................................................................24

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018)..................................................................32

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .................................................................................23

*Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ....................................................................................24

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 15, 2015)...............................................................31

*Feinberg v. Am. Express Co.*,
2011 WL 4807916 (E.D. Pa. Oct. 7, 2011) ..............................................................25

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ..................................................................................17

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ....................................................................25

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)..........................................................24

*Handal v. Innovative Indus. Props., Inc.*,
   157 F.4th 279 (3d Cir. 2025) .......................................................................4, 12, 29

*Herskowitz v. Nutri/System, Inc.*,
   857 F.2d 179 (3d Cir. 1988) .................................................................... 17-18

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
   620 F. Supp. 3d 167 (D.N.J. 2022)..........................................................4, 11, 12

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .......................................................................22, 25

*In re Majesco Sec. Litig.*,
   2006 WL 2846281 (D.N.J. Sep. 29, 2006) ...........................................................33

*In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*,
   2011 WL 3444199 (D.N.J. Aug. 8, 2011) .............................................................15

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,
   2012 WL 3779309 (D.N.J. Aug. 29, 2012) ...........................................................29

*In re Merck & Co., Inc. Sec. Litig.*,
   432 F.3d 261 (3d Cir. 2005) ..................................................................................34

*In re Novo Nordisk Sec. Litig.*,
   2018 WL 3913912 (D.N.J. Aug. 16, 2018) ........................................... 9, 15-16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................. 16-17

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ..................................................................................16

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ...................................................................................18

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ................................................................ 12-13

*Pirani v. Slack Techs., Inc.*,
   127 F.4th 1183 (9th Cir. 2025) ...................................................................40

*Pirani v. Slack Techs., Inc.*,
   2020 WL 7061035 (N.D. Cal. June 5, 2020)..............................................40

*In re PTC Therapeutics, Inc. Sec. Litig.*,
   2017 WL 3705801 (D.N.J. Aug. 28, 2017) .....................................23, 36, 38, 39

*In re Ravisent Techs., Inc.*,
   2004 WL 1563024 (E.D. Pa. July 13, 2004) ...............................................34

*Roofers' Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018) ...................................... 16, 28, 32-33

*San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*,
   2025 WL 2176586 (3d Cir. July 30, 2025)..................................................15

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ...............................................................4, 20

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
   351 F. Supp. 3d 874 (E.D. Pa. 2018).............................................18, 36, 38, 39

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992) ................. 10-11

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..........................................................................21

*Tomaszewski v. Trevena, Inc.*,
   482 F. Supp. 3d 317 (E.D. Pa. 2020).......................................................17, 22

*In re Toronto-Dominion Bank Sec. Litig.*,
   2018 WL 6381882 (D.N.J. Dec. 6, 2018).......................................... 1, 34, 39-40

*In re Viropharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014)..........................................................33

vi

*In re Walmart, Inc. Sec. Litig.*,
    151 F.4th 103 (3d Cir. 2025) ..............................................................2, 9, 10

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................................13

*Wu v. GSX Techedu Inc.*,
    738 F. Supp. 3d 527 (D.N.J. 2024)..............................................................*passim*

Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Third Amended Complaint ("TAC") (Dkt. 159-1, "Mot.").[1]

## PRELIMINARY STATEMENT

Defendants' *third* Rule 12 motion should be denied. Far from the "targeted" motion that Defendants previewed at the pre-motion conference, Defendants' Motion asks the Court to revisit its prior holdings regarding scienter, falsity, and materiality with respect to every challenged statement in the case. But the Court has already considered and rejected these arguments. Any group pleading deficiencies have been cured, and Defendants' citations to *Walmart* and *Handal*—two readily distinguishable cases—do not negate the Court's well-reasoned opinions.

To start, there is no group pleading here. The TAC identifies (i) "particularly which statements are attributable to which Defendants" and (ii) "which scienter arguments are applicable to which Defendants." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *14 (D.N.J. Dec. 6, 2018). And Plaintiffs' scienter allegations were previously credited by the Court. Dkt. 84 at 30-35.

Among other things, Defendants shrug off the admitted-to facts relied on by

---

[1] Unless otherwise noted, all emphasis is added, all internal citations and quotations are omitted, and all capitalized terms shall have the same meaning ascribed to them in the TAC. Citations to "¶" are to paragraphs in the TAC.

the Court in sustaining the Regulatory Statements eighteen months ago, including (i) Coinbase's admission that by mid-2022, the U.S. Securities and Exchange Commission ("SEC") had privately told it that all the crypto assets it listed other than Bitcoin were securities, and (ii) Armstrong's admission that by January 2023 the SEC had terminated discussions with Coinbase and shifted back to an enforcement investigation, signaling an impending action. Despite their self-confessed knowledge, Defendants continued to falsely downplay the likelihood of an SEC action. The fact that the SEC Chair was contemporaneously voicing the SEC's stance that most crypto tokens are securities (*e.g.*, Mot. at 20) does not immunize Defendants from "misleadingly describ[ing] a favorable picture of the improbability that the SEC would file an enforcement action"—an allegation this Court has now sustained *twice*. Dkt. 84 at 28; Dkt. 135 at 40.

*In re Walmart, Inc. Securities Litigation*, 151 F.4th 103 (3d Cir. 2025) is distinguishable and provides no basis to upset this Court's prior rulings. In *Walmart*, the Third Circuit found that Walmart's disclosure of a government investigation was sufficient. But unlike here, at the time of Walmart's disclosure it was still negotiating with prosecutors who "agreed to postpone any indictment" and just three weeks later agreed not to bring any charges. *Id.* at 108, 114-15. Here, by contrast, the SEC told Coinbase in January 2023—*prior* to the February 2023 10-K disclosing the SEC investigation—that it was shifting to enforcement mode such that Defendants knew

that "[d]iscussions were over" with the SEC and Coinbase faced "an imminent enforcement action." ¶¶ 189, 302. In fact, shortly after the enforcement action was filed, Grewal admitted that Coinbase knew the action was impending, stating, "***[t]his was a day we knew that would come*** . . . . ***we weren't blindsided by anything***." ¶ 303.

Plaintiffs agree that companies have no duty to disclose they "'w[ere], in fact, violating' the law." Mot. at 2 (quoting *Walmart*, 151 F.4th at 120). But that's not the issue here. As this Court held, "[a]lthough disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing, Defendants ***still*** had an obligation to include the details that would have presented a complete and less favorable [picture]." Dkt. 84 at 28. And to the extent Defendants are relitigating their argument that Coinbase had no duty to "predict [the] outcome" of the SEC investigation (Mot. at 10), the Court previously found this argument "***misplaced***," explaining:

> Plaintiffs' claim is better qualified as seeking recourse for the misleading nature of the Regulatory Statements in concealing that [Coinbase] had listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that most assets it listed were likely securities, thus increasing the risk that the SEC would bring an enforcement action.

Dkt. 84 at 30.

These omitted, highly material facts distinguish this case from *Walmart*. Given that Defendants were told by January 2023 that an enforcement action was

3

imminent, "[f]uture action against the Company could hardly at this time be considered mere speculation." *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 187-88 (D.N.J. 2022).

