# EXHIBIT 39

BEFORE THE UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

_____

In the Matter of Coinbase, Inc.                                        File No. HO-14315

_____

**WELLS SUBMISSION ON BEHALF OF**

**COINBASE GLOBAL, INC. AND COINBASE, INC.**

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Attorneys for Coinbase Global, Inc. and Coinbase, Inc.*

April 19, 2023

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................9

    I.     The Company ...........................................................................................9

    II.    Relevant Products and Services.............................................................10

    III.   Coinbase's Substantial History of Engagement with the Commission......................11

    IV.   Efforts To Register a Trading Platform with the Commission.................................14

ARGUMENT ..........................................................................................................16

    I.     An Enforcement Action Would Present Major Programmatic Risks to the Commission. ...........................................................................16

        A.    The Extensive Factual Record in This Case Militates Against Enforcement.............................................................17

        B.    The Staff's Case Rests on Unsupported and Untested Legal Theories..........19

        C.    The Staff's Novel Legal Theories Would Be Foreclosed by the Major Questions Doctrine, Due Process, and Equitable Defenses..........................23

        D.    An Enforcement Action Is Imprudent When There Are Alternative Paths Available. .......................................................36

    II.    The Staff's Enforcement Action Would Fail on the Merits Because Coinbase Does Not List, Clear, or Effect Trading in Securities. .............................................37

        A.    Coinbase Does Not List, Clear, or Effect Trading in Securities....................38

        B.    Coinbase Wallet Is Not a Broker. ...............................................43

        C.    Coinbase's Staking Services Do Not Constitute a Securities Offering..........47

CONCLUSION .......................................................................................................52

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ala. Ass'n of Realtors* v. *HHS*,
141 S. Ct. 2485 (2021)..................................................................................................24, 27

*CFTC* v. *Russell*,
No. 23-cv-2691 (E.D.N.Y. April 11, 2023)...................................................................25

*CFTC* v. *Zhao*,
No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023)...............................................................25, 31

*Christopher* v. *SmithKline Beecham Corp.*,
567 U.S. 142 (2012)...............................................................................................25, 28, 34

*Elson* v. *Geiger*,
506 F. Supp. 238 (E.D. Mich. 1980)...............................................................................52

*FCC* v. *Fox Television Stations, Inc.*,
567 U.S. 239 (2012)..........................................................................................................28

*Fortyune* v. *City of Lomita*,
766 F.3d 1098 (9th Cir. 2014) .........................................................................................28

*Found. Ventures, LLC* v. *F2G, Ltd.*,
2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010)...............................................................46

*Gary Plastic Packaging Corp.* v. *Merrill Lynch Pierce, Fenner & Smith, Inc.*,
756 F.2d 230 (2d Cir. 1985)..............................................................................................43

*Grenader* v. *Spitz*,
537 F.2d 612 (2d Cir. 1976)..............................................................................................42

*Hocking* v. *Dubois*,
839 F.2d 560 (9th Cir. 1988), *withdrawn*, 863 F.2d 654 (1988) ...............................50

*Hocking* v. *Dubois*,
885 F.2d 1449 (9th Cir. 1989) (en banc) ..................................................................20, 41

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011)..............................................................................51

*In re Voyager Dig. Holdings*,
1-22-bk-10943 (Bankr. S.D.N.Y. Mar. 7, 2023)............................................................37

*Page(s)*

*In re Voyager Dig. Holdings*,
    649 B.R. 111 (Bankr. S.D.N.Y. Mar. 11, 2023) ............................................................. *passim*

*Jobanputra* v. *Kim*,
    2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) ..........................................................................46

*Kemmerer* v. *Weaver*,
    445 F.2d 76 (7th Cir. 1971) ......................................................................................................39

*Kosakow* v. *New Rochelle Radiology Assocs.*,
    274 F.3d 706 (2d Cir. 2001) ......................................................................................................35

*Landegger* v. *Cohen*,
    2013 WL 5444052 (D. Colo. Sept. 30, 2013) ..........................................................................46

*Lehman Bros. Com. Corp.* v. *Minmetals Int'l NonFerrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001) ......................................................................................42

*Marine Bank* v. *Weaver*,
    455 U.S. 551 (1982) ..................................................................................................................39

*Marini* v. *Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ......................................................................................51

*Mordaunt* v. *Incomo*,
    686 F.2d 815 (9th Cir. 1982) ....................................................................................................41

*Noa* v. *Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ......................................................................................................42

*Pabst Brewing Co.* v. *Jacobs*,
    549 F. Supp. 1068 (D. Del.), *aff'd*, 707 F.2d 1394 (3d Cir. 1982) ...........................................3

*Pfaff* v. *U.S. Dep't of Hous. & Urban Dev.*,
    88 F.3d 739 (9th Cir. 1996) ......................................................................................................28

*Revak* v. *SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ....................................................................................................50, 51

*Rollins Env't Servs.* v. *EPA*,
    937 F.2d 649 (D.C. Cir. 1991) ..................................................................................................29

*SEC* v. *Am. Growth Funding II, LLC*,
    2016 WL 8314623 (S.D.N.Y. Dec. 30, 2016) ..........................................................................35

*SEC* v. *Beaxy Digital Ltd.*,
    No. 23-cv-1962 (N.D. Ill. Mar. 29, 2023) ...........................................................................26, 33

*Page(s)*

*SEC* v. *Belmont Reid & Co., Inc.*,
794 F.2d 1388 (9th Cir. 1986) ...................................................................................41, 42

*SEC* v. *Bittrex*,
No. 23 Civ. 580 (W.D. Wash. Apr. 17, 2023) ...............................................................5, 25, 39

*SEC* v. *Collyard*,
154 F. Supp. 3d 781 (D. Minn. 2015), *aff'd in part, vacated in part on other grounds*, 861 F.3d 760 (8th Cir. 2017) .....................................................................46

*SEC* v. *ETS Payphones, Inc.*,
408 F.3d 727 (11th Cir. 2005) .....................................................................................39

*SEC* v. *Glenn W. Turner Enters.*,
474 F.2d 476 (9th Cir. 1973) ...................................................................................42, 52

*SEC* v. *Hansen*,
1984 WL 2413 (S.D.N.Y. Apr. 6, 1984)..................................................................23, 45

*SEC* v. *Hui Feng*,
935 F.3d 721 (9th Cir. 2019) .......................................................................................23

*SEC* v. *Int'l Loan Network, Inc.*,
968 F.2d 1304 (D.C. Cir. 1992)....................................................................................52

*SEC* v. *Kik Interactive Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020)...........................................................................40

*SEC* v. *KPMG, LLC*,
2003 WL 21976733 (S.D.N.Y. Aug. 20, 2003).........................................................35, 36

*SEC* v. *Kramer*,
778 F. Supp. 2d 1320 (M.D. Fla. 2011).........................................................................46

*SEC* v. *LBRY*,
21-cv-00260 (D.N.H. Nov. 21, 2022).............................................................................27

*SEC* v. *M&A West, Inc.*,
2005 WL 1514101 (N.D. Cal. 2005) ............................................................................46

*SEC* v. *NAC Found., LLC*,
512 F. Supp. 3d 988 (N.D. Cal. 2021) ..................................................................40, 41, 42

*SEC* v. *Payward Ventures, Inc.*,
No. 23-cv-588 (N.D. Cal. Feb. 9, 2023) ........................................................................32

*SEC* v. *Rayat*,
2021 WL 4868590 (S.D.N.Y. Oct. 18, 2021)..................................................................34

-iv-

*Page(s)*

*SEC* v. *Ripple Labs Inc.*,
   No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y. Oct. 21, 2022)........................................................28

*SEC* v. *RMR Asset Mgmt. Co.*,
   479 F. Supp. 3d 923 (S.D. Cal. 2020)................................................................................23, 45

*SEC* v. *Rubera*,
   350 F.3d 1084 (9th Cir. 2003) ............................................................................................41, 49

*SEC* v. *Sneed*,
   2021 WL 4202171 (N.D. Tex. Sept. 10, 2021)........................................................................52

*SEC* v. *StratoComm Corp.*,
   2 F. Supp. 3d 240 (N.D.N.Y. 2014), *aff'd*, 652 F. App'x 35 (2d Cir. 2016) ..........................45

*SEC* v. *Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)......................................................................................40

*SEC* v. *U.S. Pension Trust Corp.*,
   2009 WL 2365702 (S.D. Fla. July 30, 2009)......................................................................23, 45

*SEC* v. *W.J. Howey, Co.*,
   328 U.S. 293 (1946)...................................................................................................... *passim*

*SEC* v. *Zubkis*,
   2000 WL 218393 (S.D.N.Y. Feb. 23, 2000)............................................................................45

*Sherman* v. *Posner*,
   266 F. Supp. 871 (S.D.N.Y. 1966)...........................................................................................29

*Spielman* v. *General Host Corp.*,
   402 F. Supp. 190 (S.D.N.Y. 1975), *aff'd* 538 F.2d 39 (2d Cir. 1976) ......................................3

*United Hous. Found., Inc.* v. *Forman*,
   421 U.S. 837 (1975)...............................................................................................................41, 51

*United States* v. *Leonard*,
   529 F.3d 83 (2d Cir. 2008)........................................................................................................39

*United States* v. *S. Ind. Gas & Elec. Co.*,
   245 F. Supp. 2d 994 (S.D. Ind. 2003)......................................................................................29

*West Virginia* v. *EPA*,
   142 S. Ct. 2587 (2022)................................................................................................... *passim*

**Statutes**

15 U.S.C. § 77b(a)(1).......................................................................................................20, 38, 40

*Page(s)*

15 U.S.C. § 77h(a) ........................................................................................................4

15 U.S.C. § 78c(a)(4)...................................................................................................44

15 U.S.C. § 78c(a)(8)...................................................................................................40

15 U.S.C. § 78c(a)(9)...................................................................................................40

15 U.S.C. § 78c(a)(10)....................................................................................20, 38, 40

15 U.S.C. § 78c(a)(23)(A) .................................................................................21, 34

15 U.S.C. § 78c(a)(23)(B)............................................................................................21

Securities Act of 1933............................................................................... *passim*

Securities Exchange Act of 1934.............................................................. *passim*

UCC § 8-503(a)....................................................................................................47, 48

**Bills**

Digital Commodities Consumer Protection Act, S. 4760, 117th Cong.
     (2021–2022)..........................................................................................................25

Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong.
     (2021–2022)..........................................................................................................25

**Other Authorities**

Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top
     Financial Cop on Bankman-Fried Blowback*, Intelligencer (Feb. 23, 2023),
     https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-
     and-his-crypto-crackdown.html ..........................................................................30

BondGlobe, Inc., SEC Denial of No-Action Request,
     2001 WL 103418 (Feb. 6, 2001)..........................................................................45

CFTC Chair Heath Tarbert, Comments on Cryptocurrency Regulation at Yahoo!
     Finance All Markets Summit (Oct. 29, 2019) .......................................................31

CFTC Chair Rostin Behnam, Comments Before the U.S. Senate Comm. on
     Agriculture, Nutrition & Forestry (Mar. 8, 2023)................................................30

CFTC Chair Rostin Behnam, Comments Budget Hearing—Fiscal Year 2024
     Request for the CFTC Before the U.S. House of Representatives Subcomm.
     on Agriculture, Rural Dev., Food and Drug Admin. & Related Agencies
     (Mar. 28, 2023) ...............................................................................................30, 31

*Page(s)*

Citi-ONE ATS (Form ATS-N),
    https://www.sec.gov/Archives/edgar/data/91154/000009115423000005/xslAT
    S-N_X01/primary_doc.xml ...................................................................................................4

*Clearing Agencies*, U.S. Sec. & Exch. Comm'n (Mar. 24, 2023),
    https://www.sec.gov/tm/clearing-agencies ...............................................................22

*CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box"
    Today*, CNBC (Feb. 10, 2023), https://www.cnbc.com/2023/02/10/first-on-
    cnbc-cnbc-transcript-sec-chair-gary-gensler-speaks-with-cnbcs-squawk-box-
    today.html .................................................................................................................5

*COIN Institutional Holdings*, NASDAQ (Apr. 16, 2023),
    https://www.nasdaq.com/market-activity/stocks/coin/institutional-holdin ..............9

Coinbase, *Annual Report* (Form 10-K) (Feb. 21, 2023),
    https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/00016797882300
    0031/coin-20221231.htm ..........................................................................................9

Coinbase, *Coinbase User Agreement* (Apr. 13, 2023), https://www.coinbase.com/
    legal/user_agreement/united_states ...............................................................47, 48, 49

Coinbase, *Our Approach to Transparency, Risk Management, and Consumer
    Protection* (Nov. 8, 2022), https://www.coinbase.com/blog/our-approach-to-
    transparency-risk-management-and-consumer-protection .........................................8

Coinbase, *Petition for Rulemaking – Digital Asset Securities Regulation* (July 21,
    2022), https://www.sec.gov/rules/petitions/2022/petn4-789.pdf............................15

Coinbase, *Petition for Rulemaking – Digital Asset Issuer Registration and
    Reporting* (Dec. 6, 2022), https://assets.ctfassets.net/c5bd0wqjc7v0/
    3gOsojzU0Gl5r9PlTnlqcd/e48708f2e95074e4d727
    e2eab41dee2b/Comment_Letter_in_Response_to_Petition_-
    _Disclosures_12_6_22__final_.pdf ........................................................................15

Coinbase, *Petition for Rulemaking – "Proof-of-Stake" Blockchain Staking
    Services* (Mar. 20, 2023),
    https://assets.ctfassets.net/c5bd0wqjc7v0/14M656jdtxxvFF15U9hTGE/5e055
    b443cf1a5925b8092dadae07d7d/Staking_Comment_Letter_3-20-2023.pdf...................15, 33

Coinbase, *Shareholder Letter: Fourth Quarter and Full-Year 2022*
    (Feb. 21, 2023), https://s27.q4cdn.com/397450999/files/doc_financials/
    2022/q4/Shareholder-Letter-Q4-2022.pdf ...............................................................9

Coinbase, *What Is Staking?*, https://www.coinbase.com/learn/crypto-basics/what-
    is-staking....................................................................................................................51

*Page(s)*

Coinbase Global, Inc., Registration Statement (Form S-1A) (Mar. 23, 2021),
https://www.sec.gov/Archives/edgar/data/1679788/000162828021005373/coi
nbaseglobalincs-1a2.htm.................................................................................................13

Coinbase Global, Inc., Rule 424(b)(4) Final Prospectus (Apr. 14, 2021),
https://www.sec.gov/Archives/edgar/data/1679788/000162828021006850/coi
nbaseglobalinc424b.htm ...............................................................................................14

CoinGecko, *Q2 2022 Cryptocurrency Report* (July 13, 2022),
https://www.coingecko.com/research/publications/q2-2022-cryptocurrency-
report....................................................................................................................................24

Confirmation and Affirmation of Securities Trades; Matching, 63 Fed. Reg.
17,943 (Apr. 13, 1998)..................................................................................................21

*Digital Assets Primer*, CFTC (Dec. 2020), https://www.cftc.gov/media/5476/
DigitalAssetsPrimer/download ......................................................................................31

FCC Comm'r Michael O'Rielly, *Remarks Before Silicon Flatirons Tech
Conference* (Feb. 10, 2020), https://www.fcc.gov/document/comm-orielly-
remarks-silicon-flatirons-tech-conference ....................................................................27

Financial Services GOP (@Financial Services GOP), Twitter (Mar. 28, 2023),
https://twitter.com/FinancialCmte/status/1640816951843774466?cxt=HHwW
hICzweCUrcUtAAAA......................................................................................................24

*Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3,
2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-
digital-assets...................................................................................................................30

FTC Comm'r Noah Joshua Phillips, *How (Not) to Regulate Technology* (Oct. 6,
2022), https://www.ftc.gov/system/files/ftc_gov/pdf/hudson-speech.pdf.............................27

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and
Retail Investors Collide, Part III*, 117th Cong. 1 (May 6, 2021).........................................1, 26

Gary Gensler, *Fintech Beyond the Crisis*, MIT Sloan School of Management
Conference (Apr. 25, 2019) ...........................................................................................25

Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022),
https://www.sec.gov/news/speech/gensler-sec-speaks-090822..................................................5

IBKR ATS (Form ATS-N),
https://www.sec.gov/Archives/edgar/data/922792/000090266422002622/xslA
TS-N_X01/ primary_doc.xml .........................................................................................4

*Page(s)*

Jamie Redman, *Crypto Employment Abounds with More Than 8,000 Jobs in 2020*, Bitcoin.com (Jan. 18, 2020), https://news.bitcoin.com/crypto-employment-abounds-with-more-than-8000-jobs-in-2020...............................................................24

*Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges*, SEC (Feb. 9, 2023), https://www.sec.gov/news/press-release/2023-25........................................33

Letter from Coinbase Global, Inc. to Div. Corp. Fin., SEC (Feb. 12, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162827921000104/file name1.htm.................................................................................................12, 13

Letter from Div. Corp. Fin., SEC to AmeriCann, Inc. (Oct. 8, 2019), https://www.sec.gov/Archives/edgar/data/1508348/000000000019014401/file name1.pdf..............................................................................................................3

Letter from Div. Corp. Fin., SEC to Bright Green Corp. (Sept. 27, 2022), https://www.sec.gov/Archives/edgar/data/1886799/000000000022010650/file name1.pdf..............................................................................................................3

Letter from Div. Corp. Fin., SEC to Coinbase Global, Inc. (Dec. 7, 2020), https://www.sec.gov/Archives/edgar/data/1679788/000000000020011705/file name1.pdf...................................................................................................13, 14, 30

Letter from Div. Corp. Fin., SEC to Coinbase Global, Inc. (Feb. 5, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000000000021001522/file name1.pdf............................................................................................................14

Letter from Div. Corp. Fin., SEC to Elys Gam Tech., Corp. (June 8, 2021), https://www.sec.gov/Archives/edgar/data/1080319/000000000021007076/file name2.txt..............................................................................................................3

Letter from Patrick McHenry (Chair of Comm. on Fin. Servs.) *et al*. to Chair Gary Gensler (Apr. 18, 2023), https://financialservices.house.gov/uploadedfiles/2023-04-17_all_fsc_gop_letter_to_sec_on_nse_registration_final.pdf.............................................................................................................36

Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities*, DLx Law, 55–58, 96–97 (Nov. 10, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4282385 .............................39

Michelle Neal, *Advances in Digital Currency Experimentation*, Fed. Reserve Bank N.Y. (Nov. 4, 2022), https://www.newyorkfed.org/newsevents/speeches/2022/nea221104....................................24

MS Trajectory Cross ATS-1 (Form ATS-N), https://www.sec.gov/Archives/edgar/data/68136/000095012320010536/xslATS-N_X01/primary_doc.xml ......................................................................................4

*Page(s)*

Notice of Proposed Exemptive Order Granting Conditional Exemption from the
Broker Registration Requirements of Section 15(a) of the Securities Exchange
Act of 1934 for Certain Activities of Finders, Exchange Act Rel. No. 90112,
2 (Oct. 7, 2020) ...................................................................................................45

*Oversight of the SEC: Hearing Before the Fin. Serv. Comm.*, 118th Cong. (Apr.
18, 2023) ...............................................................................................7, 30, 32

Paul Grewal (Coinbase Chief Legal Officer), *We Asked the SEC For Reasonable
Crypto Rules for Americans.  We Got Legal Threats Instead*, Coinbase Blog
(Mar. 22, 2023), https://www.coinbase.com/blog/we-asked-the-sec-for-
reasonable-crypto-rules-for-americans-we-got-legal...................................11

*Paxos Issues Statement*, Paxos (Feb. 13, 2023),
https://paxos.com/2023/02/13/paxos-issues-statement..............................31

Paxos Trust Co., SEC Staff No-Action Letter, 2019 WL 5543753 (Oct. 28, 2019) .....................22

Rep. Ben Cline, *Budget Hearing—Fiscal Year 2024 Request for the CFTC Before
the House Comm. on Agric., Rural Dev., Food and Drug Admin. & Related
Agencies* (Mar. 28, 2023)..........................................................................24

Robinhood, https://robinhood.com/us/en..................................................46

Rodrigo Seira *et al.*, *Lessons from Crypto Projects' Failed Attempts to Register
with the SEC* (Mar. 23, 2023), https://policy.paradigm.xyz/writing/secs-path-
to-registration-part-ii.................................................................................14

Roslyn Layton, *It's Time To End the SEC's 'Clarity' Charade on Crypto*, Forbes
(Sept. 12, 2021), https://www.forbes.com/sites/roslynlayton/2021/09/12/its-
time-to-end-the-secs-clarity-charade-on-crypto/?sh=1e7833d325fa.......................14

*SEC Chair Gary Gensler: There Needs To Be 'Greater Investor Protection' of
Crypto Markets*, CNBC (May 7, 2021), https://www.cnbc.com/video/
2021/05/07/sec-chairman-gary-gensler-there-needs-to-be-greater-investor-
protection-of-crypto-markets.html...............................................................1, 26

*SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto
Firms*, Yahoo! News (Dec. 7, 2022), https://news.yahoo.com/sec-gensler-
runway-getting-shorter-161605453.html...................................................2, 8, 26

SEC, Supplemental Information and Reopening of Comment Period for
Amendments to Exchange Act Rule 3b-16 Regarding the Definition of
"Exchange" (Release No. 34-97309) (Apr. 14, 2023),
https://www.sec.gov/rules/proposed/2023/34-97309.pdf.........................5

Securities Exchange Act Release No. 64017 (Mar. 3, 2011), 76 Fed. Reg. 14,472
(Mar. 16, 2011) .......................................................................................21

*Page(s)*

Sigma X2 (Form ATS-N),
    https://www.sec.gov/Archives/edgar/data/42352/000095012323000583/xslAT
    S-N_X01/ primary_doc.x....................................................................................4

Statements of Amy Starr (FinHub), *Perspectives on SEC Engagement Concerning
    Digital Assets* (June 4, 2019), https://www.youtube.com/watch?v=1-
    7Qyfkpe60&t=2s ............................................................................................12

*Tech GDP as a Percent of Total GDP in the U.S. 2017-2021*, Statista (Apr. 7,
    2022), https://www.statista.com/statistics/1239480/united-states-leading-
    states-by-tech-contribution-to-gross-product/...........................................................27

Thomas Franck, *One in Five Adults Has Invested in, Traded or Used
    Cryptocurrency*, *NBC News Poll Shows*, NBCNews.com (Mar. 31, 2022),
    https://www.nbcnews.com/tech/tech-news/one-five-adults-invested-traded-
    used-cryptocurrency-nbc-news-poll-show-rcna22380 ............................................24

*Transcript: The Path Forward: Cryptocurrency with Gary Gensler*,
    Wash. Post (Sept. 21, 2021), https://www.washingtonpost.com/washington-
    post-live/2021/09/21/transcript-path-forward-cryptocurrency-with-gary-
    gensler/.........................................................................................................32

Vanguard, https://investor.vanguard.com/corporate-portal ...........................................46

Virtu MatchIt (Form ATS-N), https://www.sec.gov/Archives/edgar/data/1457716/
    000145771623000007/xslATS-N_X01/primary_doc.xml ........................................4

William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions:
    When Howey Met Gary (Plastic)*, U.S. Sec. & Exch. Comm'n (June 14, 2018),
    https://www.sec.gov/news/speech/speech-hinman-061418................................29, 39

**PRELIMINARY STATEMENT**

In April 2021—two years ago this month—this Commission declared effective Coinbase Global, Inc.'s registration statement, allowing Coinbase's shares to be sold to millions of investors the Commission is mission-bound to protect, including retail investors, mutual funds, and pension funds.[1] The Commission did so after years of discussions with Coinbase and a months-long process of extensive review and comment on its registration statement. Those processes focused on all aspects of Coinbase's business, including its listing and custodying of digital assets, provision of trading and staking services, self-custody wallet software, and related securities law analyses.

In May 2021, one month after Coinbase's shares were listed, Chair Gensler told the public that the Commission lacked statutory authority to regulate businesses like Coinbase. He testified before Congress, "I do think that working with Congress, and I think it is only Congress that could really address it, . . . because right now the exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the [CFTC] . . . . Right now, there is not a market regulator around these crypto exchanges."[2] The next day, he explicitly stated again that Congress needed to act before the Commission could: "There is *no federal authority* to actually bring a regime to the crypto exchanges . . . . [The SEC] will be working with Congress, if they see fit to try to bring some protection."[3]

Despite these prior statements, four months ago Chair Gensler proclaimed, "I feel that we have enough authority, I really do, in this space" to require crypto companies to register with the

---

[1] At the time, the Commission was led by Acting Chair Lee, and Commissioners Peirce, Roisman, and Crenshaw were members. The Division of Corporation Finance was led by Acting Director and future General Counsel John Coates.

[2] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. 1 (May 6, 2021), 167 Cong. Rec. 44-837 (2021) (statement of Gary Gensler).

[3] *SEC Chairman Gary Gensler: There Needs To Be 'Greater Investor Protection' of Crypto Markets*, CNBC (May 7, 2021), https://www.cnbc.com/video/2021/05/07/sec-chairman-gary-gensler-there-needs-to-be-greater-investor-protection-of-crypto-markets.html (emphasis added).

Commission as national securities exchanges ("NSEs").[4]  Of course, in the time between these diametrically opposed statements, Congress has not filled the statutory void Chair Gensler once recognized.  Nor has the Commission filled that void itself through rulemaking, despite repeated formal requests from Coinbase and others.[5]  The only change appears to be the perceived risks in the crypto industry following the collapse of other institutions that are nothing like Coinbase.

Based on this newly expressed view, the Staff now contends that Coinbase has operated illegally since at least 2018.  This abrupt move toward litigation did not result from discovering new facts about Coinbase's business; the Commission has the same facts today that it has had for years.  Nor does it result from the Staff's discovery of something that Coinbase concealed or misrepresented in its extensive engagement with the Staff, including during the registration process.  Coinbase did no such thing.

Instead, the threat of imminent litigation appears to be intended to pressure Coinbase to accept demands that the Commission simply does not have the authority to order; namely, that Coinbase (i) agree that virtually all digital assets listed on Coinbase's platform are securities; and (ii) overhaul its entire business model to register as an NSE and clearing agency, potentially requiring Coinbase to jettison its entire customer-facing business and overhaul its public company governance structure to conform to limits on concentrated voting control of NSEs and clearing agencies.  Neither of those objectives is supported by law or within the bounds of the Commission's authority.

---

[4] *See SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, Yahoo! News (Dec. 7, 2022), https://news.yahoo.com/sec-gensler-runway-getting-shorter-161605453.html.

[5] *See* App'x A, at 6–8.  The Commission reopened its exchange registration proposal only to explicitly address digital asset securities trading platforms on April 14, 2023.  This action provides more evidence that the Commission agrees that rulemaking is necessary to provide clarity—having not done so until now further corroborates the fact that the Commission has not provided Coinbase, or the industry, with clear rules of the road.  Furthermore, this rulemaking does not address other fundamental issues, including the application of *Howey* to digital assets.

-2-

For that sole reason, the Commission should exercise its discretion to decline to bring an enforcement action against Coinbase.  But there are other compelling reasons to decline to proceed to litigation too.

*First*, litigation on this record will put the Commission's own practices on trial, as a court will assess the full history of Coinbase's extensive efforts to engage with the Commission, including during its public listing process.  Since at least 2018, the Staff repeatedly asked for (and received) Coinbase's securities law analyses related to its listing process and staking services.  That the Staff never raised any specific concerns about Coinbase's ongoing provision of these services should lead the court to conclude that the Commission's claims should be barred on equitable grounds alone.

These same issues were front and center during the Commission's review of Coinbase's registration statement, including in numerous comment letters received from the Division of Corporation Finance.  Of course, the Commission could have simply declined to review Coinbase's S-1 as it often appears to do when it questions the legality of an underlying business.[6]  But it did not. While the Division of Corporation Finance does not always review a proposed registrant's underlying lines of business for securities law compliance, in Coinbase's case, that is exactly what happened. Securities law is the SEC's core competency.  A trier of fact would reject any suggestion that the Staff did not consider Coinbase's compliance with securities law when it allowed Coinbase to go public.[7]

---

[6] *See* Letter from Div. Corp. Fin., SEC  to AmeriCann, Inc. (Oct. 8, 2019) (marijuana cultivation and distributor company) (declining to review S-1 registration statement), https://www.sec.gov/Archives/edgar/data/1508348/000000000019014401/filename1.pdf; Letter from Div. Corp. Fin., SEC to Elys Game Technology, Corp. (June 8, 2021) (sports betting company) (same), https://www.sec.gov/Archives/edgar/data/1080319/000000000021007076/filename2.txt; Letter from Div. Corp. Fin., SEC to Bright Green Corp. (Sept. 27, 2022) (marijuana cultivation and distributor company) (same), https://www.sec.gov/Archives/edgar/data/1886799/000000000022010650/filename1.pdf.

[7] *See, e.g.*, *Spielman* v. *General Host Corp.*, 402 F. Supp. 190, 197 (S.D.N.Y. 1975), *aff'd* 538 F.2d 39 (2d Cir. 1976) ("While the registration of securities by the SEC does not constitute Commission approval of the language of the prospectus . . . clearance by the Commission in the face of charges identical with those presented here may be given some weight," and the "documentary evidence of arguments pressed by [defendant's] counsel upon the Commission makes this a particularly appropriate case in which to give some credit to the Commission's clearance."); *see also Pabst Brewing Co.* v. *Jacobs*, 549 F. Supp. 1068 (D. Del.), *aff'd*, 707 F.2d 1394 (3d Cir. 1982) ("Generally, courts have refused to accord weight to a clearance of proxy materials by the SEC staff. . . . A limited exception exists, however, where the precise

If the Commission *had* believed in April 2021 that Coinbase's core businesses violated securities law, it would have been required by its own mandate to prevent the S-1 from becoming effective to protect the investing public.[8]  Instead, it allowed the offering to proceed, and millions of members of the public invested their savings in Coinbase.  Investors could only infer by this approval that the Commission did not think Coinbase's core business was unlawful.  It is those innocent investors who stand to lose the most from the Commission's abrupt about-face.

Coinbase's long history of engagement will also demonstrate the Commission's repeated refusal to respond to requests for clarity or rulemaking, even when its own practices or the law so required.  This will include Coinbase's exhaustive and fruitless attempts—dozens of meetings and hundreds of hours of communications—to register a securities trading platform with the Commission since at least 2018.  For example, Coinbase repeatedly sought guidance on how to activate its Commission-registered alternative trading system ("ATS") subsidiary, given that multiple broker-dealers today operate ATSs through which they provide trading platform, brokerage, and custody services directly to retail customers.[9]  But those discussions eventually were terminated due to the Chair's apparent preference to require all retail crypto platforms to instead register as NSEs.  This decision is perplexing because the Commission has not adopted or proposed any rule excluding crypto

---

factual or legal question has been brought to the attention of the SEC prior to the issue of the form, and the SEC has subsequently allowed the form to be sent to the shareholders without modification . . . . This limited exception is applicable to this case.  The SEC's staff had knowledge of the precise legal question that is before this Court and accordingly, this Court must accord some weight to the Staff's inaction.").

[8] The Staff's declaration of the effectiveness of Coinbase's registration statement necessarily reflected consideration of whether (among other things) Coinbase's public listing was consistent with "the public interest and protection of investors."  *See* 15 U.S.C. § 77h(a).

[9]  *See, e.g.*, Citi-ONE ATS Form ATS-N, https://www.sec.gov/Archives/edgar/data/91154/ 000009115423000005/xslATS-N_X01/primary_doc.xml;  IBKR  ATS  Form  ATS-N, https://www.sec.gov/Archives/edgar/data/922792/000090266422002622/xslATS-N_X01/ primary_doc.xml; MS Trajectory Cross ATS-1 Form ATS-N, https://www.sec.gov/Archives/ edgar/data/68136/000095012320010536/xslATS-N_X01/primary_doc.xml; Sigma X2 Form ATS-N, https://www.sec.gov/Archives/edgar/data/42352/000095012323000583/xslATS-N_X01/ primary_doc.xml; Virtu MatchIt Form ATS-N, https://www.sec.gov/Archives/edgar/data/1457716/ 000145771623000007/xslATS-N_X01/primary_doc.xml.

platforms from the existing ATS exemption.[10]  All of this further calls into question the Chair's invitations to "come in, talk to us, and register," and blithe assertions that "there's a clear way to [register], and there are forms on our website."[11]  There still remains no way for Coinbase to register a platform or any products.

*Second*, the Staff's laundry list of proposed charges all rest on three primary legal theories, each of which is flawed and untested.  The Staff first contends that some unidentified subset of the digital assets listed on Coinbase's spot platform meet the definition of a security.  We say "unidentified" because when Coinbase asked during the Wells call which assets the Staff views as securities, the Staff responded that it was "not in a position" to identify them.  Instead, the Staff pointed to (i) the securities fraud charges the Commission filed last year against a faithless Coinbase employee who front-ran Coinbase's listing of a handful of digital assets in violation of its own policies,[12] and (ii) public statements by Chair Gensler that he believes the majority of digital assets are securities.  But Coinbase does not list the majority of digital assets.  Nor does Coinbase attempt, as another crypto platform allegedly did, to instigate *post hoc* changes to the factual record to defend its listing decisions.[13]

---

[10] Indeed, the Commission's recent proposal on exchange registration solicits comments *for the first time* on whether a digital asset securities trading platform should have the choice to register as an NSE or an ATS.  *See* SEC, Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange" (Release No. 34-97309) (Apr. 14, 2023), https://www.sec.gov/rules/proposed/2023/34-97309.pdf.

[11] Gary Gensler, *Kennedy and Crypto* (Sept. 8, 2022), https://www.sec.gov/news/speech/gensler-sec-speaks-090822; *CNBC Transcript: SEC Chair Gary Gensler Speaks with CNBC's "Squawk Box" Today*, CNBC (Feb. 10, 2023), https://www.cnbc.com/2023/02/10/first-on-cnbc-cnbc-transcript-sec-chair-gary-gensler-speaks-with-cnbcs-squawk-box-today.html.

[12] Notably, after careful deliberation, the United States Attorney's Office for the Southern District of New York declined to bring securities fraud charges with respect to this same employee's conduct, instead electing to pursue only wire fraud charges.  And significantly, rather than await a fully briefed decision on whether the digital asset transactions at issue in that case are, in fact, securities, the Commission has apparently determined to settle the case on what appear to be lenient terms.

[13] *See* Compl., *SEC* v. *Bittrex. Inc.*, 23 Civ. 580 (W.D. Wash. Apr. 17, 2023), ECF No. 1 ("*Bittrex* Compl.").

In litigation, the Commission will not be able to rely on conclusory or broad assertions about what is a security under *SEC* v. *W.J. Howey, Co.*, 328 U.S. 293 (1946). Instead, for each digital asset listed on Coinbase that it contends is a security, the Commission would have to prove that the asset is being sold as part of an investment contract when traded in the secondary market on Coinbase. Notably, the Commission has been engaged in years of protracted litigation attempting to do that for primary market transactions in a single asset: XRP. As there, if the Commission pursues this matter, it will face a well-resourced adversary that will necessarily be motivated to exhaust all avenues. And unlike in that case, here the Commission will need to overcome the growing skepticism courts already have expressed towards extending *Howey*'s reach to include secondary trading of assets where no issuer is involved in the transaction at issue. The Commission will also have to contend with the CFTC's position that many of the same assets the Chair implies are securities, including Ether and various stablecoins, are commodities, raising important questions about fair notice and the limits of Commission authority.

The Staff next contends that Coinbase's spot platform is operating as an unregistered exchange, clearing agency, and broker, and its self-custody Wallet software is operating as an unregistered broker. The Commission also will have to prove that these services fit within these various Exchange Act definitions. That will be no easy task. For example, the Commission has never had to litigate its views about the scope of the clearing agency definition, putting at risk its untested assertions of jurisdiction. With respect to Wallet, even if some of the assets users could access were securities, the access that Coinbase provides through a passive user interface is not enough to trigger broker registration requirements. The Staff has pointed to Coinbase receiving transaction-based compensation for Wallet—which Coinbase no longer does—but the law requires more to sustain an unregistered broker charge.