Defendants also claim—for the third time—that the Regulatory Statements are nonactionable opinions. But the Court rejected this argument and found "these statements are actionable as they did not fairly align with the information in [Defendants'] possession." Dkt. 84 at 29 n.19. The fact that the SEC, under a different administration, changed its position and dismissed the action ***two years later*** does not erase Defendants' scienter at the time of their statements or render them true, as "[f]raud depends on the state of events when a statement is made, not on what happens later." *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010).

Defendants' challenges to the Bankruptcy Risk Statements fare no better. *Handal v. Innovative Industrial Properties, Inc.*, 157 F.4th 279 (3d Cir. 2025) did not change the pleading standards as Defendants urge. It is also distinguishable. In *Handal*, the Third Circuit found that the defendants' response to a pointed analyst question regarding two specific entities would not have been understood by a reasonable investor to refer to a third, unrelated entity engaged in fraud and thus was not materially misleading. 157 F.4th at 295. But here, Defendants affirmatively "[put] the safety of customers' assets 'in play'" through their statements underscoring the need to safeguard those assets. Dkt. 84 at 22. As this Court held:

4

"In noting that hacking and lost keys were risks to safeguarding customers' assets, [Defendants] had a duty to provide the ***complete*** picture of known risks . . . . Instead, [they] concealed their knowledge of the potential bankruptcy risks to safeguarding customers' assets." *Id*. at 22-23. In so holding, the Court rejected Defendants' straw-man argument—recycled in their current Motion—that bankruptcy "was never a realistic possibility for Coinbase during the Class Period." Mot. at 3. The Court found that Plaintiffs' claim is more properly framed as the "fail[ure] to disclose that, in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets." Dkt. 84 at 21.

As to scienter, Plaintiffs allege the requisite defendant-by-defendant particularity. Armstrong, Haas, and Choi all publicly addressed the issue of custodial risks to Coinbase's customers knowing that the Company had failed to provide its retail customers with the same protections explicitly provided to its institutional customers—and Armstrong admitted as much following the May 2022 corrective disclosure. ¶ 211. To the extent Plaintiffs plead scienter facts that apply to more than one Defendant, as this Court held, "the same facts can be used to support scienter for multiple corporate executives" who participated in the fraud. Dkt. 135 at 41.

Finally, as to the Securities Act claims, the Court already rejected Defendants' contention that the Bankruptcy Risk Statements are protected by the safe harbor. *Id.* at 25-26. And the Court previously ruled that Plaintiffs have pled standing under

Third Circuit law. Dkt. 84 at 42-45.

## BACKGROUND

On September 5, 2024, the Court denied in large part Defendants' motion to dismiss the Second Amended Complaint (Dkt. 68, "SAC"). Dkt. 84.

*First*, the Court sustained Plaintiffs' claims regarding the **Regulatory Statements**, finding that "Defendants misleadingly described a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities." *Id.* at 28. The Court found that (i) "[t]he Regulatory Statements are misleading as Plaintiffs allege Coinbase decided to list crypto assets from late 2019 through 2021, that its own review process determined had high risk scores, and thus were likely to be securities," and (ii) "a subset of the statements were [also] misleading in that Defendants concealed that the SEC had indicated to Defendants by mid-2022 that most crypto assets on Coinbase's platform were likely securities." *Id.* at 29. As the Court explained, "[a]lthough disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing, Defendants *still* had an obligation to include the details that would have presented a complete and less favorable [picture]." *Id.* at 28.

The Court also found that Plaintiffs adequately alleged scienter based on (i) Defendants' review of the high risk scores that were generated under Coinbase's

6

internal framework, (ii) Coinbase's admission that the SEC had told the Company in January 2023 that it would be bringing an enforcement action, (iii) Armstrong's admission that Defendants were aware by mid-2022 of the SEC's position that Coinbase's listed assets were securities, and (iv) Defendants' Class Period insider sales, including sales after the Direct Listing that netted Armstrong more than $320 million and Grewal more than $65 million, and a $3.7 billion compensation package for Armstrong. *Id.* at 34-35; *see also* ¶¶ 121, 312-13. In addition, the Court found that the fraud concerned Coinbase's core operations, which, under Third Circuit precedent, further bolsters a finding of scienter. Dkt. 84 at 33-34.

*Second*, as to the **Bankruptcy Risk Statements**, the Court credited Plaintiffs' allegations that Defendants failed to disclose that, in the event of a bankruptcy, Coinbase customers' crypto assets could be considered part of the bankruptcy estate and therefore not recoverable by the customers. *Id.* at 21-22. The Court found that although Defendants "detailed the need to safeguard customers' assets" in their disclosures, they "specified only two risks—hacking and the loss or destruction of private keys," but "concealed their knowledge of the potential bankruptcy risks to safeguarding [those] assets." *Id.* at 22-23. The Court further held that, "to the extent [the Bankruptcy Risk Statements] highlight Coinbase's alleged ability to safely store customers' assets," they are "actionable as they contain 'embedded' falsities and concern a central part of Coinbase's business." *Id.* at 24 (quoting *City of Warren*

7

*Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023)).

The Court also found scienter based on the allegations that "(i) Defendants submitted the SEC Comment Letter demonstrating [their] understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy," "(ii) Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets," and "(iii) Armstrong eventually conceded that Defendants 'should have updated our retail terms sooner' to provide retail customers with 'the same protections' as institutional customers." *Id*. at 33.

On February 10, 2025, Defendants filed a motion for judgment on the pleadings under Rule 12(c). Dkt. 103. On April 11, 2025, Defendants filed a motion to certify the Court's September 5, 2024 order for interlocutory review with regard to the Court's standing determination for the Securities Act claims. Dkt. 122.

On September 30, 2025, the Court denied in large part Defendants' Rule 12(c) motion and denied their motion for interlocutory review. Dkt. 135. As to the Rule 12(c) motion, the Court held that it "***still*** finds Plaintiffs have adequately alleged Defendants made the [alleged false statements] with scienter where the allegations do not ***solely*** rely on group pleading." *Id.* at 38-39.

On October 21, 2025, Plaintiffs amended the complaint. The amended allegations in the TAC are narrowly tailored to remedy any potential group pleading issue and to further bolster Armstrong's and Grewal's scienter. As set forth in

8

**Appendix A**, the TAC (i) identifies the speaker of each alleged misstatement, and (ii) clarifies the connection between Plaintiffs' scienter allegations and each Individual Defendant.

## LEGAL STANDARD

A Rule 12(b)(6) motion must be denied if the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A district court is required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the plaintiff." *In re Novo Nordisk Sec. Litig.*, 2018 WL 3913912, at *4 (D.N.J. Aug. 16, 2018) (Martinotti, J.) (citation modified).

## ARGUMENT

I.    **THE REGULATORY STATEMENTS ARE ACTIONABLE**

A.    **The Court Has Twice Sustained the Regulatory Statements, and Defendants' New Authority Does Not Disturb Those Rulings**

1.    **The Enforcement Statements Were False or Misleading**

*February 23, 2023 Form 10-K.* As previewed above, *Walmart* is inapposite and does not annul the Court's prior holding as to the February 23, 2023 10-K. In *Walmart*, the Third Circuit found sufficient Walmart's disclosure that it was under investigation and that it could provide no assurances as to the outcome. 151 F.4th at 118-20. But unlike here, at the time of the disclosure, Walmart was continuing to negotiate with prosecutors such that the investigation "remained ongoing," even

9

after the prosecutors told Walmart of their initial intent to indict the company. *Id.* at 114. In addition, the "prosecutors agreed to postpone any indictment to allow Walmart time to present its case to prosecutors," and then dropped the investigation just three weeks later with no charges brought. *Id.* at 108.