The Staff further contends that Coinbase's staking services are investment contracts. When asked which asset-specific staking services are in scope, the Staff responded, "All of them," ignoring critical differences among both the assets and Coinbase's related activities. When asked whether

-6-

recent changes to Coinbase's staking program impacted its securities analysis, the Staff responded, "We have not yet reached a view on this," again reflecting an apparent approach of determining on the fly what the law requires. Ultimately, the Staff's analysis appears to rest on superficial and incorrect analogies to products and services offered by others, not how Coinbase's services actually operate now or in the past.[14]

An adverse ruling for the Commission on any of these theories would have an impact far beyond the crypto markets. What is more, a court will have to address the unique fair notice and due process concerns presented by the Commission's pursuit of a company whose practices were examined by and known to the Commission when it became a public company. A ruling on those grounds could call into question the Commission's ability to engage with industry through Staff guidance in lieu of rulemaking. Separately, a court will also have to address the Major Questions Doctrine and whether the Commission is exceeding its statutory authority in this matter. This would include contending with the Chair's own prior testimony that the Commission lacks the authority it now seeks to assert, and the Chair's refusal just this week to explain whether specific digital assets are securities and why.[15]

A ruling from a court on these issues could curtail the Commission's ability to address many other novel products or markets without express legislative authority. Further, a court's cabining or rejection of the Commission's *Howey* theory would hinder the Commission's ability to pursue insider trading, fraud, and manipulation cases involving investment contracts. A court's dismissal of either the Commission's clearing agency or broker registration theory would allow numerous firms to

---

[14] Notwithstanding the narrowly limited information that the Staff has been willing to share regarding their theories or the bases for them, we have tried to summarize above our understanding of the charges that are under consideration. In the event that the Commission considers any violations, legal theories, factual matters, or product offerings that are not addressed in this submission, Coinbase requests an opportunity to address such additional matters before the Commission acts on any enforcement recommendation, in particular if they were not raised in the Wells notice or as part of this investigation.

[15] *See Oversight of the SEC: Hearing Before the Fin. Serv. Comm.*, 118th Cong. (Apr. 18, 2023) (in response to being asked how Chair Gensler "categorize[s] Ether," he responded, "it depends on the facts and the law.").

deregister or otherwise withdraw from SEC oversight. This litany of risks underscores the need for caution and restraint by the Commission.

*Third*, the investigation of this matter has departed dramatically from the Staff's ordinarily careful and thoughtful approach to matters of similar significance. After Coinbase provided detailed proposals to the Staff for creating paths to registration, the Staff abruptly ended those conversations and shifted back to investigation. The Staff repeated without explanation that "time is of the essence"—perhaps based on the Chair's public statements that the "runway is getting shorter" for crypto companies—took only a few hours of testimony from two mid-level Coinbase employees, and issued a Wells notice while document production on the subjects at issue was still underway.[16] Whether the Staff has done more is a mystery because, in another departure from usual practice, it refused without explanation to make its record available to Coinbase for review. On a record this bare, the Commission's willingness to proceed to serious litigation against a U.S. public company that serves millions of customers without meaningfully exploring other alternatives is, frankly, difficult to understand. This is particularly true given that there is no need for exigency; Coinbase is extensively regulated by the Commission and other U.S. authorities and has a proven track record of customer protection and commitment to compliance.[17] A focus on all of this will only serve to undermine public and judicial confidence in the fairness and thoroughness of the Commission's enforcement processes.

\*       \*       \*

Coinbase has never wanted to litigate with the Commission. The Commission should not want to litigate either. Litigation will put the Commission's own actions on trial, erode public trust cultivated over decades, undermine incentives for market participants to engage with the Commission in good faith, and present significant risks to broad aspects of the Commission's enforcement program.

---

[16] *SEC's Gensler: 'The Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, *supra* n.4.

[17] *See* Coinbase, *Our Approach to Transparency, Risk Management, and Consumer Protection* (Nov. 8, 2022), https://www.coinbase.com/blog/our-approach-to-transparency-risk-management-and-consumer-protection.

Better, alternative paths are available.  The Commission could return to Congress to seek the authority it wants over the crypto industry.  In the meantime, it could respond to Coinbase's pending petition for rulemaking or initiate its own—giving the industry a fair opportunity to provide input and expertise.  And, if the Commission believes that particular digital assets are securities, or certain parts of Coinbase's business should be registered in particular ways, Coinbase continues to welcome that dialogue.

## BACKGROUND

### I.    The Company

Founded in 2012, Coinbase Global, Inc. is the publicly-traded parent company of Coinbase, Inc., the largest digital asset trading platform in the United States and one of the larger such platforms in the world.  In 2022, trading volume on Coinbase was $830 billion, reflecting its status as a trusted platform by verified users in more than 100 countries.[18]  Roughly 25% of the top 100 largest hedge funds in the world have onboarded with Coinbase.[19]  With a market capitalization of more than $16 billion, Coinbase Global, Inc. counts among its shareholders leading mutual funds and institutional investors, as well as a substantial base of retail investors; retail ownership accounts for over 38% of all owners.[20]

Unlike many digital asset platforms, Coinbase made a deliberate decision to be domiciled in the United States and to register its parent's securities with the Commission.  Indeed, Coinbase has long embraced regulation—and being regulated in the United States—as a core part of its mission.  It has taken many significant steps in that regard:

---

[18]    Coinbase,    Annual    Report    (Form 10-K),    7–8    (Feb. 21,    2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/1679788/000167978823000031/coin-20221231.htm.

[19]    Coinbase, *Shareholder Letter: Fourth Quarter and Full-Year 2022*, 3 (Feb. 21, 2023), https://s27.q4cdn.com/397450999/files/doc_financials/2022/q4/Shareholder-Letter-Q4-2022.pdf.

[20]    *See COIN Institutional Holdings*, NASDAQ (Apr. 16, 2023), https://www.nasdaq.com/market-activity/stocks/coin/institutional-holdings.

- ***SEC-Registered Broker-Dealer***.  Coinbase Global, Inc. is the direct owner of Coinbase Capital Markets Corp., a non-custodial, executing broker-dealer account that was first registered with the Commission in 1982 and acquired by Coinbase Global, Inc. in 2019, with FINRA approval. Coinbase Capital Markets is currently dormant and requires Commission guidance and further FINRA approval to become operative.

- ***SEC-Noticed ATS***.  Coinbase Global, Inc. is also the direct owner of Coinbase Securities, Inc., a registered broker-dealer and ATS that was acquired by Coinbase Global, Inc. in 2018. Unable to find a scalable digital asset securities ATS pathway, Coinbase Securities was forced to file a Cessation of Operations report in June 2021.  Coinbase Securities is currently dormant and requires Commission guidance and further FINRA approval to become operative.

- ***State Money Transmitter Licenses***.  Since 2014, Coinbase has obtained money transmitter licenses or their equivalent in 45 states (everywhere required), as well as the District of Columbia and Puerto Rico.

- ***New York BitLicense and Trust Company***.  In 2017, Coinbase obtained a BitLicense from the New York Department of Financial Services ("NYDFS") for Coinbase and a limited purpose trust company charter for Coinbase Custody Trust Co., LLC, and those entities have been subject to prudential oversight by the NYDFS since that time.

- ***CFTC-Licensed DCM***.  In 2022, Coinbase completed acquisition of LMX Labs, LLC, d/b/a Coinbase Derivatives, a CFTC-registered Designated Contract Market, where users can trade, among other products, Bitcoin and Ether derivatives.

Coinbase's extensive licensing and registration efforts are part of its core commitment to regulatory compliance.  At no point during the registration process for any of these various licenses did the SEC—or any other regulator—suggest that Coinbase's core business violated the law.

## II.    Relevant Products and Services

The Coinbase products and services relevant to the Staff's proposed charges are:

- ***The Digital Asset Spot Exchange***.  Users of Coinbase's spot exchange are able to custody their digital assets with Coinbase, as well as trade digital assets for other digital assets or fiat currencies by submitting orders to Coinbase's internal order books and automated matching engine.

- ***Coinbase Prime***.  Prime is a custody and trading-related service that provides custody of digital assets through Coinbase Custody and access to the spot exchange through a Prime user interface.  Prime also provides a routing service for assets supported on Coinbase's spot exchange, which sends orders to third-party platforms that meet Coinbase's rigorous diligence standards.

- ***Coinbase Wallet***.  Coinbase Wallet is a free graphical user interface that allows users to self-custody their digital assets—*i.e.*, Wallet users' assets are never within Coinbase's custody or

control.  Users can choose to connect their Wallets to third-party decentralized protocols, exchanges, and applications and send, receive, and swap digital assets, without using intermediaries, such as centralized trading platforms.  Wallet's core role is limited to translating user instructions into code that can be processed by protocols.

- **Staking**.  Proof-of-stake blockchain protocols rely on staking to validate transactions.  Protocol participants can designate (or "stake") their crypto assets on the network by running public open-source software on their computers to validate transactions and receive rewards from the network for their participation.  Coinbase's "delegated proof-of-stake" services allow retail users to participate in staking for certain protocols while their assets are custodied at Coinbase.

### III.    Coinbase's Substantial History of Engagement with the Commission

Since its founding in 2012, Coinbase has been fully transparent about its business and has proactively sought to promote the development of clear U.S. legal standards to responsibly govern the digital asset industry.  To this end, for years, Coinbase has (i) shared extensive information with the Commission about its business and securities law analyses for asset listing and staking; (ii) engaged in persistent efforts to register a trading platform to list digital asset securities; and (iii) repeatedly sought clarity and guidance from the Commission regarding its views on the applicability of the securities laws to both Coinbase and the broader digital asset industry.  Put simply, Coinbase's core commitment to regulatory compliance has never wavered:  "Tell us the rules, and we will follow them."[21]

A chronology of just some of Coinbase's efforts to engage with the Commission over four years spans eight pages and is attached as Appendix A.  This list includes dozens of instances in which Coinbase sought clarity from the Commission on when registration might be required for digital asset companies, and, if so, how to effect such registration, including with respect to its dormant broker-dealer and ATS.  The list also includes examples of Coinbase's extensive engagement with the Commission on the topics at issue in this Wells, including:

---

[21] Paul Grewal (Coinbase Chief Legal Officer), *We Asked the SEC For Reasonable Crypto Rules for Americans.    We  Got  Legal  Threats  Instead*, Coinbase  Blog  (Mar.  22,  2023), https://www.coinbase.com/blog/we-asked-the-sec-for-reasonable-crypto-rules-for-americans-we-got-legal.

*Asset Listing Process.*  For more than four years, the Commission has been equipped with the same information it has today regarding Coinbase's listing process and related securities law analyses. Between June 2018 and August 2020 alone, Coinbase presented its securities law analysis to the Staff at least seven times, and provided more than a dozen examples of Coinbase's analyses applied to particular assets it lists.[22]  Although *Howey* is inapposite to the secondary market trading of digital assets, in the absence of clear guidance, Coinbase has long assessed each asset under *Howey* before listing.  Coinbase also tailored its listing framework in response to discussions with the Staff and FinHub's April 2019 Digital Asset Framework—engagement FinHub leadership has publicly recognized.[23]

During Coinbase's six-month-long S-1 review process, the Staff asked on multiple occasions for written information concerning Coinbase's securities law analysis for listed assets, to which Coinbase provided detailed responses.  Coinbase explained that its "methodology and weighting is based on its review, in consultation with legal and technical advisors, of the April 2019 Framework developed by [FinHub]."[24]  Coinbase also provided the Commission with questions it addresses for each asset, as relevant to each *Howey* prong.  For example, Coinbase stated that "whether token holders receive payments or fees in any form as a result of holding the token," and "the existence and content of publicity and statements associated with a project development team all contribute to the overall

---

[22] *See generally* App'x A.  Notwithstanding the privileged nature of legal advice Coinbase has received regarding the application of the securities laws to particular assets, Coinbase voluntarily waived privilege with respect to the specific examples it provided to the Staff.  And, despite Coinbase's efforts to engage on the Staff's concerns, the Staff has refused to share with Coinbase any views whatsoever on the specific facts and circumstances of any asset that Coinbase lists or any service that it offers.

[23] *See* Statements of Amy Starr (FinHub), *Perspectives on SEC Engagement Concerning Digital Assets* (June 4, 2019), https://www.youtube.com/watch?v=1-7Qyfkpe60&t=2s; *see also* App'x A at 1-2.

[24] Letter from Coinbase Global, Inc. to Div. Corp. Fin., SEC (Feb. 12, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162827921000104/filename1.htm.

'weight' of" *Howey*'s "reasonable expectation of profits" and "efforts of others" prongs in Coinbase's analysis.[25]  The Staff, again, at no time raised concerns, responding only:

> Please revise [the registration statement] to clarify that ***Bitcoin and Ether are the only digital assets as to which senior officials at the SEC have publicly expressed such a view***, and further clarify that ***as to all other digital assets there is currently <u>no certainty under the applicable legal test</u>*** that such assets are not securities . . . .[26]

At least 48 assets that traded on Coinbase's platform at the time the S-1 was declared effective are still trading on Coinbase today.  Now, without any corresponding change to applicable law, the Staff appears to contend that some substantial number of the assets listed on Coinbase's trading platform are securities.  No explanation for this change in view has ever been provided.

***Coinbase Wallet***.  Coinbase Wallet has been available since at least 2018.  Coinbase's S-1 referenced Wallet at least six times,[27] and since April 2021, Wallet and its functionality have been discussed in at least 14 filings with the Commission; the Commission has never previously raised any concerns.

***Staking***.  The information regarding Coinbase's staking services that the Commission has today is the same that it has had since at least 2019.  Prior to Coinbase's S-1 process, Coinbase met with Commission Staff on at least four occasions to provide information regarding its staking program, the specific assets made available for staking, and its related securities law analysis.  Coinbase also provided that same legal analysis in writing in January 2020 and February 2021.[28]  The Staff raised no concerns during any of those meetings, and Coinbase heard nothing more after submitting its written analysis.

---

[25] *Id.*

[26] Letter from Div. Corp. Fin., SEC to Coinbase Global, Inc. (Dec. 7, 2020), https://www.sec.gov/Archives/edgar/data/1679788/000000000020011705/filename1.pdf.

[27] *See* Coinbase Global, Inc., Registration Statement (Form S-1A) (Mar. 23, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162828021005373/coinbaseglobalincs-1a2.htm.

[28] *See* App'x A, at 2, 4; Letter from Coinbase Global, Inc. to Div. Corp. Fin., SEC (Feb. 12, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162827921000104/filename1.htm.

Additionally, during Coinbase's six-month S-1 process, the Staff requested Coinbase's "legal analysis as to why [its] activities supporting staking are executed in compliance with the federal securities laws."[29]  Coinbase responded with a detailed securities law analysis of its staking program. The Staff replied it "neither agreed nor disagreed" with Coinbase, and did not further comment on this topic before allowing Coinbase's S-1 registration to become effective.[30]  Coinbase's final prospectus referenced staking 64 times.[31]

## IV.   Efforts To Register a Trading Platform with the Commission

Coinbase does not list the vast majority of digital assets that exist today.  And it rejects approximately 90% of the assets it reviews for potential listing—many on the basis that they are at high risk of being considered digital asset securities.  Coinbase users would like to be able to lawfully trade many of these assets, and Coinbase would like to provide these users with a securities trading platform, which it currently does not.  To that end, since at least 2018, Coinbase has engaged in exhaustive efforts with the Commission to register such a platform.  Among other things, in 2019 and 2020, Coinbase sought necessary no-action relief from the Commission to operate its dormant broker-dealer ATS.  The Staff and certain Commissioners, however, have repeatedly refused to engage with Coinbase regarding registration, let alone to act on such efforts, while simultaneously touting to the public that the Commission's "door is open" and "companies should come in and register."[32]

---

[29]  Letter from Div. Corp. Fin., SEC to Coinbase Global, Inc. (Dec. 7, 2020), https://www.sec.gov/Archives/edgar/data/1679788/000000000020011705/filename1.pdf.

[30]  Letter from Div. Corp. Fin., SEC to Coinbase Global, Inc. (Feb. 5, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000000000021001522/filename1.pdf.

[31]  *See* Coinbase Global, Inc., Rule 424(b)(4) Final Prospectus (Apr. 14, 2021), https://www.sec.gov/Archives/edgar/data/1679788/000162828021006850/coinbaseglobalinc424b.htm.

[32]  *See* Roslyn Layton, *It's Time To End the SEC's 'Clarity' Charade on Crypto*, Forbes (Sept. 12, 2021), https://www.forbes.com/sites/roslynlayton/2021/09/12/its-time-to-end-the-secs-clarity-charade-on-crypto/?sh=1e7833d325fa.  This sentiment has been echoed by numerous market participants. *See, e.g.*, Rodrigo Seira *et al.*, *Lessons from Crypto Projects' Failed Attempts to Register with the SEC* (Mar. 23, 2023), https://policy.paradigm.xyz/writing/secs-path-to-registration-part-ii ("As we have shown . . . projects that have attempted to come into compliance with the SEC's registration requirements expended great effort and resources yet ultimately most of them failed. . . . The failure of projects that have attempted

For example, in December 2019, Coinbase presented a detailed action plan to the Staff on its efforts to activate its two dormant broker-dealers and to obtain necessary approval from the Commission and FINRA.[33]  And, in June 2020, Coinbase presented an update to the Staff on its persistent, but unsuccessful, engagement with the Division of Trading and Markets and FINRA, to activate its dormant broker-dealers, and sought further guidance on how to get the registered platform operative.  Those efforts came to naught, and Coinbase withdrew its applications.[34]

Between 2019 and the present, Coinbase met with Commissioners or Staff regarding registration-related topics at least 24 times, although, since November 2021, Chair Gensler has repeatedly declined to meet with Coinbase and, since July 2022, his office has referred all meeting requests to Enforcement.[35]  While the Chair's door may be open to some—including companies that are not SEC-registrants—it has never been open to Coinbase.

In July 2022, months before Chair Gensler expressed his view that no further authority was needed for the Commission to regulate the digital asset industry, Coinbase filed a petition for rulemaking, requesting that the Commission propose and adopt rules regarding digital asset securities and registration.[36]  Coinbase filed two follow-on comment letters dated December 6, 2022, and March 20, 2023.[37]  Coinbase's petition and follow-on letters include over 140 specific questions for the

---

to register is due in large part to the SEC's reluctance to provide a workable framework through rulemaking, exemptive relief, guidance and industry engagement.  Instead, the agency's preferred approach has been to engage in a highly publicized campaign of regulation by enforcement.").