Here, by contrast, Grewal admitted that the SEC told Coinbase by no later than January 2023—***prior*** to the February 2023 10-K—that it was shifting to enforcement mode such that Defendants knew "[d]iscussions were over" and Coinbase faced "an imminent enforcement action." ¶ 189. And in the days immediately after the action was filed, Grewal admitted that Coinbase knew the SEC was going to file the action against the Company for a long time, stating, "***this was a day we knew that would come***" and "***we weren't blindsided by anything***." ¶ 303.

After considering Defendants' admissions and Plaintiffs' additional allegations, the Court previously concluded that the February 2023 10-K statement is actionable. Dkt. 84 at 28-30 (despite no "duty to disclose uncharged, unadjudicated wrongdoing, Defendants still had an obligation to include the details that would have presented a complete and less favorable [picture]" of the status of the SEC investigation). Given the known facts withheld by Defendants, the Court's holding is entirely consistent with *Walmart*—companies may not have a duty to confess that they "'w[ere], in fact, violating' the law," Mot. at 2 (quoting *Walmart*, 151 F.4th at 120), but they still have a duty to "speak truthfully" and to disclose all

10

material facts required to make their statements about issues that they put "in play" not misleading. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992); *see also Becton*, 620 F. Supp. 3d at 186 ("Defendants may not describe 'a favorable picture' of a material issue 'without including the details that would have presented a complete and less favorable one.'") (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018)).

Defendants also assert that they had no duty to "predict [the] outcome" of the SEC investigation. Mot. at 10. But the Court previously rejected this argument too, finding it "misplaced as Plaintiffs' claim is better qualified as seeking recourse for the misleading nature of the Regulatory Statements in concealing that [Coinbase] had listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that most assets it listed were likely securities, thus increasing the risk that the SEC would bring an enforcement action." Dkt. 84 at 30. These omitted material facts further distinguish this case from *Walmart*. Given that Defendants were told by January 2023 that an enforcement action was imminent (¶ 189), "[f]uture action against the Company could hardly at this time be considered mere speculation." *Becton*, 620 F. Supp. 3d at 187-88. The fact that the SEC had not yet formally filed its suit does not matter. *See id.* at 187 ("The fact that the FDA had not issued a formal warning letter . . . does not mean that the Company was free to issue misleading statements that failed to recognize the serious, immediate, and

11

known risks posed by a near-certain enforcement action.").

**May 10, 2022 Form 10-Q.** The Court previously held that "Defendants had a duty to disclose material facts related to the likelihood that the crypto assets listed were securities and, as a result, the likelihood that the SEC would file an enforcement action"—crediting Plaintiffs' allegations that Coinbase "listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that most assets it listed were likely securities." Dkt. 84 at 29-30.

Defendants argue (again) that Plaintiffs fail to plead that Armstrong knew the SEC had requested information about Coinbase's listing process by May 2022, but the Court already rejected this argument. *See id.* at 29.[2] Like the SAC, the TAC alleges that "[b]y no later than May 2022" the SEC had turned its focus to Coinbase, serving the Company with "a request for information about its asset listings process"

---

[2] Defendants cite extensively to *Handal*. *See* Mot. at 9-18 (citing 157 F.4th 279). But the pleading standards articulated in *Handal* are the same as those the Court applied in denying Defendants' prior Rule 12 motions. *Compare* Dkt. 84 at 16-17 (a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" "with particularity") (alteration in original), *and* Dkt. 135 at 8-9 (same), *with Handal*, 157 F.4th at 292-93 (a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . with particularity"). *Handal* is also distinguishable. There, the plaintiffs alleged that the defendants concealed that the company had been defrauded by a third party, but failed to plead any facts showing that the defendants "knew [of] or suspected" any fraud until after all but one of the challenged statements were made. *Handal*, 157 F.4th at 287-91, 297-98. Here, Plaintiffs adequately allege that Defendants knew or had access to facts that rendered their statements false or misleading at the time they were made, and the Court has twice sustained the claims. Dkt. 84; Dkt. 135.

(¶ 264), which Armstrong knew from his frequent interactions with the SEC as Coinbase's CEO (¶¶ 296-303, 306)—allegations that must be accepted as true at this stage. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

In addition, because Coinbase listed assets on its platform between late 2019 through 2021 that its own process determined had "high 'risk' scores" indicative of securities (¶¶ 163, 264), it was misleading for Coinbase to tell investors that it "may be subject to regulatory scrutiny" "if we are unable to properly characterize a crypto asset" (¶ 263)—Defendants were deliberately disregarding the internal indicia signaling that these assets were securities.

Finally, the falsity of the May 2022 statement does not hinge on whether the "SEC investigation demonstrated *certainty* that crypto assets qualified as securities." Mot. at 13 (emphasis in original). As the Court previously held, "Defendants had a duty to disclose material facts related to the ***likelihood*** that the crypto assets listed were securities and, as a result, the ***likelihood*** that the SEC would file an enforcement action." Dkt. 84 at 29. Defendants' renewed citation to a subsequent court decision finding that there is room for difference of opinion on whether certain crypto assets are securities (Mot. at 13) is irrelevant. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) (when determining relevance in securities fraud cases, "the securities law approaches matters from an ***ex ante*** perspective") (citation modified); *cf.* Dkt. 84 at 23 n.16 ("Defendants' argument, that

13

bankruptcy courts have found that customers' crypto assets are not part of a cryptocurrency platform's estate, is misguided. The legal landscape that has played out ***following the period*** when the Bankruptcy Risk Statements were made is ***not relevant*** to the Court's analysis.").

### 2. The Listing Statements Were False or Misleading

As the Court has now found twice, "Defendants misleadingly described a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities." Dkt. 84 at 28; Dkt. 135 at 40. In so finding, the Court considered and rejected Defendants' renewed claim that they were merely responding to the SEC's publicly stated views of the crypto markets. *Compare* Mot. at 13-14 (pointing to Grewal's statement that Coinbase "100% disagree[d] with the SEC's decision" and asserting that a reasonable investor "'would [not] have understood' Grewal's post as an assurance of minimal risk"), *with* Dkt. 78-1 at 26 (first motion to dismiss: "Coinbase was *highlighting* the new positions the SEC was taking that *amplified* that very risk despite Coinbase's disagreement with the SEC's changing positions, which it also disclosed") (emphasis in original), *and* Dkt. 103-1 at 25 (motion for judgment on pleadings: "Many of the statements allegedly downplaying the risk of regulatory action consist of responses to the SEC's publicly stated views about crypto.").

Defendants' citations to the SEC's publicly voiced policy pronouncements

14

provide no basis for the Court to depart from its prior holdings. Mot. at 13-14. In the face of the SEC's campaign to tamp down on unregistered crypto sales, the insider trading action, and later the Wells Notice, Defendants unremittingly denied that Coinbase listed securities, thus downplaying the risk posed by the SEC. ¶¶ 265, 268-69, 290.