[33] *See* App'x A, at 2.

[34] *Id.* at 2–3.

[35] *Id.* at 5–6.

[36] *See* Coinbase, *Petition for Rulemaking – Digital Asset Securities Regulation* (July 21, 2022), https://www.sec.gov/rules/petitions/2022/petn4-789.pdf.

[37] *See* Coinbase, *Petition for Rulemaking – Digital Asset Issuer Registration and Reporting* (Dec. 6, 2022), https://assets.ctfassets.net/c5bd0wqjc7v0/3gOsojzU0Gl5r9PlTnlqcd/e48708f2e95074e4d727 e2eab41dee2b/Comment_Letter_in_Response_to_Petition_-_Disclosures_12_6_22__final_.pdf; Coinbase, *Petition for Rulemaking – "Proof-of-Stake" Blockchain Staking Services* (Mar. 20, 2023),

Commission, and identify specific areas of existing regulation that would need to be clarified or tailored in light of the unique structure of digital asset markets to allow for registration. The Commission has never responded.

Last summer, the Staff invited Coinbase to present its views on potential paths to registration of a digital asset trading platform. Coinbase made dozens of presentations, including on (i) a possible ATS structure, (ii) the feasibility of trading securities and non-securities on a single platform, and (iii) a possible NSE structure and accompanying changes to the Commission's existing processes that would be required.[38] On the eve of providing a response to Coinbase's proposals, the Staff abruptly terminated the discussions without explanation and turned back to its investigation.

<strong>ARGUMENT</strong>

**I.    An Enforcement Action Would Present Major Programmatic Risks to the Commission.**

The Commission should exercise its discretion to decline to pursue enforcement action against Coinbase for reasons more fundamental than potentially losing the case: If the Commission brings this case, it will do substantial unnecessary harm to the public, and the Commission itself will face significant programmatic risks.

An enforcement action against Coinbase would send a message to market participants and to the public that there is existential risk to being proactively transparent with this Commission. The story that will be told is one of a company that, in trying to bring new products and beneficial innovation to U.S. markets, consistently tried to gain clarity on and comply with the law, including by voluntarily providing the Commission with extensive information about its business, only to have that information used against it in a mystifying effort to extinguish major portions of its business. The regulatory relationship between the Commission and regulated entities has always been one of back-and-forth dialogue. Here, the lack of engagement is detrimental and a departure from that usual practice. The

---

https://assets.ctfassets.net/c5bd0wqjc7v0/14M656jdtxxvFF15U9hTGE/5e055b443cf1a5925b8092dadae07d7d/Staking_Comment_Letter_3-20-2023.pdf.

[38] App'x A at 5–8.

Commission cannot complete its tripartite mission of protecting investors, promoting efficient markets, and facilitating capital formation, if companies are loath to voluntarily share information with the Commission.

The enforcement action the Staff is contemplating against a U.S. public company like Coinbase also poses substantial risk to core components of the Commission's enforcement program, and to public confidence in the agency itself. In the Staff's rush to litigation, it does not appear to have considered the extensive collateral consequences that would come from a loss on some or all of its novel claims. For example, the Commission has never had to defend in court its approach to clearing agency regulation. A loss on that claim could lead multiple companies across asset classes to withdraw from Commission regulation. The same holds true for the Staff's novel and untested application of *Howey*, a case brought under the Securities Act of 1933 ("Securities Act"), to secondary market transactions necessary to sustain the unregistered exchange and broker-dealer charges under the Securities Exchange Act of 1934 ("Exchange Act"). A court should limit *Howey* to its original understanding and, in so doing, will substantially cabin the Commission's broad assertion of its authority in cases well beyond the digital asset industry.

Additionally, the Staff's expansive theories with respect to both listing and staking services will have broad market impact. With no clarity on which assets or services the Commission might view as securities and why, and no path to registration, the proposed charges would serve only to deprive millions of U.S. retail users of the benefits of using a well-regulated digital asset platform and custodian when they stake their assets.

**A. The Extensive Factual Record in This Case Militates Against Enforcement.**

Litigation will showcase the history of Coinbase's interactions with the Commission over the past four years, regarding the same topics that are the subject of the Wells notice. But significantly, a case against Coinbase will demonstrate that litigation is being used to pressure Coinbase into accepting a fate that the Commission does not have the authority to order—one that would require Coinbase to (i) concede that a substantial set of Coinbase-listed digital assets are securities, even though they are

-17-

not; and (ii) overhaul its entire business model and public share governance structure, a model extensively discussed with the Commission in the S-1 process, to register as an NSE. Neither of those objectives is supported by law or within the bounds of the Commission's authority.

Litigation will further demonstrate that, in an attempt to achieve these policy ends, the Staff abruptly rushed to enforcement, bypassing the Commission's ordinary investigatory processes. And in another departure from usual practice, the Staff refused to make its record available to Coinbase for review in the Wells process. Rushing to court on a record like this casts a shadow over the important investigative work that historically has been undertaken by the Staff, undermining judicial and public confidence in its enforcement efforts. And a loss on any one of the Staff's novel theories would substantially limit the Commission's authority.

The Staff has also declined to engage with Coinbase on facts that are critical to its contemplated theories. For example, Coinbase recently made changes to its staking services and Wallet. And although Coinbase does not think these products were ever within the scope of the Commission's jurisdiction, with these changes, this question is beyond doubt. But the Staff has not asked about these changes, much less discussed their impact on its claims. This not only calls into question the factual bases for the Staff's contemplated charges, but also raises a multitude of fair notice and equitable concerns that would bar an enforcement action from proceeding. Indeed, Coinbase's history of attempted engagement, met with silence from the Staff and the Commission, will provide the strongest possible evidence of what courts already have observed: Market participants did not receive "fair notice" of a regulatory regime that regulators themselves cannot agree on.[39] The Commission cannot now seek to charge these participants for violating laws that the Commission failed to articulate—even when asked by the industry and Congress—and how those laws would apply to them.

---

[39] *See In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. Mar. 11, 2023) ("[R]egulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities . . . subject to securities laws, or neither, or even on what criteria should be applied in making the decision. This uncertainty has persisted despite the fact that the cryptocurrency exchanges have been around for a number of years.")

**B.      The Staff's Case Rests on Unsupported and Untested Legal Theories.**

The Commission should exercise its discretion to decline enforcement for another fundamental reason:  Each of the Staff's purported legal theories—to the extent they can be discerned—is unsupported by law, untested in court, and likely to result in unintended consequences for the Commission, investors, and markets far beyond the digital asset industry.

The Commission's settled enforcement actions in this space do not carry the force of law in potential litigation against Coinbase.  If the Commission pursues litigation against Coinbase, each of these theories will be fully aired, tested, and likely upended.  And while Coinbase is fully prepared to litigate these issues, it is worth reiterating that Coinbase should not be forced to do so when there are viable alternative paths available.

### 1.      The Staff's Theories Are Predicated on a Misapplication of *Howey*.

The Staff alleges three primary claims against Coinbase.  *First*, the Staff contends that Coinbase is acting as an unregistered securities exchange and clearing agency, in violation of Sections 5 and 17A of the Exchange Act, respectively, based on its spot exchange-related activities.  *Second*, the Staff contends Coinbase is acting as an unregistered broker, in violation of Section 15(a) of the Exchange Act, based on its trading-related services, including the spot exchange and Coinbase Prime, and through its provision of self-custody wallet software, Coinbase Wallet.  *Third*, the Staff claims that Coinbase's staking services constitute an unregistered securities offering, in violation of Sections 5(a) and (c) of the Securities Act.

The Staff's purported theories as to each of these claims—which Coinbase is mostly left to guess—all appear to rely on a misapplication of existing law that no court could uphold.  Specifically, to support claims that Coinbase is acting as an unregistered securities exchange, clearing agency, and broker-dealer, the Staff contends that secondary trading in unidentified assets listed on Coinbase's spot platform—or made available through Wallet—are all securities.  But the Staff's theories with respect to secondary trading have no support in existing law.

-19-

The *Howey* test does not map on to secondary market trading. The plain text of the Securities and Exchange Acts require the presence of a *contract* with an issuer, promoter, or distributor of an investment or scheme for there to be a security. *See* 15 U.S.C. § 77b(a)(1); *id.* § 78c(a)(10). An attempt to apply *Howey* here, where no such contract exists, especially in the absence of any secondary purchaser's reliance on promises by the issuer or promoter, will fail. Indeed, the sole appellate decision to address *Howey* in a context without an issuer or promoter, contradicts the Staff's now-asserted position. In *Hocking* v. *Dubois*, 885 F.2d 1449 (9th Cir. 1989) (en banc), the court held that the combination of a condominium purchase and an option to enter into a rental pool agreement did not automatically constitute an investment contract. Notably, the court observed: "In its amicus brief, the SEC argues that in the absence of any affiliation or selling arrangement between the sellers of the condominium (or the real estate agent) and the operator of the rental pool, the sale of a condominium is not a transaction that involves an investment contract." *Id.* at 1458 n.7. That is exactly the opposite of the position the Staff now appears to take.

Were the Staff to pursue this theory, a court should limit *Howey* to its original, intended scope (*i.e.*, circumstances where a purchaser enters into an explicit contractual arrangement with an asset's issuer or promoter). Such a ruling would not only diminish the Commission's jurisdiction over digital asset markets, but would also undermine its ability to pursue a range of cases premised on broad *Howey*-related theories.

### 2. The Staff's Clearing Agency Theory Is Unsupported by Law, Ignores Statutory Exemptions, and Would Have Far-Reaching Impact Across Industries.

The Staff's claim that Coinbase acts as an unregistered clearing agency is equally unavailing. There can be no clearing agency without securities transactions. Coinbase neither lists nor facilitates transactions in securities and, therefore, cannot be a clearing agency.

But even if there were securities transactions, Coinbase still would not be acting as a clearing agency under the law. The Staff has not specified which of Coinbase's operations it believes constitute clearing agency activity—the Staff has neither conducted any interviews nor received documents

-20-

regarding Coinbase's supposed clearing agency activity.  Thus, Coinbase can only speculate that the Staff is wrongfully conflating a Coinbase entity such as Coinbase's trading platform or custody business, both regulated by NYDFS, with clearing agency activity.  But the Exchange Act provides a tailored and precise "clearing agency" definition, centered on firms that act as central counterparties, central securities depositories or facilities that allow "for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities."  15 U.S.C. § 78c(a)(23)(A).  Coinbase provides none of these services.

The Exchange Act definition is further limited by enumerated exclusions, including for broker-dealers and national securities exchanges that provide clearing-related functions that are part of their customary broker, dealer, or exchange activities. 15 U.S.C. § 78c(a)(23)(B).  The Commission would be acting contrary to law if it claimed, despite these exclusions, that Coinbase is an unregistered clearing agency, given that the Commission also alleged that Coinbase should be registered as a broker or exchange.

The risk to the Commission making this argument extends beyond a case against Coinbase. The Commission has long provided broad but informal interpretations of the scope of the clearing agency definition.  For example, in 1998, the Commission published an interpretive release providing that certain matching services constitute clearing agency functionality.[40]  Likewise, in 2011, the Commission published another interpretive release providing that security-based swap market participants offering collateral management services, trade matching services, and tear up and compression services are engaging in clearing agency activity.[41]  And the Division of Trading and Markets granted Paxos no-action relief from clearing agency registration in connection with its

---

[40] Confirmation and Affirmation of Securities Trades; Matching, 63 Fed. Reg. 17,943 (Apr. 13, 1998).

[41] Securities Exchange Act Release No. 64017 (Mar. 3, 2011), 76 Fed. Reg. 14,472 (Mar. 16, 2011).

operation of a securities settlement system.[42]  Many market participants have registered with, sought exemptions from, or otherwise relied upon interpretations from the Commission with respect to clearing agency activity.  A court ruling narrowing the Commission's authority could result in the Commission losing some or all of its jurisdiction over these firms.[43]  The Commission has never had to defend these clearing agency interpretations before a court, but it would have to do so in litigation against Coinbase.  An adverse decision for the Commission could upset decades of seemingly unchallenged authority, unsettle the Commission's clearing and settlement regulatory regime, and risk substantial market disruption.  The Commission should exercise cautioned restraint in considering whether to put that guidance at risk.

**3.    The Staff's Broker Theories for Wallet Are Unsupported by Law and Pose Widespread Programmatic Risk.**

The Staff further contends that Coinbase Wallet—a graphical user interface that allows users to self-custody their assets and connect to third-party platforms—is operating as an unregistered broker-dealer in violation of Section 15(a) of the Exchange Act.  The Staff's broker theory appears to be based entirely on Coinbase having received "transaction-based compensation" for certain, limited transactions.  Coinbase, however, no longer receives such compensation, and the fact that it did at one time would be insufficient as a matter of law to sustain an unregistered broker charge.

To prevail on a broker charge, the Commission first would need to prove, on an individualized basis, that each secondary transaction at issue through Wallet involved a security, which it cannot do. But even if it could, Coinbase's historical receipt of certain transaction-based compensation is not sufficient to prove that Wallet is a broker.  Although Staff no-action guidance has declared transaction-based compensation as sufficient to require broker registration even for passive technology platforms,

---

[42] *Paxos Trust Co.*, SEC Staff No-Action Letter, 2019 WL 5543753 (Oct. 28, 2019).

[43] For example, Bloomberg, DTCC, and SS&C have obtained exemptions in reliance on this guidance. *See Clearing Agencies*, U.S. Sec. & Exch. Comm'n (Mar. 24, 2023), https://www.sec.gov/tm/clearing-agencies.

that view is squarely at odds with how courts routinely analyze the broker determination and would analyze Wallet in any litigation.[44]  Although there is no case law on self-custody wallets, courts make clear that the broker determination is fact-specific and based on the totality of the circumstances—and that meeting one factor, including receiving transaction-based compensation, is not dispositive.[45]

Losing on the Wallet claim would significantly narrow how the broker definition is interpreted, circumscribing the Commission's asserted authority even in traditional markets by allowing traditional securities-related technology service providers that the Commission regulates today to deregister with the Commission.

### C.      The Staff's Novel Legal Theories Would Be Foreclosed by the Major Questions Doctrine, Due Process, and Equitable Defenses.

The Staff's novel and far-reaching claims face additional threshold hurdles on the bases of the Major Questions Doctrine, due process concerns, and a multitude of equitable defenses.  Coinbase is uniquely positioned to prevail on these arguments.

#### 1.      The Major Questions Doctrine Forecloses the Staff's Novel Theories.

The Staff's claims predicated on secondary trading and authority over IT services (staking) and software (Wallet) should be foreclosed by the Major Questions Doctrine.

##### a.      The Major Questions Doctrine Forecloses the Commission's Efforts to Use *Howey* to Regulate the Entire Digital Asset Industry.

Courts consistently presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2609 (2022).  The Supreme

---

[44] *See, e.g.*, *SEC* v. *Hansen*, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984); *SEC* v. *Hui Feng*, 935 F.3d 721 (9th Cir. 2019).

[45] *See, e.g.*, *SEC* v. *RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923, 926 (S.D. Cal. 2020) (applying a "totality of the circumstances" approach to determine if a person had engaged in being a broker-dealer); *SEC* v. *U.S. Pension Trust Corp.*, 2009 WL 2365702, at *9 (S.D. Fla. July 30, 2009) (finding summary judgment inappropriate even though defendants actively solicited investors, received transaction-based compensation, and regularly participated in securities transactions because of fact disputes on whether they advised investors as to the merits of the investments and the relationship between the defendants and the purchasers of the securities).

Court has explained that an agency's assertion of "unheralded regulatory power over a significant portion of the American economy" presents a major question. *Id.* at 2608. And to take such regulatory action, it must point to *clear* congressional authorization. *See Ala. Ass'n of Realtors* v. *HHS*, 141 S. Ct. 2485, 2489 (2021).

The digital asset industry is valued at over one trillion dollars.[46] Twenty percent of Americans own cryptocurrency, and the per-day worldwide trading volume is around $100 billion.[47] The industry employs thousands of Americans.[48] An agency declaration that the majority of all digital assets, or more shockingly that all digital assets other than Bitcoin, are unregistered "securities" that cannot legally be traded constitutes an obvious assertion of regulatory authority over a "significant portion of the American economy." *West Virginia*, 142 S. Ct. at 4608.

Other points underscore the lack of clear congressional authorization for the Commission's attempts to assert sweeping regulatory authority over the entire digital asset industry, through ad hoc enforcement against Coinbase. The Supreme Court has explained that when an issue "has been the subject of earnest and profound debate across the country," an agency's claim of delegated authority is "all the more suspect." *West Virginia*, 142 S. Ct. at 2614. Congress is actively debating the Commission's "approach to digital assets" and the proper "regulatory sphere for digital assets."[49] If

---

[46] *See* Michelle Neal, *Advances in Digital Currency Experimentation*, Fed. Reserve Bank N.Y. (Nov. 4, 2022), https://www.newyorkfed.org/newsevents/speeches/2022/nea221104.

[47] *See* Thomas Franck, *One in Five Adults Has Invested in, Traded or Used Cryptocurrency*, *NBC News Poll Shows*, NBCNews.com (Mar. 31, 2022), https://www.nbcnews.com/tech/tech-news/one-five-adults-invested-traded-used-cryptocurrency-nbc-news-poll-show-rcna22380; CoinGecko, *Q2 2022 Cryptocurrency Report* (July 13, 2022), https://www.coingecko.com/research/publications/q2-2022-cryptocurrency-report.

[48] *See* Jamie Redman, *Crypto Employment Abounds with More Than 8,000 Jobs in 2020*, Bitcoin.com (Jan. 18, 2020), https://news.bitcoin.com/crypto-employment-abounds-with-more-than-8000-jobs-in-2020.

[49] Financial Services GOP (@Financial Services GOP), Twitter (Mar. 28, 2023), https://twitter.com/FinancialCmte/status/1640816951843774466?cxt=HHwWhICzweCUrcUtAAAA (interview of Rep. Patrick McHenry announcing April 18, 2023 House Financial Services Committee oversight hearing); *see also, e.g.*, Rep. Ben Cline, Budget Hearing—Fiscal Year 2024 Request for the CFTC Before the House Comm. on Agric., Rural Dev., Food and Drug Admin. & Related Agencies (Mar. 28, 2023) (noting SEC and CFTC's conflicting positions on digital assets and recommending that "legislation to

-24-

Congress had already clearly authorized the Commission to regulate in this area, there would be no need for debate.