Defendants cannot establish that the SEC's public messaging fully countered the deceptive impact of their lulling statements to Coinbase's shareholders. To invoke this kind of "truth-on-the-market" defense, Defendants must show that the allegedly corrective information was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at *3 (3d Cir. July 30, 2025); *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011) (same); *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 350 (3d Cir. 2009) ("Just as we require investors to act upon public information indicating fraud, so, too, do we allow them to rely upon corporate statements discounting the possibility of malfeasance."); *Novo Nordisk*, 2018 WL 3913912, at *6 ("statements acknowledging the challenges of [intermediary] contracts and pricing pressures in the market" "do not preclude the possibility Defendants' statements [touting the efficacy of Novo's products and assuring

15

continued growth despite increasing pricing pressures] were misleading").[3]

Defendants' denials defeat any truth-on-the-market defense, particularly at this phase of the litigation. *See Roofers' Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018) ("[T]he truth on the market defense is 'intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint.'") (quoting *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015)); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("A 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage.").

Defendants also re-argue that the Listing Statements are inactionable opinions. Mot. at 13-14. But the Court previously "disagree[d]" with this contention and held that the statements were "actionable as they did not 'fairly align[] with the information in [Defendants'] possession.'" Dkt. 84 at 29-30 n.19 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)) (second alteration in original). To be sure, there is no complete defense for "honestly believe[d]" opinions under *Omnicare*. 575 U.S. at 189 n.6. "[I]f the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id.* at 188; *see id.* at 186-90, 194 (the "fairly-align" standard is objective

---

[3] While Plaintiffs do not oppose Defendants' attempt to judicially notice documents for the limited purpose of ascertaining "what the documents state[]," they should not be used "to prove the truth of their contents." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

and applied from "an ordinary investor's perspective").

Moreover, the fact that the SEC, under a different administration, changed its position and dismissed its enforcement action against Coinbase *two years later* (Mot. at 14) is irrelevant to whether Defendants' statements were false or misleading at the time they were made. "Just as [the Court] cannot countenance pleading fraud by hindsight, ***neither can [it] infer innocence by hindsight***." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001); *accord Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at *7-8 (E.D. Pa. Mar. 1, 2021) (FDA approval "two years after the end of the class period does not indicate that the statements were not false or misleading at the time they were made . . . . The FDA's actions in 2020 do not obviate Plaintiff's allegations regarding 2017 or 2018, nor do they render any allegedly false statements from that time true.") (emphasis omitted); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 n.100 (E.D. Pa. 2020) (post-class period FDA approval of drug "has no bearing on Plaintiffs' allegation that during the class period Defendants deceived investors"); *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188 (3d Cir. 1988) (on appeal from trial of Section 10(b) claim, affirming exclusion under Federal Rule of Evidence 403 of company's "post-merger performance" after preparation of proxy statement as evidence of "management's

17

pre-merger intentions or expectations").[4]

Defendants' attempt to defend Grewal's March 22, 2023 blog post by claiming that he was "not required to *admit* the SEC's allegations" also fails. Mot. at 14-15 (emphasis in original). Although Defendants may not have a freestanding duty to disclose unadjudicated wrongdoing, they were not free to describe "a favorable picture" of a material issue "without including the details that would have presented a complete and less favorable one." *Endo*, 351 F. Supp. 3d at 900; *see id.* at 897 ("[O]nce a company has chosen to speak on an issue, even one it had no independent obligation to discuss, it cannot omit material facts related to that issue."). Rather than remain silent, Defendants deliberately minimized the regulatory risk stemming from the Wells Notice and misled investors by continuing to conceal that Coinbase listed crypto assets flagged as securities by its own internal process. ¶¶ 295-305.

### 3.    The Staking Statements Were False or Misleading

In challenging Plaintiffs' allegations regarding the Staking Statements,

---

[4] Defendants' reliance on *In re Philip Morris International Inc. Securities Litigation*, 89 F.4th 408 (2d Cir. 2023) is misplaced. Mot. at 14-15. There, the plaintiffs challenged the defendants' interpretation of clinical study results, such that the claims turned on "whether [the statements] expressed an interpretation of the data that was objectively irrational or unreasonable when they were made." 89 F.4th at 422. Here, as the Court found, Defendants omitted highly "material facts related to the likelihood that the crypto assets listed were securities and, as a result, the likelihood that the SEC would file an enforcement action." Dkt. 84 at 29. This was not a matter of clinical interpretation.

Defendants first rehash their argument that these statements are inactionable opinions. Mot. at 15, 16-17. But the Court already rejected this argument. Dkt. 84 at 29 n.19. And while Defendants now cite to the SEC's subsequent guidance to claim that their opinions were "reasonable" (Mot. at 15), this argument fares no better than their attempts to invoke other irrelevant post-Class Period developments in defense of their misstatements. *See supra* at 13-14, 17-18.

Defendants also point to the Risk Factor in the May 2022 10-Q and Coinbase's acknowledgement of "regulatory uncertainty" as insulating their Staking Statements. Mot. at 15-16. But the Court previously rejected this argument too, holding that "generic warnings of a risk do 'not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.'" Dkt. 84 at 29 n.19 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014)). The Court also previously sustained Defendants' statements about Coinbase's staking program despite their claim that they publicly discussed the SEC's position on other crypto firms' staking programs and expressed their disagreement with the SEC's views. *See* Dkt. 78-1 at 10-11 (first motion to dismiss); Dkt. 84 at 28-30; *see also supra* at 14-15.

### 4. The Review Process Statements Were False or Misleading

Defendants first attempt to defend their statements regarding Coinbase's purportedly "rigorous process" by again pointing to irrelevant post-Class Period

19

events. Mot. at 16-17. This argument fails. *See supra* at 13-14, 17-18; *Schleicher v. Wendt*, 618 F.3d 679, 684 (7th Cir. 2010) ("Fraud depends on the state of events when a statement is made, not on what happens later.").

Defendants also attack the particularity of Plaintiffs' allegations regarding the CRC scores, but the Court previously deemed these allegations sufficient. Dkt. 135 at 39-40 ("Plaintiffs' assertions regarding the CRC . . . were acknowledged as sufficiently pled over Defendants' objections. . . . It was similarly determined that the Regulatory Statements were misleading because, as alleged, Coinbase had decided to list crypto assets from late 2019 through 2021, that its own review process determined had 'high "risk" scores,' and thus were likely to be securities.").

Plaintiffs allege (again) that (i) Coinbase helped to found the CRC; (ii) Coinbase "adopted" the CRC framework, (iii) Coinbase utilized the CRC scores in "determining whether an asset will be deemed to be a security," and (iv) from late 2019 through 2021, "Coinbase made available on the Coinbase Platform crypto assets with high 'risk' scores under the CRC framework." ¶¶ 161-63. Given that Coinbase listed "crypto assets with high 'risk' scores" and added assets "even where it recognized [they] had the characteristics of securities," it was materially misleading for Defendants to tout the Company's purportedly "rigorous" process for determining whether a particular digital asset is a security. ¶¶ 163, 265-70. Moreover, despite Grewal's misleading statements to the contrary, the SEC had

20

never approved or ratified Coinbase's asset listing process. ¶ 267.

**B.    The TAC Adequately Pleads Scienter for the Regulatory Statements**

Tacitly acknowledging that Plaintiffs' scienter allegations against Armstrong and Grewal are individually tailored, Defendants abandon their group pleading arguments (Mot. at 19) and instead recycle their old scienter challenges that the Court has rejected twice—and should reject again. Plaintiffs' scienter allegations are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The fact that Armstrong's and Grewal's misleading statements were made in the context of "defend[ing] Coinbase's legal position" (Mot. at 19) is not a defense: as this Court previously found, a company can openly disagree with the SEC or another regulatory agency on a legal question and *at the same time* misrepresent or conceal "material facts related to . . . *the likelihood that the SEC would file an enforcement action*." Dkt. 84 at 29.