The issue of whether or which digital assets can be characterized as securities is not just the "subject of earnest and profound debate across the country." *West Virginia*, 142 S. Ct. at 2614. It is the subject of debate across Chair Gensler's own statements over the past few years.[50] And in the past few weeks, the CFTC formally took a position contrary to the one the Commission appears willing to assert in potential litigation against Coinbase.[51]

Ultimately, Congress is the appropriate body to develop a comprehensive regulatory regime for the digital asset industry. Until it does so, the Commission may not assert authority over the entire industry via enforcement.[52] Courts recently and repeatedly have signaled that they would agree.[53]

### b.    Regulation of Secondary Trading in Digital Assets Is Also a Major Question.

Regulation of secondary trading in digital assets poses another major question. Significantly, Chair Gensler previously acknowledged the Commission's lack of statutory authority over digital asset

---

address th[is] issue should place regulatory authority with the CFTC"); Digital Commodities Consumer Protection Act, S. 4760 , 117th Cong. (2021-2022); Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong. (2021-2022).

[50] *Compare* Gary Gensler, *Fintech Beyond Crisis*, MIT Sloan School of Mgmt. Conf. (Apr. 25, 2019) ("Silvio Micali's Alogrand, he's a Turing Award winner at MIT I work with . . . Silvio's got a great technology, it has performance, you could create Uber on top of it."), *with Bittrex* Compl. at ¶ 179 (since its 2019 initial token sale "ALGO was offered and sold as an investment contract and therefore a security").

[51] Compl. at ¶ 24, *CFTC* v. *Zhao*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF No. 1; Compl. at ¶ 12, *CFTC* v. *Russell*, No. 23-cv-2691 (E.D.N.Y. Apr. 11, 2023), ECF No. 1.

[52] *See Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142 (2012) (invalidating an agency enforcement action where the agency invoked an "interpretation to impose potentially massive liability . . . for conduct that occurred well before the interpretation was announced").

[53] *See In re Voyager Dig. Holdings, Inc.,* 649 B.R. 111, 119 (Bankr. S.D.N.Y. Mar. 11, 2023) ("There have been differing proposals in Congress to adopt different types of regulatory regimes for cryptocurrency trading. Meanwhile, the SEC has filed some actions against particular firms with regard to particular cryptocurrencies, and those actions suggest that a wider regulatory assault may be forthcoming. The CFTC seems to have taken some positions that are at odds with the SEC's views. Just how this will all sort itself out, how the pending actions relating to cryptocurrencies will be decided, and just what issues might be raised in future regulatory actions, and how they will affect individual firms or the industry as a whole, is unknown.").

secondary trading platforms and explicitly recognized in May 2021 that Congress would have to act before the Commission was granted any such authority.[54]   But now, without the passage of any legislation or rulemaking, the Commission's authority in this space has somehow appeared.  Late last year, Chair Gensler declared, "I feel that we have enough authority, I really do, in this space" to require crypto companies "to come into compliance" with the Commission's NSE registration requirements.[55] This sort of *ipse dixit* is not sufficient to oppose a Major Questions Doctrine challenge here.

The vast majority of the Commission's prior digital asset cases in federal court involved primary offerings, which can resemble securities offerings properly subject to Commission oversight—but which are materially different from secondary trading.[56]  That the Commission has not before sought to regulate all digital asset secondary trading is not surprising.  Unlike in the primary offering context, where Commission disclosure rules have a singular role to play, in the secondary market context the Commission is not uniquely situated.  Investors transact in currencies, commodities, and commodity futures on exchanges without Commission regulation.  Instead, U.S. law empowers other regulators—the CFTC in the case of commodity derivatives, and the states in the case of spot market commodities and currency transactions.

The Commission itself appears to have recognized the limits to its authority in the absence of formal rulemaking.  For example, in a recently litigated matter, a federal judge asked a member of the

---

[54] *See Game Stopped?  Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, supra* n.2; SEC Chairman Gary Gensler:  *There Needs To Be 'Greater Investor Protection' of Crypto Markets*, CNBC (May 7, 2021), *supra* n.3.

[55] *SEC's Gensler: The 'Runway Is Getting Shorter' for Non-Compliant Crypto Firms*, *supra* n.4 (Statement of Gary Gensler).

[56] The sole outlier federal court action involving secondary trading, *SEC* v. *Wahi*, 2:22-cv-010009 (W.D. Wash. July 21, 2022), focused only on a small handful of tokens and did not purport to assert authority over the entire crypto industry.  And the Commission's new enforcement action against Beaxy Digital for running an unregistered securities exchange is premised on the contention that Beaxy facilitated trading in "crypto asset securities," circularly defined as digital assets that "meet[] the definition of a security under the federal securities laws."  Compl. at 2 n.1, *SEC* v. *Beaxy Digital Ltd.*, No. 23-cv-1962 (N.D. Ill. Mar. 29, 2023), ECF No. 1.

Commission trial team whether the Commission would be willing to fashion a settlement where the "SEC would take positions on things like . . . the secondary market" for a particular asset. The Commission's lawyer responded that the judge's request was:

> [A]n ask to have the SEC make policy through a settled remedy, [but] you know, there should be consistency across . . . the industry. We will see what we can do, but . . . it could be very difficult for the SEC to fashion a policy about secondary sales in this circumstance because it really is policy and we're constrained by all of the things that have to go into it before the SEC makes policy.[57]

In short, the Commission has never relied on its authority to impose such a remarkable measure, particularly in an enforcement setting, and it should continue to adhere to the "constraints" on its authority to do so. *Id.*; *see also West Virginia*, 142 S. Ct. at 2609.

### c.    The Major Questions Doctrine Also Forecloses the Commission's Efforts to Regulate IT Services or Software as a Securities Offering (Staking) or Broker (Wallet).

The Staff's position, with respect to the provision of IT services (staking) and software (Wallet), is an attempt to regulate how IT service providers were or are compensated; the Securities and Exchange Acts confer no such authority. The U.S. technology industry is undoubtedly a "significant portion of the U.S. economy"—valued at $1.8 trillion and comprising 9.3% of the total U.S. economy[58]—and thus requires clear congressional authorization to regulate. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

Today, there is active policy debate on how to regulate technology companies, including among the Federal Trade Commission and Federal Communications Commission.[59] The Commission is mentioned nowhere in that debate and has no legislatively-granted authority to regulate this space.

---

[57] Tr. of Hr'g at 34, *SEC* v. *LBRY*, 21-cv-00260 (D.N.H. Nov. 21, 2022).

[58] *Tech GDP as a Percent of Total GDP in the U.S. 2017-2021*, Statista (Apr. 7, 2022), https://www.statista.com/statistics/1239480/united-states-leading-states-by-tech-contribution-to-gross-product/.

[59] *See, e.g.*, FTC Comm'r Noah Joshua Phillips, *How (Not) to Regulate Technology* (Oct. 6, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/hudson-speech.pdf; FCC Comm'r Michael O'Rielly, *Remarks Before Silicon Flatirons Tech Conference* (Feb. 10, 2020), https://www.fcc.gov/document/comm-orielly-remarks-silicon-flatirns-tech-conference.

### 2. The Fair Notice Doctrine Forecloses an Enforcement Action.

If the Commission were to proceed with litigation, based on the facts present here and its long history of inaction, inconsistent statements regarding what the law requires, and pattern of announcing new policies via enforcement, Coinbase has compelling arguments that any enforcement action should be foreclosed on due process and fair notice grounds. The circumstances present in Coinbase's case go far beyond the facts of the fair notice defenses that the Commission has previously faced.[60]

### a. Coinbase Lacked Fair Notice of the Commission's Position on Digital Asset Securities.

"[L]aws which regulate persons or entities must give fair notice of conduct that is forbidden or required," and regulated parties must "know what is required of them so they may act accordingly." *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Fortyune* v. *City of Lomita*, 766 F.3d 1098, 1105 (9th Cir. 2014) ("Entities regulated by administrative agencies have a due process right to fair notice of regulators' requirements.").

It is bedrock law that an agency announcing new policies via enforcement action fails to provide "fair notice" because regulated parties cannot be expected to "divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012); *see also Pfaff* v. *U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 n.4 (9th Cir. 1996) ("The disadvantage to adjudicative procedures is the lack of notice they provide to those subject to the agency's authority."). When "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise" and the resulting due process violation, is particularly "acute." *Christopher*, 567 U.S. at 158.

---

[60] *See, e.g.*, Defs.' Opp. to Pl.'s Mot. Summ. J., 43–58, *SEC* v. *Ripple Labs Inc.*, No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y. Oct. 21, 2022), ECF No. 675 (arguing that Defendants did not have fair notice that in issuing and offering XRP, they were required to register XRP as a security).

To date, the Commission has provided market participants, including Coinbase, with virtually no information—or at best conflicting information—about which digital assets or transactions in digital assets it views as securities and why. This is despite the fact that Coinbase and numerous other digital asset platforms have existed for more than a decade, and the Commission has received relevant securities law analyses from Coinbase since at least 2018 and never before raised any concerns. The Commission has ignored rulemaking petitions and calls for greater transparency, and it now contemplates seeking potential injunctive relief, while continuing to refuse to engage substantively on the topics at issue.[61] Fair notice squarely proscribes enforcement in these circumstances.

The fair notice issues here are only heightened by the uncertainty and confusion caused by the Commission's continuously shifting views on what the law requires. Indeed, "[c]onfusion within the enforcing agency as to the proper interpretation of a regulation is . . . relevant evidence to show a lack of fair notice." *United States* v. *S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1011 (S.D. Ind. 2003).[62]

Chair Gensler has articulated diametrically opposed and inconsistent views about whether the Commission, or any regulator, has authority over digital asset exchanges. And there is a history of conflicting statements among Commission leadership as to what digital assets fall within their jurisdiction. Senior Commission Staff long expressed views that Bitcoin and Ether are not securities.[63]

---

[61] *See Sherman* v. *Posner*, 266 F. Supp. 871, 874 (S.D.N.Y. 1966) ("Notwithstanding the Commission's rules, this court is not disposed, as some would suggest, to completely emasculate the actions of the Commission of any meaning. It is submitted that the action, or inaction, as the case may be, of the Commission is to be accorded some weight where, as in our case, the information which forms the basis for an injunctive motion previously has been brought to the attention of the Commission and the Commission has presumably approved issuance of the material. In an area where the primary power of protection of investors is vested in the Commission, their failure to take a stronger position is of some weight, particularly on a motion of this sort for preliminary relief.")

[62] *See Rollins Env't Servs.* v. *EPA*, 937 F.2d 649, 653 (D.C. Cir. 1991) (imposing no penalty for regulatory violation, because "[n]o reasonable reader . . . could have known that EPA's current construction [of the regulation] is what the agency originally must have had in mind," when the EPA "itself is uncertain of the meaning of its regulation, when agency personnel give conflicting advice to private parties about how to comply with it, and when the agency's chief legal officer finds the regulatory language equally supportive of one of two possible constructions").

[63] *See* William Hinman, Dir., Div. of Corp. Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, U.S. Sec. & Exch. Comm'n (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-

Indeed, during Coinbase's public listing process, the Staff informed Coinbase that "Bitcoin and Ether are the only digital assets as to which senior officials at the SEC have publicly expressed such a view," and asked Coinbase to revise its S-1 to reflect that "*as to all other digital assets, there is currently no certainty* under the applicable legal test."[64]  That is because the Commission implicitly recognized that it would need Congressional authority and/or rulemaking to bring certainty to these questions—a point Chair Gensler recognized just the following month.  But then, earlier this year, Chair Gensler stated that he believes that "[e]verything other than Bitcoin," including Ether, is clearly a security.[65]  And just this week, the Chair inexplicably refused to tell Congress whether Ether is a security.[66]

There is also confusion between the two major regulators in the digital assets space—the SEC and CFTC have expressed conflicting views with each other over time.  After Chair Gensler recently stated that "[e]verything other than Bitcoin," including Ether, is clearly a security,[67] CFTC Chair Behnam testified twice that "[E]ther is a commodity" and therefore falls under the CFTC's jurisdiction.[68]  The CFTC Chair noted that both agencies previously consulted about whether Bitcoin

061418 (noting in a public speech that well-established cryptocurrencies, including Bitcoin and Ether, were "no longer" securities, if they ever were, and that a "token . . . by itself is not a security"); *see also Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (FinHub's 2019 public framework for identifying "some of the factors to be considered in determining whether and when a digital asset may no longer be a security," which includes Hinman's concept of decentralization, and does "not replace or supersede" prior statements of the Staff or Commission).

[64] Letter from Div. Corp. Fin., SEC to Coinbase Global, Inc. (Dec. 7, 2020), https://www.sec.gov/Archives/edgar/data/1679788/000000000020011705/filename1.pdf (emphasis added).

[65] *See, e.g.*, Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top Financial Cop on Bankman-Fried Blowback*, Intelligencer (Feb. 23, 2023), https://nymag.com/intelligencer/2023/02/gary-gensler-on-meeting-with-sbf-and-his-crypto-crackdown.html (quoting Chairman Gensler as saying that "[e]verything other than Bitcoin" looks like a security).

[66] *See Oversight of the SEC: Hearing Before the Fin. Serv. Comm.*, 118th Cong. (Apr. 18, 2023) (Chair Gensler's response on how he "categorize[s] Ether": "it depends on the facts and the law").

[67] *See id.*

[68] *See, e.g.*, CFTC Chair Rostin Behnam, Comments Before the U.S. Senate Comm. on Agriculture, Nutrition, & Forestry (Mar. 8, 2023); CFTC Chair Rostin Behnam, Comments Budget Hearing—Fiscal Year 2024 Request for the CFTC Before the U.S. House of Representatives Subcomm. on Agriculture,

and Ether fell "within the commodity regime **_or_** the securities regime," and determined that these were commodities; this has resulted in Bitcoin and Ether derivatives trading on CFTC registered platforms since 2014 (Bitcoin) and 2020 (Ether).[69]  Billions of notional CFTC-regulated Ether derivatives have traded in reliance on the previously settled view (of both the SEC and CFTC) that Ether was a non-security commodity.

To add to the confusion, the CFTC recently brought two enforcement actions premised on the notion that Ether and other assets (such as Litecoin, and stablecoins USDC, USDT, and BUSD), are commodities within the scope of its enforcement authority.[70]  The Commission seemingly disputes this position in light of the recent Wells notice to BUSD's issuer, Paxos, asserting that this stablecoin is an unregistered security.[71]

As a federal judge recently observed:  "[R]egulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities . . . subject to securities laws, or neither, or even on what criteria should be applied in making the decision.  This uncertainty has persisted despite the fact that the cryptocurrency exchanges have been around for a number of years." *In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. Mar. 11, 2023).  Moreover, while "[t]he current regulatory environment can

---

Rural Dev., Food and Drug Administration & Related Agencies (Mar. 28, 2023) ("[I]n my view—and I've said this many times—I believe [Ether and Bitcoin] are a commodity."); *see also* CFTC Chair Heath Tarbert, Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit (Oct. 29, 2019) ("It is my view as Chairman of the CFTC that [E]ther is a commodity, and therefore it will be regulated under the CEA.").

[69]  *Digital Assets Primer*, CFTC (Dec. 2020), https://www.cftc.gov/media/5476/DigitalAssetsPrimer/download (stating that "[t]he first [B]itcoin derivative . . . was listed for trading by TeraExchange in 2014" and "[i]n 2020, ErisX listed for trading the first futures contract based on [E]ther").

[70] Compl. at ¶ 24, *CFTC* v. *Zhao*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF No. 1; Compl. at ¶ 12, *CFTC* v. *Russell*, No. 23-cv-2691 (E.D.N.Y. April 11, 2023), ECF No. 1.

[71]  *Paxos Issues Statement*, Paxos (Feb. 13, 2023), https://paxos.com/2023/02/13/paxos-issues-statement/.

only be characterized as uncertain," "the future regulatory environment can only be characterized . . . as virtually unknowable." *Id.*

Coinbase obviously had no notice of these vacillating positions when the Commission allowed it to become a public company in 2021. And, as Congress observed just this week, the Commission still has not issued formal guidance that could allow anyone to understand whether or not they will be viewed as violating securities laws.[72] An enforcement action against Coinbase here would represent the type of unforeseeable regulatory action that due process squarely prohibits.

### b.    Coinbase Lacked Fair Notice of the Commission's Position on Staking Services As Securities Offerings.

The fair notice issues implicated by the Staff's contemplated charges against Coinbase for staking present with equal force because the Commission provided no notice at all about its position on whether the securities laws apply to staking services until it filed a complaint against Kraken on February 9, 2023.[73] Prior to February 2023, the Commission itself had not made a single statement on staking, despite hearing from industry participants (including Coinbase) about their legal analyses of staking services since at least 2019. At most, Chair Gensler made a brief, passing comment to the media in the fall of 2021 regarding potential future enforcement actions against unspecified "staking products."[74] But one media statement by a member of the Commission is not policy guidance, and it does not constitute fair notice, such that market participants should reasonably be expected to understand what—if any—staking-related activities it views as violative of securities law.

---

[72] *See Oversight of the SEC: Hearing Before the Fin. Serv. Comm.*, 118th Cong. (Apr. 18, 2023) (Chairman McHenry stating to Chair Gensler, "You have failed to provide clarity on how digital asset firms should adhere. Your punishing these firms for failing to apply to these laws, without knowing how they apply . . . regulation by enforcement is not sustainable" and "let me be clear, [this Congress's] goal is to make law and we expect you to play a constructive role in that process.").

[73] Compl., *SEC* v. *Payward Ventures, Inc.*, No. 23-cv-588 (N.D. Cal. Feb. 9, 2023), ECF No. 1.

[74] *Transcript: The Path Forward: Cryptocurrency with Gary Gensler*, Wash. Post (Sept. 21, 2021), https://www.washingtonpost.com/washington-post-live/2021/09/21/transcript-path-forward-cryptocurrency-with-gary-gensler/.