**1.    Plaintiffs Adequately Allege Armstrong's Scienter**

*Armstrong's Admissions.* Defendants first take aim at the Court's reliance on Armstrong's admission that the SEC's "tone" in its communications with Coinbase shifted in mid-2022 and that the SEC told the Company that "we think everything other than Bitcoin is a security," arguing that these facts were publicly known. Mot. at 19-20 (citing Dkt. 135 at 40). But Defendants made this exact argument in their

Rule 12(c) motion (Dkt. 103-1 at 22 n.9 (motion for judgment on pleadings: "the SEC made essentially those same views known publicly")), and the Court nonetheless found Plaintiffs' scienter allegations to be sufficient. *See* Dkt. 135 at 39 (holding that allegation that "the SEC told Defendants that 'we think everything other than Bitcoin is a security'" supports scienter); Dkt. 84 at 34 (same). Armstrong's admissions regarding the SEC's warnings to Coinbase amply underscore his knowledge of facts contradicting his public statements. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254-55 (5th Cir. 2009) (defendants' "post-period admissions . . . directly and cogently tend to prove their state-of-mind at the time of their misleading statements and omissions").

***Subsequent Developments.*** Defendants also point again to "[s]ubsequent developments" as undercutting the inference of Armstrong's scienter (Mot. at 20-21), but those events post-date Defendants' statements by more than two years and are therefore irrelevant. *See supra* at 13-14, 17-18; *Alberici*, 2021 WL 798299, at *7-8; *Tomaszewski*, 482 F. Supp. 3d at 334 n.100.

***CRC Scores.*** Defendants' recycled challenge to Plaintiffs' allegations based on the CRC scores also fails. Mot. at 21. The TAC (like the SAC) specifically pleads that Armstrong, through his role as Coinbase's CEO, received or had access to the CRC risk scores. ¶ 305. The TAC also includes new allegations that Coinbase and Armstrong ***admitted*** that the Company utilized CRC scores in evaluating assets for

22

listing, further confirming Armstrong's awareness of the scores and their role in Coinbase's listing process. ¶ 162 (Coinbase confirmed that it used CRC scores in "conduct[ing] a legal review that analyzes potential assets under applicable securities laws"); ¶ 161 (Armstrong described CRC framework as one of "our own self regulatory frameworks" that Coinbase "proactively created"). These admissions significantly undercut Defendants' repeated attempts to distance themselves from the CRC scores. Mot. at 18 n.4. *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (scienter supported by "specific admissions from top executives"). Critically, Defendants do not claim that Coinbase did not utilize CRC scores in evaluating assets—they assert only that Coinbase conducted its own analysis "[i]n addition" to using CRC scores. Mot. at 18 n.4.

In light of these admissions about the CRC scores, Plaintiffs need not point to "internal memoranda or confidential sources" to support their allegations. *Cf.* Mot. at 21. Moreover, given that Coinbase's operation of a cryptocurrency platform for customers to trade, invest in, and store crypto assets was the Company's core business (¶ 306), "[i]t seems implausible" that Armstrong was "not paying close attention" to its listing process for crypto assets. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017); *see also* Dkt. 84 at 33-34 (crediting Plaintiffs' core operations allegations and citing cases finding scienter supported by core operations inference).

***Motive.*** Defendants' third attempt to refute Plaintiffs' motive allegations against Armstrong falls short (again). Defendants asserted these same challenges—almost verbatim—in their Rule 12(b)(6) and Rule 12(c) motions, and the Court twice held that the "allegations as to Armstrong's financial motivations further support" scienter. Dkt. 84 at 34-35; Dkt. 135 at 41. After the direct listing, Armstrong continued to sell Coinbase stock throughout the Class Period, garnering over $323 million in profits, and he was motivated to maintain the inflation in Coinbase's stock in order to unlock higher tranches of his lucrative compensation plan. ¶¶ 121, 312-13. And while Defendants point again to Armstrong's Rule 10b5-1 plan, this plan was entered into in August 2022—months ***after*** the SEC investigation began and Armstrong was in possession of material nonpublic information about Coinbase's listed assets—and is thus "no defense to scienter." *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *accord Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012).

### 2. Plaintiffs Adequately Allege Grewal's Scienter

***Grewal's Admissions.*** The TAC alleges several new admissions by Grewal about the SEC's enforcement action in which he conceded that Defendants knew that an SEC enforcement action was imminent: "[T]his was a day we knew that would come. And so, we've been preparing for it for a very, very long time . . . . we

24

weren't blindsided by anything." ¶ 303.

Defendants' claim that these admissions do not support Grewal's scienter because they post-dated the Wells Notice is unfounded. *Lormand*, 565 F.3d at 254-55 (defendants' "post-period admissions" establish scienter); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (scienter adequately alleged based on "subsequent admissions" that established defendants' "present knowledge of the [concealed] risk"). Moreover, Defendants' attempt to diffuse Grewal's admissions by injecting their own interpretation of his statements (Mot. at 23-24) is inappropriate at this stage. *See, e.g.*, *Feinberg v. Am. Express Co.*, 2011 WL 4807916, at \*3 (E.D. Pa. Oct. 7, 2011) ("the Court may not consider defendant's version of the facts at the motion-to-dismiss stage").

***CRC Scores***. Defendants largely ignore the TAC's well-pled allegations tying Grewal to the CRC scores. The TAC alleges that (i) Coinbase founded the CRC and utilized the CRC scores as part of its legal review of potential assets (¶¶ 161-62), (ii) as Coinbase's Chief Legal Officer, Grewal oversaw Coinbase's asset listing review and had knowledge of the process, as confirmed by his January 2022 blog post (¶ 305), (iii) in his role as CLO, Grewal had access to the CRC scores for listed assets (*id.*), and (iv) Coinbase listed securities "with high 'risk' scores under the CRC framework," "even where it recognized the crypto assets had the characteristics of securities." ¶ 163. These facts support a strong inference of Grewal's scienter.

*Motive.* Defendants' claim that Grewal's Class Period stock sales netting more than $65 million in proceeds do not evidence his scienter has already been rejected twice and should be rejected again. Dkt. 135 at 41; Dkt. 84 at 35. As with Armstrong's stock sales, the fact that Grewal's sales were made pursuant to a Rule 10b5-1 plan does not negate scienter because this plan was entered into in August 2022—months after the SEC had begun investigating Coinbase and at a time when Grewal possessed material nonpublic information. *Supra* at 24; Dkt. 159-23.