The lack of fair notice is underscored by Chair Gensler's recent statements that all staking services must be registered, based entirely on the settlement of a single enforcement action focused on one platform's idiosyncratic staking product. There, the Chair stated that Kraken's settlement "should make clear to the marketplace that staking-as-a-service providers must register."[75] But Kraken's staking services look nothing like Coinbase's, and that settled action provided no notice to Coinbase as to whether *its* staking services would be viewed as violating securities law. When asked whether recent changes to Coinbase's staking program altered the Staff's securities law analysis, the Staff responded that it had "not reached a view."

The Chair's directive that staking service providers must register is also illusory because there is no actual path to registration for any staking services. Shortly after the Kraken settlement, Coinbase submitted a comment to the Commission seeking guidance on which staking services would need to be registered, and if so, how to register.[76] The Commission has not responded.

### c. Coinbase Lacked Fair Notice of the Commission's Position on Clearing Agency Requirements for Custodial Digital Asset Platforms.

Coinbase also did not have fair notice that the Staff would seek to charge the company as an unregistered clearing agency. The Commission provided no indication that it believed clearing agency regulations apply to custodial digital asset platforms that perform certain automated settlement functions until it filed a complaint against Beaxy on March 29, 2023—the first of its kind.[77]

The Chair's public statements that custody and retail-facing trading services should be disaggregated do not provide fair notice of the Commission's newly adopted position—unsupported by law—on the illegality of clearing-related activities by digital asset platforms. The Exchange Act provides a tailored and precise "clearing agency" definition, centered on firms that act as central

---

[75] *Kraken to Discontinue Unregistered Offer & Sale of Crypto Asset Staking-As-A-Service Program & Pay $30 Million to Settle SEC Charges*, SEC (Feb. 9, 2023), https://www.sec.gov/news/press-release/2023-25.

[76] Coinbase, *Mar. 20, 2023 Petition for Rulemaking*, *supra* n.36.

[77] Compl., *SEC* v. *Beaxy Digital, Ltd.*, No. 23-cv-1962 (N.D. Ill. Mar. 29, 2023), ECF No. 1.

counterparties, central securities depositories, or facilities that allow for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities. 15 U.S.C. § 78c(a)(23)(A). Coinbase today provides none of these services and could not have foreseen the Commission's attempt to apply this requirement to the digital asset industry. Rather, Coinbase performs the same settlement-related activities that it discussed in detail with the Commission for years, including during the public listing process.

### d. Coinbase Lacked Fair Notice of the Commission's Position on Broker Registration for Self-Custody Wallets.

The same fair notice issues are present with respect to the Staff's contemplated Wallet-related charges. Coinbase is not aware of a single statement, rule, or guidance issued by the Commission or the Staff regarding the applicability of broker requirements to self-custody wallet software like Wallet. No court will bless attempts to charge Coinbase, on the basis that it should have "divine[d] the agency's interpretations in advance." *Christopher*, 567 U.S. at 159.

This is the first time Coinbase has heard of an issue regarding Wallet. Wallet has been available since at least 2018, was referenced six times in the effective S-1, and since April 2021, has been discussed in at least 14 SEC filings. The Commission's "conspicuous inaction" renders this fair notice violation particularly "acute." *Id.* at 158.

### 3. Equitable Defenses Should Further Bar This Action from Proceeding.

If the Commission were to proceed with litigation, despite the extensive record of the Commission's inaction, conflicting positions, engagement with Coinbase in the S-1 process, and refusal to provide clarity, Coinbase would have strong equitable arguments to bar an enforcement action from proceeding—on equitable estoppel grounds and because of the Commission's "unclean hands." *See SEC* v. *Rayat*, 2021 WL 4868590, at *3 (S.D.N.Y. Oct. 18, 2021) ("The SEC agrees that the defenses of equitable estoppel and unclean hands are not categorically unavailable against the government.").

-34-

The federal doctrine of equitable estoppel applies when "the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow* v. *New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001). The elements of the defense include proof that the plaintiff made a misrepresentation of fact to the defendant with reason to believe that the defendant would rely on it; that the defendant did reasonably rely upon it; and that the defendant was harmed by the reliance. *Id.* Ordinarily, whether the defense applies is a question of fact. *Id.* It is unnecessary for the defendant to show that the plaintiff intended to deceive the defendant when it made the representation. *Id.* at 726; *see also SEC* v. *KPMG, LLC*, 2003 WL 21976733, at *2 (S.D.N.Y. Aug. 20, 2003) (an estoppel defense can be raised against the Government in circumstances where the Government's actions are "inconsistent with 'the minimum standard of decency, honor, and reliability' which citizens have a right to expect from their Government"). Recognizing the need to deter government abuses, an unclean hands defense is permitted in circumstances "where it appears that the government may have engaged in outrageous or unconstitutional activity." *SEC* v. *Am. Growth Funding II, LLC*, 2016 WL 8314623, at *3 (S.D.N.Y. Dec. 30, 2016).

Here, the Commission misrepresented its position when it said that it did not view certain digital assets as securities, and when it said it lacked authority to regulate digital asset platforms. Coinbase reasonably relied on such representations (and the Commission's continued silence) by continuing and expanding its business, including by devoting substantial resources to engaging with the Commission prior to, during, and after its public listing process. And Coinbase has been significantly harmed by such reliance; the Commission would now seek to shut down core parts of its business after allowing it to become a public company offering the same services it does today. The harm is compounded because Coinbase has not only sought clarity from the Commission to ensure

that it was adhering to the limited existing guidance, but also has substantially limited the types of products and services it makes available to its users.[78]

An enforcement action should also be barred because Chair Gensler misrepresented his position when he said to "come in and register," even though registration of any part of Coinbase's business was simultaneously foreclosed by the Commission.  Members of Congress explicitly recognized this "misrepresentation" just this week.[79]  Coinbase relied on the Chair's statement and continued to provide the Commission with extensive information about its business and securities law analyses in its ongoing efforts to register.  Yet, now, the Commission is trying to use this information to substantially extinguish the same core business it allowed to go public just two years ago.

Unlike other market participants that do not have the same record of substantial compliance and engagement as Coinbase—and have not gone through an expansive S-1 review process—Coinbase and its investors will be uniquely harmed by litigation.  The Commission's vacillation, conflicting statements, omissions, and silence collectively fail to meet the minimum standards of fairness and reliability that citizens "have a right to expect from their Government."  *KPMG*, 2003 WL 21976733, at *2.

### D.    An Enforcement Action Is Imprudent When There Are Alternative Paths Available.

Coinbase has never wanted litigation with the Commission.  But it will litigate and exhaust all

---

[78] U.S. retail adoption of cryptocurrency has increased from 8.3% in 2021 to 20% in 2023.  But compliance-driven companies like Coinbase have had their growth slowed by the lack of regulatory clarity in the United States, especially from the Commission.  Coinbase has declined to offer a number of products and services that its users have requested—such as certain lending, derivatives trading, and staking products—because there is no path to offer them in the U.S. today.  And in Q4 2022, Coinbase's U.S. volume meaningfully decreased with some of its users likely opting instead to trade on unregulated offshore competitors' platforms that to date appear not to have been the focus of the Commission's attention.

[79] *See* Letter from Patrick McHenry (Chair of Comm. on Fin. Servs.) *et al*. to Chair Gary Gensler (Apr. 18, 2023), https://financialservices.house.gov/uploadedfiles/2023-04-17_all_fsc_gop_letter_to_sec_ on_nse_registration_final.pdf ("Without clear rules of the road, your push for firms to 'come in and register' is a willful misrepresentation of the SEC's non-existent registration process.  The only entity to blame for the lack of registrants is the SEC itself.  The SEC should take this opportunity to work with Congress to ensure innovators and investors have the regulatory clarity and protections that they deserve.")

available avenues, if forced to do so by the Commission. Alternative paths nonetheless remain available, preferable, and better for the Commission and Coinbase. If the Commission believes that certain digital assets are securities, or certain parts of Coinbase's business need to be registered, Coinbase continues to welcome that dialogue. The Commission could respond to Coinbase's request for rulemaking (and the 140 questions therein) or initiate its own. If the Commission believes that Coinbase should register a securities trading platform, Coinbase remains open to that discussion, as it has been for the last four years. And if the Commission wants to consider how issuer disclosure, brokerage, custody, clearing, and related issues can work in the digital asset securities markets, Coinbase remains available to discuss these issues—and is keen to do so—at any time. These issues need not, and should not, be addressed before a court.

## II.    The Staff's Enforcement Action Would Fail on the Merits Because Coinbase Does Not List, Clear, or Effect Trading in Securities.

Because the Staff has not identified which assets it thinks are securities, Coinbase finds itself in the position of trying to respond to "some unspecified issue" with some unidentified assets, in order to "somehow . . . prove a negative"—namely that Coinbase "is not violating registration requirements."[80] As a federal judge recently observed: "I don't know how any party could possibly be expected to address the SEC's comments with the limited guidance the SEC has provided."[81]

In litigation, the Commission will not be able to rely on vague generalizations. To convince a court to order Coinbase to stop listing any particular digital asset, the Commission will need to prove that transactions in that specific digital asset are securities transactions. It will need to do that for every asset that it chooses to allege as a security—no court will allow the Commission to shut down substantial portions of Coinbase's business through examples.[82] This will be extremely challenging

---

[80] Tr. of Hr'g at 44, *In re Voyager Dig. Holdings*, 1-22-bk-10943 (Bankr. S.D.N.Y. Mar. 7, 2023), ECF No. 1172.

[81] *Id.* at 47.

[82] *See id.* at 27–28 ("You know, when I have a regulator who's charged with protecting investors, they either think there's an issue or there's not. I expect them to come in and tell me there is or there isn't. I

for the Commission because at great cost to its business, Coinbase does not list securities and rejects some 90% of the assets that it reviews (even though many of these trade on other platforms). Coinbase has a robust listing process through which it has already screened all of the assets it lists against these criteria, and has already done the analysis to conclude they are not securities under applicable law.[83] Moreover, because Coinbase disclosed that process to the Commission on multiple occasions, without ever receiving a response, the Commission will have to confront in such litigation its own failure to provide the guidance Coinbase sought.

### A.  Coinbase Does Not List, Clear, or Effect Trading in Securities.

The Securities and Exchange Acts define a "security" as including a laundry list of financial instruments such as notes, stocks, bonds, and investment contracts. *See* 15 U.S.C. § 77b(a)(1); *id.* § 78c(a)(10). Each of these instruments confers upon the holder some enforceable legal right (such as to receive dividends, interest, or principal payments) against an identifiable party. Because digital assets do not fit into another enumerated category, their status typically turns on whether they are "investment contracts"—a term "undefined by the Securities Act or by relevant legislative reports" but common under 1930s state blue-sky laws. *Howey*, 328 U.S. at 298. Under *Howey*, an "investment contract" is any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298–99.

As a threshold matter, digital assets are computer code that operate on blockchain technology. They do not necessarily memorialize any contractual relationship with an issuer or other party, or

---

don't expect them to come in here and say the Debtor should prove the impossible. The Debtor should somehow, without any guidance from you as to what issues you think the Debtor needs to prove, the Debtor should somehow prove that nothing that's going on here raises an issue under the securities laws without even a contention by anybody in the room, or at least not from you, that what the Debtor is doing does violate the securities laws. I just don't get how that's proper or how you would expect anybody to be able to comply with what you're asking.")

[83] In 2022 alone, Coinbase declined to list over 1,000 assets that went through its review process.

inherently constitute securities. Courts have consistently found that the "object" of an investment contract is distinguishable from the investment contract—each digital asset "all by itself is not a security, just as the orange groves in *Howey* were not."[84]  *See, e.g.*, *SEC* v. *ETS Payphones, Inc.*, 408 F.3d 727, 732–33 (11th Cir. 2005) (scheme involving sale-leaseback of payphones was an investment contract, without suggesting that the payphones were securities); *Kemmerer* v. *Weaver*, 445 F.2d 76, 79–80 (7th Cir. 1971) (sales of "live breeding beavers" plus service agreements for their care was an investment contract, without suggesting that the beavers themselves were securities).  Thus, digital assets implicate the securities laws only when sold as part of an ongoing "investment contract, transaction or scheme."  *Howey*, 328 U.S. at 298–99.

Unlike for traditional securities like stocks which represent ongoing claims against an issuer, for the Commission to prevail, it will need to show that particular digital assets are sold as part of investment contracts *when traded on Coinbase*, even though none of the asset issuers, their affiliates, or underwriters are in ongoing contractual privity with the purchasers of those digital assets.  *See United States* v. *Leonard*, 529 F.3d 83, 89 (2d Cir. 2008) (applying *Howey* to "relatively new" types of investments requires a "case-by-case analysis").  In its recent *Bittrex* complaint, the Commission alleged in a conclusory manner that certain assets were continually "offered" as an investment contract, years after their initial offerings, even where management of the associated protocol had changed or was distributed to users.[85]  But no court would allow the Commission to assume these are "ongoing" investment schemes without proving as much on an individualized basis.[86]  *See Marine Bank* v. *Weaver*, 455 U.S. 551, 559 n.9 (1982) (rejecting that a certificate of deposit was "somehow

---

[84] *See* Hinman, *supra* n.63.

[85] *See Bittrex* Compl. ¶¶ 143–45, 155 (alleging OMG "offered and sold as an investment contract" for 7 years since ICO, even though "management of the OMG Network continued to change hands"); *id.* ¶¶ 162–63 (same for DASH, 9 years after ICO, even though protocol is "run by a subset of its users"); *id.* ¶¶ 173–79, 195–99, 205–11, 220–22 (same for ALGO, TKN, NGC, and IHT, 4 to 6 years after ICOs).

[86] *See* Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities*, DLx Law, 55–58, 96–97 (Nov. 10, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4282385.

transformed into a security when it was pledged"). The Commission will be unable to do so for the following reasons.

*First*, for there to be an investment contract, there needs to be one or more contracts with the issuer. The plain language of the statutes make clear this requirement. *See* 15 U.S.C. § 77b(a)(1); *id.* §§ 78c(a)(8)–(10); *see also Howey*, 328 U.S. at 300 (explaining that the "contract" requirement in that case was readily satisfied by multiple agreements between the promoter and his purchasers). None of these assets are being traded on Coinbase in conjunction with any ongoing contractual privity between issuers and Coinbase's users.

Prior cases applying *Howey* to digital assets have overwhelmingly targeted digital asset issuers, not exchanges. In these cases, the Commission has charged the issuer or promoter of a digital asset with raising capital from investors in exchange for digital assets, whose value would be based on the success of the issuer or promoter's business. *See, e.g.*, *SEC* v. *Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020); *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020); *SEC* v. *NAC Found.*, *LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021). It was argued that the issuer entered into an "implicit" contract with the initial buyer, at a specific point in time, to develop the business in exchange for funding. *Telegram*, 448 F. Supp. 3d at 358–59; *see id.* at 371, 379 (finding that the "appropriate point at which to evaluate the scheme" was at the time of sale to initial purchasers, who had investment intent at that time and thus were underwriters of primary offering); *Kik*, 492 F. Supp. 3d at 180–82 (issuer "promised" to create an ecosystem, as part of "a single effort by [the issuer] to raise capital to deploy [its protocol]"). No such legal theory will be available in a case against Coinbase because, again, no issuer can raise capital from users trading on Coinbase.

*Second*, even if each asset issuer were engaged in ongoing marketing efforts at the time of each transaction on Coinbase, and even if those ongoing marketing efforts were somehow viewed as sufficient to establish an implicit investment contract (*e.g.*, as a scheme), it does not follow that secondary market transactions implicate that investment contract. To the contrary, the secondary market transactions on Coinbase fail all four of the *Howey* prongs.

-40-

***Investment of Money***.   Secondary market purchasers do not invest money in the issuer's enterprise.   To satisfy *Howey*'s "investment of money" element, courts specifically require "the investor [to] commit his assets to *the enterprise* in such a manner as to subject himself to financial loss." *SEC* v. *Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003).   But in a secondary market transaction, the transaction is simply between two market participants trading on the platform; any "investment of money" does not go to the issuer or promoter, but to the previous owner of the digital asset.

***Common Enterprise***.   There is also no common enterprise present in the secondary trading on Coinbase, which requires that there be "either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)." *Hocking*, 885 F.2d at 1455.   Horizontal commonality does not exist here because secondary-market purchasers never "pool their investments together." *NAC Found.*, 512 F. Supp. 3d at 996.   Vertical commonality is also lacking for secondary market trading, particularly where the promoter's initial protocol development efforts are complete, because there is no "direct relation between the success or failure of the promoter and that of his investors." *Mordaunt* v. *Incomo*, 686 F.2d 815, 817 (9th Cir. 1982).   Users of the tokens may sustain profits or losses based on market forces and the timing of their individual purchasing decisions, regardless of the promoter's success or failure.

***Expectation of Profits***.   For the many digital assets listed on Coinbase's spot exchange that have consumptive utility or are stablecoins, *Howey*'s "expectation of profit" prong is also not satisfied. The securities laws do not apply "when a purchaser is motivated by a desire to use or consume the item purchased." *United Hous. Found., Inc.* v. *Forman*, 421 U.S. 837, 852–53 (1975).   Even if some digital asset holders may hope that their assets appreciate in value, that is not dispositive.[87]   In this regard, digital assets are no different from tradable commodities that have both consumptive and investment value, like gold.

---

[87] *See SEC* v. *Belmont Reid & Co., Inc.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (holding that even though purchasers of gold coins were anticipating their purchases to appreciate in value and were "speculating in the world gold market," the gold coins were nonetheless not securities).

***Efforts of Others***.    There are no "efforts of others" in secondary market transactions,

particularly where the promoter's initial protocol development efforts are already complete.  To satisfy

*Howey*'s "efforts of others" prong, investors must anticipate profits from the "undeniably significant"

efforts of others, namely *"those essential managerial efforts* which affect the failure or success of the

enterprise." *SEC* v. *Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973) (emphasis added).  An

investor entitled to receive a share of an enterprise's profits—whether corporate dividends, or proceeds

from the harvest and sale of oranges—clearly relies on management's business acumen.  In the context

of an initial coin offering for a digital asset with no current utility, purchasers arguably "view[] his or

her prospective trading success as a function of the [promoter's] efforts." *NAC Found.*, 512 F. Supp.

3d at 997.  But secondary markets for established digital assets are different.  When a digital asset's

protocol becomes functional or its governance is distributed among unaffiliated parties, there may be

few "managerial efforts" to speak of.  If the digital asset's original promoter dissolves or goes bankrupt,

there may be no "managers" at all, but the digital asset may remain functional.