**II.    THE BANKRUPTCY RISK STATEMENTS ARE ACTIONABLE**

**A.    The Bankruptcy Risk Statements Were False or Misleading**

**1.    The Court Has Twice Sustained the Bankruptcy Risk Statements, and *Handal* Does Not Disturb That Ruling**

Defendants argue—for the third time—that Plaintiffs fail to plead that Armstrong, Haas, and Choi had contemporaneous knowledge about "the uncertain legal treatment of crypto assets in bankruptcy." Mot. at 25-26.[5] But this recycled contention runs headlong into the Court's prior finding that Plaintiffs' allegations "sufficiently demonstrated Defendants had known of the Bankruptcy Risk at the time of the Statements" and "made knowing material misstatements or omissions"

---

[5] *See* Dkt. 78-1 at 16-17 (first motion to dismiss: "the SAC fails to allege a single fact suggesting any bankruptcy risk, let alone a risk to customer assets in a bankruptcy, existed at the time the challenged statements were made . . . . '[W]ithout contemporaneous falsity, there can be no fraud.'"); Dkt. 103-1 at 16-17 (motion for judgment on pleadings: "Plaintiffs fail to allege that any particular Defendant had actual knowledge that any Bankruptcy Risk statement was false or misleading").

to conceal such risks. Dkt. 135 at 25.

In so finding, the Court credited (i) Coinbase's May 2022 Form 10-Q disclosure of the risk to retail customers' assets in the event of a bankruptcy which the Court viewed as an "admission" "effectively acknowledg[ing] the substantial likelihood that the omission . . . was material to investors" (Dkt. 84 at 21-22), (ii) Defendants' June 2019 Comment Letter "demonstrating [their] understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy" (*id.* at 33; Dkt. 135 at 24); (iii) Defendants' "affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets" (but not retail customers' assets) (*id.*); and (iv) Armstrong's concession that Coinbase "should have updated [its] retail terms sooner to provide retail customers with the same protections as institutional customers." *Id.* The TAC re-pleads these allegations and specifically ties them to Armstrong, Haas, and Choi. ¶¶ 101-05, 106-17, 294.

Defendants also argue again that they had no obligation to disclose "the alleged bankruptcy risk." Mot. at 26. In support, Defendants try to parse the Bankruptcy Risk Statements into various categories and then argue that each category of statements does not "imply anything about bankruptcy risk." Mot. 26-32; *see also* Dkt. 78-1 at 15-16 (first motion to dismiss: none of "the challenged statements related to a possible bankruptcy risk"). But the Court already found that *all* of Defendants' statements concerning the security of customers' crypto assets

27

gave rise to "a duty to provide the complete picture of known risks to customer[s]' assets," yet Coinbase and the Executive Defendants "specified only two risks—hacking and the 'loss or destruction of private keys,'" thereby "conceal[ing] their knowledge of the potential bankruptcy risks to safeguarding [such] assets." Dkt. 84 at 22-23; *see also id.* (by "noting that hacking and lost keys were risks to safeguarding customers' assets, Coinbase and the Executive Defendants had a duty to provide the complete picture of known risks to customer[s]' assets"). "By placing the safety of customers' assets 'in play,'" Defendants were obligated to "disclose the risks that its retail customers' assets faced." *Id.* at 22 (citing *Shapiro*, 964 F.2d at 282); Dkt. 135 at 24 (same); *see* ¶¶ 235-37, 250, 382-89 (allegations regarding duty to disclose).[6]

In addition, while Defendants repeat their mantra that a Coinbase bankruptcy during the Class Period was unlikely (Mot. at 26, 31, 33), as the Court previously explained, this is not the issue: Plaintiffs' claim does not turn on the short-term risk that Coinbase would go bankrupt, but rather Defendants' "fail[ure] to disclose that, in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets." Dkt. 84 at 21.

---

[6] The Court's finding that Defendants had a duty to disclose the bankruptcy risk also disposes of Defendants' contention that a statement is not misleading because it is "simply incomplete." Mot. at 27; *see Papa*, 2018 WL 3601229, at *13 ("The law does not permit [defendants] to mislead investors through half-truths.").

28

Defendants' reliance on *Handal*—a readily distinguishable case—does not salvage their argument. Mot. at 26-32 (citing 157 F.4th 279). In *Handal*, the Third Circuit found that the defendants' allegedly misleading response to a pointed analyst question regarding two specific entities would not have been understood by a reasonable investor to refer to a third, unrelated entity engaged in fraud. 157 F.4th at 295. Here, by contrast, Defendants, through their affirmative statements, put "in play" a much broader and far-reaching subject—the safety of customer assets traded on Coinbase's platform—and thus had a duty to disclose ***all*** the material risks impacting the safety of those assets, including the risk of loss in the event of a bankruptcy. Dkt. 84 at 22.[7]

Defendants also claim (again) that Coinbase's addition of the bankruptcy risk disclosure in May 2022 does not support a falsity finding because it was added in response to SAB 121, after the challenged statements were made. Mot. at 28; *see*

---

[7] As discussed *supra* (at n.2), *Handal* is also distinguishable given the plaintiffs' failure to plead any facts showing that the defendants knew of or suspected any fraud by the third party entity until after all but one of the alleged false statements were made. Defendants' other cited cases are also inapposite. *See In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2012 WL 3779309, at *2 (D.N.J. Aug. 29, 2012) (cited at Mot. at 28-29) (rejecting argument that Merck's statements about past commercial performance were rendered misleading by failure to disclose adverse information about drug's safety profile); *In re Amarin Corp. PLC Sec. Litig.*, 2022 WL 2128560, at *3 (3d Cir. June 14, 2022) (cited at Mot. at 28, 31) (challenged disclosures "did not make any affirmative characterizations regarding the effectiveness of the mineral oil placebo" and thus "did not put into play . . . additional information regarding the mineral oil placebo").

29

*also* Dkt. 78-1 at 17 (first motion to dismiss). But the Court previously sustained the Bankruptcy Risk Statements in the face of this argument. Dkt. 84 at 22-23. To be sure, SAB 121 did not create a new disclosure obligation—instead, it expressly reinforced the obligation "under *existing* Commission rules." ¶¶ 127-28. Thus, the timing of SAB 121 is beside the point. The fact that the SEC later rescinded SAB 121 is equally irrelevant as the underlying obligation remained unchanged: "[b]y placing the safety of customers' assets 'in play,'" Defendants were *still* under a duty under Section 10(b) of the Exchange Act to "disclose the risks that its retail customers' assets faced" so as to not render the Bankruptcy Risk Statements misleading. Dkt. 84 at 22 (citing *Shapiro*, 964 F.2d at 282). And, in any event, the actionability of Defendants' statements is determined at the time the statements were made—not years later. *See supra* at 13-14, 17-18.

Defendants' rehashed assertion that they had no duty to disclose the bankruptcy risk under Item 303 of SEC Regulation S-K also fails. Mot. at 32-33; *see also* Dkt. 78-1 at 15 n.3 (first motion to dismiss). As the Court previously held, although "Item 303 does not create an affirmative duty of disclosure," "Coinbase and the Executive Defendants' failure to disclose the known uncertainty of the risks that bankruptcy posed to asset safety in violation of Item 303 rendered the Asset Safety Disclosures materially misleading." Dkt. 84 at 23 (citing *In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 392 (D.N.J. 2018) ("[A]n omission

30

in the context of Item 303 can give rise to a Rule 10b-5 claim if the Item 303 omission renders other statements materially misleading.") (emphasis omitted)).