Further, Coinbase's efforts to establish a secondary market for the assets do not transform those

assets into securities.  Courts have consistently held that when the value of an asset is determined by

pre-existing secondary markets, rather than the efforts of a promoter or issuer, the efforts of others

prong is not satisfied.[88]  Many commodities trade in secondary markets without constituting securities.

And, as with those commodities, many of the assets listed on Coinbase were first traded in secondary

markets years ago.

---

[88] *See, e.g.*, *Noa* v. *Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (certificates of ownership for silver bars warehoused by issuer who advertised it "would buy the silver back at any time at the spot price" were not investment contracts because the profits depended on the silver market not the seller's efforts); *Belmont Reid*, 794 F.2d at 1391 (contracts for sale of gold coins sold to raise capital were not investment contracts, in part, because the coin buyer's profits "depended upon the fluctuations of the gold market," not the seller, thus failing to satisfy the efforts of *Howey*'s other prong); *Grenader* v. *Spitz*, 537 F.2d 612, 619 (2d Cir. 1976) (holding that housing coop shares were not investment contracts, in part, because their value "depend[ed] upon the general housing market, the status of the neighborhood and the availability of credit" rather than the seller's efforts); *Lehman Bros. Com. Corp.* v. *Minmetals Int'l NonFerrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (holding no investment contract where "any gain likely would result in large part from market movements, not from capital appreciation due to Lehman's efforts.").

-42-

Coinbase's efforts to establish a secondary digital asset market are markedly different from situations where courts have found secondary market-related activities to give rise to investment contracts. For example, in *Gary Plastic Packaging Corp.* v. *Merrill Lynch Pierce, Fenner & Smith, Inc.*, the court held that an investment contract was present because Merrill Lynch possessed "significant economic power" with respect to relevant transactions. 756 F.2d 230, 240 (2d Cir. 1985). The court explained that Merrill Lynch was "engaged in activity that is significantly greater than that of an ordinary broker or sales agent," including negotiating with certificate of deposit (CD) issuers on what rates they offer, and marketing the CDs to investors like an underwriter. *Id.* Additionally, the court pointed to two primary facts that supported its conclusion that "customers rely on the skill and financial stability of Merrill Lynch." *Id.* First, "resale in the secondary market created and maintained by Merrill Lynch [was] crucial to the investor . . . [because] in the event Merrill Lynch failed to maintain the promised secondary market, an investor would have considerable difficulty liquidating a CD." *Id.* And second, investors "rel[y] on Merrill Lynch's implicit promise to maintain its marketing efforts," because "[i]f Merrill Lynch were not an influential and well-known participant in the marketplace, the CD Program would not be viable." *Id.* at 240–41.

Unlike Merrill Lynch in *Gary Plastic*, Coinbase does not negotiate with asset issuers about the economic attributes of the assets that will be sold or act as an underwriter with respect to the distribution of those assets. Nor do users depend on Coinbase for a secondary trading market for those assets. Many of the assets listed on Coinbase trade on at least one (often multiple) other digital asset spot exchanges available to U.S. users.[89] Coinbase could step away, and users would easily continue to engage in the same exact activities on several other platforms.

### B.    Coinbase Wallet Is Not a Broker.

The Staff alleges that Coinbase Wallet is operating as an unregistered broker in violation of Section 15(a) of the Exchange Act. But Wallet is software, not a broker, and does not perform any of

---

[89] As of 2023, more than 170 assets listed on Coinbase were also listed on one or more U.S. digital asset trading platforms.

the customary activities that would be required for the Commission to prove that Wallet is a broker. Further, the Commission has been provided with extensive information about Wallet and its functionality, including during Coinbase's S-1 process, and in at least 14 of Coinbase's SEC filings since April 2021, and it has never raised concerns until now.

### 1.    Overview of Coinbase Wallet.

Coinbase Wallet is free software made available by Coinbase in the form of a mobile application and a browser extension. The software provides a graphical user interface that allows a user to self-custody her digital assets by storing her private keys on her mobile device or personal computer. Those private keys are controlled solely by the user, and Wallet users' assets are never within Coinbase's custody or control. Users can also connect their Wallets to third-party decentralized protocols and can send, receive, and swap digital assets through those third-party protocols. Users solely control which activities they engage in with respect to third-party protocols. Wallet's core role is to translate user instructions (entered through the Wallet interface) into code that can be processed by those protocols. Coinbase does not earn fees on transactions conducted through Wallet.[90]

### 2.    Coinbase Wallet Is a Software Tool, Not a Broker.

The Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Thus, as a threshold matter, Wallet could only be a broker if it performs broker functions with respect to securities. Because Wallet users can only use Wallet to interface with secondary markets, the Staff's proposed Wallet claims relating to Wallet will fail for the same reasons: Secondary market transactions do not involve investment contracts, and thus do not involve securities. Without proving that specific transactions

---

[90] Coinbase historically collected a flat 1% administrative fee when users swapped one digital asset for another digital asset using Wallet's internal "Swap" functionality, which allows users to connect to the third-party application programming interface 0x, which in turn connects the user to various decentralized exchanges. Other than this administrative swap fee, any transactional "gas" or "network" fees charged to users for transferring assets in their wallet were paid to the relevant blockchain networks, not to Coinbase. Coinbase did not receive any other fees for Wallet users' activities.

through Wallet constitute securities—which it cannot do—the Commission cannot claim that Wallet is a securities broker.[91]

But even if Wallet had been used to transact in securities, categorizing Wallet as a broker also would be wrong as a matter of fact and law. "To demonstrate that someone is acting as a broker, the SEC is required to show a regularity of participation in securities transactions at key points in the chain of distribution." *SEC* v. *StratoComm Corp.*, 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014), *aff'd*, 652 F. App'x 35 (2d Cir. 2016). The broker determination is fact specific, and based on the totality of the circumstances—meeting one factor is not dispositive.[92]

In evaluating whether someone acted as a broker, courts look to a list of non-exclusive factors first announced in *SEC* v. *Hansen*, including "whether that person 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." 1984 WL 2413, at *10. In the past, the Commission has also considered the factors set forth in *Hansen* in evaluating whether an entity is a broker.[93] Wallet does not satisfy these factors. It is not involved in negotiations between the issuer and purchaser, does not make any financial valuations as to an investment's merits, and never acts as a "finder" of investors.[94] As for "transaction-based

---

[91] Coinbase is not aware of a single statement, rule or guidance issued by the Commission or the Staff regarding the applicability of broker-dealer requirements to self-custody wallets like Wallet, which raises serious concerns, including with respect to fair notice. *See supra* p. 39.

[92] *See, e.g.*, *SEC* v. *RMR Asset Mgmt. Co.*, 479 F. Supp. 3d 923, 926 (S.D. Cal. 2020) (applying a "totality of the circumstances" approach to determining if person was a broker-dealer); *U.S. Pension Trust Corp.*, 2009 WL 2365702, at *9 (finding summary judgment inappropriate even though defendants actively solicited investors, received transaction-based compensation, and regularly participated in securities transactions).

[93] *See, e.g.*, *BondGlobe, Inc.*, SEC Denial of No-Action Request, 2001 WL 103418, at *3 (Feb. 6, 2001) (citing *SEC* v. *Zubkis*, 2000 WL 218393, at *9 (S.D.N.Y. Feb. 23, 2000)).

[94] *See* Notice of Proposed Exemptive Order Granting Conditional Exemption from the Broker Registration Requirements of Section 15(a) of the Securities Exchange Act of 1934 for Certain Activities of Finders,

compensation," Coinbase's prior receipt of a 1% administrative fee when customers used the "Wallet

Swap" function—which is no longer the practice—does not change the outcome of the analysis.

Multiple courts have held that transaction-based compensation is not sufficient to prove broker activity,

and should "not be weighted so heavily so as to subsume" other factors in the broker-dealer analysis.[95]

*Landegger* v. *Cohen*, 2013 WL 5444052, at *6 (D. Colo. Sept. 30, 2013).

Courts have also expanded upon the *Hansen* factors, considering activities such as "handling

customer funds and securities, participating in the order-taking or order-routing process . . . , extending

or arranging for the extension of credit in connection with a securities transaction, . . . analyzing the

financial needs of an issuer, recommending or designing financing methods, discussing details of

securities transactions, and recommending an investment." *SEC* v. *Collyard*, 154 F. Supp. 3d 781,

788-89 (D. Minn. 2015), *aff'd in part, vacated in part on other grounds*, 861 F.3d 760 (8th Cir. 2017).

Wallet does none of those things. Wallet is asset-agnostic software. Unlike typical broker applications,

Wallet was not purpose-built for securities transactions and does not perform order routing or execution

services or custody customer assets.[96] Users retain custody of their digital assets and choose where,

when, and how to trade them, without direction by Coinbase.

---

Exchange Act Rel. No. 90112, 2 (Oct. 7, 2020) (defining a "finders" as networks of angel investors "who may identify and in certain circumstances solicit potential investors").

[95] *See Found. Ventures, LLC* v. *F2G, Ltd.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010) (organization not a broker because it was "not employed by [the issuer], was supposed to receive commission rather than a salary," and did not "make[] valuations or give[] advice regarding the merits of an investment," "participate[] in negotiations between the issuer and the investor," or sell other investors' securities); *Jobanputra* v. *Kim*, 2022 WL 4538201, at *9 (S.D.N.Y. Sept. 28, 2022) (although organization received transaction-based compensation, gave investment advice, and may have participated in negotiations, it was not a broker); *SEC* v. *M&A West, Inc.*, 2005 WL 1514101, at *9 (N.D. Cal. 2005) (although defendant drafted documents, facilitated securities transactions, and received payment upon transaction's completion, it did not have assets entrusted to it and was not authorized to enter transactions "for the account of others," so was not a broker); *SEC* v. *Kramer*, 778 F. Supp. 2d 1320, 1336, 1339 (M.D. Fla. 2011) (despite receiving transaction-based compensation, defendant was not a broker because he did not participate in the negotiations, discuss transactions' details, promote investments, or analyze the parties' financial status).

[96] *See, e.g.*, Robinhood, https://robinhood.com/us/en/; Vanguard, https://investor.vanguard.com/corporate-portal/.

In short, Wallet does nothing more than make available passive software that provides users a digital asset self-custody solution through which they may engage in activities of their choosing without direction or recommendation by Coinbase—this is wholly insufficient to characterize Wallet as a broker under applicable law.

**C.      Coinbase's Staking Services Do Not Constitute a Securities Offering.**

The Staff contends that Coinbase's staking services constitute an unregistered securities offering in violation of Sections 5(a) and (c) of the Securities Act.  This argument will fail because Coinbase's staking-related activities involve the mere provision of IT services that do not satisfy any prong of the *Howey* test for an investment contract.

**1.      Overview of Coinbase's Staking Services.**

Coinbase launched retail staking services for eligible users in November 2019 with Tezos (XTZ); users can also stake Cosmos (ATOM) (September 2020); Ether (ETH) (April 2021); Cardano (ADA) (March 2022); and Solana (SOL) (June 2022).

Coinbase does not employ any discretion as to which assets to stake and when to stake them; those decisions are made by the users themselves.  Coinbase simply provides users with IT services— access to servers running publicly available open-source software, reliable internet access, and electricity.  Like any responsible IT service provider, Coinbase uses certain proprietary systems and technical measures to avoid the risk of security breaches or operational errors.  Should Coinbase experience a technology failure, attributable to its own acts or omissions, that results in a "slashing" penalty from a digital asset protocol, Coinbase has contractually committed in its User Agreement to replace any assets lost to such events.  This is no different from any other IT provider indemnifying its customers from losses it causes.  Notably, Coinbase has never had a slashing event occur.

Coinbase's staking services are built on top of Coinbase's services as a digital asset custodian. Users are the exclusive owners of their assets and the assets never become the property of Coinbase. Consistent with Coinbase's User Agreement and UCC Article 8, assets held by Coinbase are not

-47-

subject to the claims of its general creditors.[97]  A user's decision to stake has no effect on a customer's property interests.[98]

Users can unstake assets at any time, subject to protocol-imposed waiting periods (which range from days to weeks),[99] and Coinbase's processing time.  A Coinbase user who wishes to stake or unstake.[100] ADA, ATOM, SOL, and XTZ can submit such requests via the Coinbase app or website, and Coinbase will carry out the necessary blockchain operations.[101]

When a protocol distributes rewards, Coinbase passes through those rewards in proportion to the amount of the users' staked tokens, minus Coinbase's disclosed, flat-percentage commission fee.[102] Because all rewards rates are set by the protocol, a user will earn the same gross rewards whether she

---

[97] *See* Coinbase, *Coinbase User Agreement*, § 2.7.1 (Apr. 13, 2023), https://www.coinbase.com/legal/user_agreement/united_states ("Title to Supported Digital Assets shall at all times remain with [the customer] and shall not transfer to Coinbase."); *see also* UCC § 8-503(a).

[98] *Coinbase User Agreement*, *supra* n.86, at App'x. 4, § 3.1.1 ("This instruction to stake your digital assets does not affect the ownership of [the customer's] digital assets in any way.").

[99] ETH staking is different—as of April 12, the Ethereum protocol now allows for unstaking, but unstakers need to wait on a queue to unstake.

[100] Historically, for assets other than ETH, Coinbase maintained a reserve of unstaked assets from among users whose assets were eligible for staking, which varied by asset and was based on the underlying protocol's unbonding period.  This practice allowed Coinbase to avoid unnecessary staking and unstaking operations by monitoring aggregate inflows and outflows over a multi-day period and, where possible, provide some users with faster liquidity.  Coinbase, however, never advertised or promised faster liquidity to users.  Coinbase never used this reserve for anything other than providing faster liquidity where possible, *i.e.*, Coinbase never used the reserve for lending, borrowing, trading, or similar activity designed to earn profits.  In any event, Coinbase discontinued this practice and now enforces each protocol's unbonding periods for its users without exception; all assets that users designate for staking are staked and there are no longer liquidity reserves.

[101] Historically, for ADA, ATOM, SOL, and XTZ, Coinbase retail users that held the minimum balances were enrolled automatically to receive staking rewards but could opt out at any time; users were able to stake all of a particular token, or none.  Those practices were discontinued on March 22, 2023.

[102] Retail users who elect to stake their assets through Coinbase's service pay Coinbase a flat percentage commission—typically 25% or 35%, depending on the token—on any rewards the users generate by participating in the proof-of-stake protocol.  Coinbase One subscribers pay a 15% flat commission for staking of some assets (referred to as a "boosted reward").  Coinbase's flat percentage commission broadly covers Coinbase's costs in running the staking service, plus a profit for providing the service—just like any other technology service provider, *e.g.*, "cloud" service providers that manage all-in technology costs for users on an aggregate basis.

-48-

stakes with Coinbase, stakes on her own, or stakes with another pass-through staking provider. Even when multiple users' assets are pooled for staking, none of those users will achieve higher expected rewards, as rewards are split *pro rata* as compared to what they could earn by staking on their own.

### 2.    Coinbase's Staking Services Are Not an Investment Contract.

Coinbase's retail staking services fail all four prongs of the *Howey* test.

#### a.    There Is No Investment of Money.

The Staff contends that Coinbase's staking program involves the "investment of money" because users assets are "locked in" to participate. But users make no "investment of money" into Coinbase's retail staking program. To satisfy this element, courts require "the investor [to] commit his assets to the enterprise in such a manner as to subject himself to financial loss." *Rubera*, 350 F.3d at 1090. This prong is not met for multiple reasons.

*First*, Coinbase users who stake retain full ownership over their assets at all times. A user never gives up ownership of the assets to Coinbase, the relevant protocol, or any other party. Coinbase's User Agreement amplifies this point, stating that the "instruction to stake your digital assets does not affect the ownership of your digital assets in any way."[103]

*Second*, any lockup periods and liquidity risks associated with staking are imposed by the protocol itself, not Coinbase—meaning they are not unique to Coinbase's retail staking program and would be the same for anyone who stakes without using a service provider.

*Third*, slashing penalties do not amount to a risk of loss under *Howey*. Slashing penalties are dictated by the protocol, not Coinbase. And to the extent that slashing takes place due to an act or omission by Coinbase, Coinbase indemnifies the user—eliminating any risk of "financial loss" for staking through Coinbase. Putting aside this limited contractual obligation to indemnify customers against losses from service outages caused by Coinbase, Coinbase users are exposed to the same risks as they would be if they staked without using a service provider.

---

[103] *See* Coinbase User Agreement, *supra* n.86 at App'x 4, § 3.1.1.

### b.   There Is No Common Enterprise.

The Staff contends that Coinbase's staking program constitutes a common enterprise because Coinbase "pools tokens," at one time had maintained liquidity reserves, and provides *pro rata* reward distributions to users less a commission. Coinbase's retail staking services, however, do not satisfy *Howey*'s "common enterprise" prong on any of these bases, and implicate neither horizontal nor vertical commonality.

*No Horizontal Commonality*. Horizontal commonality is "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Some courts have specified that horizontal commonality requires the pooling of investments "and split[ting] the net profits *and losses* in accordance with [the investors'] pro rata investments." *Hocking* v. *Dubois*, 839 F.2d 560, 566 (9th Cir. 1988) (emphasis added), *aff'd in relevant part*, 885 F.2d at 1459 (en banc). There is no horizontal commonality here because there is no tying. A user who stakes with Coinbase earns staking rewards based on payout rates determined by the protocol—not by Coinbase or anything Coinbase does—which would be the same if the user stakes without using a service provider.

The mechanical act of aggregating assets in an omnibus wallet alone does not change this conclusion. Courts considering horizontal commonality focus on the connection between the fortunes of the pooled investors. Simply put, protocol-imposed rewards rates do not change depending on whether there is asset aggregation by a validator node operated by a home staker, by Coinbase, or by a competitor. Nor does the amount of assets staked by a particular node increase the rewards rate per asset—*i.e.*, the protocols Coinbase supports do not pay escalating rewards for staking more assets at a node. Any increased likelihood of a node receiving rewards due to staking more digital assets is offset by the ensuing need to split those rewards *pro rata* among users.