Finally, Defendants claim that three of their statements discussing Coinbase's ability to keep customer assets safe are "inactionable puffery and opinion." Mot. at 31-32. The Court already rejected this argument too: "[T]o the extent [the Bankruptcy Risk Statements] highlight Coinbase's alleged ability to safely store customers' assets, [they] are actionable as they contain 'embedded' falsities and concern a central part of Coinbase's business." Dkt. 135 at 24 (citing *City of Warren Police*, 70 F.4th at 686); *see also Enzymotec*, 2015 WL 8784065, at *14 ("[A] statement is considered puffery only when it is immaterial," and materiality determinations "are peculiarly for the trier of fact."). Each of the statements Defendants identify address the security Coinbase purportedly provided for customer assets and are thus actionable under the Court's prior holding. *See* ¶ 252 (referencing "the security we offer" and stating, "[w]e have world-class security in custody when you purchase assets with Coinbase and hold them in Coinbase"); ¶ 249 (discussing Mt. Gox bankruptcy and purported benefits of Coinbase's custody services over self-custodial services); ¶ 260 ("we're a great, safe place to buy your first Bitcoin to trade to safely store").

31

### 2.    The Bankruptcy Risk Statements Are Not Protected by the PSLRA Safe Harbor

Defendants also re-argue—practically verbatim from their Rule 12(c) motion—that the Bankruptcy Risk Statements are forward-looking statements protected by the PSLRA safe harbor. *Compare* Mot. at 38-39, *with* Dkt. 103-1 at 13-20 (motion for judgment on pleadings). The Court previously rejected this argument as well, holding that the Bankruptcy Risk Statements "are actionable and allege known or present risks a[t] the time such Statements were made" and "the safe harbor does not apply." Dkt. 135 at 25-26. In support of this holding, the Court also reiterated its prior finding that Plaintiffs pled actual knowledge. *Id.* at 25 (citing Dkt. 84 at 23) (Plaintiffs' allegations adequately asserted that "'Coinbase and the Executive Defendants concealed their knowledge of the potential bankruptcy risks to safeguarding customers' assets,'" citing Armstrong's admission that Coinbase "should have updated [its] retail terms sooner"). Defendants' recycled arguments do not disturb this holding.

In addition, the Bankruptcy Risk Statements are not forward-looking—instead, they describe some of the ***current*** risks to retail customers' assets but omit the risk of asset loss in the event of a bankruptcy. As courts in this Circuit have held repeatedly, "PSLRA's safe harbor does not apply" to "alleged omission[s] of present facts." *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018); *accord Papa*, 2018 WL 3601229, at *7 (because "plaintiffs challenge

32

defendants' alleged omission of present facts with respect to the challenged statements, [the] safe harbor does not apply") (alteration omitted); *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at *14 (D.N.J. Jan. 30, 2002) ("the safe harbor provision does not afford corporations a free pass to lie to investors . . . . purposeful omission[s] of existing facts . . . do not qualify as forward-looking statements"); *In re Majesco Sec. Litig.*, 2006 WL 2846281, at *4 (D.N.J. Sep. 29, 2006) ("omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor"); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014) (same).

The fact that these statements addressed "contingent future risks" does not render them forward-looking. Mot. at 38. As the Court previously held, although "Defendants repeatedly emphasized the security that Coinbase offered . . . . [they] knew they had not taken steps to protect the Company's retail customers' assets from potential bankruptcy risks." Dkt. 84 at 22; *see also* Dkt. 135 at 25-26. Thus, Defendants' repeated claim that their statements about Coinbase's ability to protect customers' assets depended entirely on future events is undermined by the deliberate steps they took to alter Coinbase's institutional customer agreement to protect those clients' assets in the event of a bankruptcy without any corresponding changes to the retail customer agreement. Dkt. 84 at 23; Dkt. 135 at 25.

Finally, Defendants echo their old claim that because the Bankruptcy Risk

33

Statements are forward-looking, "Plaintiffs' disavowal of scienter foreclose[s] the Securities Act claims." Mot. at 39; *see also* Dkt. 103-1 at 15-16 (motion for judgment on pleadings). But even if the Bankruptcy Risk statements were forward-looking (they're not), "[t]he safe harbor of the PSLRA specifically does not apply to statements made in connection with an IPO." *In re Ravisent Techs., Inc.*, 2004 WL 1563024, at *11 n.27 (E.D. Pa. July 13, 2004); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (quoting 15 U.S.C. § 78u-5(b)(2)(D)) (PSLRA includes statutory carve-out for "statements made in connection with an initial public offering"). Because the Bankruptcy Risk Statements in Coinbase's Prospectus and Registration Statement were issued in connection with the Direct Listing, Defendants are not immune from liability under the safe harbor. ¶¶ 232-34, 238.

### B.    The TAC Adequately Pleads Scienter for the Bankruptcy Risk Statements

The TAC identifies (i) "particularly which statements are attributable to which Defendants," and (ii) "which scienter arguments are applicable to which Defendants." *Toronto-Dominion*, 2018 WL 6381882, at *14. *See* Appendix A. Moreover, as the Court previously held, "the same facts can be used to support scienter for multiple corporate executives." Dkt. 135 at 41-42 (citing *Wu v. GSX Techedu Inc.*, 738 F. Supp. 3d 527, 559 (D.N.J. 2024) ("[T]he allegations as to the CEO's scienter and the CFO's scienter are largely baked together in this case.")).

In finding—twice—that Plaintiffs adequately alleged scienter, the Court

34

relied on the well-pled allegations that:

> (i) Defendants submitted the SEC Comment Letter demonstrating Defendants' understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy; (ii) Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets; [and] (iii) Armstrong eventually conceded that Defendants "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers.

Dkt. 135 at 23-24; Dkt. 84 at 33. The TAC reasserts these same allegations and ties them to each speaker—Armstrong, Haas, and Choi. There is no group pleading.

### 1.    Plaintiffs Adequately Allege Armstrong's Scienter

***Coinbase Custody Comment Letter.*** Plaintiffs allege that the June 2019 Comment Letter demonstrated that Armstrong "understood the potential adverse consequences of commingling customer assets in the event of a bankruptcy," citing his role as Coinbase's CEO and a member of management for Coinbase Custody. ¶¶ 40, 102-05. Armstrong's high-level positions with Coinbase and Coinbase Custody raise a strong inference that he knew of the Comment Letter or had access to it. ¶¶ 40, 103-05; *see Wu*, 738 F. Supp. 3d at 562 ("[C]ourts routinely look to a person's position in a given company to determine whether the person's statements were made with scienter. ***This is the approach in the Third Circuit***."); *see also* Dkt. 84 at 33 ("[P]laintiffs have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

***User Agreements and Efforts to Mitigate Risks to Institutional Customers.*** Defendants assert that Plaintiffs fail to plead that Armstrong was aware of the differences between the retail and institutional user agreements. Mot. at 37. But, based on the frequency with which Armstrong publicly addressed Coinbase's custodial services provided under the Retail User Agreement, including in response to analyst questions, it is implausible that as Coinbase's CEO and a member of Coinbase Custody management, he was unaware of the terms of the Company's user agreements and the disparate protection provided for retail versus institutional customers—and if he was unaware of such terms, then at a minimum it was reckless for him to speak about the custodial services under the agreements. *See, e.g.*, *PTC*, 2017 WL 3705801, at *16-17 (speaking "explicitly and repeatedly" about results and company's talks with FDA supported scienter); *Endo*, 351 F. Supp. 3d at 906 (defendants' public comments "confirm they had intimate knowledge of the data . . . . ***These officers were speaking as authoritative sources who possessed the information to support their statements***."); *Wu*, 738 F. Supp. 3d at 561 ("sharp, detailed, and recurring questions that challenge the company's position on important matters can strongly bear on scienter").