*No Vertical Commonality*. Vertical commonality can be either broad or strict. Broad vertical commonality requires that "the fortunes of the investors . . . be linked only to the *efforts* of the

-50-

promoter," while strict vertical commonality requires that the investor's financial success be tied to the efforts *and success* of the promoter. *Revak*, 18 F.3d at 87–88. There is neither broad nor strict vertical commonality here; Coinbase charges its retail users its flat-percent commission on rewards actually received, which does not link the fortunes of Coinbase and its users. As courts have found, service fees collected "for every consummated transaction" do not satisfy vertical commonality.[104]

### c. There Is No Reasonable Expectation of Profits.

Coinbase's retail staking services do not satisfy *Howey*'s "reasonable expectation of profits" prong, which requires an investor to be attracted to the investment based on "the prospects of a return on his investment" rather than "a desire to use or consume the item purchased." *Forman*, 421 U.S. at 852–53.

*First*, fundamentally, it is not correct to conceptualize staking rewards as a "return" on an asset. Staking rewards are simply the consideration paid to the user by the protocol, in exchange for the user performing validation services—processing and confirming that transactions conform to protocol requirements and are "valid." That is a fee for a service, not a return on investment. An asset holder who provides no validation service receives nothing.

*Second*, Coinbase's marketing of its retail staking services does not lead users to expect "investment profits." Coinbase describes staking as a means for users to put their tokens to work, *i.e.*, to perform validation assignments for certain protocols.[105] That Coinbase has stated that users can earn rewards through staking, and that the word "yield" is part of the terminology used by the industry

---

[104] *See, e.g.*, *Marini* v. *Adamo*, 812 F. Supp. 2d 243, 260–61 (E.D.N.Y. 2011) (finding that, in the case of a coin collector selling his coins to a coin dealer, a commission earned at the time of purchase would not support vertical commonality, but a commission earned at the time of ultimate sale to a third party, where the commission would rise or fall depending on the ultimate sale value, would meet vertical commonality, which "hinges on this latter sales-based commission"); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) ("Unlike a stockbroker, who collects a fee for every consummated transaction, [the investment manager's] financial compensation was linked to the fortunes of the investors" because "[i]f profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then [the investment manager] did not receive a performance fee.").

[105] Coinbase, *What Is Staking?*, https://www.coinbase.com/learn/crypto-basics/what-is-staking.

and Coinbase (*i.e.*, APY) does not change this conclusion because those statements merely convey facts about how the protocols operate.

### d.    Profits Are Not Generated Based on the Efforts of Others.

The Staff contends that users reasonably expect profits from Coinbase's efforts based on public statements about the difficulty of engaging in staking independently and Coinbase's efforts to achieve pooled staking rewards for its users.  But the "effort of others" prong requires more:  Investors' expected profits must be derived from another's "essential managerial" or entrepreneurial efforts that are "undeniably significant" to the enterprise's success or failure.  *Glenn W. Turner Enters.*, 474 F.2d at 482; *see also SEC* v. *Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992).  The mere existence of some ministerial third-party involvement is not enough to meet this prong.[106]

Coinbase's retail staking services are not entrepreneurial, managerial, or essential.  The user decides which asset to stake and how much, and the relevant blockchain protocol governs which validator nodes receive rewards and the amount of such rewards.  Nothing Coinbase does can increase the amount of rewards.  All Coinbase does is perform the ministerial service of running publicly available validation software on a reliable, secure server and passing through rewards from the protocol to the user, less a fixed percentage fee, without any increase in expected rewards due to pooling.

### CONCLUSION

The Commission's case against Coinbase will fail as a matter of fact and law.  Litigation will also expose the deep inequities present in the Commission's dealings with Coinbase, subject the Commission to far-reaching programmatic risk, and, ultimately, harm investors, markets, and market participants in both traditional and digital assets.  These risks can be avoided.

---

[106] *Compare, e.g.*, *SEC* v. *Sneed*, 2021 WL 4202171, at *7 (N.D. Tex. Sept. 10, 2021) (interests in "digital asset mining pools" promising yields of 25-60% were securities because yield would be "derived . . . entirely from the managerial efforts" of promoter), *with Elson* v. *Geiger*, 506 F. Supp. 238, 243 (E.D. Mich. 1980) (land sale where "[t]he return on investment . . . was the lessee's fixed rent payment, which was totally independent of . . . managerial expertise," was not a security).

Coinbase remains ready, willing, and eager to engage collaboratively with the Commission on charting a path forward toward registration and regulation of digital asset securities markets.  But it cannot do so without reciprocal engagement from the Commission, and litigation will decimate those efforts.

Dated:  New York, New York
      April 19, 2023

Respectfully submitted,

/s/ *Steven R. Peikin*

Steven R. Peikin
Kathleen S. McArthur
James M. McDonald
William H. Wagener
Olivia G. Chalos

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Coinbase Global, Inc. and Coinbase, Inc.*

**Appendix A –Examples of Coinbase's Engagement with SEC[1]**

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 1. | 01/18/2018 | Meeting | Trading & Markets | Coinbase met with Trading & Markets Staff to discuss possible no-action relief regarding Rule 15c3-3's good control location requirement in connection with its dormant, Commission-registered BD/ATS. |
| 2. | 05/23/2018 | Meeting | Commissioner Peirce | Coinbase met with Commissioner Peirce. |
| 3. | 06/28/2018 | Correspondence | FinHub<br>Trading & Markets | Coinbase provided FinHub and Trading & Markets Staff with its legal analyses and outside counsel's legal analyses for four assets it intended to list on the platform "in an attempt to be as transparent as possible" and to "give [the Staff] an opportunity to raise any questions." |
| 4. | 08/03/2018 | Meeting | FinHub<br>Trading & Markets | Coinbase had a call with FinHub and Trading & Markets Staff to discuss its analysis of certain digital assets for listing on the platform. |
| 5. | 10/04/2018 | Correspondence | FinHub<br>Trading & Markets | Coinbase proactively reached out to FinHub and Trading & Markets Staff regarding potential new assets for listing and to set up a call to discuss its legal analyses. |
| 6. | 10/05/2018 | Meeting | FinHub<br>Trading & Markets | Call with FinHub and Trading & Markets Staff regarding potential new assets for listing on Coinbase. |
| 7. | 10/09/2018 | Correspondence | FinHub<br>Trading & Markets | Coinbase provided FinHub and Trading & Markets Staff with its internal legal analyses for two assets. |
| 8. | 10/23/2018 | Correspondence | FinHub<br>Trading & Markets | Coinbase provided FinHub and Trading & Markets Staff with internal legal analysis memos for three assets. |
| 9. | 02/08/2019 | Meeting | FinHub | Coinbase delivered a detailed presentation on its asset listing process, including how Coinbase determines whether an asset may be at risk of being characterized as a security. |

---

[1]     This appendix contains a representative set of examples of Coinbase's engagement with the Commission from 2018 through the present. It does not include the full universe of Coinbase's engagement, meetings, or written communications with the Commission, and also does not include the full list of attendees at the listed meetings.

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 10. | 02/14/2019 | Correspondence | FinHub<br>Trading & Markets | Coinbase provided FinHub and Trading & Markets Staff with a legal analysis memo for an asset listed on its trading platform. |
| 11. | 09/26/2019 | Meeting | Commissioner Jackson | Coinbase met with Commissioner Jackson. |
| 12. | 09/27/2019 | Meeting | Commissioner Peirce | Coinbase met with Commissioner Peirce. |
| 13. | 12/18/2019 | Meeting | FinHub | Coinbase presented on its: (i) spot trading platform, including how customers submit trades and Coinbase's role in those transactions; (ii) digital asset listing process, providing specific examples of Coinbase's relevant legal analyses for certain assets; (iii) staking services; and (iv) upcoming efforts to reactivate its dormant BD/ATS. |
| 14. | 01/06/2020 | Correspondence | FinHub | As a follow up to the December 18, 2019 meeting, Coinbase submitted written responses to Staff questions regarding staking and validators. |
| 15. | 01/10/2020 | White Paper | FinHub | Coinbase, together with the Proof of Stake Alliance, submitted a White Paper regarding staking as a service and the relevant securities law analysis. |
| 16. | 02/12/2020 | Meeting | FinHub | Coinbase, together with the Proof of Stake Alliance, presented on staking and the relevant securities law analysis. |
| 17. | 02/20/2020 | Meeting | Commissioner Peirce | Coinbase held a meeting with Commissioner Peirce. |
| 18. | 07/14/2020 | Meeting | Corporation Finance<br>FinHub<br>Investment Management<br>Trading & Markets | Coinbase presented on: (i) an update on its efforts to reactivate its dormant broker-dealer and ATS; (ii) asset listing and legal scores for certain assets made available for trading on Coinbase's spot trading platform; (iii) staking services; (iv) assets made available for staking; and (v) New York Department of Financial Services oversight. |
| 19. | 08/17/2020 | Meeting | Corporation Finance<br>Enforcement | Coinbase presented: (i) its asset listing philosophy, (ii) a summary of its asset review processes, (iii) details of its |

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| | | | FinHub | securities law review for assets approved to list on its platform, (iv) how listing determinations are made, and (v) specific assets Coinbase listed or planned to list including select questions from the securities law analysis for those assets. |
| 20. | 08/20/2020 | Meeting | FinHub | Coinbase presented on: (i) its staking services; (ii) assets made available for staking; and (iii) relevant securities law analysis. |
| 21. | 09/25/2020 | Meeting | Trading & Markets | Coinbase presented on BD/ATS topics and discussed an alternative model—"Model B"—based on the recently published no-action letter. Model B would allow for Coinbase Custody Trust Co. (CCTC) to serve as transfer agent as well as custodian; this plan would also involve transferring tokenized certificates of securities. |
| 22. | 10/09/2020 | Correspondence | Corporation Finance | Coinbase submitted its first draft S-1 with extensive information about its business operations. |
| 23. | 10/16/2020 | Meeting | Corporation Finance Trading & Markets | Coinbase discussed the role of CCTC as transfer agent, in connection with its BD/ATS with Trading & Markets and Corporation Finance Staff. |
| 24. | 11/20/2020 | Call | Trading & Markets | Coinbase discussed whether CCTC's status as a transfer agent in connection with its BD/ATS would give rise to the need to register as a clearing agency. |
| 25. | 12/02/2020 | Correspondence | Trading & Markets | Coinbase's outside counsel confirmed with an Associate Director in the Division of Trading & Markets that he would support a no-action letter stating that a transfer agent would be a good control location with respect to Rule 15c3-3. |
| 26. | 12/07/2020 | Correspondence | Corporation Finance | Corporation Finance Staff sent Coinbase a comment letter on the first draft of Coinbase's S-1. |
| 27. | 12/17/2020 | Meeting | Corporation Finance | Coinbase met with Corporation Finance Staff to discuss the potential issuance of digital asset securities. |

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 28. | 12/21/2020 | Correspondence | Corporation Finance | Coinbase submitted a response letter regarding its S-1 to the Staff with a robust analysis applying each of the *Howey* factors to its staking services. |
| 29. | 02/05/2021 | Correspondence | Corporation Finance | The Staff sent Coinbase a second comment letter regarding Coinbase's S-1, asking, as relevant, about Coinbase's securities analyses for assets listed on its spot trading platform. |
| 30. | 02/12/2021 | Correspondence | Corporation Finance | Coinbase submitted a response letter to the Staff regarding its draft S-1, with a detailed response regarding its securities law analyses for digital assets listed on its spot trading platform. |
| 31. | 02/29/2021 | Meeting | Commissioner Peirce | Coinbase met with Commissioner Peirce to discuss Coinbase's broker-dealers and the digital assets securities market, generally. |
| 32. | 03/12/2021 | Correspondence | Corporation Finance | The Staff sent Coinbase their final comment letter on Coinbase's S-1. |
| 33. | 03/17/2021 | Correspondence | Corporation Finance | Coinbase submitted its fourth S-1 to Corporation Finance Staff. |
| 34. | 04/01/2021 | Notice | Corporation Finance | The Commission declared Coinbase's S-1 effective. |
| 35. | 04/12/2021 | Meeting | FinHub<br>Intergovernmental Affairs<br>Investment Management<br>Office of Legislative and | Coinbase presented to SEC Staff on the Coinbase Lend Program, which would allow Coinbase customers to loan their eligible digital currencies to Coinbase in exchange for rewards. |
| 36. | 04/16/2021 | Meeting | Corporation Finance<br>FinHub<br>Investment Management<br>Trading & Markets | Coinbase presented to the Staff on its plan for facilitating the trading of digital asset securities using a BD/ATS model, the contemplated registration of CCTC as a transfer agent, and the designation of CCTC as a transfer agent as a good control location. |
| 37. | 06/30/2021 | Meeting | Enforcement | Coinbase proactively presented to Enforcement Staff a proposal for a Retail Lend product, which it ultimately did not launch after receiving negative Commission feedback. |

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 38. | 11/08/2021 | Meeting | Chair Gensler | Coinbase met with Chair Gensler to discuss its continued interest in registering a securities trading platform. |
| 39. | 02/01/2022 | Meeting | Commissioner Crenshaw | Coinbase and Commissioner Crenshaw discussed DeFi and transparency in the digital asset marketplace. |
| 40. | 02/04/2022 | Meeting | Commissioner Lee | Coinbase met with Commissioner Lee to discuss digital assets generally and to introduce its policy team. |
| 41. | 03/22/2022 | Meeting | Investors Advocate Office | Coinbase discussed its application to sit on the advisory committee, which was denied. |
| 42. | 04/07/2022 | Meeting | Office of the Chair | Coinbase met with Staff in the Chair's office to discuss how to register given Chair Gensler's view in a recent speech concerning registration. |
| 43. | 04/12/2022 | Meeting | Trading & Markets | Coinbase and Trading & Markets Staff discussed Coinbase's Grayscale exchange-traded products (ETP) comment letter. |
| 44. | 04/27/2022 | Meeting | Trading & Markets | Coinbase inquired about broker-dealer registration. Trading & Markets Staff declined to tell Coinbase how it could restart the process. |
| 45. | 05/03/2022 | Call | Trading & Markets | Coinbase had a follow up call with Trading & Markets Staff about broker-dealer and ETP issues. |
| 46. | 07/22/2022 | Petition for Rulemaking | Commission | Coinbase filed a formal petition for rulemaking regarding digital asset securities regulation, including 140 specific questions for the Commission. |
| 47. | 09/13/2022 | Meeting | Corporation Finance Enforcement Trading & Markets | Coinbase met with Staff to discuss considerations on a path to registration. |
| 48. | 09/20/2022 | Meeting | Corporation Finance Enforcement Trading & Markets | Coinbase met with Staff and primarily discussed the NSE registration model. |
| 49. | 10/04/2022 | Meeting | Corporation Finance Enforcement Trading & Markets | Coinbase met with Staff to discuss potential approaches to a registration framework. Coinbase also presented on the potential treatment of digital assets under Reg. NMS and Coinbase's current custody and settlement practices. |

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 50. | 10/11/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss Coinbase's custody and settlement practices as well as ATS and NSE registration models. |
| 51. | 10/18/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss custody, clearing and settlement topics. |
| 52. | 10/25/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss its trading platform, including order routing, third party platforms, and trading and best execution. |
| 53. | 11/04/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss private key security practices in the digital asset space. |
| 54. | 11/08/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss issuer registration and disclosure requirements. |
| 55. | 11/09/2022 | Meeting | Commissioner Lizárraga | Coinbase met with Commissioner Lizárraga to discuss the Coinbase rulemaking petition. |
| 56. | 11/22/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss issuer registration and the disclosure regime. |
| 57. | 12/01/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff and presented a detailed written proposal outlining a proposed registration framework. |
| 58. | 12/06/2022 | Comment Letter | Commission | Coinbase filed a follow-on comment letter in connection with its July 22, 2022 petition for rulemaking regarding digital asset securities regulation. |
| 59. | 12/07/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to discuss Staff's questions regarding Coinbase's proposed registration framework, presented to the SEC Staff at the December 1 meeting. |
| 60. | 12/20/2022 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with Staff to request information on the SEC's position on the core topics they had been discussing for months. Staff did not provide clarity. |

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 61. | 01/06/2023 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase met with SEC Staff to discuss Coinbase's proposal regarding digital asset and digital asset securities listings. |
| 62. | 01/23/2023 | Meeting Request | Commissioner Uyeda | Coinbase contacted Commissioner Uyeda's confidential assistant to request a meeting. |
| 63. | 01/23/2023 | Call | Enforcement | Enforcement Staff informed Coinbase they would be proceeding with enforcement and no longer engaging on registration. |
| 64. | 01/26/2023 | Meeting Request | Office of the Chair | Coinbase requested a meeting with Chair Gensler's crypto counsel, and received no response. |
| 65. | 01/30/2023 | Meeting Request | Trading & Markets | Coinbase requested a meeting with Trading & Markets Staff to discuss market structure issues around an NSE model. |
| 66. | 02/03/2023 | Meeting Request | Corporation Finance | Coinbase requested a meeting to discuss issuer registration topics. The Division of Corporation Finance denied Coinbase's request. |
| 67. | 02/06/2023 | Meeting Request | Commissioner Lizárraga | Coinbase requested a meeting with Commissioner Lizárraga to discuss Coinbase's issuer disclosure comment letter. |
| 68. | 02/13/2023 | Meeting Request | Office of the Chair | Coinbase followed up regarding its 01/26/2023 request for a meeting with Chair Gensler's crypto counsel; the meeting request was declined; Coinbase was directed to the Division of Enforcement. |
| 69. | 02/17/2023 | Meeting Request | Commissioner Crenshaw | Coinbase requested a meeting with Commissioner Crenshaw to discuss Coinbase's issuer disclosure comment letter. |
| 70. | 02/22/2023 | Meeting | Commissioner Peirce | Coinbase met with Commissioner Peirce to discuss Coinbase's issuer disclosure comment letter. |
| 71. | 03/03/2023 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase presented to Staff on Coinbase's staking services. |

| | Date | Description | Relevant Division(s)/Personnel | Topic(s) Covered |
|---|---|---|---|---|
| 72. | 03/10/2023 | Meeting | Corporation Finance<br>Enforcement<br>Trading & Markets | Coinbase presented to Staff on Coinbase's staking services. |
| 73. | 03/20/2023 | Comment Letter | Commission | Coinbase filed a follow-on comment letter regarding staking, in connection with July 22, 2022 formal petition for rulemaking. |

-8-