***Armstrong's Admissions.*** The Court previously found scienter based in part on Armstrong's admission that Coinbase had failed to provide retail customers with "the same protections" as institutional customers and that the Company "should have

36

updated [its] retail terms sooner." Dkt. 84 at 33; Dkt. 135 at 24; *see also* ¶ 117. Defendants' repeated effort to reframe this concession as a "backwards-looking statement" with no bearing on his "actual contemporaneous knowledge" (Mot. at 37-38; Dkt. 103-1 at 18 (motion for judgment on pleadings)), has already been rejected by the Court and should be rejected again. Dkt. 84 at 23 n.17 ("Armstrong's admissions following the May 10, 2022 Form 10-Q report are illuminating."); Dkt. 135 at 24; *see supra* at 26-27, 32, 34-35. Moreover, Defendants' attempt to recast SAB 121 as a "newly required disclosure" is counterfactual. *See supra* at 29-30.

*Motive.* Defendants' latest attempt to refute the motive allegations against Armstrong also fail. Mot. at 37. As the Court has twice found, Armstrong was highly motivated to maintain the inflation in Coinbase's stock price as he reaped proceeds of over $290 million through his sales in the wake of the Direct Listing, and grossed proceeds of more than $320 million during the Class Period. Dkt. 84 at 34-35; Dkt. 135 at 41; ¶¶ 121, 312-13.

### 2.    Plaintiffs Adequately Allege Haas's Scienter

*Coinbase Custody Comment Letter.* As with Armstrong, Haas's position as Coinbase's CFO and her roles as Governor and Director of Coinbase Custody give rise to an inference that she knew of or had access to the Comment Letter. ¶¶ 41, 102-05; *see Wu*, 738 F. Supp. 3d at 562.

37

***User Agreements and Efforts to Mitigate Risks to Institutional Customers.*** Defendants assert that Plaintiffs fail to adequately allege that "Haas was aware of distinctions between retail and institutional user agreements." Mot. at 36. However, Haas frequently addressed the Company's custodial services provided under the Retail User Agreement, including in response to analyst questions; as such, it is implausible that as she was unaware of these distinctions (and if she was unaware, then at a minimum, she spoke recklessly). *PTC*, 2017 WL 3705801, at *16-17; *Endo*, 351 F. Supp. 3d at 906; *Wu*, 738 F. Supp. 3d at 561.

***Motive.*** As the Court previously found, Haas's stock sales further evidence her scienter. Mot. at 36; Dkt. 84 at 35; Dkt. 135 at 41. In the first two days of the Direct Listing, Haas netted gross proceeds of over $99 million from stock sales, and she garnered over $115 million from her Class Period sales. ¶ 121.

### 3.    Plaintiffs Adequately Allege Choi's Scienter

***Coinbase Custody Comment Letter.*** Similar to Armstrong and Haas, Choi's roles as Coinbase's COO and Governor of Coinbase Custody support an inference that she knew of or had access to the Comment Letter. ¶¶ 42, 102-05; *see Wu*, 738 F. Supp. 3d at 562.

***User Agreements and Efforts to Mitigate Risks to Institutional Customers.*** As with Armstrong and Haas, the fact that Choi addressed the Company's custodial services provided under the Retail User Agreement, including in response to analyst

questions, gives rise to a strong inference that she was aware of differing protections provided to retail versus institutional customers; if she was not, she spoke recklessly. *PTC*, 2017 WL 3705801, at \*16-17; *Endo*, 351 F. Supp. 3d at 906; *Wu*, 738 F. Supp. 3d at 561.

**Motive.** Choi's stock sales further support scienter. Mot. at 35-36; Dkt. 84 at 35; Dkt. 135 at 41. Choi capitalized on Coinbase's successful Direct Listing, netting over $223 million in proceeds, and garnering over $429 million in proceeds over the course of the Class Period. ¶ 121. While Defendants recycle their contention that insider stock sales in a direct listing do not contribute to an inference of scienter, the Court already rejected this argument. Mot. at 35-36; Dkt. 84 at 35; *see* Dkt. 78-1 at 32 (first motion to dismiss: "In a direct listing, insider sales are inherently usual and unsuspicious.").

### 4.    Plaintiffs' Core Operations Allegations

The Court has twice credited Plaintiffs' core operations allegations as further establishing scienter. *See* Dkt. 84 at 33-34 ("Plaintiffs' allegations—that retail fees make up a substantial portion of Coinbase's revenue and that Defendants acknowledged asset security was vital to their efforts in retaining retail clients—are further persuasive here."); Dkt. 135 at 27-28. These allegations, when combined with the individualized allegations discussed above, bolster the inference of the Individual Defendants' scienter. *See Toronto-Dominion*, 2018 WL 6381882, at \*14

39

(crediting core operations allegations combined with particularized allegations, including those "stemming from insider sales"); *cf.* Mot. at 35 (asserting that core operations doctrine requires "other, individualized allegations" of scienter).

## III.    PLAINTIFFS ADEQUATELY PLEAD TRACEABILITY

The Court previously found that Plaintiffs adequately pled standing for the Section 11 and 12(a)(2) claims. Dkt. 84 at 40-42. The Court recognized the split of authority regarding the sufficiency of statistical tracing allegations, but nonetheless concluded that Plaintiffs' allegations were sufficient under Third Circuit law, as Defendants acknowledge. *Id.*; Mot. at 40. The Ninth Circuit's non-binding—and distinguishable—decision in *Pirani v. Slack Technologies, Inc.*, 127 F.4th 1183 (9th Cir. 2025) provides no grounds for the Court to revisit its prior holding.[8]

### CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: March 16, 2026

Respectfully submitted,

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

---

[8] In *Slack*, the plaintiff's "inability to trace" was "undisputed" by the parties. *Pirani v. Slack Techs., Inc.*, 2020 WL 7061035, at *1 (N.D. Cal. June 5, 2020). Here, by contrast, Plaintiffs allege that they purchased Coinbase stock "pursuant and/or traceable to the Offering Materials" and allege the timing of their purchases and the purchase price, as well as a high statistical inference that the purchased shares were registered. ¶¶ 36-38, 420.

*/s/ James E. Cecchi*
James E. Cecchi
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
decklund@carellabyrne.com

*Liaison Counsel for the Putative Class*

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**
Matthew L. Mustokoff
Margaret E. Mazzeo
Marianne Assunta Dy Uy
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
mmazzeo@ktmc.com
muy@ktmc.com

–and–

Stacey M. Kaplan (*pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
skaplan@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz, and Lead Counsel for the Putative Class*

41

## CERTIFICATE OF SERVICE

I, James E. Cecchi, hereby certify that on March 16, 2026, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Third Amended Consolidated Class Action Complaint to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 16, 2026                          Respectfully submitted,


                                               /s/ James E. Cecchi
                                               James E. Cecchi
                                               **CARELLA, BYRNE, CECCHI, BRODY
                                                 & AGNELLO, P.C.**
                                               5 Becker Farm Road
                                               Roseland, New Jersey 07068
                                               Telephone: (973) 994-1700
                                               Facsimile: (973) 994-1744
                                               jcecchi@carellabyrne.com

                                               *Liaison Counsel for the Putative Class*

42